## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE POLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-217 (GMS) |
| | ) | |
| COMPUTER SCIENCES CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S OPENING BRIEF IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

Sarah E. DiLuzio (#4085)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, Delaware 19801
(302) 984-6000 (general)
(302) 984-6279 (direct)
(302) 658-1192 (fax)
sdiluzio@potteranderson.com

Of counsel:
Larry R. Seegull
Amy Beth Leasure
DLA PIPER RUDNICK GRAY CARY US LLP
6225 Smith Avenue
Baltimore, Maryland 21209
(410) 580-3000 (general)
(410) 580-4253 (direct)
(410) 580-3253 (fax)
larry.seegull@dlapiper.com

*Counsel for Defendant*
*Computer Sciences Corporation*

Date: May 6, 2005

## TABLE OF CONTENTS

**Page(s)**

NATURE AND STAGE OF PROCEEDINGS ............................................................... 1

SUMMARY OF ARGUMENT ...................................................................................... 2

STATEMENT OF FACTS ............................................................................................. 3

INTRODUCTION ........................................................................................................... 3

ARGUMENT ................................................................................................................ 18

    I.      Summary Judgment Standards. ............................................................... 18

    II.     Plaintiff's Race Discrimination Claim Fails As A Matter Of Law. ........... 19

          A.     Plaintiff Cannot Establish A *Prima Facie* Case of Race Discrimination. ......... 20

          B.     CSC Had Legitimate Non-Discriminatory Reasons For Not  Promoting Plaintiff To SMTS — Reasons That Had Nothing  To Do With Her Race And There Is No Evidence Of Pretext .............................................................. 21

    III.    Plaintiff's Retaliation Claim Fails As A Matter Of Law ............................. 26

          A.     Plaintiff Cannot Establish A *Prima Facie* Case Of Retaliation. ...................... 27

               1.     Plaintiff's Purported "Isolation" Does Not Rise  To The Level Of An Adverse Employment Action. ............................................................... 27

               2.     Plaintiff Cannot Establish That A Causal Connection Existed Between Her Termination and Her Protected Activities. ....................... 28

          B.     CSC Had A Legitimate Non-Retaliatory Reason For Terminating Plaintiff — Her Failure To Provide Medical Documentation — Which Had Nothing To Do With Her Protected Activity And There Is No Evidence Of Pretext. ... 29

    IV.    Plaintiff's Equal Pay Act Claim Fails As A Matter Of Law. ...................... 32

    V.    Plaintiff's Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing Fails As A Matter Of Law. ............................................................ 33

    VI.    The Determinations Of The Equal Employment Opportunity Commission And The Delaware Department Of Labor Do Not Defeat Summary Judgment And Are Based Upon Material Errors Of Fact .......................................................... 35

    CONCLUSION ..................................................................................................... 39

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 247-48 (1986) ................................................................... 19

*Baker v. Wilmington Trust Co.*,
320 F.Supp.2d 196, 202 (D. Del. 2004)................................................ 34

*Barber v. CSX Distribution Services*,
68 F.3d 694, 698 (3d Cir. 1995) ............................................................ 21

*Berry v. E.I. DuPont de Nemours & Co.*,
625 F. Supp. 1364, 1377 (D. Del. 1985)................................................ 19

*Berry v. Jacobs IMC, LLC*,
2004 WL 1179270, at * 409 (3d Cir. May 27, 2004) ................. 22, 24, 25

*Billet v. CIGNA Corp.*,
940 F.2d 812, 825 (3d Cir. 1991) .......................................................... 25

*Brewer v. Quaker State Oil Refining Corp.*,
72 F.3d 326, 332 (3d Cir. 1995) ............................................................ 27

*Bynum v. Fort Worth Indep. Sch.*,
41 F. Supp.2d 641, 657-58 (N.D. Tex. 1999)........................................ 39

*Byrnie v. Town of Cromwell Bd. of Educ.*,
243 F.3d 93, 103 (2d Cir. 2001) ............................................................ 27

*Celotex Corp. v. Catrett*,
477 U.S. 317, 322 (1986)................................................................... 18, 19

*Charlton v. Paramus Bd. of Ed.*,
25 F.3d 194, 201 (3d Cir. 1994) ............................................................ 28

*Choe-Rively v. Vietnam Veterans of America Chapter 83*,
135 F.Supp.2d 462, 475 (D. Del. 2001).................................................. 21

*Clark County Sch. Dist. v. Breeden*,
532 U.S. 268, 273 (2001)........................................................................ 31

*Conneen v. MBNA America Bank, N.A.,*
334 F.3d 318, 334 (3d Cir. 2003) ............................................................ 37

*Dickerson v. Department of Human Services,*
767 F. Supp. 605, 612 (D. N.J. 1991) ...................................................... 39

*Edwards v. Pennsylvania Turnpike Comm'n,*
2003 WL 22508498, at *2 (3d Cir. Nov. 5, 2003) ................................... 25

*Ferguson v. E.I. DuPont de Nemours and Co.,*
560 F. Supp. 1172, 1193 n.48 (D. Del. 1983) ......................................... 24

*Fuentes v. Perskie,*
32 F.3d 759, 765 (3d Cir. 1994) ........................................................ 25, 27

*Goosby v. Johnson & Johnson Med. Inc.,*
288 F.3d 313, 323 (3d Cir. 2000) ............................................................ 31

*Hampton v. Borough of Tinton Falls Police Dep't,*
98 F.3d 107, 112 (3d Cir. 1996) .............................................................. 19

*Hughes v. Derwinski,*
967 F.2d 1168, 1174-1175 (7th Cir. 1992) .............................................. 31

*Johnson v. E.I. DuPont de Nemours & Co.,*
60 F. Supp.2d 289, 294 (D. Del. 1999) ......................................... 27, 31, 34

*Johnson v. Gober,*
2003 WL 22967266, at *459-60 (3d Cir. Dec. 18, 2003) ....................... 27

*Jordan v. CSX Intermodal, Inc.,*
991 F. Supp. 754, 758 (D. Md. 1998) ..................................................... 36

*Lafate v. Chase Manhattan Bank,*
123 F. Supp.2d 773, 786 (D. Del. 2000) ................................................. 30

*Lewis v. State of Del. Dept. of Public Instruction,*
948 F. Supp. 352, 361 (D. Del. 1996) ..................................................... 24

*Manning v. Metropolitan Life Ins. Co.,*
127 F.3d 686, 693 (8th Cir.1997) ............................................................ 29

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792, 802 (1973) ........................................................................ 20

*McLaughlin v. Diamond State Port Corp.,*
  2004 WL 3059543, *9 (D. Del. 2004)...................................................... 26

*Messina v. E.I. Du Pont de Nemours and Co.,*
  308 F.Supp.2d 491, 495 n.10 (D. Del. 2004)........................................... 41

*Munday v. Waste Management, Inc.,*
  126 F.3d 239, 243 (4th Cir. 1997) ............................................................ 29

*Price Waterhouse v. Hopkins,*
  490 U.S. 228, 227 (1989)........................................................................... 27

*Reeves v. Sanderson Plumbing Products, Inc.,*
  530 U.S. 133, 146 (2000)........................................................................... 20

*Richmond v. ONEOK, Inc.,*
  120 F.3d 205, 209 (10th Cir. 1997) .......................................................... 31

*Robinson v. City of Pittsburgh,*
  120 F.3d 1286, 1300 (3d Cir. 1997) ............................................... 5, 28, 29

*Sarullo v. United States Postal Serv.,*
  352 F.3d 789, 798 (3d Cir. 2003) ............................................................. 20

*Scaria v. Rubin,*
  117 F.3d 652 (2d Cir. 1997) ..................................................................... 24

*Schatzman v. Martin Newark Dealership, Inc.,*
  158 F.Supp.2d 392, 401 n.5 (D. Del. 2001)....................................... 19, 28

*Schorr & Solis-Cohen,*
  983 F.2d 509, 545 (3d Cir. 1992) ............................................................. 27

*Shanley v. Salesianum School,*
  1995 WL 628401, at *10 (D. Del. Apr. 27, 1995).................................... 35

*Shellenberger v. Summit Bancorp, Inc.,*
  318 F.3d 183, 187 (3d Cir. 2003) ............................................................. 29

*Simms v. Oklahoma ex rel. Dep't of Mental Health,*
  165 F.3d 1321, 1331 (10th Cir. 1999) ...................................................... 38

*Smart v. Ball State Univ.,*
  89 F.3d 437, 441 (7th Cir. 1996) .............................................................. 30

iv

*St. Mary's Honor Center v. Hicks,*
509 U.S. 502, 506 (1993)............................................................. 19, 20, 25

*Strag v. Board of Tr.,*
55 F.3d 943, 950 (4th Cir. 1995) ............................................... 36

*Strother v. Southern Cal. Permanente Med. Group,*
79 F.3d 859 (9th Cir. 1996) ....................................................... 30

*Taylor v. Procter & Gamble Dover Wipes,*
184 F.Supp.2d 402, 417 (D. Del. 2002)...................................... 31

*Texas Dep't of Community Affairs v. Burdine,*
450 U.S. 248, 254-55 (1981) ..................................................... 19, 20

*Wagner v. Berwick Industries,*
2004 WL 2931049 (3d Cir. Dec. 20, 2004) ............................... 30

*Williams v. Alabama Indus. Dev't Tra'g,*
146 F. Supp.2d 1214, 1224 (M.D. Ala. 2001) ........................... 38

*Williams v. Aviall Services, Inc.,*
2003 WL 21018567, at *5 (N.D. Tex. 2003) ............................. 38

## Federal Statutes

29 U.S.C. § 206(d) ....................................................................... 1

29 U.S.C. § 206(d)(1) .................................................................. 34, 35

42 U.S.C. § 1981........................................................................... 1, 19

## State Cases

*Lord v. Sounder,*
748 A.2d 393, 401 (Del. 2000) ................................................... 37

*Merrill v. Crothall-American, Inc.,*
606 A.2d 96, 103 (Del. 1992) ..................................................... 37

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff commenced this action on April 8, 2004, alleging six counts in her Complaint.

(D.I. 1.)  Specifically, Plaintiff alleged as follows:

Count I:    CSC discriminated against Plaintiff on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e)-(5)(f)(1) ("Title VII").

Count II:   CSC discriminated against Plaintiff on the basis of her race in violation of 42 U.S.C. § 1981 ("Section 1981").

Count III:  CSC discriminated against Plaintiff based upon her gender in violation of Title VII.

