IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                                )
                                             )
            Plaintiff,                       )
                                             )
      v.                                     )          C.A. No. 04-217 (GMS)
                                             )
COMPUTER SCIENCES CORP.,                     )
                                             )
            Defendant.                       )
_____)

**APPENDIX TO DEFENDANT'S OPENING BRIEF IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

Sarah E. DiLuzio (#4085)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, Delaware 19801

(302) 984-6000 (general)
(302) 984-6048 (direct)
(302) 658-1192 (fax)
sdiluzio@potteranderson.com


Of counsel:
Larry R. Seegull
Amy Beth Leasure
DLA PIPER RUDNICK GRAY CARY US LLP
6225 Smith Avenue
Baltimore, Maryland 21209
(410) 580-3000 (general)
(410) 580-4253 (direct)
(410) 580-3253 (fax)
larry.seegull@dlapiper.com

Counsel for Defendant
*Computer Sciences Corporation*

Date: May 6, 2005

## TABLE OF CONTENTS

**Appendix Pages**

Excerpts of Transcript of Deposition of Diane Poland.........................................A1 to A138

*Berry v. Jacobs IMC, LLC*, 2004 WL 1179270 (3d Cir. May 27, 2004)......................A139-43

*Edwards v. Pennsylvania Turnpike Comm'n*,
    2003 WL 22508498 (3d Cir. Nov. 5, 2003)............................................A144-47

*Johnson v. Gober*, 2003 WL 22967266 (3d Cir. Dec. 18, 2003).............................A148-53

*Wagner v. Berwick Industries*, 2004 WL 2931049 (3d Cir. Dec. 20, 2004)..................A154-56

*Shanley v. Salesianum School*, 1995 WL 628401 (D. Del. Apr. 27, 1995)....................A157-65

*Williams v. Aviall Services, Inc.*, 2003 WL 21018567 (N.D. Tex. Feb. 12, 2003)............A166-71

*Cimino v. Delaware Dep't of Labor*,
    2002 U.S.Dist. LEXIS 2979 (D. Del. Feb. 25, 2002)..................................A172-79

Salary Reports for Diane Poland...............................................................A180-83

Job Description for Member Technical Staff A Position..........................................A184

Overall Merit Guidelines.....................................................................A185

March 14, 2001 Letter from Human Resources to Diane Poland
    Regarding Offer of Reassignment to the Chemical Group
    for the position of Leverage Server Administration Supervisor...........................A186

March 20, 2001 Letter from Human Resources to Diane Poland
    Regarding Revised Offer of Reassignment to the Chemical
    Group for the position of Leverage Server Administration Supervisor...................A187

Leave of Absence Without Pay Policy from the
    Computer Science Corporation Employee Handbook.................................A188-92

Human Resources Management Policy
    ("HRMP") 247 Regarding Leave of Absence Without Pay.........................A193-201

Diane Poland's August 6, 2001 Request for Medical Leave of Absence......................A202

Responsibilities While You Are On a Leave
    of Absence–Medical Leave—FMLA Eligible Form....................................A203

August 8, 2001 Letter from Simmie Osborn to
    Diane Poland Regarding Ms. Poland's Rights
    Under the Family and Medical Leave Act and
    Responsibilities Under the Company's Leave of Absence Policy...................A204-06

E-mails from Simmie Osborn to Diane
    Poland (December 12, 2001, January 4, 2002,
    and January 24, 2002) Regarding Ms. Poland's
    Duty to Submit Updated Medical Certifications........................................A207-10

February 25, 2002 Letter from Maureen Summers
    to Diane Poland Regarding Ms. Poland's
    Obligations Under the Company's Leave of Absence Policy.............…..................A211

E-mail from Simmie Osborn to Diane Poland
    (March 18, 2002) Regarding Ms. Poland's
    Obligations Under the Company's Leave of Absence Policy........................…..A212-13

May 21, 2002 Letter from Maureen Summers
    to Diane Poland Regarding Ms. Poland's
    Duty to Submit Updated Medical Certifications…........................................A214

June 20, 2002 Letter from Simmie Osborn to
    Diane Poland Regarding Her Duty
    to Submit Updated Medical Certifications…..............................................A215-16

June 14, 2002 Medical Certification
    From Dr. Scott Houser Regarding
    Diane Poland's Medical Condition............…...........................................…..A217-18

September 29, 2002 Facsimile of Medical
    Certification from Dr. Scott Houser
    Regarding Diane Poland's Medical Condition.............................…...……......A219-20

September 26, 2002 Letter from Maureen Summers to
    Diane Poland Regarding Voluntary Resignation…...….................................…...…A221

Affidavit of Randall Miller.................................................................................…...A222-24

Affidavit of Dawn Dworsky..............................................................................…..A225-32.1

Affidavit of Maureen Summers.................................................................…A233-37

Affidavit of MaryAnne Doll-Johnson.......................................................…..-A238-41

Affidavit of Sonia Koplowicz..............................................................…....-A242-45

Affidavit of Edwin Derek Alston............................................................…A246-47

Affidavit of Jennifer Miller....................................................................…A248-49

Affidavit of Dahl Landers....................................................................…A250-51

Affidavit of Simmie Hoeft..................................................................…..A252-61

Affidavit of Beth Musumeci...........................................................................A262-63

*McLaughlin v. Diamond State Port Corp.*, 2004 WL 3059543 (D. Del. 2004).............A264-274

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                    )
                                 )
            Plaintiff,           )
                                 )        Civil Action
v.                               )        No. 04-217 (GMS)
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
            Defendant.           )


        Deposition of DIANE POLAND taken pursuant
to notice at the law offices of Potter, Anderson &
Corroon, 1313 North Market Street, The Hercules Plaza,
Sixth Floor, Wilmington, Delaware, beginning at 9:10 a.m.
on Wednesday, March 30, 2005, before Kathleen White
Palmer, Registered Merit Reporter and Notary Public.


APPEARANCES:


        JEFFREY K. MARTIN, ESQUIRE
        KERI L. WILLIAMS, ESQUIRE
        MARGOLIS EDELSTEIN
           1509 Gilpin Avenue
           Wilmington, Delaware  19806
           for the Plaintiff

        LARRY R. SEEGULL, ESQUIRE
        AMY BETH LEASURE, ESQUIRE
        DLA PIPER RUDNICK GRAY CARY LLP
           6225 Smith Avenue
           Baltimore, Maryland  21209-3600
           for the Defendant


------------------------------------------------------
            WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A -01

Diane Poland                                    5

1      A.    Half hour, I guess, last night and maybe 15,

2    half hour this morning.

