Diane Poland                                                    251

1        Q.    Isn't it true that you submitted a resume to

2   Ms. Landers, but there was some kind of computer error?

3        A.    That's possible.

4        Q.    So that you received some kind of e-mail

5   notification that the resume was not properly submitted?

6        A.    That's possible.

7        Q.    Isn't it true that you did not resubmit the

8   resume?

9        A.    I don't recall.

10       Q.    You're not denying that that's true?

11       A.    I'm not.

12       Q.    Do you know if anybody spoke to Miss Landers on

13  your behalf?

14       A.    No, I don't.

15       Q.    Do you know what was said, if anything, on your

16  behalf to Miss Landers?

17       A.    No.

18       Q.    Do you remember having a conversation or several

19  conversations with Jennifer Miller in customer support

20  services about an open position?

21       A.    I do remember having a conversation with

22  Jennifer.

23       Q.    Do you remember these conversations taking place

24  in early 2002?

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

Diane Poland

252

1       A.   Possible.  I don't remember exactly when.

2       Q.   Do you remember that there was an open position

3   that you were being considered for?

4       A.   I do believe so.

5       Q.   Isn't it true that you were told you could keep

6   your same salary and there wouldn't be any cut in pay if

7   you take this position?

8       A.   I don't recall.

9       Q.   Do you recall how long this position was going

10  to be for or what the nature of the position was?

11      A.   I don't.

12      Q.   You were offered this position; correct?

13      A.   I don't remember.  I know we talked about it,

14  but I don't know if I was ever offered a position.

15      Q.   You don't recall turning down the position?

16      A.   I don't recall, no.

17      Q.   You're not denying you turned it down?

18      A.   No, I'm not.

19      Q.   Do you know who, if anyone, spoke to Miss Miller

20  on your behalf?

21      A.   No.

22      Q.   Do you know what, if anything, was said on your

23  behalf?

24      A.   No.

1    Q.    She also asked you for requisition numbers.  Do

2    you recall that?

3    A.    I believe so.

4    Q.    You never sent her any requisition numbers of

5    positions you were interested in; correct?

6    A.    I believe I have, yes, but I don't know what

7    they are.

8                MR. SEEGULL:  Let's take a break.

9                (A recess was taken at this time.)

10   BY MR. SEEGULL:

11   Q.    Ms. Poland, you used to be friendly with the

12   other members of the Managed Print group; correct?

13   A.    That's correct.

14   Q.    Was there anybody you were not friends with?

15   A.    Not really, no.

16   Q.    You were friendly with everybody in the group?

17   A.    Yes.

18   Q.    Including Dawn Dworsky?

19   A.    No.

20   Q.    You were never friendly with her?

21   A.    No, not really.  I didn't have much interaction

22   with her outside of team meetings.

23   Q.    Other than Dawn Dworsky, though, you were

24   friendly with everybody else on the team?

Diane Poland                              257

1        A.    Pretty much.

2        Q.    You weren't ever excluded from team meetings,

3    were you?

4        A.    Yes, I was.

5        Q.    When were you excluded from team meetings?

6        A.    I was excluded from team meetings after I went

7    to HR and complained about Dawn.  And then from that

8    point on I was in, I don't recall, maybe one meeting as a

9    team after that.

10       Q.    You're denying that you went to team meetings

11   after the summer of 2001?

12       A.    I'm denying that I didn't have any meetings to

13   go to because I wasn't aware of them.

14       Q.    Are you denying that you went to team meetings

15   after the summer of 2001?

16       A.    I don't know about the timing.  I just know

17   after I complained about Dawn, that I didn't have much

18   communication with the team as a whole after that.

19       Q.    But you did go to team meetings?

20       A.    Possibly.

21       Q.    If other members of the team said, oh, no,

22   Miss Poland was at these team meetings in the latter half

23   of 2001 and the beginning part of 2002, you're not

24   denying that that's true?



Diane Poland

258

1      A.    I can't deny that that's true.

2      Q.    Do you recall an incident in which your freezer

3  broke, your home freezer?

4      A.    It's been broke several times, so it's possible.

5      Q.    And somebody from the team came to fix it for

6  you?

7      A.    No, no, no.  I know what you're talking about.

8  My freezer did break to my refrigerator, and MaryAnne

9  came over and she put my food in her freezer for me and I

10  got the freezer fixed.

11     Q.    Didn't somebody try to fix it for you, though?

12     A.    No.

13     Q.    Didn't Randall Miller come over and try to fix

14  it for you?

15     A.    No.

16     Q.    You say Ms. Doll-Johnson took your food and put

17  it in her freezer so it wouldn't spoil?

18     A.    Yes.

19     Q.    You've gotten together with Ms. Doll-Johnson

20  outside of work?

21     A.    Yes, I had.

22     Q.    How many times?

23     A.    I don't know.  Several.

24     Q.    Isn't it true after you filed your charge of

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Diane Poland                                    259

1    discrimination with the Department of Labor and after you

2    made your complaints to human resources, you continued to

3    receive e-mails from the Managed Print group asking you

4    to go to lunch with them?

5        A.    Not that I recall.

6        Q.    You're not denying that that's true?

7        A.    No, I'm not.

8        Q.    Isn't it true that you refused to go to lunch

9    with them?

10       A.    Not that I recall.

11       Q.    You ignored them?

12       A.    I don't recall ever getting the e-mails.

13       Q.    But you're not denying that?

14       A.    No, I'm not.

15       Q.    Isn't it true that you stopped talking to your

16   fellow team members after you filed your charge --

17       A.    No, that's not true at all.

18       Q.    -- and you made your complaint?

19             Didn't you turn your computer monitor away

20   from the group?

21       A.    No.

22       Q.    Weren't you invited to a Christmas party in 2001

23   at Paul White's house?

24       A.    I don't recall.  I know I went to a Christmas

Diane Poland                                              262

1    entertaining?

2        A.    No.

3        Q.    Do you recall telling her that you felt like you

4    knew all the people on the team because of her stories?

5        A.    No.

6        Q.    Are you denying that that conversation happened?

7        A.    No.

8        Q.    Do you remember calling MaryAnne Doll-Johnson at

9    home at approximately midnight for assistance with a

10   work-related problem?

11       A.    Oh, it's possible.  I don't remember, but it's

12   possible.

13       Q.    Didn't Ms. Doll-Johnson leave home in the middle

14   of the night and come in to CSC to help you with the

15   problem?

16       A.    It's possible.  Many a nights we were there, so

17   I don't know.

18       Q.    You considered her a mentor; correct?

19       A.    Yes.

20       Q.    You still consider her a friend?

21       A.    No.

22       Q.    You considered her a friend while you were at

23   CSC?

24       A.    For a time, yes.



**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Diane Poland                    263

1    Q.    In fact, you recommended her for a Star award?

2    A.    Yes, I did.

3    Q.    You thanked her for her personal interest and

4    excellent preparatory training?

5    A.    Possibly, yes.

6    Q.    And that you told her you were able to

7    accomplish your Dazel training because of her?

8    A.    Possibly, yes.

9    Q.    Do you know if anybody considered you a mentor?

10   A.    I don't know.

11   Q.    Did you train anybody in the Managed Print

12   group?

13   A.    I was responsible for assisting Audrey when she

14   first came on board and helping Randy when needed.  That

15   was part of my duties.

16   Q.    But you didn't train Randy?

17   A.    Well, if he had a problem.  I didn't have to sit

18   down and go over step by step or anything like that.  But

19   if he had a problem, he asked me a question, I answered

20   it.

21   Q.    But you trained Audrey you're saying?

22   A.    I was responsible for setting up training with

23   Audrey, yes.

24   Q.    What position was Ms. Daigger?



Diane Poland                                    264

1       A.    I don't know.

2       Q.    Do you know what level she was?

3       A.    No.

4       Q.    Do you know if she had been promoted?

5       A.    No.

6       Q.    Did you ever ask Mr. Miller for help on

7    anything?

8       A.    Not that I can recall.

9       Q.    You're not denying that you occasionally asked

10   him for help on certain things?

11      A.    I can't deny it because I don't recall.

12            (Defendant's Exhibit 20 was marked for

13   identification.)

14   BY MR. SEEGULL:

15      Q.    Miss Poland, I'm now showing you what's been

16   marked as Defendant's Exhibit 20.  It is a document that

17   is titled "Leaves of Absence Without Pay."  Do you

18   recognize this?

19      A.    No.

20      Q.    This is a document that was contained in the

21   handbook; correct?

22      A.    It's possible.  I don't know.

23      Q.    You knew that the company had a policy that said

24   in order to be out on continued approved medical leave,

Diane Poland                                    265

1   you had to provide a certification of your need for the

2   medical leave every 30 days?

