Case 1:04-cv-00217-GMS    Document 47    Filed 05/06/2005    Page 1 of 20

83 Fed.Appx. 455
83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.))
(Cite as: 83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.)))

Page 2

exhaust his administrative remedies prior to filing lawsuit alleging constructive discharge, barring claim; employee never filed a formal complaint with Equal Employment Opportunity department. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 29 C.F.R. §§ 1614.105(a)(1), 1614.106(b).

[5] Civil Rights 🗝1505(6)
78k1505(6) Most Cited Cases

[5] Civil Rights 🗝1530
78k1530 Most Cited Cases
Former employee of Veterans Affairs (VA) was not entitled to equitable tolling of the statutory time requirements governing his Title VII suit challenging VA's contest of his claim for workers compensation benefits and alleging hostile work environment; although employee claimed he thought all of his complaints were consolidated, ALJ clearly articulated the denial of the consolidation request and employee provided no evidence that he had mistakenly believed the complaints had in fact been consolidated. Civil Rights Act of 1964, § 717(c), 42 U.S.C.A. § 2000e-16(c).

*456 On Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. Civil No. 00-cv-01873). District Judge: Hon. John E. Jones, III.

Andrew J. Ostrowski (Argued), Bailey, Stretton & Ostrowski, Harrisburg, PA, for Appellant.

Thomas A. Marino, United States Attorney, Kate L. Mershimer (Argued), Assistant United States Attorney, Office of United States Attorney, Middle District of Pennsylvania, Harrisburg, PA, for Appellees.

Before: SLOVITER, ALITO, Circuit Judges and OBERDORFER, District Judge. [FN*]

FN* Hon. Louis F. Oberdorfer, United States District Court for the District of Columbia, sitting by designation.

OPINION OF THE COURT

SLOVITER, Circuit Judge.

**1 Lewis Johnson, a former employee of the Department of Veterans Affairs ("VA") at its Lebanon Medical Center ("Lebanon"), filed suit against the Secretary of the Veteran's Administration, employees of Lebanon and the employees' union, complaining about his non-selection for a Housekeeping Aid position in 1998, the creation of a hostile work environment, the VA's contest of his claim for Worker's Compensation benefits, and the VA's termination of his employment. He appeals from the District Court's order granting summary judgment for the defendants. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the grant of summary judgment is plenary. Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir.2002).

I.

Johnson had been employed as a Housekeeping Aid and applied for another Housekeeping Aid position in the "extended care" section of the hospital. Under the applicable union agreement, positions designated as entry-level because of their high turn-over rate or the specific requirements of the job are placed on the "Open and Continuous" list and filled through a competitive selection process for which seniority was not the determining factor for selection.

In the spring of 1998, the VA changed its employment selection process to a new approach in which the units within the VA were viewed as "teams" and the employment *457 decisions were to be made by a product line manager who would seek employees to foster a team environment. The Housekeeping Aid vacancy for which Johnson applied was posted on the "Open and Continuous" list in June 1998. Johnson (who is African-American), Ronald Hull, and other VA employees applied for the position. Only Johnson and Hull were then employed as Housekeeping Aids; the other applicants were from the Food Service department.

The applications were referred to Alice Fidler, the Nurse Manager and team leader of the extended care unit, who was designated as the decision maker for this vacancy. Fidler in turn sought the assistance of Barbara Kohr, a Nurse Manager in the Hospice Unit. Fidler and Kohr focused their decision on Hull and Johnson because of their previous housekeeping experience. Fidler did not consider the applicants' seniority, and, instead, focused on selecting the applicant she believed was most qualified for the position.

Fidler testified that she selected Hull because of his experience, initiative, and understanding of patients' needs. Fidler thought Hull possessed a better ability to get along with difficult patients as well as staff members. Because the "product line" approach was to build teams on the VA staff, Fidler thought that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

83 Fed.Appx. 455                                                                                                       Page 3
83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.))
**(Cite as: 83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.)))**

Hull was not only more qualified but that also he would fit in better with the team than Johnson. Both Kohr and Fidler testified in their depositions that race played no role in the decisionmaking process. Nevertheless, Johnson believed that Fidler did not select him for the position because of his race.

In October 1999, a fellow Housekeeping Aid, Irv Erickson, made a racially disparaging remark to Johnson. Erickson admitted making the remark, but contended he was kidding with Johnson. A few days after the incident, Erickson heard that Johnson was going to file an Equal Employment Opportunity ("EEO") department complaint against him. In attempting to talk with Johnson about this complaint, Erickson allegedly bumped and pushed Johnson. Johnson submitted a "Report of Contact" to an EEO counselor on October 18, 1999, and on October 20, Erickson's supervisors informed him to refrain from future contact with Johnson or he would be subject to disciplinary actions. Johnson subsequently filed a complaint with the EEO claiming that Erickson's conduct constituted a hostile work environment.

**2 On May 9, 2000, the VA sent a letter to Johnson informing him that his claim was dismissed. The VA advised Johnson that he had a right to appeal this decision to the EEOC within 30 days, or file a civil action in a District Court within 90 days. Johnson received the VA's decision on May 10, 2000, but did not file an EEOC appeal. Rather, Johnson filed a Title VII complaint on October 24, 2000, over two months after the deadline.

Shortly after the October 1999 incident with Erickson, Johnson went on sick leave and sought Worker's Compensation Benefits. While there was some confusion as to the filing of the paperwork because of the guidance Johnson received from the VA, the Department of Labor ultimately denied Johnson's claim. Johnson complained to an EEO counselor on February 5, 2000 that the VA failed to follow the appropriate guidelines in processing his paper work for the Worker's Compensation claim. On April 13, 2000, Johnson filed a formal complaint with the EEO.

On May 10, 2000, the VA dismissed Johnson's claim because the authority to grant Workers Compensation benefits was vested solely with the discretion of the Department of Labor. Johnson was notified by letter that he had a right to appeal *458 to the EEOC within 30 days, or that he could file a civil action with 90 days. Johnson received this letter on or about May 11, 2000, but did not file an EEOC appeal. As noted above, he filed the lawsuit on October 24, 2000, more than five months after he received the final decision.

Johnson did not return to work after he left for sick leave subsequent to the Erickson incident, and on November 25, 1999, his sick leave ran out. On August 4, 2000, Johnson was advised by letter that he could receive a maximum of one year leave without pay, and that year would conclude on November 24, 2000. Johnson's physician responded by letter dated August 16, 2000 that Johnson could not return to work. On October 24, 2000, the VA proposed terminating Johnson from his Housekeeping Aid position due to his medical problems, informed Johnson of this decision, and instructed him that he had fourteen days to reply.

On November 13, 2000, a Personnel Management Specialist contacted Johnson's attorney, who verified that Johnson had received the letter. On November 14, 2000, Johnson requested permission to continue his leave without pay pending his Worker's Compensation claim, but on November 17, 2000, the VA advised him that he was being removed from employment due to his medical condition and his inability to work. Johnson received the letter on December 2, 2000. This letter advised Johnson that he could appeal this decision to the Merit System Protection Board or under the negotiated grievance procedure. Johnson took neither action, nor did he see an EEO counselor to allege discrimination, retaliation, or improper termination.

II.
A. *Johnson's Non-Selection Claim*

The burden shifting analysis applicable to a discrimination claim as set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), provides that the claimant bears the initial burden of establishing a prima facie case of discrimination by showing that plaintiff is a member of a protected class, was qualified for and rejected for the position, and that non-members of the protected class were treated more favorably. *See Ezold v. Wolf, Block, Schorr and Solis-Cohen,* 983 F.2d 509, 522 (3d Cir.1993).

**3 Once a claimant establishes a prima facie case, the burden shifts to the employer to demonstrate a legitimate nondiscriminatory reason for the adverse employment decision. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254-56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the employer proffers a legitimate nondiscriminatory reason for its decision,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00217-GMS   Document 47   Filed 05/06/2005   Page 3 of 20

83 Fed.Appx. 455
83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.))
(Cite as: 83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.)))

Page 4

the burden then shifts to the plaintiff to demonstrate that the proffered reason was a mere pretext for unlawful discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Here, the District Court held that Johnson satisfied his burden of demonstrating a prima facie case, that the VA articulated legitimate nondiscriminatory reasons for its decision, and that Johnson failed to demonstrate that these reasons were a mere pretext for discrimination.

