6.2.2    Such payment arrangement shall be determined on a timely basis by the employee's cognizant Director/Manager of Human Resources.

6.3    Employee and company contributions to CSC's Pension Plan and Matched Asset Plan are suspended during an approved Leave of Absence Without Pay; however, the period of the leave shall be counted for the purpose of vesting in accordance with the terms and conditions of the specific plan documents.

6.4    Employees who were participants in CSC's Pension Plan and Matched Asset Plan prior to taking a Leave of Absence Without Pay may, if reinstated, resume their participation in these plans upon reinstatement, in accordance with the terms and conditions of the specific plan documents.

## 7. RETURN FROM LEAVE OF ABSENCE

7.1    Employees returning from an approved Leave of Absence Without Pay must report in person to the appropriate Human Resources Departmental office the first business day following the scheduled end of the leave to determine work status and reinstatement.

7.2    Unless otherwise prohibited by state or local law, reinstatement of an employee returning from a Leave of Absence Without Pay (other than a Military Leave) of greater than thirty calendar days in duration is subject to the availability at the time the employee's leave is scheduled to end of a position for which the employee is fully qualified and, in the case of medical leave, subject to appropriate medical clearance and independent verification and physical examination, as CSC requests, in accordance with Human Resources Management Policy 246, Sections 4.2.4 and 4.2.5.

7.3    Persons who are returned to work from a Leave of Absence Without Pay of greater than thirty calendar days in duration, receive credit for all service earned prior to the thirty-first day of the leave of absence for purposes of computation of benefits and CSC service, in accordance with Human Resources Management Policy 215, Section 4.1.1, or as otherwise required by applicable state or local law.

7.4    An employee on a Leave of Absence Without Pay is required to keep the supervisor and cognizant Director/Manager of Human Resources informed of current circumstances which may prevent the employee from returning to work as scheduled. Any employee who is on a Leave of Absence Without Pay and is able to return to work before the scheduled end of the leave shall advise the supervisor and the cognizant Director/Manager of Human Resources immediately. The cognizant Director/Manager

of Human Resources and the supervisor shall then jointly determine the status of the employee's leave.

8. **FAILURE TO RETURN**

8.1    If an employee who has been granted a Leave of Absence Without Pay does not return to work on the scheduled date of return, he/she will be separated from service retroactive to the scheduled date of return.

8.2    An employee who engages in gainful employment with any employer during a Leave of Absence Without Pay, or during any extension thereof, except as specifically approved in writing in his/her leave of absence approval, shall be terminated retroactive to the date the leave or the extension commenced.

8.3    An employee who misrepresents any information furnished in support of a request for a Leave of Absence Without Pay or an extension thereof shall be terminated retroactive to the date the leave or the extension commenced.

9. **EXCEPTIONS**

9.1    Exceptions to this policy require the prior approval of the Corporate VP of Human Resources.


Van B. Honeycutt
Chairman and Chief Executive Officer


**CSC** Computer Sciences Corporation

RECEIVED

AUG 16 2001

HRSS

*Request for Leave*

537745

## Instructions

This request should be completed by an employee as soon as requirements for leave are known. The request should then be forwarded through supervision and Human Resources for approval.

## Employee Information (Please print)

Name: **Poland**          **Diane**                    Social Security Number: 187 - 54 - 4066
        Last          First          Middle

Organization/Division: **CIS/DCCS**          **620**     Work Phone: (302) 391 - 6727
                    Name          Number

Work Address/Mail Code: **400 Commerce Dr**

Effective Date of Leave: **8 / 06 / 01**   Expected Return Date: **08 / 21 / 01**   ☒ Exempt ☐ Non-Exempt *(check one)*

Supervisor's Name: **Dawn Dworsky**                Supervisor's Phone: (302) 391 - 7751

Reason for Leave: **Medical / Sick leave with pay**

*Note: Please see reverse of this form for important information regarding The Family Medical Leave Act of 1993 (FMLA).*

## Employee Acknowledgment

I understand that the determination of my leave status as either paid or unpaid, and the designation of my leave as Family & Medical Leave Act leave shall be the responsibility of my Human Resources representative in accordance with CSC policy.

I also understand that in the event I do not report to work at the expiration of the above leave or at the end of an authorized extension. If I engage in employment elsewhere (except as specifically provided for in the approval of my leave), or if I have misrepresented any information furnished in support of a request for a leave or an extension, my employment with Computer Sciences Corporation will be terminated in accordance with CSC policy.

I understand that if I am on a medical leave of absence, my employment with CSC will be subject to termination if I fail to provide Human Resources with a doctor's certificate on a monthly basis or if I am unable to return to work after 12 months on a medical leave of absence.

In addition, I understand that during the period of my leave, any employee-paid share of the cost for my selected healthcare plan(s) is due monthly in advance and, should my payment be more than 30 days late, that CSC has the right to terminate my coverage. Furthermore, any payment due to the company as of the effective date of my return to work will be recovered by the Company through a deduction from the first paycheck that I receive after returning from the leave.

I also understand that unless otherwise prohibited by law, in the case of unpaid leaves of absence in excess of 30 calendar days, my reinstatement depends upon the availability, at the time my leave is scheduled to end, of a position for which I am qualified and, in the case of any leave or excused absence for medical reasons, receipt of an appropriate medical clearance and physician's examination and independent verification, as CSC requests.

Employee Signature: _Diane Poland_                Date: 08 / 14 / 01

## Signatures                    ☐ Approved        ☐ Disapproved

First-level Manager: _____          Date: ___/___/___

Second-level Manager: _____          Date: ___/___/___

Other (as appropriate): _____          Date: ___/___/___

## Type(s) of Leave: (to be completed by Human Resources representative)

☐ Emergency        ☐ Vacation                  ☐ Educational            ☐ Military (Reserve)
☐ Jury Duty        ☑ Verification of Medical    ☐ Family/Medical Leave    ☐ Personal
☐ Relocation          Condition/Certification    ☐ Medical**              ☐ Special Assignment
☐ Sick Leave        ☐ Witness Duty              ☐ Military (Extended)

** This type of unpaid leave should be used for illness or injury that does not qualify for approval under the Family and Medical Leave Act.

Human Resources: _____          ☐ Approved ☐ Disapproved  Date: ___/___/___

## Reason for Disapproval

Distribution: White - Payroll     Yellow - Employee     Pink - Human Resources     Goldenrod - Supervisor                C-0143 (8/98)

PEFT
EXHIBIT NO. 22
KWP 3-30-05

## YOUR RESPONSIBILITIES WHILE YOU ARE ON A LEAVE OF ABSENCE
## MEDICAL LEAVE - FMLA ELIGIBLE

- To be granted a medical leave of absence, you must submit a Health Care Provider Certification form completed by your physician stating the reasons for the leave and the expected duration of the medical circumstances requiring the leave.

- After the initial 30 days of leave, you must submit a certificate of disability from your attending physician every 30 days.

- You must tell me (within the week) the last day that you actually worked.

- You must exhaust your accrued paid leave prior to charging leave without pay. You should first use your sick leave, vacation leave, and then charge leave without pay. You may stop using your paid leave if you are enrolled in CSC's Long Term Disability program and you have fulfilled the benefit waiting period (30 or 180 days) or if you are receiving worker's compensation benefits.

- Be sure that your time cards are properly charged to FMLA for the first twelve (12) weeks of leave.

| TOE CODE 78 | FAMILY MEDICAL LEAVE PAID SICK |
| TOE CODE 77 | FAMILY MEDICAL LEAVE PAID VACATION |
| TOE CODE 72 | FAMILY MEDICAL LEAVE WITHOUT PAY |

If you are unable to enter your time using the above codes, use the appropriate leave codes for the current week (sick, vacation, or LWOP). You will have to do a labor correction so that the time can correctly be entered as FMLA. Please contact me if you experience trouble entering the FMLA codes.

-  Once you have been advised that you are in an unpaid status, stop entering time into TES.

- Make sure you keep me informed of when you expect to return back to work.

- Prior to returning to work, you must advise me of your return and fax a doctor's release at least two days prior to your return. Otherwise, the time you submit into TES will not be processed and would result in no paycheck for you.

- If you fail to present a doctor's release upon your return, you will be sent home.

- You are expected to pay your normal contributions for benefits during your leave of absence if you choose to continue coverage. Failure to make timely payments may result in cancellation of your coverage. Please see the attached schedule for benefit payments.

- If upon your return to work you are unable to enter your time into TES, please complete a paper time card until you are able to enter your time in TES.

