5.      In or about August 2001, Ms. Poland applied for a UNIX position in the AIS group. I scheduled two interviews with Ms. Poland, but she stood me up for both interviews. Further, Ms. Poland never provided me with any explanation for missing the interviews.

6.      Subsequently, in November 2001, Ms. Dworsky again contacted me on Ms. Poland's behalf about an open position in AIS. Although I was hesitant to give Ms. Poland consideration after her failure to appear for the previous interviews, I eventually decided to give her another opportunity to apply. Accordingly, I sent Ms. Poland a link to the applicable job posting. Despite the fact that such opportunities at CSC are few and far between, Plaintiff failed to submit an application for the position.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_Dahl Landers_ _(signature)_
Dahl Landers

_5/5/05_
Date

2

A251

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE POLAND, | ) | |
| | ) | |
| Ms. Poland, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-217 (GMS) |
| | ) | |
| COMPUTER SCIENCES CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### AFFIDAVIT OF SIMMIE HOEFT

I, Simmie Hoeft, do hereby depose and swear as follows:

1.      I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.      I am a former employee of Computer Sciences Corporation ("CSC"). I started my employment with CSC in October 2000. During my employment with CSC, I was known by the name "Simmie Osborn." At times during my employment with CSC, I served in the position of Leave Coordinator.

3.      CSC maintains a Leave of Absence Without Pay Policy ("Leave Policy"). The Leave Policy provides, in part, that an employee on a medical leave of absence must submit a certificate of disability to Human Resources from his or her attending physician every thirty days from the date the medical leave is commenced. The Leave Policy further provides that any failure on the part of the employee to provide a continuing medical certification may be considered a resignation by the Company. Importantly, CSC's Leave Policy places no affirmative duty on CSC to remind employees of their obligations under the policy. In fact, under the explicit terms of the policy, an employee

may be deemed to have resigned upon his or her first failure to provide a timely medical certificate.

4.    I have reviewed Ms. Poland's leave records. On August 6, 2001, Diane Poland requested a full-time medical leave of absence due to stress. I was assigned to be Ms. Poland's Leave Coordinator. CSC granted Ms. Poland's request for leave, and counseled her both orally and in writing about her obligations and responsibilities during the time she was out on medical leave, including her duty to provide a medical certificate every 30 days to the Benefits Office. On August 14, 2001, Ms. Poland acknowledged her obligations under the Leave Policy. Specifically, Ms. Poland acknowledged that her "employment with CSC will be subject to termination if I fail to provide Human Resources with a doctor's certificate on a monthly basis."

5.    Ms. Poland returned from her medical leave on August 22, 2001. Shortly thereafter, however, Ms. Poland took another full-time medical leave of absence on August 27, 2001 through September 10, 2001.

6.    On September 11, 2001, Ms. Poland returned to work and presented a medical certificate allowing her to return to work, but restricting her to a 30-hour workweek. CSC accommodated Ms. Poland's request by providing Ms. Poland with a 30-hour reduced work schedule, and designated the remaining 10 hours as FMLA leave. Ms. Poland continued to work a reduced schedule until she returned to a full-time medical leave of absence on February 21, 2002. Ms. Poland remained on a full-time leave of absence until September 27, 2002.

7.    In direct violation of her obligations under CSC's Leave Policy, Ms. Poland repeatedly failed to submit timely medical certifications to CSC every thirty days.

2

As one example, Ms. Poland submitted an October 30, 2001 certification from her medical provider, which stated that Ms. Poland was only able to work a 30-hour work week "for 1 month (the month of November)." Ms. Poland did not submit an updated medical certification (dated December 3, 2001), however, until December 13, 2001, as is clear by the facsimile history on the certification itself. True and correct copies of the medical certifications from Ms. Poland's medical provider dated October 30, 2001 and December 3, 2001 are attached to this Affidavit as Exhibits 1 and 2. Although, under the terms of its Leave Policy, CSC could have designated Ms. Poland's first omission to submit a medical certification every thirty days to constitute a voluntary separation from employment back in December 2001 (when Ms. Poland submitted her medical certification nearly two weeks late). CSC did not do so, however; rather, it provided Ms. Poland with numerous chances to comply with its Leave Policy, and gave Ms. Poland countless reminders and warnings regarding the potential consequences she would suffer if she continued to fail to comply. Ms. Poland was repeatedly told in writing that she needed to get her medical documentation in on time — but she was repeatedly late in providing her medical information. In fact, Ms. Poland failed to provide timely medical documentation on more than four separate occasions.

8.     Though not required under CSC's Leave Policy, I called, e-mailed and sent letters to Ms. Poland on numerous occasions to remind her that her medical certificate was either coming due or was delinquent. Maureen Summers, Human Resources Specialist, also reminded Ms. Poland several times in writing of her obligations under the Leave Policy, and the potential consequences for her failure to submit certifications. In fact, in addition to the notifications of her duties under the

3

Leave Policy mentioned above, Ms. Poland also received the following written reminders of her obligation to timely submit medical certifications to CSC:

