Not Reported in F.Supp.2d
2003 WL 21018567 (N.D.Tex.)
(Cite as: 2003 WL 21018567 (N.D.Tex.))

(*Id.* at 71-72, 75-76.) According to the affidavit of Abercrombie, Abercrombie's investigation had included taking Williams' statement regarding the confrontation, comparing witness statements to the statement of Puente, and reviewing Williams' employment record with Aviall. (*Id.* at 71.)

**\*5** Finally, Aviall presents a copy of Williams' discharge notice. (*Id.* at 106.) The discharge notice explains that Aviall terminated Williams' employment due to insubordination, inappropriate personal conduct, and violation of company rules. (*Id.*) With respect to insubordination, the discharge notice describes an "unwillingness to accept supervisory or management authority." (*Id.*) With respect to inappropriate personal conduct, the discharge notice cites "unbusiness-like conduct which is offensive and is not in the interest of the company, management, fellow employees[,] or customers." (*Id.*) With respect to violation of company rules, the discharge notice refers to Williams parking his car in a handicapped parking space. (*Id.*)

The Court concludes that Aviall has met its burden of setting forth a legitimate, non-discriminatory reason for terminating Williams' employment. *Russell*, 235 F.3d at 222. As such, the burden shifts to Williams to prove, by a preponderance of the evidence, that Aviall's stated reason for terminating Williams' employment amounts to a pretext for race discrimination. *Id.* To this end, Williams proffers several arguments, which the Court will now address in turn.

First, Williams contends that the Texas Workforce Commission determined that Aviall had terminated Williams' employment "for a reason that [was] not misconduct connected with the work." (P.'s Resp. at 1.) In support of his contention, Williams presents a copy of the Texas Workforce Commission's "Determination on Payment of Unemployment Benefits," dated July 27, 2001. (*Id.* at Ex. 1.) In that determination, the Texas Workforce Commission indeed found that Aviall had terminated Williams' employment for a reason other than misconduct. (*Id.*) Nonetheless, the Court declines to rely on the determination of the Texas Workforce Commission as evidence of race discrimination. Most importantly, the determination does not purport to find that race discrimination played a role in Aviall's termination of Williams' employment. Furthermore, even if the Court were to interpret the determination of the Texas Workforce Commission as implicitly implicating race discrimination, an administrative agency's determination of discrimination does not, by

itself, create a genuine issue of material fact regarding discrimination. *Bynum v. Fort Worth Indep. Sch. Dist.*, 41 F.Supp.2d 641, 657 (N.D.Tex.1999) (concluding that an EEOC determination of discrimination does not create a genuine issue of a material fact for the district court where all of the remaining summary judgment evidence establishes that there was no discrimination). As such, Williams' first argument is without merit.

Second, Williams contends that he was a "good employee." (P.'s Resp. at 2.) In support of his contention, Williams presents three earnings statements, all of which indicate that he received increased pay. (*Id.* at Ex. 4.) Williams also presents a chart listing Aviall's discharged warehouse clerks as evidence that Aviall would have discharged him earlier if his attendance or work performance had been poor. (*Id.* at Ex. 5.) The Court concludes that this evidence fails to create a genuine issue of material fact on the issue of race discrimination. Even if Williams were a "good employee," this fact alone does not rebut the overwhelming evidence that Aviall had a legitimate, non-discriminatory reason for terminating Williams' employment. *See Ray v. Tandem Computers, Inc .*, 63 F.3d 429, 432, 434, 436 (5th Cir.1995) (holding that an employer had a legitimate, non-discriminatory reason for terminating an employee's employment despite the employee's history of company recognition and awards); *Guthrie v. Tifco Industries*, 941 F.2d 374, 376, 378 (5th Cir.1991) (holding that an employer had a legitimate, non-discriminatory reason for demoting an employee despite the employee's history of promotions and salary increases). As such, Williams' second argument is without merit.

**\*6** Third, Williams alleges that similarly-situated, white employees have not been discharged after parking in a restricted parking space or after speaking in a loud voice. (P.'s Resp. at 2.) However, Williams presents no evidence to support his allegation. In fact, during his deposition, Williams admitted that he could not name any white employees who had parked in a restricted parking space. (D.'s Am.App. at 54.) He also admitted that he did not know whether any of the white employees who had allegedly parked in a restricted parking space had been reprimanded by a supervisor or whether they had engaged in a verbal altercation with a supervisor. (*Id.* at 34, 55.) Furthermore, during his deposition, Williams admitted that he could not name any black employees who had been treated less favorably than white employees due to race. (*Id.* at 34.) Finally, although

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21018567 (N.D.Tex.)
**(Cite as: 2003 WL 21018567 (N.D.Tex.))**

Williams named one white employee whom he believed had been treated more favorably due to his race, Williams admitted that he did not know whether that white employee had been reprimanded for the alleged poor conduct that Williams had observed. (*Id.* at 49.) A genuine issue of material fact is not created by conclusory allegations or by unsubstantiated assertions. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). As such, Williams' third argument is without merit.

Fourth, Williams alleges that various statements in the affidavits of Koch, Stange, and Abercrombie are false. (P.'s Resp. at 1-2.) He further alleges that certain documents submitted by Aviall have been falsified. (*Id.* at 2-3.) These allegations fail to create a genuine issue of material fact as to race discrimination. Williams' statements are conclusory; are not supported by the evidence of record; and, in some cases, are contradicted by his own sworn deposition testimony. *See Little,* 37 F.3d at 1075 (holding that a genuine issue of material fact is not created by conclusory allegations or by unsubstantiated assertions); *Thurman v. Sears, Roebuck & Co.,* 952 F.2d 128, 137 n.23 (5th Cir.1992) (concluding that a genuine issue of material fact is not created by a plaintiff's statements that inexplicably contradict the plaintiff's previous deposition testimony). As such, Williams' fourth argument is without merit.

As a final matter, the Court declines to analyze Williams' apparent allegation that Aviall caused him to be discharged from two subsequent jobs by informing his employers that he had filed suit against Aviall. [FN2] This allegation is not contained in Williams' Complaint, nor is it raised in Williams' Answers to the Magistrate Judge's Questionnaire. As such, Williams has brought no such claim against Aviall. [FN3]

> FN2. This claim appears to have been raised for the first time in Williams' deposition testimony. (D.'s Am.App. at 56-64.)

> FN3. The Court notes that even if it were to consider this claim with respect to the motion for summary judgment, Aviall has submitted significant evidence that Williams' subsequent employers terminated his employment for reasons other than Aviall's alleged interference. (D.'s Am.App. at 107-20.) The Court also notes that Williams did not address this claim in his response to the motion for summary

judgment. (P.'s Resp. at 1-3.)

In sum, Williams has entirely failed to meet his burden of presenting evidence that Aviall terminated his employment due to race discrimination. *See Rubinstein v. Adm'rs of the Tulane Educ. Fund,* 218 F.3d 392, 400 (5th Cir.2000) ("While we are mindful of the Supreme Court's recent admonition that Title VII plaintiffs need not always present evidence above and beyond the prima facie case and pretext, discrimination suits still require evidence of discrimination.") (citation to *Reeves* omitted). Rather, the overwhelming evidence before this Court suggests that Aviall terminated Williams' employment due to Williams' misconduct. Accordingly, Aviall's motion for summary judgment should be GRANTED in full.

**IV. Recommendation**

**\*7** For the foregoing reasons, the Court RECOMMENDS that Defendant's motion for summary judgment be GRANTED and that the case be DISMISSED with prejudice.

*INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT*
Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Perales v. Casillas,* 950 F.2d 1066, 1070 (5th Cir.1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir.1996) (en banc).

2003 WL 21018567 (N.D.Tex.)

**Motions, Pleadings and Filings (Back to top)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2003 WL 21018567 (N.D.Tex.)
**(Cite as: 2003 WL 21018567 (N.D.Tex.))**

Page 6

- 3:01CV02151_____(Docket)
(Oct. 25, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 U.S. Dist. LEXIS 2979

FRANCIS H. CIMINO, et al., Plaintiffs, v. DELAWARE DEPARTMENT OF LABOR, et al., Defendants.

