# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE POLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-217 (GMS) |
| | ) | |
| COMPUTER SCIENCES CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**APPENDIX TO DEFENDANT'S REPLY TO PLAINTIFF'S ANSWERING
BRIEF TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Sarah E. DiLuzio (#4085)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, Delaware 19801
(302) 984-6000 (general)
(302) 984-6048 (direct)
(302) 658-1192 (fax)
sdiluzio@potteranderson.com

Of counsel:
Larry R. Seegull
Amy Beth Leasure
DLA PIPER RUDNICK GRAY CARY US LLP
6225 Smith Avenue
Baltimore, Maryland 21209
(410) 580-3000 (general)
(410) 580-4253 (direct)
(410) 580-3253 (fax)
larry.seegull@dlapiper.com

Counsel for Defendant
*Computer Sciences Corporation*

Date: June 8, 2005

**TABLE OF CONTENTS**

**Appendix Pages**

Excerpts of Transcript of Deposition of Diane Poland.....................................…….....C1 to C10

Excerpts of Transcript of Deposition of Dawn Dworsky......................................C11-C14

*Jones v. City of Wilmington*, 2004 WL 1534778 (D. Del. June 14, 2004)....................C15-C20

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                    )
                                 )
              Plaintiff,         )
                                 )       Civil Action
v.                               )       No. 04-217 (GMS)
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
              Defendant.         )


          Deposition of DIANE POLAND taken pursuant
to notice at the law offices of Potter, Anderson &
Corroon, 1313 North Market Street, The Hercules Plaza,
Sixth Floor, Wilmington, Delaware, beginning at 9:10 a.m.
on Wednesday, March 30, 2005, before Kathleen White
Palmer, Registered Merit Reporter and Notary Public.


APPEARANCES:

          JEFFREY K. MARTIN, ESQUIRE
          KERI L. WILLIAMS, ESQUIRE
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware  19806
             for the Plaintiff

          LARRY R. SEEGULL, ESQUIRE
          AMY BETH LEASURE, ESQUIRE
          DLA PIPER RUDNICK GRAY CARY LLP
             6225 Smith Avenue
             Baltimore, Maryland  21209-3600
             for the Defendant


----------------------------------------------------
                WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477




WILCOX & FETZER LTD.
Registered Professional Reporters



C-01

Diane Poland                                                  213

1      A.    Because I was told to.

2      Q.    That was a real project; correct?

3      A.    Yes.

4      Q.    It was important work?

5      A.    Yes.

6      Q.    Were you the only one that got to work on the

7   Dazel manual?

8      A.    Yes.

9      Q.    Were you able to do the work on the Dazel

10   manual?

11      A.    Yes.

12      Q.    Did you have the skills to write this Dazel

13   manual?

14      A.    Yes.

15      Q.    Did anybody else have the skills to write this

16   Dazel manual?

17      A.    I don't know.

18      Q.    Do you know if other people had projects they

19   were working on?

20      A.    I don't know.  I guess so.  I don't know.

21      Q.    Do you know what the other people were working

22   on when you were working on the Dazel manual?

23      A.    No.

24      Q.    Do you know anything about the performance of

Diane Poland                                214

ther employees in Dawn Dworsky's group?

A.    No.

Q.    How long did it take you to write the Dazel manual?

A.    I don't remember, but it took me more than a month.

Q.    Did it take you six months?  Did it take you --

A.    I don't believe it took me six months.  I don't recall how long it took, but I don't think it took six months.

Q.    How long was the manual?

A.    I don't know.  I don't remember.

Q.    So you went to a meeting with Mike Suman and Dawn Dworsky and complained that your engineering projects were not complete?

A.    No.  They called me into a meeting.

Q.    Okay.

A.    And told me.

Q.    That's when they assigned you the Dazel manual?

A.    Yes.

Q.    Did you have any other conversations with Dawn Dworsky or Mike Suman about this manual?

A.    At some point Dawn sent an e-mail to myself and I forget the other person's name, she had someone read

Diane Poland    -    217

1    Q.    Anything else you can recall about this manual?

2    A.    No.

3    Q.    You weren't offended that you were asked to work

4  on this important manual, were you?

