**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DIANE POLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-217 (GMS) |
| | ) | |
| COMPUTER SCIENCES CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S PROPOSED PRETRIAL ORDER

Sarah E. DiLuzio (#4085)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, Delaware 19801
(302) 984-6000 (general)
(302) 984-6279 (direct)
(302) 658-1192 (fax)
sdiluzio@potteranderson.com

Of counsel:
Larry R. Seegull
DLA PIPER RUDNICK GRAY CARY US LLP
6225 Smith Avenue
Baltimore, Maryland 21209
(410) 580-3000 (general)
(410) 580-4253 (direct)
(410) 580-3253 (fax)
larry.seegull@dlapiper.com

Counsel for Defendant
*Computer Sciences Corporation*

Date: September 19, 2005

This draft Pretrial Order, and its attached schedules, was prepared by Defendant, without contribution by Plaintiff, with the exception of Schedules A and B. Plaintiff intends to file a motion to request that Plaintiff be permitted to postpone filing any other matter required on her part for the Pretrial Order, until after the Court has ruled upon Defendant's Motion for Summary Judgment, which is currently pending before the Court. (D.I. 40.) Defendant has agreed that it will not oppose Plaintiff's motion, provided, however, that Defendant is not prejudiced in any manner thereby, and that Defendant does not waive the right to object to any portion of Plaintiff's pretrial submission (including, but not limited to, any exhibit or witness identified therein) and/or to supplement Defendant's pretrial order and/or attached schedules in response thereto.

This matter having come before the court at a pretrial conference held pursuant to Fed. R. Civ. P. ("Rule") 16, and Jeffrey K. Martin, Esquire, Margolis Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware 19806, (302) 777-4680, having appeared as counsel for Plaintiff, and Sarah E. DiLuzio, Esquire, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, P.O. Box 951, Wilmington, Delaware 19801, (302) 984-6279 and Larry R. Seegull, Esquire, DLA Piper Rudnick Gray Cary US LLP, 6225 Smith Avenue, Baltimore, Maryland 21209, (410) 580-4253, having appeared as counsel for Defendant, the following actions were taken:

(1)     Statement of the Action

    (a)     Plaintiff's Statement

        None at this time.

(b)    Defendant's Statement

This is an action for race discrimination based upon Plaintiff's purported failure to receive a promotion based on the fact that Randall Miller was promoted and she was not; retaliation based upon her termination from employment; an Equal Pay Act claim based on the fact that men allegedly were paid more than women in the group in which Plaintiff was working; and a claim for a purported breach of the implied covenant of good faith and fair dealing based upon the discrimination and retaliation that Plaintiff claims she suffered. Jurisdiction of the court is invoked under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e)-(5)(f)(1), 29 U.S.C. § 206(d), and 42 U.S.C. § 1981. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Jurisdiction is not disputed.

(2)    The following stipulations and statements were submitted and are attached to and made a part of this Order.

(a)    A comprehensive stipulation or statement of all uncontested facts, which will become a part of the evidentiary record in the case (and which, in a jury trial, may be read to the jury by the Court or any party).

- *See* Schedule (a) – Defendant's Proposed Stipulation of All Uncontested Facts, attached hereto at Tab A.

- Plaintiff's Proposed Stipulation of All Uncontested Facts: none at this time.

(b)    An agreed statement or statements by each party of the contested issues of fact and law and a statement or statements of contested issues of fact or law not agreed to;

- Plaintiff's Statement or Statements of the Contested Issues of Fact and/or of Law: none at this time.

- *See* Defendant's Schedule (b) – Contested Issues of Fact and Law, attached hereto at Tab B.

(c)    Except for rebuttal exhibits, schedules in the form set out in the attached Schedule (c) of;

   (1)    all exhibits (all exhibits shall be marked for identification before trial), including documents, summaries, charts and other items expected to be offered in evidence. *See* the following Schedules, attached hereto at Tab C:

- Schedule (c)(1)(1).    Plaintiff's    Exhibits    Without Objections:

   None at this time.

- Schedule (c)(1)(2).    Plaintiff's Exhibits With Defendant's Objections:

   None at this time.

- Schedule (c)(1)(3).    Defendant's    Exhibits    Without Objections:

   *See* Attached Schedule.

- Schedule (c)(1)(4).    Defendant's Exhibits With Plaintiff's Objections:

   None at this time. Accordingly, at this time, there are no exhibits to which Plaintiff has objected to deliver to the Court, as set forth in the Court's form of final pretrial order at Schedule (c) n.2-3, so as to permit rulings *in limine* where possible.

   (2)    Any demonstrative evidence and experiments to be offered during trial;

4

- *See* Schedule (c) (2) Defendant's Demonstrative Evidence, attached hereto at Tab C. Plaintiff has no objections at this time.

- Plaintiff's Demonstrative Evidence:  none at this time.

(d)    A list or lists of names and addresses of the potential witnesses to be called by each party, with a statement of any objections to calling, or to the qualifications of, any witnesses identified on the list.

- *See* Schedule (d) Defendant's Potential Witnesses, attached hereto at Tab D.  Defendant reserves the right to call any rebuttal witnesses, any witnesses identified on Plaintiff's witness list and such document custodians as may be necessary without prior notice.  Plaintiff has no objections at this time.

- Plaintiff's Potential Witnesses:  none at this time.

(e)    Stipulations or statements setting forth the qualifications of each expert witness in such form that the statement can be read to the jury at the time the expert witness takes the stand.

- Not applicable.  No expert witnesses have been designated in this case by either Plaintiff or Defendant.

(f)    A list of all depositions, or portions thereof, to be read into evidence and statements of any objections thereto;

- *See* Schedule (f) – Defendant's Designation Of Deposition Testimony To Be Read Into Evidence, attached hereto at Tab F. Plaintiff has submitted no objections at this time.

- Plaintiff's Designation of Deposition Testimony to Be Read Into Evidence:  none at this time.

(g)    An itemized statement of special damages;

- *See* Schedule (g) – Defendant's Statement of Special Damages, attached hereto at Tab G.

- Plaintiff's Statement of Special Damages:  none at this time.

(h)    Waivers of any claims or defenses that have been abandoned by any party;

- *See* Schedule (h) – Defendant's Statement of Waivers of Any Claims or Defenses Abandoned by Any Party, attached hereto at Tab H.

- Plaintiff's Statement of Waivers of Any Claims or Defenses Abandoned by Any Party:  none at this time.

(i) For a jury trial, each party shall provide the following:

    (i) trial briefs except as otherwise ordered by the Court;

- Plaintiff's Trial Brief:  none at this time.

- *See* copy of Trial Brief of Defendant Computer Sciences Corporation, attached hereto at Tab I (i).

    (ii) three sets of marked proposed jury instructions, verdict forms, and special interrogatories, if any;  and

- *See* Defendant's Proposed Jury Instructions, attached hereto at Tab I (ii).

- Plaintiff's Proposed Jury Instructions:  none at this time.