Count IV:   CSC retaliated against her in violation of Title VII and/or Section 1981.

Count V:    CSC violated the Equal Pay Act, 29 U.S.C. § 206(d).

Count VI:   CSC breached an implied covenant of good faith and fair dealing.

On May 24, 2004, CSC filed an Answer denying the substantive allegations of the Complaint.  (D.I. 6.)

On October 18, 2004, the Court entered a Scheduling Order for the completion of discovery and the submission of case dispositive motions.  (D.I. 13.)  The Court later extended the deadlines for the completion of discovery and submission of dispositive motions.  (Ordered 3/28/05.)

On November 10, 2004, the Court entered a Protective Order regarding the production, exchange, and use of confidential information.  (Ordered 11/10/04.)  That Protective Order is still in effect.

This is CSC's Opening Brief in support of its Motion for Summary Judgment on all of Plaintiff's claims.

## SUMMARY OF ARGUMENT

I.      Defendant is entitled to summary judgment on all of the claims set forth in Plaintiff's Complaint.   There are no material issues of fact in dispute and CSC is entitled to judgment as a matter of law.

II.     Plaintiff's race discrimination claim fails as a matter of law.  Plaintiff cannot make out a *prima facie* case of discrimination.  Further, even if she could, CSC had legitimate, non-discriminatory reasons for not promoting Plaintiff which had nothing to do with her race. Finally, Plaintiff cannot show that CSC's explanation is a pretext for discrimination.

III.    Plaintiff's retaliation claim fails as a matter of law.  Plaintiff cannot make out a *prima facie* case of retaliation.  Further, even if she could, CSC had legitimate, non-retaliatory reasons for terminating Plaintiff which had nothing to do with any protected activity. Finally, Plaintiff cannot show that CSC's explanation is a pretext for retaliation.

IV.     Plaintiff's Equal Pay Act claim fails as a matter of law.  In Plaintiff's work group, a woman received the highest salary.  Further, any difference between Plaintiff's salary and the salary of the male employee in her work group was not based upon sex in any way; rather, it was based upon a number of factors other than sex.

V.      Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of Delaware law.  Plaintiff cannot show any facts on the record to support such a claim.

## STATEMENT OF FACTS[1]

## INTRODUCTION

Based upon the undisputed facts, as spelled out in Plaintiff's own deposition testimony, this case is now ripe for disposition on summary judgment. As alleged in Plaintiff's Complaint, and clarified and limited through her deposition testimony, Plaintiff's claims are limited to the following:

1)     A race discrimination claim based upon Plaintiff's failure to receive a promotion, based on the fact that Randall Miller was promoted and she was not (Pl. Dep. at A3-4)[2];

2)     A retaliation claim based upon purported isolation Plaintiff supposedly suffered from members of the group she was working in and her termination from employment more than one year after she filed a charge of discrimination (Pl. Dep. at A5-6);

3)     An Equal Pay Act claim based on the fact that men were allegedly paid more than women in the group she was working in (Pl. Dep. at A2-3); and

4)     A claim for a purported breach of the implied covenant of good faith and fair dealing based upon the discrimination and retaliation that Plaintiff claims she suffered (D.I. 1 at ¶ 87-88; Pl. Dep. at A6.)

As discussed in greater detail below, CSC is entitled to judgment on all of Plaintiff's claims. CSC's decision to promote Randall Miller had absolutely nothing to do with race. (A229-31.) Rather, it was a decision based on the common sense business judgment of her supervisor, Dawn Dworksy, that Mr. Miller was ready for the promotion due to his qualifications, level of experience, performance and time within the MTSA (lower-level) position. (A229-30.)

---

[1]   CSC assumes Plaintiff's testimony as true for purposes of this Motion only.

[2]   Pertinent testimony from Plaintiff's deposition testimony is included in CSC's Appendix to its Opening Brief in Support of Its Motion for Summary Judgment and is referred to as "Pl. Dep. at A __." Documents, affidavits and deposition testimony of deponents other than Plaintiff are also included in CSC's Appendix and are referred to as "A __."

In the Summer of 2002 when Mr. Miller was promoted to the SMTS (higher-level) position, he had been an MTSA for nearly five (5) years. (A222, 229.) Plaintiff, however, had only been an MTSA for less than two (2) years when she went out on medical leave in February 2002. (Pl. Dep. at A35-37, 60.)  In addition, at the time of his promotion, Mr. Miller had over ten (10) years of UNIX (a type of specialized computer software) experience and possessed the necessary expertise and competencies for the SMTS position. (A222-24, 229-30.)  Plaintiff, on the other hand, had only been programming in UNIX for about two (2) years, and Ms. Dworsky did not believe Plaintiff possessed a sufficient level of computer skills and technical expertise to warrant a promotion. (A230-31;  Pl. Dep. at A21-23, 41-42, 50-53.)  Such factors were among the considerations Ms. Dworsky relied upon in determining, in her business judgment, that Mr. Miller deserved to be promoted to the SMTS position.

Moreover, when Mr. Miller was promoted to SMTS in the Summer of 2002, Plaintiff was on full-time medical leave. (Pl. Dep. at A120-21.) Indeed, Plaintiff had been on intermittent leave since August 2001 and on full-time leave since February 2002. (Pl. Dep. at A108-21.) It would have been inconsistent with CSC practice to promote Plaintiff in the Summer of 2002 while she was on an extended medical leave of absence, without knowing when or if she would return to active employment. (A230-31, 236.) Ms. Dworsky did not actually consider Plaintiff for promotion at this time because she was on a leave of absence, but Ms. Dworsky did not believe Plaintiff had sufficient UNIX experience, time in her MTSA role, or other skills to warrant a promotion at that time. (A230-31.) In any event, race played absolutely no role in any promotion decision — and Plaintiff has no evidence to support such a claim. (A229-31.)

Similarly, Plaintiff's termination from employment had no causal connection to her protected activities. CSC's Leave of Absence Policy requires that employees on medical leave submit medical certifications every thirty days. (A188-201, A252-53.) The policy specifies that a failure to do so will be considered a voluntary resignation on the part of the offending employee. (A195, 252-53.) Plaintiff, admittedly, was well aware of her obligations under CSC's

4

Leave Policy. (Pl. Dep. A30-32, 107-11, 113-16, 119-27.) Despite this fact, Plaintiff repeatedly failed to submit timely medical certifications, and, eventually, was deemed to have voluntarily resigned in accordance with the explicit terms of the Company's Leave Policy. (A235-36, A244-45, 253-57.) Accordingly, CSC had legitimate, non-retaliatory reasons for terminating Plaintiff which had nothing to do with her protected activity. Plaintiff has provided not one hint of evidence to support her claim that CSC retaliated against her for filing a charge of discrimination more than one year before her termination. Nor is Plaintiff's claim of isolation supported by the evidence. To the extent that Plaintiff's working relationship with her co-workers deteriorated, she has only herself to blame for ignoring her co-workers. (A238-39, 241.) Moreover, a claim of "isolation" does not rise to the level of an adverse employment action. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) ("isolation and lack of respect from fellow managers and co-workers did not amount to adverse employment action").

Plaintiff also cannot establish a claim under the Equal Pay Act because a woman was the highest paid person in the Dazel subgroup during the time Plaintiff worked in that group. (A231, 236-37.) In addition, any difference between the compensation received by Plaintiff and Randall Miller was based solely on legitimate business reasons other than sex, including Mr. Miller's experience and service date with CSC. (A231, 236-37.)

Finally, because Plaintiff's claim for breach of the covenant of good faith and fair dealing is based upon the exact same set of facts as her claims for discrimination and retaliation, this claim clearly must fail as well.

Accordingly, Defendant is entitled to summary judgment as a matter of law on all of Plaintiff's claims.

### Plaintiff Was Hired As An At-Will Employee In The Help Desk.

Computer Sciences Corporation (hereinafter "CSC", "the Company" or "Defendant") is an information technology ("IT") services company, which provides outsourcing of IT services.

Outsourcing is the practice of turning over operational responsibilities for computers and IT systems to an outside firm.

CSC hired Plaintiff as an at-will employee on November 5, 1997. (Pl. Dep. at A24-29.) Plaintiff was initially hired as a help desk technician, Member Technical Staff B ("MTSB") (Pl. Dep. at A26-27.)[3] CSC offered Plaintiff a starting annual salary of $41,000, which was $6,000 to $8,000 more than Plaintiff's annual salary at her previous job. (Pl. Dep. at A29.) Plaintiff considered this to be a fair starting salary. (Pl. Dep. at A29.) As a help desk technician, Plaintiff was responsible for responding to calls regarding technical problems encountered by the customer, such as issues with printers, servers, and the desktop itself. (Pl. Dep. at A39-40.)

While serving as a help desk technician, Plaintiff received a raise on May 16, 1998, and her annual salary was increased to $42,025. (A180; Pl. Dep. at A33-34.) On May 15, 1999, Plaintiff received another raise, thereby increasing her salary to $43,118 annually. (A181; Pl. Dep. at A34-35.) Plaintiff also received bonuses during this time period. (Pl. Dep. at A36-37.)

**Plaintiff Was Transferred To The Managed Print And Dazel Group.**

On October 2, 1999, Plaintiff transferred from her position at the help desk to a position as a technical service analyst in the Managed Print and Dazel ("MPD") group. (Pl. Dep. at A50-53.) Plaintiff considered this move to be a promotion. (Pl. Dep. at A50-52.) Plaintiff's new supervisor in the MPD group was Edwin Derek Alston. (Pl. Dep. at A52.)

Plaintiff worked in the Dazel subgroup of the MPD group and provided "second level" e-mail, facsimile and print support to CSC's clients.[4] (A225-26; Pl. Dep. at A52.) Dazel is a sophisticated software application that allows a computer to communicate with a printer, facsimile, or

---

[3]  The normal chain of promotion within CSC is as follows: MTSB to Member Technical Staff A ("MTSA"), and, ultimately, to Senior Member Technical Staff ("SMTS"). (Pl. Dep. at A27-29.)

[4]  In July 2001, when Plaintiff filed her charge of discrimination, only three other individuals performed engineering work in the Dazel subgroup: Audrey Daigger, MaryAnne Doll-Johnson, and Randall Miller. (A231.)

e-mail, and guarantees delivery. (A225; Pl. Dep. at A16-17.) Dazel runs on the UNIX computer operating system. (A225.) The UNIX platform is a complex computer program with numerous command codes that require proficient knowledge, expertise, and skill of the operating system. (A225-26.)