3      Q.    Did you talk to anybody else about your

4    deposition other than your attorneys?

5      A.    No.

6                MR. MARTIN:  Off the record for a moment.

7                (Discussion off the record.)

8    BY MR. SEEGULL:

9      Q.    Miss Poland, we are obviously going to be here

10   probably the whole day and we'll be getting into more

11   details of your case, of course, but I want to get an

12   overview of what the case is about, if I can.

13               Of course, you filed a complaint against

14   the company, and in that complaint you have several

15   claims.  I believe your first claim is an Equal Pay Act

16   claim where, specifically, you claim that men were paid

17   more than women; is that correct?

18     A.    No.  When I went to the Department of Labor, I

19   went on a discrimination claim and investigations found

20   the other facts.  I didn't know about the gender.

21     Q.    I'm saying in this lawsuit, not what you

22   originally claimed, necessarily, to the Department of

23   Labor, but in this lawsuit you brought a claim that men

24   were paid more than women; is that correct?



WILCOX & FETZER LTD.
Registered Professional Reporters

Diane Poland                    6

1      A.    That's correct.

2      Q.    Specifically you're claiming that that happened

3   in the group supervised by Dawn Dworsky?

4      A.    Yes.

5      Q.    That is your first claim, and that's the Equal

6   Pay Act claim; correct?

7      A.    Well, you keep saying that's my first claim.  My

8   first claim was discrimination.

9      Q.    I don't mean first in terms of order, but that's

10  one of your claims.  Let's put it that way.

11     A.    Okay.  Yes.

12     Q.    Another one of your claims is that you suffered

13  discrimination with respect to promotion based upon your

14  race; is that correct?

15     A.    Yes, that's correct.

16     Q.    Here you believe that Randall Miller and

17  MaryAnne Doll-Johnson, both of whom are white, as I

18  understand it --

19     A.    Yes.

20     Q.    -- were promoted ahead of you because they are

21  white and that you are African-American and you were not

22  promoted; is that right?

23     A.    Not totally.  Randy Miller was the only person I

24  believe that should not have been promoted over me.



Diane Poland                              7

1    Q.    Fair enough.

2          That you believe that Randall Miller was

3    promoted ahead of you because he's white and you were not

4    promoted because you are African-American?

5    A.    Because he's white and because he happened to be

6    a friend of Dawn Dworsky's.

7    Q.    So you're claim racial discrimination; correct?

8    A.    Yes.

9    Q.    Then you have two more claims.

10         Another one of your claims is that you were

11   retaliated against because you were terminated for filing

12   a charge of discrimination and for complaining about

13   discrimination; correct?

14   A.    No.  I was retaliated against because I went to

15   HR to complain about Dawn Dworsky and her discrimination

16   against me.  And then subsequently they fired me.

17   Q.    Let me see if I understand you.

18         You're claiming that you were subject to

19   unlawful retaliation because you complained of

20   discrimination and the way they retaliated against you --

21   A.    One of the ways, yes.

22   Q.    -- and they terminated you when you were on

23   medical leave, and we are going to get into the details

24   of that later; is that correct?



WILCOX & FETZER LTD.
Registered Professional Reporters

A -04

1      A.    That's correct.

2      Q.    Was there some other way that they retaliated

3   against you other than terminating you?

4      A.    Yes.

5      Q.    What is that?

6      A.    There were several things.

7      Q.    Go ahead.

8      A.    Do you want to get into detail?

9      Q.    We don't have to get into detail.  Can you just

10  categorize in some way if you can -- if you can't, we'll

11  deal with it later, but if you can generally categorize

12  the nature of the retaliation?

13     A.    Generally work was taken from me.  I was banned

14  from communication from the team.  I was -- I could not

15  meet with anybody on the team.  I couldn't talk to them.

16  And people in HR were given instruction not to talk to

17  me.

18     Q.    Have you finished your answer?

19     A.    Yes.

20     Q.    Any other way that you've been retaliated

21  against other than the ways -- let's call that isolation.

22  Is that fair to say that you were isolated, you felt?

23     A.    Yes.

24     Q.    So that you were isolated from the group, you



Diane Poland                    9

1    felt, and in addition you were terminated, those were the

2    ways that the company retaliated against you?

3        A.    Some of the ways, yes.

4        Q.    Is there anything else that we haven't talked

5    about?  We are going to explore all the details of that.

6    But anything else other than those two things?

7        A.    Well, that was just the generalization, so yes.

8        Q.    We'll get into the specifics of that later.

9                  Then your last claim is that you have

10   brought a claim based on the breach of the covenant of

11   good faith and fair dealing, and what is that claim based

12   upon?

13       A.    I don't understand that question.

14       Q.    You brought a claim in your complaint for the

15   breach of the covenant of good faith and fair dealing.

16   What is that claim and what is it based upon?

17       A.    I don't know what good faith and fair dealing

18   means.  I don't know what you're saying.

19       Q.    Do you know what the supposed breach was?

20       A.    No.

21       Q.    Let's go back.

22                  Have we now talked about all of your claims

23   in general terms?

24       A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1     Q.    Have you ever been in the military?

2     A.    No.

3     Q.    When did you first contact an attorney to handle

4   your case against Computer Sciences Corporation?

5     A.    I don't remember the exact date, but I know it

6   was after I had spoken with the Department of Labor and

7   they did their investigation, and after working in

8   meetings with HR at CSC, sometime after that.

9     Q.    Would this have been in 2001?

10    A.    Yes.

11    Q.    Late 2001?

12    A.    Yes, I would say late 2001 because the real

13   issues began approximately June, so yes.

14    Q.    The real issues you think began in June of 2001?

15    A.    Approximately, yeah.

16    Q.    Was the attorney you contacted Mr. Martin?

17    A.    No.

18    Q.    Wha  WQQpNt the first attorney you contacted?

19    A.    He was in Philadelphia.  I don't remember his

20   name, but it was a law office in Philadelphia.

21    Q.    Did he represent you?

22    A.    No.  I went in for a consultation and that was

23   pretty much it.