3        A.    I believe so, yes.

4        Q.    And that your medical leave could be extended

5   for successive periods of up to 30 calendar days?

6        A.    I don't know how long it could be extended.

7        Q.    There's nothing wrong with an employer requiring

8   an employee to provide updated medical information, is

9   there?

10        A.    I don't think so.

11        Q.    Or to require that it be provided within a

12   certain time frame?

13        A.    I don't think so.

14              (Defendant's Exhibit 21 was marked for

15   identification.)

16   BY MR. SEEGULL:

17        Q.    I'm now showing you what's been marked as

18   Defendant's Exhibit 21.  Have you ever seen this before?

19        A.    Not that I recall, no.

20        Q.    This is an HR management policy?

21        A.    That's what it says.

22        Q.    You have never seen this before?

23        A.    Not that I recall, no.

24        Q.    You don't deny that you have?



Diane Poland                                    266

1       A.    No, I don't.

2             (Defendant's Exhibit 22 was marked for

3    identification.)

4    BY MR. SEEGULL:

5       Q.    I'm now showing you what's been marked as

6    Defendant's Exhibit 22.  Do you recognize this document?

7       A.    "Request for Leave"?

8       Q.    Yes.

9       A.    Yes.

10      Q.    And you signed it; correct?

11      A.    Yes, I did.

12      Q.    You signed it on August 14th, 2001?

13      A.    Yes.

14      Q.    This was a document you submitted to request

15   leave; correct?

16      A.    Yes.

17      Q.    You were requesting leave from August 6 of 2001

18   to August 21st of 2001?

19      A.    Yes.

20      Q.    What was the reason for your leave?

21      A.    I don't remember.  August 6.  I don't remember.

22   I think I was out on stress, anxiety.

23      Q.    You didn't tell the company that that was the

24   reason you needed leave?



WILCOX & FETZER LTD.
Registered Professional Reporters

1      A.    I don't recall.

2      Q.    The company could have asked for more

3  information than you gave here?

4      A.    I guess.  I don't know.

5      Q.    They didn't, did they?

6      A.    Not that I recall.

7      Q.    Do you see in this document in the third

8  paragraph that it says "...my employment with CSC will be

9  subject to termination if I fail to provide Human

10  Resources with a doctor's certificate on a monthly

11  basis..."?  Do you see that?

12      A.    No.  Yes, I do.

13      Q.    You acknowledged that; right?

14      A.    By signing this sheet.

15      Q.    Yes?

16      A.    Yes.

17      Q.    Now, do you know if you, in fact, returned to

18  work on August 21, 2001?

19      A.    I don't remember.

20      Q.    Tell me the way that the leave works at the

21  company.

22      A.    I don't remember how it worked.  I don't

23  remember.

24      Q.    Isn't there some position called a leave



Diane Poland                                        268

1  coordinator?

2      A.    I don't know.

3      Q.    Do you know who Simmie Osborn is?

4      A.    I remember speaking with her.

5      Q.    Do you remember who she is?

6      A.    I don't know who she is, but I remember speaking

7  with her.

8      Q.    Did you ever personally meet her?

9      A.    No.

10     Q.    Do you know her race?

11     A.    No.

12     Q.    Do you know if she knew you had ever complained

13  of discrimination?

14     A.    No, I don't think so.

15     Q.    Do you know if she knew your race?

16     A.    I don't know.

17            (Defendant's Exhibit 23 was marked for

18  identification.)

19  BY MR. SEEGULL:

20     Q.    I am now showing you what has been marked as

21  Defendant's Exhibit 23.  This was a document you were

22  provided while you were on leave; correct?

23     A.    It looks familiar.

24     Q.    You were advised that in the second bullet point

1    that "you must submit a certificate of disability from

2    your attending physician every 30 days"?

3         A.    I do see that, yes.

4         Q.    You were told that?

5         A.    No, not -- I was given this.

6         Q.    Through this document you were told that that's

7    what you had to do?

8         A.    I guess so, yes.

9         Q.    You read this?

10        A.    Yes, I did.

11        Q.    You understood that it was your obligation to

12   comply with this?

13        A.    Yes, I do.

14        Q.    You see the name at the bottom there where it

15   says "Simmie Osborn"?

16        A.    Yes.

17        Q.    That was the person you were supposed to call if

18   you had any questions; correct?

19        A.    Well, that's the person I did call.  I don't

20   know if I was supposed to at all times, but I did talk

21   with her several times.

22        Q.    Tell me about your conversations with her.

23        A.    A lot of it just stemmed around putting my --

24   putting my time in the time entry system.

**W&F**

Diane Poland                                    270

1      Q.     What does that mean?

2      A.     The time entry system is -- I had to put time in

3   there.

4      Q.     How do you put time into a time entry system if

5   you're on leave?

6      A.     I had to do it via phone.

7      Q.     So you had questions about how to do that?

8      A.     When it didn't work, what was the work around.

9      Q.     So you tried to do it via phone and then there

10   was some problem in doing that?

11     A.     Yes.

12     Q.     So you called Simmie Osborn about that?

13     A.     Sometimes.

14     Q.     And she told you how to get around it?

15     A.     Sometimes.

16     Q.     Did she tell you how to handle that?

17     A.     I had to at some point submit some paperwork to

18   Dawn.  I don't remember what they were.  To get that time

19   system adjusted.

20     Q.     Was it adjusted?

21     A.     I don't know.

22     Q.     Did it get fixed?

23     A.     The dialing in part did at some point, but I

24   don't know if the system ever got adjusted correctly.

Diane Poland                                    271

1    Q.   Do you know whether or not your time was ever

2   entered?

3    A.   I believe so.

4    Q.   You believe it was?

5    A.   Yes.

6    Q.   So as far as you were concerned, it was fixed?

7    A.   As far as I was concerned.

8         (Defendant's Exhibit 24 was marked for

9   identification.)

10  BY MR. SEEGULL:

11   Q.   I'm now showing you a document that's been

12  marked as Defendant's Exhibit 24.  This is a letter you

13  received from Ms. Osborn that's dated August 8th, 2001;

14  correct?

15   A.   Yes, it is.

16   Q.   You received it a couple of days after that?

17   A.   Probably.  I'm not sure when I received it.

18   Q.   This letter sets out the expectations regarding

19  your leave?

20   A.   Yes.

21   Q.   This is your initial leave before you go on your

22  intermittent leave; correct?

23   A.   I believe so.

24   Q.   That is before you go on your reduced leave

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

A -113

1    status, this is the leave, this is the first leave you go

2    out on which is full time?

3         A.    I'm not sure because it's dated August the 8th.

4    I don't know.  I know it's a leave policy.  I don't know

5    when it was submitted to me.

6         Q.    Well, just to go back, didn't you request

7    full-time leave as of August 8th, 2001?  Didn't we just

8    look at that?

9         A.    I put in workmen's comp.  I believe that's what

10   this says, "Request for Leave."

11        Q.    Just look at Defendant's Exhibit 22.

12        A.    Okay.

13        Q.    Okay?  You see that your effective date of leave

14   was August 6, 2001?

15        A.    Yes.

16        Q.    So it was right after you requested that leave

17   that you were sent this letter; correct?

18        A.    Yes.

19        Q.    So that's what this letter relates to?

20        A.    I assume so, yes.

21        Q.    Ms. Osborn was telling you that CSC was going to

22   designate your leave as FMLA leave?

23        A.    I believe so, yes.

24        Q.    They were approving your leave?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Diane Poland                                    273

1      A.    I believe so, yes.  They did.

2      Q.    Do you see in paragraph 3 on the second page you

3  were told that you have to use all of your paid leave

4  according to the policy prior to taking an unpaid leave

5  of absence?

6      A.    Yes.

7      Q.    That was the policy of the company; right?

8      A.    Yes.

9      Q.    Then do you see on paragraph 7 that you were

10  told that if you were on leave for a personal health

11  condition, you were required to furnish the benefits

12  office with medical certification every 30 days?

13      A.    Yes, I do see that.

14      Q.    Now, in addition to this letter, isn't it true

15  that Ms. Osborn spoke to you over the phone when you

16  commenced your first leave of absence and told you about

17  your duties and your obligations under the leave of

18  absence policies?

19      A.    It's possible, but I don't recall I spoke with

20  her specifically about that.

21      Q.    Didn't she also tell you that you had to provide

22  an updated doctor's note every 30 days?

23      A.    It's possible.

24      Q.    You returned to work on August 22nd, 2001;



WILCOX & FETZER LTD.
Registered Professional Reporters

A -115

Diane Poland                                    274

1    correct?

2        A.    I think so.

3        Q.    But you went out again on an additional medical

4    leave on August 27th through September 10th?

5        A.    Yeah.  I know I went out again, but I don't

6    remember the dates.