[1] On appeal, Johnson appears to challenge the legitimacy of the VA's articulated reason for the adverse employment decision. He argues that he had more seniority than Hull and that the VA failed to award the Housekeeping Aid position to the applicant who had the most seniority. We have previously noted the limited inquiry that should be performed in evaluating the reasons put forth by the defendant. We stated, " 'The question is not whether the employer made the best, or even a *459 sound, business decision; [the ultimate inquiry] is whether the real reason is [discrimination].' " *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 647 (3d Cir.1998) (quoting *Keller v. Orix Credit Alliance,* 130 F.3d 1101, 1109 (3d Cir.1997)); *see also Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1216 (3d Cir.1988) ( "our inquiry ... is not an independent assessment of how we might evaluate [an] employee").

Here, the VA presented sufficient evidence to satisfy its burden at this step of the inquiry. Despite Johnson's argument to the contrary, the VA appropriately decided that the Housekeeping Aid position would not be awarded based entirely on seniority because the Master Agreement with the union provided that a vacant Housekeeping Aid position would be placed on the "Open and Continuous" list. Because of this designation, there was nothing to preclude award of this position after considering a variety of criteria, not only seniority.

The decision on Johnson's application was made in accord with the appropriate procedures as provided in the Master Agreement. The two decision makers, Fidler and Kohr, reviewed the applicants to determine which candidate was best for the position. The selection of Hull was based on a number of criteria including Hull's seventeen years of experience in housekeeping, Hull's demeanor with patients, and his general commitment to providing a clean working environment. Thus, the District Court's conclusion that the VA satisfied its burden of demonstrating a legitimate nondiscriminatory reason for Johnson's non-selection was not erroneous.

Johnson argues that the reasons put forth were a mere pretext for discrimination. We have stated that
**4 To survive summary judgment when the employer has articulated a legitimate nondiscriminatory reason for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.
*Simpson,* 142 F.3d at 644 (quotations omitted) (citing *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994)).

In support of Johnson's allegation that Fidler considered race in reaching her decision, Johnson contends that a number of years earlier Fidler made a disparaging racial remark during another employment decision involving a black applicant. Johnson alleges that Randal Houck, a former subordinate of Fidler, heard Fidler say that she did not want any more of "them" on the floor. App. at 317. Houck apparently interpreted this statement to mean that Fidler would not hire the applicant because he was African-American, but Houck could not point to the specific time period when this statement was made, but suggested the statement was made between three or four years prior to Houck's deposition which would put the statement at one and one-half to three years before Johnson's non-selection. In her deposition, Fidler denied ever making this remark. Johnson admitted that he never saw or heard Fidler act in a racially discriminatory manner towards him or other employees.

As Justice O'Connor noted, a claimant fails to satisfy his or her burden to show pretext by presenting evidence of an isolated inappropriate remark made by a decision maker, unrelated to the decisionmaking process. *460*Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). Furthermore, this court has noted that "[s]tray remarks by non-decisionmakers or by decisionmakers related to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold,* 983 F.2d at 545.

In light of the isolation of this alleged remark and its failure to have any connection to Johnson's non-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

83 Fed.Appx. 455
83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.))
**(Cite as: 83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.)))**

Page 5

selection, we agree that this evidence is insufficient to establish that VA's proffered reason was a mere pretext for discrimination. We have no basis to reverse the District Court's grant of summary judgment in favor of VA on Johnson's non-selection claim, and therefore will affirm.

**B. *Johnson's Hostile Work Environment and Workers Compensation Claim***

This District Court properly concluded that Johnson waived his hostile work environment claim as well as his Workers Compensation claim by failing to file a timely appeal. We have made clear that a plaintiff in a Title VII action must "exhaust all required administrative remedies before bringing a claim for judicial relief." *Robinson v. Dalton,* 107 F.3d 1018, 1020 (3d Cir.1997). Thus, an employee bringing suit under Title VII must adhere to the administrative requirements. Specifically, 42 U.S.C. § 2000e-16(c) (2003) provides that a Title VII claimant must initiate an action in federal court within 90 days of the receipt of the notice of a final agency action or after 180 days from the date of filing the original cause of action when no agency decision has been reached. Johnson failed to do so.

**\*\*5** [2] The EEO issued its decision on Johnson's Worker's Compensation claim on May 10, 2000. Johnson did not file an EEOC appeal, and filed his Title VII lawsuit on October 24, 2000, more than five months after he received the final agency decision.

[3] The VA sent Johnson a letter on May 9, 2000 informing him that his hostile work environment claim had been dismissed, and advised him that he had a right to appeal this decision to the EEOC within 30 days, or file a civil action in the district court within 90 days. Johnson received the VA's decision on May 10, 2000, but did not file an EEOC appeal and rather filed the Title VII complaint on October 24, 2000, over two months after the deadline passed. Therefore, these claims were untimely.

**C. *Johnson's Constructive Discharge Claim***

[4] The District Court concluded that Johnson waived his discharge related claims by failing to exhaust or even pursue his administrative remedies. An employee must seek relief by contacting the EEO within 45 days of the alleged discriminatory event, 29 C.F.R. § 1614.105(a)(1), and filing a formal EEO complaint within 15 days of the receipt of the notice of the right to file such a complaint, 29 C.F.R. § 1614.106(b). Here, Johnson did not contact the EEO at any point, and therefore never filed a formal complaint. Thus, Johnson failed to exhaust his administrative remedies for his discharge claims, and his Title VII claim based on this ground cannot be maintained.

**D. *Absence of Any Basis to Excuse Untimeliness***

[5] Despite failing to exhaust his administrative remedies, Johnson argues that the District Court should have excused the untimeliness of his claims. He contends first that the time requirements **\*461** should be waived because his other claims would have grown out of his non-selection claim. He argues second that the District Court should have applied equitable considerations and tolled the statutory requirements in relation to his claims. We agree with the District Court that neither argument has merit. First, Johnson's hostile work environment claim and Worker's Compensation claim involve distinct factual circumstances unrelated to his non-selection claim. Second, it is also unlikely that Johnson's discharge claim would grow out of Johnson's non-selection claim.

In *Rush v. Scott Specialty Gases Inc.,* 113 F.3d 476, 484-85 (3d Cir.1997), we noted that a failure to promote claim and a harassment claim involved distinct and different types of conduct. *Id.* The same conclusion is applicable here. Johnson's discharge claim occurred nearly two years after Johnson's application for the Housekeeping Aid position, and would not, in any way, grow out of a consideration of his non-selection claim. The District Court properly concluded that Johnson's discharge claim was untimely.

Nor is equitable tolling appropriate. We have stated:
[T]here are three principal, though not exclusive, situations in which equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.
**\*\*6** *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1391-92 (3d Cir.1994). We have recognized that "[r]unning throughout the equitable [tolling] cases is the obligation of the plaintiff to exercise due diligence to preserve his or her claim." *Robinson,* 107 F.3d at 1023.

Here, Johnson argues that equitable tolling was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

83 Fed.Appx. 455                                                                 Page 6
83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.))
**(Cite as: 83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.)))**

appropriate because he requested that his complaints be consolidated, and that even though the ALJ refused his request, he proceeded as if the complaints were consolidated. The District Court noted that the ALJ clearly articulated the denial of the consolidation request, and that Johnson provided no evidence that he had mistakenly believed that the complaints had in fact been consolidated. Additionally, the records from the administrative hearings on the non-selection claim show that Johnson's other claims were not under consideration. Because the record is devoid of any reasonable basis for Johnson's belief that his claims had been consolidated, we conclude he did not exercise due diligence in preserving his claims. Thus, the District Court did not err in concluding that equitable tolling was not appropriate.

### III.

Johnson not only failed to satisfy his burden of demonstrating that the VA's proffered reason for his adverse employment decision was pretext, but he also failed to exhaust his administrative remedies as required. We will therefore affirm the District Court's decision granting summary judgment for the defendants.

83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

• 03-1423                     (Docket) (Feb. 13, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

122 Fed.Appx. 570  Page 1
122 Fed.Appx. 570, 2004 WL 2931049 (3rd Cir.(Pa.))
(Cite as: 122 Fed.Appx. 570, 2004 WL 2931049 (3rd Cir.(Pa.)))

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Linda WAGNER, Appellant,
v.
BERWICK INDUSTRIES.
No. 03-3878.

Submitted Under Third Circuit LAR 34.1(a) Nov. 12, 2004.
Decided Dec. 20, 2004.