Simmie Osborn, (703) 318.2516, CSC Service Center, HR Support Services, 45154 Underwood Lane, Sterling, VA 20166 Mail Code 217. Fax (703) 318.2888. email: sosborn3@csc.com

~1384431.doc



PEFT

EXHIBIT NO. 23

A-203

**Computer Sciences Corporation**
www.csc.com

DEFT

EXHIBIT NO. 24

KWP 3-30-05

August 8, 2001

Diane Poland
12 Berks Crt.
New Castle, DE 19720

Dear Diane:

Under the Family and Medical Leave Act (FMLA) of 1993, employers are required to provide up to 12 weeks of unpaid, job protected leave to eligible employees for certain family and medical reasons. Employees are eligible if they have worked for a covered employer for at least one year. An eligible employee may take FMLA for any of the following reasons:

- For the birth of a son or daughter, and to care for the newborn child;
- For placement with the employee son or daughter for adoption or foster care;
- To care for the employee's spouse, son, daughter, or parent with a serious health condition; and
- **Because of a serious health condition that makes the employee unable to perform the functions of the employee's job.**

The Benefits Office has been informed of your recent request for workplace absence under FMLA. Your eligibility has been reviewed and a preliminary determination has been made for the leave that you have requested to count against your annual FMLA leave entitlement.

Except as explained below, you have the right under FMLA, for up to 12 weeks of leave in a 12-month period for the reasons listed above. Also, your benefits will be maintained during any period of unpaid leave under the same conditions as if you continued to work, and you will be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions of employment on your return from leave. If you do not return to work following FMLA leave for a reason other than: (1) The continuation, recurrence, or onset of a serious health condition which entitle you to FMLA; or (2) other circumstances beyond control, you may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave.

This correspondence is also to inform you that:

1.      You are required to submit the following forms to the Benefits Office no later than 15 days from your receipt of this letter, or from the date your leave commences (whichever comes later).

Service Center
45154 Underwood Lane
Sterling, Virginia 20166
703.318.2800  Fax 703.318.2888

**A-204**

Computer Sciences Corporation
www.csc.com

| Reason for Leave | Forms Required |
|---|---|
| Employee's serious health condition (including maternity) | ➢ Request for Leave Form<br>➢ Health Care Provider Certification<br>➢ CNA Long Term Disability Claim Form (if applicable) |
| Birth and/or care of newborn child | ➢ Request for Leave Form |
| Placement of child for adoption or foster care | ➢ Request for Leave Form<br>➢ |
| Seriously ill spouse, child or parent | ➢ Request for Leave form<br>➢ HealthCare Provider Cert. |

CSC

2.      Failure to submit the requested forms may result in termination of your leave until the certification is submitted.

3.      You are required to use all accrued leave according the Human Resources Management Policies, HRMP 246, Sick Leave, HRMP 244, Paid Vacation and HRMP 247, Leave Without Pay, before taking an unpaid leave of absence. Sick leave can only be used for your own health reasons and that of your immediate family (as defined) in the Sick Leave Policy. Otherwise, vacation leave should be used. If accrued vacation hours are exhausted, you should charge your time to an unpaid leave of absence. If your leave is for your own serious health condition, and you are enrolled in the CSC Long Term Disability Plan, you may defer use of paid hours once the waiting period for that plan has been satisfied.

4.      The following FMLA TOE codes should be used:

            TOE Code 78  Sick Hours
            TOE Code 77  Vacation Hours
            TOE Code 72  Unpaid Leave

5.      Your health insurance can be continued as long as you are disabled, for a period not to exceed one year from you effective date of unpaid leave. You will receive information on premiums due during your leave in future correspondence. You will have a minimum 30-day grace period from the premium due date in which to make premium payments. If payment is not made in a timely manner, your group health insurance may be cancelled, provided we notify you in writing at least 15 days before the date your health insurance coverage will lapse, or at our option, we may pay your share of the premiums during your FMLA leave, and recover these payments from your first paycheck(s) upon your return to work.

Service Center
45154 Underwood Lane
Sterling, Virginia 20166
703.318.2800  Fax 703.318.2888

**Computer Sciences Corporation**
www.csc.com

6.     We will do the same with other contributory benefits (e.g., supplemental life insurance, and disability insurance) while you are on FMLA leave.  If we do pay your premiums for other benefits, when you return from leave, premium deductions will be recovered from your first paycheck(s) upon your return.  Information on continuing any Matched Asset Plan loan payments to avoid default, and continuation of Reimbursement Account Plan participation (if you are enrolled in that plan) is also included in this package.  Any Matched Asset Plan and Pension Plan contributions will be suspended once you are in an unpaid leave status until your return to work.

7.     If you are on leave for your own personal health condition, you are required to furnish the Benefits Office with medical certification every 30 days. If the circumstances of your leave change and your are able to return to work earlier than the date originally indicated, you are required to notify us at least two working days prior to the date you intend to return to work. In addition, you will be required to present a return-to-work certificate to the Benefits Office prior to being restored to employment. If this certificate is not received, your return to work may be delayed until it is received.

8.     CSC medical leave of absence policy allows up to 12 continuous months of unpaid leave. If you are unable to return to work after 12 months of unpaid leave, your employment with CSC will be administratively terminated. In such a case, a termination letter and a summary of your CSC benefits options will be sent to you. If you are eligible for Long Term Disability benefits, your LTD benefits will continue.

9.     You are not a "key employee" as described in the FMLA regulations.

Additional information on FMLA (Summary Information - Request for Leave) is also enclosed.  If you have any questions, please feel free to contact me at 703.318.2516.

Sincerely,

Simmie Osborn
Associate Member Professional Staff
Human Resources

Enclosures

Service Center
45154 Underwood Lane
Sterling, Virginia  20166
703.318.2800   Fax 703.318.2888

**A-206**

Simmie J Osborn
/CORP/CSC

12/12/01 04:52 PM

To: Diane Poland/GIS/CSC
cc:
Subject: Updated Doctor's note

DEFT
EXHIBIT NO. 25
KWP 3-30-05

Diane,
Please submit an updated doctor's note stating that you are either released to return to work full time or
that you are still only able to work a reduced work schedule including the probably duration of the reduced
schedule. FYI, Please submit an updated doctor's note every 30 days. Thanks!
Simmie Osborn
HRSS Leave Dept.
Phone: 703-318-2516
Fax: 703-318-2888

A-207

**Diane Poland**
**/GIS/CSC**

01/04/02 10:18 AM

To: Simmie J Osborn/CORP/CSC@CSC
cc: Dawn M Dworsky/GIS/CSC@CSC
Subject: Re: TES

Simmie,

I will submit a time adjustment timesheet today for the hours I was unable to submit because of a TES error.  Additional FMLA TES hours wil be subimitted for wk: 12/31-1/5/02.  I did not experience problems submitting my time for 12/24-12/28.

Thanks
Diane Poland
Simmie J Osborn



**Simmie J Osborn**
**/CORP/CSC**

01/04/2002 09:45 AM

To: Diane Poland/GIS/CSC@CSC
cc: Dawn M Dworsky/GIS/CSC@CSC
Subject: Re: TES

Diane,

I have updated your FMLA balance in the system, however it will be necessary for you to submit a paper time sheet for this weeks time (you may also have to submit a paper time sheet for time entered 12/24-12/28 if you experienced problems recording FMLA that week too).  It is very important that your time be recorded as FMLA.

Also, I received your updated Doctor's note indicating that you are to work 30 hours a week through 1/13/2002 and that you may return to full time on 1/14/2002, if you are not able to return to a 40 hour work week on 1/14/2002, we will need an updated note extending your disability.

Please let me know if you have any questions.

Thank you.

Simmie Osborn
HRSS Leave Dept.
Phone: 703-318-2516
Fax: 703-318-2888
Diane Poland

**Diane Poland**
**/GIS/CSC**

01/03/02 02:26 PM

To: CSC Service Center
cc: Simmie J Osborn/CORP/CSC@CSC, Dawn M Dworsky/GIS/CSC@CSC
Subject: TES



A-208

Good Afternoon,

I am unable to TES FMLA codes 72 and 78 for this week.  I have to do this because of my current intermittent leave status.  The error I receive is "Family Medical Leave Balance is 0,zero".

Please update my balance so that I can enter the correct leave status for this week given the current TES cut-off.

Thanks
Diane Poland
302.391.8933



**Simmie J Osborn**
**/CORP/CSC**

01/25/02 08:42 AM

To:  Diane Poland/GIS/CSC
cc:
Subject:  Re: Updated doctor's note

Diane,

No problem at all!  Thank you!

Simmie Osborn
HRSS Leave Dept.
Phone: 703-318-2516
Fax: 703-318-2888
Diane Poland



**Diane Poland**
**/GIS/CSC**

01/25/02 08:29 AM

To:  Simmie J Osborn/CORP/CSC@CSC
cc:  Dawn M Dworsky/GIS/CSC@CSC, Maureen
     Summers/CEG/CSC@CSC, Sonia D Koplowicz/CEG/CSC@CSC
Subject:  Re: Updated doctor's note

Simmie,

I apologize,  it was an oversight.  I did submit the note to Dawn Dworsky in a timely manner.  I will fax you
a copy of the note on Monday.