| Date | Reminder By Company To Ms. Poland To Submit Medical Documentation |
|------|--------------------------------------------------------------------|
| 12/12/01 | E-mail from Ms. Osborn to Ms. Poland requesting that Ms. Poland submit an updated doctor's note. |
| 1/4/02 | E-mail from Ms. Osborn to Ms. Poland reminding Ms. Poland that she would need to submit a certification extending her disability period if she was not able to return to a 40-hour work week. |
| 1/24/02 | E-mail from Ms. Osborn to Ms. Poland requesting Ms. Poland to submit a doctor's note extending her disability period. |
| 2/25/02 | Letter from Ms. Summers to Ms. Poland reminding Ms. Poland of her obligation under the Leave Policy to submit a certificate of disability at the commencement of her medical leave and every thirty days thereafter. Ms. Summers also warned Ms. Poland that *"CSC Human Resources Management (HRMP) 247 further states that any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation."* |
| 3/18/02 | E-mail from Ms. Osborn to Ms. Poland reminding Ms. Poland to submit an updated medical certification which includes an estimated return to work date. |
| 5/21/02 | Letter from Ms. Summers to Ms. Poland reminding Ms. Poland of her obligation to provide a continuing certificate of disability every 30 days, and *noting that Ms. Poland had been reminded of this requirement at least six times via written correspondence and ten times via telephone.* Ms. Summers noted that her medical certification was due on 5/12/02, and thus, was overdue. Ms. Summers again reminded Ms. Poland that *"[f]ailure to provide the required medical certification on time and every 30 days is a violation of company policy, and considered by CSC to be a voluntary resignation."* |
| 6/20/02 | Letter from Ms. Osborn to Ms. Poland reminding Ms. Poland to submit an updated medical certification no later than 7/28/02. Ms. Osborn again warned Ms. Poland that *"[f]ailure to provide the required medical certification on a timely basis may be considered by CSC as a voluntary resignation of your employment with CSC."* |

A255

9.     On June 21, 2002, CSC received a certification from Ms. Poland's medical provider dated June 14, 2002, which stated that Ms. Poland may "be able to return to work within the next two to three months." Thus, at the very latest, Ms. Poland was required under CSC's Leave Policy to provide an updated medical certification to CSC by September 14, 2002. Despite the numerous written and oral warnings Ms. Poland received regarding her obligation to provide timely medical certifications and specifying the consequences for a failure to do so, Ms. Poland did not provide an updated medical certification by that date. Therefore, in accordance with CSC's Leave Policy, Maureen Summers and Sonia Koplowicz determined that Ms. Poland's failure to submit a timely medical certification constituted a voluntary resignation on Ms. Poland's part, and terminated her employment effective September 27, 2002. CSC did not receive an updated medical certification for Ms. Poland until September 29, 2002, after she had been terminated.

10.     I have reviewed the medical leave of absence records of several other employees who were terminated for the same reason as Ms. Poland. CSC terminated both Aliza Panitz (Caucasian female) and Monte Moser (Caucasian male) due to their failure to provide requisite medical certifications related to their medical leaves of absence in accordance with CSC's Leave of Absence policy. Neither of these employees had ever made claims or complaints about discrimination about their employment with CSC.

5

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.


_____          _5-5-05_____
Simmie Hoeft                                      Date

6

A257

**CSC**

# Fax

| To: | Simmie Osborn | From: | Diane Poland |
|-----|---------------|-------|--------------|
| Fax: | 703-318-2888 | Pages: | 2, including cover |
| Phone: | 703-318-2516 | Date: | 11/2/2001 |
| Re: | Doctor Note | CC: | |

☐ Urgent    X For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● Comments: Postal Code 9514

537745

 **TOTAL CARE PHYSICIANS**

Michael
Beard
M/C 217

Date: 10/30/01

Diane Poland is under my care and is able to work only a 30 hour work week for 1 month (the month of November). Any questions please call me at 836-4300.

Dr. R. Tarchiano, MD

TOTAL CARE PHYSICIANS, P.A.
2000 GLASGOW AVE.
SUITE 124
NEWARK, DE 19702

**Respond to Below Checked Office**

☐ Professional Bldg., Suite 101, 1320 Philadelphia Pike, Wilmington, DE 19809     (302) 798-0666
☐ Omega Professional Center, Bldg. B - Suite 89, Omega Drive, Newark, DE 19713     (302) 738-5500
☐ Glasgow Medical Center, Suite 204, 2600 Summit Bridge Rd., Newark, DE 19702     (302) 836-4200





| | | | |
|---|---|---|---|
| To: | Simmie Osborne | From: | Diane Poland |
| Fax: | 703.318.2888 | Pages: | 2, Including cover |
| Phone: | 703.318.2516 | Date: | 12/13/2001 |
| Re: | Per your Request | CC: | |

☐ Urgent    x For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● Comments:.

537245

Michael
Beard
M/C 217

## CERTIFICATE TO RETURN TO WORK

Name Dani Beard

has been under my care from ___12-3-01___ to ___12-3-01___

and will be able to return to work on ___12-4-01___

Nature of illness or injury _____

⊐ Restrictions    ⊐ Light Work

Comments _Patient to work 30 hrs a week_
_for 4 wks_

Dr _Torrosco_ ___ Phone _83c-4200_

Address **TOTAL CARE PHYSICIANS, PA** Date _12-3-01_
**2600 GLASGOW AVE.**
**SUITE 124**
**NEWARK, DE 19702**

A261

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                          )
                                       )
                Plaintiff,             )
                                       )
        v.                             )        C.A. No. 04-217 (GMS)
                                       )
COMPUTER SCIENCES CORP.,               )
                                       )
                Defendant.             )
                                       )

## AFFIDAVIT OF BETH MUSUMECI

I, Beth A. Musumeci, do hereby depose and swear as follows:

1.      I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.      I am currently an employee of Computer Sciences Corporation ("CSC"), and have worked for CSC since June 1997.

3.      In March 2001, I held the position of Leverage Server Administration Supervisor ("LSA Supervisor").  At that time, I was preparing to transition to a new position, and I was tasked with hiring my replacement in the LSA Supervisor position.

4.      In March 2001, Diane Poland applied for the LSA Supervisor position, and I conducted an interview of her.

5.      Despite the fact that Ms. Poland had no supervisory experience at that time, I believed that Ms. Poland displayed the capability for the position, and I decided to offer her the job.  I have reviewed Ms. Poland's promotion history documents.  The position would not have been a promotion for Ms. Poland, because it was a Member Technical Staff A ("MTSA") level position, and Ms. Poland was a MTSA at the time.

A262

However, the position would have involved additional responsibility because it was a supervisory position.