C.A. No. 01-458 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2002 U.S. Dist. LEXIS 2979

February 25, 2002, Decided

**DISPOSITION-1:** **[*1]** Defendants' motions to dismiss were granted in part and denied in part.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Relying on state law and 42 U.S.C.S. §§ 1981, 1983, and 1985(3), plaintiffs, a computer programmer and his business, sued defendants--state agencies and a state employee, a contractor, a subcontractor, and an employee of the subcontractor. Defendants moved to dismiss the lawsuit under Fed. R. Civ. P. 12(b)(6).

**OVERVIEW:** The state defendants contracted with the contractor for computer programming services. The contractor engaged a subcontractor. The subcontractor's employee hired the programmer to work on the state defendants' project. The programmer alleged that he and another white employee were laid off merely to protect defendants from lawsuits by two black employees who were terminated. Ruling on the defendants' motions to dismiss, the court noted that the programmer did not allege the contractor played any active role in depriving the programmer of his rights. Based on an agency theory, the contractor could be liable under 42 U.S.C.S. § 1981 and for breach of the implied covenant of good faith and fair dealing. Direct involvement was necessary for claims under 42 U.S.C.S. §§ 1983 and 1985(3). The programmer failed to establish that he was a third-party beneficiary of the contract between the state defendants and the contractor. The Eleventh Amendment deprived the court of jurisdiction over the state defendants, except over claims against individual defendants in their individual capacities. Defendants who were not parties to the programmers' contract could not have breached it.

**OUTCOME:** The court granted in part and denied in part the defendants' motions. The court dismissed all claims against the state institutional defendants, but only some of the claims against an individual sate defendant. The court dismissed only some of the claims against the contractor. The court dismissed all claims against the subcontractor but only some of the claims against the subcontractor's employee.

**CORE TERMS:** motion to dismiss, immunity, fair dealing, third-party, termination, injunctive relief, third party, implied covenant, beneficiary, terminated, agency relationship, conspiracy, waived, individual liability, Eleventh Amendment, state law claim, individual capacity, color of state law, civil rights, abrogated, stranger, involvement, conspired, terminate, theory of respondeat superior, personal liability, state agency, state law, deprivation, falsified

## LexisNexis(TM) Headnotes

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN1]The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. Thus, in deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. In particular, the court looks to whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer. However, the court need not credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. The court will only dismiss a complaint if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN2]In order to prevail, a party moving for dismissal must show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.

*Constitutional Law > Civil Rights Enforcement > Civil Rights Generally*

[HN3]The United States Supreme Court has suggested that, in order to impose liability on a defendant under 42 U.S.C.S. § 1981 for the actions of a third party, an

agency relationship between the defendant and the third party must exist.

***Business & Corporate Entities > Agency > Agency Established > Elements of Agency***

[HN4]Agency is a fiduciary relationship which results in the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control.

***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action***

[HN5]When deciding a motion to dismiss, the court will not examine the merits of the claims.

***Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > Coverage***

[HN6]The theory of respondeat superior cannot support a 42 U.S.C.S. § 1983 claim.

***Constitutional Law > Civil Rights Enforcement***

[HN7]While the United States Court of Appeals for the Third Circuit has not addressed this issue, district courts in the Third Circuit have held that 42 U.S.C.S. § 1985(3) liability may not be premised on a respondeat superior theory. Nor may an employer be held to conspire with one of its own employees acting in his official capacity.

***Contracts Law > Contract Interpretation > Good Faith & Fair Dealing***

[HN8]The Delaware Supreme Court has strictly limited the application of the implied covenant in the employment context, holding that a plaintiff must establish that he or she falls into one of four exclusive categories. The four categories are: (1) where the termination violates public policy and no other remedial scheme exists; (2) where the employer misrepresented an important fact and the employee relied thereon to either accept a new position or remain in a present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation earned through the employee's past service; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination. The implied covenant of good faith and fair dealing does, however, permit a cause of action against an employer for the deceitful acts of its agent when the latter manufactures false grounds to cause an employee's dismissal. Irrespective of the category implicated, a claim for the breach of duty of good faith and fair dealing requires employer conduct amounting to fraud, deceit, or misrepresentation. Thus, the traditional elements of fraud must be present in a claim for breach of an implied covenant of good faith.

***Contracts Law > Breach > Causes of Action***

[HN9]Either party to an agreement may enforce its terms if it is breached.

***Contracts Law > Third Parties > Beneficiaries > Claims & Enforcement***

[HN10]A third-party who is, in effect, a stranger to the agreement, may enforce a contractual promise in his own right if the contract has been made for his benefit. However, essential to a third-party's right of enforceability, is the contracting parties' intention to view the stranger as either a creditor or donee beneficiary. Thus, a third party has no rights under a contract that did not, by itself, manifest an intention to benefit the third party.

***Civil Procedure > Pleading & Practice > Pleadings > Interpretation***

[HN11]The court cannot assume that a plaintiff will prove facts which he has not alleged.

***Constitutional Law > State Autonomy***

[HN12]Under the Eleventh Amendment, private parties cannot sue states in federal court for monetary damages. A state is not entitled to this immunity if it has waived its immunity or if Congress has abrogated the state's immunity through a valid exercise of its power.

***Constitutional Law > State Autonomy***

[HN13]A waiver of Eleventh Amendment immunity will be found only where it has been stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction. Such an express waiver may be made through clear constitutional or statutory language.

***Constitutional Law > State Autonomy***

[HN14]Neither the Constitution of Delaware nor the Delaware Code expressly waives Delaware's Eleventh Amendment sovereign immunity.

***Constitutional Law > State Autonomy***

[HN15]Congress has not abrogated the states' immunity for claims under 42 U.S.C.S. §§ 1981, 1983 and 1985(3).

***Governments > State & Territorial Governments > Claims By & Against***

[HN16]Although prospective (injunctive) relief is available against state officials, it is not available against state agencies.

2002 U.S. Dist. LEXIS 2979

*Constitutional Law > Civil Rights Enforcement > Civil Rights Generally*

[HN17]A third party may be liable under 42 U.S.C.S. § 1981 if that party intentionally interferes, on the basis of race, with another's right to make and enforce contracts, regardless of whether the employer or anyone else may also be liable.

*Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > Coverage*

[HN18]To establish personal liability in a 42 U.S.C.S. § 1983 action, the plaintiffs must show that the defendant: (1) was acting under color of state law; and (2) caused the deprivation of a federal constitutional right enjoyed by the plaintiffs.

*Torts > Multiple Defendants > Conspiracy*

[HN19]In order to establish a claim under 42 U.S.C.S. § 1985(3), the United States Supreme Court requires the following elements: (1) that two or more defendants conspired; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the law; (3) that one or more of the conspirators acted in furtherance of the conspiracy; and (4) that such an act injured a person or his property or deprived him of exercising any right or privilege of a citizen of the United States.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

*Contracts Law > Breach > Causes of Action*

[HN20]Where a defendant was not a party to the contract, his actions could not have breached an implied covenant of good faith and fair dealing in the contract.

**COUNSEL:** For FRANCIS H. CIMINO, PROFESSIONAL CONSULTING SOLUTIONS, INC., plaintiffs: Richard R. Wier, Jr., Law Offices of Richard R. Wier, Jr., Wilmington, DE.

For DELAWARE DEPARTMENT OF LABOR, DIVISION OF UNEMPLOYMENT INSURANCE, THOMAS MACPHERSON, KAREN PASQUALE, defendants: Thomas H. Ellis, Department of Justice, Wilmington, [*2] DE.

For FUTURTECH CONSULTING, LLC, defendant: Kathleen Jennings, Karen S. VanHoy Sullivan, Oberly & Jennings, Wilmington, DE.

For DAVID CASTETTER, CORK SCREW WILLOW LTD., defendants: Roy S. Shiels, Brown, Sheils, Beauregard & Chasanov, Dover, DE.

For DELAWARE DEPARTMENT OF LABOR, DIVISION OF UNEMPLOYMENT INSURANCE, THOMAS MACPHERSON, KAREN PASQUALE, cross-claimants: Thomas H. Ellis, Department of Justice, Wilmington, DE.

For FUTURTECH CONSULTING, LLC cross-defendant: Kathleen Jennings, Karen S. VanHoy Sullivan, Oberly & Jennings, Wilmington, DE.