5    A.    I wasn't offended, no.

6    Q.    Have we talked about all of your conversations

7  with Dawn, or was there anything else that you remember?

8    A.    I don't know.  There was so many.  It's possible

9  we've talked about them all and it's possible we missed

10  some.

11    Q.    Let's just go through it again.

12          You talked about the performance of

13  appraisal conversations; correct?

14    A.    Correct.

15    Q.    You told me everything you remember about the

16  conversations about salary?

17    A.    Yes.

18    Q.    You've told me everything you remember about the

19  conversations related to expectations?

20    A.    Everything that I can remember.

21    Q.    And promotion?

22    A.    Yes.

23    Q.    You've told me everything you can remember about

24  the conversations related to the Dazel manual?

Diane Poland

275

1   weekly basis from your paid leave bank?

2       A.   I don't know.

3       Q.   Do you remember that Dawn Dworsky told you you

4   were free to ask coworkers to assist you on the Dazel

5   manual project?

6       A.   No, I don't.

7       Q.   You're not denying that she said that?

8       A.   No.

9       Q.   Do you remember that she told you she would

10  assign you to a new engineering project as soon as one of

11  the projects became available?

12      A.   I believe she did say that at some point, yes.

13      Q.   It is within management's discretion to

14  determine which employees are assigned to which projects?

15          MR. MARTIN:   Objection.

16      A.   I think so.  I don't know.

17      Q.   Do you know that Mike Suman and Dawn Dworsky

18  assigned the DDE project to Audrey Daigger while you were

19  out on leave?

20      A.   I think so.  I don't remember.

21      Q.   And that when you returned, didn't they tell you

22  that they couldn't reassign you to this project because

23  the client had been working with Ms. Daigger and they

24  wanted to continue to work with her?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

C-05

Diane Poland                                    276

A.    No.

Q.    They never told you about that?

A.    No.

Q.    You're not denying that they said that?

A.    No, I'm not.

Q.    Do you know of any other projects that were
available for you to work on other than the Dazel manual?

A.    I don't recall them, but there were several I
was assigned to at the time.

Q.    But do you recall any other projects that were
available that you could have worked on other than the
manual?

A.    To my knowledge, there were others, but I don't
remember the names of them.

Q.    Even though you worked on this manual, your
benefits didn't change?

A.    No.

Q.    Your salary didn't change?

A.    No.

Q.    You would agree that management has the right to
assign projects in accordance with what it deems best or
in the client's interest?

        MR. MARTIN:  Objection.

A.    I don't know.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

C-06

Diane Poland                    306

Q.    Who is "they"?

A.    MaryAnne, Randy, and Dawn.

Q.    You don't know what they were talking about?

A.    I don't recall, no.

Q.    What happened?

A.    And Randy did a gesture and Dawn made a joke and that was it.  And there was no discussion.

Q.    The gesture that Randy did was what?

A.    Just something like that (demonstrating).  I don't remember the whole gesture.

Q.    He took his fingers to his nose?

A.    Yes.

Q.    And just put them at his nose?

A.    Yes.

Q.    Just laid them underneath his nose?

A.    Yes.

Q.    On his upper lip?

A.    Somewhere around there.

Q.    He didn't say anything?

A.    He said something, but I couldn't hear him. Dawn heard him.

Q.    So you don't know what he said?

A.    I don't know what he said.

Q.    You're saying Dawn then made a joke?



Diane Poland                                            307

1    A.    Yes.

2    Q.    What was the joke she made?

3    A.    I didn't hear it.

4    Q.    Did you hear anything she said?

5    A.    No.

6    Q.    Did this have any reference to you?

7    A.    I believe so, but I don't know.

8    Q.    Why do you believe it had a reference to you?

9    A.    Because it was just us present at the present

10   time and no one there told me what it was.

11   Q.    So nobody told you what they were laughing

12   about?

13   A.    That's correct.

14   Q.    You didn't hear it, so you didn't know what they

15   were laughing about?

16   A.    That's correct.

17   Q.    But you figured because they're all laughing, it

18   must be about me?

19   A.    At the time, yes.

20   Q.    Do you still believe that?

21   A.    Yes.

22   Q.    So he writes here:  "'Everyone laughed, I too,

23   because I didn't get it.  Later when I realized what she

24   meant, I was offended by the fact they were making a joke

**W&F**

**WILCOX & FETZER LTD.**                        C-08

Registered Professional Reporters

Diane Poland                          308

of my perfume and body odor.'"