- *See* Defendant's Proposed Special Verdict Form, attached hereto at Tab I (iii).

- Plaintiff's Proposed Verdict Form or Special Interrogatories:  none at this time.

    (iii) a list of questions the party requests the court to ask prospective jurors in accordance with Fed. R. Civ. P. 47(a) and D. Del. LR 47.1(a);

- *See* copy of Defendant's Proposed Voir Dire, attached hereto at Tab I (iv).

- Plaintiff's Proposed Voir Dire:  none at this time.

(j) For a non-jury trial, each party shall provide proposed *Findings of Fact and Conclusions of Law* in duplicate.

- Not applicable.

6

(k)     A statement summarizing the history and status of settlement negotiations, indicating whether further negotiations are ongoing and likely to be productive;

- *See* Schedule (k) History and Status of Settlement Negotiations, Defendant's Statement, attached hereto at Tab K.

- Plaintiff's Statement of History and Status of Settlement Negotiations:  none at this time.

(l)     A statement that each party has completed discovery, including the depositions of expert witnesses (unless the court has previously ordered otherwise).  Absent good cause shown, no further discovery shall be permitted.

- *See* Schedule (l) A Statement That Each Party Has Completed Discovery Including the Depositions of Expert Witnesses, Defendant's Statement, attached hereto at Tab L.

- Plaintiff's Statement That Each Party Has Completed Discovery Including the Depositions of Expert Witnesses:  none at this time.

(m)     All Motions *in Limine*:  no party shall file more than ten (10) motions *in limine* without prior approval of the court.   In accordance with this Court's October 18, 2004 Scheduling Order, briefs (opening, answering, and reply) on all such motions shall be filed by October 7, 2005.  Opening and answering briefs shall not exceed five (5) pages and reply briefs shall not exceed three (3) pages. The parties should submit an original and two (2) copies.

- Defendant intends to file several Motions in Limine, which shall be filed by October 7, 2005, in accordance with the Scheduling Order.

(3)     Trial of this case is expected to take four (4) days.

(4)     *[Indicate the type of trial by placing an X in the appropriate box]*

Jury    ☒            Non-Jury    ☐

7

(5)     The Defendant recommends that nine jurors be selected at the commencement of trial.  Plaintiff has submitted no recommendation at this time.

(6)     This Order will control the course of the trial and may not be amended except by consent of the parties and the court, or by order of the court to prevent manifest injustice.

(7)     Possibility of settlement of this case was considered by the parties.


_____
United States District Judge



Respectfully submitted by,

POTTER ANDERSON & CORROON LLP

By: _Sarah E. DiLuzio_____
     Sarah E. DiLuzio (#4085)
     1313 North Market Street
     6th Floor, P.O. Box 951
     Wilmington, Delaware  19801
     (302) 984-6279
     (302) 658-1192 (fax)
     sdiluzio@potteranderson.com

     Of counsel:
     Larry R. Seegull
     DLA PIPER RUDNICK GRAY
         CARY US LLP
     6225 Smith Avenue
     Baltimore, Maryland  21209
     (410) 580-4253
     (410) 580-3253 (fax)
     larry.seegull@dlapiper.com

     *Counsel for Defendant*
     *Computer Sciences Corporation*

Dated:  September 19, 2005
699448

8

# SCHEDULE A

# Uncontested Facts

### Schedule (a)

### Defendant's Proposed Stipulation of All Uncontested Facts

The following statements of fact are agreed to be true between the parties:

1. Computer Sciences Corporation ("CSC") is one of the world's leading information technology (IT) service companies, and provides outsourcing of IT services.

2. CSC hired Plaintiff as an at-will employee on November 5, 1997.

3. Plaintiff initially was hired as a help desk technician, Member Technical Staff B ("MTSB").

4. The normal chain of promotion within CSC is: from MTSB to Member Technical Staff A ("MTSA"), and, ultimately, to Senior Member Technical Staff ("SMTS").

5. When CSC hired Plaintiff, the Company offered her a starting annual salary of $41,000, which was $6,000 to $8,000 more than Plaintiff's annual salary at her previous job. Plaintiff considered this to be a fair starting salary.

6. As a help desk technician, Plaintiff was responsible for responding to calls regarding technical problems encountered by the customer, such as issues with printers, servers, and the desktop itself.

7. While in her role as a help desk technician, Plaintiff received a raise on May 16, 1998, and her annual salary was increased to $42,025. On May 15, 1999, Plaintiff received another raise, thereby increasing her salary to $43,118 annually. Plaintiff also received bonuses during this time period.

8.  On October 2, 1999, Plaintiff transferred from her position at the help desk to a position as a technical service analyst in the Managed Print and Dazel ("MPD") group. Plaintiff considered this move to be a promotion.

9.  Plaintiff's new supervisor in the MPD group was Edwin Derek Alston.

10.  Plaintiff worked in the Dazel subgroup of the MPD group, and provided "second level" e-mail, facsimile and print support to CSC's clients.

11.  Dazel is a sophisticated software application that allows a computer to communicate with a printer, facsimile machine, or e-mail service, and guarantees delivery. Dazel runs on the UNIX operating system. The UNIX platform is a complex computer program with numerous command codes that require proficient knowledge, expertise and skill of the operating system.

12.  In her position in the MPD group, Plaintiff was expected to be able to perform command line programming in UNIX.

13.  On May 13, 2000, Mr. Alston promoted Plaintiff from MTSB to Member Technical Staff A ("MTSA"). Contemporaneously, Plaintiff also received a $4,000 raise, thereby increasing her salary from $43,118 to $46,996.98.

14.  In May 2000, CSC implemented a business restructuring, and, as a direct result, Dawn Dworsky replaced Mr. Alston as manager of the MPD group, and became Plaintiff's new supervisor.

15.  Despite the change in supervision, Plaintiff's duties did not change in any way.

16.  In March 2001, Plaintiff applied for a transfer and reassignment to the position of Leverage Server Administration Supervisor, which was a position outside the

MPD group. This position would have provided Plaintiff with additional responsibility because it was a supervisory position.

17. At that point in time, Beth Musumeci held the position for which Plaintiff applied, and was responsible for hiring into the job because she was transitioning to a new position.

18. Ms. Musumeci conducted an interview of Plaintiff for the supervisory position.

19. Despite the fact that Plaintiff had no supervisory experience at that time, Ms. Musumeci believed Plaintiff displayed capability for the position and decided to offer her the job.

20. Although the position was not a promotion for Plaintiff because it was an MTSA-level position, Ms. Musumeci chose to offer Plaintiff a 6% salary increase because the position involved additional responsibilities. This offer was well within the applicable salary range recommended by Human Resources for the position.

21. Ms. Musumeci's second offer of an 8% salary increase was still too low in Plaintiff's estimation, and she rejected the second offer. Plaintiff thus remained in her position with the MPD group at that time.

22. Previously, Plaintiff also had received a "3" in her annual performance appraisals for the period of April 1997 to March 1998, and for the period of April 1998 to March 1999, and Plaintiff had no complaint about those two evaluations.