In her position in the MPD group, Plaintiff was expected to be able to perform command line programming in UNIX. (A226; Pl. Dep. at A17-18.) Plaintiff, however, had never programmed in UNIX before she transferred to the MPD group. (Pl. Dep. at A21-23, 41-42.)

### In May 2000, Plaintiff Was Promoted To Member Technical Staff A.

On May 13, 2000, Mr. Alston promoted Plaintiff from MTSB to MTSA. (Pl. Dep. at A35-37, 60.) Contemporaneously, Plaintiff also received a $4,000 raise, thereby increasing her salary from $43,118 to $46,996.98. (A182; Pl. Dep. at A35.) At that time, Mr. Alston told Plaintiff that she should not expect another promotion any time soon based on time in her new position, and that she would have much to learn in order to succeed at her new level of MTSA. (A246-47.)

### Dawn Dworsky Is Assigned Management
### Responsibilities For The Managed Print And Dazel Group.

In May 2000, CSC implemented a business restructuring. (A225, 247.) As a direct result of this restructuring, Dawn Dworsky (Caucasian) replaced Mr. Alston as manager of the MPD group and became Plaintiff's new supervisor. (A225.) Despite the change in supervision, Plaintiff's duties did not change in any way. (Pl. Dep. at A62.)

### Plaintiff Rejected A Transfer To A Supervisory Position.

In March 2001, Plaintiff applied for a transfer and reassignment to the position of Leverage Server Administration Supervisor. (A262; Pl. Dep. at A82-83.) Although the transfer would not have been a promotion for Plaintiff since it was an MTSA-level position, it would have involved additional responsibility because it was a supervisory position. (A262-63; Pl. Dep. at

A83, 86.) At that time, Beth Musumeci held the position, and was responsible for hiring into the job because she was transitioning to a new position. (A262.)

Ms. Musumeci conducted an interview of Plaintiff for the position. (Pl. Dep. A84.) Despite the fact that Plaintiff had no supervisory experience at that time, Ms. Musumeci believed Plaintiff displayed capability for the position and decided to offer her the job. (A262; Pl. Dep. at A83.) Although the position was not a promotion for Plaintiff, Ms. Musumeci chose to offer Plaintiff a 6% salary increase because the position involved additional responsibilities. (A186, 262-63.) This offer was well within the applicable salary range recommended by Human Resources for the position. (A263; Pl. Dep. at A85.)

Plaintiff, however, turned down the offer, and informed Ms. Musumeci that she demanded a 36% salary increase. (A263; Pl. Dep. at A86.) Ms. Musumeci was shocked by this counter-offer, believing it excessively high, particularly given the fact that Plaintiff had no supervisory experience. (A263.) Ms. Musumeci, however, provided Plaintiff with a second offer for the position, this time for an 8% salary increase. (A263; Pl. Dep. at A87-88.) Unfortunately, Ms. Musumeci's offer was still too low for Plaintiff, and she rejected the position. (Pl. Dep. at A88.) Plaintiff thus remained in her position with the MPD group at that time.

### Ms. Dworsky Evaluated Plaintiff As Exhibiting "Good" Work Performance And Awarded Her A 5% Merit Raise.

In or about May 2001, Ms. Dworsky completed an annual performance evaluation of Plaintiff for the period of April 1, 2000 through March 31, 2001. (Pl. Dep. at A63-65.) Ms. Dworsky rated Plaintiff as a "3" or "good," indicating that Plaintiff's performance "consistently meets expectations and job requirements."[5] (Pl. Dep. at A63-65.)

---

[5] Plaintiff also received a "3" in her annual performance appraisals for the period of April 1997 to March 1998, and for the period of April 1998 to March 1999. (Pl. Dep. at A43-49, 65.) Plaintiff had no complaint about those evaluations. (Pl. Dep. at A43-49, 65.)

CSC considers its employees for merit salary increases at the time the annual performance evaluations are conducted. (A226.) In 2001, CSC's Human Resources department issued annual Overall Merit Guidelines ("Guidelines"), which designated the recommended merit percent increase an employee should receive based on his or her evaluation rating. (A185, 226, 242.) The Guidelines also limited the percent of the workforce population that can receive a particular rating. (A185, 226, 242.) If a manager wanted to diverge from these recommended Guidelines, he or she had to first obtain approval from management and Human Resources. (A226, 242.)

With respect to employees who were rated a "3" during the 2001 evaluation and salary review period — as Plaintiff did — the Guidelines recommended a salary increase of between 0-4%. (A185, 226, 242.) Ms. Dworksy, however, desired to reward what she perceived to be Plaintiff's good effort and performance for her first year as an MTSA by providing Plaintiff with a 5% salary increase. (A226, 242.) Because Ms. Dworsky wanted to provide Plaintiff with a salary increase over and above the recommended Guidelines, Ms. Dworsky sought and obtained approval from management and Human Resources to do so, and Plaintiff received a 5% salary increase. (A226, 242-43; Pl. Dep. at A69.)

**Plaintiff Was Dissatisfied With Her May 2001**
**Performance Evaluation And Merit Salary Increase.**

According to Plaintiff, her issues with CSC began in approximately June 2001, when she received her performance review from Ms. Dworsky for the April 1, 2000 through March 31, 2001 time period. (Pl. Dep. at A7.) Despite the fact that Plaintiff received a "good" evaluation and a merit salary increase above the recommended Guidelines, Plaintiff was displeased with both her evaluation and salary increase. (Pl. Dep. A65-68.) Plaintiff was also upset that she was

not promoted to SMTS in May 2001, ***despite the fact that she had only held the position of MTSA for one year at that time***. (Pl. Dep. A35-37, 60, 70.)[6]

When Ms. Dworsky met with Plaintiff to discuss her performance appraisal, Ms. Dworsky told Plaintiff that she was on the right career path and should continue doing the type of work that she was doing. (Pl. Dep. at A70.) Ms. Dworsky advised Plaintiff that she did not promote Plaintiff to SMTS that year because Plaintiff did not yet have the requisite skill set or expertise to be an SMTS. (A227; Pl. Dep. at A78-80.)[7]

Ms. Dworsky informed Plaintiff that, although she was doing well with the UNIX system for her level as an MTSA, Plaintiff did not yet have the requisite skills or expertise to work with the UNIX operating system at a senior level. (A227.) She also told Plaintiff that she would have to demonstrate the ability to lead projects independently, work independently with the client, mentor and train others, improve her decision-making capabilities, and independently manage a "category one" problem before she could be promoted. (A227.) During this meeting, Ms. Dworsky also shared with Plaintiff her expectations of employees in MTSA and SMTS positions. (A227.)

Plaintiff remained dissatisfied and, thus, arranged several meetings to discuss her performance appraisal with Ms. Dworsky, Maureen Summers (Human Resources Specialist), and

---

[6]   Plaintiff admitted that being in a particular position for one year was not an excessively long time to remain in the same position: "It's not long to me." (Pl. Dep. at A71-72.)

[7]   The only person Ms. Dworsky promoted to an SMTS at this time was MaryAnne Doll-Johnson (Caucasian). (A228.) At the time of Ms. Doll-Johnson's promotion to SMTS, she had more years of relevant experience with the UNIX operating system and had been an MTSA for a longer period of time than Plaintiff. (A228.) Importantly, Plaintiff believed that Ms. Doll-Johnson deserved to be promoted at the time, and admits that Ms. Doll-Johnson had more UNIX experience and more time in the MTSA position than Plaintiff did. (Pl. Dep. at A89-90.) Plaintiff does not contend that the promotion of Ms. Doll-Johnson instead of her was in any way discriminatory. (Pl. Dep. at A3-4.)

Sonia Koplowicz (Senior Human Resources Manager).  (Pl. Dep. at A75-76.)[8]  Plaintiff informed these individuals that she wanted to be rated a "2" instead of a "3," and that she wanted Ms. Dworsky to reevaluate her appraisal.  (Pl. Dep. at A77.)  During these meetings, Plaintiff also stated that she had wanted to be promoted to SMTS, even though she had been promoted only one year earlier.  (A227;  Pl. Dep. at A76.)

Ms. Dworsky again explained why she rated Plaintiff as she did.  (Pl. Dep. at A76-77.) Ms. Summers thoroughly explained the salary increase process to Plaintiff and that Plaintiff's salary was consistent with her peers, and reiterated that Plaintiff received a higher salary increase than was recommended under the Guidelines.  (A226-27, 234.)  Ms. Summers and Ms. Dworsky also explained that Plaintiff was not ready for a promotion to SMTS at that time because of her limited time in her current position (only one year) and because she did not have the necessary level of expertise and skill in UNIX, among other factors.  (A226-27, 234; Pl. Dep. at A78-80.)

**Following Her 2001 Performance Appraisal,**
**Plaintiff Isolated Herself from Her Team Members.**

When Plaintiff first started with the MPD group, she was on friendly terms with all of her co-workers in the group.  (Pl. Dep. at A100-01.)  In fact, Plaintiff often asked her co-workers for assistance with problems or questions that she had with her job duties, and they all willingly assisted Plaintiff with her problems.  (Pl. Dep. at A56-57.)  Plaintiff considered at least one of her co-workers, MaryAnne Doll-Johnson, to be her mentor.  (Pl. Dep. at A104.)  Indeed, Plaintiff even recommended Ms. Doll-Johnson for an award, claiming that she was able to accomplish her Dazel training with her assistance.  (A238, 240; Pl. Dep. at A105.)  Plaintiff also socialized on occasion with Ms. Doll-Johnson outside of work.  (Pl. Dep. at A102.)

---

[8]  These meetings took place shortly before and after Plaintiff filed her charge of discrimination in July 2001.  (A227-28, 234; Pl. Dep. at A74.)

After Plaintiff filed her charge of discrimination, she began to isolate herself from the other members of the MPD group. (A224, 238-39.) For instance, Plaintiff refused all invitations to join them for lunch. (A238-39; Pl. Dep. at A102-03.) Plaintiff also began to refuse to speak to her team members. (A224, 238-39.) In fact, Plaintiff's purposeful isolation and refusal to communicate with co-workers became so uncomfortable and tense that one team member, Ms. Doll-Johnson, contacted Human Resources for advice on how to alleviate the stressful work situation that Plaintiff created. (A238-39, 241.)

### Despite Her Request To Transfer Out Of The MPD Group, Plaintiff Failed To Follow Through With Job Offers, Leads And Other Offers Of Assistance.