24    Q.    Who was the first attorney you contacted that

1    A.    How long did she take care of me?

2    Q.    Yes.

3    A.    For a long time.  Probably -- a long time.  At

4  least two -- maybe two to three years after that.

5    Q.    So was that from the middle of 1985 until about

6  the middle of 1988?

7    A.    About -- no, actually.  Maybe about '87.

8    Q.    So maybe about two years?

9    A.    Yes, yes.

10    Q.    During that time you weren't working or going to

11  school?

12    A.    I wasn't working.  I got a job at some point,

13  but I don't remember.  I worked for the State.

14    Q.    The State of Pennsylvania?

15    A.    Yes.  United States government.

16    Q.    Oh, the United States government?

17    A.    Mm-hmm.

18    Q.    You have to answer yes.

19    A.    Yes, yes.  I'm sorry.

20    Q.    That's okay.

21    A.    I'm just trying to remember.  I think I worked

22  for the Social Security Administration after I got

23  better.

24    Q.    I'm going to turn to your resume on the second

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A -08

Diane Poland                              29

1    page.  You have a section on "Work History."  I think you

2    got this in reverse chronological order, that being that

3    on the bottom of that section is the earliest position

4    you held and moving up from there; is that correct?

5        A.    Correct.

6        Q.    So just starting at the bottom, it says you were

7    a fiscal technician in the Office of Financial

8    Operations?

9        A.    That's correct.

10       Q.    That was in the Social Security Administration?

11       A.    Yes.

12       Q.    You did that from 1987 until 1993?

13       A.    That's correct.

14       Q.    Where was that?

15       A.    In Philadelphia.  It used to be at 3535 Market,

16   but they're not -- they're no longer in that building.

17       Q.    What does it mean to be a fiscal technician?

18       A.    At the time I administered grants with the

19   professionals there.  I was their administrator.  They

20   would bring in the grants and I would take care of those

21   files for them.

22       Q.    How do you go about administering grants?  What

23   does that involve?

24       A.    For me it just involved filing the paperwork



Diane Poland

30

```
 1    that was put on my desk and returning it to them to speak
 2    with the grantee.
 3         Q.    Do you have any children?
 4         A.    Yes.
 5         Q.    How many children do you have?
 6         A.    A son.
 7         Q.    How old is he?
 8         A.    Eighteen.
 9         Q.    So what is his date of birth?
10         A.    October 27th, 1986.
11         Q.    So you obviously had your child while you were
12    suffering from the kidney condition?
13         A.    No.  I was better by then.
14         Q.    So what were you doing at that point in time if
15    you weren't working and you weren't going to school in
16    1986?  What were you doing?
17         A.    I was at home with my mom.
18         Q.    You weren't sick; correct?
19         A.    I was better.  I was still on meds, but I was
20    better.  I didn't have the pain.
21         Q.    Who is your son's father?
22         A.    Woodrow Wilson, Jr.
23         Q.    You married Mr. Wilson in 1991?
24         A.    No.  We divorced in '92.
```



1        Q.    I'm sorry.  So when did you get married?

2        A.    We got married, I believe, it was August of

3    1986, I guess.  I'm pretty sure.

4        Q.    After the Social Security Administration, the

5    next position you held was a civil communications officer

6    for the Public Safety Division at the University of

7    Pennsylvania?

8        A.    Yes.

9        Q.    That was from 1993 until 1994?

10       A.    Yes.

11       Q.    What did you do in that position?

12       A.    I worked as a civil -- civil communications

13   officer taking calls from university personnel, students,

14   and officers.

15       Q.    Is that what a dispatcher does?

16       A.    Yes, yes.

17       Q.    So you were a dispatcher?

18       A.    In essence, yes.

19       Q.    The next position you held was in the PENN Card

20   Center, office manager/customer service?

21       A.    That's correct.

22       Q.    That was from 1994 until 1997?

23       A.    Yes.

24       Q.    That was at the University of Pennsylvania?

Diane Poland                          32

1    A.    Yes.

2    Q.    Tell me about that position.

3    A.    In that position I worked in the -- I did pin

4  card ID center and I helped one of the persons -- at the

5  time it was one person on staff delivered cards to the

6  clients, meaning the students, the staff, and any

7  visiting people.  I had to install card readers,

8  maintenance card readers, and assist the director in any

9  way.

10   Q.    So what is a card reader?

11   A.    They had them downstairs.  If you take your card

12  and you swipe it, it reads it.

13   Q.    It's like a magnetic card reader?

14   A.    Yes, yes.  They were at the time.

15   Q.    How do you install these card readers?

16   A.    Well, you go out to a site and you find out what

17  the client wants, what they want the card reader to be.

18  Find out if wires can be taken down to the site.  I would

19  go out after the telecommunications officers would go out

20  and run the wires and then I would just go out and attach

21  the card reader itself to that.

22   Q.    You didn't actually do the wiring?  All you did

23  was attach the card reader?

24   A.    The hardware.



1      Q.     Attaching the card reader?

2      A.     Mm-hmm.

3             MR. MARTIN:   Yes?

4             THE WITNESS:   Yes.

5             MR. SEEGULL:   Off the record.

6             (Discussion off the record.)

7   BY MR. SEEGULL:

8      Q.     Was there any computer programming involved in

9   that?

10     A.     Some, yes.   I had to -- depending on what the

11  client needed and who needed access, I put that in the

12  system before I would go out and install the readers.

13     Q.     Okay.

14     A.     So when someone swiped the card, it would admit

15  them or decline them.

16     Q.     So you would have to use certain software

17  application?

18     A.     Yes.

19     Q.     What was the application you used?

20     A.     At the time we are using Oracle, GMC at the

21  time, Card One I believe it was at the time, and Oracle.

22  And UNIX system for the database.

23     Q.     You weren't actually doing the programming?   You

24  were doing the data entry into these programs?

Diane Poland                              34

1    A.    Correct.

2    Q.    So there was a menu that you'd go into and

3  fields you'd have to fill out?

4    A.    Yes.

5    Q.    How would you know what information to put into

6  these fields?

7    A.    I would receive that from the client.  It was

8  just information on who was being admitted.

9    Q.    So in other words, your manager or the client

10  might say Jim Jones is coming today and we need him to

11  have his card activated?

12    A.    Correct.

13    Q.    Then you would take Jim Jones' information, and

14  if he had a card number, you would take that information,

15  you'd put it into the system and say allow Jim Jones to

16  enter this building today?