7        Q.    You remember you stayed out until

8    September 10th, 2001?

9        A.    I remember being out, but I don't remember the

10   dates.

11       Q.    Do you remember when you returned to work you

12   presented a disability certificate that allowed you to

13   return to work, but only for 30 hours per week?

14       A.    I do remember coming in with that note, yes.

15       Q.    Do you remember that CSC approved your reduced

16   schedule and designated the ten hours that you needed to

17   have off as FMLA time?

18       A.    I believe so, yes.

19       Q.    They continued to pay you for those ten hours

20   even though you were --

21       A.    I believe so.  I think so.

22       Q.    -- even though you were on leave?

23       A.    Even though I was on leave.

24       Q.    They continued to deduct those ten hours on a



Diane Poland                                    275

1    weekly basis from your paid leave bank?

2        A.    I don't know.

3        Q.    Do you remember that Dawn Dworsky told you you

4    were free to ask coworkers to assist you on the Dazel

5    manual project?

6        A.    No, I don't.

7        Q.    You're not denying that she said that?

8        A.    No.

9        Q.    Do you remember that she told you she would

10   assign you to a new engineering project as soon as one of

11   the projects became available?

12       A.    I believe she did say that at some point, yes.

13       Q.    It is within management's discretion to

14   determine which employees are assigned to which projects?

15            MR. MARTIN:    Objection.

16       A.    I think so.  I don't know.

17       Q.    Do you know that Mike Suman and Dawn Dworsky

18   assigned the DDE project to Audrey Daigger while you were

19   out on leave?

20       A.    I think so.  I don't remember.

21       Q.    And that when you returned, didn't they tell you

22   that they couldn't reassign you to this project because

23   the client had been working with Ms. Daigger and they

24   wanted to continue to work with her?



Diane Poland                                    276

1      A.    No.

2      Q.    They never told you about that?

3      A.    No.

4      Q.    You're not denying that they said that?

5      A.    No, I'm not.

6      Q.    Do you know of any other projects that were

7   available for you to work on other than the Dazel manual?

8      A.    I don't recall them, but there were several I

9   was assigned to at the time.

10      Q.    But do you recall any other projects that were

11   available that you could have worked on other than the

12   manual?

13      A.    To my knowledge, there were others, but I don't

14   remember the names of them.

15      Q.    Even though you worked on this manual, your

16   benefits didn't change?

17      A.    No.

18      Q.    Your salary didn't change?

19      A.    No.

20      Q.    You would agree that management has the right to

21   assign projects in accordance with what it deems best or

22   in the client's interest?

23            MR. MARTIN:  Objection.

24      A.    I don't know.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Diane Poland                                277

1           (Defendant's Exhibit 25 was marked for

2    identification.)

3    BY MR. SEEGULL:

4       Q.   Ms. Poland, I'm now showing you Defendant's

5    Exhibit 25.   This is a series of e-mails during the

6    course of 2001 and 2002, mostly between you and

7    Ms. Osborn.   If you could just look through it and let me

8    know if you, in fact, did receive these e-mails as it

9    reflects your name and on the dates reflected.

10      A.   (The witness reviews the document.)   They look

11   okay to me.

12      Q.   These were the e-mails that you received?

13      A.   I believe so.

14      Q.   Looking at the first page, on December 12th,

15   2001, you were told by Miss Osborn that you should submit

16   an updated doctor's note every 30 days?

17      A.   Yes.

18      Q.   Turning to the second page, if you'll look at

19   the second e-mail in the middle of the page, in the

20   second paragraph --

21      A.   Yes.

22      Q.   -- do you see at the bottom of that paragraph it

23   says:  "If you are not able to return to a 40 hour work

24   week on 1/14/2002, we will need an updated note extending

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A -119

Diane Poland                                      278

1  your disability"?

2       A.    Yes, I do see that.

3       Q.    Do you see on the last page, January 24th, 2002,

4  the bottom e-mail?

5       A.    Yes.

6       Q.    Do you see that you were told at the end "Please

7  submit an updated doctor's note extending your

8  disability"?

9       A.    Yes, I do see that.

10      Q.    With respect to all of your medical notes and

11  your correspondence about your medical conditions, do you

12  know the exact dates on which you returned or provided

13  your certifications or medical information to CSC?

14      A.    No, I don't recall.

15      Q.    Would the company know what dates you turned in

16  your medical notes?

17      A.    I would assume so.

18      Q.    How would the company do that?  Would they look

19  at the dates of the notes?

20      A.    I don't know.

21      Q.    Would they look at facsimile headers?

22      A.    I don't know.

23      Q.    Now, you continued on a reduced leave schedule

24  until February 21, 2002; correct?

1    A.    Possibly, yes, around that time.

2    Q.    That's when you went out on full-time medical

3 leave?

4    A.    I believe so.

5    Q.    That lasted until September 27, 2002?

6    A.    I don't recall.

7    Q.    About that?

8    A.    About that.

9          (Defendant's Exhibit 26 was marked for

10 identification.)

11 BY MR. SEEGULL:

12    Q.    I'm now showing you what's been marked as

13 Defendant's Exhibit 26.  This first page is a letter that

14 you received from Maureen Summers on or about

15 February 25th, 2002?

16    A.    That's correct.

17    Q.    Ms. Summers told you that as required by CSC

18 policy, a certificate of disability from your attending

19 physician must be presented to CSC at the commencement of

20 your medical leave and then every 30 days thereafter;

21 correct?

22    A.    Yes.

23    Q.    She also told you that according to CSC's

24 policy, any failure on the part of the employee to

Diane Poland                                          280

1    provide a continuing certificate of disability may be

2    considered a resignation.

3        A.   Yes.

4        Q.   She told you that you had to provide your

5    disability certificate to Simmie Osborn?

6        A.   Yes.

7        Q.   And that you were to do so by March 4th, 2002?

8        A.   Yes.

9        Q.   Lastly, you were told by the company that

10   failure to provide this certification may result in your

11   voluntary resignation from CSC?

12       A.   Yes.

13       Q.   If you'll turn to the last page of this

14   document, you received an e-mail from Simmie Osborn on

15   March 1, 2002; correct?

16       A.   Yes.

17       Q.   Ms. Osborn told you that she had left a message

18   for you at home?

19       A.   Yes.

20       Q.   She was asking you if you had an estimated

21   return-to-work date?

22       A.   Yes.

23       Q.   She was responding to your e-mail in which you

24   told her "Thank you so much for all your help" on the

Diane Poland                    281

1   last page?

2       A.    Let me see how they flow here.  Yes.

3       Q.    Then going to the first e-mail in the string, or

4   the last in time, I should say, it's an e-mail that you

5   received from Ms. Osborn on March 18th, 2002, at

6   11:56 a.m.?

7       A.    Yes, I see that.

8       Q.    Ms. Osborn told you that your updated doctor's

9   note is due no later than close of business March 29th,

10  2002?

11      A.    Yes.

12            (Defendant's Exhibit 27 was marked for

13  identification.)

14  BY MR. SEEGULL:

15      Q.    Miss Poland, I'm now showing you a letter that

16  was sent to you by Maureen Summers on March 21, 2002.

17      A.    Yes.

18      Q.    You received it on or about that date?

19      A.    Yes, I assume so.

20      Q.    That is addressed to 12 Berks Court, New Castle,

21  Delaware.  That's the address where you currently live?

22      A.    Yes.

23      Q.    You lived there in May of 2002?

24      A.    Yes.



Diane Poland                            282

1      Q.    Do you see in the first paragraph Miss Summers

2   says:  "According to CSC policy, you are required to

3   provide a continuing certificate of disability every

4   thirty (30) days from the date your medical leave

5   commenced on February 20th, 2002"?

6      A.    Yes, I do.

7      Q.    You knew that you had been informed of this

8   policy requirement via written correspondence on

9   August 8th, 2001; December 12, 2001; January 4th, 2002;

10  January 24th, 2002; February 25th, 2002; and most

11  recently on March 18, 2002?

12     A.    That's what it says, yes.

13     Q.    That's true?

14     A.    I don't know.  I don't know if I received

15  everything on those dates.

16     Q.    You're not denying it?

17     A.    I am not.

18     Q.    It says:  "In addition, you were contacted by

19  the Service Center by phone or at least 10 occasions and

20  reminded that the doctor's note was needed every 30

21  days"; correct?

22     A.    That's what it says again, but I don't know.

23     Q.    You're not denying that, either?

24     A.    No.

Diane Poland                                    283

1      Q.    You were also told that the current physician's

2   certificate was due on May 12, 2002, and is now nine days

3   overdue; correct?