**Background:** Former employee brought suit against former employer, alleging age discrimination in violation of the Age Discrimination in Employment Act (ADEA) and the Pennsylvania Human Relations Act (PHRA) and retaliation in violation of Title VII and the PHRA. The United States District Court for the Middle District of Pennsylvania, James M. Munley, J., granted summary judgment in favor of employer. Employee appealed.

**Holdings:** The Court of Appeals, Buckwalter, Senior District Judge, sitting by designation, held that:
(1) termination of employee for unsatisfactory job performance did not violate the ADEA or the PHRA;
(2) employee waived argument that erroneous listing of retaliation claim as arising under Title VII instead of the ADEA should not have resulted in the dismissal of that claim; and
(3) absence of causal connection between exercise of protected activity and employee's termination precluded recovery on PHRA retaliation claim.
Affirmed.

West Headnotes

**[1] Civil Rights** 1204
78k1204 Most Cited Cases
Employee's termination did not violate the Age Discrimination in Employment Act (ADEA) or the Pennsylvania Human Relations Act (PHRA), where she had been evaluated upon her job performance and did not satisfy the job criterion. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; 43 P.S. § 951 et seq.

**[2] Federal Courts** 614
170Bk614 Most Cited Cases
Former employee's argument that her erroneous listing of retaliation claim against employer as arising under Title VII instead of the Age Discrimination in Employment Act (ADEA) should not have resulted in dismissal of the claim, which was raised for the first time on appeal, was waived. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[3] Civil Rights** 1252
78k1252 Most Cited Cases
No causal connection existed between exercise of protected activity and
employee's termination, as required to recover on retaliation claim brought under the Pennsylvania Human Rights Act (PHRA), where employee was terminated four months after meeting with employer's president but there was no evidence that anything except her unsatisfactory performance led to her dismissal. 43 P.S. § 951 et seq.

*570 Appeal from the United States District Court for the Middle District of Pennsylvania. (Civil Action No. 01-cv-1908). District Judge: Honorable James M. Munley.

Cynthia L. Pollick, The Employment Law Firm, Pittston, PA, for Appellant.

Daniel T. Brier, Donna A. Walsh, Myers, Brier & Kelly, Scranton, PA, for Appellee.

*571 Before McKEE and CHERTOFF, Circuit Judges and BUCKWALTER, Senior District Judge. [FN*]

FN* Honorable Ronald L. Buckwalter,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Fed.Appx. 570  
122 Fed.Appx. 570, 2004 WL 2931049 (3rd Cir.(Pa.))  
**(Cite as: 122 Fed.Appx. 570, 2004 WL 2931049 (3rd Cir.(Pa.)))**

Page 2

Senior District Judge for the Eastern District of Pennsylvania, sitting by designation.

OPINION

BUCKWALTER, Senior District Judge.

**\*\*1** This is an appeal by Linda Wagner from the grant of summary judgment for Defendant Berwick Industries LLC in a suit alleging age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621-34 (Count I) and the Pennsylvania Human Relations Act, 43 P.S. § 951-63 (Count II) and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq. (Count III) and the Pennsylvania Human Relations Act (Count IV).

Our review of the District Court's grant of summary judgment is plenary. Wagner contends that the District Court erred in finding (1) that she did not present sufficient evidence to permit a fact finder to either disbelieve Berwick's non-discriminatory reason for her dismissal or believe that a discriminatory motive permeated that decision; and (2) that the record did not establish a causal link between the termination of her employment and any complaints she may have made regarding age discrimination.

Before discussing the first assignment of error, we note that the record clearly supports Berwick's non-discriminatory reason for dismissal. As set forth in the District Court's opinion, Wagner had at least four warnings that her job performance was not satisfactory. Actually, Wagner had more than four warnings, and was disciplined less severely than required under defendant's four-step disciplinary system up to the time of her termination.

Wagner argues, however, that she presented sufficient evidence to permit a fact finder to disbelieve defendant's non-discriminatory reason or believe that a discriminatory motive permeated the decision to terminate her.

To that end, she argues that (1) younger employees were neither disciplined nor specifically scrutinized as she was; (2) she was the sole employee evaluated in 1999; (3) she was singled out by defendant's instructions to certain departments to watch for her errors rather than scrutinize all employees; (4) she was disciplined more harshly than non-protected workers; and (5) younger workers made fun of her and made references to her being "so ancient."

The record, as found by the District Court (and with which finding we agree), does not support her contentions. Simply stated, plaintiff has failed to point to evidence from which a fact finder could reasonably infer that she satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3rd Cir.1998).

[1] In this case, defendant evaluated plaintiff based upon her job performance. Plaintiff does not dispute this. Instead, she argues that even though she admittedly did not satisfy the job criterion the employer relied upon, she has nevertheless presented sufficient evidence to permit a fact finder to disbelieve defendant's non-discriminatory reason or to believe a discriminatory motive permeated defendant's decision.

**\*572** For reasons substantially as set forth in the District Court's opinion, we disagree.

**\*\*2** As to the second assignment of error, the District Court assumed that even if Wagner engaged in protected activity, the record does not support the requisite causal link. Even adopting that assumption, her retaliation charge faces other obstacles.

First, the retaliation count in Wagner's complaint was brought under Title VII and not the ADEA. The District Court properly dismissed this. For the first time in this litigation, Wagner mentions in footnote 2, page 22 of her brief that "such clerical error of listing Title VII instead of ADEA should not have eliminated Wagner's claim for retaliation since she specifically listed a claim for retaliation."

[2] As Berwick points out, and Wagner does not dispute in her reply brief, this is the very first time this argument has been raised. "Arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible of review in this Court absent exceptional circumstances (*e.g.*, the public interest requires that the issues be heard or manifest injustice would result from the failure to consider such issues)." *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 799 (3rd Cir.2001). No such exceptional circumstances exist.

Second, Wagner does not contest in any of her briefs before this court the contention of Berwick that her retaliation charge under the PHRA was untimely filed precluding her from seeking relief in this proceeding.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

122 Fed.Appx. 570
122 Fed.Appx. 570, 2004 WL 2931049 (3rd Cir.(Pa.))
**(Cite as: 122 Fed.Appx. 570, 2004 WL 2931049 (3rd Cir.(Pa.)))**

Page 3

[3] Finally, assuming that the PHRA retaliation charge was properly filed, as the District Court noted (and we agree) there is no causal connection between the exercise of protected activity and Wagner's dismissal.

When Wagner met with Berwick's president for a third time, it was after her third written warning and while she was terminated about four months after that meeting, there is no evidence that anything but her unsatisfactory performance led to her dismissal.

The judgment of the District Court will be affirmed.

122 Fed.Appx. 570, 2004 WL 2931049 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

• 03-3878 (Docket) (Sep. 24, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.  
1995 WL 628401 (D.Del.), 68 Fair Empl.Prac.Cas. (BNA) 1104  
(Cite as: 1995 WL 628401 (D.Del.))

Page 1

C

**Motions, Pleadings and Filings**

United States District Court, D. Delaware.  
Deanna SHANLEY, Plaintiff,  
v.  
SALESIANUM SCHOOL, et al, Defendants.  
No. CIV. A. 91-482 LON.

April 27, 1995.

ORDER

LONGOBARDI

*1 This case was tried to the Court without a jury on the dates of October 19, 20, 21 and 22, 1992. Plaintiff seeks a judgment and monetary damages for alleged violations of Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. and the Equal Pay Act, 29 U.S.C. § 206(d).

After contemplating the evidence presented, the arguments of counsel and the pertinent legal authority germane to the issues herein, the Court enters the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

1. Plaintiff Deanna G. Shanley is a woman and was highly qualified to teach Social Studies at Salesianum School Inc. where she was employed as a part time teacher in 1985-86 and as a full time teacher from September 1, 1986 until August 31, 1990.

2. Defendant Salesianum School Inc. ("Salesianum") is a non-profit, religious affiliated and church related Delaware corporation operating a private high school for boys. Docket Item ("D.I.") 128 at III, Admission 1.

3. At all times relevant to this litigation, Defendant Salesianum employed men and women on its faculty. *Id.* at IV, Admission 22.

4. At all times relevant to this action, Defendant Father Richard N. Grant was Principal of Salesianum, a member of the School Council and a member of its Board of Trustees. *Id.* at III, Admission 9. As such, Father Grant was at all times an agent of Defendant Salesianum.

5. Defendant Father Richard T. Reece was at all times relevant to this lawsuit an Oblate of St. Francis de Sales, Chairman of the Board of Directors at Salesianum and Provincial of the Wilmington/Philadelphia province and during the year 1989-90 was a member of the Board of Trustees. Defendants' Trial Exhibits ("DX") 1, 2, 3, 4; D.I. 151, Volume ("Vol.") B at 61.