Thanks
Diane Poland

Simmie J Osborn



**Simmie J Osborn**
**/CORP/CSC**

01/24/2002 03:32 PM

To:  Diane Poland/GIS/CSC@CSC
cc:  Dawn M Dworsky/GIS/CSC@CSC, Maureen
     Summers/CEG/CSC@CSC, Sonia D Koplowicz/CEG/CSC@CSC
Subject:  Updated doctor's note

Diane,

I was preparing to close your file since the last doctor's note I received released you to return to work full
time effective 1/14/2002.  However, in review of your time entry, I noticed that you are continuing to use
FMLA Sick 2 hours each day.  Please submit an updated doctor's note extending your disability.  Thanks!

Simmie Osborn
HRSS Leave Dept.
Phone: 703-318-2516
Fax: 703-318-2888

**A-210**



February 25, 2002


Diane Poland
12 Berks Court
New Castle, DE 19720

Dear Ms. Poland:

**CSC**

Our records show that you left work on Wednesday, February 20, 2002 indicating you would be out on disability.

As required by CSC policy, a certificate of disability from your attending physician must be presented to CSC at the commencement of your medical leave and then every thirty (30) days thereafter. CSC Human Resources Management Policy (HRMP) 247 further states that any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation, as determined by the employee's supervisor and the cognizant Director/Manager of Human Resources.

Please send your disability certificate to Simmie Osborn by close of business Monday, March 4, 2002. A self-addressed return envelope is enclosed for your convenience. Failure to do so may result in your voluntary resignation from CSC.

If you have any questions, I can be reached at 302.391.6213.

Sincerely,

Maureen D. Summers
Human Resources Specialist
Chemical Group




Enclosure: Return envelope

A-211

 **Simmie J Osborn**
**/CORP/CSC**

03/18/02 11:56 AM

To: Diane Poland/GIS/CSC
cc:
Subject: Re: Disability Note 

Diane,

I left a voice mail on your home phone.

I am going to place you inactive in the system as of 2/21/02. Please do not enter TES until you return to work.

Also, you updated doctor's note is due no later than COB 3/29/02. Please make sure that your doctor includes an estimated return to work date on the updated doctor's note.

Please let me know if you have any questions. Thanks!

Simmie Osborn
HRSS Leave Dept.
Email: sosborn3@csc.com
Phone: 703-318-2516
Fax: 703-318-2888
Address: CSC Service Center
        45154 Underwood Lane
        Sterling, VA 20166-9514

Diane Poland

 **Diane Poland**
**/GIS/CSC**

03/05/02 01:36 AM

To: Simmie J Osborn/CORP/CSC@CSC
cc:
Subject: Re: Disability Note

Hi Simmie,

I do not know how long I will be out sick; therefore, its best that I continue to TES until I have a better idea of continued healthcare I will need. I will however, contact you when I am more clear.

Thanks
Diane Poland
325-2790
Simmie J Osborn

 **Simmie J Osborn**
**/CORP/CSC**

03/01/02 02:31 PM

To: Diane Poland/GIS/CSC@CSC
cc:
Subject: Re: Disability Note

Hi Diane,

A-212

I just left a message for you at home.  I was wondering if you had an estimated return to work date?  I understand that you won't know the exact date, but if you know that you are going to be out over 30 days then I can place you unpaid in the system and you wouldn't have to enter time each week.  Please let me know!  Thanks!

Simmie Osborn
HRSS Leave Dept.
Email: sosborn3@csc.com
Phone: 703-318-2516
Fax: 703-318-2888
Address: CSC Service Center
            45154 Underwood Lane
            Sterling, VA 20166-9514

Diane Poland



**Diane Poland**
**/GIS/CSC**
03/01/02 12:38 PM

To: Simmie J Osborn/CORP/CSC@CSC
cc:
Subject: Disability Note

Good Afternoon
Simmie,

THANK YOU SO MUCH FOR ALL YOUR HELP.

Sincerely
Diane Poland

A-213



May 21, 2002

Diane Poland
12 Berks Court
New Castle, DE 19720

Dear Diane,



Our records show that you have been on a medical leave since February 20, 2002. According to CSC policy, you are required to provide a continuing certificate of disability every thirty (30) days from the date your medical leave commenced on February 20, 2002. You were informed of this policy requirement via written correspondence on 8/8/01, 12/12/01, 1/4/02, 1/24/02, 2/25/02, and most recently on 3/18/02. In addition, you were contacted by the Service Center by phone on at least 10 occasions and reminded that the doctor's note was needed every 30 days. Please be advised that the current physician's certificate was due on May 12, 2002 and is now 9 days overdue.

It is your responsibility to provide a continuing certificate of disability every thirty (30) days. The certificate of disability must be documented, on a doctor's letterhead and signed by your physician. A phone call from your doctor is not acceptable.

Failure to provide the required medical certification on time and every 30 days is a violation of company policy, and considered by CSC to be a voluntary resignation. Please fax the certification to Maureen Summers @ 301.391.6190 by or before 5:00 p.m. EST on Thursday, May 23, 2002. If the doctor certification is not received by aforementioned date and time, CSC will consider this your voluntary resignation.

If you have any questions pertaining to the above, I can be reached at 302-391-6213 or you can contact Simmie Osborn at 703-318-2516.

Sincerely,

Maureen Summers

Maureen Summers
Human Resources Specialist
Chemical Group

Copy to:     Simmie Osborn- Leave Team
             Personnel File

A-214

*DEFT*

EXHIBIT NO. *28*

KWP *3-30-05*

June 20, 2002

Diane Poland
12 Berks Court
New Castle, DE 19720

Dear Diane,



This letter pertains to your current medical leave of absence status with Computer Sciences Corporation (CSC).  Your last day of work was February 20, 2002.

As you know, under CSC policy, you are required to provide a continuing certificate of disability every thirty (30) days from the date your medical leave commenced.  Your last doctor's note is dated May 22, 2002 with an estimated return to work date of July 2002. It is your responsibility to provide this doctor's note and ensure that it is received by the Service Center. Failure to provide the required medical certification on a timely basis may be considered by CSC as a voluntary resignation of your employment with CSC.

Please send your updated doctor's directly to my attention for receipt no later than COB July 28, 2002.   We will accept a faxed copy of the certification if it clearly reflects your doctor's letterhead, phone number and address. You can fax the note to 703-318-2888.

Please let me know if you have any questions; I can be reached at 703-318-2516.

Sincerely,


Simmie Osborn
Human Resources

A-215

FedEx | Ship Manager | Label 7918 6713 3802                wysiwyg://12/https://www.fedex.com/cgi-...06gits/02730/7918_6713_3802sfa0j1.

From: ANDREW HANEY (703)318-2640
COMPUTER SCIENCES CORP-HRSS M/C 217
45154 UNDERWOOD LANE

STERLING, VA, 20166

**To: Diane Poland (302)325-2790**

**12 Berks Court**

**New Castle, DE, 19720**

Ref: 094.001



DELIVERY ADDRESS BARCODE(FEDER-EDX)

**TRK # 7918 6713 3802** FORM
6201              FedEx ** 2DAY **

19720-DE-US         **SF ILGA**

REVENUE BARCODE

FedEx.

SHIP DATE: 20JUN02
WEIGHT: 1 LBS

**PHL**

**MON**
A1
Deliver by:
**24JUN02**

---

## Shipping Label

| Schedule Courier | Find a Dropoff Location | Shipping History |

| Shipment Complete | Cancel Shipment | Edit Shipment Information |

1. Use the "Print" feature from your browser to send this page to your laser printer.
2. Fold the printed page along the horizontal line.
3. Place label in air waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and sc

## Shipment Details

To print a copy of the shipment information for your records, please click "Shipment Details".

| Shipment Details |

## Ship a New Package

| Ship Inside U.S. | Ship Outside U.S. | Ship to Same Recipient |

Use of this system constitutes your agreement to the service conditions in the current FedEx service Guide, available upon request.
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare
a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from
FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,
consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary
value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current
FedEx Service Guide.

Jun 21 02 01:57p     Scott Houser, M.D.          3026339562          p.1

**SCOTT HOUSER, M.D.**
5239 WEST WOODMILL DRIVE
WOODMILL CORPORATE CENTER
SUITE 49
WILMINGTON, DE 19808
(302) 633-1263
FAX: (302) 633-9562

DEFT
EXHIBIT NO. 29
KWP 3-30-05

---

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: *Jimmie Osborne* | FROM: Scott Houser, M.D. |
| COMPANY: | DATE: *6/18/02* |
| FAX NUMBER: *703 318-2888* | TOTAL NO. OF PAGES INCLUDING COVER: *2* |
| PHONE NUMBER: *703 318-2518* | SENDER'S REFERENCE NUMBER: |
| RE: *Diane Poland* | YOUR REFERENCE NUMBER: |

☐ URGENT  ☒ FOR REVIEW  ☐ PLEASE COMMENT  ☐ PLEASE REPLY  ☐ PLEASE RECYCLE

NOTES/COMMENTS:

This facsimile transmission is intended only for the addressee named above. It contains information that is privileged, confidential or otherwise protected from use and disclosure. If you are not the intended recipient, you are hereby notified that any review, disclosure, copying or dissemination of this transmission or the taking of any action in reliance on its contents, or other use is strictly prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for its return to us.