6.    Although the position was not a promotion for Ms. Poland, I decided to offer Ms. Poland a 6% salary increase, because the position would have involved additional responsibilities. Although the Human Resources department issued the formal offer letter to Ms. Poland, I determined the amount of the salary offer, with the guidance of the salary range guidelines issued by Human Resources. I have reviewed the applicable salary range recommended by Human Resources for the position, and this offer was well within that range.

7.    Ms. Poland turned down my initial offer for the LSA Supervisor position, and informed me that she wanted about a 36% salary increase. I was shocked by this counter-offer and believed it was excessively high, particularly given the fact that Ms. Poland had no prior supervisory experience.

8.    In response to Ms. Poland's demand, I provided Ms. Poland with a second offer for the position, this time for an 8% salary increase. Ms. Poland declined my second offer for the LSA Supervisor position as well because the offer was still not high enough for her.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

Beth A. Musumeci                          Date  5/5/05

2

A263

Westlaw.

Slip Copy                                                            Page 1

2004 WL 3059543 (D.Del.)

**(Cite as: 2004 WL 3059543 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Dannette G. MCLAUGHLIN Plaintiff,
v.
DIAMOND STATE PORT CORP. Defendant.
No. C.A.03-617(GMS).

. Dec. 30, 2004.
Laurence V. Cronin, Smith, Katzenstein, & Furlow,
Wilmington, DE, for Plaintiff.

Donald E. Reid, Jason A. Cincilla, Morris, Nichols,
Arsht & Tunnell, Wilmington, DE, for Defendant.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 Presently before the court is defendant Diamond
State Port Corp.'s ("Diamond State") motion for
summary judgment. (D.I.36.) This is an action
brought by plaintiff Dannette McLaughlin on July
1, 2003, in which she alleges one count of unlawful
gender discrimination in violation of Title VII of
the Civil Rights Act of 1964, *as amended,* 42
U.S.C. § 2000e *et seq.* ("Title VII"), and one count
of unequal pay in violation of the Equal Pay Act, 29
U.S.C. § 206 (1998). (D.I.I.) On October 14, 2004
McLaughlin sought to amend her complaint for the
first time by adding a retaliation claim under Title
VII, and an equal protection claim under 42 U.S.C.
§ 1983 (2003). (D.I.34.) The court denied her
motion (D.I.56), so only the counts of the original
complaint are the proper subject of Diamond State's

motion. For the following reasons, the court will
grant summary judgment in favor of Diamond State.

II. JURISDICTION

The court has jurisdiction pursuant to 28 U.S.C. §
1331 (1993).

III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law." Fed.R.Civ.P. 56©;
*see also Boyle v. County of Allegheny Pa.,* 139 F.3d
386, 392 (3d Cir.1998). Thus, summary judgment is
appropriate only if the moving party shows that
there are no genuine issues of material fact that
would permit a reasonable jury to find for the
non-moving party. *Boyle,* 139 F.3d at 392. A fact is
material if it might affect the outcome of the suit. *Id.*
(citing *Anderson v. Liberty Bobby, Inc.,* 477 U.S.
242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986)). An issue is genuine if a reasonable jury
could possibly find in favor of the non-moving
party with regard to that issue. *Id.* In deciding the
motion, the court must construe all facts and
inferences in the light most favorable to the
non-moving party. *Id.; see also Assaf v. Fields,* 178
F.3d 170, 173-74 (3d Cir.1999).

IV. BACKGROUND

Defendant Diamond State is a corporation-like arm
of the State of Delaware created to operate the Port
of Wilmington. Del.Code Ann., tit. 29, § 8735(a)
(2003). It assumed control of the Port of
Wilmington in 1995. (Markow Dep. at 7:10, D.I. 42
Ex. B at 4.) Diamond State has three classes of
employees: A, B, and C. A and B class employees
are the subject of a collective bargaining agreement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3059543 (D.Del.)

**(Cite as: 2004 WL 3059543 (D.Del.))**

between Diamond State and the International Longshoreman's Assoc. AFL-CIO, Local 1694-1. (See generally D.I. 42 Ex. C.) Employees begin as C class and graduate to B class once they have worked 800 hours. (Immediato Dep. at 48:12-15, D.I. 42 Ex. A. at 14.) A and B class employees perform the same work, however, A class employees are guaranteed 40 hours per week. (Markow Dep. at 18:11-14, D.I. 42 Ex. B at 7.) B class employees work as needed to fill in the gaps left by the A class employees. (Id.) Although various positions are available at Diamond State, only the positions of lift-truck operator and laborer/checker are relevant in this case.

*2 Whenever there is an A class opening, it is posted and B class employees may apply. The list of interested employees is then sent to individual supervisors, who rate the employees based on certain criteria. (Markow Dep. at 56:19-577:, D.I. 42 Ex. B at 16-17.) These criteria include good work ethic, punctuality, strong port knowledge, and ability to perform the particular position. (See, e.g., D.I. 42 Ex. G at DSPA4187.) Each supervisor ranks his or her top five choices and assigns each top-five candidate anywhere from one to five points, with the top candidate receiving five points and the fifth candidate receiving one point. (Stansbury Dep. at 40:8-20, D.I. 42 Ex. D at 12.) Each supervisor then returns his or her score sheet to labor relations hiring manager Andrew Markow and terminal manager William Stansbury, who tally the candidates' points. (Markow Dep. at 57:6-13, D.I. 42 Ex. B at 17.) This tallying usually reveals a grouping of just a few candidates with a high number of points. (Id.) The employees in that group are granted interviews with Markow and Stansbury (and sometimes HR manager Philip Immediato). (Markow Dep. at 57:15-58:10, D.I. 42 Ex. B at 17.) These interviews result in a final recommendation and offer of employment. (Id.)

Plaintiff McLaughlin, a woman, was hired in 1998 as a C class employee and graduated to B class in 1999. (D.I. 40 at 7.) During her time as a B class employee, she applied for six A class openings as either a lift truck operator or as a laborer. (D.I. 38 Ex. F at DSPA2502, DSPA4208, DSPA2514,

DSPA2908, DSPA4135, DSPA4168.) In all but one case, a man was chosen for promotion over McLaughlin.