For DAVID CASTETTER, CORK SCREW WILLOW LTD., cross-defendants: Roy S. Shiels, Brown, Sheils, Beauregard & Chasanov, Dover, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:** MEMORANDUM AND ORDER

**I. INTRODUCTION**

The plaintiffs, Francis H. Cimino ("Cimino") and his wholly-owned corporation, Professional Consulting Solutions ("PCS"), filed the above-captioned action against the Delaware Department of Labor, Division of Unemployment Insurance and W. Thomas MacPherson ("MacPherson"), Director of the Division of Unemployment Insurance (the "state defendants"), in both his personal [*3] and official capacities. Cimino also named David Castetter ("Castetter"), Cork Screw Willow, Ltd. ("Cork Screw") and FuturTech Consulting LLC ("FuturTech") as defendants. In his complaint, Cimino alleges civil rights violations of 42 U.S.C. §§ 1981, 1983 and 1985(3). He also alleges state law claims.

Presently before the court are the defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the court will grant these motions in part and deny them in part.

**II. STANDARD OF REVIEW**

[HN1]The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).* Thus, in deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them." *Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir.1990).* In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is [*4] not frivolous, and to provide

defendants with adequate notice to frame an answer." *Colburn v. Upper Darby Tp.*, 838 F.2d 663, 666 (3d Cir.1988). However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3rd Cir.1997). The court will only dismiss a complaint if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249-50, 106 L. Ed. 2d 195, 109 S. Ct. 2893 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)). Thus, [HN2]in order to prevail, a moving party must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

## III. BACKGROUND

On October 5, 1998, the state defendants contracted with FuturTech for computer programming services until June 30, 1999. FuturTech entered into a subcontract with Cork Screw, which would allow Cork Screw's employee Castetter to work [*5] on FuturTech's computer programming services contract with the state. Castetter was assigned to work on the Department of Labor's Y2K project. Cimino alleges that Castetter had the power to hire and fire the employees he supervised on that project. In accordance with that alleged power, Castetter hired Cimino, and PCS to work on the Y2K project until September 1999. However, Castetter terminated Cimino and PCS on August 6, 1999. Castetter also laid off three additional subcontractors on August 6, 1999. Two of these individuals were black and the other white. Cimino is also white.

In his complaint, Cimino alleges that the defendants terminated him solely because of his race. Specifically, he alleges that the state defendants delegated the job of terminating the two black employees to Castetter. The state defendants, including MacPherson, then allegedly conspired to terminate Cimino and the other white employee because the state defendants feared that the two black employees would sue them.

FuturTech filed a motion to dismiss on August 22, 2001. The state defendants filed a motion to dismiss on November 5, 2001. Cork Screw and Castetter filed a motion to dismiss on November 30, 2001. The [*6] court will now address each of these motions in turn.

## IV. DISCUSSION

A. FuturTech's Motion to Dismiss

Cimino's complaint does not allege any active role on FuturTech's part in depriving him of his rights. Rather, the complaint alleges liability on FuturTech's part based on actions taken by its subcontractor, Castetter.

For the following reasons, the court will grant FuturTech's motion with regard to the Section 1983, 1985(3) and Third-Party Beneficiary claims. It will deny the motion with regard to the Section 1981 and breach of an implied covenant of good faith and fair dealing claims.

1. Section 1981 Liability

The first issue the court must address with respect to FuturTech is whether Section 1981 supports a respondeat superior theory of liability for non-government defendants.

[HN3]The Supreme Court has suggested that, in order to impose liability on a defendant under Section 1981 for the actions of a third party, an agency relationship between the defendant and the third party must exist. *See General Building Contractors Assoc. v. Pennsylvania United Engineers and Constructors*, 458 U.S. 375, 394, 73 L. Ed. 2d 835, 102 S. Ct. 3141 (1982); *see also Blair v. Philadelphia Housing Authority*, 609 F. Supp. 276, 279 (E.D. Pa. 1985); [*7] *Choice v. Easton Hospital* 1988 U.S. Dist. LEXIS 1319, at *2 (E.D. Pa. Feb. 22 1988); *Malone v. Schenk*, 638 F. Supp. 423, 425 (C.D. Ill. 1985). [HN4]Agency is a fiduciary relationship which results in the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control. *See General Building Contractor's Assoc.*, 458 U.S. at 391. Therefore, to establish an agency relationship between Castetter and FuturTech, Cimino must allege that FuturTech gave its consent for Castetter to act on its behalf, and that Castetter is in FuturTech's control.

Cimino has alleged that FuturTech paid Castetter directly, and that Castetter had full authority to manage personnel for FuturTech. n1 Based on these allegations, the court concludes that Cimino has alleged sufficient information to establish the possibility of an agency relationship. Accordingly, it will not grant FuturTech's motion to dismiss the 1981 claim.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The court recognizes that FuturTech denies that Castetter was their agent. However, [HN5]when deciding a motion to dismiss, the court will not examine the merits of the claims.

2002 U.S. Dist. LEXIS 2979

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[*8]

2. Section 1983 Liability

Cimino's complaint purports to hold FuturTech liable for Section 1983 violations as well. However, in defending his Section 1981 claims, Cimino acknowledges that [HN6]the theory of respondeat superior cannot support a Section 1983 claim. *See Gibbs v. Hargett*, 1986 WL 12129, at *2 (D. Del. Oct. 27, 1986) (noting that Section 1983 claims require "willful participation or joint action."); *see also Powell v. Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982)* (holding that neither municipal nor private corporations may be held liable on the theory of respondeat superior under Section 1983). Thus, because Cimino has not alleged any active role that FuturTech played in the alleged discrimination, the court will dismiss the Section 1983 claim against it.

3. Section 1985(3) Liability

Cimino finally alleges that FuturTech violated Section 1985(3). [HN7]While the Third Circuit has not addressed this issue, district courts in this Circuit have held that Section 1985(3) liability may not be premised on a respondeat superior theory. *See Hankins v. City of Philadelphia, 1998 U.S. Dist. LEXIS 5101, 1998 WL 175600*, at *14 (E.D. Pa. April 9, 1998); *[*9] see also Gant v. Aliquippa Borough, 612 F. Supp. 1139, 1142 (W.D. Pa. 1985)* (holding that "an employer may not be subject to a conspiracy claim by the doctrine of respondeat superior."). Nor may an employer be held to conspire with one of its own employees acting in his official capacity. *See Gant, 612 F. Supp. at 1142.* Moreover, even to the extent that Cimino could argue that there was a conspiracy between Castetter and the other named defendants in which FuturTech acquiesced, this argument must also fail. Cimino has clearly stated that, "Castetter testified that he complained to a FuturTech employee . . . that there had been this racially motivated layoff." Thus, while FuturTech may have had knowledge of the alleged conspiracy after the fact, that is insufficient to hold it responsible for the actual conspiracy.

Accordingly, the court will dismiss Cimino's Section 1985(3) claim against FuturTech.

4. State Law Claim: Breach of the Covenant of Good Faith and Fair Dealing

Cimino argues that the defendants breached his contract with them by engaging "in fraud, deceit and misrepresentation in their administration of and termination of [his] [*10] employment [] contract."

[HN8]The Delaware Supreme Court has strictly limited the application of the implied covenant in the employment context, holding that a plaintiff must establish that he or she falls into one of four exclusive categories. *See Lord v. Souder, 748 A.2d 393, 401 (Del. 2000)*. The four categories are: (1) where the termination violates public policy and no other remedial scheme exists; (2) where the employer misrepresented an important fact and the employee relied thereonto either accept a new position or remain in a present one; (3) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation earned through the employee's past service; and (4) where the employer falsified or manipulated employment records to create fictitious grounds for termination. *See E.I. duPont de Nemours & Co. v. Pressman, 679 A.2d 436, 442-44 (Del. 1996)*. The implied covenant of good faith and fair dealing does, however, permit a cause of action against an employer for the deceitful acts of its agent when the latter manufactures false grounds to cause an employee's dismissal. *See id. at 437.* [*11]

Finally, irrespective of the category implicated, a claim for the breach of duty of good faith and fair dealing requires employer conduct amounting to fraud, deceit, or misrepresentation. *See Peterson v. Beebe Med. Ctr., Inc., 1992 Del. Super. LEXIS 454, 1992 WL 354087*, at *5 (Del. Nov. 13, 1992), aff'd, 1993 Del. LEXIS 142 (Del. 1993)*. Thus, the traditional elements of fraud must be present in a claim for breach of an implied covenant of good faith. *See Hudson v. Wesley College, Inc., 1998 Del. Ch. LEXIS 235, 1998 WL 939712*, at *13 (Del. Ch. Dec. 23, 1998) aff'd 734 A.2d 641 (Del. 1999)*.