          You never said anything like that to

Dr. Rieger?

     A.   No, I did not.

     Q.   He made that up?

     A.   I don't know.  I guess he did.  I didn't write

it.

     Q.   You're not denying you said that to him?

     A.   I'm not denying it, but I don't recall ever

saying anything like that to him.

     Q.   But you might have, you might not have?

     A.   Might have, might not have.  I don't think I

did.

     Q.   Now, are you saying there was something racial

about this incident, or it was just personally offensive

because you weren't involved in the joke?

     A.   It was something offensive there, but I don't

know the joke.  I don't know what it was.

     Q.   So you don't know if it was racial or not?

     A.   I don't know.

     Q.   Let's go to the next incident, number 3.

          "Miss Poland charged that in several

meetings with human resources, Dawn and her manager,

people could not understand her reaction:  'what was



1  State of Delaware )
                     )
2  New Castle County )

3              CERTIFICATE OF REPORTER

4

5          I, Kathleen White Palmer, Registered Merit
   Reporter, do hereby certify that there came before me
6  the 30th day of March, 2005, the deponent herein, DIAN
   POLAND, who was duly sworn by me and thereafter examine
7  by counsel for the respective parties; that the questi
   asked of said deponent and the answers given were take
8  down by me in Stenotype notes and thereafter transcrib
   into typewriting under my direction.
9
           I further certify that the foregoing is a tru
10 and correct transcript of the testimony given at said
   examination of said witness.
11
           I further certify that reading and signing of
12 the deposition were waived by the deponent and counsel

13         I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.

15

16

17

18         _____

19         Kathleen White Palmer, RPR, RMR
           Certification No. 149-RPR
20         (Expires January 31, 2005)

21

22 DATED:   April 1, 2005
           _____
23

24

                    **W&F**
         WILCOX & FETZER LTD.                    C-10
          Registered Professional Reporters

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                    )
                                 )
            Plaintiff,           )
                                 )      Civil Action
v.                               )      No. 04-217 (GMS)
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
            Defendant.           )


            Deposition of DAWN M. DWORSKY taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 1:15 p.m. on Friday, May 6, 2005, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.


APPEARANCES:


        JEFFREY K. MARTIN, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19806
          for the Plaintiff

        LARRY R. SEEGULL, ESQUIRE
        DLA PIPER RUDNICK GRAY CARY LLP
          6225 Smith Avenue
          Baltimore, Maryland  21209-3600
          for the Defendant

ALSO PRESENT:


        DIANE POLAND

------------------------------------------------------
                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

C-11

Dawn M. Dworsky                                      44

E
X
H
I
B
I
T
S

1    A.    None.

2    Q.    Did she answer your question?

3    A.    Yes.

4    Q.    How did she answer your question?

5    A.    That she didn't know the answer to my question

6    because it was different in different churches.

7    Q.    There was another allegation made about a smell

8    that you had detected.  Do you recall that?

9    A.    One of the desktop engineers -- I sat on the row

10   of cubicles on the other side of the wall -- came to me

11   and told me they smelled something burning.  As a

12   manager, it's my job to try and find out where the

13   burning was coming from.  To do that, I needed to walk

14   the rows of the cubicles to try and see if we could

15   identify where the burning was coming from.

16   Q.    Did you?

17   A.    Yes.

18   Q.    Where did it come from?

19   A.    There was a cord in between the cubicle walls

20   that was burning.

21   Q.    Do you recall that you discussed that issue with

22   someone from HR on that particular day?

23   A.    No, I did not.

24   Q.    Did you later discuss this issue with someone



WILCOX & FETZER LTD.
Registered Professional Reporters

C-12

Dawn M. Dworsky    -                45

1  from HR?

2       A.    What's "later"?

3       Q.    Any day after when this occurred.

4       A.    Yes.

5       Q.    With whom did you speak?

6       A.    Sonia.

7       Q.    Did you ever talk with Diane about this issue?

8       A.    No.

9       Q.    You've stated that your relationship with Dian

10  did change after this performance review was initiated;

11  correct?