23. CSC considers its employees for merit salary increases at the time the annual performance evaluations are conducted.

24. With respect to employees who were rated a "3" during the 2001 evaluation and salary review period, as Plaintiff did, the Overall Merit Guidelines recommended a salary increase of between 0-4%.

25. In approximately June 2001, Plaintiff received her performance review from Ms. Dworsky for the April 1, 2000 through March 31, 2001 time period.

26. In the Spring of 2001, the only person Ms. Dworsky promoted to an SMTS was MaryAnne Doll-Johnson.

27. At the time of Ms. Doll-Johnson's promotion to SMTS, she had both more years of relevant experience with the UNIX operating system and had been an MTSA for a longer period of time than Plaintiff.

28. In her meetings with Plaintiff, Ms. Summers thoroughly explained the salary increase process to Plaintiff, and that Plaintiff's salary was consistent with her peers and that she received a higher salary increase than recommended under the Guidelines.

29. Plaintiff filed a charge of discrimination with the Delaware Department of Labor on July 5, 2001.

30. The meetings between Plaintiff, Ms. Dworsky, Ms. Koplowicz and Ms. Summers regarding Plaintiff's performance appraisal took place at a point in time shortly before and after Plaintiff filed her charge.

31. In the Summer of 2001, because she was still upset about not being promoted, Plaintiff requested assistance from Ms. Summers and Ms. Koplowicz to be transferred out of the MPD group and into another position with CSC. Plaintiff

also met with or spoke to Ms. Dworsky, Mike Suman (Ms. Dworsky's supervisor) and Leanne Thomas (another Human Resources Manager) regarding this request.

32. In response to Plaintiff's request, Ms. Koplowicz, Ms. Summers and Ms. Dworsky spoke with various managers on Plaintiff's behalf regarding open positions for her transfer.

33. In early 2002, Ms. Summers, on Plaintiff's behalf, contacted Jennifer Miller at the help desk about an open position.

34. The position would have been a lateral move, and Plaintiff would have been able to maintain her then-current salary. Ms. Poland also would have been able to maintain her then-current schedule of working 30 hours per week, as an accommodation to her medical condition.

35. Ms. Miller and Plaintiff discussed the open position, and Ms. Miller offered her the position. Plaintiff, however, rejected Ms. Miller's offer. Accordingly, Plaintiff remained in the MPD group.

36. When Plaintiff had first started with the MPD group, she was on friendly terms with all of her co-workers in her group.

37. At that time, Plaintiff considered at least one of her co-workers, MaryAnne Doll-Johnson, to be her mentor, and even recommended Ms. Doll-Johnson for an award, claiming that she was able to accomplish her Dazel training with her assistance. Plaintiff also socialized on occasion with Ms. Doll-Johnson outside of work.

38. CSC maintains a Leave of Absence Without Pay Policy ("Leave Policy"). CSC's Leave Policy, provides, in relevant part: "A Medical Leave of Absence Without

Pay may be granted for up to thirty calendar days and may be extended for successive periods of up to thirty calendar days for up to a total of twelve consecutive months upon presentation of a physician's statement, and CSC's verification as it deems appropriate…. A certificate of disability from the attending physician is required every thirty days from the date the medical leave is commenced. Any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation…."

39.  CSC granted Plaintiff's request for leave, and counseled her both orally and in writing about her obligations and responsibilities during the time she was out on medical leave, including her duty to provide a medical certification every thirty (30) days to the Benefits Office.

40.  Plaintiff returned from her medical leave on August 22, 2001.

41.  Shortly thereafter, however, Plaintiff took another full-time medical leave of absence on August 27, 2001 through September 10, 2001.

42.  On September 11, 2001, Plaintiff returned to work and presented a medical certification allowing her to return to work, but restricting her to a 30-hour workweek.

43.  CSC accommodated Plaintiff's request by providing Plaintiff with a 30-hour reduced work schedule, and designated the remaining ten (10) hours as FMLA leave.

44.  Subsequent to September 11, 2001, Plaintiff continued to work a reduced schedule until she returned to a full-time medical leave of absence on February

21, 2002. Plaintiff remained on a full-time leave of absence until September 27, 2002.

45. Although, under the terms of its Policy, CSC could have designated Plaintiff's first such omission to constitute a voluntary separation from employment, CSC did not do so. Rather, CSC provided Plaintiff with numerous chances to comply with its Leave Policy, and gave Plaintiff countless written and telephonic reminders about her responsibilities under the Policy and warnings regarding the potential consequences she would suffer if she continued to fail to comply.

46. The decision to terminate Plaintiff following what CSC believed to be her voluntary resignation was made by Sonia Koplowicz and Maureen Summers.

47. In July 2002, Plaintiff had been out on full-time medical leave for five months, since February 2002.

48. In the Summer of 2002, Randall Miller had been an MTSA for nearly five (5) years, and consistently had performed well in his position.

49. When Plaintiff went out on medical leave in February 2002, she only had been an MTSA for less than two (2) years.

50. On one occasion during Plaintiff's employment with CSC, Ms. Dworsky posed an inquiry to a group of employees while Plaintiff was present regarding church practices after she visited an African-American church with her African-American babysitter.

51. Plaintiff reported the comment to Ms. Summers in Human Resources, who, in turn, reported the comment to her supervisor, Ms. Koplowicz.

52.

53. Between July 2001 (when Plaintiff filed her charge of discrimination) and September 2002 (when Plaintiff was terminated), there were four individuals who performed engineering work in the Dazel subgroup: Plaintiff, Audrey Daigger, MaryAnne Doll-Johnson and Randall Miller.

54. During this period of time, MaryAnne Doll-Johnson was the highest paid member of the Dazel subgroup, earning an annual salary of $64,518.90.

55. In the Summer of 2002, Plaintiff only had been employed by CSC for five years.

# SCHEDULE B

# Contested Facts

## Schedule (b)

### Contested Issues of Fact and Law

An agreed statement or statements by each party of the contested issues of fact

and law and a statement or statements of contested issues of fact or law not agreed to.

#### Plaintiff's Statement of Contested Issues of Fact

None at this time.

#### Defendant's Objections to Plaintiff's Proposed Contested Issues of Fact

Should Plaintiff be permitted to provide a statement of Proposed Contested Issues of Fact at a later point in time, Defendant reserves the right to submit objections to such a statement.

#### Defendant's Statement of Contested Issues of Fact

Defendant reserves the right to modify the following submission, based upon the Court's ruling on the pending summary judgment motion and/or in the interests of justice.

Currently pending before the Court is Defendant's Motion for Summary Judgment, filed May 6, 2005, which has been fully briefed (D.I. 40, 42, 54, 56.) Defendant continues to believe that no genuine issues of material fact are in dispute, and that, accordingly, summary judgment is appropriate. However, certain nonmaterial issues of fact exist, and are summarized below.

1.   Did Ms. Dworsky make a racially derogatory comment when she asked a question about the cultural practices of African American churches?