In the Summer of 2001, because she was still upset about not being promoted, Plaintiff requested assistance from Human Resources representatives Maureen Summers and Sonia Koplowicz to be transferred out of the MPD group and into another position with CSC. (Pl. Dep. at A92.) Plaintiff also met with or spoke to Dawn Dworsky, Mike Suman (Ms. Dworsky's supervisor) and Leanne Thomas (another Human Resources Manager) regarding this request. (Pl. Dep. at A92.) In response to Plaintiff's request, Ms. Koplowicz, Ms. Summers and Ms. Dworsky spoke with various managers on Plaintiff's behalf regarding open positions for her transfer. (A228-39, 234-35, 243.)

Plaintiff put a number of limitations on the types of positions that she would consider. For instance, she informed Human Resources that she would not take a position that involved UNIX support, travel, or a rotational shift. (A243; Pl. Dep. at A92-93.) She also stated that she needed a position with part-time hours due to her medical condition. (A243; Pl. Dep. at A92-93.) Plaintiff knew that CSC was then in a downsizing mode, and, accordingly, there were few open positions. (A243; Pl. Dep. at A94.)

Ms. Koplowicz informed Plaintiff that CSC was committed to helping Plaintiff locate another position within CSC, and, thus, CSC managers worked very closely with Plaintiff

12

towards this goal. (A243; Pl. Dep. at A94.)[9] As a result of these efforts, Plaintiff was offered transfers into several other positions, all of which Plaintiff declined to pursue. For instance, during August of 2001, Plaintiff expressed interest in a position in the Applications Interconnect Services ("AIS") group under the supervision of Dahl Landers. (Pl. Dep. at A96.) Ms. Dworsky contacted Ms. Landers on Plaintiff's behalf and recommended Plaintiff to Ms. Landers. (A229, 250.) Based upon Ms. Dworsky's recommendation, Ms. Landers scheduled two interviews with Plaintiff during August 2001. (A251; Pl. Dep. at A97.) Plaintiff, however, stood Ms. Landers up for both interviews, and never provided Ms. Landers with any explanation. (A229, 251; Pl. Dep. at A97.)

Subsequently, in November 2001, Ms. Dworsky, on Plaintiff's behalf, again spoke with Ms. Landers regarding another open position in the AIS group. (A229, 251.) Ms. Landers was hesitant to give Plaintiff consideration after her failure to appear for the previous interviews, but Ms. Dworsky eventually convinced Ms. Landers to give Plaintiff another opportunity to apply. (A229, 251.) Accordingly, on November 26, 2001, Ms. Dworsky met with Plaintiff to discuss the AIS opportunity. (A229, 251; Pl. Dep. at A97.) Soon thereafter, Ms. Landers sent Plaintiff a link to the applicable job posting. (Pl. Dep. at 97.) Despite the facts that open positions at CSC were very limited at that time and that Plaintiff was purportedly so anxious to transfer out of the MPD group, Plaintiff failed to follow through with Ms. Landers, and never submitted an application for the position. (A229, 251; Pl. Dep. at A98.)

Similarly, in early 2002, Ms. Summers, on Plaintiff's behalf, contacted Jennifer Miller at the help desk about an open position. (A234-35, 248.) The position would have been a lateral move, and Plaintiff would have been able to maintain her then-current salary. (A235, 248-49; Pl.

---

[9]  In attempting to assist Plaintiff, Ms. Koplowicz asked Plaintiff to provide her with the position requisition numbers for the open positions that Plaintiff was interested in. (A243; Pl. Dep. at A95.) Despite Ms. Koplowicz's repeated requests, Plaintiff never provided position requisition numbers to Ms. Koplowicz for several of the positions. (A243; Pl. Dep. at A94-96.)

Dep. at A98-99.) Ms. Poland also would have been able to maintain her then-current schedule of working 30 hours per week, as an accommodation to her medical condition. (A235.) Ms. Miller and Plaintiff discussed the open position. (A235, 248-49; Pl. Dep. at A98-99.) Ms. Miller believed that Plaintiff would be a good fit for the job, and offered her the position. (A235, 248-49.) Plaintiff, however, rejected Ms. Miller's offer. (A235, 249; Pl. Dep. at A99.) Accordingly, Plaintiff remained in the MPD group.

### Plaintiff Went Out On Full-Time FMLA Leave.

On August 6, 2001, Plaintiff requested a full-time medical leave of absence due to stress. (Pl. Dep. at A108-09.) CSC maintains a Leave of Absence Without Pay Policy ("Leave Policy"). (A188-201, 252.) Plaintiff was aware that the Company maintained such a policy, and that it was her responsibility to comply with it. (Pl. Dep. at A30-32, 106-07.) The Leave Policy, provides, in relevant part:

> A Medical Leave of Absence Without Pay may be granted for up to thirty calendar days and may be extended for successive periods of up to thirty calendar days for up to a total of twelve consecutive months upon presentation of a physician's statement, and CSC's verification as it deems appropriate.... *A certificate of disability from the attending physician is required every thirty days from the date the medical leave is commenced. Any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation....*

(A195.) (emphasis added). Importantly, CSC's Leave Policy places no affirmative duty on CSC to remind employees of their obligations under the policy. (A193-201, 235, 252.) Further, under the explicit terms of the policy, an employee may be deemed to have resigned upon his or her first failure to provide a timely medical certification. (A195, 235, 252.)

CSC granted Plaintiff's request for leave, and counseled her both orally and in writing about her obligations and responsibilities during the time she was out on medical leave, including her duty to provide a medical certification every thirty (30) days to the Benefits Office. (A202-06, 235-36, 253; Pl. Dep. at A110-11; A113-16.) On August 14, 2001, Plaintiff acknowledged her obligations under the Leave Policy. (A202, 253; Pl. Dep. at A108-09.)

14

Specifically, Plaintiff acknowledged that her "*employment with CSC will be subject to termination if I fail to provide Human Resources with a doctor's certificate on a monthly basis.*" (A202, 253; Pl. Dep. at A108-09.) (emphasis added).

Plaintiff returned from her medical leave on August 22, 2001. (A253; Pl. Dep. at A115-16.) Shortly thereafter, however, Plaintiff took another full-time medical leave of absence on August 27, 2001 through September 10, 2001. (A253; Pl. Dep. at A116.) On September 11, 2001, Plaintiff returned to work and presented a medical certification allowing her to return to work, but restricting her to a 30-hour workweek. (A253; Pl. Dep. at A116.) CSC accommodated Plaintiff's request by providing Plaintiff with a 30-hour reduced work schedule, and designated the remaining ten (10) hours as FMLA leave. (A235, 253; Pl. Dep. at A116.) Plaintiff continued to work a reduced schedule until she returned to a full-time medical leave of absence on February 21, 2002. (A235, 253; Pl. Dep. at A120-21.) Plaintiff remained on a full-time leave of absence until September 27, 2002. (A235, 253; Pl. Dep. at A121.)

### Plaintiff Failed To Submit Timely Medical Documentation And CSC, In Accordance With Its Leave Policy, Deemed Plaintiff To Have Voluntarily Resigned.

In direct violation of her obligations under CSC's Leave Policy, Plaintiff repeatedly failed to submit timely medical certifications to CSC every thirty (30) days. (A235-36, 253-56.) Although, under the terms of its Policy, CSC could have designated Plaintiff's first such omission to constitute a voluntary separation from employment, CSC did not do so. (A254.) Rather, CSC gave Plaintiff numerous chances to comply with its Leave Policy. (A235-36, 253-56.)

Though not required under CSC's Leave Policy, Simmie Osborn, CSC Service Center Representative, called, e-mailed and sent letters to Plaintiff on numerous occasions to remind her that her medical certification was either coming due or was delinquent. (A207-10, 212-13, 215-16, 254-55; Pl. Dep. at A119-32.) Maureen Summers also reminded Plaintiff several times in writing of her obligations under the Leave Policy, and the potential consequences for her failure to submit certifications. (A211, 214, 235-36; Pl. Dep. at A121-24.) In fact, in addition to

the notifications of her duties under the Leave Policy mentioned above, Plaintiff also received the

following written reminders of her obligation to timely submit medical certifications to CSC:

| Date | Reminder By Company To Plaintiff To Submit Medical Documentation |
|---|---|
| 12/12/01 | E-mail from Ms. Osborn to Plaintiff requesting that Plaintiff submit an updated doctor's note. |
| 1/4/02 | E-mail from Ms. Osborn to Plaintiff reminding Plaintiff that she would need to submit a certification extending her disability period if she was not able to return to a 40-hour work week. |
| 1/24/02 | E-mail from Ms. Osborn to Plaintiff requesting Plaintiff to submit a doctor's note extending her disability period. |
| 2/25/02 | Letter from Ms. Summers to Plaintiff reminding Plaintiff of her obligation under the Leave Policy to submit a certificate of disability at the commencement of her medical leave and every thirty days thereafter. Ms. Summers also warned Plaintiff that *"CSC Human Resources Management (HRMP) 247 further states that any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation."* |
| 3/18/02 | E-mail from Ms. Osborn to Plaintiff reminding Plaintiff to submit an updated medical certification which includes an estimated return to work date. |
| 5/21/02 | Letter from Ms. Summers to Plaintiff reminding Plaintiff of her obligation to provide a continuing certificate of disability every 30 days, and *noting that Plaintiff had been reminded of this requirement at least six times via written correspondence and ten times via telephone.* Ms. Summers noted that her medical certification was due on 5/12/02, and thus, was overdue. Ms. Summers again reminded Plaintiff that *"[f]ailure to provide the required medical certification on time and every 30 days is a violation of company policy, and considered by CSC to be a voluntary resignation."* |
| 6/20/02 | Letter from Ms. Osborn to Plaintiff reminding Plaintiff to submit an updated medical certification no later than 7/28/02. Ms. Osborn again warned Plaintiff that *"[f]ailure to provide the required medical certification on a timely basis may be considered by CSC as a voluntary resignation of your employment with CSC."* |

(A207-16, 235-36, 254-56; Pl. Dep. at A119-32.) (emphasis added.)

On June 21, 2002, CSC received a certification from Plaintiff's medical provider dated

June 14, 2002, which stated that Plaintiff may "be able to return to work within the next two to

three months." (A217-18, 256; Pl. Dep. at A128.) Thus, at the very latest, Plaintiff was required

under CSC's Leave Policy to provide an updated medical certification to CSC by September 14,

2002. (Pl. Dep. at A128-29.) Despite the numerous written and oral warnings Plaintiff received regarding her obligation to provide timely medical certifications and specifying the consequences for a failure to do so, Plaintiff did not provide an updated medical certification by that date. (A236, 256; Pl. Dep. at A129-30.)[10] Therefore, in accordance with its Leave Policy, CSC determined that Plaintiff's failure to submit a timely medical certification constituted a voluntary resignation on Plaintiff's part, and terminated her employment effective September 27, 2002.[11] (A221, 236, 256.)