17    A.    Yes.

18    Q.    I'm giving you an example, but that's the kind

19  of thing that you would do?

20    A.    Yes, that's the kind of thing I would do.

21    Q.    On top of that you would also attach these card

22  readers to wires that the telecommunications people had

23  set up for you to attach?

24    A.    Yes.



Diane Poland                          35

1     Q.    Now, I'm not an electrician.  How did you know

2  which wires to attach to which wires?

3     A.    On-the-job training.

4     Q.    So somebody would tell you that the red wire

5  connects to the red wire and the green wire to the green

6  wire, that kind of thing?

7     A.    That kind of thing, yes.

8     Q.    Is it the equivalent of somebody installing a

9  light in their house?

10     A.    I don't know.  I've never installed a light.  I

11  don't know.

12     Q.    From there you went off to Computer Sciences

13  Corporation?

14     A.    Yes.

15     Q.    That was in 1997?

16     A.    Yes.

17     Q.    We'll talk about that in a minute.

18           You at some point went on to get further

19  education?

20     A.    Yes.

21     Q.    That was when?  In April 2000 you have listed on

22  your resume; is that right?

23     A.    That's correct.

24     Q.    That was at Wesley College?



Diane Poland                              52

1     Q.    What is Dazel?

2     A.    Dazel is an output server that generally manages

3  output from any location, from almost any format, at

4  least at the time that I was working with it.  I don't

5  know what it does today.

6     Q.    Is it a software program?

7     A.    It is a software program, yes.

8     Q.    Again, I'm not a technology person, so I'm

9  struggling to understand these terms.

10           But this software program runs on a

11  computer?

12     A.    It runs on servers and you can administer via

13  computer, yes.

14     Q.    So it runs on a server and then you can access

15  that server through a computer?

16     A.    Correct.

17     Q.    You took this certification course to learn how

18  to operate the Dazel software?

19     A.    Correct.

20     Q.    The purpose of the Dazel software is to allow --

21  you say "output," but does that mean printing to be

22  performed?

23     A.    Yes, yes.

24     Q.    So it allows one computer to send a job to the

Diane Poland                          53

1  printer and then to report back that the print job has

2  been done?

3      A.   Yes.

4      Q.   You don't actually program Dazel?  The Dazel

5  program is already done; is that correct?

6      A.   That's incorrect.  I built Dazel at the time.

7      Q.   Explain that to me.  I thought Dazel was a

8  product.

9      A.   It is a product.  Out of the box it's just a

10 server.  In order for that server to perform for the

11 client, you have to set it up to perform to the specs

12 that the client needs.

13     Q.   So is it fair to say what you do is you take

14 this Dazel software and you have to implement it?

15     A.   That's fair.

16     Q.   You have to, I guess, integrate it into the

17 customers' or the clients' system?

18     A.   Yes.

19     Q.   That means that you have to get the Dazel server

20 to talk to the computers that the company has?

21     A.   Generally, yes.

22     Q.   Is there a programming language that you do this

23 in?

24     A.   It's done in several different languages.  So it



1  would be UNIX, Shell, Perl, and depending on what the

2  client has crossover with Microsoft Networks.

3      Q.    So UNIX, Shell, Perl, and crossover with --

4      A.    It could crossover with Microsoft Networks.

5      Q.    What is Microsoft Networks?

6      A.    Microsoft Networks is a server, Microsoft

7  servers.

8      Q.    So as somebody working for CSC, you could decide

9  whether or not you wanted to use UNIX or Shell or Perl or

10 this Microsoft Networks to do this, let's say,

11 integration effort?

12     A.    I would decide depending upon what the customer

13 specs were.

14     Q.    In other words, if the customer was using Shell,

15 then you would have to use Shell and Dazel?

16     A.    No.

17     Q.    Explain to me how this works because I'm

18 struggling.

19     A.    Shell is one of the languages to help Dazel

20 work.  Generally the client side would be Microsoft

21 Networks or UNIX System.  Perl and Shell were languages,

22 we used to program it to work with those systems.

23     Q.    Is it difficult to program with Perl?

24     A.    Yes.



Diane Poland                                    56

1   each one of these have their own separate language and

2   anybody who uses them finds one more usable than the

3   other, so -- but you have to use them -- it depends on

4   the client which one you use.

5        Q.    Now, where did you learn how to use Shell?

6        A.    On the job.

7        Q.    Which job was that?

8        A.    I used Shell prior to CSC when I was actually

9   working for the United States government many, many years

10  before that, but it had changed so much.  I learned a lot

11  more working at CSC using Shell.

12       Q.    What position did you learn how to use Shell at

13  CSC?

14       A.    I first discovered they were using Shell when I

15  was at the help desk, but I didn't have to use it often.

16  I just had to help troubleshoot with it.

17       Q.    But you said you didn't have to use it a lot?

18       A.    No, because when you are at the help desk, you

19  simply take calls from customers who are having problems

20  and you try to troubleshoot.

21       Q.    So you didn't program in Shell?

22       A.    No.

23       Q.    You said you learned really how to use Shell in

24  a position at CSC.  What position was that?



WILCOX & FETZER LTD.
Registered Professional Reporters

A -19

Diane Poland                    57

1      A.    When I first went to Managed Print, and

2   technical systems analyst was my position.

3      Q.    Technical systems analyst?

4      A.    Yes.

5      Q.    When was that that you became a technical

6   systems analyst?

7      A.    Well, when I was hired at the help desk I was

8   also a technical systems analyst.

9      Q.    So is that when you started learning how to use

10  Shell, or was it later on when you were transferred?

11     A.    Well, I first started learning to use Shell with

12  the government.  I began -- I've discovered that they

13  were using Shell at CSC or for DuPont, which was our

14  client, when I was at the help desk.  I became more

15  familiar with Shell when I began to work with Managed

16  Print.

17     Q.    When was that?

18     A.    I think it was a year after I was hired.  I was

19  promoted to the Managed Print team.

20     Q.    Is that when you started reporting to Derek

21  Alston?

22     A.    Alston, yes.

23     Q.    We'll probably have a document that will show

24  when you started working for Mr. Alston.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1   those programs before you worked for Mr. Alston.

2       A.    I used UNIX when I worked for the University of

3   Pennsylvania.  A lot of their systems ran on UNIX at the

4   time.