4      A.    That's what it says, yes.

5      Q.    That's true?

6      A.    I don't know.  I don't recall.

7      Q.    You're not denying it?

8      A.    No, I'm not.

9      Q.    You were told that a phone call from your doctor

10  is not acceptable, that it has to be a certificate from

11  the doctor on the doctor's letterhead signed by the

12  doctor?

13     A.    That's what it says, yes.

14     Q.    You were also told that failure to do this on

15  time and every 30 days is a violation of company policy?

16     A.    Yes, that's what it says.

17     Q.    And that it would also be considered by CSC to

18  be voluntary resignation?

19     A.    Yes, that's what it says.

20     Q.    You were told you could fax the certification to

21  Maureen Summers?

22     A.    Yes, that's what it says.

23     Q.    You were told if it's not received by the

24  aforementioned date and time, CSC would consider this a

Diane Poland                                    284

1    voluntary resignation?

2        A.    That's what it says, yes.

3        Q.    You were also told that if you had any

4    questions, you could contact Simmie Osborn?

5        A.    Yes, that's what it says.

6              (Defendant's Exhibit 28 was marked for

7    identification.)

8    BY MR. SEEGULL:

9        Q.    I'm now showing you, Miss Poland, what's marked

10   as Defendant's Exhibit 28.  This is a letter that was

11   sent to you by Simmie Osborn on June 20th, 2002; correct?

12       A.    Yes.

13       Q.    You received it on or about that date?

14       A.    On or about, I believe.

15       Q.    Again, this related to your leave at that point?

16       A.    Yes.

17       Q.    Again, you were told that you had to provide a

18   continuing certificate of disability every 30 days from

19   the date your medical leave commenced?

20       A.    That's what it says, yes.

21       Q.    You were told that your estimated return-to-work

22   date of July of 2002 was provided by your doctor's note

23   of May 22nd, 2002?

24       A.    That's what it says, yes.

Diane Poland                              285

1    Q.    You were told that it was your responsibility to

2    provide this doctor's note and insure that it is received

3    by the Service Center?

4    A.    Yes, that's what it says.

5    Q.    You were also told that the failure to provide

6    the required medical certification on a timely basis may

7    be considered by CSC as a voluntary resignation of your

8    employment with CSC?

9    A.    Yes, that's what it says.

10   Q.    You were told that you could contact her if you

11   had any questions and that you should provide the

12   doctor's note directly to her no later than July 28th,

13   2002?

14   A.    I can contact Simmie Osborn, yes.

15   Q.    And that you should provide the updated doctor's

16   note no later than July 28th, 2002?

17   A.    Yes, it does say that.

18         (Defendant's Exhibit 29 was marked for

19   identification.)

20   BY MR. SEEGULL:

21   Q.    I'm now showing you what's marked as Defendant's

22   Exhibit 29.

23   A.    Okay.

24   Q.    I believe this is a fax that your doctor sent on



Diane Poland

286

1    your behalf to Simmie Osborn; is that right?

2       A.    It looks like it.

3       Q.    Have you ever seen this before?

4       A.    No, I don't recall it.

5       Q.    You were never given a copy of this?

6       A.    I might have, but I don't recall it.

7       Q.    Do you see that your doctor in the note that's

8    attached said at the bottom:  "I am hopeful that she will

9    be able to return to work within the next two or three

10   months"?

11      A.    Yes, I do see that.

12      Q.    The doctor's note is dated June 14, 2002?

13      A.    Yes, I do see that.

14      Q.    How long would three months be from June 14,

15   2002?

16      A.    I don't know.

17      Q.    Well, one month from June 14th, 2002, would be

18   July 14, 2002; right?

19      A.    That's correct.

20      Q.    Another month would be August 14, 2002?

21      A.    That's correct.

22      Q.    So a third month would be September 14, 2002?

23      A.    That's correct.

24      Q.    So your doctor was saying that he was hopeful

Diane Poland                          287

1    you would be able to return to work either by

2    August 14th, 2002, or at the latest September 14, 2002;

3    correct?

4         A.    I believe so, yes.

5                     (Defendant's Exhibit 30 was marked for

6    identification.)

7    BY MR. SEEGULL:

8         Q.    I'm now showing you what's been marked as

9    Defendant's Exhibit 30.  This is the next medical note

10   that your doctor provided; correct?

11        A.    I believe so.

12        Q.    It's a note from your doctor, Scott Houser?

13        A.    Yes, it is.

14        Q.    What were you seeing Dr. Houser about?

15        A.    I was seeing him on stress and anxiety and

16   depression.

17        Q.    How often were you seeing him?

18        A.    I don't recall, but I saw him maybe once a week

19   for a time and then once a month for a time.

20        Q.    He provided this note that's dated

21   September 27th, 2002; correct?

22        A.    Yes.

23        Q.    He faxed it to Simmie Osborn on September 29th,

24   2002; correct?

Diane Poland                                    288

1       A.    I assume.  So that's what it says on the fax.

2       Q.    Are you aware of any medical documentation that

3   you provided to the company other than what we've just

4   seen?

5       A.    No, I'm not aware that I can recall it, no.

6             (Defendant's Exhibit 31 was marked for

7   identification.)

8   BY MR. SEEGULL:

9       Q.    I'm now showing you what's been marked as

10  Defendant's Exhibit 31.  Do you recognize this document?

11      A.    It looks familiar.  It looks like the one I just

12  saw.

13      Q.    This is a letter from Maureen Summers to you

14  dated September 26, 2002?

15      A.    Yes, it is.

16      Q.    Miss Summers told you that you had been out on

17  medical leave since February 20th, 2002?

18      A.    Yes, that's what it says here.

19      Q.    And that you are required to provide a

20  continuing certificate of disability every 30 days from

21  the date your medical leave commenced on February 20th?

22      A.    I see that.

23      Q.    And that was according to CSC policy?

24      A.    Yes.

Diane Poland                                    289

1       Q.    Miss Summers recounted that you had been

2   informed of this policy requirement by a written

3   correspondence several times including August 8th and

4   December 12th of 2001, January 4th, January 24th,

5   February 25th, March 18th, May 21st, and June 20th of

6   2002?

7       A.    That's what it says, yes.

8       Q.    That's true?

9       A.    I don't know.  I don't recall.

10      Q.    You're not denying it?

11      A.    I'm not denying it.

12      Q.    She also says that the last doctor's note was

13  dated June 14, 2002, and it indicated that you would be

14  out for two to three additional months?

15      A.    That's what it says, yes.

16      Q.    Miss Summers told you that an updated

17  physician's certificate was due on September 21st, 2002?

18      A.    Yes, that's what it says.

19      Q.    And that it is now past due?

20      A.    That's what it says.

21      Q.    And that's true?

22      A.    I don't know.  I don't recall.

23      Q.    Then she told you that your failure to provide

24  the required medical certification on time is a violation



1   of company policy?

2       A.    Yes, that's what it says.

3       Q.    And that she said, "As stated in the CSC Human

4   Resources Management Policy 247, any failure on the part

5   of the employee to provide the above paperwork may be

6   considered a resignation"?

7       A.    Yes, that's what it says.

8       Q.    She told you in the end, "Therefore, your

9   failure to provide the required medical documentation, is

10  considered your voluntary resignation from CSC effective

11  September 27th, 2002"?

12      A.    Yes, that's what it says.

13      Q.    That's what happened; right?

14      A.    Yes.  I was terminated.

15      Q.    They considered it a voluntary resignation, but

16  you believed it was a termination?

17      A.    They considered it a voluntary -- what is it?

18  Voluntary resignation, yes.

19      Q.    But you considered it a termination?

20      A.    Yes.

21      Q.    But it's true, did you not comply with CSC's

22  policy; correct?

23      A.    No, that's not correct.  I don't recall all the

24  dates on this letter, so I don't recall.



Diane Poland                                    293

1        Q.    Not in any way did they do that; right?

2        A.    Well, at some point they asked me to see another

3   doctor, but I don't know specifically why.

4        Q.    That was in connection with your workers'

5   compensation claim, though?

6        A.    I believe so.

7        Q.    Do you believe CSC acted in a fair manner with

8   respect to your leave of absence?

9        A.    No.

10       Q.    How long do you think you had the right to be

11  out?

12       A.    For as long as I was ill.

13       Q.    Do you think you could have remained an employee

14  for two years out on leave?

15       A.    I don't know.

16       Q.    How about five years?

17       A.    I don't know.

18       Q.    How about ten years?

19       A.    I don't know.

20       Q.    What's reasonable in your mind?

21       A.    I don't know.  I really don't have a

22  guesstimation on that.

23       Q.    Are you aware of anyone else who failed to get

24  his or her medical certificates in on time when they were

Diane Poland                                          294

1    out on medical leave?

2         A.    No, I'm not aware.

3         Q.    Do you know anybody else who was out on medical

4    leave at CSC?