6. At all pertinent times, Defendant Salesianum was acting through its agents, servants and employees, including Defendants Grant and Reece, who were acting within the scope of their authority and employment.

7. The School Council of Salesianum is an advisory body to the principal of Salesianum with one of its primary functions being the development of a school budget. D.I. 155, Vol. A at 112; D.I. 151, Vol. B at 61.

8. In conjunction with the School Council, Father Grant, as principal of Salesianum, was ultimately responsible for the development and presentation of a fiscally sound operating budget to the Board of Trustees of Salesianum.

9. The Board of Trustees was the governing body of Salesianum, D.I. 128 at II, Admission 3, and included both religious and lay members. *Id.*, Admission 4.

10. The lay Board members were not simply a rubber-stamp for the religious members. The lay members were both independent and outspoken in their views as to what was in the best interests of the school. D.I. 154, Vol. G at 35-37.

11. The Board of Trustees was painfully aware that student enrollment at Salesianum had been steadily declining since the 1985-86 school year. D.I. 153, Vol. D at 51; D.I. 155, Vol. A at 156.

*2 12. The income for the school year 1989-90 was based on an anticipated student enrollment of 1065 students but the school opened with 1045 students. DX 1 at 4. [FN1]

13. To deal with the financial impact of 20 less students and prior to the start of the 1989-90

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1995 WL 628401 (D.Del.), 68 Fair Empl.Prac.Cas. (BNA) 1104  
(Cite as: 1995 WL 628401 (D.Del.))

Page 2

academic year, Father Grant approached four women, including Mrs. Shanley, and one man, and requested that they accept a reduction in pay with a corresponding reduction in class schedule. D.I. 151, Vol. B at 77-78.

14. In addition, Father Grant had considered approaching another man from the Science Department but never did because the Head of that Department persuaded Father Grant that the Department could not afford to have a reduction in the number of classes being taught. *Id.*

15. The man approached for a reduction in salary, James "Buzz" McCaffery, indicated that he could not afford to accept the reduction and therefore his salary was not reduced. D.I. 153, Vol. D at 28-29.

16. Mrs. Shanley agreed voluntarily to the reduced classes for a reduced salary arrangement. D.I. 155, Vol. A at 32. Father Grant had told all of those teachers approached about a reduction in salary, including Mrs. Shanley, that they were not obligated to accept the reduction and that Father Grant could not compel them to take this reduction.

17. After Father Grant had approached these individuals, the School Council, through Father Grant, proposed to the Board of Trustees at a September 12, 1989 meeting a two-pronged solution for dealing with the financial impact of 20 less students.

18. Particularly, previously approved salary increases for lay faculty would be reduced by one percent and oblates and staff salaries would be reduced by one percent and those teachers Father Grant had previously approached would take a reduction in class schedule from 5 classes to 4, along with a corresponding 1/5th reduction in salary. DX 1 at 4; D.I. 155, Vol. A at 124-129.

19. The criteria used by Father Grant in selecting the faculty members to be asked to accept salary reductions for the school year 1989-90 was simply based upon seniority of full-time teachers in those areas of curriculum where there was a lesser need because of a corresponding decrease in enrollment. Plaintiff's Exhibit ("PX") 18 at 9, ¶ 15.

20. Father Grant, with the approval of the School Council, informed the Board that the teachers selected for this reduction in salary were the last ones hired in their respective departments. DX 1 at 4.

21. At the September 12, 1989 meeting, the entire two-pronged proposal was unanimously approved by the Board of Trustees. *Id.;* D.I. 155, Vol. A at 124-129.

22. There was a genuine concern voiced by the Board of Trustees for the faculty members receiving a reduction in salary and an ad hoc fund raising committee was established in an effort to raise monies to return those faculty members whose salaries were being reduced to the status of full teachers (*i.e.,* 5/5ths) for the second semester. DX 1 at 4; D.I. 154, Vol. G at 24-25. 23. On January 31, 1990, Father Grant received a check from Father Kearney representing the money raised by this committee to underwrite the salaries of the teachers who had their salaries reduced in September, 1989. D.I. 153, Vol. D at 27-29. This was a bit of powerful circumstantial evidence which proved a lack of gender animus.

*3 24. On or about February 26, 1990, two of the women who had their salaries reduced, Rebecca Foote and Mary Ann Ryan, accepted the school's offer to return to a full-time schedule while one of the women, Barbara Piech, did not. *Id.* at 26-31.

25. Mrs. Shanley had knowledge that Mrs. Ryan returned to a full schedule, D.I. 155, Vol. A at 72-73, and at some point indicated to colleagues that if offered to return to a full schedule she would decline due to the lateness of the second semester. *Id.* at 38.

26. In November 1989, Father Grant, in consultation with the faculty and School Council of Salesianum, began the complicated process for presenting a projected budget to the Board of Trustees of Salesianum for the fiscal year July 1, 1990, to June 30, 1991. [FN2] This was the usual and customary procedure that had been traditionally followed in previous years. (The actions which were taken in pursuit of this budget process are the basis for this law suit.)

27. Father Grant, in projecting a budget to the School Council, estimated that 1000 students would be enrolled for the 1990-91 school year.

28. This estimate by Father Grant was a considered and reasoned one based on demographic information, historical data indicating enrollment trends, incoming applications of freshmen and other relevant factors. The estimate also represented a reasonable and undistorted exercise of business judgment in furtherance of his duties.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-158

Not Reported in F.Supp.  
1995 WL 628401 (D.Del.), 68 Fair Empl.Prac.Cas. (BNA) 1104  
(Cite as: 1995 WL 628401 (D.Del.))

Page 3

29. Thereafter, in a report made by the School Council to the Board of Trustees on January 16, 1990, based on an anticipated enrollment of 1000 students, the Council recommended that tuition be raised slightly, certain faculty salaries be slightly increased but, that more significantly, to deal with the sharp decline in student enrollment, that the budget be balanced by other cuts, loans or teacher layoffs. DX 14.

30. The operating budget at Salesianum was premised on a rather simplistic formula. The largest single expenditure for the school was salaries paid to personnel while the largest source of income for the school is tuition to be charged.

31. In a meeting of the Board of Trustees on January 23, 1990, the Projected Budget (without contingency) reflected a $100,000 deficit which was to be addressed by the reduction of three or four teachers under objective guidelines to be established by the Board. There was a plethora of evidence on this particular $100,000 projected loss which with the benefit of hindsight and an overlay of hypothesis might have led to confusion. That confusion is factually resolved by the simple finding that the $100,000 figure was submitted as a projected loss and that this was based on an exercise of budgetary discretion without any inference of a plan to sexually discriminate or which would result in a benign but nevertheless sexually adverse result.

32. The Board of Trustees opined that a reduction of faculty, a relocation of staff and the savings on the pension fund would result in a balanced budget. DX 3.

*4 33. The Board of Trustees charged Father Grant with the unenviable duty of reducing the faculty in order to help balance the budget (the reduction in force or "RIF"), pursuant to the following guidelines:
   (a) Oblate faculty were not to be considered since oblates terms at the School are determined by the Oblate Provincial.
   (b) *Determination would be made of those departments which could best bear a reduction with the least detriment to the department and school as a whole.* (Emphasis added).
   (c) *Non-renewal of teachers in a department would be based on seniority.* (Emphasis added).
   (d) A non-renewed teacher could appeal to the Board of Trustees only on the grounds that the proper procedure had not been followed.
DX 31.

34. Under these "riffing" guidelines, neither a teacher's gender nor a teacher's performance were relevant and there was no evidence, direct or circumstantial, to indicate that the guidelines were gender generated.

35. To aid him in accomplishing this task, Father Grant requested that all Department Heads at Salesianum prepare a scenario setting out the course offerings and teaching assignments as if that Department had one less teacher. D.I. 151, Vol. B at 100-101.

36. Father Grant specifically requested that each Department prepare a scenario with one less teacher rather than the presentation of an argument to aid him in his decision, as each Department Head could make a compelling argument that the particular department could not afford the loss of a teacher. D.I. 153 at 37.

37. The determination by Father Grant of which teachers were to be riffed necessarily had to be completed prior to March 15, 1990, because many contracts of the lay faculty at Salesianum automatically renew on March 15 unless notified in writing by the Principal of non-renewal. PX 1; D.I. 155, Vol. A at 42. The exigencies of time and the vagaries of prospective circumstances dictated the terms of the decision.