A-217

Jun 21 02 01:57p    Scott Houser, M.D.    3026339562    p.2

# Scott Houser, M.D.
## Adult Psychiatrist

5239 West Woodmill Drive
Woodmill Corporate Center
Suite 49
Wilmington, DE 19808

Phone:  (302) 633-1263
Fax:    (302) 633-9562

Re: Diane Poland (DOB: 8/29/64)

June 14, 2002

To Whom It May Concern:

I am writing to you at the request of my patient, Diane Poland, whom I have been treating for over six months initially at Suburban Psychiatric Associates and now at my private office. She is currently diagnosed with Major Depression, Recurrent, Severe. She was last seen on 6/3/02 and although has shown some minimal improvement, she continues with severe symptoms of depression which include impaired concentration, isolation, anhedonia, anxiety, sleep and appetite disturbance, and feelings of worthlessness.

She is currently on Effexor XR 150mg daily and Adderall XR 30mg daily. We are continuing to titrate the dosages to reduce her depressive symptoms. We are meeting monthly to monitor her progress.

Because of the severity of her symptoms and her minimal response to medications, I believe that she is unable to do any type of work at this time. I am hopeful that she will be able to return to work within the next two to three months.

Thank you for your attention.

Sincerely,

Scott Houser, M.D.
Adult Psychiatrist

A-218

Sep 29 02 07:39p    Scott Houser, M.D.    3026339562    p.1

## SCOTT HOUSER, M.D.
### 5239 WEST WOODMILL DRIVE
### WOODMILL CORPORATE CENTER
### SUITE 49
### WILMINGTON, DE 19808
### OFFICE: (302) 633-1263
### FAX: (302) 633-9562



DEFT
EXHIBIT NO. 30
KWP 3-30-05

### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: Simmie Osbourne | FROM: Scott Houser, M.D. |
| COMPANY: | DATE: 9/29/2002 |
| FAX NUMBER: 703 318-2888 | TOTAL NO. OF PAGES INCLUDING COVER: 2 |
| PHONE NUMBER: 703 318-2518 | SENDER'S REFERENCE: Sandy: Office Manager |
| RE: Diane Poland | YOUR REFERENCE NUMBER: |

☐ URGENT    X FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

ATTACHED IS THE UPDATED INFORMATION YOU REQUESTED.

This facsimile transmission is intended only for the addressee named above. It contains information that is privileged, confidential or otherwise protected from use and disclosure. If you are not the intended recipient, you are hereby notified that any review, disclosure copying or dissemination of this transmission or the taking of any action in reliance on its contents, or other use is strictly prohibited. If you have received this transmission in error, please notify us by telephone immediately so that we can arrange for its return to us.

**A-219**

Sep 29 02 07:40p     Scott Houser, M.D.            3026339562            p.2

# Scott Houser, M.D.
### Adult Psychiatrist

5239 West Woodmill Drive
Woodmill Corporate Center
Suite 49
Wilmington, DE 19808



Phone: (302) 633-1263
Fax: (302) 633-9562

September 27, 2002

Re: Diane Poland (SSN: 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)

To Whom It May Concern:

I am writing to you as a follow-up for Diane Poland. I have seen her twice since my last letter: July 29, 2002 and September 13, 2002. Her depression steadily improved over the past three months while we have gradually increased her Effexor XR to 225mg daily. She was taking Adderall XR 30mg daily as an adjunct to the antidepressant and was able to discontinue it early in September with a minor increase in depression lasting a few days that resolved spontaneously. Her anxiety is still present although at a much lower intensity.

If any further information is needed, please contact me at the above telephone number.

Sincerely,

Scott Houser, M.D.
Adult Psychiatrist

A-220

DEC.09'2002 16:02 3023916190          CSC CHEMICAL GROUP HR          #3136 P.002/002

> DEFT
> EXHIBIT NO. 31
> KWP 3-30-05

September 26, 2002

Diane Poland
12 Berks Court
New Castle, DE 19720



Dear Diane:

Our records show that you have been on a medical leave since February 20, 2002. According to CSC policy, you are required to provide a continuing certificate of disability every thirty (30) days from the date your medical leave commenced on February 20, 2002.

You were informed of this policy requirement via written correspondence several times, including 8/8/01, 12/12/01, 1/4/02, 1/24/02, 2/25/02, 3/18/02, 5/21/02, and most recently on June 20, 2002. Your last doctor's note, dated June 14, 2002, indicated you would be out for 2-3 additional months. An updated physician's certificate was due on September 21, 2002 and is now past due.

Your failure to provide the required medical certification on time is a violation of company policy. As stated in CSC Human Resources Management Policy (HRMP) 247, any failure on the part of the employee to provide the above paperwork may be considered a resignation, as determined by the employee's supervisor and the cognizant Director/Manager of Human Resources. Therefore, your failure to provide the required medical documentation, is considered your voluntary resignation from CSC effective September 27, 2002.

Any questions regarding your benefits should be directed to CSC's Service Center @ 1.877.612.2211.

Good luck to you in your future endeavors.

Sincerely,

Maureen D Summers

Maureen D. Summers
CSC Human Resources
400 Commerce Drive
Newark, DE 19713

A-221

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|                                       |     |                       |
| ------------------------------------- | --- | --------------------- |
| DIANE POLAND,                         | )   |                       |
|                                       | )   |                       |
|     Plaintiff,    | )   |                       |
|                                       | )   |                       |
|     v.            | )   | C.A. No. 04-217 (GMS) |
|                                       | )   |                       |
| COMPUTER SCIENCES CORP.,              | )   |                       |
|                                       | )   |                       |
|     Defendant.    | )   |                       |

## AFFIDAVIT OF RANDALL MILLER

I, Randall Miller, do hereby depose and swear as follows:

1.    I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.    I am currently an employee of Computer Sciences Corporation ("CSC"), and have worked for CSC since the Spring of 1997. When I first began working for CSC, I was a Member of Technical Staff B. Shortly thereafter (within 3 months), I was promoted to Member of Technical Staff A. Prior to CSC, I worked for DuPont, one of CSC's largest customers. I started working for DuPont in 1984.

3.    I have over 11 years of UNIX experience. As a DuPont employee, I gained hands-on practical experience by completing increasingly complex UNIX and programming assignments. During this time, I supplemented my practical experience by studying programming guides and handbooks and working with DuPont Electrical Engineers who were proficient in the UNIX operating system.

4.    Between April 1987 and April 1993, I worked in the DuPont Image Systems Department as a Research Technician and Software Specialist, where I created

customer interfaces for the Dupont's Digital Imaging products using the C programming language on a UNIX Sun Sparc network. Thereafter, I worked as a Technical Specialist in the DuPont Printing and Publishing Group from April 1993 to March 1995. In this capacity, I supported UNIX based Sun Sparc servers and workstations, image stations, and proofing systems. I was tasked with supporting customers who had no knowledge of the UNIX operating system and developed installation and maintenance scripts that aided the field support groups. I was also responsible for the maintenance and integrity of UNIX based Sun Sparc workstations within the work group, as well as a network of lab machines. My duties included the installation, maintenance and upgrading of the UNIX operating system, network, and application software, as well as troubleshooting hardware and software problems in UNIX.

5.    Between March 1995 and January 1997, I worked as a Support Analyst in DuPont's customer support center where I provided first level support involving UNIX issues. As a result of my experience, I developed a reputation among my peers as the contact person for UNIX resource issues, questions, and troubleshooting and had a strong command of the UNIX operating system. Following my transition to CSC in 1997, I worked as a Systems Engineer, where I created and maintained DceS Field Engineering websites on UNIX Web Servers. In mid-November 2000, I transferred to the Managed Print and Dazel ("MPD") team, which was supervised by Dawn Dworsky, to assist UNIX issues. My transition to the MPD group was not a promotion; rather, it was merely a change of assignment. Accordingly, I was not promoted to Senior Member of Technical Staff at that time.

2

6.    While with CSC, I complemented my UNIX experience with computer base training courses ("CBT") and seminars related to the UNIX operating system. Some of the courses include:    Shell Programming;    UNIX: Process and Data Utilities; UNIXWare File Management;  UNIXWare Job Control;  UNIX: Using Shell;  TCP/IP for UNIX Users;    Essentials of HP-UX;    Solaris (SUN UNIX) 2.5.1 System Administration: System Operation; and Oracle Introduction: SQL Plus.

7.    I also gained background in the UNIX operating system by attending seminars and courses as a DuPont employee.

8.    I initially learned UNIX as a computer hobbyist.  In fact, in the mid-1980's, I built a UNIX system on my home computer.