McLaughlin believes that she was passed over because of her gender. Therefore, on May 28, 2002, she filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). (D.I. 42 Ex. J.) However, she continued to work for Diamond State even after filing the EEOC charge. Of the six promotions, three were offered before the EEOC complaint and three were offered after. The EEOC issued a right-to-sue letter on April 3, 2003. (D.I. 1 ¶ 8.) McLaughlin filed the present action on July 1, 2003.(Id.)

**V. DISCUSSION**

**A. Count I--Title VII Gender Discrimination**

Title VII prohibits an employer from discriminating against any individual on the basis of race, color, religion, sex or national origin:
> It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin.

42 U.S.C. § 2000e-2(a).

Discrimination claims under Title VII are analyzed under the three-step burden-shifting framework set forth in *McConnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case by demonstrating that she is a member of a protected class. The plaintiff must then establish that she was qualified for an employment position, but was not hired for the position "under circumstances that give rise to an inference of unlawful discrimination." *See Waldron v. SL Indus., Inc.,* 56 F.3d 491, 494 (3d Cir.1995). When the plaintiff establishes this prima facie showing, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 3059543 (D.Del.)

**(Cite as: 2004 WL 3059543 (D.Del.))**

decision. *Id.* If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons for its employment decision were pretextual--that is, that they are false and that the real reason for the employment decision was discriminatory. *Id.* If the plaintiff cannot carry the burden of proof under the shifting-framework established in *McDonnell-Douglas,* the defendant is entitled to summary judgment. *Stafford v. Noramco of Delaware, Inc.,* 2000 WL 1868179, at *1 (D.Del. Dec.15, 2000).

*3 In its opening brief, Diamond State concedes for the purposes of this motion that McLaughlin is a member of a protected class, that she applied for and was qualified for a number of promotions, and that she did not receive any of the promotions. (D.I. 37 at 13.) However, Diamond State vigorously disputes that the circumstances give rise to an inference of unlawful discrimination. (Id.) Obviously, McLaughlin disagrees with Diamond State's characterization of the evidence. She contends that the circumstances give rise to an inference of discrimination for four reasons: (1) Diamond State's pattern and practice of discriminating against women, (2) its supervisors' comments and conduct toward McLaughlin based specifically on her gender, (3) its disparate treatment of McLaughlin with regard to training and opportunities, and (4) its subjective promotion process. (D.I. 40 at 17.)

1. Pattern and Practice of Discriminating Against Women

McLaughlin first argues that the circumstances give rise to an inference of discrimination because Diamond State has a pattern and practice of discriminating against women. She points to Diamond State's response to Interrogatory No. 11, in which it admits that prior to March 31, 2004, the last time a woman was hired to an A class A full-time position was on June 7, 1982. (Def.'s Resp. to Interrogs., No. 11, D.I. 42 Ex. F at 5.) And, although Diamond State hired Tina Woolford to a Chapter A full-time position in May 2004 (D.I. 38

Ex. F at DS.PA4134), McLaughlin speculates that Woolford's promotion was either the result of some sort of nepotism, because her "father and two uncles are currently A class employees" (D.I. 40 at 6 n. 3), or a deliberate attempt by Diamond State to defend itself in this lawsuit (Id. at 23 n. 12). McLaughlin also points to an apparent conflict between Immediato's testimony, in which he says he tried to implement a solution to the gender gap (Immediato Dep. at 57:13-59:16, D.I. 42 Ex. A at 17), and Markow's testimony, in which he says he made promotion decisions based only on the ranking numbers he was given by the supervisors (Markow Dep. at 61:13-21, D.I. 42 Ex. B at 18). She argues this conflict is a basis from which a reasonable factfinder could infer that the dearth of female promotions remains unaddressed. Finally, McLaughlin argues that the Port of Wilmington was not amenable to women based on Immediato deposition testimony, in which he described the intensely physical nature of the job, the vulgarity and lack of professionalism among the employees, and the lack of a women's restroom at the work site as of 1997. [FN1] (Immediato Dep. at 52:15-54:10, D.I. 42 Ex. A at 15-16.)

> FN1. It is unclear from the record whether there was a women's restroom. To be precise, Immediato testified that the "rest room facilities needed upgrading." (Immediato Dep. at 53:17-18, D.I. 42 Ex. A at 16.)

The court does not believe that this is sufficient evidence from which a reasonable factfinder could infer a pattern and practice of gender discrimination. Although a twenty-two year drought between female A class employees is disconcerting, McLaughlin skims over the fact that Diamond State did not purchase the Port of Wilmington until September 1995. (Castagna Dep. at 10:18-21, D.I. 38 Ex. B at APP24.) Thus, any gender discrimination prior to that date is not attributable to Diamond State. And even if it were so attributable, McLaughlin presents no evidence as to the number of female employees who applied for promotion to A class full-time positions from 1982 until 2000, or as to the number of female employees

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 4

2004 WL 3059543 (D.Del.)

**(Cite as: 2004 WL 3059543 (D.Del.))**

overall during this period. Without such evidence, any statistically-based inference of discrimination would be unreasonable. Furthermore, McLaughlin's attempt to discount Woolford's promotion as an act of nepotism is pure conjecture because she offers no evidence of a connection between Woolford's father and two uncles to the promotion process. Further, to the extent McLaughlin argues that Woolford's promotion was a deliberate attempt to defend itself in this lawsuit, the court considers such an inference impermissible. Just as subsequent remedial measures are generally inadmissible under Fed.R.Evid. 407, a defendant's attempt to reverse allegedly discriminatory practices should also be inadmissible. It would be perverse indeed if attempts to reverse discrimination could be used to condemn a defendant. Such use of evidence would only serve to discourage reform, and the court will not permit it. [FN2]

> FN2. McLaughlin's brief refers to an incident in which she was abruptly assigned to work on a larger machine "as soon as Plaintiff filed her EEOC charge." (D.I. 40 at 9.) Her point in raising this seems to be along the same lines as her point about Diamond State promoting Woolford as an attempt to defend itself. If so, the court is of the same opinion about the appropriateness of such an inference.