As discussed *supra* in Section IVA1, the court concludes that Cimino has alleged sufficient facts demonstrating that Castetter may have been FuturTech's agent. Cimino further points to the deposition testimony of Nicholas P. Marica ("Marica"). In that deposition, Marica testified that Castetter admitted to firing Cimino due to his race. Accordingly, the court declines to dismiss this state law claim against FuturTech.

5. State Law Claim: Third-Party Beneficiary Rights

Cimino finally alleges that he and PCS were third-party beneficiaries of the contract between the Division of [*12] Unemployment Insurance and FuturTech.

The Delaware Supreme Court has noted that is it axiomatic that [HN9]either party to an agreement may enforce its terms if it is breached. *See Triple C Railcar Service v. Wilmington, 630 A.2d 629, 633 (Del. 1993)*. "Equally well-settled is the principle that [HN10]a third-party who is, in effect, a stranger to the

Page 5

2002 U.S. Dist. LEXIS 2979

agreement, may enforce a contractual promise in his own right if the contract has been made for his benefit." *Id.* However, essential to a third-party's right of enforceability, is the contracting parties' intention to view the stranger as either a creditor or donee beneficiary. *See id.* Thus, a third party has no rights under a contract that did not, by itself, manifest an intention to benefit the third party. *See id.*

In the present case, Cimino has failed to allege any language in the Division of Unemployment Insurance/FuturTech contract that manifests an intention to benefit strangers to their contract. As [HN11]the court cannot assume that Cimino will prove facts which he has not alleged, it will dismiss this count as to all the named defendants. *See City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256 (3d Cir. 1998). [*13]

B. The State Defendants' Motion to Dismiss

Cimino's complaint also names the Delaware Department of Labor, the Division of Unemployment Insurance and W. Thomas MacPherson (MacPherson), Director of the Division of Unemployment Insurance, in his official, as well as individual, capacity, as defendants.

1. Eleventh Amendment Immunity Against Damages

The state defendants, including MacPherson in his official capacity, assert that the Eleventh Amendment deprives the court of jurisdiction to adjudicate Cimino's civil rights claims for damages pursuant to 42 U.S.C. §§ 1981, 1983, and 1985(3). The court agrees.

Cimino's complaint alleges that the Delaware Department of Labor, Division of Unemployment Insurance, a state agency, violated his civil rights. As a result, he requests both monetary and injunctive relief. However, [HN12]under the Eleventh Amendment, private parties cannot sue states in federal court for monetary damages. *See Board of Trustees of University of Alabama v. Garrett,* 531 U.S. 356, 121 S. Ct. 955, 962, 148 L. Ed. 2d 866 (2001). A state is not entitled to this immunity if it has waived its immunity or if Congress has abrogated the state's immunity through [*14] a valid exercise of its power. *See Lavia v. Comm. of Pennsylvania,* 224 F.3d 190, 195 (3d Cir. 2000).

Neither of the two above conditions are met here. First, the state has not waived its Eleventh Amendment immunity. [HN13]A waiver will be found only where it has been stated "by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Space Age Products, Inc. v. Gilliam,* 488 F. Supp. 775, 780 (D. Del. 1980) (citing *Edelman v. Jordan,* 415 U.S. 651, 673, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974)). Such an express waiver may be made through clear constitutional or statutory language. *See Lavia,* 224 F.3d at 195 [HN14]Neither the constitution nor the code of Delaware expressly waives Delaware's Eleventh Amendment sovereign immunity. *See Ospina v. Department of Corrections,* 749 F. Supp. 572, 579 (D. Del. 1990). Therefore, Delaware has not clearly waived its immunity.

Moreover, [HN15]Congress has not abrogated the states' immunity for claims under Sections 1981, 1983 and 1985(3). *See Quern v. Jordan,* 440 U.S. 332, 345, 59 L. Ed. 2d 358, 99 S. Ct. 1139 (1979); *Henry v. Texas Tech Univ.,* 466 F. Supp. 141, 146 (N.D. Texas 1979); [*15] *Carmen v. San Francisco Unified School Dist.,* 982 F. Supp. 1396, 1404 (N.D. Cal. 1997). Since Delaware's immunity has not been waived or abrogated, Cimino cannot sue the State agency for money damages.

Furthermore, Cimino may not assert a claim for injunctive relief against the state. In *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy,* the Supreme Court noted that, [HN16]although prospective (injunctive) relief is available against state officials, it is not available against state agencies. 506 U.S. 139, 146, 113 S. Ct. 684, 121 L. Ed. 2d 605 (1993). Since the Delaware Department of Labor, Division of Unemployment Insurance, is a state agency, it cannot be sued for injunctive relief under the Eleventh Amendment.

It is clear, however, that a claim for injunctive relief would be available against MacPherson. *See Green v. Mansour,* 474 U.S. 64, 68-69, 88 L. Ed. 2d 371, 106 S. Ct. 423 (1985). The state defendants do not dispute this.

Accordingly, the court will dismiss each of the claims against the Delaware Department of Labor, Division of Unemployment Insurance and MacPherson in his official capacity.

2. MacPherson's Individual Liability Under Section 1981

MacPherson claims that he cannot [*16] be individually liable under Section 1981 because he was not a party to a contract with Cimino and PCS. The court finds this argument unpersuasive.

[HN17]A third party may be liable under Section 1981 if that party "intentionally interferes, on the basis of race, with another's right to make and enforce contracts, regardless of whether the employer or anyone else may also be liable." *Olumuyiwa v. Harvard Protection Servs, Inc.,* 2000 U.S. Dist. LEXIS 6364, at *14 (E.D.N.Y. May 12, 2000); *see also*

*Daniels v. Pipefitters' Ass'n Local Union No. 597, 945 F.2d 906, 914 (7th Cir. 1991)* (holding that "this kind of race-based impediment to contract formation constitutes exactly the sort of racially discriminatory interference with the right to contract that remains actionable under § 1981."); *Pryor v. National Collegiate Athletic Ass'n, 153 F. Supp. 2d 710, 718 (E.D. Pa. 2001).*

In the present action, Cimino has alleged that MacPherson was directly involved with the decision to terminate Cimino because of his race. He further alleges that MacPherson's intentional involvement actually resulted in Cimino's termination, thus interfering with his **[*17]** employment contract. Accordingly, the court will not dismiss the Section 1981 claim against MacPherson in his individual capacity.

3. MacPherson's Individual Liability Under Section 1983

[HN18]To establish personal liability in a Section 1983 action, the plaintiffs must show that MacPherson: (1) was acting under color of state law; and (2) caused the deprivation of a federal constitutional right enjoyed by the plaintiffs. *See Kentucky v. Graham, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985).* The state defendants argue that Cimino was an at-will employee, and thus could be fired at any time. Thus, they contend that he has failed to allege any constitutional deprivation. n2 However, Cimino clearly alleges that he was denied equal protection of the laws due to discrimination. Accordingly, the court will not dismiss the Section 1983 claim against MacPherson in his individual capacity.



- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n2 MacPherson does not state that he takes exception with a finding that he was acting under color of state law. Accordingly, the court will not discuss this element.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*18]**

4. MacPherson's Individual Liability Under Section 1985(3)

[HN19]In order to establish a claim under Section 1985(3), the Supreme Court requires the following elements: (1) that two or more defendants conspired; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the law; (3) that one or more of the conspirators acted in furtherance of the conspiracy; and (4) that such an act injured a person or his property or deprived him of exercising any right or privilege of a citizen of the United States. *See Griffin v. Breckenridge, 403 U.S. 88, 102-103, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971).*

In his complaint, Cimino pled that "McPherson [sic] and Castetter agreed to fire the two white employees . . . to make it look like the terminations [of the two black employees] were not because of the race of the black employees." Cimino further alleges that Castetter subsequently terminated him.