12      A.    Yes.

13      Q.    Tell me, please, how it changed.

14      A.    She, from that point on, wouldn't communicate

15  with me at all.  Now, if I asked her a question or tall

16  to her directly, she would be polite and she would spe;

17  But she isolated herself.

18      Q.    So if Diane were to testify that it was you tl

19  isolated her, you would disagree with that?

20      A.    Yes.

21      Q.    You've testified that she would not communica

22  with you unless you spoke with her directly?

23      A.    Yes.

24      Q.    Did you have any type of e-mail contact with

**W&F**

72

E
X
H
I
B
I
T
S

State of Delaware )

                  )

New Castle County )

### CERTIFICATE OF REPORTER

       I, Kathleen White Palmer, Registered Merit Reporter and Notary Public, do hereby certify that there came before me on the 6th day of May, 2005, the deponent herein, DAWN M. DWORSKY, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed into typewriting under my direction.

       I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

       I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

Kathleen White Palmer, RPR, RMR
Certification No. 149-RPR
(Expires January 31, 2008)

DATED: May 13, 2005

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

C-14

Westlaw.

Not Reported in F.Supp.2d
2004 WL 1534778 (D.Del.)
(Cite as: 2004 WL 1534778 (D.Del.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
David L. JONES, Plaintiff,
v.
CITY OF WILMINGTON, et al., Defendants.
No. Civ.A. 00-952-KAJ.

June 14, 2004.

J. Michael Johnson, Maron & Marvel, P.A., Wilmington, Delaware, for plaintiff.

Rosamaria Tassone, City of Wilmington Law Department, Wilmington, Delaware, for defendants City of Wilmington, Wilmington Police Department, James Jubb, Michael Boykin, Rita Crowley, Nancy Dietz, and Martin Donohue.

Seth Jason Reidenberg, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, for defendant Robert Fox.

MEMORANDUM OPINION

JORDAN, J.

I. Introduction

*1 Presently before me is a motion for summary judgment by defendants the City of Wilmington, the Wilmington Police Department ("WPD"), Sergeant Robert Fox ("Sgt.Fox"), Captain James Jubb ("Cpt.Jubb"), Chief Michael Boykin ("Chief Boykin"), Captain Rita Crowley ("Cpt.Crowley"), Captain Nancy Dietz ("Cpt.Dietz"), and Captain Martin Donohue ("Cpt.Donohue") (collectively "Defendants") on plaintiff David L. Jones' ("Plaintiff") lawsuit for racial discrimination. (D.I. 104; the "Motion"). Because Plaintiff brings this action pursuant to 42 U.S .C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"), I have jurisdiction over this case pursuant to 28 U.S.C. § § 1331 and 1343. For the reasons that follow, the Motion will be granted.

II. Background

The procedural history and factual background of this case are set forth in a Memorandum Opinion dated January 8, 2004 and will not be repeated here. (D.I.95.) Rather, the facts pertinent to the Motion are incorporated below.

In that earlier Memorandum Opinion, the Defendants' motion for summary judgment on Plaintiff's unlawful discrimination and retaliation claim under Title VII and 42 U.S.C. § 1983 was denied without prejudice because the Defendants withheld discovery from Plaintiff that was essential to a fair consideration of the Plaintiff's claims. Specifically, the Defendants withheld Office of Professional Standards ("OPS") files of "thirty-seven officers charged and/or convicted of dishonesty and/or inaccurate reporting ... [,] information regarding camera room assignments ... [,][and] information regarding officers who attended training while serving punishment for a dishonesty conviction." (D.I. 95 at 20.) I held that without these OPS files, Plaintiff did not have a fair opportunity to meet his burden of establishing a *prima facie* case of race discrimination and retaliation under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). (D.I. 95 at 23.) Accordingly, I also granted a motion by the Plaintiff to compel the production of the thirty-seven OPS files. (*Id.* at 24; D.I. 94.) Having produced the OPS files to Plaintiff, the Defendants now renew their motion for summary judgment against Plaintiff. (D.I.104, 105.)

III. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1534778 (D.Del.)
**(Cite as: 2004 WL 1534778 (D.Del.))**

530 U.S. 133, 150 (2000).

**\*2** To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:

> do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

IV. Discussion

A. The *McDonnell Douglas* test for establishing a *prima facie* case of discrimination

The United States Supreme Court in *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), set forth a three-step burden shifting analysis for Title VII and § 1983 racial discrimination claims. *See St. Mary's Honor Society v. Hicks*, 509 U.S. 502, 506 n.1 (1983) (stating that the *McDonnell Douglas* framework applies to both Title VII and § 1983 discrimination claims). First, the plaintiff has the initial burden of establishing a *prima facie* case of racial discrimination. *See McDonnell Douglas*, 411 U.S. at 802. This is done by showing that the plaintiff: 1) is a member of a protected class; 2) was qualified for the position; 3) suffered an adverse job action; and 4) was treated differently than employees who are not members of his protected class. *King v. City of Philadelphia*, Civ. A. No. 99-6303, 2002 WL 1277329 at \*9 (E.D. Pa. June 4, 2002) (applying the *McDonnell Douglas* test to a race discrimination claim by a police officer who was terminated from employment), *aff'd* by 2003 WL 1705967 (3d Cir. Apr. 1, 2003); *see also Weldon v. Kraft*, 896 F.2d 793, 797 (3d Cir.1990). Whether the plaintiff has established a *prima facie* case of discrimination is a question of law for the court. *Sarullo v. United States Postal Service*, 352 F.3d 789, 798 (3d Cir.2003).

If the plaintiff establishes a *prima facie* case of racial discrimination, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802. "The employer satisfies its

burden of production by introducing evidence which, if taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). If the employer meets its "relatively light" burden by articulating a legitimate reason for the employment decision, the burden shifts back to the plaintiff to show "by a preponderance of the evidence" that the nondiscriminatory reason offered by the employer was a mere pretext for racial discrimination. *See id.* (citing *McDonnell Douglas*, 411 U.S. at 802).

**\*3** In his complaint, Plaintiff advances a disparate treatment theory of discrimination, contending that the Defendants discriminated, harassed, and retaliated against him because he is African-American. (D.I. 1 at ¶ ¶ 98-123). Specifically, Plaintiff asserts that his disciplinary proceeding, his assignment to the camera room, and his lack of training opportunities demonstrate that he was treated more harshly than white and Hispanic police officers, and thus that he is the victim of racial discrimination. [FN1] (*Id.*) The Third Circuit has stated that "[a] disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated" on the basis of race. *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir.1990).

> FN1. The Plaintiff has since backed away from his assertion that he has been treated differently than Hispanic officers would have been. (*See* n.3, *infra*, and associated text.)

The Defendants argue that Plaintiff "was not treated differently than white or Hispanic police officers with respect to the charges brought against him or the penalty imposed upon him," and "is not similarly situated to the white and Hispanic officers with whom Plaintiff seeks to compare himself in his Complaint and deposition." (D.I. 105 at 9.) The Defendants assert that those officers were not similarly situated to Plaintiff because, unlike Plaintiff, they were not charged with multiple acts of dishonesty and deception. [FN2] (*Id.* at 27.) Moreover, the Defendants claim that those other dishonesty and inaccurate reporting cases involved different OPS investigators, different OPS supervisors, different complaint board members, and different appeal hearing board members. (*Id.* at 28.) According to the Defendants, "Plaintiff cannot prove intentional racial discrimination when different decisionmakers are involved." (*Id.*) (Citing *Timms v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 3
2004 WL 1534778 (D.Del.)
(Cite as: 2004 WL 1534778 (D.Del.))

*Frank, 953 F.2d 281, 287 (7th Cir.1992)* (holding that "it is difficult to say that the differen[t] [treatment] was more likely than not the result of intentional discrimination when two different decisionmakers are involved").) Therefore, the Defendants claim that Plaintiff has not established a *prima facie* case of discrimination under the fourth prong of the *McDonnell Douglas* test.

> FN2. In Plaintiff's Answering Brief to the Defendants' first motion for summary judgment, Plaintiff claimed that he is similarly situated to other white officers involved in single incidents of dishonesty because, even though he was charged with multiple counts of dishonesty, his course of conduct involved only a single set of events, in effect a single incident. (D.I. 75 at 16.)