2.   Did Dawn Dworsky and Randall Miller put their hands to their noses to infer there was a smell and laugh, and, if so, were they laughing about Plaintiff?

3.   If the answer to question two is in the affirmative, was their action taken with racial bias, and was it racially offensive?

4.   Was Ms. Dworsky's comment regarding a smell related to a burning electrical cord?

5.    After Plaintiff returned from her initial leave of absence, was writing a technical manual the only project available for Plaintiff to work on?

6.    Was Plaintiff excluded from communications?

7.    Did Ms. Dworsky begin to scrutinize and criticize Plaintiff's work and isolate her from the rest of the MPD group after Plaintiff voiced her complaints to Ms. Dworsky regarding her performance appraisal?

8.    Did Ms. Dworsky have any input in determining the amount of the salary increase offers that Beth Musumeci made to Plaintiff for the position of leverage server administration supervisor in the chemical group in March 2001?

9.    Did Ms. Dworsky not like the fact that Plaintiff applied for the leverage server administration supervisor position?

10.    Did Ms. Dworsky advise Plaintiff that she would receive a salary adjustment because her salary was unfairly and unjustly disproportionate to other members of the team?

11.    During her employment with CSC, did Plaintiff received an increase in salary every year?

12.    Plaintiff had never programmed in UNIX until she transferred to the MPD group.  Thus, Plaintiff did not even begin to learn to program in UNIX until after she transferred to the MPD group on October 2, 1999.

13.    At the time of Plaintiff's May 2000 promotion, Mr. Alston told Plaintiff that she should not expect another promotion any time soon based on time in her new position, and that she would have much to learn in order to succeed at her new level of MTSA.

14.    In March 2001. Ms. Dworsky informed Plaintiff that she would not "hold [her] back" if she wanted to seek the supervisory position of Leverage Server Administration Supervisor.

15.    Plaintiff turned down the offer of a position as Leverage Server Administration Supervisor at a 6% salary increase and informed Ms. Musumeci that she demanded a 36% salary increase.

16.    Ms. Musumeci was shocked by this counter-offer, believing it excessively high, particularly given the fact that Plaintiff had no supervisory experience.

17.    Ms. Musumeci provided Plaintiff with a second offer for the position, this time for an 8% salary increase.

18.    In May 2001, Ms. Dworsky completed an annual performance evaluation of Plaintiff for the period of April 1, 2000 through March 31, 2001, in which she rated Plaintiff a "3" or "good", indicating that Plaintiff's performance "consistently meets expectations and job requirements."

19.    In 2001, CSC's Human Resources department issued annual Overall Merit Guidelines ("Guidelines"), which designated the recommended merit percent increase an employee should receive based on his or her evaluation rating. The Guidelines also limited the percent of the workforce population that could receive a particular rating. If a supervisor wanted to diverge from these Guidelines, approval had to be obtained from management and Human Resources.

20.    Ms. Dworsky desired to reward what she perceived to be Plaintiff's good effort and performance for her first year as an MTSA by providing Plaintiff with a 5% salary increase.

21.    Because Ms. Dworsky wanted to provide Plaintiff with a salary increase above the recommended Guidelines, Ms. Dworsky obtained approval from management and Human Resources, and Plaintiff received a 5% salary increase.

22.    Despite the fact that Plaintiff received a "good" evaluation and a merit salary increase above the recommended Guidelines, Plaintiff was displeased with both her evaluation and salary increase. Plaintiff also was upset that she was not promoted to SMTS in May 2001, despite the fact that she had only held the position of MTSA for one year at that time.

23.    When Ms. Dworsky met with Plaintiff to discuss her appraisal, Ms. Dworsky told Plaintiff that she was on the right career path and should continue doing the type of work that she was doing.

24.    Ms. Dworsky advised Plaintiff that she did not promote Plaintiff at that time because Plaintiff did not yet have the requisite skill set or expertise to be an SMTS. For instance, she did not yet have the expertise to work with the UNIX operating system at a senior

level. She also told Plaintiff that she would have to demonstrate the ability to lead projects independently, work independently with the client, mentor and train others, improve her decision-making capabilities, and independently manage a "category one" program before she could be promoted.

25. In Spring of 2001, Plaintiff believed that Ms. Doll-Johnson deserved to be promoted at the time. Ms. Doll-Johnson had more UNIX experience and more time in the MTSA position than Plaintiff did.

26. The promotion of Ms. Doll-Johnson instead of Plaintiff was in no way discriminatory.

27. Despite Ms. Dworsky's explanation to Plaintiff regarding her performance appraisal, Plaintiff remained dissatisfied, and, thus, arranged several meetings to discuss her performance appraisal with Ms. Dworsky, Maureen Summers (Human Resources Specialist) and Sonia Koplowicz (Senior Human Resources Manager).

28. During these meetings, Plaintiff informed these individuals that she wanted to be promoted to SMTS, even though she had been promoted only one year earlier. Ms. Dworsky again explained why she rated Plaintiff as she did.

29. Ms. Summers and Ms. Dworsky also explained that Plaintiff was not ready for a promotion to SMTS at that time because of her limited time in her current position (only one year) and because she did not have the necessary level of expertise and skill in UNIX, among other factors.

30. In Summer of 2001, Plaintiff put a number of limitations on the types of positions that she would consider. For instance, she informed Human Resources that she would not take a position that involved UNIX support, travel, or a rotational shift. She also stated that she needed a position with part-time hours due to her medical condition. Plaintiff, however, knew that CSC was then in a downsizing mode, and, accordingly, there were few open positions.

31. Ms. Koplowicz informed Plaintiff that CSC was committed to helping Plaintiff locate another position within CSC, and, thus, CSC managers worked very closely with Plaintiff towards this goal.

32. At times, however, Plaintiff failed to follow through when managers and/or HR staff attempted to assist her to find another position.

33. For instance, on several occasions, Plaintiff failed to provide Ms. Koplowicz with requisition numbers for the positions for which Plaintiff had an interest, even though Ms. Koplowicz informed Plaintiff that she needed such information in order to assist Plaintiff by contacting the relevant managers in charge of filling the positions in question.

34. As a result of CSC managers' efforts to assist Plaintiff to find another position, Plaintiff was offered transfers into several other positions, all of which Plaintiff declined to pursue. For instance, during August of 2001, Plaintiff expressed interest in a position in the Applications Interconnect Services ("AIS") group under the supervision of Dahl Landers.

35. Ms. Dworsky contacted Ms. Landers on Plaintiff's behalf and recommended Plaintiff to Ms. Landers. Based upon Ms. Dworsky's recommendation, Ms. Landers scheduled two interviews with Plaintiff during August 2001. Plaintiff, however, stood Ms. Landers up for both interviews, and never provided Ms. Landers with any explanation.

36. Subsequently, in November 2001, Ms. Dworsky, on Plaintiff's behalf, again spoke with Ms. Landers regarding another open position in the AIS group.