### Randall Miller Was Promoted to SMTS In July 2002.

In July 2002, while Plaintiff remained on her full-time medical leave, Ms. Dworsky promoted Randall Miller (Caucasian) from MTSA to SMTS. (A229.) Significantly, Mr. Miller had been in the MTSA position for nearly five (5) years prior to his promotion. (A222-24, 229.) At the time of his promotion, Mr. Miller had over ten (10) years of practical, tenured experience working with the UNIX operating system as an employee for both CSC and for past employers, including DuPont. (A222-24, 229.)

Ms. Dworsky considered a number of factors in determining that Mr. Miller was qualified for promotion to SMTS. (A229-30, 232.1.) Ms. Dworsky believed that Mr. Miller demonstrated the ability to work independently on important technical projects without direct supervision; provide technical direction and guidance to others; handle various tasks involving a variety of computer programs; deal with issues related to outages on the network, independently manage a "category one" problem, was skilled in advanced troubleshooting, and that he possessed strong decision-making capabilities. (A229-31, 232.1.) Ms. Dworsky did not believe that Plaintiff possessed these same skills. (A230.) In addition, in Ms. Dworksy's business

---

[10] In fact, CSC did not receive an updated medical certification for Plaintiff until September 29, 2002, after she had been terminated. (A219-20, 236, 256; Pl. Dep. at A129-30.)

[11] This decision was made by Sonia Koplowicz and Maureen Summers. (A236, 245.)

judgment, Mr. Miller's years of experience working with the UNIX operating system prior to July 2002 qualified him for promotion to SMTS. (A229-31.) She also based her decision to promote Mr. Miller, among other factors, upon the factors set forth in the CSC Engineering Progression form. (A230, 232.1.)

Because Plaintiff had been out on medical leave since February 2002, Ms. Dworsky did not consider Plaintiff for a promotion at that time. (A230.) It is standard CSC practice and policy not to consider an employee for promotion while they remain out on medical leave. (A230, 236.) Ms. Dworsky has never promoted any employee while the employee was on medical leave. (A230.) In any event, Ms. Dworsky did not consider Plaintiff ready for promotion at that time because she did not have the requisite UNIX experience, had not been an MTSA for a sufficient length of time, and did not have the other skills or demonstrated performance to warrant a promotion. (A230-31.)

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARDS.

Summary judgment is appropriate in this case because Plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Moreover, a "plaintiff's conclusory assertion that [s]he was treated differently by itself is insufficient to raise an inference of discrimination." *Berry v. E.I. DuPont de Nemours & Co.*, 625 F. Supp. 1364, 1377 (D. Del. 1985); *Celotex*, 477 U.S. at 324 (holding that a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment). Based upon this standard, summary judgment should be entered for CSC on all of Plaintiff's claims.

18

## II.  PLAINTIFF'S RACE DISCRIMINATION
##      CLAIM FAILS AS A MATTER OF LAW.

In this lawsuit, Plaintiff claims that CSC failed to promote her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e)-(5)(f)(1) ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").[12]  To establish a claim for race discrimination, Plaintiff must show that CSC intentionally discriminated against her on the basis of her race.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993);  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  To do so, she must demonstrate that CSC treated her differently than other similarly situated employees who were not within her protected class, and that the reason for the different treatment was unlawful discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Plaintiff's own claim of discriminatory animus in and of itself does not give rise to an inference of unlawful discrimination.  *See Sarullo v. United States Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003), *cert. denied*, 124 S.Ct. 2392 (2004).

In this case, Plaintiff has no direct evidence of discriminatory motive.  In the absence of direct proof, Plaintiff's claim can survive only if she can prove intentional discrimination by inference, according to the well-established standard set forth in *McDonnell Douglas*.  *See Sarullo*, 352 F.3d at 797.  Assuming Plaintiff can make a *prima facie* showing, the burden then shifts to CSC to proffer a legitimate nondiscriminatory reason for its actions.  *McDonnell Douglas*, 411 U.S. at 802.  This burden is a relatively light one, and is met when CSC proffers a lawful reason for its actions.  *Burdine*, 450 U.S. at 256-58.  Once CSC does so, the presumption of discrimination produced by Plaintiff's *prima facie* case disappears.  *Id.*  The burden then shifts back to Plaintiff to show that CSC's purported legitimate business reason is merely a pretext for

---

[12]  Title VII and Section 1981 discrimination claims are analyzed under the same substantive standard.  *See Hampton v. Borough of Tinton Falls Police Dep't*, 98 F.3d 107, 112 (3d Cir. 1996); *Schatzman v. Martin Newark Dealership, Inc.*, 158 F.Supp.2d 392, 401 n.5 (D. Del. 2001).

discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146 (2000); *McDonnell Douglas*, 411 U.S. at 804. At all times, the ultimate burden of persuasion remains with Plaintiff. *Reeves*, 530 U.S. at 146; *Hicks*, 509 U.S. at 506. Moreover, a plaintiff's unsupported speculation that an employer acted with discriminatory animus is insufficient to withstand summary judgment. *Choe-Rively v. Vietnam Veterans of America Chapter 83*, 135 F.Supp.2d 462, 475 (D. Del. 2001).

For the reasons stated below, Plaintiff cannot meet her burden of proof in this case. Plaintiff does not have evidence that is even sufficient to establish a *prima facie* case of discrimination, and alternatively, cannot show that CSC's explanations of its actions were merely a pretext for race discrimination.

A.    **Plaintiff Cannot Establish A *Prima Facie* Case of Race Discrimination.**

To set forth a *prima facie* case of race discrimination based upon a failure to promote, Plaintiff must establish: 1) that she belongs to the protected class; 2) that she applied for and was qualified for the job; 3) that despite her qualifications she was rejected; and 4) that the employer either ultimately filled the position with someone outside her protected class or continued to seek applicants from among those having plaintiff's qualifications. *See Barber v. CSX Distribution Services*, 68 F.3d 694, 698 (3d Cir. 1995) (quoting *Fowle v. C & C Cola*, 868 F.2d 59, 61 (3d Cir.1989)).

Plaintiff cannot establish her *prima facie* case, because she cannot prove that she was qualified for the SMTS position. Plaintiff needed to demonstrate a total competency with the UNIX operating system in order to be qualified for promotion to the SMTS position. (A231.) As Plaintiff admitted in deposition, she did not even begin to learn to program in UNIX until she transferred to the MPD group on October 2, 1999. (Pl. Dep. at A21-23, 41-42.) Although by February 2002, when Plaintiff went out on full-time leave, Plaintiff had progressed with her UNIX training, she still had not reached the level of total competency that is required of an SMTS. (A231.) Rather, before she could qualify for an SMTS position, Plaintiff still needed to

further progress to the point that she could work more independently, improve her troubleshooting skills, improve her decision-making capabilities, and demonstrate increased proficiency in the UNIX operating system. (A231.)

Moreover, Plaintiff cannot demonstrate that someone of a different race was treated more favorably than her. Plaintiff had significantly less UNIX experience and had been in her MTSA position for significantly less time than Randall Miller. The following chart clearly demonstrates how much more UNIX experience and longevity as an MTSA Mr. Miller had, compared to Plaintiff:

|  | **Years of UNIX Experience** | **Years as An MTSA** |
|---|---|---|
| Plaintiff | About 2 (as of February 2002, the date of her medical leave) | Less than 2 (as of February 2002, the date of her medical leave) |
| Randall Miller | 10 (at time of promotion) | Nearly 5 (at time of promotion) |

(A222-24, 230-31; Pl. Dep. at A21-23, 36-37, 41-42.)

Because Plaintiff cannot show that she was qualified for the SMTS position, or demonstrate that others with similar qualifications were promoted ahead of her, Plaintiff cannot establish her *prima facie* case, and, thus, summary judgment is warranted. *See Berry v. Jacobs IMC, LLC*, 2004 WL 1179270, at * 409 (3d Cir. May 27, 2004) (summary judgment granted to employer on plaintiff's discriminatory failure to promote claim, in part, because plaintiff failed to establish his *prima facie* case by showing that he was qualified for the position) (attached at A139-43.)

**B.    CSC Had Legitimate Non-Discriminatory Reasons For Not Promoting Plaintiff To SMTS — Reasons That Had Nothing To Do With Her Race And There Is No Evidence Of Pretext.**

Plaintiff's claim of racial discrimination must fail even if she could somehow establish a *prima facie* case, because Plaintiff has no evidence that CSC's articulated reasons for not promoting her — that she was out on medical leave and because she did not have the requisite skills or UNIX experience and time in the MTSA position — were pretexts for discrimination.

21

Ms. Dworsky promoted Mr. Miller because, based on Ms. Dworksy's business judgment, he deserved promotion due to his level of experience, his overall performance and competency, his technical skills with the UNIX operating system, and his time within the MTSA position. (A229.) Mr. Miller had been developing his capabilities for a number of years, and had consistently performed well in his position. (A222-24, 229-30.) Ms. Dworsky also determined that Mr. Miller qualified for the SMTS position because he was able to work independently on important technical projects without direct supervision; provide technical direction and guidance to others; handle various tasks involving a variety of computer programs; deal with outages on the network; independently manage a "category one" problem; was skilled in advanced troubleshooting; and because he possessed strong decision-making capabilities. (A229-30.) Ms. Dworsky did not believe that Plaintiff possessed these same skills. (A230-31.)

Plaintiff had only been programming in UNIX for about two (2) years, and Ms. Dworsky did not believe that Plaintiff possessed the same level of computer skills and technical expertise. (A230-31; Pl. Dep. at A21-23, 41-42.) Additionally, in February 2002, when Plaintiff went out on full-time medical leave, Plaintiff had only held the MTSA position for less than two years, far less time in her position than Mr. Miller had when he was promoted. (Pl. Dep. at A35-37, A60.) In order to be qualified for the SMTS position, Ms. Dworsky believed that Plaintiff needed to progress with her UNIX competency to the point at which she could work more independently, improve her decision-making capabilities, improve her troubleshooting skills and demonstrate increased proficiency in the UNIX operating system. (A231.)