5       Q.    Okay.

6       A.    And Perl I learned while working for Derek.  And

7   Shell I've used off and on through the years.

8       Q.    I thought Shell you learned when you worked for

9   Derek.

10      A.    I learned to use it more efficient.  I didn't

11  have to use it much prior to that.

12      Q.    So tell me about your experience with UNIX prior

13  to working with Mr. Alston.  Was it only at the

14  University of Pennsylvania?

15      A.    Yes.

16      Q.    In which position was it that you had to work

17  with UNIX?

18      A.    Both positions I held there.

19      Q.    Did you do any programming in UNIX --

20      A.    No.

21      Q.    -- or was it just applications?

22      A.    Application usage.

23      Q.    When you went to work for Mr. Alston, was that

24  when you started programming in UNIX?



WILCOX & FETZER LTD.
Registered Professional Reporters

A -21

Diane Poland 62

1    A.    I did it both.  I had to use it as an

2    application as well as program, the back end.

3    Q.    Which means programming?

4    A.    Yes.

5    Q.    Now, how does using it as an application compare

6    to programming?  Is one more difficult than another?

7    A.    I guess it depends on the person.

8    Q.    How did you find it?

9    A.    The front end is simple to me and the back end

10   is simple, as well.  I didn't find either one too

11   difficult.

12   Q.    Is one more technical than the other?

13   A.    The back end is always more technical.

14   Q.    I would think it would be much more

15   sophisticated skills that are needed to program in UNIX

16   than it does to use an application running on UNIX.

17   A.    That's correct.

18   Q.    The same would be true for Dazel and Shell and

19   Perl?

20   A.    Yes.

21   Q.    You didn't program in any of those languages

22   until you started working for Mr. Alston; correct?

23   A.    Correct.

24   Q.    The application work you did in UNIX at the

Diane Poland                          63

1    University of Pennsylvania involved manipulating the

2    software running on UNIX?

3        A.    At times, yes.

4        Q.    How much time do you think you spent working

5    with UNIX when you were at the University of

6    Pennsylvania?

7        A.    Every day.

8        Q.    You used an application that ran on UNIX every

9    day; correct?

10       A.    Yes, but my application, if there was an issue,

11   a problem with my application, it generally was something

12   happening in the background, in which case I had to work

13   with the UNIX team.

14       Q.    There were UNIX programmers that you'd have to

15   go to?

16       A.    Yes.

17       Q.    You'd have to get them to fix the problem?

18       A.    Yes.  We would have to work through what the

19   issues were.

20       Q.    Have we now talked about all of your UNIX and

21   Dazel and Shell and Perl experience prior to your time of

22   working with Derek Alston?

23       A.    I believe so, at least what you've asked me.

24       Q.    Is there anything that I haven't asked you that



Diane Poland                                          66

1          A.    I did research on the web and CSC came up into

2     my e-mail one day with a position and I applied.

3                      (Defendant's Exhibit 4 was marked for

4     identification.)

5     BY MR. SEEGULL:

6          Q.    I am now showing you what has been marked as

7     Defendant's Exhibit 4.  I believe it's your application

8     for employment at CSC; is that correct?

9          A.    Yes.

10         Q.    You filled this out?

11         A.    Yes.

12         Q.    That's your handwriting from the front page

13    until the last page?

14         A.    Yes, it is.

15         Q.    You completed this in October of 1997?

16         A.    Yes.

17         Q.    And everything on here is true and accurate?

18         A.    Yes.

19         Q.    If you turn to the second page of Exhibit 4, the

20    first substantive page of the application --

21         A.    Yes.

22         Q.    -- you'll see at the bottom there it asks you to

23    list all of your proficiencies?

24         A.    Yes.

Diane Poland                    67

1      Q.    You see that you did not list UNIX, Perl, Dazel,

2  or Shell; correct?

3      A.    Yes.

4      Q.    Is that because they were not proficiencies when

5  you were applying for employment at CSC; correct?

6      A.    Correct.

7      Q.    Did you read this document before you submitted

8  it to Computer Sciences Corporation?

9      A.    Yes.

10     Q.    You knew that if you were hired you would be an

11 at-will employee?

12     A.    Yes.

13     Q.    Which meant that you could be terminated at any

14 time for any reason with or without cause or notice?

15     A.    Yes.

16     Q.    You knew that there was no promise or guarantee

17 that your employment would continue for a definite period

18 of time?

19     A.    Yes.

20     Q.    What position were you applying for?

21     A.    At this time I was applying for the help desk

22 position.

23     Q.    Did you know what a help desk person did?

24     A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Diane Poland                             71

1        Q.    What were you told about the position you were

2    applying for?

3        A.    I don't remember everything I was told.  I know

4    it was a position opened at the help desk.  I know it

5    required me to answer phones, talk to customers, and I

6    knew it required me to troubleshoot applications.  And at

7    the time the client was DuPont.  I don't remember all

8    that was discussed.

9        Q.    Did they tell you what skills you'd need to have

10   in order to work as -- what was the position title?

11       A.    It was technical systems analyst.

12       Q.    Did they tell you what skills you would need to

13   have for a technical systems analyst?

14       A.    They -- not -- no.  They just asked me what

15   skills I did have and we talked about that.

16       Q.    Who made the decision to hire you?

17       A.    I don't know, but I believe the offer letter

18   came from Dawn or Nancy.  I'm not sure who made the

19   decision.

20            (Defendant's Exhibit 5 was marked for

21   identification.)

22   BY MR. SEEGULL:

23       Q.    I am now showing you what has been marked as

24   Defendant's Exhibit 5.  Do you recognizes this?



WILCOX & FETZER LTD.
Registered Professional Reporters

A -26

1     A.    Yes.

2     Q.    What is it?

3     A.    What is it?

4     Q.    Yes.

5     A.    It's the offer letter I received.

6     Q.    It was actually signed not by Dawn, but by Jerry

7  Flowers?

8     A.    Yes.

9     Q.    Who is Jerry Flowers?  Do you know?

10     A.    At the time I didn't, but I know who Jerry is

11  now.

12     Q.    Who is Jerry?

13     A.    He worked for the human resource department.

14     Q.    Your position that they were offering you was as

15  a Member Technical Staff B?