5         A.    No, I'm not aware of anyone.

6         Q.    You've never been diagnosed with a psychiatric

7    disorder, have you?

8         A.    Only as a result of this, just anxiety and

9    depression.

10        Q.    That's not a psychiatric disorder.

11        A.    Then I don't know what a psychiatric disorder

12   is.

13        Q.    Well, you're not claiming that you have a

14   psychiatric disability, do you?

15        A.    I'm not sure because I'm not sure the meaning of

16   "psychiatric disability."

17        Q.    I could be wrong, but I thought what you were

18   claiming is that you suffered the normal workplace

19   stress.

20        A.    I don't know what the "normal workplace stress"

21   is.

22        Q.    Is this anything more than garden variety

23   workplace stress that you suffered?

24        A.    What's "garden variety workplace stress"?

Diane Poland                              296

1      Q.    Did you ever receive any correspondence from

2    Miss Dworsky regarding your leave?

3      A.    I don't recall.  I'm not sure.

4      Q.    Did you ever discuss with Ms. Dworsky your leave

5    situation?

6      A.    Probably, but I don't recall.

7      Q.    Do you know whether the company has ever

8    terminated anybody else for failing to turn in proper

9    medical documentation?

10     A.    Not to my knowledge.

11     Q.    Do you know one way or another?

12     A.    I don't know.

13     Q.    You would agree that an employer has a right to

14   expect its employees to follow its policies; correct?

15          MR. MARTIN:  Objection.

16     A.    I -- I don't know.

17     Q.    Wouldn't you agree that an employer has a right

18   to expect its employees to follow their policies?

19          MR. MARTIN:  Objection.  Asked and

20   answered.

21     A.    I don't know.

22     Q.    You would agree that a business has the right to

23   terminate an at-will employee for failing to follow the

24   terms of its policies?

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

**A -135**

Diane Poland                           300

1   African Americans"; is that right?

2       A.   Yes.

3       Q.   He says:  "'I had coffee,'" and he's recounting

4   what you said, "'I had coffee, talking to Paul about home

5   repairs.'"  Does this ring a bell?

6       A.   Sounds familiar, yes.

7       Q.   "'Dawn came over, all dressed up.'"  Sound

8   familiar?

9       A.   Sounds familiar.

10      Q.   "'Paul asked her whether she had a big

11  meeting.'"

12      A.   Sounds familiar.

13      Q.   "'She said that she was going to her son's

14  graduation at church.'"

15      A.   Sounds familiar.

16      Q.   "'She then asked me,'" meaning yourself, "'why

17  do Black people dress up for church and why is the music

18  so loud.  I told her, I could not speak for all Black

19  people.'"

20      A.   Yes, I do recall that conversation.

21      Q.   Is that the whole conversation or is there more

22  to it than that?

23      A.   It probably was more to it, but that's the gist

24  of it.

1     Q.    Did you tell her you were offended by this

2  comment?

3     A.    No.

4     Q.    Why not?

5     A.    I didn't feel the need to.

6     Q.    She told you that her son was graduating -- was

7  it a black church she was going to?

8     A.    I don't know.

9     Q.    Who was the Paul that's being referred to here?

10     A.    Paul White.

11     Q.    Did you discuss with Mr. White this

12  conversation?

13     A.    I don't remember.  Maybe we did after the fact,

14  but not while Dawn was there.

15     Q.    Did you discuss it with anybody else?

16     A.    No, just Sonia, Maureen, people I'd been talking

17  with in HR.

18     Q.    Let's go to the second point.  It says:

19  "Miss Poland furnished another example of what she

20  considered a racially insensitive remark," and he's

21  quoting you now.  "'Dawn had moved Randy, promoted him,

22  into my group.  I worked with Randy on a server."

23          Who is this Randy that's being referred to

24  here?

360

1   State of Delaware )
                     )
2   New Castle County )

3

4               CERTIFICATE OF REPORTER

5        I, Kathleen White Palmer, Registered Merit
    Reporter, do hereby certify that there came before me on
6   the 30th day of March, 2005, the deponent herein, DIANE
    POLAND, who was duly sworn by me and thereafter examined
7   by counsel for the respective parties; that the questions
    asked of said deponent and the answers given were taken
8   down by me in Stenotype notes and thereafter transcribed
    into typewriting under my direction.

9
         I further certify that the foregoing is a true
10  and correct transcript of the testimony given at said
    examination of said witness.

11
         I further certify that reading and signing of
12  the deposition were waived by the deponent and counsel.

13       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.

15

16

17

18               Kathleen Palmer (signature)

19           Kathleen White Palmer, RPR, RMR
             Certification No. 149-RPR
20           (Expires January 31, 2005)

21

22  DATED:  April 1, 2005

23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

A -138

Westlaw.

99 Fed.Appx. 405                                                                                                           Page 1
99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands))
**(Cite as: 99 Fed.Appx. 405,  2004 WL 1179270 (3rd Cir.(Virgin Islands)))**

**C**
This case was not selected for publication in the
Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit
court rule before citing this opinion. Third Circuit
Local Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
James BERRY, Appellant,
v.
JACOBS IMC, LLC.
No. 03-3776.

Submitted Under Third Circuit LAR 34.1(a) May 7,
2004.
Decided May 27, 2004.

**Background:**  Former employee sued employer,
alleging various forms of employment discrimination
and breach of contract, in violation of federal and
territorial law. The District Court of the Virgin
Islands Division of St. Croix granted summary
judgment in favor of the employer, and the employee
appealed.

 **Holdings:**  The Court of Appeals, Barry, Circuit
Judge, held that:
 (1) court had jurisdiction over both the order
granting summary judgment, and an order denying
the employee's motion for reconsideration;
 (2) employee failed to prove race discrimination in
his job assignment or the promotion of another
individual to a superintendent position;
 (3) there was no breach of contract;
 (4) employer's conduct did not rise to the level
required to support a claim of intentional infliction of
emotional distress;
 (5) employee failed to prove negligent infliction of
emotional distress;
 (6) employee failed to prove a pattern and practice
of race discrimination; and
 (7) employee failed to prove that he was
constructively discharged.
 Affirmed.

West Headnotes

**[1] Federal Courts ⌐══768.1**
170Bk768.1 Most Cited Cases
Appellate court had jurisdiction over both a district
court order granting summary judgment for the
defense, and an order denying the plaintiff's motion
for reconsideration, despite claim that the notice of
appeal indicated only that the plaintiff was appealing
from the order denying reconsideration; the specified
order denying the motion for reconsideration was
predicated upon the unspecified order granting
summary judgment, and the defendant was not
prejudiced by the plaintiff's failure to note the
summary judgment order in the notice of appeal.
F.R.A.P.Rule 3(c)(1)(B), 28 U.S.C.A.

**[2] Civil Rights ⌐══1135**
78k1135 Most Cited Cases
Black former employee failed to prove race
discrimination in his job assignment or the promotion
of another individual to a superintendent position; the
position which most closely resembled the
employee's former position with another employer
was held by a black worker, and the employee did not
produce evidence showing that he was qualified for a
promotion to the superintendent position; moreover,
the former employee failed to rebut the employer's
nondiscriminatory explanations for placing the other
worker into the position most closely resembling the
employee's former position, and for believing that the
employee was not qualified for a promotion. Civil
Rights Act of 1964, § 701 et seq., as amended, 42
U.S.C.A. § 2000e et seq.

**[3] Labor and Employment ⌐══201**
231Hk201 Most Cited Cases
Original memorandum of understanding did not
guarantee housing allowances to employees for the
full duration of their employment, and thus, there was
no breach of contract when employer issued an
amended memorandum of understanding which
limited the housing allowance to a maximum period
of 24 months; the original memorandum of
understanding provided that "[t]he terms and
conditions stated in this assignment letter are based
on current project schedules and requirements and
therefore could be subject to change."

**[4] Damages ⌐══57.56**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

99 Fed.Appx. 405                                                                Page 2
99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands))
**(Cite as: 99 Fed.Appx. 405,  2004 WL 1179270 (3rd Cir.(Virgin Islands)))**

115k57.56 Most Cited Cases

Employer's conduct, which former employee claimed was racially discriminatory and breached his contractual rights, did not rise to the level required to support a claim of intentional infliction of emotional distress under Virgin Islands law. Restatement (Second) of Torts § 46.

**[5] Damages** ☞57.56
115k57.56 Most Cited Cases

Former employee claiming race discrimination and breach of contract failed to prove that he suffered any sort of an injury as a result of employer's conduct, or that it was reasonably foreseeable that employer's conduct would result in such injury, thus defeating his claim of negligent infliction of emotional distress under Virgin Islands law. Restatement (Second) of Torts § 313 (1965).