38. Mrs Shanley's employment contract required that she receive notice by the Principal of non-renewal prior to March 15. DX 32 at 539.

39. After receiving all of the reports from Department Heads and with a background of a study of enrollment figures, the projected enrollment for the next year, consultation with the school council and school attorney and based on his experience and general knowledge, Father Grant determined that four out of the ten departments could best bear the loss of one teacher. D.I. 157, Vol. E at 36-39.

40. Father Grant did not "target" individuals for the RIF as of January 23, 1990, but rather, pursuant to the guidelines established by the Board of Trustees, proceeded to undertake the task of making difficult staffing cuts created by declining enrollment and increasing tuition.

41. The guidelines established by the Board were the *only* factors considered by Father Grant.

42. Consequently, pursuant to those guidelines, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1995 WL 628401 (D.Del.), 68 Fair Empl.Prac.Cas. (BNA) 1104  
**(Cite as: 1995 WL 628401 (D.Del.))**

Page 4

most junior full-time person in each of those four Departments was selected for "riffing."

*5 43. At the time of the RIF, Mrs. Shanley was the most junior full-time person in the Social Studies Department at Salesianum. D.I. 155, Vol. A at 76-77.

44. Against the contractual impediments of notice created by her written employment contract with Salesianum, Father Grant informed Mrs. Shanley on March 14, 1990, along with two other women and one man, that their contracts would not be renewed for the 1990-91 school year. D.I. 128 at IV, Admissions 20, 21.

45. Against a backdrop of stark fiscal reality, these teachers, including Mrs. Shanley, were necessarily terminated for legitimate business reasons.

46. Mrs. Shanley was not terminated in order to prevent her from achieving tenure nor to prevent the school from maintaining an influential woman's perspective on the faculty at Salesianum.

47. In a letter dated April 11, 1990, Mrs. Shanley appealed the termination decision to the Board of Trustees. PX 1.

48. In her appeal letter, Mrs. Shanley pointed to a handful of male teachers from other disciplines (i.e., religion, athletics) whom she believed were less senior than she. She also contended that the discriminatory practices of the Defendants shielded those other persons from the RIF.

49. At trial, Mrs. Shanley also presented her own "scenario" whereby the most senior member of the Social Studies Department, who was also qualified to teach a limited number of subjects in Religion, could have been moved into the Religion Department full time. Under those circumstances, she could have taken over those classes that would require coverage by virtue of the shift. D.I. 155, Vol. A at 98.

50. Mrs. Shanley is not qualified to teach any subject other than those she taught for the Social Studies Department, *Id.* at 68-69, and she was not qualified to teach in any of the areas of discipline she pointed to in her letter of appeal. Id. at 104.

51. Mrs. Shanley's appeal was given due consideration at a May 8, 1990 Board of Trustees meeting.

52. The Board of Trustees questioned Father Grant extensively about the process and the fairness of the process that was undertaken in determining which departments would be riffed. D.I. 154, Vol. G at 27-28.

53. Father Grant's reasons for selecting those specific Departments chosen for the reduction of one teacher are set forth fully in a memorandum to the Board of Trustees dated May 8, 1990. DX 4 at 60-61.

54. The credible evidence indicates that the decision to RIF, impacting 3 female and 1 male teacher, while obviously a difficult one, was made without gender animus, was made solely with the best interests of the school in mind and was made out of business necessity, with no reasonable alternative available.

55. The Social Studies Department was objectively viewed as a Department that could best afford the loss of a teacher because certain non-essential "elective" courses could be eliminated without significant disruption to the curriculum as well as the fact that less disruption to the entire school would occur by simply moving the most senior member of that Department, Jim Haley, back to a full-time Social Studies schedule.

*6 56. Put simply, Plaintiff's teaching position was eliminated because of the lack of need for a Social Studies teacher when viewed against other Departments facing the loss of a teacher.

57. The teacher Mrs. Shanley wished to move into the Religion Department full-time, Jim Haley, was a long-standing member of the faculty who could only teach limited courses in freshmen religion and had historically only taught religious studies when the Social Studies Department could spare him. He was not primarily a religious educator.

58. No one was hired to replace Plaintiff's vacant teaching position for the 1990-91 school year.

59. Contrary to Plaintiff's claims that less senior people were kept at her expense, Father Grant's decision in the first instance, pursuant to his charge from the Board of Trustees, was premised on which *department* could best bear the loss. The decision was not premised on choosing the least senior members of the faculty. [FN3]

60. Under Father Grant's thoughtful and fair determination that the Social Studies Department was a Department that could best bear the loss of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-160

Not Reported in F.Supp.  
1995 WL 628401 (D.Del.), 68 Fair Empl.Prac.Cas. (BNA) 1104  
**(Cite as: 1995 WL 628401 (D.Del.))**

Page 5

teacher, Mrs. Shanley was properly terminated as she was the most junior member of that Department. *See* Finding of Fact 37.

61. At the time of the May 8, 1990 Board of Trustees meeting, there was no information available to the Board from course tallies or other sources which reflected a higher projection of student enrollment than the 1000 students anticipated at the January 23, 1990 meeting.

62. The Board of Trustees, excluding Father Grant, satisfied that the entire process was fair, unanimously agreed to uphold the decision not to renew Mrs. Shanley's employment contract. DX 4 at 57.

63. Defendant Father Richard T. Reece informed Mrs. Shanley in a letter dated May 17, 1990, of the Board of Trustees' decision to deny her appeal. PX 2.

64. Salesianum did not have a formal recall policy for teachers that were riffed because of the size of the school and because Salesianum had not regularly engaged in a practice or custom of reducing its faculty.

65. Michael Johnson, a religion educator who had been riffed on March 15, 1990, was subsequently recalled for a 2/5ths schedule in September of the 1990-91 school year. Mrs. Shanley was not informed of any possibility of being recalled and she was in fact not recalled at any time subsequent to the decision to RIF her.

66. The decision to not recall Mrs. Shanley was based in small part on her decision to cease all communications with Father Grant at the time of the riffing decision. Because of the lack of a formal policy for recall and Mrs. Shanley's personal animosity towards him subsequent to the RIF, Father Grant did not feel obligated to inform Mrs. Shanley about the possibility of a recall. Moreover, Father Grant reasonably believed at the time that neither she nor Salesianum would benefit from a recall.

67. The more compelling evidence in the record relating to the recall decisions is that at the time of the recall policy there was simply a greater need for a religion teacher than a social studies teacher.

*7 68. Furthermore, the Plaintiff's argument that Father Grant's discriminatory intent in riffing Mrs. Shanley is evidenced by his use of the term "reactionary feminist" is not supported by the credible evidence. Rather, the Court finds that this was neither his perception nor that of the Board of Trustees at the time of the RIF or at any other time in the litigation. His use of that term was simply an attempt to characterize the perceptions expressed by some of Mrs. Shanley's colleagues to him *subsequent* to the riffing decision. [FN4]

69. Father Reece was not a party to the employment contract between Mrs. Shanley and her employer, Defendant Salesianum School. DX 32.

70. Father Reece was not a part of the administration of the Salesianum School and never directed Father Grant to RIF any particular teacher. D.I. 153, Vol. D at 79.

71. Father Reece engaged in no conduct that can be seen to constitute intentional discrimination against Mrs. Shanley.

72. Subsequent to her appeal to the Board of Trustees, on August 16, 1990, Plaintiff timely filed a written charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC"). DX 35.

73. On June 13, 1991, at the request of the Plaintiff, the EEOC issued to Plaintiff a right to sue letter. DX 38.

74. On August 30, 1991, Plaintiff instituted this action.

75. An amended complaint was filed on or about September 26, 1991, and a second amended complaint was filed on March 12, 1992.

76. As of the date of trial, Plaintiff's action contained claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) et seq. and the Equal Pay Act, 29 U.S.C. 5206(d).

77. Prior to being riffed, Mrs. Shanley had been teaching four classes at Salesianum pursuant to her voluntary decision in 1989-90 to "go 4/5ths."

78. In 1989-90, Mr. Foley, a male teacher and the Department Head for Social Studies, teaching a 5/5ths schedule, taught more classes with more students than Mrs. Shanley did under a 4/5ths teaching schedule and had the same number of students, or more, in each one of his classes.

79. Mr. Foley was subject to the same pay scale as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 6
1995 WL 628401 (D.Del.), 68 Fair Empl.Prac.Cas. (BNA) 1104
**(Cite as: 1995 WL 628401 (D.Del.))**

all other teachers at Salesianum.