9.    Diane Poland was a member of the MPD group when I transferred into that group. When I first began working with Ms. Poland, she was very friendly and I got along with her very well.  However, in approximately Fall of 2001, I noticed that Ms. Poland had isolated herself from other members of the MPD group. She stopped talking to me and other members of the group around that time.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_____          _5/4/05_____
Randall Miller                                            Date

3

A224

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE POLAND, | ) | |
| | ) | |
| Ms. Poland, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-217 (GMS) |
| | ) | |
| COMPUTER SCIENCES CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT OF DAWN DWORSKY

I, Dawn Dworsky, do hereby depose and swear as follows:

1.    I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.    I am currently employed by Computer Sciences Corporation ("CSC") as the New Service Delivery Manager.  My previous position during the relevant time period was Manager of Field Engineering, Test & Integration, Dazel and Managed Print.  I have been employed by CSC or a predecessor company since 12/22/78.  In my previous position, I was responsible for managing the Engineering of Desktop Application, Engineering of Managed Print & Dazel, and Engineering of Desktop Software.

3.    In May 2000, CSC implemented a business restructuring.  As a result of this restructuring, I replaced Edwin Derek Alston as manager of the Managed Print and Dazel ("MPD") group.  I became Diane Poland's supervisor at that time.

4.    Ms. Poland was a member of the Dazel subgroup of the MPD group throughout the time that I served as her supervisor.  Dazel is a sophisticated software application that allows a computer to communicate with a printer, facsimile, or e-mail, and guarantees delivery.  Dazel runs on the UNIX computer operating system.  The UNIX

platform is a complex computer program with numerous command codes that require proficient knowledge, expertise, and skill of the operating system. In her position in the MPD group, Ms. Poland was expected to be able to perform command line programming in UNIX.

5.    In or about May 2001, I completed an annual performance evaluation of Ms. Poland for the period of April 1, 2000 through March 31, 2001. I rated Ms. Poland as a "3" or "good," indicating that Ms. Poland's performance "consistently meets expectations and job requirements."

6.    CSC considers its employees for merit salary increases at approximately the same time of year that its annual performance evaluations are conducted. In 2001, CSC's Human Resources department issued annual Overall Merit Guidelines ("Guidelines"), which designated the recommended merit percent increase an employee should receive based on his or her evaluation rating. The Guidelines also limited the percent of the workforce population that can receive a particular rating. If a manager wanted to diverge from these recommended Guidelines, he or she had to first obtain approval from Human Resources. With respect to employees who were rated a "3" during the 2001 evaluation and salary review period, the Guidelines recommended a salary increase of between 0-4%. I wanted to reward Ms. Poland's good effort and performance for her first year in her position as a Member of Technical Staff A ("MTSA") by providing Ms. Poland with a 5% salary increase. Because I wanted to provide Ms. Poland with a salary increase over and above the recommended Guidelines, I sought and obtained Human Resources' approval to do so, and Ms. Poland received a 5% salary increase in 2001.

2

7.     I met with Ms. Poland on June 12, 2001 regarding her performance appraisal. During this meeting, Ms. Poland indicated displeasure with not being given a promotion along with her salary increase, despite the fact that Ms. Poland received a "good" evaluation and a merit salary increase above the recommended Guidelines.  Ms. Poland was upset that she was not promoted to Senior Member of Technical Staff ("SMTS") in May 2001, even though she had only held the position of MTSA for one year at that time. Ms. Poland expressed to me that she deserved a promotion because she had completed Computer Based Training ("CBTs") courses in the UNIX operating system, and was furthering her education by pursuing a degree in Business Management.  In addition, Ms. Poland claimed that she deserved a larger salary increase because she had worked hard during the prior year.

8.     During our June 12, 2001 meeting, I explained to Ms. Poland the reasons that she did not receive a promotion in May 2001.  I advised Ms. Poland that I did not promote Ms. Poland to SMTS that year because Ms. Poland did not yet have the requisite skill set or expertise for the SMTS position and because she had only been in her current position of MTSA for one year at that time.  I also told Ms. Poland that she would have to demonstrate the ability to lead projects independently, mentor and train others, work independently with the client, improve her decision-making capabilities and independently manage a "category one" problem before she could be promoted.  Further, I informed Ms. Poland that, although she was doing well with the UNIX system for her level as an MTSA, Ms. Poland did not yet have the requisite skills or expertise to work with the UNIX operating system at a senior level.  During this meeting, I also shared with Ms. Poland my expectations of employees in MTSA and SMTS positions.

9.    The only person I promoted to an SMTS in May 2001 was MaryAnne Doll-Johnson.  At the time of Ms. Doll-Johnson's promotion to SMTS, she had more years of relevant experience with the UNIX operating system than Ms. Poland, and had been an MTSA for a longer period of time than Ms. Poland.  She also had all of the other skills that I was looking for in an SMTS, including the ability to lead projects independently, mentor and train others, work independently with the client, independently manage a "category one" problem, deal with issues related to outages on the network, had effective decision-making capabilities, and was skilled in advanced troubleshooting.

10.    Ms. Poland remained dissatisfied with her salary increase and the fact that she was not promoted and, thus, she arranged several meetings to discuss these issues with Maureen Summers (Human Resources Manager) and me.  With respect to her request for a higher salary increase, I again explained why I rated Ms. Poland as I did.  Ms. Summers and I again thoroughly explained the salary increase process to Ms. Poland and that Ms. Poland's salary was consistent with her peers, and reiterated that Ms. Poland received a higher salary increase than was recommended under the Guidelines.  Ms. Summers and I also explained that Ms. Poland was not ready for a promotion to SMTS at that time because of her limited time in her current position (only one year, and thus had limited on-the-job experience) and because she did not have the necessary level of expertise and skill in UNIX, among other factors.  I told Ms. Poland that she would be eligible for a promotion in the future if she concentrated on increasing her technical skills and continued her good performance.

11.    In the Summer of 2001, Ms. Poland made it known to me that she wanted

to be transferred out of the MPD group and into a management position with CSC. I was willing to help her in whatever manner that I could with her goal. In August 2001, Ms. Poland informed me of her interest in a UNIX-related position in the Applications Interconnect Services ("AIS") group under the supervision of Dahl Landers. I contacted Ms. Landers on Ms. Poland's behalf and recommended Ms. Poland to Ms. Landers. Ms. Landers scheduled two interviews with Ms. Poland during August 2001. Ms. Poland, however, stood Ms. Landers up for both interviews, and never provided Ms. Landers with any explanation. Subsequently, in November 2001, I again spoke with Ms. Landers, on Ms. Poland's behalf, about another open position in the AIS group. On November 26, 2001, I met with Ms. Poland to discuss the AIS opportunity. Despite the facts that open positions at CSC were very limited at that time and that Ms. Poland was purportedly anxious to transfer out of the MPD group, Ms. Poland failed to follow through with Ms. Landers, and never submitted an application for the position.

12.    In July 2002, while Ms. Poland was on a full-time medical leave of absence, I promoted Randall Miller (Caucasian) from MTSA to SMTS. My decision to promote Randall Miller had absolutely nothing to do with race. Rather it was a decision based on my business judgment that Mr. Miller was ready for promotion due to his qualifications, level of experience, his technical skills with the UNIX operating system, his overall performance and time within the MTSA position. Significantly, Mr. Miller had been in the MTSA position for nearly five (5) years prior to his promotion. At the time of his promotion, Mr. Miller had over 10 years of practical, tenured experience working with the UNIX operating system as an employee for both CSC and for past employers, including DuPont. While employed at CSC, Mr. Miller also complemented his UNIX

experience with CBTs and seminars related to the UNIX operating system. I also believed that Mr. Miller demonstrated the ability to work independently on important technical projects without direct supervision; to provide technical direction and guidance to others; to handle various tasks involving a variety of computer programs; to deal with issues related to outages on the network, independently manage a "category one" problem and that he possessed strong decision-making capabilities and was skilled in advanced troubleshooting. I did not believe that Ms. Poland possessed the same skills. In addition, in my business judgment, Mr. Miller's years of experience working with the UNIX operating system prior to July 2002 qualified him for promotion to SMTS. I believed that Mr. Miller displayed total competency with the UNIX operating system. I based my decision to promote Mr. Miller, among other factors, upon the factors set forth in the CSC Engineering Progression Promotion form. A true and correct copy of the CSC Engineering Progression Promotion form which I completed for Mr. Miller's planned progression promotion is attached to this Affidavit as Exhibit 1. These are the same factors that I would consider in promoting anyone, regardless of race or other protected category.

13.    Because Ms. Poland had been out on medical leave since February 2002, I did not consider Ms. Poland for a promotion in July 2002. It is standard CSC practice and policy not to consider an employee for promotion while they remain out on medical leave. I have never promoted any employee while the employee was on medical leave. I did not actually consider Ms. Poland for promotion at this time because she was on a leave of absence, but I also did not believe that she had sufficient UNIX experience, time in her MTSA role, or other skills to warrant a promotion at that time. Ms. Poland had only been

programming in UNIX for about 2 years, and I did not believe that Ms. Poland possessed the same level of computer skills and technical expertise as Mr. Miller. Although by February 2002, when Ms. Poland went out on full-time medical leave, Ms. Poland had progressed with her UNIX training, I did not believe that Ms. Poland had reached the level of total competency required of an SMTS. In order to be qualified for the SMTS position, I believed that Ms. Poland needed to progress to the point at which she could work more independently, improve her decision-making capabilities, improve her troubleshooting skills, and demonstrate increased proficiency in the UNIX operating system. Additionally, in February 2002, when Ms. Poland went out on full-time medical leave, Ms. Poland had only held the MTSA position for less than two years, far less time in her position than Mr. Miller had when he was promoted.