*4 McLaughlin's argument that a conflict between the testimony of Immediato and Markow permits an inference that the twenty-two year drought remains unaddressed is similarly unsupported by the evidence. Immediato testified at length about his efforts beginning around 1997 to increase the number of women in the A class:

BY MS. CALO:

Q: Did you ever take any initiative to determine why there were no women in A class other than Ms. Wilhelmania Archie?

A: The initiative I took was since the route to A was through B, the initiative that I took was to make sure that the feeder source, namely B, had representation of females, which, frankly, overall at the port when I first got there, there was very few females even attempting to be hired at the

hiring hall. Frankly, it--I believe the number was like 27 percent when I left that there were some--across including the office and whatever. There were a, certainly a representative. It had come a long way in terms of women.

Q: In the B class or throughout the facility?

A: Well, both. In the B class there were--because in order to get to B you had to have 800 hours of work. So there has to be an initiative to, first of all, get hired in order to get your 800 in order to get in B. And then it was-- it's an evolutionary process just by virtue of the union structure, because then, even though you were in B--and I don't recall specifically as a matter when Dannette came on board, but it was probably 2001, somewhere around there, that you came at the bottom of B by virtue of their structure.

So now as work slowed down, you were, for lack of a better term, you were subject to the seniority hiring process, because the Bs actually, they had a seniority right after the As were hired. A's were guaranteed 40 hours if there was any work. So the top part of B was largely male. Shirley Taylor might be the highest one and she was like whatever number.

But as the Bs--the good news is as we started establishing and the Bs grew in number, there were more females there. Certainly there were a fair amount of female, "fair amount" being I'd say 18 percent, 15 percent, 15 to 18 percent, where before there was one in the A. So it's an evolutionary process....

(Immediato Dep. at 47:22-49-10, D.I. 42 Ex. A at 14-15.)

McLaughlin contrasts this with Markow's testimony:

BY MS. CALO:

Q:.... Over the course of time that you've been involved in the process of hiring B members into the A class fication, has there been any initiative on your part to try to interview more women?

A: Any initiative? On my part, on my personal part?

Q: Correct.

A: No. The numbers are what they are.

Q: Numbers being the ranks?

A: Yes.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A267

Slip Copy

2004 WL 3059543 (D.Del.)

**(Cite as: 2004 WL 3059543 (D.Del.))**

Page 5

(Markow Dep. at 61:13-21, D.I. 42 Ex. B at 18.)

In spite of McLaughlin's assertion to the contrary, these two pieces of testimony are not in conflict. Immediato testified that he took a bottom-up approach, by bringing women in first as C class, then promoting them to B class once they worked 800 hours. From there, promotion to A class was done by the ranking system. Markow merely testified that he adhered strictly to the "numbers" (or ranks) when considering promotions from B class to A class. His testimony sheds no light on the efforts of Immediato to bring women up through the system.

**\*5** McLaughlin's final assertion that the unrefined nature of the Port of Wilmington shows that Diamond State engaged in discrimination is also unfounded. Immediato testified to the following:
BY MS. CALO:
Q:.... Did you take any actions to try to entice women to join the port, for example?
A: In my own way, by providing structure and providing discipline in the ranks, I tried to make the port more of a place where women would want to work. Quite frankly, prior to my arrival I'm not sure that was the case. I tried to be on top of enough things and develop enough structure and performance standards, including attendance and treatment of each other, employee interaction, to the point that we would not tolerate a number of things that were in place prior to Diamond State Port Corporation.
Q: What things did you witness when you first joined Diamond State that would be either a barrier or inhospitable, if you will, to women?
...
A: Well, it was like the wild west down there, so to speak, when I joined. I mean, I was scared, I mean, I was offended just in terms of, you know, what I witnessed. There were no--in my view there were very few standards that were in place, that people knew they needed to be on time even, things of that nature. There was no standards of performance that were acceptable. There was no drug or alcohol program as an example. There was a number of things. It's too much for me to get into, but it was basically free wheeling from

all respects.
...
There were times when I first got there that people would ride down to the street and ride down to the corner and try to put people in to get work down there. You didn't know whether you were getting drug free people or not. It was pretty tough, rough. Not that it's a piece of cake now. It was a lot rougher when I got there than when I left.
Q: What you are describing it seems to me is an environment that was probably hard or difficult for everyone?
A: Yes.
...
Q: Were there things in particular that you saw that would be harder for women to deal with or manage than men?
...
A: Well, it's an immensely physically environment. It's a labor intensive environment. I don't think I'm speaking out of turn by saying that that certainly would, in my view, influence certain things around, you know, the female end of it because it was very labor intensive. Certain women would respond to it and do well and other women perhaps would choose another course because it was clearly extremely labor intensive....

Q: We talked about this at the very beginning. When you first got there, through your employment with Diamond State, was there rough kind of cursing language used in the facility that you observed?
A: The language was different. As I described earlier, it was more street. I didn't sense that it was offensive to the population, largely. It may not have been appropriate for this office, but in that environment I would say it was rough language, but it wasn't necessarily totally offensive language....
**\*6** (Immediato Dep. at 50:2-54:7, D.I. 42 Ex. A at 15-16.)

This testimony does not implicate Diamond State in a pattern and practice of gender discrimination. Attorney Calo, on behalf of McLaughlin,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2004 WL 3059543 (D.Del.)

**(Cite as: 2004 WL 3059543 (D.Del.))**

specifically elicited testimony that the environment was difficult for everyone, *regardless of gender*. Furthermore, Immediato was describing the Port of Wilmington as it existed just after Diamond State assumed control. So even if the environment was once gender biased, such bias is not attributable to Diamond State. As to the physical environment, it is certainly not evidence of discrimination to elicit testimony that the nature of the work tends to attract more men than women. Thus, McLaughlin's evidence is inadequate to permit a reasonable factfinder to conclude that Diamond State had a pattern and practice of discriminating against women.