Based on these allegations, the court concludes that dismissal for failure to state a claim would be inappropriate.

5. State LawClaim: Breach of Implied Covenant of Good Faith and Fair Dealing **[*19]**

Castetter, perhaps as an agent of FuturTech, entered into a contract with Cimino. [HN20]MacPherson was not a party to this contract. Accordingly, his actions could not have breached an implied covenant of good faith and fair dealing in the Castetter/Cimino contract. This claim will be dismissed.

C. Castetter's and Cork Screw's Motion to Dismiss

As an initial matter, the court will dismiss all of Cimino' claims against Cork Screw. Cimino has alleged only that FuturTech subcontracted with Castetter, through Castetter's employer Cork Screw. Cork Screw was not a party to the FuturTech/Division of Unemployment Insurance contract. It had no involvement with the type of work Castetter performed, how he performed the work, the hours he worked, or the amount he was paid for his work. Indeed, Cork Screw's only involvement was to receive a set payment from FuturTech for the number of hours that Castetter worked. Cimino has not alleged any facts from which the court can assume the existence of an agency relationship, n3 or that Cork Screw itself engaged in any intentional discrimination, or a conspiracy to commit intentional discrimination. Accordingly, as Cimino's complaint alleges nothing **[*20]** more, there can be no basis under any of the theories he has advanced for Cork Screw's liability.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n3 Notably, Cimino has failed to allege facts demonstrating that Cork Screw in any way controlled Castetter.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

2002 U.S. Dist. LEXIS 2979

Cimino does not state that he is suing Castetter in an official capacity as a representative of the state. The following analysis thus addresses only Castetter's personal liability.

1. Castetter's Section 1981 Liability

Cimino alleges that Castetter terminated his employment due to his race. These allegations are sufficient to withstand a motion to dismiss for failure to state a claim. Accordingly, the court will not dismiss Cimino's Section 1981 claim.

2. Castetter's Section 1983 Liability

Cimino next alleges that Castetter acted at the "express direction of the Department and the Division through MacPherson" when Castetter terminated him due to his race. The court thus concludes that, for the purposes of a motion to dismiss, Cimino has alleged that Castetter was acting under color of state **[*21]** law when he deprived him of a constitutional right. *See Kentucky v. Graham*, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985).

3. Castetter's Section 1985(3) Liability

Cimino's complaint alleges that Castetter and MacPherson conspired to terminate Cimino due to his race, and that they did in fact terminate him. As discussed above in conjunction with MacPherson's individual liability, this allegation will suffice for the purpose of a motion to dismiss.

4. State Law Claim: Breach of Implied Covenant of Good Faith and Fair Dealing

It is undisputed that Cimino and Castetter entered into an employment contract. Cimino now alleges that Castetter fired him because of his race, and falsified the reasons for that termination. Accordingly, the court declines to dismiss this claim against Castetter.

V. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. FuturTech's motion to dismiss (D.I. 9) is GRANTED with respect to the Section 1983, 1985(3) and Third-Party Beneficiary claims. It is DENIED with respect to all other claims;

2. The Department of Labor, Division of Unemployment Insurance, and MacPherson's motion to dismiss (D.I. 24) is GRANTED on **[*22]** all claims with respect to the Department of Labor, Division of Unemployment Insurance and MacPherson in his official capacity. It is GRANTED with respect to MacPherson in his individual capacity as to both of the state law claims. It is DENIED with respect to MacPherson in his individual capacity as to all other claims, including claims for injunctive relief;

3. Cork Screw's and Castetter's motion to dismiss (D.I. 30) is GRANTED with respect to Cork Screw on all claims. It is GRANTED with respect to Castetter on the Third-Party Beneficiary claim. It is DENIED with respect to Castetter as to all other claims.

Date: February 25, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**PRIVATE DATA**

COMPUTER SCIENCES CORPORATION
DUPONT ALLIANCE

SALARY REVIEW

EFFECTIVE DATE: 05-16-98

**PRIVATE DATA**

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

D. POLAND
CCC:  DEPT/SECT:551

TYPE OF ACTION  : 105
WORK WEEK CODE  : 040

CURRENT JOB CODE: S2200   CURRENT JOB TITLE: MTSB TECH

|  | HOURLY | MONTHLY | ANNUALIZED |
|---|---|---|---|
| FORMER BASE RATE : | 19.7116 | 3,416.68 | 41,000.00 |
| INCREASE AMOUNT : | 0.4928 | 85.42 | 1,025.00 |
| CURRENT BASE RATE: | 20.2043 | 3,502.08 | 42,025.00 |

OEFT
EXHIBIT NO. 2
KWP 3-32-05

A-180

**PRIVATE DATA**      COMPUTER SCIENCES CORPORATION     **PRIVATE DATA**
DUPONT ALLIANCE

SALARY REVIEW

EFFECTIVE DATE:  05-15-99

```
D     AND
C     DEPT/SECT:700                              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

T..  .. ACTION : 105
WORK WEEK CODE : 040
```

CURRENT JOB CODE: S2200  CURRENT JOB TITLE: MTS8 TECH

|  | HOURLY | MONTHLY | ANNUALIZED |
|---|---|---|---|
| FORMER BASE RATE : | 20.2043 | 3,502.08 | 42,025.00 |
| INCREASE AMOUNT : | 0.5253 | 91.05 | 1,093.00 |
| CURRENT BASE RATE: | 20.7296 | 3,593.13 | 43,118.00 |

A-181

**PRIVATE DATA**      Computer Sciences Corporation      **PRIVATE DATA**
6200 Chemical & Energy Group

Salary Review

Effective Date: 05/13/2000

Name: POLAND , DIANE             Org Unit: 60002244
Personnel Number: O0532745         Global Processing Enginee
SSN: 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             Cost Center: 5230523000

Event Reason: Promotion
Weekly Working Hours: 40.00

Former  Job Code/Title: 50000055 MEMBR TECH STAFF B - TECH
Current Job Code/Title: 50000058 MEMBR TECH STAFF A - TECH

|                          | Hourly Earnings | Monthly Earnings | Annual Earnings | Annualized Salary |
|--------------------------|-----------------|------------------|-----------------|-------------------|
| Former Base Rate:        | 20.7298         | 3593.17          | 43118.00        | 43118.00          |
| Increase Amount:         | 1.8650          | 323.25           | 3878.98         | 3878.98           |
| Current Base Rate:       | 22.5948         | 3916.42          | 46996.98        | 46996.98          |

| Deductions Per Pay Period    | Old   | New   |
|------------------------------|-------|-------|
| CSC MAP 401(k) deduction     | 82.92 | 90.38 |
| Elected MAP %:               | 5.00  |       |

A-182

Name: POLAND DIANE
Personnel number: 00532745

Current Organizational Assignment
Company Code: 6200 Dupont Alliance
Pers Subarea: 6200 CBG
Org Unit: 60002244 GPES
Business Area: 202
Cost Center: 21002L0000

Current Job/Salary Data
Job Code: 50000058
Job Title: MTSA-
Salary: 49,345.92
Pay scale: S03

Status/Schedule
Status: Withdrawn
Group: Regular
Subgroup: Full-Time Salaried
Wkly hours: 40.00

Educ/Dates/EEO
Degree: HS Diploma or equiv.
Hire Date: 11/10/1997
Years Exp: 0.00
Sex/EEO: F Black

Job/Salary History

| CoCd | Date | Event | Job Code | Job Title | Pay Scale | 2080 Salary |
|------|------|-------|----------|-----------|-----------|-------------|
| 6200 | 09/28/2002 | Termination voluntary - Health | 50000058 | MTSA- | S03 | 49,345.92 |
| 6200 | 05/12/2001 | Position/Job/Salary Change - Merit Increase with R | 50000058 | MTSA-TECH | S03 | 49,345.92 |
| 6200 | 05/13/2000 | Position/Job/Salary Change - Promotion | 50000058 | MTSA-TECH | S03 | 46,996.98 |
| 6200 | 09/18/1999 | Conversion-Active - Legacy Data Load | 50000055 | MTSB-TECH | S02 | 43,117.36 |

A-183

**CSC**
Computer Sciences Corporation

DEFT
EXHIBIT NO. 14
KWP 3-30-05

## Job Description

Title: Member Technical Staff A
Typically reports to: Manager
FLSA Status: Exempt
Date: 04/15/96
Position Number S23

### Summary

Performs work on relatively technical assignments. Communicates with internal and external sources to assure proper and timely project completion.