**B. The cases involving allegedly "similarly situated" white officers**

Plaintiff argues that eight of the disciplinary files produced by the Defendants involve similarly situated white [FN3] officers and African-American officers "which establish disparate treatment between black and white officers in terms of the number of charges brought and the severity of the penalties imposed." (D.I. 112 at 12-13.) I disagree.

> FN3. Regarding the treatment of Hispanic police officers, Plaintiff states that "[s]uffice it to say that the dishonesty charges involving Hispanic officers are too few in number and too factually distinct to be probative on whether race played a role in disciplinary outcomes. Barring objection by the City, plaintiff would agree to an Order striking references to Hispanics from the pleadings." (D.I. 112 at 7.)

1. Case # 92-752 involved two white male WPD police officers who were off-duty, and had been drinking, when they went to an area frequented by prostitutes, supposedly to converse with them. (D.I. 106 at A-1.) While the officers were speaking to one of the prostitutes in the parking lot of a diner, a New Castel County ("NCC") police officer appeared. (*Id.*) Upon seeing the NCC police car, the WPD officers drove off. (*Id.*) Believing the WPD officers had been soliciting prostitutes, the NCC officer pulled the off-duty WPD officers over. (*Id.*) The WPD officers identified themselves as police and stated that they were speaking to a possible confidential informant in relation to a drug investigation. (*Id.*)

*4 The NCC officer released the WPD officers, but reported the incident to his superior. (*Id.* at A-2.) The NCC police department contacted the WPD about the situation and an internal investigation ensued. (*Id.*) The WPD officers admitted they lied to the NCC officer "to avoid any further embarrassment." (*Id.* at A-11.) Both officers were charged with one count of dishonesty and one count of associating with known criminals. (*Id.* at A46- 56.) Finding no evidence that the WPD officers intended to solicit the prostitutes for sex, the NCC police department did not charge the officers criminally. (*Id.*) The officers received a fifteen day suspension for the dishonesty charge and a two day suspension for the associating with known criminals charge. (*Id.*)

2. Case # 92-676 involved a white male police officer who was scheduled to be working an extra duty job at an apartment building when he was seen by a supervisor at the police station signing up for another extra-duty job. (*Id.* at A-57.) When the supervisor questioned why the officer was at the police station when he should have been at the apartment building, the officer stated that he had permission to leave his assignment by the apartment manager. (*Id.*) The matter was investigated and the apartment manager denied giving the officer permission to leave his assignment. (*Id.*) The officer was charged and found guilty on one count of dishonesty and one count of failure to properly patrol. (*Id.* at A-74.) As a result, the hearing board imposed a fifteen day suspension for the dishonesty conviction and issued a written reprimand for failing to properly patrol. (*Id.*) On appeal, the officer's dishonesty conviction was reversed and the conviction for failure to patrol was affirmed. (*Id.* at A-76.)

3. In Case # 01-092, the hearing board directed OPS to investigate a white male police officer for dishonesty as a result of an inconsistency in the officer's testimony during a hearing. (*Id.* at A-78-83.) Because three individuals verified the underlying facts surrounding the officer's statement, the case was dismissed as a misunderstanding. [FN4] (*Id.*)

> FN4. Plaintiff argues that "there was no penalty on the underlying issue or 'misunderstanding.'" (D.I. 112 at 4.)

4. Case # 95-688 and # 95-400 involved a white female police officer. (*Id.* at A-197-217.) The officer called in sick and reported that she had injured her hand in a door. (*Id.*) It was later discovered that the injury was a result of a physical confrontation with a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1534778 (D.Del.)
(Cite as: 2004 WL 1534778 (D.Del.))

Page 4

married man with whom she was having a relationship. (*Id.*) When questioned, the officer admitted she lied because she was embarrassed about the situation. The officer was charged with one count of dishonesty, but, the matter was later dismissed. (*Id.*) According to the Defendants, "the matter was later dismissed because of confidential information received from the officer's doctor." [FN5] (D.I. 105 at 12.)

> FN5. The Plaintiff disputes this characterization of the dismissal, saying "the record establishes that the matter was dismissed due to the officer's 'embarrassment.'" ' (D.I. 112 at 4.)