37. Ms. Landers was hesitant to give Plaintiff consideration after her failure to appear for the previous interviews, but Ms. Dworsky eventually convinced Ms. Landers to give Plaintiff another opportunity to apply.

38. Accordingly, on November 26, 2001, Ms. Dworsky met with Plaintiff to discuss the AIS opportunity.

39. Soon thereafter, Ms. Landers sent Plaintiff a link to the applicable job posting. Despite the facts that open positions at CSC were very limited at that time and that Plaintiff was purportedly so anxious to transfer out of the MPD group, Plaintiff failed to follow through with Ms. Landers, and never submitted an application for the position.

40. When she first started with the MPD group, Plaintiff often asked her co-workers for assistance with problems or questions that she

had with her job duties, and they all willingly assisted Plaintiff with her problems.

41. However, after Plaintiff's meetings with Ms. Dworsky, Ms. Koplowicz and Ms. Summers in the Summer of 2001 regarding her performance appraisal and after Plaintiff filed her charge of discrimination, Plaintiff began to isolate herself from the other members of the MPD group.

42. For instance, Plaintiff began to refuse to speak to her team members and she refused all invitations to join them for lunch.

43. In fact, Plaintiff's purposeful isolation and refusal to communicate with co-workers became so uncomfortable and tense that one team member, Ms. Doll-Johnson, contacted Human Resources for advice on how to alleviate the stressful work situation that Plaintiff created.

44. On August 6, 2001, Plaintiff requested and was granted a full-time medical leave of absence due to stress.

45. CSC's Leave Policy places no affirmative duty on CSC to remind employees of their obligations under the policy. Further, under the explicit terms of the policy, an employee may be deemed to have resigned upon his or her first failure to provide a timely medical certification.

46. On August 14, 2001, Plaintiff acknowledged her obligations under the Leave Policy. Plaintiff specifically acknowledged that her "employment with CSC will be subject to termination if I fail to provide Human Resources with a doctor's certificate on a monthly basis." Accordingly, Plaintiff was well aware of her obligations to provide a medical certification every thirty days during her medical leave of absence.

47. She also knew that her failure to comply with this obligation would give CSC the right to terminate her employment, and that CSC could have terminated her employment on the first occasion that she failed to provide timely certification.

48. After Plaintiff returned from her initial medical leave of absence, she was assigned to write a technical manual. The technical manual was an important project for the MPD group, and Plaintiff was not offended by the assignment. Further, Plaintiff did not receive any change in salary or benefits as a result of being assigned to this project.

49.   In direct violation of her obligations under CSC's Leave Policy, Plaintiff repeatedly and consistently failed to submit timely medical certifications to CSC every thirty (30) days while she was on leave.

50.   Plaintiff first violated CSC's Leave Policy by failing to submit a timely medical certification in December 2001, when she submitted her medical certification nearly two weeks late.

51.   Although not required under CSC's Leave Policy, Simmie Osborn, CSC Service Center Representative, called, e-mailed and sent letters to Plaintiff on numerous occasions to remind her that her medical certification was either coming due or was delinquent.

52.   Maureen Summers also reminded Plaintiff several times in writing of her obligations under the Leave Policy, and the potential consequences for her failure to submit certifications.

53.   Plaintiff specifically was warned in writing several times that a failure to provide a timely medical certification could be considered a voluntary resignation under the Leave Policy. In fact, she was told in writing on at least the following occasions that a failure to provide timely medical documentation would be grounds for termination: August 14, 2001, February 25, 2002, May 21, 2002, and June 20, 2002.

54.   Despite all of these warnings, Plaintiff failed to provide timely medical documentation on more than four separate occasions.

55.   On June 21, 2002, CSC received a certification from Plaintiff's medical provider dated June 14, 2002, which stated that Plaintiff may "be able to return to work within the next two to three months." Thus, at the very latest, Plaintiff was required under CSC's Leave Policy to provide an updated medical certification to CSC by September 14, 2002.

56.   Despite the numerous written and oral warnings Plaintiff received regarding her obligation to provide timely medical certifications and specifying the consequences for a failure to do so, Plaintiff did not provide an updated medical certification by that date.

57.   Therefore, in accordance with its Leave Policy, CSC determined that Plaintiff's failure to submit a timely medical certification constituted a voluntary resignation on Plaintiff's part, and terminated her employment effective September 27, 2002.

58. CSC acted in compliance with its Leave Policy when it terminated Plaintiff's employment.

59. Plaintiff was not terminated from CSC until September 27, 2002, nearly fifteen months after she filed her July 5, 2001 charge of discrimination. Plaintiff did not engage in any other protected activity between July 5, 2001 and September 27, 2002.

60. CSC has terminated other similarly-situated employees, who had not previously filed charges of discrimination, based on their failures to provide requisite medical certifications related to their medical leaves of absence in accordance with CSC's Leave Policy. For instance, CSC terminated both Aliza Panitz (Caucasian female) and Monte Moser (Caucasian male) due to their failure to provide requisite medical certifications related to their medical leaves of absence in accordance with CSC's Leave of Absence policy.

61. Ms. Dworsky did not consider Plaintiff for a promotion in July 2002 because, according to CSC's standard practice and policy, employees on an extended medical leave of absence are not considered eligible for promotion. In accordance with this policy and practice, Ms. Dworsky has never promoted any employee while the employee was out on medical leave.

62. However, even though Ms. Dworsky did not consider Plaintiff for a promotion in July 2002 because she was ineligible due to her leave status, Ms. Dworsky did not believe that Plaintiff had sufficient UNIX experience, time in her MTSA role or other skills to warrant a promotion to SMTS at that time.

63. In the Summer of 2002, Randall Miller had over ten (10) years of practical, tenured UNIX experience and possessed the necessary expertise and competencies for the SMTS position. Specifically, Ms. Dworsky believed, in her business judgment, that Mr. Miller was qualified for the SMTS position because he demonstrated the ability to work independently on important technical projects without direct supervision, provide technical direction and guidance to others, handle various tasks involving a variety of computer programs; deal with issues related to outages on the network, independently manage a "category one" problem, was skilled in advanced troubleshooting, and that he possessed strong decision-making capabilities.

64. Ms. Dworsky did not believe that Plaintiff possessed these same skills.

65. In February of 2002, Plaintiff had only been programming in UNIX for about two (2) years and had not reached the level of competency that is required of an SMTS, in Ms. Dworsky's business judgment.

66. Before Plaintiff could qualify for an SMTS position, Ms. Dworsky believed that Plaintiff still needed to further progress to the point that she could work more independently on important technical projects without direct supervision, improve her troubleshooting skills, improve her decision-making capabilities, demonstrate the ability to provide technical direction and guidance to others, demonstrate the ability to deal with issues related to outages on the network, demonstrate the ability to independently manage a "category one" problem, and demonstrate increased proficiency in the UNIX operating system.

67. Ms. Dworsky's question regarding church practices was not asked in a disrespectful manner and was simply directed to cultural practices of an African-American church. Plaintiff did not show offense at the time, and never informed Ms. Dworsky that she was offended by the comment.