Moreover, Plaintiff had been out on full-time medical leave since February 2002. (A230.) Ms. Dworsky did not consider Plaintiff for a promotion at the time that Mr. Miller was promoted in July 2002. (A230.). Indeed, it would have been strange for her to do so and inconsistent with standard CSC practice and policy to promote an employee out on extended medical leave, not knowing if she was going to return to work. (A230, 236.) Ms. Dworsky has never promoted any employee while the employee was out on medical leave. (A230.)

Simply put, there is absolutely no evidence that race was a factor in any promotion decision.

The promotion of a better qualified candidate is a legitimate and non-discriminatory reason for preferring the successful applicant over the rejected employee. *See, e.g., Berry v. Jacobs IMC, LLC*, 2004 WL 1179270, at * 409 (3d Cir. May 27, 2004) (employer provided non-discriminatory reasons for promotion, including the other candidate's "excellent credentials and experience" and the employer's business judgment that plaintiff was not qualified for the position) (attached at A139-43); *Lewis v. State of Del. Dept. of Public Instruction*, 948 F. Supp. 352, 361 (D. Del. 1996) (non-discriminatory reason includes conclusion that the other candidate "was more qualified than plaintiff and plaintiff was not a 'team player'"); *Ferguson v. E.I. DuPont de Nemours and Co.*, 560 F. Supp. 1172, 1193 n.48 (D. Del. 1983) ("The reasons primarily focused upon the superior qualifications of the individual--a recognized legitimate reason.") (citations omitted); *Scaria v. Rubin*, 117 F.3d 652 (2d Cir. 1997) (no violation of Title VII because the successful applicant for the promotion had superior knowledge of relevant procedures and areas of expertise required for the new position).

Importantly, Plaintiff can point to no evidence that CSC's articulated reason for not promoting her was a pretext for discrimination. As made clear by the Third Circuit Court of Appeals, "to discredit the employer's proffered reason [as pretextual], the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

Indeed, the federal courts repeatedly have recognized that an employer's decisions regarding employee status, such as promotion decisions, are entirely within the employer's prerogative, particularly when, as here, the decision-making process includes an analysis of skills essential to certain functions. *See Ezold*, 983 F.2d at 527 (cautioning against "'unwarranted invasion or intrusion' into matters involving professional judgments about an employee's

23

qualifications for promotion") (citation omitted); *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) ("Barring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions."), *overruled in part on other grounds by St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).

Plaintiff admits that she does not know anything about Mr. Miller's technical experience, nor how long he had been an MTSA before he was promoted to SMTS. (Pl. Dep. at A81; A90.) In fact, Plaintiff conceded that she did not know whether or not Mr. Miller deserved to be promoted. (Pl. Dep. at A91-92.)

Plaintiff's mere speculation that the reason she was not promoted to SMTS was because of her race is insufficient as a matter of law to defeat summary judgment. *See Berry*, 2004 WL 1179270, at *409 (plaintiff did "not offer[] any evidence beyond his own conclusory allegation that [defendant] discriminated against him based on race....[t]hus, there was insufficient evidence to support the claim of pretext.") (attached at A139-43); *Edwards v. Pennsylvania Turnpike Comm'n*, 2003 WL 22508498, at *2 (3d Cir. Nov. 5, 2003) (summary judgment properly granted because plaintiff did "not present[] any evidence from which a reasonable fact finder could find she was more qualified than the applicants who were recommended for the position.") (attached at A144-47); *McLaughlin v. Diamond State Port Corp.*, 2004 WL 3059543, *9 (D. Del. 2004) ("Since [Plaintiff] has not presented evidence that she was more qualified than the people who ultimately prevailed [in receiving a promotion], her argument that the subjective promotion process gives rise to an inference of discrimination must fail.") (attached at A264-74.)

The only evidence Plaintiff has offered that is related in any way to her race is a question posed by Dawn Dworsky to Plaintiff, in which Ms. Dworsky purportedly asked Plaintiff "why do Black people dress up for church and why is the music so loud?" (Pl. Dep. at A136.) In response, Plaintiff allegedly stated that she "could not speak for all Black people." (Pl. Dep. at A136.) Ms. Dworsky admits that she posed an inquiry to a group of employees while Plaintiff

24

was present regarding church practices after she visited a church with her African-American babysitter. (A232.) Ms. Dworsky did not ask the question in a disrespectful manner and was simply asking about the cultural practices of the church. (A232.) Plaintiff did not show offense at the time, and never informed Ms. Dworsky that she was offended by the comment (A232; Pl. Dep. at A137.)[13]

Such a stray remark, completely unrelated to the decision-making process, is simply insufficient evidence of pretext to satisfy Plaintiff's burden under the law. *See Johnson v. Gober*, 2003 WL 22967266, at *459-60 (3d Cir. Dec. 18, 2003) (isolated inappropriate remark made by a decision maker, unrelated to the decision-making process, was not sufficient evidence to establish that employer's proffered reason for failing to promote plaintiff was a mere pretext for discrimination) (attached at A148-53) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 227 (1989) (O'Connor, J., concurring); *Fuentes v. Perskie*, 32 F.3d 759, 766 (3d Cir. 1994) (holding alleged stray remark, standing alone, did not present sufficient evidence to establish pretext); *Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight."); *Johnson v. E.I. DuPont de Nemours & Co.*, 60 F. Supp.2d 289, 294 (D. Del. 1999) (same), *aff'd*, 208 F.3d 206 (3rd Cir. 2000).

Simply put, ***Plaintiff has no evidence that CSC's decision not to promote her was anything more than a legitimate exercise of business judgment regarding whether her skills warranted promotion, which this Court is not permitted to second-guess.*** *See, e.g., Brewer v.*

---

13  Plaintiff did report the comment to Ms. Summers in Human Resources, who, in turn, reported the comment to her supervisor, Ms. Koplowicz. (A233-34, 244.) Ms. Summers and Ms. Koplowicz questioned Ms. Dworsky about the statement, who admitted to asking about the cultural practices of an African-American church but denied she meant it in a disrespectful manner. (A233-34, 244.) Ms. Koplowicz advised Ms. Dworsky that, although she genuinely intended to inquire about a specific practice, she must be careful with her statements because some statements may be misconstrued or taken out of context. (A244.)

*Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("[W]e do not sit as a super-personnel department that reexamines an entity's business decisions."); *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) ("[T]he court must respect the employer's unfettered discretion to choose among equally qualified candidates."). Importantly, ***Plaintiff even admitted that an employer has the right to evaluate between two candidates to determine which, in the employer's business judgment, is the most qualified candidate, and that experience, education and seniority are valid considerations in the employer's decision-making process.*** (Pl. Dep. at A73.)

Based on the foregoing, Defendant is entitled to summary judgment on Plaintiff's race discrimination claim arising out of her claim for failure to be promoted to SMTS.

## III.    PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF LAW.

Plaintiff also alleges that she suffered unlawful retaliation under Title VII and Section 1981 in the form of purported isolation from her co-workers, and due to her termination from employment. (Pl. Dep. at A4-6.)[14]  For the reasons set forth below, CSC is entitled to summary judgment on Plaintiff's retaliation claim as well.

In order to prove unlawful retaliation, Plaintiff must show: "(i) that she engaged in a protected activity;  (ii) that she suffered an adverse employment decision;  and (iii) that there was a causal connection between the protected activity and the adverse employment decision." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1299 (3d Cir. 1997) (quoting *Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir. 1995)); *Charlton v. Paramus Bd. of Ed.*, 25 F.3d 194, 201 (3d Cir. 1994).  If a *prima facie* case is made, then CSC must proffer a legitimate, non-retaliatory reason for the adverse decision, and thereby rebut the presumption of retaliation raised by

---

[14]  Although it is not clear from Plaintiff's Complaint whether she has brought her retaliation claim under both Title VII and Section 1981, Defendant assumes solely for purposes of this Motion that she has. The same standards of proof apply to retaliation claims brought under Title VII and Section 1981. *See Schatzman v. Martin Newark Dealership, Inc.*, 158 F.Supp.2d 392, 401 n.5 (D. Del. 2001).

Plaintiff's *prima facie* case. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003). Once CSC produces a legitimate, non-retaliatory explanation, Plaintiff bears the ultimate burden of proving that CSC's proffered reason is pretextual. *See id.*

For the reasons stated below, Plaintiff does not have evidence that is even sufficient to establish a *prima facie* case of retaliation, and, alternatively, cannot show that CSC's legitimate, non-retaliatory reason for Plaintiff's termination was pretextual. Nor does Plaintiff present sufficient evidence of isolation to survive summary judgment.

**A.    Plaintiff Cannot Establish A *Prima Facie* Case Of Retaliation.**

**1.    Plaintiff's Purported "Isolation" Does Not Rise To The Level Of An Adverse Employment Action.**

Plaintiff alleges that she suffered retaliation when her co-workers allegedly isolated her and ceased communicating with her. (Pl. Dep. at A4-6.) Importantly, ***Plaintiff*** was the one who isolated herself, stopped talking to members of the group, and ignored social invitations from the group. (A224, 232, 238-39, 241.)

However, assuming *arguendo*, that Plaintiff was the victim of isolation on the part of her co-workers, such a fact would not support Plaintiff's retaliation claim, because isolation does not rise to the level of an adverse employment action. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) ("isolation and lack of respect from fellow managers and co-workers did not amount to adverse employment action"); *Munday v. Waste Management, Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (the concept of an "adverse employment action" does not "encompass a situation where the employer has instructed employees to ignore and spy on an employee who engaged in a protected activity."); *Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 693 (8th Cir.1997) (holding that evidence of "disrespect and ostracization by ... supervisors" did not establish an adverse employment action); *Strother v. Southern Cal. Permanente Med. Group*, 79 F.3d 859 (9th Cir. 1996) ("[M]ere ostracism in the workplace is not enough to show an adverse employment decision."); *c.f. Lafate v. Chase Manhattan Bank*, 123 F. Supp.2d 773, 786 (D. Del.

2000) ("not everything that makes an employee unhappy 'qualifies as retaliation for otherwise, minor and even trivial employment actions that an irritable chip-on-the-shoulder employee did not like would form the basis of a [retaliation claim].'") (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).

Accordingly, without an adverse employment action, Plaintiff cannot establish a *prima facie* claim of retaliation based upon the isolation that she purportedly suffered, and, accordingly, CSC is entitled to summary judgment on that claim.