16     A.    Yes.

17     Q.    What's abbreviated as an MTSB?

18     A.    Yes.

19     Q.    What is an MTSB?

20     A.    It's just a Member Technical Staff B.  It was

21  what I was hired as.

22     Q.    That's a level within the company?

23     A.    It was -- it is a position.  I don't know that

24  it's a level.  B is the level, I guess, because they had

**W&F**

1   Member Technical Staff A and B.  So I was hired as a

2   Member Technical Staff B.

3       Q.    Which is the lower of the two?

4       A.    Yes.

5       Q.    Those are grades within the company, Member

6   Technical Staff B, Member Technical Staff A; correct?

7       A.    I think they are levels.  I don't know that they

8   are grades.

9       Q.    So one level within the company is Member

10  Technical Staff B, the next level up is Member Technical

11  Staff A?

12      A.    Mm-hmm.

13      Q.    Yes?

14      A.    Yes, yes.

15      Q.    The next level up is the senior level of

16  technical staff?

17      A.    Yes.

18      Q.    And that's an SMTS?

19      A.    Yes.

20      Q.    Do you know what the next level up is from SMTS?

21      A.    No.

22      Q.    Do you know what the level is beneath MTSB?

23      A.    No.

24      Q.    Are there levels beneath MTSB?

Diane Poland                                    74

1      A.    I don't know.

2      Q.    Are there levels above SMTS?

3      A.    I don't know.  I assume there are because there

4   are managers.  I assume they are above that.

5      Q.    You were given an annual salary when you started

6   of $41,000?

7      A.    Yes.

8      Q.    This was approximately six to $8,000 more than

9   you had been earning at the University of Pennsylvania?

10     A.    Approximately, yes.

11     Q.    You believe that was a fair starting salary?

12     A.    Yes.

13     Q.    At the time that you were hired, the highest

14  degree that you had obtained was a high school diploma;

15  is that correct?

16     A.    That's correct.

17     Q.    That's true today, as well; correct?

18     A.    Yes.

19     Q.    You read this letter before you signed it?

20     A.    Yes.

21     Q.    That's your signature and you signed it on

22  November 5th of 1997?

23     A.    Yes.

24     Q.    You were provided documents when you started

1       A.    I'm noticing it says "Revised" in January of

2   2002, so I don't know that this is the book.

3       Q.    Okay.

4             (Defendant's Exhibit 8 was marked for

5   identification.)

6   BY MR. SEEGULL:

7       Q.    I am now showing you what's been marked as

8   Defendant's Exhibit 8.  Do you recognize this Employee

9   Handbook?

10      A.    No.

11      Q.    Do you have any reason to believe this is not

12  the Employee Handbook you received in November 1997?

13            MR. MARTIN:  I'm going to object to that

14  question based upon her previous answer that you may not

15  have picked up.  She said she saw something on-line.

16      Q.    Go ahead, Miss Poland.

17      A.    I don't know if this is the handbook, either.

18      Q.    This is the one, if you'll note, it says it's

19  the 1995 version; correct?

20      A.    It does say that.

21      Q.    In fact, you were given a handbook; correct?

22      A.    I was given a handbook.

23      Q.    Do you have any reason to believe that this is

24  not the handbook that you received?



1    A.    I don't know about "reason to believe."  I don't

2    trust CSC at this point, so I don't know if this is the

3    handbook.

4    Q.    Do you have a copy of the handbook you received?

5    A.    I doubt it.  I don't know.

6    Q.    You didn't produce one to us in discovery?

7    A.    Right.

8         MR. SEEGULL:  Jeff, do you have a copy of

9    the handbook that Miss Poland received?

10        MR. MARTIN:  Not that I'm aware of.

11   BY MR. SEEGULL:

12   Q.    So you don't have a copy?

13   A.    I don't think so.  I know I did sign for one,

14   but I don't know if I still have one.

15   Q.    So you would have no way of knowing whether or

16   not this was the handbook you received?

17   A.    No.

18   Q.    You would have no way of knowing exactly what

19   handbook you received at this point?

20   A.    At this point, no.

21   Q.    So you have no way to dispute that this is the

22   handbook that you received?

23   A.    No, I do not.

24   Q.    Is that correct?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A-31**

Diane Poland                        79

1      A.    That's correct.

2      Q.    You understood it was your obligation to comply

3   with the policies of the company?

4      A.    Yes.

5      Q.    You understood that if you failed to comply with

6   the policies of the company that you could be terminated?

7      A.    Yes.

8      Q.    You also understood that CSC had a policy

9   prohibiting discrimination, harassment, and retaliation?

10     A.    Yes.

11     Q.    You consulted that policy during your

12  employment?

13     A.    Yes.

14     Q.    There are other policies related to a drug-free

15  workplace and vacation pay and sick leave and leaves of

16  absence and privacy of employee information?

17     A.    Yes.

18     Q.    You understood it was your obligation to comply

19  with those policies?

20     A.    Yes.

21     Q.    Of course, you understood that the company had

22  the right to update its Employee Handbook from time to

23  time?

24     A.    Yes.



WILCOX & FETZER LTD.
Registered Professional Reporters

A -32

Diane Poland                                    80

1        Q.    In fact, they did update their handbook;

2    correct?

3        A.    According to what you've shown me.

4        Q.    Well, do you remember receiving a revised

5    handbook in October 2002?

6        A.    No, I don't.

7        Q.    Do you remember whether you did or did not?

8        A.    I do not.

9        Q.    So you might have received it, you might not

10   have?

11       A.    Correct.

12       Q.    Therefore, you would have no way of knowing

13   whether Defendant's Exhibit 7 is the revised handbook

14   that you received?

15       A.    I don't know what this is.  I have never seen it

16   till today to my knowledge.

17       Q.    You would have no way of knowing whether or not

18   this is a handbook you received; is that correct?

19       A.    If I had received it, I would have no way of

20   knowing.

21             (Defendant's Exhibit 9 was marked for

22   identification.)

23   BY MR. SEEGULL:

24       Q.    I am showing you what has been marked as

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

**A -33**

Diane Poland                                    81

1     Defendant's Exhibit 9.  These are a series of documents

2     you may or may not have seen.  They're computer-generated

3     documents from the HR system of the company.  I want to

4     go through your salaries.  That's why I'm showing you

5     these documents.

6                   If you'll look on the first page, it shows

7     that your annualized salary -- do you see that column on

8     the right?