**[6] Civil Rights** ☞1139
78k1139 Most Cited Cases

There was no evidence showing that racial discrimination was employer's standard operating procedure--the regular rather than the unusual practice--and thus alleged acts of discrimination did not rise to the level required for a finding of a pattern and practice of race discrimination; acts alleged were, at most, isolated or sporadic. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[7] Labor and Employment** ☞826
231Hk826 Most Cited Cases

Former employee failed to demonstrate that his working conditions were so unpleasant or difficult that a reasonable person in the employee's shoes would resign, as required to prevail on a claim for constructive discharge under the Virgin Islands Wrongful Discharge Act.
*406 Appeal from the District Court of the Virgin Islands Division of St. Croix. D.C. Civil No. 01-cv-00007. District Judge: The Honorable Raymond L. Finch, Chief Judge.

Maxwell D. McIntosh, Alkon & Meaney, St. Croix, USVI, for Appellant.

Stephanie L. Adler, Jackson Lewis, Orlando, FL, for Appellee.

Before BARRY, AMBRO, and SMITH, Circuit Judges.

OPINION

BARRY, Circuit Judge.

**\*1 Plaintiff James Berry brought suit against defendant Jacobs Industrial Maintenance Company, LLC ("Jacobs") alleging various forms of employment discrimination and breach of contract, in violation of federal and territorial law. The District Court granted summary judgment in favor of Jacobs. Plaintiff appeals, and we will affirm.

I.

Plaintiff, an African-American male, was employed by Jacobs as a mechanical troubleshooter from August 1999 to September 2000. Jacobs was formed in August 1999 to provide various services, such as maintenance *407 and construction for the HOVENSA oil refinery. Prior to this employment, plaintiff worked as an off site superintendent for the Virgin Islands Industrial Maintenance Company, LLC ("VI IMC"), a contractor that provided services to the HOVENSA refinery before Jacobs was created in 1999.

In August 1999, representatives of Jacobs gave a presentation to prospective job applicants. Plaintiff alleges that during the question and answer session, he asked a Jacobs representative about the pay rates and employment positions offered at Jacobs. Although plaintiff did not recall the representative's exact words, he interpreted them to mean that successful applicants would not be given a pay cut or be demoted from their current positions at their respective companies if they chose to work for Jacobs.

Plaintiff then accepted a position at Jacobs as a mechanical troubleshooter. According to him, this new position constituted a demotion from his former position at VI IMC because it was not supervisory in nature. He admitted, however, that the mechanical troubleshooter position had not existed at VI IMC. In addition, plaintiff's salary at Jacobs was at least equal to what he had made at VI IMC. He also received a housing allowance from Jacobs, which he had not received while employed at VI IMC. Moreover, he acknowledged that the exact position he had occupied at VI IMC did not exist at Jacobs. The position at Jacobs that most closely resembled his former position was that of a terminal zone supervisor, which was filled by Val Richardson, a black West Indian employee. Daryl Kramer, Routine Maintenance Manager of Jacobs, stated that he had considered plaintiff for the position of a terminal zone supervisor, but hired Richardson instead

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because Richardson "had excellent credentials and experience and was highly regarded by his colleagues at IMC and HOVENSA." (A72).

In June 2000, plaintiff asked Ken Lawson, General Manager of Jacobs, about opportunities to be promoted to a superintendent's position. Lawson informed plaintiff that he did not believe that he was qualified. According to Lawson, he had been told that plaintiff was not working a 40-hour week, and had a problem with absenteeism. In September 2000, plaintiff resigned from Jacobs and accepted a position as an operator trainee at HOVENSA.

Plaintiff then brought suit in the United States District Court for the Virgin Islands against Jacobs alleging (1) employment discrimination, in violation of Title VII of the Civil Rights Act of 1964 and the Virgin Islands Civil Rights Act;  (2) breach of contract;  (3) intentional infliction of emotional distress or, in the alternative, negligent infliction of emotional distress; (4) pattern and practice of racial discrimination against black employees;  and (5) constructive discharge, in violation of the Virgin Islands Wrongful Discharge Act. Jacobs moved for summary judgment. In support of its motion, it filed the deposition transcript of plaintiff, and affidavits of General Manager Lawson and Routine Maintenance Manager Kramer.   Plaintiff did not oppose the motion.

**\*\*2** In an order dated April 9, 2003, the District Court granted Jacobs's motion, and plaintiff moved for reconsideration.   The District Court denied the motion for reconsideration on August 11, 2003. Plaintiff filed a notice of appeal, which stated that he was appealing from the order denying his motion for reconsideration.   We have jurisdiction pursuant to 28 U.S.C. § 1291, and will affirm the orders of the District Court.

## II.

[1] In his brief to us, plaintiff contends that the District Court erred  (1) in granting **\*408** summary judgment to Jacobs because it failed to consider all the evidence in the record;  and (2) in denying plaintiff's motion for reconsideration.   Jacobs, in response, argues that the notice of appeal failed to designate the April 9, 2003 order granting summary judgment;  rather, the notice indicated only that plaintiff was appealing from the August 11, 2003 order denying the motion for reconsideration.

Federal Rule of Appellate Procedure 3(c)(1)(B) requires that the notice of appeal "designate the

judgment, order, or part thereof being appealed." Although plaintiff did not specify the order granting summary judgment in his notice of appeal, his failure to do so "is not fatal because a policy of liberal construction of notices of appeal prevails" in this Court. *Nationwide Mut. Ins. Co. v. Cosenza,* 258 F.3d 197, 202 n. 1 (3d Cir.2001). We may exercise jurisdiction over orders not designated in the notice "if there is a connection between the specified and unspecified order, the intention to appeal the unspecified order is apparent and the opposing party is not prejudiced and has a full opportunity to brief the issues." *Williams v. Guzzardi,* 875 F.2d 46, 49 (3d Cir.1989).

Here, those requisites have been met. The "specified order" denying the motion for reconsideration is predicated upon the "unspecified order" granting summary judgment.   *See, e.g., Lusardi v. Xerox Corp.,* 975 F.2d 964, 972 (3d Cir.1992). Moreover, Jacobs has not been prejudiced by plaintiff's failure to note the summary judgment order in the notice of appeal;   indeed plaintiff's intent to challenge that order was apparent in his motion to reconsider, and both parties have fully briefed the issue of whether summary judgment was warranted.   Thus, we have jurisdiction over both the order granting summary judgment, and the order denying the motion for reconsideration.

We will first address the order of summary judgment.   Our review of a grant of summary judgment is plenary.   *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir.2004).   Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact," and where, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Id.* Even if the non-moving party does not respond to the motion, summary judgment should be granted only when it is appropriate.   *See Anchorage Assoc. v. Virgin Islands Bd. of Tax Review,* 922 F.2d 168, 175 (3d Cir.1990).

**\*\*3** Plaintiff first argues that the grant of summary judgment on his race discrimination claim was erroneous.   To succeed on a Title VII claim, a plaintiff must initially establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class;  (2) he was qualified for an open position;  and (3) nonmembers of the protected class were treated more favorably. *See Goosby v. Johnson*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

& *Johnson Med., Inc.,* 228 F.3d 313, 318- 19 (3d Cir.2000). Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *Id.* If the defendant meets its burden of persuasion, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir.1999). A plaintiff may prove pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in **\*409** the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 413 (quoting *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1108- 09 (3d Cir.1997)). He may also defeat a motion for summary judgment if he demonstrates that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994)).

[2] Plaintiff did not set forth a *prima facie* case of discrimination. He did not come forward with evidence demonstrating that nonmembers of the protected class were given more favorable treatment. The position at Jacobs which most closely resembled his former position--terminal zone supervisor--was held by a black employee, Val Richardson. Moreover, as for his request for a promotion to the position of superintendent, he did not produce evidence showing that he was qualified.

Even if we assume that plaintiff made out a *prima facie* case, Jacobs has satisfied its burden of articulating a legitimate, nondiscriminatory reason for its actions. Jacobs claimed that it hired Richardson over plaintiff as the terminal zone supervisor based on the feedback it received from Richardson's previous supervisor, and because of Richardson's "excellent credentials and experience." In addition, Jacobs's general manager provided a valid reason for believing that plaintiff was not qualified for a promotion: he routinely saw plaintiff's name on reports of those leaving work early, and had been informed that he was not working a 40-hour week. Plaintiff, in turn, has not offered any evidence beyond his own conclusory allegation that Jacobs discriminated against him based on race. Thus, there was insufficient evidence to support the claim of pretext, and the District Court did not err in granting summary judgment on the race discrimination claim. [FN1]

FN1. Plaintiff also alleges that Jacobs's actions violated the Virgin Islands Civil Rights Act. He does not, however, specify the violations claimed. Thus, we will assume that his Virgin Islands claim mirrors his Title VII claim. For the reasons stated previously, plaintiff failed to produce sufficient evidence to survive summary judgment on this claim. *See, e.g., Matheson v. Virgin Islands Cmty. Bank, Corp.,* 297 F.Supp.2d 819, 832 (D.Vi.2003).