80. The salary scale in use since at least 1985-86 and through 1989-90 is gender-neutral being based only on academic background, teaching experience and the number of classes taught and not the number of students in the classroom.

### CONCLUSIONS OF LAW [FN5]

1. Under Title VII of the Civil Rights Act or 1964, 42 U.S.C. § 2000(e) et seq., it is unlawful for an employer to terminate an employee or take any other adverse action against an employee because of the employee's sex.

2. Defendant Salesianum is an employer within the meaning of Title VII of the Civil Rights Act.

3. Defendants Grant and Reece are employers within the meaning of Title VII of the Civil Rights Act. 42 U.S.C. § 2000e(b).

4. Plaintiff is an employee within the meaning of Title VII of the Civil Rights Act. 42 U.S.C. § 2000e(f).

*8 5. This Court has jurisdiction over the parties to, and the subject matter of, this lawsuit pursuant to Title VII of the Civil Rights Act and the Equal Pay Act.

6. Plaintiff has executed all administrative requirements necessary to the commencement of this lawsuit.

7. Plaintiff is a member of a protected class (females) within the meaning of Title VII of the Civil Rights Act.

8. Plaintiff's claim of sex discrimination under Title VII is based on both a disparate treatment and a disparate impact theory. Particularly, Plaintiff's theories of a violation under Title VII are:
> (1) disparate treatment where a plaintiff shows through direct or indirect evidence that an employer's action toward the plaintiff/employee was more likely than not motivated by unlawful discrimination, or that the articulated business justification underlying the employment action is not worthy of belief.
> D.I. 163 at 2, citing, Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981) and McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).
> (2) disparate treatment where sex discrimination is a motivating factor in an employer's adverse employment decision.
> D.I. 163 at 3 (citations omitted).
> (3) disparate impact where an employee's facially neutral employment practice actually falls more harshly on a protected group, thus having a disparate impact on that group.
> Id. (citations omitted).

9. "The procedure for reviewing a Title VII case is well-settled." Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175, 179 (3rd Cir.1985), cert, denied, 475 U.S. 1035 (1986), overruled on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Because there is often no direct "smoking gun" evidence of intentional discrimination in disparate treatment cases, [FN6] the Supreme Court established a system of presumptions and shifting burdens of production in McDonnell Douglas, 411 U.S. 792, and refined by Burdine, 450 U.S. 248, whereby plaintiffs alleging unlawful discriminatory treatment are afforded the opportunity to prove their case without direct evidence:
> First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's [dismissal]." Third, should, the Defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
> Burdine, 450 U.S. at 252-53.

10. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 253.

11. "The burden of establishing a prima facie case of disparate treatment is not onerous." Id.

*9 12. Plaintiff established a *prima facie* case of sex discrimination by establishing that she was, and is, a member of a protected class, that she was terminated from a job for which she was qualified while members of the non-protected class (men) received more favorable treatment by being retained. Jackson v. University of Pittsburgh, 826 F.2d 230, 233 (3rd Cir.1987) (race discrimination), quoting Westinghouse Elec. Corp., 764 F.2d 175 (sex discrimination); Duffy v. Wheeling Pittsburgh Steel

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1995 WL 628401 (D.Del.), 68 Fair Empl.Prac.Cas. (BNA) 1104  
(Cite as: 1995 WL 628401 (D.Del.))

Page 7

Corp., 738 F.2d 1393, 1395 (3rd Cir.1984) (age discrimination); Massarsky v. General Motors Corp., 706 F.2d 111, 118 (3rd Cir.1983) (same). Cf. McDonnell Douglas, 411 U.S. at 802 (race discrimination). [FN7]

13. Defendants carried their burden of producing a legitimate, non-discriminatory justification for Plaintiff's firing thereby rebutting the inference of discrimination created by the *prima facie* case, Burdine, 450 U.S. at 255; McDonnell Douglas, 411 U.S. at 802, in that the evidence and testimony demonstrated that Plaintiff was terminated from her position at Salesianum as part of a reduction in force (RIF) aimed towards eliminating a $100,000 fiscal deficit for the 1990-91 school year. [FN8]

14. Because the Defendants have met their burden of production, Plaintiff has the burden of persuading the Court that the reason articulated by the Defendants for her termination "was not the true reason for her termination." Burdine, 450 U.S. at 256.

15. Plaintiff may meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id., citing McDonnell Douglas, 411 U.S. at 804-05; accord, Jalil v. Avdel Corp., 873 F.2d 701, 706-07 (3rd Cir.1989).

16. To that end, circumstantial evidence may suffice to challenge the Defendant's alleged reasons as pretext. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 895 (3rd Cir.), cert. dismissed, 483 U.S. 1052 (1987).

17. Plaintiff has failed to establish that the legitimate, non-discriminatory justification for Plaintiff's discharge asserted by Defendants was merely a pretext or unworthy of credence in that the preponderance of the credible evidence suggests that Plaintiff's firing was not in any way or part the result of intentional discrimination but rather was (1) due to a steady decrease in the enrollment of students and consequently tuition income that necessitated an offsetting reduction in faculty; (2) based on the fact that the credible judgment of the person best equipped and empowered to make the decision (Father Grant) was that her Department was more amenable than others to handle a faculty reduction; (3) due to the fact that she was the most junior member of that Department, and (4) based on the fact that the termination scenario involving Mrs. Shanley was one of the scenarios which would cause the least

disruption to the school as a whole. She was, consequently, the unfortunate victim of a difficult staffing decision that had to be made for the 1990-91 academic year. [FN9]

*10 18. Even after an exhaustive review of the facts and law and in spite of the Plaintiff's rather eloquent attempt at revisionist historical content, *i.e.*, inferring unlawful animus and other motivations from otherwise innocent facts and circumstances, the Court concludes that the Plaintiff cannot carry her burden of proving that gender played a part in the riffing decision. Further, the Court cannot say that the Plaintiff has carried her burden of proving that a discriminatory pattern or practice existed at the time of her firing.

19. "The plaintiff's initial burden with respect to a disparate impact claim is heavier than it is when disparate treatment is alleged. To establish a prima facie case under the disparate impact model, the plaintiff must show that the facially neutral employment practice had a significantly discriminatory impact." Massarsky, 706 F.2d at 120 (quotations omitted). See Griggs v. Duke Power Co., 401 U.S. 424 (1971); 42 U.S.C. § 2000e-2(k)(1).

20. When the plaintiff meets this burden, the employer defendant must prove that the practice resulting in the adverse impact is required by business necessity. Griggs, 401 U.S. at 431. 42 U.S.C. § 2000e-2(k)(1)(A)(i).

21. Plaintiff's claim under a disparate impact analysis fails because, even if the Court were to make the tenuous assumptions that disparate impact analysis is even applicable to the instant suit and that the Plaintiff has satisfied its *prima facie* burden of demonstrating that a *specific employment practice* has caused a significant discriminatory impact, [FN10] the preponderance of the evidence persuasively shows that the Defendants have undoubtedly met their burden of demonstrating that the "riffing" practice was both consistent with and required by business necessity.

22. Plaintiff has failed to establish a claim under the Equal Pay Act in so much as the credible evidence suggests that all teachers were paid according to teaching experience, academic degree and number of classes taught while there is no credible evidence that Salesianum School paid different wages to employees of different genders for equal work, requiring equal skill, effort and responsibility and performed under similar working conditions. Angelo

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1995 WL 628401 (D.Del.), 68 Fair Empl.Prac.Cas. (BNA) 1104
(Cite as: 1995 WL 628401 (D.Del.))

Page 8

*v. Bacharach Instrument Co.,* 555 F.2d 1164, 1171 (3rd Cir.1977)..

NOW, THEREFORE, IT IS ORDERED that:

1. In accordance with the Findings of Fact and Conclusions of Law entered this date, judgment is hereby entered in favor of Defendants Salesianum School, Inc., Richard N. Grant and Richard T. Reece.

2. The Court determines and declares that the Defendants did not violate the Civil Rights Act of 1964 nor the Equal Pay Act of 1963.