14.     Throughout the time that Ms. Poland was employed in the Dazel subgroup, a woman, MaryAnne Doll-Johnson, was the highest paid person in that subgroup. In July 2001, four individuals performed engineering work in the Dazel subgroup: Ms. Poland, Audrey Daigger, MaryAnne Doll-Johnson and Randall Miller. Any difference between the compensation received by Ms. Poland and Randall Miller was based solely on legitimate business reasons other than sex. Mr. Miller received a higher salary than Ms. Poland because of his experience and his longevity with the company, based upon his CSC service date. Mr. Miller had been employed with CSC and its predecessor, DuPont, for many years, much longer than Ms. Poland, who had only been employed by CSC for five years. Consequently, Mr. Miller had gradually earned a higher salary over that time period, whereas Ms. Poland started only a few years ago. The sex of the employees was not a factor in setting their compensation levels.

15.    I admit that I posed an inquiry regarding church practices after I visited a church with my African-American babysitter.  I did not ask the question in a disrespectful manner and was simply asking about the cultural practices of the church.  Ms. Poland did not show any physical offense to the comment at the time, and never informed me that she was offended by the comment.  Ms. Summers and Ms. Koplowicz questioned me about the statement, and I admitted to asking about the cultural practices of an African-American church but denied that I meant it in a disrespectful manner.  Ms. Koplowicz advised me that, although I genuinely intended to inquire about a specific practice, I needed to be careful with my statements because some statements may be misconstrued or taken out of context.

16.    Ms. Poland never complained to me about any alleged racial comments. Although Ms. Poland expressed to me that she felt that I favored other members of the team over her, I immediately addressed her concerns by discussing them with her.  I also sought assistance from Human Resources to resolve Ms. Poland's concerns.  I deny that I ever retaliated against Ms. Poland for voicing her complaints, through isolation or any other means.  Despite efforts I took to lessen Ms. Poland's feelings of exclusion in the MPD team, Ms. Poland isolated herself from other members of the team.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_____          5/5/05
Dawn Dworsky                              Date

8

A232

**CSC** Computer Sciences Corporation

*Engineering Progression Promotion*

**Date Originated:** June 7, 2002
Use this form only during the merit review cycle for planned progression promotions within the Engineering Family

*Employee Information*

| Employee's Name: | Miller | Randall | | Social Security: | 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 |
|---|---|---|---|---|---|
| | Last | First | | | |
| Organization: | DCeS | 620/6960/560 | | | |
| | Name | Number (Org / CCC / Dept)* | | | |
| Work Location: | 500 Creekview Drive | Newark/DE/19702 | | | |
| | Address | City/State/Zip | | | |

*Current Engineering Position:*

| Job Title | Member Technical Staff A | Job Code: | mtsa | Salary Grade/Rate Range: | S4 |
|---|---|---|---|---|---|
| Salary: | $61,535 | Hours of Work: | 44 | | |

*Proposed Engineering Position:*

| Job Title | Senior Member Technical Staff | Job Code: | smts | Salary Grade/Rate Range: | S4 |
|---|---|---|---|---|---|
| Salary: | $64,611.75 | Hours of Work: | 44 | | |

**Please check one box from each category**

**Summary**

| | |
|---|---|
| ☐ | Assist in performing the more routine engineering assignments related to research, design, development and modification of complex system and subsystems. |
| ☐ | Performs difficult and complex engineering activities relative to the research, design, development, and modification of existing and planned systems and subsystems using prescribed methods. |
| ☒ | Performs the more difficult and complex engineering assignments for important segments of a project or projects involving the research, design, development, and modification of existing systems and subsystems. |
| ☐ | Performs and/or directs advanced theoretical studies and/or laboratory experiments of a highly complex nature in a variety of scientific/engineering fields to discover concepts, techniques and applications that will advance the state-of-the-art and ultimately contribute to profitable systems development and/or new business acquisitions. |

**Competencies**

| | |
|---|---|
| ☐ | Incumbent will receive specific and detailed instruction about required tasks and results expected. Work is checked for during progress for accuracy upon completion. Initiative and judgement are expected to be used in performing assigned tasks. May provide work direction to one or more non professional employees on projects. |
| ☐ | Incumbent is expected to use initiative and judgment in performing assigned tasks that will have clear and specific objectives. Tasks are screened by supervision for unusual or difficult problems, selecting techniques / procedures to be applied on non-routine work. Errors can cause some delay or expense. May provide work direction to one or more non-professional employees on routine projects. |
| ☐ | Independently performs most assignments with instructions about general results expected. Provides technical supervision to one or more professionals. May act as task or proposal leader. Errors can cause substantial delay, expense, or inefficiency. |
| ☐ | Works independently of any direct supervision on projects with high visibility and monetary impact, which may be technically unique to the industry. Errors can cause some delay. Incumbent will usually work closely with the customer. Provides technical direction and guidance to professionals. May act as a task or proposal leader. |
| ☒ | Works independently of any direct supervision on projects with highest visibility and monetary impact, which are technically unique in nature. Provides technical direction and guidance to professionals. May act as proposal leader and/or internal consultant providing technical guidance on the most complex projects. Incumbent will work closely with the customer, which may impact future business. |
| ☐ | Works independently on technically unique projects with highest visibility and significant monetary impact. Incumbent will serve as internal consultant, providing guidance on the most complex projects. Works closely with the customer, and has an impact on future business. Generally spends a great deal of time in an advisory capacity regarding problems of a highly complex nature. |

**Accountabilities**

| | |
|---|---|
| ☐ | Assists with routine engineering problems designed to develop professional work knowledge and abilities and to provide familiarization with the engineering staff, methods and practices and programs of the company. Participates in evaluating, selecting, and applying standard engineering techniques, procedures and criteria in the research design, development and/or modification of complex systems and subsystems. Continual communication required with supervisor and other operating areas concerned with the progress of assignments. |
| ☐ | Using prescribed methods performs specific and limited portions from a broader assignment of an experienced engineer. Applies standard practices and techniques in specific situations, adjusts and correlates data, recognizes discrepancies in results and follows operations through a series of related, detailed steps or processes. |
| ☐ | Performs difficult, complex engineering research, development, and modification assignments at all levels in system analysis. Designs definition for key segments of project(s). Judgment and creativity are regularly exercised in solving highly complex, major technical problems and providing proper advice and recommendations. |
| ☒ | Performs/directs advanced theoretical studies of a highly complex nature to discover concepts, techniques, and applications that will advance the state-of-the-art and ultimately contribute to profitable systems development and/or new business acquisitions. May act as internal consultant providing guidance on the most complex projects. Uses judgment and initiative in solving complex technical problems. Advises superior of problems of a highly complex nature. Capability in establishing good customer relations. Performs other duties as required. |
| ☐ | Top level technical contributor. Work will advance the state-of-the-art and ultimately contribute to profitable systems development and/or new business acquisitions. Regularly operates under deadlines. May be subject to extreme workloads. Advises superior of problems of an advanced nature. |
| ☐ | Top level technical contributor. Work will advance the state-of-the-art and ultimately contribute to profitable systems development and/or new business acquisitions. Generally works under deadlines. Capability in establishing good customer relations. In performing tasks, individual is expected to show initiative and judgment. |

A232.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                    )
                                 )
         Ms. Poland,             )
                                 )
         v.                      )          C.A. No. 04-217 (GMS)
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
         Defendant.              )
_____)

## AFFIDAVIT OF MAUREEN SUMMERS

I, Maureen Summers, do hereby depose and swear as follows:

1.    I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.    I have been employed with Computer Sciences Corporation ("CSC") as a Human Resources Specialist since July 1, 1997.

3.    On June 15, 2001, Ms. Poland informed me that Ms. Dworsky had made a race-based comment which had offended her. According to Ms. Poland, Ms. Dworsky had told her that she had recently attended a primarily African American church, and had enjoyed the singing and loud music during the service. According to Ms. Poland, Ms. Dworsky went on to say that the services were more like a party than a church, and then she asked Ms. Poland why African Americans get so dressed up for church services. Ms. Poland found this question offensive. I immediately reported Ms. Poland's complaint about a race-based comment to my supervisor, Sonia Koplowicz (Senior Human Resources Manager). Ms. Koplowicz and I met with Ms. Dworsky to ask her about the alleged comment. Ms. Dworsky recalled that she inquired about the cultural practices of an African-American

A233

church but denied that she meant it in a disrespectful manner. According to Ms. Dworsky, Ms. Poland did not object to the statement or show any physical signs of offense at the time.