2. Supervisors' Comments and Conduct Toward McLaughlin Based Specifically on Her Gender

McLaughlin's second argument is that she was subjected to hostility based on her gender. In particular, she was (a) told she could not work on larger machines because she was a woman, (b) told by supervisor Johnson that women should be at home having men pay their bills rather than working at the port, (c) romantically propositioned by Johnson, and (d) written up by supervisor Betts after she rejected his sexual suggestions. (D.I. 40 at 19.) However, as explained below, none of her evidence is sufficient to support an inference that discrimination was a factor in the promotion process.

The record evidence that she was told she could not work on larger machines because she was a woman comes entirely from McLaughlin's own deposition testimony, from which very little can be reasonably inferred:

BY MR. CINCILLA:

Q:.... Now, I understand that you believe you have been denied machinery training, experience and promotion. But what specifically is your basis for that that is because of your gender?

A:.... When I first arrived there, like I stated, they told me that, you know, you are not going to be able to do this. You are not going to be able to do that. They don't say that to a man. Like I stated, don't tell me I can't do anything....

(McLaughlin Dep. at 137:8-138:1, D.I. 42 Ex. H

at 37.) First, McLaughlin does not specify who "they" are. Second, even though they said she could not "do this" or "do that," their motivation for coming to that conclusion is unclear; there is no evidentiary basis for assuming the motivation was gender-based animus. Finally, her assertion that "they don't say that to a man" is pure speculation given that Diamond State has hundreds of employees. Thus, the court does not find sufficient evidence to support McLaughlin's contention that she was told she could not work on large machines on account of her gender.

McLaughlin also contends that "Johnson has made the statement to me and other female workers, 'I don't think that women should be employed at Diamond State Port because women should be sitting at home having men pay their bills.' " (D.I. 42 Ex. J.) Although this sort of comment might serve as a reasonable basis from which to infer discrimination, McLaughlin has not offered any corroborating evidence, e.g., the testimony of other female workers. The absence of corroboration is noteworthy for at least two reasons; (1) McLaughlin's testimony is self-serving, and (2) as already noted, and discussed further below, the other evidence offered by McLaughlin to support her claim that Diamond State engaged in a pattern and practice of gender discrimination has difficulty passing close scrutiny. In other words, even assuming, as the court must, that Johnson made the statement to McLaughlin and other female workers, the statement alone, particularly when viewed in light of the totality of this summary judgment record, is not enough to raise a genuine issue for a jury's resolution.

*7 McLaughlin's further assertion that Johnson romantically propositioned her also proves very little. At her deposition, she said Johnson asked her to dinner once in 1999, while she was still a C class employee. She turned him down, and that seems to be the end of the story. (McLaughlin Dep. at 132:7-133:8, D.I. 42 Ex. H at 35-36.) Without more, a man asking a woman out to dinner is simply insufficient to support an inference of discrimination.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A269

Slip Copy                                                                         Page 7

2004 WL 3059543 (D.Del.)

**(Cite as: 2004 WL 3059543 (D.Del.))**

Finally, McLaughlin presents evidence that she was written up by Betts after she rejected his sexual suggestions. In her brief, McLaughlin points to two pieces of deposition testimony to support this assertion. In the first, she describes an incident in which she was doing some work for Betts and told him she needed to use the bathroom. He followed her and began yelling at her when she stepped out of the bathroom, apparently for taking too long (although it is not entirely clear). (McLaughlin Dep. at 122:11-15, D.I. 42 Ex. H at 33.) The court fails to understand how this first piece of evidence supports her assertion that Betts made sexual suggestions.

The other piece of evidence is more clear. On an unspecified number of occasions, Betts asked McLaughlin out to dinner. She consistently turned him down. Then sometime in March 2004, McLaughlin says she was listening to gospel music at lunch when Betts said, "gospel songs, it's nothing like doing it off gospel songs." In response, McLaughlin says, "I looked at him and I cussed him out because I thought that was disrespectful to God and me." (McLaughlin Dep. at 133:19-134:14, D.I. 42 Ex. H at 36.) This exchange was followed by an email from Betts to Markow on March 16, 2004:

> Apparently Net feels as if she's only suppose to operate the 21's only. I was informed that she going to try to get me fired because I'm mistreating her. This is the way I run my ship. If the ship starts at 8am everyone who is there at 8 starts on the truck they are on. Someone shows up at 8:15 they gets what left. This is another one of her ways of using her femalism to get a job. Andy, you can send her to Russle from now on. I've worked to hard to get the people I want on the ship. It is hard enough tring to get the stuff to the right place without a disgrundle employee to disrupt my operation.

(D.I. 42 Ex. O.)

The court agrees with McLaughlin insofar as she argues that Betts' comment about "doing it off gospel songs" could reasonably be construed as offensive. However, the court does not agree that this is sufficient evidence from which to infer discrimination. Of the six promotions for which

McLaughlin applied, Betts rated applicants in three--one in 2003 and two in 2004. (D.I. 38 Ex. F at DSPA2968, DSPA4135, DSPA4168.) [FN3] And, of those three, only two of the 2004 ratings processes took place after the gospel-music incident and subsequent email. Moreover, in the second of those, not only did a woman (Woolford) win the promotion (D.I. 39 Ex. F at DSPA4134), but Betts ranked her as his third choice out of twenty-nine applicants. (Id. at DSPA4135). Therefore, while Betts' comment may have been inappropriate and offensive, the evidence does not establish that he harbored any gender-based animus. [FN4]

> FN3. The ratings sheets for the 2003 promotion are missing from Diamond State's records. (D.I. 37 at 9 n. 10.) However, Diamond State admits that Betts was one of the rating supervisors involved in that promotion. (D.I. 43 at 10.)