### Competencies

Independently performs most assignments with general direction about desired results. Provides work direction to lower level technical staff members. Incumbent is expected to use creativity, initiative, and judgment in performing assigned tasks.

### Accountabilities

- Performs work on complex technical assignments for major segments of a project(s) involving research, design, and analysis for problem specification/solution definition or development/maintenance of departmental functional standards and procedures (DM/CM/QA).
- Determines cost/quality choices as a basis for measuring feasibility to various approaches.
- Provides work direction to lower level technical and non-exempt personnel.
- Performs other duties as assigned.

### Education

Bachelor's degree in an associated discipline or the equivalent experience.

### Requirements

Minimum of four years related experience in specialized area.

*Exempt Position Classification Structure 9-6*

A-184



DEFT
EXHIBIT NO. 16
KWP 3-30-05

# Overall Merit Guidelines

- Recommended Merit Percent Increase by Rating

| Rating | Population | Increase |
|--------|-----------|----------|
| 1 | 10% | 7-12% |
| 2 | 20% | 4-7% |
| 3 | 60% | 0-4% |
| 4 / 5 | 10% | 0% |

Salary Review 2001

6

Margolis Edelstein
Poland, Diane v. CSC
0232

A-185

Computer Sciences Corporation

DEFT
EXHIBIT NO. ___
KWP 3-30-05

CSC

March 14, 2001

Ms. Diane Poland
12 Berks Court
New Castle, DE 19720

Dear Ms. Poland:

We are pleased to extend to you an offer of transfer and reassignment within the Chemical Group, Department 521.

This opportunity is for the position of Supervisor, Management, reporting to Jeannie G. Maul, Director. In this position, your starting base salary will be $958.01 per week which, if annualized, is $49,817.00. Your effective date will be March 31, 2001.

Please indicate below your decision to accept or decline this offer by signing your name in the appropriate box. Then fax your response to Human Resources at 302-391-6190. Your decision must be received on or before March 21, 2001. If you have any questions or concerns, please contact the Staffing & Resources Center at 302-391-6204.

Sincerely,

Marianne Kane
Human Resources
Chemical Group

| I accept the above CSC offer of transfer. | | I decline the above CSC offer of transfer. | |
|---|---|---|---|
| | | | |
| Signature | Date | Signature | Date |

Computer Sciences Corporation



March 20, 2001                                                                    Revised

Ms. Diane Poland
12 Berks Court
New Castle, DE  19720

**CSC**

Dear Ms. Poland:

We are pleased to extend to you an offer of transfer and reassignment within the Chemical Group, Department 521.

This opportunity is for the position of Supervisor, Management, reporting to Jeannie G. Maul, Director.  In this position, your starting base salary will be $976.09 per week which, if annualized, is $50,757.00. Your effective date will be March 31, 2001.

Please indicate below your decision to accept or decline this offer by signing your name in the appropriate box.  Then fax your response to Human Resources at 302-391-6190.  Your decision must be received on or before March 21, 2001.  If you have any questions or concerns, please contact the Staffing & Resources Center at 302-391-6204.

Sincerely,

Marianne Kane
Human Resources
Chemical Group

| I accept the above CSC offer of transfer. | I decline the above CSC offer of transfer. |
|---|---|
| _____ | _____ |
| Signature                      Date | Signature                      Date |

Christiana Corporate Center
400 Commerce Drive, M/S 1SHR
Newark, DE  19713

Margolis Edelstein
Poland, Diane v. CSC
0667

A-187

DEFT

EXHIBIT NO. 20

KWP 3-30-05

# LEAVES OF ABSENCE WITHOUT PAY

CSC grants eligible employees limited unpaid leaves of absence when certain unusual and unavoidable circumstances require an employee's absence (Human Resources Management Policy 247).

## Eligibility

All regular and temporary employees are eligible for all leaves of absence without pay as described herein. Casual employees are eligible to receive an unpaid leave of absence due to military service, jury/witness duty, or for reasons addressed by the Family and Medical Leave Act of 1993.

## Conditions

Where feasible, for all unpaid leaves of absence in excess of eight hours (other than furlough, as described in this section), you must provide your supervisor, in advance, with a written request that specifies the expected duration of the leave.

All unpaid leaves of absence must be approved by your supervisor and your Human Resources representative.

## Categories

- **Family and Medical Leave**

  Eligible employees may be granted a leave of absence, as permitted under family and medical leave legislation, for the following reasons:

  - Your own illness - Leave will be permitted up to the maximum required. If you are still unable to work at the end of that time, this leave will be coordinated with medical leave as described below for a combined maximum of 12 months.

  - To care for your spouse, child, or parent who has a serious health condition - Leave will be permitted up to the maximum required.

  - To care for a new child after his/her birth or placement of a child for adoption or foster care - Leave will be permitted up to the maximum required.

  At CSC or your option, certain kinds of paid leave may be substituted for unpaid leave.

  You will be required to provide evidence of illness for yourself or your spouse, child, or parent at the time the leave is requested.

  CSC will comply with all applicable provisions of family and medical leave legislation. Your Human Resources representative can provide additional information regarding this type of leave of absence.

- **Medical**

  As an eligible employee, you may be granted an unpaid leave of absence if you are unable to work because you have become ill or injured. To be granted a medical leave, you must submit, when you formally apply for leave, a signed statement from a physician stating the reasons for the leave and the expected duration of the medical circumstances requiring the leave. Medical leaves may be granted for up to 30 calendar days and may be extended for successive periods of up to 30 calendar days for up to a total (including all periods of family and medical leave) of 12 consecutive months. After the initial 30 day leave period, you must submit a certificate of disability from your attending physician every 30 days.

  Normally, you will be expected to exhaust your sick leave before you are granted a leave for your own illness; however, if you are covered by CSC's long term disability plan and choose to receive long term disability benefits, you may retain unused sick leave accrued as of the date that your long term disability benefits commence. At your option, after your sick leave is exhausted, you may exhaust your vacation leave before being placed on unpaid medical leave. Any vacation or sick leave that accrued to your account during your leave cannot be used until you return to the company in a pay status.

- **Personal**

  As an eligible employee, you may request a leave of absence for compelling personal reasons for up to 30 calendar days.

- **Military Leave**

  All employees will be granted an unpaid leave if they enlist or are inducted into one of the military services, or if they enlist in or respond to a call or an order to active duty, active duty for training, or weekly or weekend drills in the reserves or national guard, subject to certain conditions and limitations. Please see your Human Resources representative for more information.

- **Educational**

  Consideration for Educational Leave, of up to one year, is given an employee with a good performance record, after the completion of 12 continuous months of service with CSC. The employee must attend an accredited college or university in a major field of study directly related to CSC activity.

- **Special Assignment**

  This category of unpaid leave is available to enable employees to perform civic duties or activities which, in the opinion of CSC, offer a direct or indirect benefit to CSC. Written approval of your operating unit president is required.

- **Jury and Witness Duty**

  All casual employees required to be available for jury duty, or who are subpoenaed to give testimony in a trial, will be granted unpaid leave (all other employees, see Leaves of Absence with Pay). Please see your Human Resources representative for more information.

- **Furlough**

  This category of unpaid leave is considered involuntary and will be required by CSC only when temporary disruptions require a limited cessation of work activity. A furlough will generally not exceed 30 consecutive calendar days in duration. Please see your Human Resources representative for more information.

## Benefits During Leaves of Absence

For the first 30 calendar days of your unpaid leave, vacation and sick leave hours and CSC service continue to accrue. In addition, CSC will pay the cost of all benefits that were in effect on the last day you were in a paid status for the first 30 calendar days of your leave of absence.

After the first 30 calendar days, benefits may be continued as follows:

- **FMLA and Medical Leave of Absence**

  CSC will continue to pay the cost of company-paid coverages (i.e., basic life/AD&D) for a maximum of 12 months (including the first 30 days of unpaid leave).