5. Case # 91-381 involved a white male police officer. (D.I. 107 at A-444-- 452.) The officer called in sick after his supervisor denied his previous request to take that day off. (*Id.* at A-447.) After calling in sick, the officer twice left his residence without reporting the change in his location to the WPD, as required by departmental regulations. (*Id.* at A-448.) When questioned, the officer stated that his supervisor condoned taking a sick day periodically even when not actually ill. (*Id.*) The supervisor denied ever making the statement. (*Id.*) The officer was charged with one count of dishonesty and one count of violating the WPD sick leave policy. (*Id.* at A-450.) The OPS was also investigating another possible violation of the dishonesty directive by this officer that was unrelated to that matter. (*Id.* at A-452.) However, the officer resigned prior to a hearing on the charges. (*Id.*)

*5 6. In Case # 02-092, a white female police officer submitted a crime report under the wrong case number and failed to complete several reports in a timely manner. (D.I. 110 at A-1610.) The hearing board found the officer guilty of one count of inaccurate reporting and three counts of failing to submit reports on time. (*Id.* at A-1620-1628.) The hearing board imposed a five day suspension for the inaccurate report and a twelve day suspension for the remaining charges. [FN6] (*Id.*)

> FN6. The Plaintiff argues that there was one "clear" instance of dishonesty in this case and possibly more, yet no dishonesty was charged. (D.I. 112 at 13.) However, in this case review of the record belies the assertion that this case clearly involved dishonesty. (D.I. 110 at A-1610.)

7. Case # 02-385 involved a white male police

officer. (*Id.* at A-1723- 1799.) The officer advised the Assistant United States Attorney` ("AUSA") prosecuting a case in which he was a witness that he would be unavailable for a suppression hearing because of a previously scheduled vacation. (*Id.* at A-1723.) The AUSA thus requested a continuance from the judge, who granted the continuance, but asked for verification of the officer's vacation plans. (*Id.* at A-1724.) When the AUSA advised the officer of the judge's request, the officer stated that he would be available for the hearing. (*Id.* at A-1725.) Upon further questioning, the AUSA discovered that the officer would have returned from his vacation prior to the hearing and was scheduled to work the night shift on the day of the hearing. (*Id.*) Because of the officer's false statement, which raised concerns about his credibility, the AUSA dismissed the case. (*Id.*) The officer was charged with a single count of dishonesty and his employment was terminated. [FN7] (*Id.* at A-1745.)

> FN7. The Plaintiff points out that there is some evidence in the record that the officer was also dishonest during the internal investigation, but was charged with only one count of dishonesty. (D .I. 112 at 6; *see also* D.I. 110 at 1729.) However, under a new directive which requires dismissal of an officer for a single conviction of dishonesty, it appears that any subsequent dishonesty charges would have been moot. (D.I. 105 at 14.)

8. In Case # 98-742, a white male probationary police officer was involved in an off-duty automobile accident. (*Id.* at A-1931-2042 .) The officer had been drinking and struck the curb with his vehicle, which damaged the tires. (*Id.* at A-1932.) The officer used profane language when addressing an Amtrak police officer who was present at the time. (*Id.*) Moreover, the officer was with a friend who had been convicted of a felony crime. (*Id.*) The Amtrak officer reported the accident. (*Id.*) After an investigation, the officer was charged with one count of violating the Standards of Conduct, one count of rude and insulting language, one count of failure to report an off-duty accident, and one count of associating with known criminals. (*Id.* at A-1943-1946.) The officer plead guilty to all charges with the exception of associating with known criminals. (*Id.* at A-1950.) The officer received a ten day suspension for each of the charges except associating with known criminals because that charge was found to be unsubstantiated. (*Id.*) In addition to what amounted to a thirty day suspension, the officer's probationary status was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1534778 (D.Del.)
(Cite as: 2004 WL 1534778 (D.Del.))