68. Ms. Summers and Ms. Koplowicz questioned Ms. Dworsky about the statement, who admitted to asking about the cultural practices of an African-American church but denied she meant it in a disrespectful manner. Ms. Koplowicz advised Ms. Dworsky that, although she genuinely intended to inquire about a specific practice, she must be careful with her statements because some statements may be misconstrued or taken out of context.

69. On one occasion while Plaintiff was employed in the MPD group, one of the desktop engineers reported to Ms. Dworsky that they smelled something burning. In response, Ms. Dworsky walked through the rows of cubicles to determine the source of the burning smell. She discovered that there was a cord in between the cubicle walls that was burning.

70. Even though Plaintiff claims that she witnessed Ms. Dworsky and Mr. Miller make gestures of putting their hands to their noses to infer that they smelled something and laughed, Plaintiff (1) did not hear what was said; (2) never learned what was said; (3) does not know whether it was about her; and (4) does not know whether it was racial in nature.

71. Randall Miller and MaryAnne Doll-Johnson received higher salaries than Plaintiff, in part, because of their experience and

longevity with the Company, based upon their CSC service dates. The "CSC Service Date" refers to the length of time that an employee has worked either directly for CSC or DuPont, one of CSC's largest customers, and a predecessor employer for many of CSC's employees.

72.    In the Summer of 2002, both Mr. Miller and Ms. Doll-Johnson had been employed with CSC and its predecessor DuPont for 18 years each.

73.    Mr. Miller and Ms. Doll-Johnson gradually had earned a higher salary over the time period in which they were employed by CSC and DuPont.

74.    At the time Plaintiff was terminated from CSC, her annual salary was $49,345.92. Plaintiff found employment in September 2003, approximately one year after her termination from CSC, at a comparable salary and with comparable benefits to what she was receiving from CSC at the time she was terminated. In 2004, Plaintiff received an annual compensation of $49,258.35. Thus, Plaintiff almost completely mitigated her loss of employment.

**Plaintiff's Statement of Contested Issues of Law**

None at this time.

**Defendant's Objections to Plaintiff's Proposed Contested Issues of Law**

Should Plaintiff be permitted to provide a statement of Proposed Contested Issues of Law at a later point in time, Defendant reserves the right to submit objections to such a statement.

**Defendant's Statement of Contested Issues of Law**

Defendant reserves the right to modify the following submission, based upon the Court's rulings on the pending summary judgment motion and/or in the interests of justice.

Currently pending before the Court is Defendant's Motion for Summary Judgment, filed May 6, 2005, which has been fully briefed. (D.I. 40, 42, 54, 56.)

Defendant also intends to file motions in limine with this Court in accordance with the Scheduling Order. Defendant intends that such motions will include, but not be limited to, the following:

- Motion in Limine to Preclude Evidence or Argument Regarding Determinations of the Equal Employment Opportunity Commission and the Delaware Department of Labor;

- Motion in Limine to Preclude Evidence or Argument Regarding Emotional Distress;

- Motion in Limine to Preclude Evidence or Argument Regarding Purported Isolation in the Workplace, Purported Unfair Scrutiny and/or Criticism of Work, and Regarding Fact That Plaintiff Was Assigned to Work on Training Manual Because All Fail to Rise to the Level of an Adverse Employment Action;

- Motion in Limine to Preclude Damages for a Purported Failure to Promote Because Plaintiff Was on Unpaid Medical Leave When Randall Miller Was Promoted to Senior Member of Technical Staff Position;

- Motion in Limine to Preclude Evidence or Argument Regarding Plaintiff's Contention that On One Occasion, Dawn Dworsky and Randall Miller Put Their Hands to Their Noses to Infer There Was a Smell and Laughed;

- Motion in Limine to Preclude Evidence or Argument Regarding Dawn Dworsky's Purported Statement Regarding Cultural Practices in African-American Churches;

- Motion in Limine to Exclude Claim for Backpay During Period of Time in which Plaintiff Was on a Medical Leave of Absence.

In addition, Defendant submits the following contested issues of law:

1.    Has Plaintiff proven by a preponderance of the evidence a *prima facie* case for discrimination?

2.    Has Plaintiff met her burden of proving by a preponderance of the evidence that CSC made a final decision not to promote Plaintiff?

3.    Has Plaintiff met her burden of proving by a preponderance of the evidence that the decision not to promote Plaintiff was because of Plaintiff's race?

4.    If so, does a preponderance of the evidence demonstrate that CSC would have decided not to promote Plaintiff regardless of her race?

5.    Has Plaintiff proven by a preponderance of the evidence a *prima facie* case for retaliation?

6.    Has Plaintiff met her burden of proving by a preponderance of the evidence that CSC terminated Plaintiff because she filed a charge of discrimination?

7.    If so, does a preponderance of the evidence demonstrate that CSC would have terminated Plaintiff even if she had not filed a charge of discrimination but had still failed to properly submit medical certifications?

8.    Has Plaintiff met her burden of proving by a preponderance of the evidence that CSC paid Plaintiff less than male workers for equal work in jobs that required substantially equal skill, effort and responsibility, and that were performed under similar working conditions?

9.    Does a preponderance of the evidence demonstrate that the wage differential between male and female workers, if one exists, was based on any factor other than sex?

10    Does a preponderance of the evidence demonstrate that CSC willfully violated the Equal Pay Act, meaning that CSC knew that its conduct was prohibited by law or showed reckless disregard for the law?

11.    Has Plaintiff met her burden of proving by a preponderance of the evidence that CSC harbored ill will towards Plaintiff, that CSC intended to cause harm to Plaintiff, that CSC committed acts of deceit, fraud or misrepresentation towards Plaintiff, and that all such acts resulted in her discharge from employment or her lack of promotion?

12.    Does a preponderance of the evidence demonstrate that the damages Plaintiff claims are speculative?

13.    Does a preponderance of the evidence demonstrate that Plaintiff was harmed by the breach of the implied covenant of good faith and fair dealing?

14.    Has Plaintiff proven by a preponderance of the evidence that she is entitled to punitive damages for any alleged wrongdoing?

15.    Did CSC prove by the preponderance of the evidence that Plaintiff did all she could to reduce or avoid any damages?

# SCHEDULE C (1)(1)

# Plaintiff's Exhibits

## Schedule (c)(1)(1)

### Exhibits

1.    The following exhibits were offered by Plaintiff, received in evidence and marked as indicated.

[State identification number and brief description of each exhibit.]

None at this time.

| Plaintiff's Exhibit Number | Description |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

# SCHEDULE C (1)(2)

# Plaintiff's Exhibits

### Schedule (c)(1)(2)

### Exhibits

2.  The following exhibits were offered by Plaintiff and marked for identification. Defendant objected to their receipt in evidence on the grounds stated:

[State identification number and brief description of each exhibit. Also state briefly the ground of objection, such as competency, relevancy or materiality, and the Fed. R. Evid. relied upon. Also state briefly Plaintiff's response to the objection with reference to the Fed. R. Evid. relied upon.]