### 2. Plaintiff Cannot Establish That A Causal Connection Existed Between Her Termination and Her Protected Activities.

Plaintiff cannot show that her termination from employment was retaliatory because she cannot establish that a causal connection existed between CSC's decision to terminate her employment and her protected activities. Plaintiff filed her charge of discrimination on July 5, 2001. (D.I. 1 at ¶ 36.) Plaintiff, however, was not terminated from CSC until September 27, 2002. (Pl. Dep. at A132.) A temporal distance of nearly 15 months is, as a matter of law, simply too great to support an inference of causation. *See, e.g., Wagner v. Berwick Industries,* 2004 WL 2931049 (3d Cir. Dec. 20, 2004) (4 month lag is too long to establish causal connection) (attached at A154-56); *Goosby v. Johnson & Johnson Med. Inc.*, 288 F.3d 313, 323 (3d Cir. 2000) (finding that plaintiff's complaint of discrimination a year before his discharge was not temporally proximate to establish causal connection); *Taylor v. Procter & Gamble Dover Wipes*, 184 F.Supp.2d 402, 417 (D. Del. 2002) (12 month period too remote), *aff'd*, 2002 WL 31716395 (3d Cir. Dec. 4, 2002); *Johnson v. E.I. DuPont de Nemours & Co.,* 60 F. Supp.2d 289, 297 (D. Del. 1999) (10 month period too remote), *aff'd*, 208 F.3d 1206 (3d Cir. 2000); *c.f. Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding, in retaliation case under Title VII, that reliance on temporal proximity must be "very close" to show causation and citing cases where the passage of several months disallowed finding of causation) (citing *Richmond v. ONEOK, Inc.*,

120 F.3d 205, 209 (10th Cir. 1997) (3 month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (4 month period insufficient)).

In the instant case, the temporal lag of nearly 15 months between the date of Plaintiff's charge and her termination is far too long to support any inference of causation, and, thus, Plaintiff cannot establish a *prima facie* case of retaliation on the basis of her termination.

### B.     CSC Had A Legitimate Non-Retaliatory Reason For Terminating Plaintiff — Her Failure To Provide Medical Documentation — Which Had Nothing To Do With Her Protected Activity And There Is No Evidence Of Pretext.

Moreover, Plaintiff cannot show that the reason for her termination from employment — her failure to timely submit requisite medical certifications during her medical leave of absence pursuant to CSC's well-publicized Leave of Absence Policy — was a pretext for retaliation. Plaintiff admits that she was well aware of her obligation to submit medical certifications to CSC every thirty days during her medical leave of absence.  (Pl. Dep. at A30-32, 106-11, 113-16.) Plaintiff also concedes that she knew that her failure to comply with this obligation would give CSC the right to terminate her employment.  (Pl. Dep. at A32, 109-11, 119-27.)  Indeed, Plaintiff even acknowledged that her failure to comply with CSC's Leave Policy could be grounds for termination:

> Q.  You understood that it was your obligation to comply with the policies of the company?
>
> A.  Yes.
>
> Q.  You understood that if you failed to comply with the policies of the company that you could be terminated?
>
> A.  Yes.
>
> ….
>
> Q.  There are other [CSC] policies related to … leaves of absence … ?
>
> A.  Yes.
>
> Q.  You understood it was your obligation to comply with those policies?
>
> A.  Yes.

(Pl. Dep. at A32.)

If CSC truly intended to retaliate against Plaintiff for engaging in protected activity, CSC could have terminated Plaintiff's employment the very first time that Plaintiff failed to timely submit a medical certification, back in December 2001 (when Plaintiff submitted her medical certification nearly two weeks late). (A253-54, 58-61.) CSC did not do so, however; rather, it provided Plaintiff with numerous chances to comply with its Leave Policy, and gave Plaintiff countless reminders and warnings regarding the potential consequences she would suffer if she continued to fail to comply. (A235-36, 253-56.) Plaintiff was repeatedly told in writing that she needed to get her medical documentation in on time — but she was repeatedly late in providing her medical information. (A207-21, 235-36, 253-56.) In fact, Plaintiff failed to provide timely medical documentation on more than four separate occasions. (A207-14, 254.)

Moreover, Plaintiff was told in writing on at least the following occasions that a failure to provide timely medical documentation will be grounds for termination: August 14, 2001, February 25, 2002, May 21, 2002, and June 20, 2002. (A202, 211, 214-16, 235-36, 253-56; Pl. Dep. at A108-09, 119-32.) After numerous repeated warnings, Plaintiff failed to provide medical documentation again in September 2002. (A235-36, 244-45; Pl. Dep. at A128-130.) Faced with a lack of medical documentation as of September 26, 2002, and no medical documentation having been provided for nearly two weeks after it was due, CSC had no choice but to consider Plaintiff to have voluntarily resigned and terminated her employment. (A235-36, 244-45.)

CSC's policy could not be more clear:

> *A certificate of disability from the attending physician is required every thirty days from the date the medical leave is commenced. Any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation....*

(A195.) (emphasis added.) CSC complied with its policy and there is no evidence of any retaliatory motive on the part of Sonia Koplowicz or Maureen Summers in making the termination decision. (A235-36, 244-45.) Plaintiff's charge of discrimination nearly 15 months

prior to the termination had absolutely no bearing on Ms. Koplowicz's and Ms. Summers' decision and Plaintiff has no evidence to dispute that. (A235-36, 244-45.)

In addition, any argument that Plaintiff's termination for failure to submit a medical certificate was a pretext for retaliation is undermined by the fact that similarly situated employees who had not previously filed charges of discrimination were also terminated for the same reason as Plaintiff. (A256.) For instance, CSC terminated both Aliza Panitz (Caucasian female) and Monte Moser (Caucasian male) due to their failure to provide requisite medical certifications related to their medical leaves of absence in accordance with CSC's Leave of Absence policy. (A256.) The treatment of Ms. Panitz and Mr. Moser reinforces CSC's position that Plaintiff's separation from employment was wholly unrelated to Plaintiff's protected activity. Indeed, Plaintiff cannot identify a single employee that failed to provide medical documentation in a timely manner, as Plaintiff failed to do, who was not terminated. (Pl. Dep. at A133-34, 135.)

These facts, coupled with Plaintiff's complete lack of direct evidence of retaliation, prevent Plaintiff from establishing an actionable claim of retaliation.

Based on the above, there is simply no evidence of a causal nexus between Plaintiff's protected activity and her termination. The mere fact that Plaintiff filed an EEOC charge does not, in and of itself, create an inference that everything that happened after that point, which Plaintiff did not like, was caused by the fact that she had filed her charge. Plaintiff's subjective belief that she was subject to retaliation, by itself, is insufficient. *Baker v. Wilmington Trust Co.*, 320 F.Supp.2d 196, 202 (D. Del. 2004) (plaintiff's conclusory allegations were insufficient to support a claim for retaliation); *Johnson v. E.I. DuPont de Nemours & Co.*, 60 F.Supp.2d 289, 297 (D. Del. 1999) ("Plaintiff's conclusory allegations do not constitute sufficient evidence to defeat a motion for summary judgment."). Accordingly, CSC is entitled to judgment as a matter of law on Plaintiff's claim of retaliation arising out of her separation from employment.

IV.    **PLAINTIFF'S EQUAL PAY ACT CLAIM FAILS AS A MATTER OF LAW.**

Plaintiff also contends that CSC violated the Equal Pay Act with respect to her compensation, contending that men were paid more than women in the group supervised by Ms. Dworsky. (Pl. Dep. at A2-3.) Plaintiff's claim under the Equal Pay Act cannot withstand summary judgment for the reasons addressed below.

The Equal Pay Act prohibits employers from discriminating between employees in their wages "on the basis of sex" unless such differences are because of "(i) a seniority system; (ii) a merit system; (iii) a system which measures earning by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Accordingly, the Equal Pay Act only prohibits discriminatory compensation on the basis of sex. *See id.*

Importantly, during the time that Plaintiff was employed in CSC's Dazel subgroup, *a woman was the highest paid member of that group.* (A231, 236.) As is evidenced by the salary history of the employees in the Dazel subgroup as of the period in time that Plaintiff filed her charge of discrimination, MaryAnne Doll-Johnson was the highest paid employee in the group:

|  | Sex | Salary | CSC Service Date[15] |
|---|---|---|---|
| MaryAnne Doll-Johnson | F | $64,518.90 | 6/18/84 |
| Randall Miller | M | $61,534.93 | 5/14/84 |
| Diane Poland | F | $49,345.92 | 11/10/97 |
| Audrey Daigger | F | $31,869.96 | 1/02/01 |

(A231, 236-37.) The fact that a woman was the highest paid member of the Dazel subgroup clearly undermines any contention that CSC discriminated on the basis of sex.

---

[15] The "CSC Service Date" refers to the length of time that an employee has worked either directly for CSC or DuPont, one of CSC's largest customers, and a predecessor employer for many of CSC's employees. (A236-37.)

Furthermore, Plaintiff cannot establish a violation of the Equal Pay Act because the differential in Mr. Miller's and Plaintiff's salaries was based upon factors other than sex. Importantly, one of the main reasons that Mr. Miller received a higher salary than Plaintiff was because of his experience and his longevity with the company, based upon his CSC service date. (A231, 236-37.)  *See Shanley v. Salesianum School*, 1995 WL 628401, at *10 (D. Del. Apr. 27, 1995) (considering experience an appropriate factor upon which to base compensation) (attached at A157-65);  *see also Strag v. Board of Tr.*, 55 F.3d 943, 950 (4th Cir. 1995) (granting summary judgment for defendant where comparator had twenty-four years of teaching experience while plaintiff had only nine);  *Jordan v. CSX Intermodal, Inc.*, 991 F. Supp. 754, 758 (D. Md. 1998) (granting summary judgment for defendant where comparator had over ten years of work experience as a manager before joining defendant company).  Mr. Miller had been employed with CSC and its predecessor, DuPont, for 18 years, much longer than Plaintiff, who had only been employed by CSC for five years.[16]  (A231, 236-37.)  Consequently, Mr. Miller had gradually earned a higher salary over that time period, whereas Plaintiff started only a few years ago. (A231, 236-37.)  Seniority with a company is clearly a legitimate reason to pay a male employee more than a female employee.  In any event, it was a female that was paid more than Mr. Miller, demonstrating, by definition, that the sex of the employees was not a factor in compensation. (A231, 236-37.)

Based on the foregoing, CSC is entitled to summary judgment on Plaintiff's claim brought under the Equal Pay Act.