9          A.   Yes.

10         Q.   It says that you started at $41,000 and that you

11    received an increase to $42,025?

12         A.   Yes, I see that.

13         Q.   Is that correct that you started with the

14    company at $41,000?

15         A.   Yes, it is.

16         Q.   Is it correct that you received a raise in May

17    of 1998 to $42,025?

18         A.   I know I received a raise, but if this is what

19    it's saying, I guess that's what it was because I really

20    don't remember what it was.

21         Q.   Turning to the next page, it's a similar

22    document just in a slightly different format, or maybe

23    not a different format, just a different place on the

24    page.  Again, your salary at that point was $42,025 and



Diane Poland                            82

```
 1   then you received a raise on May 15th of 1999 that took

 2   it to $43,118?

 3        A.    I know I received an increase, but I guess

 4   that's what it was, as well.   The numbers look pretty

 5   familiar.

 6        Q.    Then going to the next year in May of 2000, do

 7   you see that your salary at that point had been $43,118

 8   and from there it went to $46,996.98?

 9        A.    Yes, I do see that.

10        Q.    That was effective on May 13th of 2000?

11        A.    I see that, as well, yes.

12        Q.    That was when you received a promotion?

13        A.    Yes, it is.

14        Q.    It was about a $4,000 raise?

15        A.    Approximately, yes.

16        Q.    Is that accurate that you received about a

17   $4,000 raise in May of 2000?

18        A.    Yes, that's accurate.

19        Q.    The next document is in a slightly different

20   format, but I think it tries to capture the same

21   information.   If you look at the far right column, and

22   we've done those last two, but let's start at the

23   second-to-the-last one.   Your salary was $46,996.98 as we

24   said in May of 2000.   You then received another increase
```

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Diane Poland                                    83

1    to $49,345.92 in May of 2001?

2        A.    Yes.

3        Q.    That was a merit increase with a raise?

4        A.    It says "Merit Increase" with -- I guess that's

5    supposed to be raise.  It says an "R."

6        Q.    But, in fact, you received again about a $3,000

7    raise in May of 2001?

8        A.    Yes, approximately.

9        Q.    Then in September 2002 it shows not that there's

10   a raise, but it shows that there was a termination, a

11   voluntary termination due to health.

12       A.    That's what it shows, yes.

13       Q.    That's what it shows.  I understand you may not

14   know down to the last penny what you earned, but you are

15   not disputing the numbers that I just read to you?

16       A.    No, I'm not.

17       Q.    Those accurately reflect what your raises were

18   and what your salaries were?

19       A.    I believe so, yes.

20       Q.    And the dates of your raises and promotion?

21       A.    Yes.

22       Q.    In May of 2000 when you received your promotion,

23   you went from an MTSB to an MTSA; correct?

24       A.    Yes.



Diane Poland                                    84

1       Q.    Each year that you were employed at CSC you did

2   receive a raise?

3       A.    Yes.

4       Q.    Did you also receive bonuses while you were at

5   CSC?

6       A.    Yes, I have.

7       Q.    How often did you receive the bonuses?

8       A.    It depends.  Several times a year or once a

9   year.  I guess it depended on when they were issuing

10  them.

11      Q.    How much were the bonuses that you received?

12      A.    It can range anywhere from $200 to $1,500.

13      Q.    The bonuses were not guaranteed; correct?  They

14  were discretionary?

15      A.    I believe so.

16      Q.    Do you know exactly which bonuses you received

17  and for how much and when?

18      A.    No, I don't.

19      Q.    Would CSC have that information?

20      A.    I would hope so.

21      Q.    You started working a reduced schedule in

22  September of 2001?

23      A.    Yes, I believe so.

24      Q.    That was until February of 2002?

Diane Poland                    85

1    A.    Well, no.   I think I started reduced schedules,

2    like you said, approximately September of 2001 and up

3    until February.

4    Q.    Of 2002?

5    A.    Yes.

6    Q.    You were working the reduced schedule?

7    A.    Yes.   I think it was 30 hours a week.

8    Q.    So if you were working 30 hours a week, you

9    weren't really receiving your full-time salary, your

10   salary for 40 hours; is that correct?  Or is that not

11   correct?

12   A.    I don't remember.   I don't remember.

13   Q.    Well, based on a 30-hour workweek, your annual

14   salary for that time period would have been about

15   $37,000; right?  Is that about right?

16   A.    I guess.  I don't know.  I don't remember.   I

17   really was going through a lot at the time, so I don't

18   remember.

19   Q.    Well, in fact, your salary was not reduced

20   during this period at all even though you were on a

21   reduced work schedule; correct?

22   A.    I don't think so.  I don't remember for sure.  I

23   don't think so.

24   Q.    The reason is because the company gave you paid



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

A -38

1     A.    No.

2     Q.    Do you know what the costs were for any of those

3  benefits?

4     A.    I don't remember.  I know a certain amount came

5  out of my check for those, but I don't remember what the

6  total cost was.

7     Q.    Do you know if the company contributed on your

8  behalf to the 401(k) plan?

9     A.    I believe they matched.  At least that's -- they

10 matched at a certain percentage.  I don't remember the

11 rules, but a certain percentage you would request they

12 would match.

13    Q.    Let's talk about the first position you held at

14 CSC and that was as a help desk technician.  Do you

15 Member Technical Staff B?

16    A.    Yes.

17    Q.    Can you explain in some detail what you did as a

18 help desk technician?

19    A.    I answered calls, calls from the client which at

20 the time was DuPont.  I could get calls on desktop,

21 problems that a customer might be having, printer

22 problems, connection to the server problems,

23 telecommunication problems, phone issues.

24    Q.    This is a customer calling into a CSC help



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A -39

Diane Poland                                94

1   staff?

2        A.    That's correct.

3        Q.    These are end users that are calling in?

4        A.    Yes.

5        Q.    Is it one piece of software or all kinds of

6   software that the customer is calling in about?

7        A.    All kinds of software.

8        Q.    Is it hardware as well as software, or just

9   software?

10       A.    It could have been, yes.  It could be either.

11       Q.    So you had to diagnose the problem?

12       A.    Correct.

13       Q.    If you couldn't figure out what the problem was,

14  you would elevate it to another level?

15       A.    That's correct.

16       Q.    So starting out you had some experience, but not

17  much experience and so a lot of problems had to be

18  elevated, but then as you gained more experience, less

19  problems had to be elevated?