**\*\*4** [3] Plaintiff next contends that Jacobs was not entitled to summary judgment on his breach of contract claim. According to plaintiff, he accepted employment at Jacobs because he was offered a housing allowance of $1,500 per month, grossed up to $2,300 for Virgin Islands tax purposes. Plaintiff signed the memorandum of understanding, dated September 10, 1999, which set forth the terms of the housing allowance. He argues that although the housing allowance was to continue for as long as he was employed at Jacobs, Jacobs breached this contract when it issued an amended memorandum of understanding on November 5, 1999, which limited the housing allowance to a maximum period of 24 months.

We reject this argument. The original memorandum of understanding did not guarantee housing allowances to employees for the full duration of their employment at Jacobs. Rather, the memorandum explicitly provided that "[t]he terms and conditions stated in this assignment letter are based on current project schedules and requirements and therefore could be subject to change." (A284). Jacobs's issuance of the amended memorandum, therefore, did not constitute a breach of contract.

[4][5] Plaintiff also asserts that he established sufficient facts indicating intentional **\*410** infliction of emotional distress or, in the alternative, negligent infliction of emotional distress. We disagree. With respect to his claim of intentional infliction of emotional distress, there is nothing in the record to support a finding that Jacobs's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (1965); *see also Claytor v. Chenay Bay Beach Resort,* 79 F.Supp.2d 577, 583 (D.Vi.2000); *Manns v. Leather Shop, Inc.,* 960 F.Supp. 925, 930 (D.Vi.1997). As for the claim of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

negligent infliction of emotional distress, plaintiff did not produce evidence that he suffered any sort of an injury as a result of Jacobs's conduct, or that it was reasonably foreseeable that Jacobs's conduct would result in such injury. *See* Restatement (Second) of Torts § 313 (1965); *Anderson v. Gov't of the Virgin Islands,* 180 F.R.D. 284, 287 (D.Vi.1998).

[6] Summary judgment was also properly granted on the claim of pattern and practice of race discrimination. Although plaintiff claims that Jacobs engaged in a pattern and practice of discrimination, the acts alleged by him were, at most, isolated or sporadic. *See* United States v. Lansdowne Swim Club, 894 F.2d 83, 88 (3d Cir.1990) (quoting *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). There was no evidence showing that racial discrimination was Jacobs's "standard operating procedure--the regular rather than the unusual practice." *Id.* The alleged acts, therefore, do not rise to the level required for a finding of pattern and practice of discrimination.

**5 [7] Finally, the District Court did not err in granting summary judgment on the claim brought under the Virgin Islands Wrongful Discharge Act. To succeed in establishing a claim for constructive discharge, a plaintiff must demonstrate that the working conditions were "so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1079 (3d Cir.1992) (quotations and citations omitted). Plaintiff made no such demonstration.

### III.

Plaintiff also appeals the District Court's order denying his motion for reconsideration. According to him, the District Court erred in failing to consider the evidence in the record when it granted summary judgment to Jacobs. The denial of a motion for reconsideration is reviewed for abuse of discretion, but "if the court's denial was based upon the interpretation and application of a legal precept, review is plenary." *Le v. Univ. of Pa.,* 321 F.3d 403, 405-06 (3d Cir.2003) (quoting *Koshatka v. Philadelphia Newspapers, Inc.,* 762 F.2d 329, 333 (3d Cir.1985)).

The standard plaintiff must meet to prevail on a motion for reconsideration is high:

   a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in

the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999) (citation omitted). Plaintiff does not allege that the controlling law has changed, or that there was new evidence. Thus, he must demonstrate that the order *411 of the District Court constituted a clear error, or resulted in manifest injustice. It did not. The grant of summary judgment was proper, and we will affirm the order denying the motion for reconsideration.

### IV.

For the foregoing reasons, we will affirm the April 9, 2003 order of the District Court granting summary judgment to Jacobs, and the August 11, 2003 order denying plaintiff's motion for reconsideration.

99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands))

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

80 Fed.Appx. 261                                                                                          Page 1
80 Fed.Appx. 261, 2003 WL 22508498 (3rd Cir.(Pa.))
**(Cite as: 80 Fed.Appx. 261, 2003 WL 22508498 (3rd Cir.(Pa.)))**

**C**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Terri Lynn EDWARDS, Appellant,
v.
PENNSYLVANIA TURNPIKE COMMISSION,
Appellee.
**No. 02-4279.**

Submitted Pursuant to Third Circuit LAR 34.1(a)
Sept. 18, 2003.
Decided Nov. 5, 2003.

Former employee of Pennsylvania Turnpike Commission brought action against commission under Title VII alleging she was denied a promotion and terminated from her employment because of her race and in retaliation. The United States District Court for the Middle District of Pennsylvania, John E. Jones, III, J., granted summary judgment in favor of defendant. Employee appealed. The Court of Appeals, McKee, Circuit Judge, held that: (1) employee failed to establish that employer's proffered reasons for terminating employment were a pretext for racial discrimination; (2) employee failed to establish that she was not promoted because of racial discrimination; and (3) employee was not entitled to supplement the summary judgment record five months after discovery closed.

Affirmed.

West Headnotes

**[1] Civil Rights** 🔑1137
78k1137 Most Cited Cases

Public employee failed to establish that employer's proffered reasons for terminating employment, that employee performed her job poorly and was insubordinate, were a pretext for racial discrimination as required to support her Title VII claim against employer; although employee claimed her work actions were not unusual and that co-workers had referenced her race by criticizing her for talking "too black," remarks about race were unrelated to decision to terminate employee, were temporally remote from date of decision, and white employee who behaved similarly was at a different stage in disciplinary scheme. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights** 🔑1135
78k1135 Most Cited Cases

Public employee failed to establish that she was not promoted because of racial discrimination as required to support employee's Title VII claim against employer, where employee presented no evidence that she was more qualified that applicants who were recommended for the position. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[3] Federal Civil Procedure** 🔑2554
170Ak2554 Most Cited Cases

Plaintiff was not entitled to supplement the summary judgment record five months after discovery closed, where evidence plaintiff sought to introduce was merely corroborative of evidence already on the record and would not have altered the decision of the district court.

*262 Appeal from the final order entered on October 23, 2002 in the United States District Court for the Middle District of Pennsylvania in Civil Action No. 1:CV-01-0357. District Court: Hon. John E. Jones.

Andrew J. Ostrowski, Harrisburg, PA, for Appellant.

Marvin L. Weinberg, John C. Romeo, Fox Rothschild, Philadelphia, PA, for Appellee.

Before: MCKEE and SMITH, Circuit Judges, and SCHILLER, District Judge. [FN1]

FN1. Honorable Berle M. Schiller, U.S. District Judge, Eastern District of Pennsylvania sitting by designation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

OPINION

MCKEE, Circuit Judge.

**\*\*1** Plaintiff, Terri Lynn Edwards appeals from the district court's grant of summary judgement for the defendant, the Pennsylvania Turnpike Commission (the "Commission") as well as the district court's denial of plaintiff's motion to supplement the judgment record. For the reasons that follow, we will affirm the ruling of the district court.

### I.

Because we write only for the parties, it is not necessary to recite the facts of this case in detail. It is sufficient to note that Edwards, a former employee of the Commission, filed a complaint in the Middle District of Pennsylvania pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991, against the Commission. Edwards alleged that she was denied a promotion and terminated from her employment because of her race and/or in retaliation for having raised discrimination claims.

After discovery was closed, the Commission filed a motion for summary judgment and four months later Edwards filed a motion to supplement the summary judgment record with after-acquired evidence. **\*263** The district court granted the Commission's motion for summary judgment, [FN2] denied Edward's motion to supplement the record [FN3] and entered judgment for the Commission. This appeal followed.

> FN2. We review the district court's grant of a motion for summary judgment using a plenary standard. We must also (i) resolve conflicting evidence in favor of the nonmovant, (ii) not engage in credibility determination, and (iii) draw all reasonable inferences in favor of the nonmovant.

> FN3. We review the district court's denial of a motion to supplement the record for abuse of discretion.

### II.

As noted, Edwards appeals both the district court's grant of the Commission's motion for summary judgment as well as the court's denial of her motion to supplement the record. Each issue will be discussed separately.

**A. Motion for Summary Judgment**

[1][2] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. To be a genuine issue, the evidence must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Materiality will be determined by the substantive law of the case. Id. Therefore, "the mere existence of some alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id.