3. Consequently, the Plaintiff's request for monetary damages is denied in its entirety.

4. Each party herein is to pay their own respective costs and attorneys' fees.

> FN1. A few weeks later (September 30, 1989), the projected budget for the 1989-90 school year was revised to reflect an enrollment of 1030 students.
>
> FN2. Salesianum's fiscal year runs from July 1 to June 30. DX 8, 9, 10.
>
> FN3. Additionally, two of the men from the Religion Department to whom Mrs. Shanley points as having been intentionally shielded from the RIF due to their sex (Mr. Cleary and Mr. Vresics) were hired full-time, on September 1, 1986--the same day Mrs. Shanley was hired full-time. The credible evidence suggests that Mrs. Shanley was properly credited in terms of experience for salary purposes as a result of her part-time (2/5ths) position at Salesianum in 1985-86 but, that for purposes of seniority and tenure, she was treated the same as Mr. Cleary and Mr. Vresics.
>
> FN4. Father Grant's representation that Barbara Piech's flaw as a teacher was that she sometimes "nagged" the students does not in any way create an inference that his decision to RIF Mrs. Shanley was somehow predicated on a discriminatory intent. The Court does not credit the notion that such a characterization is exclusive to female teachers.
>
> FN5. Any Finding of Fact that might properly be categorized as a conclusion of law is incorporated herein.
>
> FN6. *See Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 48 (3rd Cir.1989); *Jackson v. University of Pittsburg,* 826 F.2d 230, 236 (3rd Cir.1987).
>
> FN7. Because [Mrs. Shanley's] complaint concerned a reduction in force, it obviously was unnecessary for [her] to follow the literal terms of the *McDonnell Douglas* model.... In *McDonnell Douglas,* the elements of the plaintiff's prima facie case were articulated in the context of an alleged discriminatory failure to hire. The Supreme Court made clear that *the nature of the required showing depends on the circumstances of the case.*
> *Massarsky,* 706 F.2d at 118 n. 13, citing *McDonnell Douglas,* 411 U.S. at 802 n. 13.
>
> FN8. Plaintiff acknowledges that Defendants have satisfied their burden of production. D.I. 163 at 5-6.
>
> FN9. Additionally, Plaintiff has failed to establish her other "disparate treatment" claim--that sex discrimination was a motivating factor in this adverse employment decision. *See* D.I. 163 at 14-16.
>
> FN10. "In order to establish a prima facie case of disparate impact discrimination, a plaintiff is required to demonstrate that application of a facially neutral standard has resulted in a discriminatory [ ] pattern." *Newark Branch, NAACP v. Town of Harrison,* 940 F.2d 792, 798 (3rd Cir.1991). In another formulation, the Third Circuit has stated that "[a] disparate impact violation is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing substantial adverse impact on a protected group .... of *Equal Employment Opportunity Commission v. Metal Service Co.,* 892 F.2d 341, 348 (3rd Cir.1990). Thus, for Plaintiff to make her *prima facie* case, she must demonstrate the existence of a specific employment practice producing a significantly discriminatory [ ] impact. *Paul v. Woolworth,* C.A. No. 91-453-MMS (December 30, 1992), slip op. at 9.
> Plaintiff essentially contends that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1995 WL 628401 (D.Del.), 68 Fair Empl.Prac.Cas. (BNA) 1104  
**(Cite as: 1995 WL 628401 (D.Del.))**

Page 9

Defendants' "policy" of Father Grant exercising his subjective judgment during the reduction in force in conjunction with the guidelines established by the Board of Trustees of laying off the employee with the least seniority in those Departments which Father Grant determined could afford a reduction was a specific employment practice. Plaintiff further postulates through the bare bone statistics of this one time business decision that this "practice" operated to the detriment of the protected group (women) because of the 4 individuals selected to be riffed in March, 1990, 3 were women and of those 4 individuals only the three women completely lost their jobs as of September, 1990.

The Court is by no means persuaded that this isolated decision to *eliminate* four positions of employment can trigger a disparate impact analysis. *See,* Green v. USX Corp., 843 F.2d 1511, 1521-25 (3rd Cir.1988) (disparate impact analysis was intended to provide a means to eradicate the dilatory effects of racial discrimination in *hiring*); *accord, Paul,* C.A. No. 91-453-MMS at 10 (liberal approach to what constitutes an employment practice for purposes of disparate impact *in the context of hiring*); Garland v. USAir, Inc., 767 F.Supp. 715, 726 (W.D.Pa.1991) (small group may be used to determine if employer has discriminated in its *hiring practices*). Further, the Court is not persuaded that the Plaintiff has satisfied the requisite *prima facie* showing for such a claim. *See,* Massarsky, 706 F.2d at 121 (an adverse impact felt by a single employee or even a few employees is not sufficient to establish disparate impact). However, in lieu of the conclusion that the Defendants have clearly established that a business necessity existed at the time of the RIF, the Court simply assumes without concluding as a matter of law that Plaintiff has made out a *prima facie* case.

1995 WL 628401 (D.Del.), 68 Fair Empl.Prac.Cas. (BNA) 1104

**Motions, Pleadings and Filings (Back to top)**

• 1:91CV00482 (Docket) (Aug. 30, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-165

Westlaw.

Not Reported in F.Supp.2d  
2003 WL 21018567 (N.D.Tex.)  
(Cite as: 2003 WL 21018567 (N.D.Tex.))

Page 1

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas, Dallas Division.
Arthur WILLIAMS, Plaintiff,
v.
AVIALL SERVICES, INC., Defendant.
No. Civ.A. 3:01-CV-2151-.

Feb. 12, 2003.

*ORDER*

FITZWATER, J.

*1 After making an independent review of the pleadings, files, and records in this case and the Findings, Conclusions, and Recommendation of the United States Magistrate Judge, I am of the opinion that the Findings and Conclusions of the Magistrate Judge are correct and they are adopted as the Conclusions of the Court. Accordingly, Defendant's "Motion for Summary Judgment," filed October 7, 2002, is GRANTED, and the case is DISMISSED with prejudice.

*FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

STICKNEY, Magistrate J.

Pursuant to the District Court's Order of Reference, entered November 14, 2002, "Defendant's Motion for Summary Judgment," filed October 7, 2002, has been referred to the United States Magistrate Judge for hearing, if necessary, and for recommendation. Having considered the evidence of the parties in connection with the pleadings, the Court RECOMMENDS that the motion for summary judgment be GRANTED and that the case be DISMISSED with prejudice.

I. Background [FN1]

FN1. The background information comes from Plaintiff's "Complaint," filed October 25, 2001; from Plaintiff's Answers to the Magistrate Judge's Questionnaire, filed December 5, 2001; from "Defendant's Motion for Summary Judgment," filed October 7, 2002; from the "Brief in Support of Defendant's Motion for Summary Judgment," filed October 7, 2002; from the "Amended Appendix in Support of Defendant's Motion for Summary Judgment," filed October 21, 2002; from "Plaintiff's Response to Defendant's Motion for Summary Judgment," filed November 5, 2002; from "Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment," filed November 15, 2002; and from "Defendant's Supplemental Appendix in Support of Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment," filed December 19, 2002.

On October 25, 2001, Plaintiff Arthur Williams ("Williams") filed the instant employment discrimination suit against his former employer, Defendant Aviall Services, Inc. ("Aviall"). (P.'s Compl. at 1.) Specifically, Williams alleges that Aviall terminated his employment due to his race-African American-in violation of Title VII of the Civil Rights Act of 1964, as amended. (P.'s Ans. to Mag. J. Quest. at 2, 3-4.)

Aviall, a distributor of replacement airplane parts, hired Williams effective November 22, 1999, to the position of warehouse clerk. (D.'s Br. at 2, 3; D.'s Am.App. at 2, 68, 82.) As a warehouse clerk, Williams was responsible for "pulling orders after a request came in on the Pick Ticket Machine and for stocking parts in the warehouse." (D.'s Br. at 3; D.'s Am.App. at 2, 3-4, 5, 82, 86.) The warehouse supervisor was Paul Stange ("Stange"), the small shipping supervisor was Eddie Puente ("Puente"), and the warehouse manager was Ken Abercrombie ("Abercrombie"). (D.'s Br. at 3-4; D.'s Am.App. at 7, 8, 9, 68, 78, 82.)

During the course of approximately one and a half years, Stange documented multiple instances of poor attendance, poor performance, and poor workplace behavior on the part of Williams. (D.'s Br. at 4-8; D.'s Am.App. at 82-84, 94, 95, 96-97, 99, 100, 101.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21018567 (N.D.Tex.)
(Cite as: 2003 WL 21018567 (N.D.Tex.))