4.      On July 3, 2001, Diane Poland, Dawn Dworsky, and I met to discuss Ms. Poland's requests for a salary raise and a promotion. I reviewed Ms. Poland's materials and Ms. Dworsky's reasons for not further increasing Ms. Poland's salary or granting a promotion. I thoroughly explained the salary increase process to Ms. Poland and that Ms. Poland's salary was consistent with her peers and in fact that she did receive a higher salary than that usually provided under the Overall Merit Guidelines issued by CSC's Human Resources department. Ms. Dworsky and I also explained to Ms. Poland that she was not eligible for a promotion to SMTS at the present time because of her limited time in her current position (only one year) and because she did not have the necessary level of expertise and skill in UNIX, among other factors.

5.      Thereafter, on July 11, 2001, Ms. Poland, Ms. Dworsky, and I met again to provide Ms. Poland with additional information to clarify Ms. Poland's salary and promotion concerns. Ms. Dworsky reiterated to Ms. Poland the necessary requirements and performance improvements that Ms. Poland needed to make in order to be promoted to SMTS. Ms. Poland was still dissatisfied with Ms. Dworsky's response about promotion and the fact that she received a 5% raise.

6.      In the Summer of 2001, Ms. Poland requested assistance from me, Sonia Koplowicz, Dawn Dworsky, Mike Suman and Leanne Thomas, among others, to be transferred out of the Managed Print and Dazel group and into another position with CSC. Accordingly, I spoke with various managers on Ms. Poland's behalf regarding open positions for her transfer. For instance, in early 2002, on Ms. Poland's behalf, I contacted Jennifer

2

Miller at CSC's Help Desk about an open Help Desk position. The position would have been a lateral move, and Ms. Poland would have been able to maintain her then-current salary. Ms. Poland also would have been able to maintain her then-current schedule of working 30 hours per week, as an accommodation to her medical condition. After Ms. Miller spoke with Ms. Poland about the open position, Ms. Miller offered Ms. Poland the position. Ms. Poland, however, rejected Ms. Miller's offer.

7.     CSC maintains a Leave of Absence Without Pay Policy ("Leave Policy"). The Leave Policy provides, in part, that an employee on a medical leave of absence must submit a certificate of disability to Human Resources from his or her attending physician every thirty days from the date the medical leave is commenced. The Leave Policy further provides that any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation by the Company. Importantly, CSC's Leave Policy places no affirmative duty on CSC to remind employees of their obligations under the policy. In fact, under the explicit terms of the policy, an employee may be deemed to have resigned upon his or her first failure to provide a timely disability certificate. I have reviewed Ms. Poland's leave records. Ms. Poland commenced an intermittent medical leave of absence on September 11, 2001 through February 21, 2002, during which time she worked a 30-hour reduced work schedule, and the remaining 10 hours were designated as FMLA leave. Ms. Poland went on a full-time leave of absence on February 21, 2002 through September 27, 2002. Despite the fact that CSC sent Ms. Poland numerous written reminders of her obligation to submit medical certifications to CSC, Ms. Poland failed to provide timely medical documentation on several occasions during her leave of absence. In fact, I personally sent Ms. Poland two letters, dated

February 25, 2002 and May 21, 2002, in which I reminded Ms. Poland of her obligation to submit a disability certificate from her doctor every thirty days, and reminded her that a failure to do so is in violation of CSC's Leave Policy and may be considered by CSC to be a voluntary resignation. After numerous repeated warnings, Ms. Poland failed to provide medical documentation again in September 2002. Faced with a lack of medical documentation as of September 26, 2002, and no medical documentation having been provided for nearly two weeks after it was due, Ms. Koplowicz and I determined that Ms. Poland had voluntarily resigned, effective September 27, 2002, pursuant to the express terms of CSC's Leave Policy. Ms. Poland's July 5, 2001 charge of discrimination had absolutely no bearing on Ms. Summer's and my decision that Ms. Poland had voluntarily resigned pursuant to the Leave Policy.

8.    It is standard CSC practice and policy not to consider an employee for promotion while they are out on an extended medical leave, without knowing when or if an employee will return to active employment. I am not aware of anyone being promoted while out on an extended medical leave.

9.    I have reviewed CSC's salary documentation for the four employees who were in the Dazel subgroup during Ms. Poland's employment in that subgroup. In July 2001, the salary and CSC service date of the members of the Dazel subgroup was as follows: MaryAnne Doll-Johnson earned a salary of $64,518.90 and had CSC service date of June 18, 1984; Randall Miller earned a salary of $61,534.93 and had a CSC service date of May 14, 1984; Ms. Poland earned a salary of $49,345.92 and had a CSC service date of November 10, 1997, and Audrey Daigger earned a salary of $31,869.96 and had a CSC service date of January 2, 2001. The "CSC service date" refers to the

4

length of time that an employee has worked either directly for CSC or DuPont, one of CSC's largest customers, and a predecessor employer for many of CSC's employees. Accordingly, as of July 2001, MaryAnne Doll-Johnson, a woman, was the highest paid employee in the Dazel subgroup. Furthermore, any differential in Mr. Miller's and Ms. Poland's salaries was based upon factors other than sex. One of the main reasons that Mr. Miller received a higher salary than Ms. Poland was because of his experience and his longevity with the company, based upon his CSC service date. Mr. Miller had been employed with CSC and its predecessor, DuPont, for many years, much longer than Ms. Poland, who had only been employed by CSC for five years. Consequently, Mr. Miller had gradually earned a higher salary over that time period, whereas Ms. Poland started only a few years ago. The sex of the employees was not a factor in setting their compensation.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_____          ___5/5/05___
Maureen Summers                          Date

5

A237

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

DIANE POLAND,           )
                                    )
       Plaintiff,       )
                                    )
       v.               )    C.A. No. 04-217 (GMS)
                                    )
COMPUTER SCIENCES CORP.,   )
                                    )
       Defendant.   )

_____)

## AFFIDAVIT OF MARYANNE DOLL-JOHNSON

I, MaryAnne Doll-Johnson, do hereby depose and swear as follows:

1.     I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.     I am currently an employee of Computer Sciences Corporation ("CSC"), and have worked for CSC since June 1997 in the Managed Print and Dazel ("MPD") group.

3.     When Diane Poland first joined the MPD group, she was on friendly terms with all of her co-workers in the group, including me. She would often ask her fellow team members for assistance with problems or questions, and they all willingly assisted her. Ms. Poland even recommended me for an award, claiming that she was able to accomplish her Dazel training with my assistance. A copy of the "Star Dust Award" is attached to this Affidavit as Exhibit 1. I considered her a friend.

4.     In approximately the Summer of 2001, Ms. Poland began to isolate herself from the other members of the MPD group, including me. For instance, Ms. Poland turned her monitor away from the group, and refused all invitations to join them for

lunch.  Ms. Poland also began to refuse to speak to her team members.  In fact, Ms. Poland's purposeful isolation and refusal to communicate with her co-workers became so uncomfortable for me that I contacted Human Resources via e-mail on September 14, 2001, and sought advice on how to alleviate the stressful work situation that Ms. Poland created.  A copy of my September 14, 2001 e-mail to Maureen Summers in Human Resources is attached as Exhibit 2.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_____
MaryAnne Doll-Johnson

_____
5/5/05
Date

2

A239

# Star Dust

*Personal Ch___*

# Maryanne Doll-Johnson

Thanks to your personal inte___, ___
training, I was able to accompl___ ___
Certification. Your care and exe___ ___

*Computer Science ___ ___*



*All-Star Recognition*

A240

Exhibit 2



**MaryAnne Dolljohnson/GIS/CSC**
09/14/2001 12:17 PM
• • • • • • • • • • • • • • • • • • • • • • • • • • • •

To:      Maureen Summers/CEG/CSC@CSC
cc:
Subject:  work environment



Here are some of my feelings about my current work environment.

Unfortunately, Diane won't speak to any of her team members.  We are a really excellent team I think one of our greatest strengths is communication and perhaps that is why this situation feels so  painful - since she won't speak to us.
Once this week, I spoke to her directly just to ask her how she was doing and I felt horrible because she didn't turn to look at me or respond at all.
The other thing that was very disheartening  was when someone had stopped and talked to her and then stopped me as I passed by and spoke to me she then  looked very angrily at me.  I was very taken aback by this and thought about it and wondered what I had done to make her so upset with me?

I am finding it difficult to function efficiently in an environment where one person feels and acts so isolated.


Things are very tense.

Thanks for listening.

MaryAnne

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DIANE POLAND, | ) | |
| | ) | |
| Ms. Poland, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-217 (GMS) |
| | ) | |
| COMPUTER SCIENCES CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF SONIA KOPLOWICZ**

I, Sonia Koplowicz, do hereby depose and swear as follows:

1.     I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.     I am currently employed as Senior Human Resources Manager by Computer Sciences Corporation ("CSC"). I have been employed by CSC since July of 1997.