> FN4. The email could be evidence of retaliation, however, the court recently denied McLaughlin's request to add a retaliation claim (among other things). (D.I.56.) Therefore, the evidence is only being analyzed by the court insofar as it is relevant to the two counts in the original complaint.

**3. Disparate Treatment With Regard to Training and Opportunities**

**\*8** McLaughlin's third argument that the circumstances give rise to an inference of discrimination is that she was not "allowed to train on the heavy machines like other less qualified male employees." (D.I. 40 at 20.) McLaughlin claims that when she signed up for formal training, the classes were cancelled. (Id.) At her deposition, she implied that when her supervisors saw her name on the training sign-up sheet, they would make an excuse to cancel the class. (McLaughlin Dep. at 81:13-15, D.I. 42 at 23.) Aside from the fact that her assertion is purely speculative, she presents no evidence showing that training tended to be canceled when women signed up. At best, her speculation about the motives of her supervisors would only support an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inference that they did not like her in particular, as opposed to women generally. But even that inference is dubious because it is undisputed that McLaughlin received training on several other processes and pieces of machinery. (D.I. 38 Ex. F at DSPA2395, DSPA2434, DSPA2437; McLaughlin Dep. at 79:19-80:10, D.I. 42 Ex. H at 22.)

McLaughlin says that unlike her male co-workers, she was even prevented from training on the heavy machinery on her own:

> BY MR. CINCILLA:
> Q:.... Now, I understand that you believe you have been denied machinery training, experience and promotion. But what specifically is your basis that that is because of your gender?
> A:.... One day I'm there on a 21,000-pound machine practicing on empty pallets. Security pulls up. They made this big stink. Hey made me get off the lift truck and I was escorted up to the office by security.
> I go to Dave Castagna and Dave Castagna told me I have to have someone with experience sitting there watching me. I said, well, in training they never told me that. They just said the way they learned was through them, they themselves practicing by themselves. So he told me, well, you have to have someone with experience or whatever to stand there with you. I said like someone is going to take off on a weekend and watch me play with a truck or take their lunch break and watch me operate a truck.
> Now, when I was here, they told me to do this. They did it. And then when I told some people what happened, it never happened to them. I went to Freeman, Russell Corbin, Timothy Miller, Darry Dillard. I told them all, why did they do that? They said they don't know because they never experienced that when they practiced on the larger machines. They never had a problem.

(McLaughlin Dep. at 137:8-139:13, D.I. 42 Ex. H at 37.) Even if requiring a person to be supervised while practicing on heavy machinery was unreasonable, McLaughlin fails to present the affidavits or testimony of the men (i.e., Freeman, Corbin, Miller and Dillard) who were allowed to train in this manner. Furthermore, McLaughlin's testimony as to the statements of those men is

inadmissible hearsay. Fed.R.Evid. 802. Thus, the court once again finds her unsupported assertions incapable of raising a genuine issue of material fact.

**\*9** McLaughlin also says that on the one occasion she was able to work on a heavy machine, supervisor Gamble told her to get down and she was replaced her with a male C class employee. (McLaughlin Dep. at 137:13-19, D.I. 42 Ex. H at 37.) Gamble could have had any number of motivations for replacing her on a piece of heavy equipment, including McLaughlin's admitted inexperience with such machines. Thus, the court will not permit McLaughlin to characterize Gamble's motives without some evidence--either direct, circumstantial or a combination of the two--as to his actual motivation.

**4. Subjective Promotion Process**

McLaughlin's final argument is that the supervisors are given no training on the ratings criteria, that no checks are in place to ensure that the suggested criteria are actually used by the supervisors, and that there is no discussion with the supervisors as to the reasons for their ratings. (D.I. 40. at 5-6, 20.) Because of this subjectivity, McLaughlin claims she was passed over for promotion in favor of less-qualified men. In particular, she says she is more qualified than (1) Harold Goodridge "because he only knows how to be a laborer and she is more experienced," (2, 3) Alfie Zimmerman and Lyndon Henry "because they only know how to operate a lift truck," (4) Tina Woolford "because [she] was not dependable or reliable during the two years prior to her promotion and no supervisors wanted her to work for them," and (5) Steve Hinkle "because he only knows how to check." (D.I. 40 at 10.) McLaughlin further points out that supervisor Corbin rated her as his first choice for promotion among all the candidates for the class A lift-truck operator position in early 2004 (D.I. 38 Ex. F at DSPA4188), but the position was ultimately awarded to Lyndon Henry. (D.I. 42 Ex. G at DSPA4192.)

The evidence shows that McLaughlin applied for six promotions (D.I. 38 Ex. F at DSPA2502,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2004 WL 3059543 (D.Del.)

(Cite as: 2004 WL 3059543 (D.Del.))

Page 9

DSPA4208, DSPA2514, DSPA2908, DSPA4135, DSPA4168). She argues that she was more qualified than five of the six successful candidates. However, McLaughlin's qualifications relative to those of Woolford are not probative on the issue of gender discrimination because both McLaughlin and Woolford are women. Therefore, only the relative qualifications of Goodridge, Zimmerman, Henry and Hinkle are relevant. But McLaughlin's criticisms of the qualifications of these four men do not show they were less qualified than her. She criticizes Goodridge because he only knows how to be a laborer. (D.I. 38 Ex. F at DSPA4197.) Similarly, she criticizes Henry because he only knows how to operate a lift truck, but he was promoted to class A *lift-truck operator*. (D.I. 42 Ex. G at DSPA4192.) The fact that one supervisor rated her highly is not evidence that she was more qualified than Henry because he had several supervisors rate him higher than her. (See D.I. 42 Ex. G at DSPA4172-DSPA4191.) She criticizes Hinkle because he only knows how to check, but by her own admission McLaughlin "very seldom" works as a laborer or checker (McLaughlin Dep. at 52:7, D.I. 42 Ex. H at 15) thereby undercutting her claim to be more qualified than Hinkle. Finally, she criticizes Zimmerman because, like Henry, he only knows how to operate a lift truck. Although Diamond State asserts that Zimmerman was hired as a lift-truck operator (D.I. 43 at 5), the portion of the record to which it cites for this proposition gives the impression that he was actually hired as a laborer (D.I. 38 Ex. F at DSPA4197). If he was hired as a lift-truck operator, then McLaughlin's criticism is without merit because he would have been hired for precisely the skill set McLaughlin says he has. If he was hired as a laborer, McLaughlin's criticism would be meritorious if not for her admission that she "very seldom" works as a laborer. Thus, either way her claim that Zimmerman only knows how to operate a lift truck does not prove she was more qualified than he. Since McLaughlin has not presented evidence that she was more qualified than the people who ultimately prevailed, her argument that the subjective promotion process gives rise to an inference of discrimination must fail.