  Employees who elected any optional coverages (e.g., coverage in either the CSC plans or any HMO, supplemental life/AD&D, retiree medical/life), may continue all or none of the optional coverages that were in effect on the last date the employee was in a paid status.

  For employees who elect to discontinue the optional coverages, these benefits will terminate at midnight on the 30th calendar day of the leave. If reenrollment is requested upon return from leave, all preexisting conditions limitations and late enrollment requirements will apply.

  If the employee elects to continue the coverages that were in effect on the last day in a pay status, required contributions must be paid in advance on a monthly basis. Benefits are subject to termination if contributions are not received on a timely basis. The maximum period allowed for continuation of coverages (both employee and dependent) while on an authorized leave of absence is 12 calendar months (including the first 30 calendar days during which coverage is continued by CSC).

  The cost of long term disability coverage will be waived during the period of time the employee is eligible to receive benefits.

- **All Other Leaves of Absence**

  After 30 calendar days, the employee has the option of continuing all or none of the coverages (except long-term disability) that were in effect on the last date for which the employee received compensation.

  If the employee elects to discontinue coverages, benefits will terminate at midnight of the 30th calendar day of the leave. If reenrollment is requested upon return from approved leave, all preexisting conditions limitations and late enrollment requirements will apply.

  If the employee elects to continue coverages, the employee must pay the full cost of the coverages on a monthly basis, in advance. Benefits are subject to termination if required premiums are not received on a timely basis.

The maximum period allowed for continuation of coverages, for both employee and dependent, while on an authorized unpaid leave of absence is 12 calendar months (including the first 30 calendar days during which coverages are continued by CSC).

To continue long-term disability coverage, employees must submit a written statement regarding the purpose of the leave, the expected duration, and an explanation of what they will be doing while on the leave of absence.  The statement should be sent through your Human Resources representative to the insurance carrier.  The carrier will notify Human Resources if it is acceptable for coverage to continue while on a leave.

If continuation of long-term disability is denied, coverage will terminate at midnight on the 30th calendar day of the leave.

If continuation of long-term disability coverage is approved, the employee will pay the full cost of the coverage on a monthly basis, in advance.

## Cost to Continue Benefits During Leave of Absence

The cost to continue benefits will be calculated by your Human Resources representative.  In the event there is a change in the cost of benefits, you will be notified of the new cost.

## Claims Filing During Leave of Absence

Medical, prescription drug, and dental claims for covered individuals during an approved leave of absence will be handled the same as for an employee who is at work.

## Return from Leave of Absence

If you return to work within 30 calendar days of the effective date of your leave, it is the company's practice to reinstate you to your position.  Unless otherwise required by law, CSC cannot guarantee that you will be reinstated to your position when you return from a leave that is in excess of 30 days.  Your continued employment in such circumstances is subject, at the time the leave is scheduled to end, to the availability of a position for which you are qualified.  However, CSC will make every reasonable effort to reinstate you to your former position or to place you in a comparable position.

During your leave of absence, you are required to keep your supervisor and your Human Resources representative informed of current circumstances which might prevent you from returning to work as scheduled.  If you are able to return to work before the scheduled end of your leave, you are expected to advise your supervisor and Human Resources representative immediately.  If you do not return to work on the scheduled date of return, you will be terminated retroactive to the scheduled date of return.  In addition, if you misrepresent any information that you provided in support of your original request for leave, or an extension to that leave, or, if you engage in gainful employment with any employer except as specifically authorized in your leave of absence approval, you will be terminated retroactive to the date the leave or the extension commenced.

If you are returning from an unpaid leave of absence of more than 30 calendar days, your service and benefit date will be adjusted for any period of leave taken beyond the 30th calendar day unless prohibited by law.

When you return from your leave, you must report in person to your Human Resources representative the first business day following the scheduled end of the leave, in order to determine your work status and reinstatement.

©COMPUTER SCIENCES CORPORATION 1995          11-9

A-192



DEFT

EXHIBIT NO. 21

KWP 3-30-05

**COMPUTER SCIENCES CORPORATION**

**HUMAN RESOURCES MANAGEMENT POLICY**          **HRMP 247**

| SUBJECT | Effective | October 31, 1987 |
|---|---|---|
| | Revision No. | 4 |
| **Leaves of Absence Without Pay** | Effective | September 20, 2001 |
| | Page No. | 1 of 9 |

### 1. POLICY

1.1      It is the policy of Computer Sciences Corporation to grant eligible employees limited unpaid leaves of absence when certain unusual and unavoidable circumstances require an employee's absence.

### 2. APPLICABILITY

2.1      All regular and temporary full-time and part-time employees as defined in Human Resources Management Policy 204, who meet the minimum eligibility requirements for each type of leave as specified below, except as provided within Sections 5.3 and 5.6 below, which are applicable to all employees.

### 3. GENERAL

3.1      Where feasible, for all categories of unpaid leave of absence, other than furlough (See Section 5.7 below), an employee must provide his/her supervisor with a written request in advance of the leave, for all Leaves of Absence in excess of eight hours and stipulate a specific period of time.

3.2      With the exception of a furlough, an approved Leave of Absence Without Pay for a period of time in excess of eight hours also requires the execution of CSC's Request for Leave form (see Appendix A).

3.3      An approved Leave of Absence Without Pay for a period of time greater than thirty calendar days requires the execution of CSC's Personnel Transaction form.

3.4      Exempt employees may not record hours worked and unpaid leave hours on the same work day.

3.5      Exempt employees will be placed on unpaid military leave or furlough in full week increments only. In any week when an exempt employee records any hours worked, no deductions from salary will be made for military leave or furlough.

A-193

4. CONDITIONS OF LEAVES OF ABSENCE

    4.1        All Leaves of Absence Without Pay must be approved by the employee's supervisor and the cognizant Director/Manager of Human Resources.

    4.2        It must be clearly understood between the employee and the supervisor, in advance, and in writing by means of the Request for Leave of Absence form, under what conditions the employee may be expected to return at the end of the leave.

    4.3        An employee who has been on an approved Leave of Absence Without Pay for thirty calendar days or fewer, is entitled to return to the position which was vacated.

    4.4        An employee who has been on an approved Leave of Absence Without Pay for greater than thirty calendar days is entitled to return to work if CSC has a vacancy for which the employee is fully qualified, as determined by CSC. If such a job vacancy does not exist on the date that the employee wishes to return, the employee may either be placed in a layoff status, or may continue in a leave of absence status in accordance with the provisions of Section 5 below, as approved in writing by the employee's supervisor and the cognizant Director/Manager of Human Resources.

    4.5        Where these conditions are in conflict with applicable federal, state or local law, the provisions of the controlling law (whether federal, state, or local) shall take precedence. Employees should contact their Human Resources organization to resolve any questions or obtain additional information about Family and Medical Leave Act issues.

5. CATEGORIES OF LEAVES OF ABSENCE

    5.1        **Medical**

    5.1.1      A Medical Leave of Absence Without Pay shall be granted to an employee who is unable to report to work because of any occupational or non-occupational injury or illness, including, but not limited to pregnancy, childbirth, or related conditions.

    5.1.1.1    All accrued sick leave and vacation must be exhausted before an employee shall be granted a Medical Leave of Absence Without Pay, except as follows:

    5.1.1.1.1  Employees covered by mandated State disability programs may integrate their sick leave with the appropriate State disability benefits.

5.1.1.1.2   An employee covered by the CSC Long Term Disability program who chooses to receive long term disability benefits shall retain all unused sick leave accrued as of the date long term disability benefits commence under the plan.

5.1.1.1.3   Any vacation or sick leave accruing to an employee's account during the period of the leave cannot be used until the employee returns to work in a pay status.

5.1.2   An employee's request for a Medical Leave of Absence Without Pay must be accompanied by a physician's signed statement on a form specified by CSC (see Human Resources Management Policy 246, Appendix A) stating the reasons for the Medical Leave, the expected duration of the medical circumstances requiring it, and the other information sought on the form. The use of a Medical Leave of Absence Without Pay, a medical leave extension and request to be returned to work is subject to the provisions of Human Resources Management Policy 246, Sick Leave, Sections 4.2.4 and 4.2.5.