Page 5

extended another year. (*Id.*)

A review of the foregoing OPS cases demonstrates the weakness in Plaintiff's assertion that he and the white officers with whom he seeks to compare himself are similarly situated. In order to be similarly situated, the individuals with whom a plaintiff seeks to be compared must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Anderson v. Haverford College*, 868 F.Supp. 741, 745 (E.D.Pa.1994). In this case, as the Defendants accurately explain, Plaintiff was charged with multiple counts of dishonesty, while the officers referenced in the disciplinary files were only charged with one count of dishonesty. Any difference in the charging decisions is at least as plausibly connected to the specific facts of each case as it is to the race of the officers involved. Those cases thus do not provide a basis for concluding that the leveling of multiple dishonesty charges against Plaintiff was out of keeping with the charging practices that the WPD had followed in other cases. There is simply no evidence that the Defendants "piled on" charges or elevated the charges against the Plaintiff because the Plaintiff is African-American. [FN8]

> FN8. To the extent Plaintiff is also attempting to argue that cases from the OPS files show that African-American officers are generally treated less favorably in disciplinary proceedings than white officers, (see D.I. 112 at 13-14), his claim still fails. The issue presented is whether, in the specific context of people similarly situated, "others not in the protected class were treated more favorably." *See Weldon*, 896 F.2d at 797 (a plaintiff must show that "others not in the protected class were treated more favorably"). Generalizations about racial distinctions are not pertinent to that question, particularly when, as in this case, the complainant has admitted that there is no policy by the City to discriminate against African-American officers. (*See* D.I. 75 at 21.)

*6 Finally, Plaintiff does not rebut the Defendants' claim that the decision makers in several of the disciplinary cases were not the same as the decision makers in Plaintiff's case. Because Plaintiff has not shown that he is similarly situated to the white officers with whom he seeks to compare himself, and the individual Defendants were not the same as the decision makers in many of the cases that Plaintiff cites, I hold that Plaintiff has not demonstrated that he was treated differently than similarly situated white officers. Accordingly, Plaintiff has failed to satisfy his burden of establishing a *prima facie* case of race discrimination with respect to internal WPD disciplinary proceedings.

C. Camera room assignment and training opportunities

With respect to Plaintiff's assignments to the camera room, the Defendants argue that Plaintiff cannot establish a *prima facie* case of discrimination because this assignment does not constitute an adverse employment action under *McDonnell Douglas*. (D.I. 105 at 30) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988) (holding that "conduct must be extreme to amount to a change in the terms and conditions of employment"). The Defendants claim that officers assigned to the camera room

> were not exposed to the elements, did not work late night hours, did not experience a reduction in salary or benefits and were afforded regular meal breaks. The position did not involve skills which exceeded Plaintiff's capabilities. The position did not involve any onerous requirements. The assignment simply entailed monitoring a camera and keeping a log of certain activity observed on the camera. Further, Plaintiff's assignment to the camera room was not a permanent transfer, merely temporary.

(D.I. 105 at 31.) Therefore, the Defendants argue, Plaintiff's assignment to the camera room does not amount to an adverse employment action. (*Id.*) Plaintiff does not even address these claims in his Answering Brief. (D.I.112.) Because unrebutted evidence and argument supports the Defendants' position that Plaintiff's assignment to the camera room does not constitute an adverse employment action, Plaintiff has not established a *prima facie* case of discrimination or retaliation based on that assignment.

Regarding his claim that he was discriminated against because of a lack of training opportunities, Plaintiff asserts that from his first full year on the force to the year of the incident in question, 1998, he averaged 53 hours a year in training. (D.I. 112 at 11.) By contrast, in 1999, Plaintiff attended 16 hours of training, 34.5 in 2000, and 13 in 2001. (*Id.*) However, Plaintiff has not offered any evidence that Plaintiff requested to attend a training program and was denied such an opportunity while he was on modified duty. Plaintiff also does not state who denied his

Not Reported in F.Supp.2d
2004 WL 1534778 (D.Del.)
(Cite as: 2004 WL 1534778 (D.Del.))

Page 6

requests for training, if any such requests were denied, and there is no evidence that any of the named Defendants refused a request by Plaintiff for training. Accordingly, Plaintiff has not met his burden of showing that any lack of training opportunities was the consequence of or amounted to discrimination.

V. Conclusion

*7 For the reasons set forth herein, the Motion (D.I.104) will be granted. An appropriate order will issue.

### ORDER

For the reasons set forth in the Memorandum Opinion issued in this case today,

IT IS HEREBY ORDERED that the Defendants' motion for summary judgment (D.I.104) is GRANTED.

2004 WL 1534778 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:00CV00952 _____ (Docket) (Nov. 14, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**C-20**