None at this time.

| Plaintiff's Exhibit Number | Description | Defendant's Basis for Objection | Plaintiff's Response to Objection |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# SCHEDULE C (1)(3)

# Defendant's Exhibits

## Schedule (c)(1)(3)

### Exhibits

3.    The following exhibits were offered by Defendant, received in evidence and marked as indicated:

[State identification number and brief description of each exhibit.]

In addition to the exhibits listed below, Defendant reserves the right to use as an exhibit any pleading or written discovery response. Defendant also reserves the right to use as an exhibit any or all of the exhibits designated by Plaintiff as exhibits (subject to the objections to be filed by Defendant). Defendant also reserves the right to use such exhibits as are necessary for purposes of rebuttal.

| Defendant's Exhibit Number | Description |
|---|---|
| DX 1 | Plaintiff's application for employment to CSC |
| DX 2 | Plaintiff's certification of receipt for employee handbook |
| DX 3 | CSC Employee Handbook (1995 Edition) |
| DX 4 | CSC Employee Handbook (Revised January 1, 2002) |
| DX 5 | Salary report for Plaintiff for 1998 |
| DX 6 | Salary report for Plaintiff for 1999 |
| DX 7 | Salary report for Plaintiff for 2000 |
| DX 8 | Salary report for Plaintiff for 2001-02 |
| DX 9 | Job description for Member Technical Staff B |
| DX 10 | Job description for Member Technical Staff A |
| DX 11 | Job description for Senior Member Technical Staff |
| DX 12 | Plaintiff's performance appraisal for the period of April 1997 to March 1998 |
| DX 13 | Performance appraisal for the period of April 1998 through March 1999. |
| DX 14 | August 31, 1999 offer of transfer to Plaintiff |
| DX 15 | Plaintiff's performance appraisal for the period of April 2000 through March 31, 2001 |
| DX 16 | Overall Merit Guidelines |
| DX 17 | Ratings and Expectations for Field Engineering, Dazel |
| DX 18 | "Star Dust Award" for which Plaintiff recommended MaryAnne Doll-Johnson |

| | |
|---|---|
| DX 19 | September 14, 2001 e-mail from MaryAnne Doll-Johnson to Maureen Summers concerning the fact that Plaintiff was isolating herself from the group and would not speak to her team members |
| DX 20 | March 14, 2001 letter from Human Resources to Plaintiff regarding offer of reassignment to the chemical group for the position of leverage server administration supervisor. |
| DX 21 | March 20, 2001 letter from Human Resources to Plaintiff regarding offer of reassignment to the chemical group for the position of leverage server administration supervisor |
| DX 22 | August 21-23, 2001 e-mail chain between Sonia Koplowicz and Plaintiff regarding potential transfer |
| DX 23 | November 26, 2001 notes to file by Dawn Dworsky concerning Plaintiff's request to transfer |
| DX 24 | December 7, 2001 e-mail from Dahl Landers to Dawn Dworsky regarding position for which Plaintiff failed to interview |
| DX 25 | January 7, 2002 notes to file by Dawn Dworsky concerning Plaintiff's request to transfer |
| DX 26 | June 7, 2002 "Engineering Progression Promotion" document regarding Randall Miller's promotion to SMTS |
| DX 27 | Leave of Absence Without Pay Policy from the Computer Sciences Corporation Employee Handbook |
| DX 28 | CSC Human Resources Management Policy 247 Regarding Leave of Absence Without Pay |
| DX 29 | Plaintiff's August 6, 2001 request for medical leave |
| DX 30 | CSC policy entitled "Responsibilities While You Are On A Leave Of Absence: Medical Leave—FMLA Eligible" |
| | August 8, 2001 letter from Simmie Osborn (Hoeft) to Plaintiff regarding Plaintiff's rights under the Family and Medical Leave Act and explaining Plaintiff's |

| DX 31 | responsibilities under Company's leave policy. |
|---|---|
| DX 32 | October 30, 2001 physician's certification stating that Plaintiff was able to work reduced 30-hour per week work schedule and November 2, 2001 facsimile transmittal from Plaintiff to Simmie Osborn (Hoeft) |
| DX 33 | December 12, 2001 e-mail from Simmie Osborn (Hoeft) regarding Plaintiff's duty to submit updated medical certifications |
| DX 34 | December 3, 2001 physician's certification indicating that Plaintiff could return to work on December 4, 2001 to a reduced work schedule and December 13, 2001 facsimile transmittal from Plaintiff to Simmie Osborn (Hoeft) |
| DX 35 | January 2, 2002 physician's certification, providing that Plaintiff should be limited to a 30-hour workweek from December 31, 2002 through January 13, 2002 and can return to work fulltime on January 14, 2002 |
| DX 36 | January 4, 2002 e-mail correspondence between Simmie Osborn (Hoeft) and Plaintiff regarding Plaintiff's duty to submit an updated medical certification |
| DX 37 | January 24-25, 2002 e-mail correspondence between Simmie Osborn (Hoeft) and Plaintiff regarding Plaintiff's duty to submit updated medical certification |
| DX 38 | January 3, 2002 physician's certification, providing that Plaintiff should be limited to a 30-hour workweek from December 31, 2001 through January 31, 2002, and facsimile transmittal dated January 28, 2002 |
| DX 39 | January 30, 2002 physician certification providing that Plaintiff should be limited to a 30-hour workweek from February 1, 2002 through February 28, 2002, and February 7, 2002 facsimile transmittal |
| DX 40 | February 25, 2002 letter from Maureen Summers to Plaintiff regarding Plaintiff's obligations under the company's leave of absence policy |
|  | Letter from Dr. Berman to Simmie Osborn (Hoeft) recommending short-term disability for Plaintiff and February 26, 2002 facsimile |

| | |
|---|---|
| DX 41 | transmittal |
| DX 42 | March 18, 2002 e-mail from Simmie Osborn (Hoeft) to Plaintiff regarding Plaintiff's obligations under the Company's leave of absence policy |
| DX 43 | April 12, 2002 letter from Dr. Don Berman to Simmie Osborn (Hoeft) recommending that Plaintiff remain out of work until June 2002. |
| DX 44 | May 21, 2002 letter from Maureen Summers to Plaintiff regarding Plaintiff's duty to submit updated medical certifications |
| DX 45 | May 22, 2002 letter from Dr. Berman to Maureen Summers recommending that Plaintiff remain out of work until July 2002 |
| DX 46 | June 20, 2002 letter from Simmie Osborn (Hoeft) to Plaintiff regarding Plaintiff's duty to submit updated medical certifications and Federal Express shipping label |
| DX 47 | June 14, 2002 certification from Dr. Scott Houser regarding Plaintiff's medical condition and June 21, 2002 facsimile transmittal sheet to Simmie Osborn (Hoeft) |
| DX 48 | September 26, 2002 letter from Maureen Summers to Plaintiff regarding Plaintiff's voluntary separation from employment |
| DX 49 | September 29, 2002 facsimile of medical certification from Dr. Scott Houser regarding Plaintiff's medical condition |
| DX 50 | Delaware Industrial Accident Board Statement of Facts Upon Failure to Reach an Agreement |
| DX 51 | Plaintiff's W-2 form for 2003 |
| DX 52 | Plaintiff's W-2 tax form for 2004 |
| DX 53 | 2003 Unemployment Compensation Benefits Payments |
| DX 54 | Office of Workers' Compensation Receipts for Compensation Paid |
| DX 55 | Employee history report for Plaintiff |
| DX 56 | Employee history report for MaryAnne Doll-Johnson |
| DX 57 | Employee history report for Audrey Daigger |