## V. PLAINTIFF'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAILS AS A MATTER OF LAW.

Count VI of the Complaint alleges a breach of the implied covenant of good faith and fair dealing under Delaware law.  "The Delaware Supreme Court has strictly limited the application

---

[16] Plaintiff was never employed by DuPont.  (Pl. Dep. at A8-15.)

of the implied covenant in the employment context, holding that a Plaintiff must establish that he or she falls into one of four exclusive categories." *Cimino v. Del. Dep't of Labor*, 2002 U.S. Dist. LEXIS 2979, at *10-11 (D. Del. Feb. 25, 2002) (attached at A172-79) (citing *Lord v. Sounder*, 748 A.2d 393, 401 (Del. 2000) (noting further that the covenant serves as a limited exception to the employment at-will doctrine)). One of these categories is implicated "where the termination violated public policy."[17] *See Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 334 (3d Cir. 2003) (applying Delaware law). A claim of breach of the implied covenant "requires employer conduct amounting to fraud, deceit, or misrepresentation." *Cimino*, 2002 U.S. Dist. LEXIS 2979, at *11 (A172-79.) Further, the existence of this cause of action does not "limit[] an employer's freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons." *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 103 (Del. 1992).

At deposition, Plaintiff was unable to identify how CSC purportedly breached the implied covenant. (Pl. Dep. at A6.) Plaintiff's Complaint, however, alleges that CSC breached the covenant by "discriminating and retaliating against Plaintiff." D.I. 1 at ¶ 88. Accordingly, based on the allegations in Plaintiff's Complaint, her cause of action for CSC's purported breach of the covenant of good faith and fair dealing is based upon the same set of facts as her claims for discrimination and retaliation. Because, for all of the reasons detailed above, Plaintiff cannot establish that CSC discriminated against her on the basis of her race or sex, or establish that CSC retaliated against her for engaging in protected activity, Plaintiff also cannot establish that CSC breached the covenant of good faith and fair dealing. Therefore, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law, and CSC is entitled to summary judgment.

---

[17] The other three exclusive categories do not appear to be implicated in this case. *See Conneen*, 334 F.3d at 334.

VI.  **THE DETERMINATIONS OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION AND THE DELAWARE DEPARTMENT OF LABOR DO NOT DEFEAT SUMMARY JUDGMENT AND ARE BASED UPON MATERIAL ERRORS OF FACT.**

Undoubtedly, Plaintiff will attempt to rely upon the determinations of the Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor ("DDOL") in an attempt to oppose this Motion for Summary Judgment. These determinations, however, do not defeat summary judgment and were based upon incorrect and incomplete factual findings.

First, courts have specifically found that a finding of discrimination by the EEOC or a state agency is insufficient to defeat summary judgment and does not create a material dispute of fact. *Simms v. Oklahoma ex rel. Dep't of Mental Health,* 165 F.3d 1321, 1331 (10th Cir. 1999) ("when the independent facts before the district court judge fail to establish a genuine issue of material fact, a favorable EEOC letter of determination does not create one" and holding that "plaintiff has provided insufficient evidence for a reasonable jury to conclude that defendant's proffered reason for not promoting [plaintiff]--that Mr. Valley was more qualified--was unworthy of belief."); *Williams v. Aviall Services, Inc.*, 2003 WL 21018567, at *5 (N.D. Tex. 2003) ("an administrative agency's determination of discrimination does not, by itself, create a genuine issue of material fact regarding discrimination.") (attached at A166-71), *aff'd* 2003 WL 22078583 (5th Cir. Sept. 8, 2003); *Williams v. Alabama Indus. Dev't Tra'g*, 146 F. Supp.2d 1214, 1224 (M.D. Ala. 2001) (rejecting plaintiff's argument that "the EEOC determination alone creates a genuine issue of fact," and stating that "EEOC investigators usually are kindly people…[b]ut there should be no confusion that they cannot usurp the judiciary's role in determining whether there is a genuine issue of material fact."); *Bynum v. Fort Worth Indep. Sch.*, 41 F. Supp.2d 641, 657-58 (N.D. Tex. 1999) (finding, on defendant's motion for summary judgment, that the EEOC letter of determination in favor of plaintiff could not create an issue of fact where the rest of the record established that defendant did not discriminate against plaintiff); *Dickerson v. Department of*

*Human Services*, 767 F. Supp. 605, 612 (D. N.J. 1991) ("EEOC letters of determination … may be excluded in situations where the administrative decision has been shown to be particularly untrustworthy.").

Importantly, the DDOL and EEOC made their respective determinations without all of the relevant evidence. For instance, at the time they issued their determinations, neither the DDOL nor the EEOC had access to Plaintiff's detailed deposition testimony, consisting of more than 350 pages of testimony. Moreover, at this stage of the case, the parties have gone through the discovery process and have exhaustively reviewed thousands of pages of documents, numerous pages of which neither administrative agency ever saw. Further, neither the DDOL nor the EEOC interviewed many of the relevant witnesses on behalf of CSC, including Sonia Koplowicz, Simmie Osborn, Randall Miller, MaryAnne Doll-Johnson, Dahl Landers, Beth Musumeci, among others. As discussed in detail above, Plaintiff's deposition testimony, when taken in conjunction with the rest of the admissible evidence presented in support of this Motion, conclusively establishes that CSC did not discriminate against Plaintiff on the basis of her race or sex, and did not retaliate against her because she engaged in protected activity. Accordingly, the agencies' determinations were not made with the benefit of all of the relevant information, and, thus, should be excluded from consideration by the Court.

Furthermore, each of the determinations committed glaring errors in fact-finding. For instance, both the EEOC and the DDOL made factual mistakes with regard to one of the most important facts of the case: Mr. Miller's years of relevant computer skills in comparison to Plaintiff's. The undisputed evidence proves that, at the time that Mr. Miller was promoted to the SMTS position, Mr. Miller had 10 years of UNIX experience and Plaintiff had about two years of UNIX programming. (A222-24, 229-31; Pl. Dep. at A21-23, 41-42.) Both the DDOL and the EEOC based their determinations on the fact that Plaintiff suffered discrimination in the promotion decision upon the inaccurate "fact" that Mr. Miller had less computer skills than

Plaintiff. Plaintiff admitted during her deposition that she does not know anything about Mr. Miller's technical experience. (Pl. Dep. at A81, 90.) Accordingly, it is undisputed that Mr. Miller had more UNIX and technical experience than Plaintiff.

Similarly, the EEOC relied upon a mistake in fact in reaching its determination that CSC retaliated against Plaintiff by terminating her employment. Specifically, the EEOC found that whereas CSC purportedly claimed that Plaintiff "failed to provide required medical certification," "the evidence shows that this medical certification was supplied." CSC, however, never asserted that Plaintiff did not eventually submit medical certification — only that no medical certification had been provided by the time of the termination and that her continuing certification had been due for nearly two weeks. (A219-21, 236, 245, 256; Pl. Dep. at A128-30.) Plaintiff's certification was not submitted to CSC until September 29, 2002, over two weeks after the certification was due under the terms of CSC's Leave Policy and two days after Plaintiff had been terminated. (A219-21, 236, 245, 256; Pl. Dep. at A128-30.)

Plaintiff was terminated for failing to provide a *timely* medical certification in accordance with CSC's Leave Policy, which explicitly provides that an employee is deemed to have voluntarily resigned if he or she does not submit a medical certification every thirty days during a medical leave of absence. (A195, 236, 245, 252, 256; Pl. Dep. at A108-09.) Plaintiff's failure to provide any medical certificate by the time of the termination, and after nearly two weeks past its due date, was the basis for the termination — and there is no evidence contradicting this reason. (A237, 245.) Moreover, there is nothing to suggest, other than pure speculation, that Plaintiff's termination in September 2002, was in any way related to her filing a charge of discrimination nearly 15 months before in July 2001. Such speculation is insufficient to defeat summary judgment. *See Messina v. E.I. Du Pont de Nemours and Co.*, 308 F.Supp.2d 491, 495 n.10 (D. Del. 2004) (plaintiff's "unsupported and conclusory allegations are insufficient to defeat a claim for summary judgment").

37

The EEOC also found that Plaintiff suffered retaliation because she "was not afforded the benefit of having up to twelve months of unpaid leave, as set forth in Respondent's leave policy." In reaching this determination, the EEOC simply was incorrect about the benefits provided under CSC's Leave Policy, which explicitly provides that continuation of an employee's medical leave is contingent upon an employee providing a medical certification every thirty days — something Plaintiff did not do. (A193-201, 235-36, 244-45, 253-56.) Had Plaintiff complied with the Leave Policy she would have been entitled to the full twelve months of unpaid leave — her own failure to comply with the policy is what led to her termination. (A236, 245.)

Further, the DDOL mistakenly found that CSC denied Plaintiff the opportunity to transfer to another team, despite assurances that she would be transferred. The relevant evidence, however, conclusively establishes the falsity of this conclusion. (A228-29, 234-35, 243, 248-51, 262-63; Pl. Dep. at A85-88, 96-99.) Plaintiff was offered opportunities to transfer; she simply declined to take them. (A228-29, 234-35, 243, 248-51, 262-63; Pl. Dep. at A85-88, 96-99.)

Importantly, not only are the determinations of the EEOC and DDOL based upon mistakes of fact, they also set forth inconsistent conclusions. For instance, although the DDOL found that Plaintiff suffered discriminatory pay on the basis of her gender, the EEOC specifically determined that she did not receive discriminatory compensation on the basis of her sex because "the record shows that another female member received the highest salary." In addition, the DDOL found that CSC retaliated against Plaintiff by denying her opportunities to transfer to another team. The EEOC, however, did not find that Plaintiff suffered retaliation on this basis. If the EEOC and the DDOL reached conflicting determinations based upon incomplete and inaccurate facts, how could Plaintiff possibly expect this Court to rely upon them to save her from summary judgment?

Accordingly, the EEOC and DDOL determinations are based upon material errors and omissions in fact, are conflicting in conclusion and do not defeat summary judgment.

38

## CONCLUSION

For the foregoing reasons, CSC respectfully requests that its motion for summary judgment be granted in all respects.

By: _Sarah E. DiLuzio_
Sarah E. DiLuzio (#4085)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, Delaware  19801
(302) 984-6000 (general)
(302) 984-6048 (direct)
(302) 658-1192 (fax)
sdiluzio@potteranderson.com

Of counsel:
Larry R. Seegull
Amy Beth Leasure
DLA PIPER RUDNICK GRAY CARY US LLP
6225 Smith Avenue
Baltimore, Maryland  21209
(410) 580-3000 (general)
(410) 580-4253 (direct)
(410) 580-3253 (fax)
larry.seegull@dlapiper.com
Counsel for Defendant
*Computer Sciences Corporation*