20       A.    No.  I started out very well.  I didn't have a

21  lot of things that were escalated.

22       Q.    You mean you didn't get more experience as you

23  were on the job?

24       A.    I always got more experience, but the experience

Diane Poland                                          96

1      Q.    Did you ever have to go out and visit the

2 customer?

3      A.    Yes, but not right away.  Maybe once or twice.

4 Not often.  That wasn't a policy of the help desk at all.

5      Q.    Was it mostly software problems or hardware

6 problems?

7      A.    It was both.  It was both.  One call -- one

8 minute it could be about software and the next call could

9 be about hardware.

10     Q.    You didn't use Dazel while you were on the help

11 desk?

12     A.    No.

13     Q.    Or Perl?

14     A.    No.

15     Q.    Or Shell?

16     A.    No.  Well, I'm just aware of them.

17     Q.    Or UNIX?

18     A.    No.  Well, I had to use UNIX.

19     Q.    I'm sorry.  What was the last thing?

20     A.    I was just aware of those software packages.  I

21 didn't have to use them to troubleshoot.

22     Q.    The same thing is true of UNIX?

23     A.    No.  I had to use UNIX.

24     Q.    Because the application was running on UNIX?

Diane Poland                              97

1      A.    Yes.

2      Q.    What was the application called that was running

3   on UNIX?

4      A.    They had a number of applications, but, I

5   don't -- we did our tickets at the time called PQRs that

6   was one system, but in the background we had something

7   that DuPont used, UNIX and VAX.  So by using them, I

8   would remotely log into the UNIX or VAX system if that

9   was the customer's issue.

10     Q.    But again, you wouldn't do any programming on

11  UNIX in this position?

12     A.    No, no.

13     Q.    By the way, do you have a home computer?

14     A.    Yes.

15     Q.    How long have you had a home computer?

16     A.    Awhile now.  I'm not sure.  Several years.

17     Q.    You've never run UNIX at home?

18     A.    No.  I have a UNIX test software, but I don't

19  run UNIX at home.  When I did pager duty, I could log

20  into my UNIX systems, but I don't run it from -- I run on

21  Microsoft at home.

22     Q.    So you've never done programming of UNIX at

23  home?

24     A.    Yes.  The training piece of it.  I have a test

Diane Poland                                101

1   BY MR. SEEGULL:

2        Q.    I am now showing you what has been marked as

3   Defendant's Exhibit 10.   It's titled "Employee

4   Contribution Appraisal" and it is dated April of 1998.

5        A.    Yes, I see that.

6        Q.    This is your performance review for the 1997 to

7   1998 time frame; correct?

8        A.    That's correct.

9        Q.    That is, the year for CSC runs from the

10  beginning of April to the end of March of the following

11  year; correct?

12       A.    Yes.

13       Q.    So this was from the beginning of April of 1997

14  to the end of March of 1998, that year?

15       A.    Yes.

16       Q.    I see on the first page it says "Description of

17  duties and responsibilities," and it actually goes on for

18  several pages.   Then it goes on to "Significant

19  Accomplishments" and "Personal Goals, Objectives and

20  Interests"?

21       A.    Yes.

22       Q.    Eventually you get to "Review."   The pages

23  aren't numbered, so I can't tell you what page it is.

24       A.    Yes.



1    Q.    Up until the point of "Review," you completed

2    all of those sections; correct?

3    A.    That's correct.

4    Q.    Those are things that you typed into the

5    performance review system?

6    A.    Most of it.  Not all of it.

7    Q.    Is there something that you did not type in?

8    A.    Yes.  I didn't type in the Roman numeral

9    descriptions.

10    Q.    Okay.  You mean the descriptions of each

11    section?

12    A.    That's correct.

13    Q.    Okay.

14    A.    I didn't type in -- I'm sorry.  The pages aren't

15    numbered, but I didn't type in the "Meet following

16    individual CSR objectives" and --

17    Q.    So there's a section on the third page of

18    Exhibit 10 which is in a smaller font?

19    A.    Yes, it is.

20    Q.    So that's not something you typed in?  That's

21    something somebody else typed in?

22    A.    I believe so.  I'm aware of what's written in,

23    but I do not remember typing that in at all.

24    Q.    Do you know who typed this in?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

**A-44**

1    A.    No.   I guess it would be Dawn.   I don't think

2 many people would have access to this.

3    Q.    To the statistics that are listed there?

4    A.    Yes.

5    Q.    Other than the heading descriptions and the

6 lower case or small font, anything else that you did not

7 type in up until the point of "Review"?

8    A.    Several of the questions I didn't type in.   I

9 didn't type in any information where it says who your

10 managers are, next level manager.

11    Q.    So on the bottom of the page where it says "Will

12 a next level manager need to approve this appraisal?" and

13 it's written "Yes," and "Next Level Manager's Name:

14 Teresa Carroll" --

15    A.    Right.

16    Q.    -- and "Will a person on your support staff

17 read/print access to this appraise?" you didn't type in

18 those questions but you did give the answers?

19    A.    That's correct, I did give the answers.

20    Q.    Anything else that you did not type in?

21    A.    Where it says "The Manager's Section should be

22 completed."

23    Q.    Again, the heading?

24    A.    Right.   I can't complete anything in the



Diane Poland                                             104

1   manager's section.

2       Q.    So up until that point, though, you completed

3   everything that we just talked about?

4       A.    All the things that are pertaining to the

5   employee, the employee sections I would have had to type

6   in.

7       Q.    You tried to be thorough and complete in your

8   descriptions of your duties and responsibilities?

9       A.    Yes.  I tried to be.

10      Q.    Is it correct that you did not list UNIX, Dazel,

11  Perl, or Shell as anything you did in your job in

12  customer support?

13      A.    That's correct, it's not there.

14      Q.    That was because it was not any duty or

15  responsibility you had in customer support?

16      A.    Well, no.  It's because I didn't type it in

17  there because UNIX isn't there.  Shell definitely would

18  not have been there and Perl would not have been there.

19      Q.    But also isn't it true that UNIX wasn't a part

20  of what you did?

21      A.    I troubleshot UNIX, as well.

22      Q.    You just didn't put it in?

23      A.    But it's not there.  Correct, it's not there.

24      Q.    You just forgot to put it in?