In disparate treatment cases brought under Title VII, once the plaintiff has established a prima facie case of discrimination the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once the defendant has met this burden, the plaintiff must show that the nondiscriminatory reason articulated by the defendant is in fact a pretext for discrimination. Id. at 804.

**\*\*2** In a Title VII action, to avoid summary judgment after the employer has proffered a legitimate, nondiscriminatory reason for adverse employment action, the plaintiff must produce evidence which: (1) casts sufficient doubt upon each proffered reason so that a fact finder could reasonably conclude that each reason was fabrication, or (2) allows a fact finder to infer that discrimination was more likely than not a motivating or determinative cause of action. See Fuentes v. Perskie, 32 F.3d 759 (3d Cir.1994). The plaintiff, therefore, must cast doubt on the legitimate reason for an employment decision advanced by the employer. This burden is met through a demonstration that such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action are such that a reasonable factfinder could rationally find them 'unworthy of credence' " Id.

Here, Edwards established a prima facie case, as the burden is not overly heavy. **\*264** The Commission

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

then sustained its burden by advancing a multitude of reasons for Edwards' termination other than discrimination. The legitimate reasons included Edwards' poor job performance as evidenced by a written warning issued to Edwards for threats she allegedly made against a co-worker, as well as a two-day suspension issued as a result of certain job deficiencies, including an incident where Edwards put a 9-1-1 dispatcher on hold so that she could continue a personal phone call. After these measures were taken, Edwards was warned that under the applicable Collective Bargaining Agreement, the next step in the disciplinary procedure would be Edwards' termination. Finally, in May of 1999, Edwards was terminated for a variety of other infractions. The Commission presented evidence which showed she was insubordinate to her direct supervisor and also charged personal periodical subscriptions and a seminar to the Commission without permission.

Edwards argues that the legitimate reasons proffered by the Commission to support their employment decisions are merely a pretext for racial discrimination. Edwards does not attempt to cast doubt upon the Commission's proffered reasons for her termination. Instead, she attempts to bring forth evidence from which a reasonable fact finder could conclude that racial discrimination was more likely than not a motivating cause for her discharge. *See Fuentes v. Perskie, 32 F.3d 759 (3d Cir.1994).* In support of this claim, Edwards asserts that her actions at work were not unusual, in that other employees behaved in a similar unprofessional manner. She also claims that co-workers and superiors had referenced her race by criticizing her for talking "too black," Plaintiff's Exhibit E at page 3, and labeled her as a "trouble-making f ----- ------," Plaintiff's Exhibit A at page 26, and that another white employee who was also written up for insubordination received no discipline in response to his actions.

**\*\*3** The evidence presented by Edwards is insufficient to create a reasonable inference that the Commission's articulated legitimate, nondiscriminatory reasons are false, or that an invidious discriminatory reason was more likely a motivating or determinative cause for her discharge. *See Torre v. Casio, Inc., 42 F.3d 825, 830 (3d Cir.1994).* We agree with the district court's determination that the remarks made about her race are not sufficient to sustain her burden. The remarks were made by supervisors unrelated to the decision to terminate Edwards and the remarks were also temporally remote from the date of the decision. Therefore they were "stray" remarks and not given

great weight. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir.1992).* [FN4]

> FN4. Our conclusion may have been different if Edwards had provided sufficient proof that the supervisors who made the remarks were involved with the decisions leading to her termination.

Also, we find Edwards' contention that she was treated differently than a White employee who engaged in similar behavior insufficient to sustain her burden. Although both Edwards and the White employee were charged with similar infractions, Edwards was fired while the White employee was not. However, the two employees were at different stages of the disciplinary scheme outlined in the Collective Bargaining Agreement. The Commission's failure to terminate the White employee, therefore, does not create an inference of racial discrimination.

Finally, we find no merit in Edwards' claim that she was not promoted because **\*265** of illegal discrimination. Edwards applied for a position in January of 1999, which she was denied. However, she has not presented any evidence from which a reasonable fact finder could find she was more qualified than the applicants who were recommended for the position. Furthermore, Edwards was not even eligible for one of the promotions she mentions because of her termination.

Edwards has not presented sufficient evidence to show that she was the subject of unlawful discriminatory treatment by the Commission. Therefore, we find there is no genuine issue as to any material fact regarding the Commission's decision to terminate her.

### B. Motion to Supplement Summary Judgment Record

[3] The district court denied Edwards' motion to supplement the summary judgment record, which was made more than five months after discovery had closed. We review the district court's decision using an abuse of discretion standard. An abuse of discretion is found where we are left with the "definite and firm conviction that the trial court committed a clear error of judgment." *Logan v. Dayton Hudson Corp., 865 F.2d 789, 790 (6th Cir., 1989)* The evidence Edwards sought to introduce was merely corroborative of evidence already on the record and would not have altered the decision of the district court. We find that the ruling of the district

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

80 Fed.Appx. 261
80 Fed.Appx. 261, 2003 WL 22508498 (3rd Cir.(Pa.))
**(Cite as: 80 Fed.Appx. 261,  2003 WL 22508498 (3rd Cir.(Pa.)))**

Page 4

court denying Edwards' motion to supplement the record was therefore not an abuse of discretion.

### III.

For the above reasons, we will affirm the ruling of the district court.

80 Fed.Appx. 261, 2003 WL 22508498 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

• 2003 WL 24031533  (Appellate Brief) Brief of Appellee (Mar. 10, 2003)Original Image of this Document (PDF)

• 2003 WL 24031532  (Appellate Brief) Brief of Appellant (Feb. 06, 2003)Original Image of this Document (PDF)

•                   02-4279                   (Docket) (Nov. 26, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

83 Fed.Appx. 455                                                                                    Page 1
83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.))
(Cite as: 83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.)))

**H**

**Briefs and Other Related Documents**

This case was not selected for publication in the
Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit
court rule before citing this opinion. Third Circuit
Local Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Lewis JOHNSON, Appellant,
v.
Hershel W. GOBER, Acting Secretary of Veterans
Affairs;  Rodney Kiscadden;
Alice Fidler;  Peg Winters;  Irvin Erickson;  Raymer
Kent;  American Federation
of Government Employees;  Local 1966.
No. 03-1423.

Argued Dec. 5, 2003.
Decided Dec. 18, 2003.

**Background:** Former employee of Veterans Affairs
brought action against former employer, coworkers,
and union, challenging his non-selection for a
position, VA's contest of his claim for workers
compensation benefits, the termination of his
employment, and alleging creation of a hostile work
environment. The United States District Court for the
Middle District of Pennsylvania, John E. Jones, III,
J., granted summary judgment in favor of defendants.
Plaintiff appealed.

  **Holdings:** The Court of Appeals, Sloviter, Circuit
Judge, held that:
  (1) employee failed to establish that employer's
proffered reason for not selecting employee for
different position was pretext for discrimination;
  (2) employee failed to file lawsuit challenging the
contest of his claim for workers compensation
benefits within 90 days of receipt of the notice of the
final agency decision;
  (3) employee failed to file his hostile work

environment lawsuit within 90 days of receipt of
notice of the final agency decision;
  (4) employee failed to exhaust administrative
remedies prior to filing lawsuit alleging constructive
discharge; and
  (5) employee was not entitled to equitable tolling of
his time barred claims.
  Affirmed.

West Headnotes

**[1] Civil Rights ☞1137**
78k1137 Most Cited Cases

**[1] Civil Rights ☞1141**
78k1141 Most Cited Cases
Employee failed to establish that employer's
proffered reason for not selecting employee for
different position, that applicant selected had 17
years of experience and good demeanor, was pretext
for discrimination based on race; although employee
had more seniority than applicant, employer's
agreement with union provided that employer could
consider a variety of criteria in filling a vacant
position, not only seniority, and one alleged racially
based disparaging remark made by supervisor, which
supervisor denied making, was not sufficient to show
racial bias.

**[2] Civil Rights ☞1530**
78k1530 Most Cited Cases
Former employee of Veterans Affairs (VA) failed to
file his Title VII lawsuit challenging the VA's contest
of his claim for workers compensation benefits
within 90 days of receipt of the notice of the final
agency decision denying benefits, barring lawsuit.
Civil Rights Act of 1964, § 717(c), 42 U.S.C.A. §
2000e-16(c).

**[3] Civil Rights ☞1530**
78k1530 Most Cited Cases
Former employee of Veterans Affairs (VA) failed to
file his Title VII lawsuit alleging hostile work
environment within 90 days of receipt of the notice of
the final agency decision dismissing his claim,
barring lawsuit. Civil Rights Act of 1964, § 717(c),
42 U.S.C.A. § 2000e-16(c).

**[4] Civil Rights ☞1514**
78k1514 Most Cited Cases
Former employee of Veterans Affairs (VA) failed to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.