Page 2

Ultimately, on July 2, 2001, after an investigation by Abercrombie into a verbal confrontation between Williams and Puente, Aviall terminated Williams' employment. (D.'s Br. at 7-11; D.'s Am.App. at 70-72, 78- 80, 106.) Aviall cited insubordination, inappropriate personal conduct, and violation of company rules as the grounds for the employment termination. (D.'s Br. at 11; D.'s Am.App. at 31-33, 106.)

Aviall now moves for summary judgment on all of Williams' claims. Specifically, Aviall contends that: (1) Aviall had a legitimate, nondiscriminatory reason for terminating Williams' employment and (2) Williams cannot show that Aviall's legitimate, nondiscriminatory reason was a pretext for race discrimination. (D.'s Br. at 12-18; D.'s Reply at 5-9.) Williams, on the other hand, contends that: (1) the Texas Workforce Commission found that Aviall had terminated his employment "for a reason that [was] not misconduct"; (2) he was a "good employee"; (3) similarly-situated, white employees were treated more favorably than he was treated; and (4) Aviall has presented false affidavit statements and falsified documents. (P.'s Resp. at 1-3.)

*2 The Court now turns to address the legal standards that will guide its analysis.

II. Legal Standards

For employment discrimination claims, the Fifth Circuit applies the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Blow v. City of San Antonio,* 236 F.3d 293, 296 (5th Cir.2001); *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir.2000). First, the plaintiff is required to establish a *prima facie* case for the particular type of discrimination he is alleging. *Russell,* 235 F .3d at 222. Upon meeting this requirement, a presumption of discrimination arises which the employer must then rebut by setting forth a legitimate, nondiscriminatory reason for the challenged action. *Id.* Once the employer meets this burden, the presumption of discrimination raised by the *prima facie* case disappears, and the plaintiff must then prove, by a preponderance of the evidence, that the employer's proffered reason is a pretext for the alleged discrimination. *Id.* At the "pretext stage, 'the only question on summary judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination." ' *Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343, 355 (5th Cir.2001) (citing *Haynes v. Pennzoil Co.,* 207 F.3d 296, 300 (5th Cir.2000).

The Supreme Court clarified the plaintiff's burden in *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133 (2000). In *Reeves,* the Court explained that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves,* 530 U.S. at 146. Nevertheless, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981); *Rubinstein v. Adm'rs of the Tulane Educ. Fund,* 218 F.3d 392, 400 (5th Cir.2000) ("While we are mindful of the Supreme Court's recent admonition that Title VII plaintiffs need not always present evidence above and beyond the prima facie case and pretext, discrimination suits still require evidence of discrimination.") (citation to *Reeves* omitted).

The Court now turns to the merits of the motion.

III. Analysis

As noted above, Aviall contends that: (1) Aviall had a legitimate, nondiscriminatory reason for terminating Williams' employment and (2) Williams cannot show that Aviall's legitimate, nondiscriminatory reason was a pretext for race discrimination. (D.'s Br. at 12-18; D.'s Reply at 5-9.) Williams, on the other hand, contends that: (1) the Texas Workforce Commission found that Aviall had terminated his employment "for a reason that [was] not misconduct"; (2) he was a "good employee"; (3) similarly-situated, white employees were treated more favorably than he was treated; and (4) Aviall has presented false affidavit statements and falsified documents. (P.'s Resp. at 1-3.)

*3 As an initial matter, Aviall does not dispute that Williams has met his initial burden of establishing a *prima facie* case of race discrimination. *Russell,* 235 F.3d at 222. As such, the burden shifts to Aviall to set forth a legitimate, non-discriminatory reason for terminating Williams' employment. *Id* . To this end, Aviall presents several pieces of evidence.

First, Aviall presents excerpts from its employee handbook regarding its progressive discipline policy, its attendance policy, and its workplace violence policy. (D.'s Am.App. at 87, 89-90, 91-92.) Aviall also presents the affidavit of Lou Koch ("Koch"), the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21018567 (N.D.Tex.)
**(Cite as: 2003 WL 21018567 (N.D.Tex.))**

Page 3

Director of Human Resources for Aviall, which confirms that Aviall has a progressive discipline policy, an attendance policy, a workplace violence policy, and a restricted parking policy. (*Id.* at 74-75.) With respect to the progressive discipline policy, Aviall may impose forms of discipline ranging from informal counseling to discharge. (*Id.* at 74-75, 87.) Furthermore, in determining the form of discipline to impose, Aviall "will consider the employee's past work record, the totality of the circumstances surrounding the incident, and the seriousness of the infraction." (*Id.* at 87.) With respect to the attendance policy, Aviall maintains that "[e]mployee[s] who are excessively absent or fail to comply with absence reporting procedures are subject to disciplinary action up to and including termination." (*Id.* at 90. *See also id.* at 75.) With respect to the workplace violence policy, Aviall maintains that it

> is committed to a policy of "zero tolerance" regarding all forms of workplace violence, including verbal/non-verbal threats, intimidation, harassment, coercion, shouting, brandishing weapons[,] and any type of physical abuse or harm. Any individual displaying such behavior in the workplace may be subject to disciplinary action up to and including termination.

(*Id.* at 92. *See also id.* at 75.) Finally, with respect to the restricted parking policy, Aviall "prohibits employees from parking in the handicapped parking spaces and the visitors' section of the Aviall parking lot without permission.... Aviall enforces this policy against all employees." (*Id.* at 75.)

Second, Aviall presents competent summary judgment evidence that Williams received a copy of the employee handbook. Most importantly, Aviall presents a "Handbook Acknowledgment" form that is signed by Williams and that is dated March 6, 2000. (*Id.* at 93.) The form states that "[m]y signature below acknowledges that I have received a handbook, read and understand Aviall's employment-at-will relationship[,] and ... shall comply with the policies set forth in this handbook." (*Id.*) Aviall also points to Williams' deposition statement that he believes he received a copy of the employee handbook. (*Id.* at 11.) Finally, Aviall presents the affidavit of Koch, confirming that Williams received a copy of the employee handbook. (*Id.* at 75.)

*4 Third, Aviall presents competent summary judgment evidence that Williams failed to comply with certain policies described in the employee handbook. On January 25, 2000, Stange issued Williams a counseling notice for absenteeism and informed Williams that his attendance must improve.

(*Id.* at 94.) On September 14, 2000, Stange issued Williams a written warning for absenteeism and notified Williams that failure to improve attendance would result in "disciplinary actions up to and including discharge." (*Id.* at 95.) In March of 2001, during a performance review, Stange and Abercrombie rated Williams as "unsatisfactory" in interpersonal skills and as "fair" in quantity of work, in job knowledge and skills, and in reliability. (*Id.* at 96-97.) As a result of the performance review, Stange and Abercrombie implemented an "Improvement Plan" with a 90-day probation period for Williams. (*Id.* at 98.) On May 8, 2001, Stange issued Williams a written warning for absenteeism and notified Williams that "failure to correct the above incident, behavior[,] or situation, will lead to disciplinary action up to and including termination." (*Id.* at 99.) On May 30, 2001, Stange issued Williams a written warning for insubordination and warned Williams that "[c]ontinued behavior of this magnitude will not be tolerated further." (*Id.* at 100.) According to the written warning and to the affidavit of Stange, Stange had instructed Williams on three different occasions "to assist with putting away merchandise in the upstairs area of the warehouse." (*Id.* at 84, 100.) On each occasion, according to the written warning and to the affidavit of Stange, Williams had failed to follow Stange's instructions. (*Id.*)

Fourth, Aviall presents competent summary judgment evidence regarding the incident that directly resulted in Aviall's termination of Williams' employment. On June 29, 2001, Puente issued Williams a suspension notice for insubordination, inappropriate personal conduct, and violation of company rules. (*Id.* at 101.) According to the affidavit of Puente, Williams had parked his car in a handicapped parking space, and Puente had asked him to move it. (*Id.* at 78-79.) However, according to the affidavit of Puente and to the statements of three witnesses, Williams had initially refused to move his car and had insisted that Puente tell him who wanted his car moved and why he needed to move it. (*Id.* at 79, 103, 104-05.) Furthermore, according to the affidavit of Puente, Williams had raised his voice and had demanded at least three times that Puente remove his hand from Williams' face. (*Id.* at 79.) However, according to the affidavit of Puente and to the statements of three witnesses, Puente had never positioned his hand near Williams' face. (*Id.* at 79, 103, 104-05.) Finally, according to the affidavits of Abercrombie and Koch, Aviall decided to terminate Williams' employment effective July 2, 2001, following an investigation by Abercrombie into the verbal confrontation between Williams and Puente.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-168