3.     In 2001, CSC's Human Resources department issued annual Overall Merit Guidelines ("Guidelines"), which designated the recommended merit percent increase an employee should receive based on his or her evaluation rating. The Guidelines also limited the percent of the workforce population that can receive a particular rating. If a manager wanted to diverge from these recommended Guidelines, he or she had to first obtain approval from their management and Human Resources. With respect to employees who were rated a "3" during the 2001 evaluation and salary review period, the Guidelines recommended a salary increase of between 0-4%. Dawn Dworsky wanted to reward Diane Poland's good effort and performance for her first year in her position as a Member of Technical Staff A ("MTSA") by providing Ms. Poland with a 5% salary

increase. Because she wanted to provide Ms. Poland with a salary increase over and above the recommended Guidelines, Ms. Dworsky sought and obtained management's Human Resources' approval to do so, and Ms. Poland received a 5% salary increase in 2001.

       4.      In the Summer of 2001, Ms. Poland requested assistance from me, Maureen Summers, Dawn Dworsky, Mike Suman and Leanne Thomas, among others, to be transferred out of the Managed Print and Dazel group and into another position with CSC. I informed Ms. Poland that CSC was committed to helping her locate another position within CSC, and, worked closely with Ms. Poland towards this goal. I spoke to various managers on Ms. Poland's behalf regarding open positions for her transfer. Ms. Poland put a number of limitations on the types of positions that she would consider, however. For instance, she informed Human Resources that she would not take a position that involved UNIX support, travel, or a rotational shift. Ms. Poland also stated that she needed a position with part-time hours due to her medical condition. Ms. Poland was aware that, at that time, CSC was in a downsizing mode, and, accordingly, there were few open positions. In attempting to assist Ms. Poland, I asked that she provide me with position requisition numbers for the open positions that she was interested in. A position requisition number identifies open positions that are referenced on CSC's electronic database. In requesting the requisition numbers from Ms. Poland, I intended to facilitate Ms. Poland's job search by contacting the hiring managers and trying to arrange interviews for Ms. Poland as quickly as possible. Despite my repeated requests, Ms. Poland never provided me position requisition numbers for several of the positions for which she expressed interest, thereby limiting my ability to assist Ms. Poland with her transfer request.

5.    Maureen Summers, a CSC Human Resources Manager, reported to me that Ms. Poland had informed her that Dawn Dworsky had made a race-based comment which had offended her. According to Ms. Poland, Ms. Dworsky had told her that she had recently attended a primarily African American church, and had enjoyed the singing and loud music during the service. According to Ms. Poland, Ms. Dworsky went on to say that the services were more like a party than a church, and then she asked Ms. Poland why African Americans get so dressed up for church services. Ms. Poland found this question offensive. Ms. Summers and I met with Ms. Dworsky to ask her about the alleged comment. Ms. Dworsky recalled that she inquired about the cultural practices of an African-American church but denied that she meant it in a disrespectful manner. According to Ms. Dworsky, Ms. Poland did not object to the statement or show any physical signs of offense at the time. I told Ms. Dworsky that, although she genuinely intended to inquire about a specific practice, she must be careful with her statements because some statements may be misconstrued or taken out of context. I never received another complaint from Ms. Poland regarding race-based comments made by Ms. Dworsky or any other employee.

6.    CSC maintains a Leave of Absence Without Pay Policy ("Leave Policy"). The Leave Policy provides, in part, that an employee on a medical leave of absence must submit a certificate of disability to Human Resources from his or her attending physician every thirty days from the date the medical leave is commenced. The Leave Policy further provides that any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation by the Company. Importantly, CSC's Leave Policy places no affirmative duty on CSC to remind employees of their obligations under the policy. In fact, under the explicit terms of the policy, an employee

may be deemed to have resigned upon his or her first failure to provide a timely disability certificate. I have reviewed Ms. Poland's leave records. Ms. Poland commenced an intermittent medical leave of absence on September 11, 2001 through February 21, 2002, during which time she worked a 30-hour reduced work schedule, and the remaining 10 hours were designated as FMLA leave. Ms. Poland went on a full-time leave of absence on February 21, 2002 through September 27, 2002. Despite the fact that CSC sent Ms. Poland numerous written reminders of her obligation to submit medical certifications to CSC, Ms. Poland failed to provide timely medical documentation on several occasions during her leave of absence. After numerous repeated warnings, Ms. Poland failed to provide medical documentation again in September 2002. Faced with a lack of medical documentation as of September 26, 2002, and no medical documentation having been provided for nearly two weeks after it was due, Maureen Summers and I determined that Ms. Poland had voluntarily resigned, effective September 27, 2002, pursuant to the express terms of CSC's Leave Policy. Ms. Poland's July 5, 2001 charge of discrimination had absolutely no bearing on Ms. Summer's and my decision that Ms. Poland had voluntarily resigned pursuant to the Leave Policy.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_____
Sonia Koplowicz

_____
Date    May 5, 2005

4

A245

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE POLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-217 (GMS) |
| | ) | |
| COMPUTER SCIENCES CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF EDWIN DEREK ALSTON

I, Edwin Derek Alston, do hereby depose and swear as follows:

1.      I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.      I am currently an employee of Computer Sciences Corporation ("CSC"), and have worked for CSC since June 1997 in a managerial capacity.

3.      In 1999, my duties included supervising the Managed Print and Dazel ("MPD") group.  On October 2, 1999, Diane Poland transferred into the MPD group as a technical service analyst.  Accordingly, I became Ms. Poland's supervisor at that time. While Ms. Poland worked under my supervision, she was the lowest performer in the MPD group, due to her lack of experience.  Ms. Poland was not nearly as technologically experienced as the other members of the group at that time.  Ms. Poland was essentially in training when she first transferred into the group, and would frequently seek assistance from her team members.

4.      On May 13, 2000, I promoted Ms. Poland from Member Technical Staff B to Member Technical Staff A ("MTSA").  I have reviewed CSC's salary history

A246

documentation for Ms. Poland. Ms. Poland also received a raise at that time, thereby increasing her salary from $43,118 to $46,996.98. At the time of her promotion, I told Ms. Poland that she should not expect another promotion any time soon based on time in her new position. I also advised her that she would have much to learn in order to be able to succeed at her new level of MTSA.

     5.    In May 2000, CSC implemented a business restructuring. As a direct result of this restructuring, Dawn Dworsky took over management of the MPD group, and I no longer supervised Ms. Poland.

     6.    Ms. Poland never complained to me that she was subjected to discriminatory statements, or that she was subjected to any other type of discrimination.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

Edwin Derek Alston

5-5-2005

Date

2

A247

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND, )
 )
      Plaintiff, )
 )
      v. )    C.A. No. 04-217 (GMS)
 )
COMPUTER SCIENCES CORP., )
 )
      Defendant. )
_____)

## AFFIDAVIT OF JENNIFER MILLER

I, Jennifer Miller, do hereby depose and swear as follows:

1.    I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.    I am an employee of Computer Sciences Corporation ("CSC"), and have worked for CSC since 1997. In 2002, I served as a Manager with CSC's Help Desk in Customer Support Services.

3.    In early 2002, Maureen Summers (Human Resources Manager) contacted me regarding an open Help Desk position on behalf of Diane Poland. Ms. Summers did not specify why Ms. Poland was looking for a new position.

4.    I had worked with Ms. Poland in the past when she had worked with the Help Desk. Because Ms. Poland had left the Help Desk on good terms, I indicated to Ms. Summers that I would be happy to speak with Ms. Poland about the open position.

5.    Subsequent to my conversation with Ms. Summers, I had a conversation with Ms. Poland regarding the Help Desk position. Because I believed that Ms. Poland would be a good fit for the job, I offered the position to Ms. Poland. I also advised Ms.

Poland that the position would be a lateral move and that she would be able to maintain her then-current salary. Ms. Poland informed me that she needed time to think over the offer. Over the course of several weeks, I spoke with Ms. Poland a few times and left her a few messages questioning whether she had decided to accept the position. Eventually, Ms. Poland informed me that she had decided to reject my offer to her for the Help Desk position.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.


_Jennifer Miller_                                    _5/5/2005_
Jennifer Miller                                       Date


2

A249

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                              )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )        C.A. No. 04-217 (GMS)
                                          )
COMPUTER SCIENCES CORP.,                  )
                                          )
            Defendant.                    )
_____)

## AFFIDAVIT OF DAHL LANDERS

I, Dahl Landers, do hereby depose and swear as follows:

1.      I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.      I am currently an employee of Computer Sciences Corporation ("CSC"), and have worked for CSC since June 1997.

3.      In the Summer of 2001, I was the Acting Manager for Applications Interconnect Services ("AIS"). At that time, I was contacted by Dawn Dworsky on Diane Poland's behalf. Ms. Dworsky inquired as to whether AIS had any open positions, and stated that she was trying to help Ms. Poland find another position that would match her skill set. Although Ms. Dworsky did not specify why she contacted me, I assumed it was because she knew that AIS was growing and might need additional staff. Ms. Dworsky asked whether I would be open to meeting with Ms. Poland, to briefly discuss what employees in AIS do, and to keep her in mind if any AIS positions opened up.

4.      Subsequently in the Summer of 2001, I met briefly with Ms. Poland to generally discuss the AIS group.