**\*10** In sum, the court is presented with a record consisting both of evidence that does not support the inferences for which McLaughlin argues, and of the McLaughlin's uncorroborated statements. Of course, the court is cognizant of *Weldon v. Kraft, Inc.,* 896 F.2d 793, 800 (3d Cir.1990), and *Jackson v. Univ. of Pittsburgh,* 826 F.2d 230, 236 (3d Cir.1987), where the Third Circuit held that no rule of law prevents a plaintiff from surviving a motion for summary judgment in a discrimination case based solely on his or her own self-serving testimony. However, those cases must be read in light of their facts, lest they be allowed to "undermine the entire *McDonnell-Douglas* framework by drastically limiting the possibility that summary judgment could be granted because virtually any contrary testimony by a plaintiff would preclude a grant of summary judgment to the defendants." *Pamintuan v. Nanticoke Mem'l Hosp.,* 192 F.3d 378, 387 (3d Cir.1999).

In *Weldon,* the plaintiff contended that (1) he and other black trainees endured unfair treatment from a particular white supervisor, (2) he was required--unlike his white co-workers--to adhere strictly to medical documentation and advance-money policies, and (3) statistical evidence showed a disproportionate number of involuntary terminations among minority employees during a four-year span. 896 F.2d at 799. Although the Third Circuit believed the plaintiff's case presented "a close case," it held:

> If a factfinder were to credit [the plaintiff's] testimony regarding the harshness of the treatment he and other blacks received as well as his view of the statistical evidence, it could conclude that the performance evaluations were unfair and that [the defendant's] explanations were pretextual.

*Id.*

In *Jackson,* the plaintiff presented "nearly 700 transcript pages" in which he made specific allegations regarding the issue of pretext. 826 F.2d at 234. In particular, he rebutted the defendant's contention that he was terminated for performance deficiencies by pointing to (1) the fact that he never received a single complaint about his performance,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A272

2004 WL 3059543 (D.Del.)

**(Cite as: 2004 WL 3059543 (D.Del.))**

(2) the compliments he received regarding his work, (3) information that was withheld from him, (4) his supervisor's solicitation of complaints about the plaintiff's work *after* he was terminated, and (5) threats communicated to the plaintiff's lawyer and others that the plaintiff's supervisor intended to ruin the plaintiff's reputation and "destroy" him. *Id.* The plaintiff also testified that he was not even assigned to some of the allegedly mishandled matters, that he was not permitted the benefit of outside consultants on specialty matters, and that, unlike his white colleagues, he was given neither a secretary nor less-experienced staff for support. *Id.* at 234-35. The Third Circuit reversed the district court's granting of summary judgment for the defendant because the plaintiff's extensive and detailed testimony contained both circumstantial and direct evidence from which a jury could infer pretext. *Id.* at 236.

*11 The court is mindful of its role in this case, as it tries to be in every case brought before it for summary resolution. In other words, the court understands that, when determining the propriety of summary judgment, its job is not to weigh the evidence or to make credibility determinations. On the other hand, the Third Circuit in *Pamintuan* clearly established that there is a threshold of sufficiency which the plaintiff must surpass before she can survive summary judgment. In contrast to both *Weldon* and *Jackson,* McLaughlin's single piece of admissible evidence that might support an inference of discrimination is Johnson's uncorroborated statement that women should not be "employed at Diamond State Port because women should be sitting at home having men pay their bills." Simply put, the court does not believe that this one statement crosses the sufficiency threshold. In other words, the court does not believe it would be reasonable, in light of the entire record, for a factfinder to infer that McLaughlin was the victim of gender-based discrimination based on Johnson's statement alone.

Therefore, McLaughlin has failed to establish a prima facie case as required by *McDonnell-Douglas,* and consequently, summary judgment on Count I of the complaint in favor of Diamond State is appropriate.

**B. Count II--Equal Pay Act**

The Federal Equal Pay Act provides:
No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.
29 U.S.C. § 206(d)(1) (1998).

Aside from the fact that the class system at Diamond State probably fits into one of the enumerated exceptions of § 206(d)(1), it is an explicit statutory requirement that liability under this statute depends on finding a pay differential "on the basis of sex." In this case, McLaughlin has failed to present evidence from which a reasonable factfinder could infer gender-based discrimination. Therefore, it is axiomatic that she has also failed to present evidence sufficient to support finding a pay differential ' on the basis of sex." Thus, summary judgment is appropriate on Count II of the complaint as well.

**VI. CONCLUSION**

*12 Because McLaughlin was unable to establish a prima facie case of gender discrimination through the introduction of admissible evidence, the court will grant summary judgment in favor of Diamond State on all counts in the complaint.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 11

2004 WL 3059543 (D.Del.)

**(Cite as: 2004 WL 3059543 (D.Del.))**


                                    *ORDER*

IT IS HEREBY ORDERED that:

1. The defendant's Motion For Summary Judgment
(D.I.36) be GRANTED; and

2. The plaintiff's complaint be DISMISSED on all
counts.

2004 WL 3059543 (D.Del.)

   **Motions, Pleadings and Filings (Back to top)**

• 1:03CV00617 (Docket)
                            (Jul. 01, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

                                                          **A274**