5.1.3   A Medical Leave of Absence Without Pay may be granted for up to thirty calendar days and may be extended for successive periods of up to thirty calendar days for up to a total of twelve consecutive months upon presentation of a physician's statement, and CSC's verification as it deems appropriate under Human Resources Management Policy 246, Sick Leave, Sections 4.2.4 and 4.2.5, if the employee is unable to perform his/her duties because of occupational or non-occupational sickness, injury, pregnancy, childbirth, or related conditions.

5.1.4   A certificate of disability from the attending physician is required every thirty days from the date the medical leave commenced. Any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation, as determined by the employee's supervisor and the cognizant Director/Manager of Human Resources.

5.1.5   The maximum twelve month period of leave will consist of all periods of Medical Leaves of Absence Without Pay that are separated by fewer than three months of paid status, unless the purpose of the leave is due to entirely unrelated medical causes.

5.1.6   An employee on an approved Medical Leave of Absence Without Pay due to a work related injury or illness shall be re-employed after the thirty day period, if, at the time the employee is medically released to return to work, he/she is qualified for the former position, and the former position is vacant, or in accordance with applicable state or local laws.

5.2     **Personal**

5.2.1   An employee may be granted a Leave of Absence Without Pay for Personal Reasons up to a maximum of thirty calendar days upon receiving the prior written approval of the employee's supervisor and the cognizant Director/Manager of Human Resources. All accrued vacation must be exhausted before an employee shall be granted an unpaid personal leave of absence.

5.3     **Leaves of Absence Without Pay - Military and Re-employment Rights**

5.3.1   CSC's policies in this area are intended to duplicate applicable federal and state law. The following policy provisions are by way of summary only. Any specific questions should be directed to the cognizant Director/Manager of Human Resources.

5.3.2   **Military Leaves of Absence**

5.3.2.1 An employee who is a Military Reservist or a National Guardsman is eligible for an unpaid leave of absence to participate in weekly or weekend drills, annual training duty, courses of instruction, or similar types of training duty of less than twelve weeks duration annually in the United States Armed Forces, except that regular and temporary full-time and part-time employees are eligible for compensation in accordance with the provisions of Human Resources Management Policy 248, Section 4.4.4.1.

The employee should advise his/her supervisor, as much in advance as possible, of the need for and the expected duration of the absence. Upon receipt of such notice, the supervisor shall grant the necessary time off. The employee shall also notify the supervisor immediately of any change in the expected date on which training will begin or in the duration of the training.

Upon release from active or inactive training duty, or, if the employee is hospitalized incidental to training, upon release from hospitalization (not to exceed one year), the employee must return to work at the beginning of the next regularly scheduled workday after the last calendar day necessary to travel to work from a place of training or, in the case of hospitalization incidental to training, from the place of hospitalization.

An employee returning from such a military leave of absence shall return with the same service/benefit date, status, pay, vacation, and sick leave benefits as the employee would have had if he/she had not been absent for these purposes.

5.3.3    **Re-employment Rights of Inductees, Enlistees, and Certain Reservists**

An employee who is inducted or enlists, or an employee who is a National Guardsman or Reservist who responds to an order/call to active duty and who performs active duty in the United States Armed Forces, is eligible for re-employment to a position of like status and pay, subject to the following conditions and limitations:

The job held by the employee at CSC was not temporary and was not one for which there was no reasonable expectation of continued employment; and

'The right of re-employment arises only if the employee is still qualified to perform the duties of his/her former position. If the employee is disabled during military service, upon his/her request, CSC shall provide the employee with another position for which the employee is qualified, which will result in like CSC service/benefit date, status and pay or the nearest approximation consistent with the employee's situation; and

The returning employee must receive and present to CSC a certificate of satisfactory completion of military service, and must apply for re-employment within ninety days after release from service, or discharge from hospitalization (to last no longer than a year) incidental to such service; and

Employees who enlist shall retain re-employment rights not to exceed five years, except as noted in the eight exempt categories. Employees in the Reserves who respond to a call or are ordered to active duty and serve active duty shall retain their rights of re-employment only if their active duty does not exceed five years plus any additional time required by law; and Re-employment shall not take place if CSC's circumstances have so changed as to make it impossible or unreasonable to do so; and re-employment under the terms provided above will be at the status/service/benefit date the employee would have had if he/she had been continuously employed by CSC during the period of military service. In determining the employee's appropriate rate of pay, the employee will be credited with general increases in the employee's appropriate job grade salary range, but not to include merit increases based on performance standards prescribed by established practice.

5.3.4    **Re-employment Rights of Reservists and National Guardsmen Who Have Served Certain Active Duty**

Military Reservists and National Guardsmen who perform initial periods of three to six consecutive months of active duty for training are eligible for the same re-employment rights as

inductees described in Section 5.3.1.2 above, subject to the same conditions and limitations, except as follows:

The request for re-employment must come within thirty-one days of the employee's release from active duty for training or release from hospitalization (not to last longer than one year) incidental to such training; and

The employee is not permitted to bump any veteran with a superior claim to the position based on the veteran's preference status.

| | |
|---|---|
| 5.4 | **Educational** |
| 5.4.1 | Consideration for Educational Leave is given an employee with a good performance record, after the completion of twelve continuous months of service with CSC. |
| 5.4.2 | The period of an Educational Leave shall not exceed one calendar year. |
| 5.4.3 | The employee must attend an accredited college or university in a major field of study directly related to CSC activity. |
| 5.4.4 | All requests for Educational Leave require the written approval of all levels of management up to and including the employee's line Vice President, as well as the cognizant Director/Manager of Human Resources. |
| 5.5 | **Special Assignment** |
| 5.5.1 | Special Assignment is a Leave of Absence Without Pay, initiated by or supported by CSC to permit an employee to perform civic duties or activities which offer a direct or indirect benefit to CSC. Such leaves require written approval by the business unit President, and an information memo sent in advance of the leave to the Corporate President. Special assignments can include, but are not limited to, the acceptance of an elective office with federal, state, or local government, or acceptance of a temporary position with another company or with a non-profit organization. |
| 5.6 | **Jury and Witness Duty Leave** |
| 5.6.1 | Any employee required by law to be available for jury duty, or subpoenaed to give testimony in a trial, will be granted unpaid time off, except that all regular and temporary, full-time and part time employees required to serve as jurors or witnesses shall be compensated in accordance with the provisions of Human Resources Management Policy 248, Sections 4.4.2 or 4.4.3. |

5.6.2    The employee should advise his/her supervisor at least ten working days before the employee is to begin to serve or testify or, if the order to serve or testify does not arrive in time, the employee must advise the supervisor the first working day after receiving such an order.

5.6.3    An employee must return to work on the first scheduled working day following release from jury or witness duty or from any obligation to appear to testify. During the period of jury duty or appearance to testify, if the court excuses the employee from going to court certain days, or part of a certain day, the employee must notify the supervisor immediately to learn if the employee should return to work for part of, or all of, the workday.

5.7    **Furlough**

5.7.1    A furlough is an involuntary Leave of Absence Without Pay required by CSC when temporary disruptions require a limited, short-term cessation of work activity.

5.7.2    A furlough shall not exceed 30 consecutive calendar days in duration.

5.7.3    If an employee cannot be restored to active work status by the end of the thirtieth day on furlough, the employee shall be laid off and the pay and/or notice provisions as specified within HRMP 213, Section 4.2.5 shall take effect.

## 6. BENEFITS DURING LEAVE OF ABSENCE

6.1    During a Leave of Absence Without Pay for thirty calendar days or less, service, vacation and sick leave benefits continue to accrue. If the Leave of Absence Without Pay extends beyond thirty calendar days, service, vacation and sick leave benefits will not accrue beyond the thirtieth calendar day of the leave, except as required by the provisions of Section 5.3 above, describing military leave, rights and responsibilities, or as otherwise required by applicable state or local law.

6.2    CSC contributions to an employee's medical, dental, life insurance and prescription drug programs, shall cease on the date the Leave of Absence Without Pay begins, except that, in the event of a medical leave, CSC shall continue to pay the Company's contribution up to one calendar year from the effective date of the leave. CSC may permit employees to continue in such benefit programs during the Leave of Absence Without Pay, provided:

6.2.1    The employee makes timely payment to CSC of both the company and employee's contributions; and

A-199