# SCHEDULE C (1)(4)

# Defendant's Exhibits

## Schedule (c)(1)(4)

### Exhibits

4.    The following exhibits were offered by Defendant and marked for identification. Plaintiff objected to their receipt in evidence on the grounds stated:

[State identification number and brief description of each exhibit. Also state briefly the ground of objection, such as competency, relevancy or materiality, and the Fed. R. Evid. relied upon. Also state briefly Defendant's response to the objection, with reference to the Fed. R. Evid. relied upon.]

| Defendant's Exhibit Number | Description | Plaintiff's Basis for Objection | Defendant's Response to Objection |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# SCHEDULE C (2)
# Defendant's Demonstratives

### Schedule (c) (2)

### Defendant's Demonstrative Evidence

Defendant intends to use demonstrative exhibits at trial, including, but not limited to, those demonstrative exhibits identified below. Defendant will identify all demonstrative exhibits twenty-four (24) hours before they are to be used at trial. Defendant also specifically reserves the right to enlarge any and all of the exhibits designated in Schedule (c) (1), or to use any additional demonstrative exhibit.

| Defendant's Exhibit Number | Description | Plaintiff's Basis for Objection | Defendant's Response to Objection |
|---|---|---|---|
| | Chronology of events relevant to Plaintiff's claims. | | |
| | Organizational charts | | |
| | Enlargement of 2001 overall merit guidelines document. | | |
| | Chronology of correspondence and communications between Plaintiff and Defendant regarding Plaintiff's medical leave of absence. | | |
| | Charts detailing the comparative UNIX experience and time in MTSA position between Randall Miller and Plaintiff. | | |
| | Charts detailing the experience, time in position, and compensation of employees supervised by Dawn Dworsky. | | |
| | Enlargement of CSC Human Resources Management Policy 247 Regarding Leave of Absence Without Pay | | |

| | | | |
|---|---|---|---|
| | Enlargement of "Star Dust Award" for which Plaintiff recommended MaryAnne Doll-Johnson | | |
| | Enlargement of CSC correspondence with Plaintiff regarding her responsibilities under leave policy | | |

# SCHEDULE D

# Witnesses

## Schedule (d)

### Potential Witnesses

**Defendant's Witnesses***

- (W)   Edwin Derek Alston
  Computer Sciences Corporation
  500 Creekview Drive
  Newark, Delaware  19711

- (W)   MaryAnne Doll-Johnson
  Computer Sciences Corporation
  500 Creekview Drive
  Newark, Delaware  19711

- (W)   Dawn Dworsky
  Computer Sciences Corporation
  400 Commerce Drive
  Newark, Delaware  19713

- (M)   Billy Graham
  Computer Sciences Corporation
  45154 Underwood Lane
  Sterling, Virginia  20166

- (M)   Traci Hersey
  Computer Sciences Corporation
  45154 Underwood Lane
  Sterling, Virginia  20166

- (W)   Simmie Hoeft
  L-3 Titan Corporation
  11955 Freedom Drive
  Suite 12002
  Reston, Virginia  20190

- (W)   Sonia Koplowicz
  Computer Sciences Corporation
  400 Commerce Drive
  Newark, Delaware  19713

- (M)   Dahl Landers
  Computer Sciences Corporation
  400 Commerce Drive
  Newark, Delaware  19713

(M)     Jennifer Miller
        Computer Sciences Corporation
        500 Creekview Road
        Newark, Delaware  19711

(W)     Randall Miller
        Computer Sciences Corporation
        500 Creekview Road
        Newark, Delaware  19711

(M)     Beth Musumeci
        Computer Sciences Corporation
        400 Commerce Drive
        Newark, Delaware  19713

(M)     Edward Stewart
        Computer Sciences Corporation
        400 Commerce Drive
        Newark, Delaware  19713

(M)     Mike Suman
        Computer Sciences Corporation
        400 Commerce Drive
        Newark, Delaware  19713

(W)     Maureen Summers
        Computer Sciences Corporation
        400 Commerce Drive
        Newark, Delaware  19713

(M)     Leanne Thomas
        Computer Sciences Corporation
        400 Commerce Drive
        Newark, Delaware  19713

(M)     Paul White
        Computer Sciences Corporation
        500 Creekview Road
        Newark, Delaware  19711

* Defendant designated those witnesses who *will* be called in the absence of reasonable notice to opposing counsel to the contrary with a "W."  Defendant designated those witnesses who *may* be called as a possibility only with a "M."

# SCHEDULE F

# Deposition Designations

## Schedule (f)

**Defendant's Designation Of Deposition Testimony To Be Read Into Evidence**

| Description | Plaintiff's Basis for Objection | Defendant's Response to Objection |
|---|---|---|
| Defendant may use portions of Plaintiff's deposition transcript for impeachment purposes and/or seek to admit portions of Plaintiff's deposition transcript as a party admission. It is Defendant's understanding that because Plaintiff is a party, Defendant need not designate specific portions of her transcript. | | |

# SCHEDULE G

# Special Damages

## Schedule (g)

### Itemized Statement of Special Damages

**Plaintiff's Statement**

**Defendant's Statement**

Not applicable.

# SCHEDULE H

# Waiver

## Schedule (h)

### Waiver of Any Claims or Defenses Abandoned by Any Party

**Plaintiff's Statement**

**Defendant's Statement**

Plaintiff has waived her claim for Defendant's purportedly retaliatory failure to transfer Plaintiff. In her Opposition to Defendant's Motion for Summary Judgment, Plaintiff proffered no record evidence to support her claim for a retaliatory failure to transfer Plaintiff. Accordingly, such claim has been waived.

Plaintiff has waived her claim that she suffered retaliation through the form of purported unfair scrutiny and criticism by Dawn Dworsky. In her Opposition to Defendant's Motion for Summary Judgment, Plaintiff proffered no record evidence to support her claim for retaliation through alleged unfair scrutiny and/or criticism. Accordingly, such claim has been waived.

Plaintiff has waived her claim that she suffered retaliation because Dawn Dworsky purportedly isolated her from the rest of the Managed Print and Dazel group. In her Opposition to Defendant's Motion for Summary Judgment, Plaintiff proffered no record evidence to support her claim for retaliation through alleged isolation. Accordingly, such claim has been waived.