# SCHEDULE I(i)

# Trial Brief

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE POLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-217 (GMS) |
| | ) | |
| COMPUTER SCIENCES CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## TRIAL BRIEF OF DEFENDANT
## COMPUTER SCIENCES CORPORATION

Sarah E. DiLuzio (#4085)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, Delaware  19801
(302) 984-6000 (general)
(302) 984-6279 (direct)
(302) 658-1192 (fax)
sdiluzio@potteranderson.com

Of counsel:
Larry R. Seegull
DLA PIPER RUDNICK GRAY CARY US LLP
6225 Smith Avenue
Baltimore, Maryland  21209
(410) 580-3000 (general)
(410) 580-4253 (direct)
(410) 580-3253 (fax)
larry.seegull@dlapiper.com

Counsel for Defendant
*Computer Sciences Corporation*

Date:  September 19, 2005

## I.   THE NATURE OF THE CASE

As alleged in Plaintiff's Complaint, and clarified and limited through her deposition testimony, Plaintiff's claims in the instant case are limited to the following:

1)   A race discrimination claim based upon Plaintiff's failure to receive a promotion, based on the fact that Randall Miller was promoted and she was not;

2)   A retaliation claim based upon her termination from employment more than one year after she filed a charge of discrimination;

3)   An Equal Pay Act claim based on the fact that men were allegedly paid more than women in the group she was working in;  and

4)   A claim for purported breach of the implied covenant of good faith and fair dealing based upon the discrimination and retaliation that Plaintiff claims she suffered.

On May 6, 2005, Defendant filed a Motion for Summary Judgment on all of Plaintiff's claims, which has been fully briefed.  (D.I. 40, 42, 54, 56.)  The Court has not yet ruled on Defendant's Motion.   This matter is scheduled for trial beginning on November 7, 2005.

## II.   CONTESTED FACTS THE EVIDENCE WILL ESTABLISH

Defendants believe that the evidence will establish the following facts:

CSC is one of the world's leading information technology (IT) service companies, and provides outsourcing of IT services.  CSC hired Plaintiff as an at-will employee on November 5, 1997.  Plaintiff was initially hired as a help desk technician, Member Technical Staff B ("MTSB").  CSC offered Plaintiff a starting annual salary of $41,000,

which was $6,000 to $8,000 more than Plaintiff's annual salary at her previous job. Plaintiff received an increase in salary during every year of her employment with CSC.

### A.    Plaintiff Was Transferred To The Managed Print And Dazel Group.

On October 2, 1999, Plaintiff transferred from her position at the help desk to a position as a technical service analyst in the Managed Print and Dazel ("MPD") group. Plaintiff worked in the Dazel subgroup. On May 13, 2000, Plaintiff was promoted from MTSB to Member Technical Staff A ("MTSA") by her supervisor at the time, Derek Alston. In May 2000, CSC implemented a business restructuring, and, as a direct result, Dawn Dworsky replaced Mr. Alston as manager of the MPD group, and became Plaintiff's new supervisor. Despite the change in supervision, Plaintiff's duties did not change in any way.

### B.    Plaintiff Was Dissatisfied With Her May 2001 Performance Evaluation And Merit Salary Increase.

In May 2001, Ms. Dworsky completed an annual performance evaluation of Plaintiff for the period of April 1, 2000 through March 31, 2001, in which she rated Plaintiff a "3" or "good", indicating that Plaintiff's performance "consistently meets expectations and job requirements." CSC considers its employees for merit salary increases at the time the annual performance evaluations are conducted. In 2001, CSC's Human Resources department issued annual Overall Merit Guidelines ("Guidelines"), which designated the recommended merit percent increase an employee should receive based on his or her evaluation rating. If a supervisor wanted to diverge from these Guidelines, approval had to be obtained from management and Human Resources. With respect to employees who were rated a "3" during the 2001 evaluation, the Guidelines recommended a salary increase of between 0-4%. Ms. Dworsky, however, desired to

reward what she perceived to be Plaintiff's good effort and performance for her first year as an MTSA by providing Plaintiff with a 5% salary increase. Because Ms. Dworsky wanted to provide Plaintiff with a salary increase above the recommended Guidelines, Ms. Dworsky obtained approval from management and Human Resources, and Plaintiff received a 5% salary increase.

Despite the fact that Plaintiff received a "good" evaluation and a merit salary increase above the recommended Guidelines, Plaintiff was displeased with both her evaluation and salary increase. Plaintiff also was upset that she was not promoted to SMTS in May 2001, despite the fact that she had only held the position of MTSA for one year at that time.

When Ms. Dworsky met with Plaintiff to discuss her appraisal, Ms. Dworsky told Plaintiff that she was on the right career path and should continue doing the type of work that she was doing. Ms. Dworsky advised Plaintiff that she did not promote Plaintiff at that time because Plaintiff did not yet have the requisite skill set or expertise to be an SMTS. For instance, she did not yet have the expertise to work with the UNIX operating system[1] at a senior level. She also told Plaintiff that she would have to demonstrate the ability to lead projects independently, work independently with the client, mentor and train others, improve her decision-making capabilities, and independently manage a "category one" problem before she could be promoted.[2]

---

[1] The UNIX platform is a complex computer program with numerous command codes.

[2] The only person Ms. Dworsky promoted to an SMTS at this time was MaryAnne Doll-Johnson, who, at the time of her promotion, had more years of relevant experience with the UNIX operating system and had been an MTSA for a longer period of time than Plaintiff. Plaintiff believed that Ms. Doll-Johnson deserved to be promoted at the time, and does not believe that the promotion of Ms. Doll-Johnson instead of her was in any way discriminatory.

Plaintiff remained dissatisfied, and, thus, arranged several meetings to discuss her performance appraisal with Ms. Dworsky, Maureen Summers (Human Resources Specialist) and Sonia Koplowicz (Senior Human Resources Manager).[3] Ms. Dworsky again explained why she rated Plaintiff as she did. Ms. Summers thoroughly explained the salary increase process to Plaintiff, and that Plaintiff's salary was consistent with her peers and that she received a higher salary increase than recommended under the Guidelines. Ms. Summers and Ms. Dworsky also explained that Plaintiff was not ready for a promotion to SMTS at that time because of her limited time in her current position (only one year) and because she did not have the necessary level of expertise and skill in UNIX, among other factors.

### C.  Following Her 2001 Performance Appraisal, Plaintiff Isolated Herself From Her Team Members.

After these meetings and after Plaintiff filed her charge of discrimination, Plaintiff began to isolate herself from the other members of the MPD group. For instance, Plaintiff began to refuse to speak to her team members and she refused all invitations to join them for lunch.

### D.  Plaintiff Went Out On Full-Time FMLA Leave.

On August 6, 2001, Plaintiff requested and was granted a full-time medical leave of absence due to stress. CSC maintains a Leave of Absence Without Pay Policy ("Leave Policy"). Plaintiff was aware that the Company maintained such a policy, and that it was her responsibility to comply with it. The Leave Policy, provides, in relevant part:

---

[3] These meetings took place shortly before and after Plaintiff filed her charge of discrimination in July 2001.

A Medical Leave of Absence Without Pay may be granted for up to thirty calendar days and may be extended for successive periods of up to thirty calendar days for up to a total of twelve consecutive months upon presentation of a physician's statement, and CSC's verification as it deems appropriate.... ***A certificate of disability from the attending physician is required every thirty days from the date the medical leave is commenced. Any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation....***

(emphasis added).

After her return from medical leave in September 2001, Plaintiff presented a medical certification allowing her to return to work, but restricting her to a 30-hour workweek. CSC accommodated Plaintiff's request by providing Plaintiff with a 30-hour reduced work schedule, and designated the remaining ten (10) hours as FMLA leave. Plaintiff continued to work a reduced schedule until she returned to a full-time medical leave of absence on February 21, 2002. Plaintiff remained on a full-time leave of absence until September 27, 2002.

### E. Plaintiff Failed To Submit Timely Medical Documentation And CSC, In Accordance With Its Leave Policy, Deemed Plaintiff To Have Voluntarily Resigned.

In direct violation of her obligations under CSC's Leave Policy, Plaintiff repeatedly failed to submit timely medical certifications to CSC every thirty (30) days while she was on leave. Although, under the terms of its Policy, CSC could have designated Plaintiff's first such omission to constitute a voluntary separation from employment, CSC did not do so. Rather, CSC gave Plaintiff numerous chances to comply with its Leave Policy.

Though not required under CSC's Leave Policy, Simmie Osborn, CSC Service Center Representative, called, e-mailed and sent letters to Plaintiff on numerous occasions to remind her that her medical certification was either coming due or was

delinquent. Maureen Summers also reminded Plaintiff several times in writing of her obligations under the Leave Policy, and the potential consequences for her failure to submit certifications. Plaintiff specifically was warned in writing several times that a failure to provide a timely medical certification could be considered a voluntary resignation under the Leave Policy.

On June 21, 2002, CSC received a certification from Plaintiff's medical provider dated June 14, 2002, which stated that Plaintiff may "be able to return to work within the next two to three months." Thus, at the very latest, Plaintiff was required under CSC's Leave Policy to provide an updated medical certification to CSC by September 14, 2002. Despite the numerous written and oral warnings Plaintiff received regarding her obligation to provide timely medical certifications and specifying the consequences for a failure to do so, Plaintiff did not provide an updated medical certification by that date. Therefore, in accordance with its Leave Policy, CSC determined that Plaintiff's failure to submit a timely medical certification constituted a voluntary resignation on Plaintiff's part, and terminated her employment effective September 27, 2002. This decision was made by Sonia Koplowicz and Maureen Summers.

**F.    Randall Miller Was Promoted To SMTS In July 2002.**

In July 2002, while Plaintiff remained on her full-time medical leave, Ms. Dworsky promoted Randall Miller (Caucasian) from MTSA to SMTS. Significantly, Mr. Miller had been in the MTSA position for nearly five (5) years prior to his promotion. At the time of his promotion, Mr. Miller had over ten (10) years of practical, tenured experience working with the UNIX operating system as an employee for both CSC and for past employers, including DuPont.

6

Ms. Dworsky considered a number of factors in determining that Mr. Miller was qualified for promotion to SMTS. Ms. Dworsky believed that Mr. Miller demonstrated the ability to work independently on important technical projects without direct supervision; provide technical direction and guidance to others; handle various tasks involving a variety of computer programs; deal with issues related to outages on the network, independently manage a "category one" problem, was skilled in advanced troubleshooting, and that he possessed strong decision-making capabilities. Ms. Dworsky did not believe that Plaintiff possessed these same skills.

Because Plaintiff had been out on medical leave since February 2002, Ms. Dworsky did not consider Plaintiff for a promotion at that time. It is standard CSC practice and policy not to consider an employee for promotion while they remain out on medical leave.

## III.    DEFENDANT'S THEORIES OF DEFENSE

### A.    Race Discrimination.

Plaintiff will be unable to meet her burden of proof on her claim that CSC failed to promote her on the basis of her race. Because Plaintiff has no direct evidence of discriminatory motive, she must prove intentional discrimination by inference, according to the standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

In order to establish a *prima facie* case of race discrimination based upon a failure to promote, Plaintiff must prove, in part, that she was qualified for the SMTS position. Because Plaintiff cannot show that she was qualified for the SMTS position, or demonstrate that others with similar qualifications were promoted ahead of her, Plaintiff

cannot establish her *prima facie* case as necessary to prevail on her claim. *See Berry v. Jacobs IMC, LLC*, 2004 WL 1179270, *409 (3d Cir. 2004) (summary judgment granted to employer on plaintiff's discriminatory failure to promote claim, in part, because plaintiff failed to establish his *prima facie* case by showing that he was qualified for the position) (attached as Exhibit A).

Further, even if Plaintiff could somehow establish a *prima facie* case, Plaintiff will still be unable to establish a claim for race discrimination. CSC did not promote Plaintiff in July 2002 because Plaintiff had been on a full-time medical leave of absence since February 2002, and it was CSC's standard practice and policy not to promote an employee out on extended medical leave, not knowing if or when she was going to return to work. Further, Dawn Dworsky did not believe that Plaintiff had the requisite skills, UNIX experience or time in the MTSA position to warrant promotion to SMTS at that time. Ms. Dworsky promoted Mr. Miller in July 2002 because, based on Ms. Dworsky's business judgment, Mr. Miller deserved promotion due to his level of experience, his overall performance and competency, his technical skills with the UNIX operating system, and his time within the MTSA position. The promotion of a better qualified candidate is a legitimate and non-discriminatory reason for preferring the successful applicant over the rejected employee. *See Berry*, 2004 WL 1179270 at *409 (employer provided non-discriminatory reasons for promotion, including the other candidate's "excellent credentials and experience" and the employer's business judgment that plaintiff was not qualified for the position); *Lewis v. State of Del. Dept. of Public Instruction*, 948 F. Supp. 352, 361 (D. Del. 1996) (non-discriminatory reason includes

8

conclusion that the other candidate "was more qualified than plaintiff and plaintiff was not a 'team player'").

Further, Plaintiff can present no evidence to establish that CSC's articulated reason for not promoting her was a pretext for discrimination. An employer's decisions regarding employee status, such as promotion decisions, are entirely within the employer's prerogative, particularly when, as in the instant case, the decision-making process includes an analysis of skills essential to certain functions. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir. 1992) (cautioning against "'unwarranted invasion or intrusion' into matters involving professional judgments about an employee's qualifications for promotion"); *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) ("Barring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions."), *overruled on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

Plaintiff's mere speculation that the reason she was not promoted to SMTS was because of her race is insufficient as a matter of law to establish her claim. *See Berry*, 2004 WL 1179270 at *409 (plaintiff did "not offer[] any evidence beyond his own conclusory allegation that [defendant] discrimination against him on the basis of race…[t]hus, there was insufficient evidence to support the claim of pretext."); *McLaughlin v. Diamond State Port Corp.*, 2004 WL 3059543, *9 (D. Del. 2004) ("Since [Plaintiff] has not presented evidence that she was more qualified than the people who ultimately prevailed [in receiving a promotion], her argument that the subjective promotion process gives rise to an inference of discrimination must fail.") (Exhibit B).

Plaintiff's reliance on a stray remark, completely unrelated to the decision-making process, is also insufficient evidence of pretext to satisfy Plaintiff's burden under the law. *Johnson v. Gober*, 2003 WL 22967266, *459-60 (3d Cir. 2003) (isolated inappropriate remark made by decision maker, unrelated to decision-making process, was not sufficient evidence to establish that employer's proffered reason for failing to promote plaintiff was a mere pretext for discrimination) (Exhibit C); *Fuentes v. Perskie*, 32 F.3d 759, 766 (3d Cir. 1994) (holding alleged stray remark, standing alone, did not present sufficient evidence to establish pretext).

**B.     Retaliation.**

Plaintiff is unable to meet her burden of proof to satisfy her claim that she was terminated in retaliation for engaging in protected activity. In order to establish a *prima facie* case for retaliation, Plaintiff must show:  "(i) that she engaged in a protected activity;  (ii) that she suffered an adverse employment decision;  and (iii) that there was a causal connection between the protected activity and the adverse employment decision." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1299 (3d Cir. 1997). Plaintiff cannot establish a *prima facie* case for retaliation because she cannot show that a causal connection existed between CSC's decision to terminate her employment and her protected activities. Plaintiff filed her charge of discrimination on July 5, 2001. Plaintiff, however, was not terminated from CSC until September 27, 2002. A temporal distance of nearly 15 months is, as a matter of law, simply too great to support an inference of causation. *See, e.g., Wagner v. Berwick Industries*, 2004 WL 2931049 (3d Cir. 2004) (4-month lag is too long to establish a causal connection) (Exhibit D); *Goosby v. Johnson & Johnson Med. Inc.*, 288 F.3d 313, 323 (3d Cir. 2000) (finding that plaintiff's complaint of

discrimination a year before his discharge was not temporally proximate to establish causal connection). Accordingly, Plaintiff cannot establish a *prima facie* case of retaliation on the basis of her termination.

Moreover, Plaintiff cannot establish that CSC's legitimate, non-retaliatory reason for terminating Plaintiff – her failure to provide medical documentation – was pretextual. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (once employer provides a legitimate, non-retaliatory explanation, plaintiff bears ultimate burden of proving that proffered reason is pretextual). Plaintiff admittedly was well aware of her obligation under CSC's Leave of Absence Policy to provide medical certification every thirty days during her leave of absence, that her failure to comply with this obligation would give Defendant the right to terminate her employment, and that Defendant could have terminated her employment the first time she failed to provide timely certification, in accordance with its policy. Accordingly, CSC complied with its policy, and there is no evidence of retaliatory motive on the part of Sonia Koplowicz or Maureen Summers in making the termination decision. To contest these facts, Plaintiff can offer nothing more than her own subjective belief that she was subject to retaliation, which simply is insufficient under the law. *See Baker v. Wilmington Trust Co.*, 320 F. Supp.2d 196, 202 (D. Del. 2004) (plaintiff's conclusory allegations were insufficient to support a claim for retaliation); *Johnson v. E.I. DuPont de Nemours & Co.*, 60 F. Supp.2d 289, 297 (D. Del. 1999) (same).

In addition, any argument that Plaintiff's termination for failure to submit a medical certification was a pretext for retaliation is undermined by the fact that similarly-situated employees who had not previously filed charges of discrimination were also

11

terminated for the same reason as Plaintiff. For instance, CSC terminated both Aliza Panitz (Caucasian female) and Monte Moser (Caucasian male) due to their failure to provide requisite medical certifications related to their medical leaves of absence in accordance with CSC's Leave of Absence policy.

## C.     **Equal Pay Act.**

Plaintiff will not be able to satisfy her burden of proof for her claim brought under the Equal Pay Act ("EPA"). The EPA only prohibits discriminatory compensation on the basis of sex. *See* 29 U.S.C. § 206(d)(1). Importantly, during the time that Plaintiff was employed in CSC's Dazel subgroup, a woman (MaryAnne Doll-Johnson) was the highest paid member of that group. The fact that a woman was the highest paid member of the Dazel subgroup clearly undermines any contention that CSC discriminated on the basis of sex.

In addition, the EPA does not prohibit differentials in wages between men and women if the "differential [is] based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Plaintiff cannot establish a violation of the EPA because the differential in Randall Miller's and Plaintiff's salaries was based upon factors other than sex. One of the main reasons that Mr. Miller received a higher salary than Plaintiff was because of his experience and his longevity with the company, based on his CSC service date. *See Shanley v. Salesianum Sch*, 1995 WL 628401, *10 (D. Del. 1995) (considering experience an appropriate factor upon which to base compensation) (Exhibit E); *Strag v. Bd. of Tr*, 55 F.3d 943, 950 (4th Cir. 1995) (judgment for defendant where comparator had twenty-four years of teaching experience while plaintiff only had nine).

Further, Mr. Miller had been employed with CSC and its predecessor, DuPont, for 18 years, much longer than Plaintiff, who had only been employed by CSC for five years. Consequently, Mr. Miller had gradually earned a higher salary over that time period, whereas Plaintiff started only a few years ago. Seniority with a company is a legitimate reason to pay a male employee more than a female employee. Thus, Plaintiff cannot establish her claim for a violation of the EPA.

**D.**   **Breach of the Implied Covenant of Good Faith and Fair Dealing.**

Plaintiff also will be unable to meet her burden of proof on her claim for breach of the implied covenant of good faith and fair dealing under Delaware law. The Delaware Supreme Court "has strictly limited the application of the implied covenant in the employment context, holding that a Plaintiff must establish that he or she fails into one of four exclusive categories." *Cimino v. Del. Dep't of Labor*, 2002 U.S. Dist. LEXIS 2979, *10-11 (D. Del. 2002) (attached as Exhibit F). One of these categories is implicated "where the termination violated public policy."[4] *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 334 (3d Cir. 2003). A claim for breach of the implied covenant "requires employer conduct amounting to fraud, deceit, or misrepresentation." *Cimino*, 2002 U.S. Dist. LEXIS 2979 at *11. Further, the existence of this cause of action does not "limit[] an employer's freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons." *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 103 (Del. 1992).

---

[4] Plaintiff does not contend that any of the other three exclusive categories are implicated in this case. *See Conneen*, 334 F.3d at 334.

Plaintiff's claim under the implied covenant is based upon the same set of facts as her claims for discrimination and retaliation. Because Plaintiff cannot establish that CSC discriminated against her on the basis of her race or sex, or establish that CSC retaliated against her for engaging in protected activity, Plaintiff also cannot establish that CSC breached the covenant of good faith and fair dealing.

## VI.    DEFENDANT'S THEORY OF DAMAGES

Defendant contends that Plaintiff is not entitled to recover any damages because she will not prove her claims against Defendant. If, however, Plaintiff does meet her burden of proving by a preponderance of the evidence that Defendant is liable on any of her theories of liability, Defendant contends that Plaintiff is barred or limited in recovering certain damages. Plaintiff is barred from recovering emotional distress damages because Plaintiff recovered workers' compensation for her alleged emotional injuries to the exclusion of all other rights and remedies. 19 *Del. C.* § 2304. Defendant also contends that Plaintiff is barred from recovering punitive damages because CSC never engaged in a discriminatory practice with malice or with reckless indifference to Ms. Poland's federally protected rights. Similarly, Defendant contends that Ms. Poland is barred from recovering liquidated or punitive damages under the Equal Pay Act because CSC acted in good faith at all times, never knew or had reason to believe that its conduct was prohibited by federal law, and never showed reckless disregard for the law.

Defendant also contends that any damages Plaintiff receives as back pay or lost wages under any theory of liability should be reduced such that Plaintiff is only compensated for periods during which she was able and available to work. Thus, Plaintiff should not receive back pay or lost wages for any period during which she was

14

on medical leave from her CSC position or, after her discharge from CSC, for any periods during which she was incapable of working due to her alleged medical problems. Similarly, Plaintiff should be precluded from seeking damages for a purported failure to promote because Plaintiff was on unpaid medical leave when Randall Miller was promoted to the Senior Member of Technical Staff Position, and was unavailable to be considered for promotion. Finally, if the jury determines that Plaintiff did not prove her retaliation claim by a preponderance of the evidence, Plaintiff is barred from recovering back pay or lost wages after the date of her lawful termination.

## V.    **DEFENDANT'S ANTICIPATED MOTION FOR DIRECTED VERDICT**

Defendant anticipates that it will move for judgment as a matter of law at the close of Plaintiff's case, and further expects that it will renew its motion at the close of Defendant's case, should the case reach that point. Defendant anticipates that its motion for judgment will be based upon, but not necessarily be limited to, the same arguments it made in the motion for summary judgment it filed with the Court on May 6, 2005. (D.I. 40.) Defendant also intends to move for judgment on Plaintiff's claim for punitive damages because there is no evidence that Defendant acted with malice or reckless indifference. Defendant does not believe that Plaintiff will be able to present sufficient evidence from which a reasonable jury could find in favor of Plaintiff on any of her claims. *See* Fed. R. Civ. P. 50(a)(1) (stating that, if at the close of a party's case, there is no legally sufficient basis upon which a reasonable jury could find in favor of that party, the court may grant judgment as a matter of law against that party).

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: _Sarah E. DiLuzio_
  Sarah E. DiLuzio (#4085)
  1313 North Market Street
  6th Floor, P.O. Box 951
  Wilmington, Delaware  19801
  (302) 984-6000 (general)
  (302) 984-6279 (direct)
  (302) 658-1192 (fax)
  sdiluzio@potteranderson.com

  Of counsel:
  Larry R. Seegull
  DLA PIPER RUDNICK
    GRAY CARY US LLP
  6225 Smith Avenue
  Baltimore, Maryland  21209
  (410) 580-3000 (general)
  (410) 580-4253 (direct)
  (410) 580-3253 (fax)
  larry.seegull@dlapiper.com

  *Counsel for Defendant*
  *Computer Sciences Corporation*

Dated: September 19, 2005

699777

# SCHEDULE I(i)

# Trial Brief (A thru F)

# EXHIBIT A

99 Fed.Appx. 405                                                                Page 1
99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands))
**(Cite as: 99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands)))**

**C**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this case. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP 1 5.3.)

United States Court of Appeals,
Third Circuit.
James BERRY, Appellant,
v.
JACOBS IMC, LLC.
No. 03-3776.

Submitted Under Third Circuit LAR 34.1(a) May 7, 2004.
Decided May 27, 2004.

**Background:** Former employee sued employer, alleging various forms of employment discrimination and breach of contract, in violation of federal and territorial law. The District Court of the Virgin Islands Division of St. Croix granted summary judgment in favor of the employer, and the employee appealed.

**Holdings:** The Court of Appeals, <u>Barry</u>, Circuit Judge, held that:

(1) court had jurisdiction over both the order granting summary judgment, and an order denying the employee's motion for reconsideration;

(2) employee failed to prove race discrimination in his job assignment or the promotion of another individual to a superintendent position;

(3) there was no breach of contract;

(4) employer's conduct did not rise to the level required to support a claim of intentional infliction of emotional distress;

(5) employee failed to prove negligent infliction of emotional distress;

(6) employee failed to prove a pattern and practice of race discrimination; and

(7) employee failed to prove that he was constructively discharged.

Affirmed.

West Headnotes

**[1] Federal Courts** 🗝768.1
170Bk768.1 <u>Most Cited Cases</u>
Appellate court had jurisdiction over both a district court order granting summary judgment for the defense, and an order denying the plaintiff's motion for reconsideration, despite claim that the notice of appeal indicated only that the plaintiff was appealing from the order denying reconsideration; the specified order denying the motion for reconsideration was predicated upon the unspecified order granting summary judgment, and the defendant was not prejudiced by the plaintiff's failure to note the summary judgment order in the notice of appeal. <u>F.R.A.P.Rule 3(c)(1)(B), 28 U.S.C.A.</u>

**[2] Civil Rights** 🗝1135
78k1135 <u>Most Cited Cases</u>
Black former employee failed to prove race discrimination in his job assignment or the promotion of another individual to a superintendent position; the position which most closely resembled the employee's former position with another employer was held by a black worker, and the employee did not produce evidence showing that he was qualified for a promotion to the superintendent position; moreover, the former employee failed to rebut the employer's nondiscriminatory explanations for placing the other worker into the position most closely resembling the employee's former position, and for believing that the employee was not qualified for a promotion. Civil Rights Act of 1964, § 701 et seq., as amended, <u>42 U.S.C.A. § 2000e</u> et seq.

**[3] Labor and Employment** 🗝201
231Hk201 <u>Most Cited Cases</u>
Original memorandum of understanding did not guarantee housing allowances to employees for the full duration of their employment, and thus, there was no breach of contract when employer issued an amended memorandum of understanding which limited the housing allowance to a maximum period of 24 months; the original memorandum of understanding provided that "[t]he terms and conditions stated in this assignment letter are based on current project schedules and requirements and therefore could be subject to change."

**[4] Damages** 🗝57.56

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

99 Fed.Appx. 405                                                                    Page 2
99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands))
**(Cite as: 99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands)))**

115k57.56 Most Cited Cases
Employer's conduct, which former employee claimed
was racially discriminatory and breached his
contractual rights, did not rise to the level required to
support a claim of intentional infliction of emotional
distress under Virgin Islands law. Restatement
(Second) of Torts § 46.

**[5] Damages** ☞57.56
115k57.56 Most Cited Cases
Former employee claiming race discrimination and
breach of contract failed to prove that he suffered any
sort of an injury as a result of employer's conduct, or
that it was reasonably foreseeable that employer's
conduct would result in such injury, thus defeating
his claim of negligent infliction of emotional distress
under Virgin Islands law. Restatement (Second) of
Torts § 313 (1965).

**[6] Civil Rights** ☞1139
78k1139 Most Cited Cases
There was no evidence showing that racial
discrimination was employer's standard operating
procedure--the regular rather than the unusual
practice--and thus alleged acts of discrimination did
not rise to the level required for a finding of a pattern
and practice of race discrimination; acts alleged were,
at most, isolated or sporadic. Civil Rights Act of
1964, § 701 et seq., as amended, 42 U.S.C.A. §
2000e et seq.

**[7] Labor and Employment** ☞826
231Hk826 Most Cited Cases
Former employee failed to demonstrate that his
working conditions were so unpleasant or difficult
that a reasonable person in the employee's shoes
would resign, as required to prevail on a claim for
constructive discharge under the Virgin Islands
Wrongful Discharge Act.
 *406 Appeal from the District Court of the Virgin
Islands Division of St. Croix. D.C. Civil No. 01-cv-
00007. District Judge: The Honorable Raymond L.
Finch, Chief Judge.

Maxwell D. McIntosh, Alkon & Meaney, St. Croix,
USVI, for Appellant.

Stephanie L. Adler, Jackson Lewis, Orlando, FL, for
Appellee.

Before BARRY, AMBRO, and SMITH, Circuit
Judges.

OPINION

BARRY, Circuit Judge.

 **\*1** Plaintiff James Berry brought suit against
defendant Jacobs Industrial Maintenance Company,
LLC ("Jacobs") alleging various forms of
employment discrimination and breach of contract, in
violation of federal and territorial law. The District
Court granted summary judgment in favor of Jacobs.
Plaintiff appeals, and we will affirm.

I.

 Plaintiff, an African-American male, was employed
by Jacobs as a mechanical troubleshooter from
August 1999 to September 2000. Jacobs was formed
in August 1999 to provide various services, such as
maintenance **\*407** and construction for the
HOVENSA oil refinery. Prior to this employment,
plaintiff worked as an off site superintendent for the
Virgin Islands Industrial Maintenance Company,
LLC ("VI IMC"), a contractor that provided services
to the HOVENSA refinery before Jacobs was created
in 1999.

 In August 1999, representatives of Jacobs gave a
presentation to prospective job applicants. Plaintiff
alleges that during the question and answer session,
he asked a Jacobs representative about the pay rates
and employment positions offered at Jacobs.
Although plaintiff did not recall the representative's
exact words, he interpreted them to mean that
successful applicants would not be given a pay cut or
be demoted from their current positions at their
respective companies if they chose to work for
Jacobs.

 Plaintiff then accepted a position at Jacobs as a
mechanical troubleshooter. According to him, this
new position constituted a demotion from his former
position at VI IMC because it was not supervisory in
nature. He admitted, however, that the mechanical
troubleshooter position had not existed at VI IMC. In
addition, plaintiff's salary at Jacobs was at least equal
to what he had made at VI IMC. He also received a
housing allowance from Jacobs, which he had not
received while employed at VI IMC. Moreover, he
acknowledged that the exact position he had occupied
at VI IMC did not exist at Jacobs. The position at
Jacobs that most closely resembled his former
position was that of a terminal zone supervisor,
which was filled by Val Richardson, a black West
Indian employee. Daryl Kramer, Routine
Maintenance Manager of Jacobs, stated that he had
considered plaintiff for the position of a terminal
zone supervisor, but hired Richardson instead

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because Richardson "had excellent credentials and experience and was highly regarded by his colleagues at IMC and HOVENSA." (A72).

In June 2000, plaintiff asked Ken Lawson, General Manager of Jacobs, about opportunities to be promoted to a superintendent's position. Lawson informed plaintiff that he did not believe that he was qualified. According to Lawson, he had been told that plaintiff was not working a 40-hour week, and had a problem with absenteeism. In September 2000, plaintiff resigned from Jacobs and accepted a position as an operator trainee at HOVENSA.

Plaintiff then brought suit in the United States District Court for the Virgin Islands against Jacobs alleging (1) employment discrimination, in violation of Title VII of the Civil Rights Act of 1964 and the Virgin Islands Civil Rights Act; (2) breach of contract; (3) intentional infliction of emotional distress or, in the alternative, negligent infliction of emotional distress; (4) pattern and practice of racial discrimination against black employees; and (5) constructive discharge, in violation of the Virgin Islands Wrongful Discharge Act. Jacobs moved for summary judgment. In support of its motion, it filed the deposition transcript of plaintiff, and affidavits of General Manager Lawson and Routine Maintenance Manager Kramer. Plaintiff did not oppose the motion.

**\*\*2** In an order dated April 9, 2003, the District Court granted Jacobs's motion, and plaintiff moved for reconsideration. The District Court denied the motion for reconsideration on August 11, 2003. Plaintiff filed a notice of appeal, which stated that he was appealing from the order denying his motion for reconsideration. We have jurisdiction pursuant to 28 U.S.C. § 1291, and will affirm the orders of the District Court.

## II.

[1] In his brief to us, plaintiff contends that the District Court erred (1) in granting **\*408** summary judgment to Jacobs because it failed to consider all the evidence in the record; and (2) in denying plaintiff's motion for reconsideration. Jacobs, in response, argues that the notice of appeal failed to designate the April 9, 2003 order granting summary judgment; rather, the notice indicated only that plaintiff was appealing from the August 11, 2003 order denying the motion for reconsideration.

Federal Rule of Appellate Procedure 3(c)(1)(B) requires that the notice of appeal "designate the judgment, order, or part thereof being appealed." Although plaintiff did not specify the order granting summary judgment in his notice of appeal, his failure to do so "is not fatal because a policy of liberal construction of notices of appeal prevails" in this Court. *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 202 n. 1 (3d Cir.2001). We may exercise jurisdiction over orders not designated in the notice "if there is a connection between the specified and unspecified order, the intention to appeal the unspecified order is apparent and the opposing party is not prejudiced and has a full opportunity to brief the issues." *Williams v. Guzzardi*, 875 F.2d 46, 49 (3d Cir.1989).

Here, those requisites have been met. The "specified order" denying the motion for reconsideration is predicated upon the "unspecified order" granting summary judgment. *See, e.g., Lusardi v. Xerox Corp.*, 975 F.2d 964, 972 (3d Cir.1992). Moreover, Jacobs has not been prejudiced by plaintiff's failure to note the summary judgment order in the notice of appeal; indeed plaintiff's intent to challenge that order was apparent in his motion to reconsider, and both parties have fully briefed the issue of whether summary judgment was warranted. Thus, we have jurisdiction over both the order granting summary judgment, and the order denying the motion for reconsideration.

We will first address the order of summary judgment. Our review of a grant of summary judgment is plenary. *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir.2004). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact," and where, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Id.* Even if the non-moving party does not respond to the motion, summary judgment should be granted only when it is appropriate. *See Anchorage Assoc. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir.1990).

**\*\*3** Plaintiff first argues that the grant of summary judgment on his race discrimination claim was erroneous. To succeed on a Title VII claim, a plaintiff must initially establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class; (2) he was qualified for an open position; and (3) nonmembers of the protected class were treated more favorably. *See Goosby v. Johnson*

99 Fed.Appx. 405                                                                                                                Page 4
99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands))
**(Cite as: 99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands)))**

*& Johnson Med., Inc., 228 F.3d 313, 318- 19 (3d Cir.2000)* Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *Id* If the defendant meets its burden of persuasion, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir.1999).* A plaintiff may prove pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in **\*409** the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Id. at 413* (quoting *Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108- 09 (3d Cir.1997)).* He may also defeat a motion for summary judgment if he demonstrates that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id* (quoting *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.1994)).*

[2] Plaintiff did not set forth a *prima facie* case of discrimination. He did not come forward with evidence demonstrating that nonmembers of the protected class were given more favorable treatment. The position at Jacobs which most closely resembled his former position--terminal zone supervisor--was held by a black employee, Val Richardson. Moreover, as for his request for a promotion to the position of superintendent, he did not produce evidence showing that he was qualified.

Even if we assume that plaintiff made out a *prima facie* case, Jacobs has satisfied its burden of articulating a legitimate, nondiscriminatory reason for its actions. Jacobs claimed that it hired Richardson over plaintiff as the terminal zone supervisor based on the feedback it received from Richardson's previous supervisor, and because of Richardson's "excellent credentials and experience." In addition, Jacobs's general manager provided a valid reason for believing that plaintiff was not qualified for a promotion: he routinely saw plaintiff's name on reports of those leaving work early, and had been informed that he was not working a 40-hour week. Plaintiff, in turn, has not offered any evidence beyond his own conclusory allegation that Jacobs discriminated against him based on race. Thus, there was insufficient evidence to support the claim of pretext, and the District Court did not err in granting summary judgment on the race discrimination claim. [FN1]

FN1. Plaintiff also alleges that Jacobs's actions violated the Virgin Islands Civil Rights Act. He does not, however, specify the violations claimed. Thus, we will assume that his Virgin Islands claim mirrors his Title VII claim. For the reasons stated previously, plaintiff failed to produce sufficient evidence to survive summary judgment on this claim. *See, e g, Matheson v. Virgin Islands Cmty. Bank, Corp., 297 F.Supp.2d 819, 832 (D.Vi.2003).*

**\*\*4** [3] Plaintiff next contends that Jacobs was not entitled to summary judgment on his breach of contract claim. According to plaintiff, he accepted employment at Jacobs because he was offered a housing allowance of $1,500 per month, grossed up to $2,300 for Virgin Islands tax purposes. Plaintiff signed the memorandum of understanding, dated September 10, 1999, which set forth the terms of the housing allowance. He argues that although the housing allowance was to continue for as long as he was employed at Jacobs, Jacobs breached this contract when it issued an amended memorandum of understanding on November 5, 1999, which limited the housing allowance to a maximum period of 24 months.

We reject this argument. The original memorandum of understanding did not guarantee housing allowances to employees for the full duration of their employment at Jacobs. Rather, the memorandum explicitly provided that "[t]he terms and conditions stated in this assignment letter are based on current project schedules and requirements and therefore could be subject to change." (A284). Jacobs's issuance of the amended memorandum, therefore, did not constitute a breach of contract.

[4][5] Plaintiff also asserts that he established sufficient facts indicating intentional **\*410** infliction of emotional distress or, in the alternative, negligent infliction of emotional distress. We disagree. With respect to his claim of intentional infliction of emotional distress, there is nothing in the record to support a finding that Jacobs's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (1965); *see also Claytor v. Chenay Bay Beach Resort, 79 F.Supp.2d 577, 583 (D.Vi.2000); Manns v. Leather Shop, Inc., 960 F.Supp. 925, 930 (D.Vi.1997).* As for the claim of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

99 Fed.Appx. 405                                                           Page 5
99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands))
(Cite as: 99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands)))

negligent infliction of emotional distress, plaintiff did not produce evidence that he suffered any sort of an injury as a result of Jacobs's conduct, or that it was reasonably foreseeable that Jacobs's conduct would result in such injury. *See Restatement (Second) of Torts § 313 (1965); Anderson v. Gov't of the Virgin Islands, 180 F.R.D. 284, 287 (D.Vi.1998)*.

[6] Summary judgment was also properly granted on the claim of pattern and practice of race discrimination. Although plaintiff claims that Jacobs engaged in a pattern and practice of discrimination, the acts alleged by him were, at most, isolated or sporadic. *See United States v. Lansdowne Swim Club, 894 F.2d 83, 88 (3d Cir.1990)* (quoting *Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)*). There was no evidence showing that racial discrimination was Jacobs's "standard operating procedure--the regular rather than the unusual practice." *Id.* The alleged acts, therefore, do not rise to the level required for a finding of pattern and practice of discrimination.

**5 [7] Finally, the District Court did not err in granting summary judgment on the claim brought under the Virgin Islands Wrongful Discharge Act. To succeed in establishing a claim for constructive discharge, a plaintiff must demonstrate that the working conditions were "so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir.1992)* (quotations and citations omitted). Plaintiff made no such demonstration.

### III.

Plaintiff also appeals the District Court's order denying his motion for reconsideration. According to him, the District Court erred in failing to consider the evidence in the record when it granted summary judgment to Jacobs. The denial of a motion for reconsideration is reviewed for abuse of discretion, but "if the court's denial was based upon the interpretation and application of a legal precept, review is plenary." *Le v. Univ. of Pa., 321 F.3d 403, 405-06 (3d Cir.2003)* (quoting *Koshatka v. Philadelphia Newspapers, Inc., 762 F.2d 329, 333 (3d Cir.1985)*).

The standard plaintiff must meet to prevail on a motion for reconsideration is high:

a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in

the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.

*Max's Seafood Cafe ex rel. Lou-Ann. Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir.1999)* (citation omitted). Plaintiff does not allege that the controlling law has changed, or that there was new evidence. Thus, he must demonstrate that the order *411 of the District Court constituted a clear error, or resulted in manifest injustice. It did not. The grant of summary judgment was proper, and we will affirm the order denying the motion for reconsideration.

### IV.

For the foregoing reasons, we will affirm the April 9, 2003 order of the District Court granting summary judgment to Jacobs, and the August 11, 2003 order denying plaintiff's motion for reconsideration.

99 Fed.Appx. 405, 2004 WL 1179270 (3rd Cir.(Virgin Islands))

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Not Reported in F.Supp.2d                                                                                         Page 1
Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: 2004 WL 3059543 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Dannette G. MCLAUGHLIN Plaintiff,
v.
DIAMOND STATE PORT CORP. Defendant.
**No. C.A.03-617(GMS).**

Dec. 30, 2004.

Laurence V. Cronin, Smith, Katzenstein, & Furlow,
Wilmington, DE, for Plaintiff.

Donald E. Reid, Jason A. Cincilla, Morris, Nichols,
Arsht & Tunnell, Wilmington, DE, for Defendant.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

**\*1** Presently before the court is defendant Diamond
State Port Corp.'s ("Diamond State") motion for
summary judgment. (D.I.36.) This is an action
brought by plaintiff Dannette McLaughlin on July 1,
2003, in which she alleges one count of unlawful
gender discrimination in violation of Title VII of the
Civil Rights Act of 1964, *as amended,* 42 U.S.C. §
2000e *et seq.* ("Title VII"), and one count of unequal
pay in violation of the Equal Pay Act, 29 U.S.C. §
206 (1998). (D.I.1.) On October 14, 2004
McLaughlin sought to amend her complaint for the
first time by adding a retaliation claim under Title
VII, and an equal protection claim under 42 U.S.C. §
1983 (2003). (D.I.34.) The court denied her motion
(D.I.56), so only the counts of the original complaint
are the proper subject of Diamond State's motion. For
the following reasons, the court will grant summary
judgment in favor of Diamond State.

II. JURISDICTION

The court has jurisdiction pursuant to 28 U.S.C. §
1331 (1993).

III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
judgment as a matter of law." Fed.R.Civ.P. 56©; *see
also Boyle v. County of Allegheny Pa.,* 139 F.3d 386,
392 (3d Cir.1998). Thus, summary judgment is
appropriate only if the moving party shows that there
are no genuine issues of material fact that would
permit a reasonable jury to find for the non-moving
party. *Boyle,* 139 F.3d at 392. A fact is material if it
might affect the outcome of the suit. *Id.* (citing
*Anderson v. Liberty Bobby, Inc.,* 477 U.S. 242, 247-
248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An
issue is genuine if a reasonable jury could possibly
find in favor of the non-moving party with regard to
that issue. *Id.* In deciding the motion, the court must
construe all facts and inferences in the light most
favorable to the non-moving party. *Id., see also Assaf
v. Fields,* 178 F.3d 170, 173-74 (3d Cir.1999).

IV. BACKGROUND

Defendant Diamond State is a corporation-like arm
of the State of Delaware created to operate the Port of
Wilmington. Del.Code Ann., tit. 29, § 8735(a)
(2003). It assumed control of the Port of Wilmington
in 1995. (Markow Dep. at 7:10, D.I. 42 Ex. B at 4.)
Diamond State has three classes of employees: A, B,
and C. A and B class employees are the subject of a
collective bargaining agreement between Diamond
State and the International Longshoreman's Assoc.
AFL-CIO, Local 1694-1. (See generally D.I. 42 Ex.
C.) Employees begin as C class and graduate to B
class once they have worked 800 hours. (Immediato
Dep. at 48:12-15, D.I. 42 Ex. A at 14.) A and B class
employees perform the same work, however, A class
employees are guaranteed 40 hours per week.
(Markow Dep. at 18:11-14, D.I. 42 Ex. B at 7.) B
class employees work as needed to fill in the gaps left
by the A class employees. (Id.) Although various
positions are available at Diamond State, only the
positions of lift-truck operator and laborer/checker
are relevant in this case.

**\*2** Whenever there is an A class opening, it is posted
and B class employees may apply. The list of
interested employees is then sent to individual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: 2004 WL 3059543 (D.Del.))**

supervisors, who rate the employees based on certain criteria. (Markow Dep. at 56:19-577:, D.I. 42 Ex. B at 16-17.) These criteria include good work ethic, punctuality, strong port knowledge, and ability to perform the particular position. (See, e.g., D.I. 42 Ex. G at DSPA4187.) Each supervisor ranks his or her top five choices and assigns each top-five candidate anywhere from one to five points, with the top candidate receiving five points and the fifth candidate receiving one point. (Stansbury Dep. at 40:8-20, D.I. 42 Ex. D at 12.) Each supervisor then returns his or her score sheet to labor relations hiring manager Andrew Markow and terminal manager William Stansbury, who tally the candidates' points. (Markow Dep. at 57:6-13, D.I. 42 Ex. B at 17.) This tallying usually reveals a grouping of just a few candidates with a high number of points. (Id.) The employees in that group are granted interviews with Markow and Stansbury (and sometimes HR manager Philip Immediato). (Markow Dep. at 57:15-58:10, D.I. 42 Ex. B at 17.) These interviews result in a final recommendation and offer of employment. (Id.)

Plaintiff McLaughlin, a woman, was hired in 1998 as a C class employee and graduated to B class in 1999. (D.I. 40 at 7.) During her time as a B class employee, she applied for six A class openings as either a lift truck operator or as a laborer. (D.I. 38 Ex. F at DSPA2502, DSPA4208, DSPA2514, DSPA2908, DSPA4135, DSPA4168.) In all but one case, a man was chosen for promotion over McLaughlin.

McLaughlin believes that she was passed over because of her gender. Therefore, on May 28, 2002, she filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). (D.I. 42 Ex. J.) However, she continued to work for Diamond State even after filing the EEOC charge. Of the six promotions, three were offered before the EEOC complaint and three were offered after. The EEOC issued a right-to-sue letter on April 3, 2003. (D.I. 1 ¶ 8.) McLaughlin filed the present action on July 1, 2003. (Id.)

V. DISCUSSION

A. Count I--Title VII Gender Discrimination

Title VII prohibits an employer from discriminating against any individual on the basis of race, color, religion, sex or national origin:

It shall be an unlawful employment practice for an employer .... to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin.
42 U.S.C. § 2000e-2(a).

Discrimination claims under Title VII are analyzed under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case by demonstrating that she is a member of a protected class. The plaintiff must then establish that she was qualified for an employment position, but was not hired for the position "under circumstances that give rise to an inference of unlawful discrimination." See *Waldron v. SL Indus., Inc.,* 56 F.3d 491, 494 (3d Cir.1995). When the plaintiff establishes this prima facie showing, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. *Id.* If the defendant produces one or more legitimate reasons, the presumption of discrimination is rebutted. The plaintiff must then prove that the employer's reasons for its employment decision were pretextual--that is, that they are false and that the real reason for the employment decision was discriminatory. *Id.* If the plaintiff cannot carry the burden of proof under the shifting-framework established in *McDonnell-Douglas,* the defendant is entitled to summary judgment. *Stafford v. Noramco of Delaware, Inc.,* 2000 WL 1868179, at *1 (D.Del. Dec.15, 2000).

*3 In its opening brief, Diamond State concedes for the purposes of this motion that McLaughlin is a member of a protected class, that she applied for and was qualified for a number of promotions, and that she did not receive any of the promotions. (D.I. 37 at 13.) However, Diamond State vigorously disputes that the circumstances give rise to an inference of unlawful discrimination. (Id.) Obviously, McLaughlin disagrees with Diamond State's characterization of the evidence. She contends that the circumstances give rise to an inference of discrimination for four reasons: (1) Diamond State's pattern and practice of discriminating against women, (2) its supervisors' comments and conduct toward McLaughlin based specifically on her gender, (3) its disparate treatment of McLaughlin with regard to training and opportunities, and (4) its subjective promotion process. (D.I. 40 at 17.)

1. Pattern and Practice of Discriminating Against Women

McLaughlin first argues that the circumstances give

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
(Cite as: 2004 WL 3059543 (D.Del.))

Page 3

rise to an inference of discrimination because Diamond State has a pattern and practice of discriminating against women. She points to Diamond State's response to Interrogatory No. 11, in which it admits that prior to March 31, 2004, the last time a woman was hired to an A class full-time position was on June 7, 1982. (Def.'s Resp. to Interrogs., No. 11, D.I. 42 Ex. F at 5.) And, although Diamond State hired Tina Woolford to a Chapter A full-time position in May 2004 (D.I. 38 Ex. F at DSPA4134), McLaughlin speculates that Woolford's promotion was either the result of some sort of nepotism, because her "father and two uncles are currently A class employees" (D.I. 40 at 6 n. 3), or a deliberate attempt by Diamond State to defend itself in this lawsuit (Id. at 23 n. 12). McLaughlin also points to an apparent conflict between Immediato's testimony, in which he says he tried to implement a solution to the gender gap (Immediato Dep. at 57:13-59:16, D.I. 42 Ex. A at 17), and Markow's testimony, in which he says he made promotion decisions based only on the ranking numbers he was given by the supervisors (Markow Dep. at 61:13-21, D.I. 42 Ex. B at 18). She argues this conflict is a basis from which a reasonable factfinder could infer that the dearth of female promotions remains unaddressed. Finally, McLaughlin argues that the Port of Wilmington was not amenable to women based on Immediato deposition testimony, in which he described the intensely physical nature of the job, the vulgarity and lack of professionalism among the employees, and the lack of a women's restroom at the work site at 1997. [FN1] (Immediato Dep. at 52:15-54:10, D.I. 42 Ex. A at 15-16.)

> FN1. It is unclear from the record whether there was a women's restroom. To be precise, Immediato testified that the "rest room facilities needed upgrading." (Immediato Dep. at 53:17-18, D.I. 42 Ex. A at 16.)

The court does not believe that this is sufficient evidence from which a reasonable factfinder could infer a pattern and practice of gender discrimination. Although a twenty-two year drought between female A class employees is disconcerting, McLaughlin skims over the fact that Diamond State did not purchase the Port of Wilmington until September 1995. (Castagna Dep. at 10:18-21, D.I. 38 Ex. B at APP24.) Thus, any gender discrimination prior to that date is not attributable to Diamond State. And even if it were so attributable, McLaughlin presents no evidence as to the number of female employees who applied for promotion to A class full-time positions

from 1982 until 2000, or as to the number of female employees overall during this period. Without such evidence, any statistically-based inference of discrimination would be unreasonable. Furthermore, McLaughlin's attempt to discount Woolford's promotion as an act of nepotism is pure conjecture because she offers no evidence of a connection between Woolford's father and two uncles to the promotion process. Further, to the extent McLaughlin argues that Woolford's promotion was a deliberate attempt to defend itself in this lawsuit, the court considers such an inference impermissible. Just as subsequent remedial measures are generally inadmissible under Fed.R.Evid. 407, a defendant's attempt to reverse allegedly discriminatory practices should also be inadmissible. It would be perverse indeed if attempts to reverse discrimination could be used to condemn a defendant. Such use of evidence would only serve to discourage reform, and the court will not permit it. [FN2]

> FN2. McLaughlin's brief refers to an incident in which she was abruptly assigned to work on a larger machine "as soon as Plaintiff filed her EEOC charge." (D.I. 40 at 9.) Her point in raising this seems to be along the same lines as her point about Diamond State promoting Woolford as an attempt to defend itself. If so, the court is of the same opinion about the appropriateness of such an inference.

*4 McLaughlin's argument that a conflict between the testimony of Immediato and Markow permits an inference that the twenty-two year drought remains unaddressed is similarly unsupported by the evidence. Immediato testified at length about his efforts beginning around 1997 to increase the number of women in the A class:

BY MS. CALO:
Q: Did you ever take any initiative to determine why there were no women in A class other than Ms. Wilhelmania Archie?
A: The initiative I took was since the route to A was through B, the initiative that I took was to make sure that the feeder source, namely B, had representation of females, which, frankly, overall at the port when I first got there, there was very few females even attempting to be hired at the hiring hall. Frankly, it--I believe the number was like 27 percent when I left that there were some--across including the office and whatever. There were a, certainly a representative. It had come a long way in terms of women.
Q: In the B class or throughout the facility?

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
(Cite as: 2004 WL 3059543 (D.Del.))

A: Well, both. In the B class there were--because in order to get to B you had to have 800 hours of work. So there has to be an initiative to, first of all, get hired in order to get your 800 in order to get in B. And then it was-- it's an evolutionary process just by virtue of the union structure, because then, even though you were in B--and I don't recall specifically as a matter when Dannette came on board, but it was probably 2001, somewhere around there, that you came at the bottom of B by virtue of their structure.

So now as work slowed down, you were, for lack of a better term, you were subject to the seniority hiring process, because the Bs actually, they had a seniority right after the As were hired. A's were guaranteed 40 hours if there was any work. So the top part of B was largely male. Shirley Taylor might be the highest one and she was like whatever number.

But as the Bs--the good news is as we started establishing and the Bs grew in number, there were more females there. Certainly there were a fair amount of female, "fair amount" being I'd say 18 percent, 15 percent, 15 to 18 percent, where before there was one in the A. So it's an evolutionary process....

(Immediato Dep. at 47:22-49-10, D.I. 42 Ex. A at 14-15.)

McLaughlin contrasts this with Markow's testimony:

BY MS. CALO:

Q:.... Over the course of time that you've been involved in the process of hiring B members into the A classification, has there been any initiative on your part to try to interview more women?

A: Any initiative? On my part, on my personal part?

Q: Correct.

A: No. The numbers are what they are.

Q: Numbers being the ranks?

A: Yes.

(Markow Dep. at 61:13-21, D.I. 42 Ex. B at 18.)

In spite of McLaughlin's assertion to the contrary, these two pieces of testimony are not in conflict. Immediato testified that he took a bottom-up approach, by bringing women in first as C class, then promoting them to B class once they worked 800 hours. From there, promotion to A class was done by the ranking system. Markow merely testified that he adhered strictly to the "numbers" (or ranks) when considering promotions from B class to A class. His testimony sheds no light on the efforts of Immediato to bring women up through the system.

*5 McLaughlin's final assertion that the unrefined nature of the Port of Wilmington shows that Diamond State engaged in discrimination is also unfounded. Immediato testified to the following:

BY MS. CALO:

Q:.... Did you take any actions to try to entice women to join the port, for example?

A: In my own way, by providing structure and providing discipline in the ranks, I tried to make the port more of a place where women would want to work. Quite frankly, prior to my arrival I'm not sure that was the case. I tried to be on top of enough things and develop enough structure and performance standards, including attendance and treatment of each other, employee interaction, to the point that we would not tolerate a number of things that were in place prior to Diamond State Port Corporation.

Q: What things did you witness when you first joined Diamond State that would be either a barrier or inhospitable, if you will, to women?

...

A: Well, it was like the wild west down there, so to speak, when I joined. I mean, I was scared, I mean, I was offended just in terms of, you know, what I witnessed. There were no--in my view there were very few standards that were in place, that people knew they needed to be on time even, things of that nature. There was no standards of performance that were acceptable. There was no drug or alcohol program as an example. There was a number of things. It's too much for me to get into, but it was basically free wheeling from all respects.

...

There were times when I first got there that people would ride down to the street and ride down to the corner and try to put people in to get work down there. You didn't know whether you were getting drug free people or not. It was pretty tough, rough. Not that it's a piece of cake now. It was a lot rougher when I got there than when I left.

Q: What you are describing it seems to me is an environment that was probably hard or difficult for everyone?

A: Yes.

...

Q: Were there things in particular that you saw that would be harder for women to deal with or manage than men?

...

A: Well, it's an immensely physically environment. It's a labor intensive environment. I don't think I'm speaking out of turn by saying that that certainly would, in my view, influence certain things around, you know, the female end of it because it was very

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: 2004 WL 3059543 (D.Del.))**

Page 5

labor intensive. Certain women would respond to it and do well and other women perhaps would choose another course because it was clearly extremely labor intensive....

...

Q: We talked about this at the very beginning. When you first got there, through your employment with Diamond State, was there rough kind of cursing language used in the facility that you observed?

A: The language was different. As I described earlier, it was more street. I didn't sense that it was offensive to the population, largely. It may not have been appropriate for this office, but in that environment I would say it was rough language, but it wasn't necessarily totally offensive language....

*6 (Immediato Dep. at 50:2-54:7, D.I. 42 Ex. A at 15-16.)

This testimony does not implicate Diamond State in a pattern and practice of gender discrimination. Attorney Calo, on behalf of McLaughlin, specifically elicited testimony that the environment was difficult for everyone, *regardless of gender.* Furthermore, Immediato was describing the Port of Wilmington as it existed just after Diamond State assumed control. So even if the environment was once gender biased, such bias is not attributable to Diamond State. As to the physical environment, it is certainly not evidence of discrimination to elicit testimony that the nature of the work tends to attract more men than women. Thus, McLaughlin's evidence is inadequate to permit a reasonable factfinder to conclude that Diamond State had a pattern and practice of discriminating against women.

2. Supervisors' Comments and Conduct Toward McLaughlin Based Specifically on Her Gender

McLaughlin's second argument is that she was subjected to hostility based on her gender. In particular, she was (a) told she could not work on larger machines because she was a woman, (b) told by supervisor Johnson that women should be at home having men pay their bills rather than working at the port, © romantically propositioned by Johnson, and (d) written up by supervisor Betts after she rejected his sexual suggestions. (D.I. 40 at 19.) However, as explained below, none of her evidence is sufficient to support an inference that discrimination was a factor in the promotion process.

The record evidence that she was told she could not work on larger machines because she was a woman

comes entirely from McLaughlin's own deposition testimony, from which very little can be reasonably inferred:

BY MR. CINCILLA:

Q:.... Now, I understand that you believe you have been denied machinery training, experience and promotion. But what specifically is your basis for that that is because of your gender?

A:.... When I first arrived there, like I stated, they told me that, you know, you are not going to be able to do this. You are not going to be able to do that. They don't say that to a man. Like I stated, don't tell me I can't do anything....

(McLaughlin Dep. at 137:8-138:1, D.I. 42 Ex. H at 37.) First, McLaughlin does not specify who "they" are. Second, even though they said she could not "do this" or "do that," their motivation for coming to that conclusion is unclear; there is no evidentiary basis for assuming the motivation was gender-based animus. Finally, her assertion that "they don't say that to a man" is pure speculation given that Diamond State has hundreds of employees. Thus, the court does not find sufficient evidence to support McLaughlin's contention that she was told she could not work on large machines on account of her gender.

McLaughlin also contends that "Johnson has made the statement to me and other female workers, 'I don't think that women should be employed at Diamond State Port because women should be sitting at home having men pay their bills."' (D.I. 42 Ex. J.) Although this sort of comment might serve as a reasonable basis from which to infer discrimination, McLaughlin has not offered any corroborating evidence, e.g., the testimony of other female workers. The absence of corroboration is noteworthy for at least two reasons; (1) McLaughlin's testimony is self-serving, and (2) as already noted, and discussed further below, the other evidence offered by McLaughlin to support her claim that Diamond State engaged in a pattern and practice of gender discrimination has difficulty passing close scrutiny. In other words, even assuming, as the court must, that Johnson made the statement to McLaughlin and other female workers, the statement alone, particularly when viewed in light of the totality of this summary judgment record, is not enough to raise a genuine issue for a jury's resolution.

*7 McLaughlin's further assertion that Johnson romantically propositioned her also proves very little. At her deposition, she said Johnson asked her to dinner once in 1999, while she was still a C class employee. She turned him down, and that seems to be the end of the story. (McLaughlin Dep. at 132:7-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: 2004 WL 3059543 (D.Del.))**

133:8, D.I. 42 Ex. H at 35-36.) Without more, a man asking a woman out to dinner is simply insufficient to support an inference of discrimination.

Finally, McLaughlin presents evidence that she was written up by Betts after she rejected his sexual suggestions. In her brief, McLaughlin points to two pieces of deposition testimony to support this assertion. In the first, she describes an incident in which she was doing some work for Betts and told him she needed to use the bathroom. He followed her and began yelling at her when she stepped out of the bathroom, apparently for taking too long (although it is not entirely clear). (McLaughlin Dep. at 122:11-15, D.I. 42 Ex. H at 33.) The court fails to understand how this first piece of evidence supports her assertion that Betts made sexual suggestions.

The other piece of evidence is more clear. On an unspecified number of occasions, Betts asked McLaughlin out to dinner. She consistently turned him down. Then sometime in March 2004, McLaughlin says she was listening to gospel music at lunch when Betts said, "gospel songs, it's nothing like doing it off gospel songs." In response, McLaughlin says, "I looked at him and I cussed him out because I thought that was disrespectful to God and me." (McLaughlin Dep. at 133:19-134:14, D.I. 42 Ex. H at 36.) This exchange was followed by an email from Betts to Markow on March 16, 2004:

> Apparently Net feels as if she's only suppose to operate the 21's only. I was informed that she going to try to get me fired because I'm mistreating her. This is the way I run my ship. If the ship starts at 8am everyone who is there at 8 starts on the truck they are on. Someone shows up at 8:15 they gets what left. This is another one of her ways of using her femalism to get a job. Andy, you can send her to Russle from now on. I've worked to hard to get the people I want on the ship. It is hard enough tring to get the stuff to the right place without a disgrundle employee to disrupt my operation.
> (D.I. 42 Ex. O.)

The court agrees with McLaughlin insofar as she argues that Betts' comment about "doing it off gospel songs" could reasonably be construed as offensive. However, the court does not agree that this is sufficient evidence from which to infer discrimination. Of the six promotions for which McLaughlin applied, Betts rated applicants in three-- one in 2003 and two in 2004. (D.I. 38 Ex. F at DSPA2908, DSPA4135, DSPA4168.) [FN3] And, of those three, only two of the 2004 ratings processes took place after the gospel-music incident and

subsequent email. Moreover, in the second of those, not only did a woman (Woolford) win the promotion (D.I. 39 Ex. F at DSPA4134), but Betts ranked her as his third choice out of twenty-nine applicants. (Id. at DSPA4135). Therefore, while Betts' comment may have been inappropriate and offensive, the evidence does not establish that he harbored any gender-based animus. [FN4]

> FN3. The ratings sheets for the 2003 promotion are missing from Diamond State's records. (D.I. 37 at 9 n. 10.) However, Diamond State admits Betts was one of the rating supervisors involved in that promotion. (D.I. 43 at 10.)

> FN4. The email could be evidence of retaliation, however, the court recently denied McLaughlin's request to add a retaliation claim (among other things). (D.I.56.) Therefore, the evidence is only being analyzed by the court insofar as it is relevant to the two counts in the original complaint.

3. Disparate Treatment With Regard to Training and Opportunities

**\*8** McLaughlin's third argument that the circumstances give rise to an inference of discrimination is that she was not "allowed to train on the heavy machines like other less qualified male employees." (D.I. 40 at 20.) McLaughlin claims that when she signed up for formal training, the classes were cancelled. (Id.) At her deposition, she implied that when her supervisors saw her name on the training sign-up sheet, they would make an excuse to cancel the class. (McLaughlin Dep. at 81:13-15, D.I. 42 at 23.) Aside from the fact that her assertion is purely speculative, she presents no evidence showing that training tended to be canceled when women signed up. At best, her speculation about the motives of her supervisors would only support an inference that they did not like her in particular, as opposed to women generally. But even that inference is dubious because it is undisputed that McLaughlin received training on several other processes and pieces of machinery. (D.I. 38 Ex. F at DSPA2395, DSPA2434, DSPA2437; McLaughlin Dep. at 79:19-80:10, D.I. 42 Ex. H at 22.)

McLaughlin says that unlike her male co-workers, she was even prevented from training on the heavy machinery on her own:
BY MR. CINCILLA:

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
(Cite as: 2004 WL 3059543 (D.Del.))

Q:.... Now, I understand that you believe you have been denied machinery training, experience and promotion. But what specifically is your basis that that is because of your gender?

A:.... One day I'm there on a 21,000-pound machine practicing on empty pallets. Security pulls up. They made this big stink. Hey made me get off the lift truck and I was escorted up to the office by security.

I go to Dave Castagna and Dave Castagna told me I have to have someone with experience sitting there watching me. I said, well, in training they never told me that. They just said the way they learned was through them, they themselves practicing by themselves. So he told me, well, you have to have someone with experience or whatever to stand there with you. I said like someone is going to take off on a weekend and watch me play with a truck or take their lunch break and watch me operate a truck.

Now, when I was here, they told me to do this. They did it. And then when I told some people what happened, it never happened to them. I went to Freeman, Russell Corbin, Timothy Miller, Darry Dillard. I told them all, why did they do that? They said they don't know because they never experienced that when they practiced on the larger machines. They never had a problem.

(McLaughlin Dep. at 137:8-139:13, D.I. 42 Ex. H at 37.) Even if requiring a person to be supervised while practicing on heavy machinery was unreasonable, McLaughlin fails to present the affidavits or testimony of the men (i.e., Freeman, Corbin, Miller and Dillard) who were allowed to train in this manner. Furthermore, McLaughlin's testimony as to the statements of those men is inadmissible hearsay. Fed.R.Evid. 802. Thus, the court once again finds her unsupported assertions incapable of raising a genuine issue of material fact.

**\*9** McLaughlin also says that on the one occasion she was able to work on a heavy machine, supervisor Gamble told her to get down and she was replaced with a male C class employee. (McLaughlin Dep. at 137:13-19, D.I. 42 Ex. H at 37.) Gamble could have had any number of motivations for replacing her on a piece of heavy equipment, including McLaughlin's admitted inexperience with such machines. Thus, the court will not permit McLaughlin to characterize Gamble's motives without some evidence--either direct, circumstantial or a combination of the two--as to his actual motivation.

4. Subjective Promotion Process

McLaughlin's final argument is that the supervisors are given no training on the ratings criteria, that no checks are in place to ensure that the suggested criteria are actually used by the supervisors, and that there is no discussion with the supervisors as to the reasons for their ratings. (D.I. 40. at 5-6, 20.) Because of this subjectivity, McLaughlin claims she was passed over for promotion in favor of less-qualified men. In particular, she says she is more qualified than (1) Harold Goodridge "because he only knows how to be a laborer and she is more experienced," (2, 3) Alfie Zimmerman and Lyndon Henry "because they only know how to operate a lift truck," (4) Tina Woolford "because [she] was not dependable or reliable during the two years prior to her promotion and no supervisors wanted her to work for them," and (5) Steve Hinkle "because he only knows how to check." (D.I. 40 at 10.) McLaughlin further points out that supervisor Corbin rated her as his first choice for promotion among all the candidates for the class A lift-truck operator position in early 2004 (D.I. 38 Ex. F at DSPA4188), but the position was ultimately awarded to Lyndon Henry. (D.I. 42 Ex. G at DSPA4192.)

The evidence shows that McLaughlin applied for six promotions (D.I. 38 Ex. F at DSPA2502, DSPA4208, DSPA2514, DSPA2908, DSPA4135, DSPA4168). She argues that she was more qualified than five of the six successful candidates. However, McLaughlin's qualifications relative to those of Woolford are not probative on the issue of gender discrimination because both McLaughlin and Woolford are women. Therefore, only the relative qualifications of Goodridge, Zimmerman, Henry and Hinkle are relevant. But McLaughlin's criticisms of the qualifications of these four men do not show they were less qualified than her. She criticizes Goodridge because he only knows how to be a laborer, but he was promoted to class A *laborer.* (D.I. 38 Ex. F at DSPA4197.) Similarly, she criticizes Henry because he only knows how to operate a lift truck, but he was promoted to class A *lift-truck operator.* (D.I. 42 Ex. G at DSPA4192.) The fact that one supervisor rated her highly is not evidence that she was more qualified than Henry because he had several supervisors rate him higher than her. (See D.I. 42 Ex. G at DSPA4172-DSPA4191.) She criticizes Hinkle because he only knows how to check, but by her own admission McLaughlin "very seldom" works as a laborer or checker (McLaughlin Dep. at 52:7, D.I. 42 Ex. H at 15) thereby undercutting her claim to be more qualified than Hinkle. Finally, she criticizes Zimmerman because, like Henry, he only knows how

Not Reported in F.Supp.2d                                                                                              Page 8
Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: 2004 WL 3059543 (D.Del.))**

to operate a lift truck. Although Diamond State asserts that Zimmerman was hired as a lift-truck operator (D.I. 43 at 5), the portion of the record to which it cites for this proposition gives the impression that he was actually hired as a laborer (D.I. 38 Ex. F at DSPA4197). If he was hired as a lift-truck operator, then McLaughlin's criticism is without merit because he would have been hired for precisely the skill set McLaughlin says he has. If he was hired as a laborer, McLaughlin's criticism would be meritorious if not for her admission that she "very seldom" works as a laborer. Thus, either way her claim that Zimmerman only knows how to operate a lift truck does not prove she was more qualified than he. Since McLaughlin has not presented evidence that she was more qualified than the people who ultimately prevailed, her argument that the subjective promotion process gives rise to an inference of discrimination must fail.

*10 In sum, the court is presented with a record consisting both of evidence that does not support the inferences for which McLaughlin argues, and of the McLaughlin's uncorroborated statements. Of course, the court is cognizant of *Weldon v. Kraft, Inc., 896 F.2d 793, 800 (3d Cir.1990)*, and *Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 236 (3d Cir.1987)*, where the Third Circuit held that no rule of law prevents a plaintiff from surviving a motion for summary judgment in a discrimination case based solely on his or her own self-serving testimony. However, those cases must be read in light of their facts, lest they be allowed to "undermine the entire *McDonnell-Douglas* framework by drastically limiting the possibility that summary judgment could be granted because virtually any contrary testimony by a plaintiff would preclude a grant of summary judgment to the defendants." *Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir.1999)*.

In *Weldon,* the plaintiff contended that (1) he and other black trainees endured unfair treatment from a particular white supervisor, (2) he was required--unlike his white co-workers--to adhere strictly to medical documentation and advance-money policies, and (3) statistical evidence showed a disproportionate number of involuntary terminations among minority employees during a four-year span. 896 F.2d at 799. Although the Third Circuit believed the plaintiff's case presented "a close case," it held:

> If a factfinder were to credit [the plaintiff's] testimony regarding the harshness of the treatment he and other blacks received as well as his view of the statistical evidence, it could conclude that the performance evaluations were unfair and that [the

defendant's] explanations were pretextual.
> *Id.*

In *Jackson,* the plaintiff presented "nearly 700 transcript pages" in which he made specific allegations regarding the issue of pretext. 826 F.2d at 234. In particular, he rebutted the defendant's contention that he was terminated for performance deficiencies by pointing to (1) the fact that he never received a single complaint about his performance, (2) the compliments he received regarding his work, (3) information that was withheld from him, (4) his supervisor's solicitation of complaints about the plaintiff's work *after* he was terminated, and (5) threats communicated to the plaintiff's lawyer and others that the plaintiff's supervisor intended to ruin the plaintiff's reputation and "destroy" him. *Id.* The plaintiff also testified that he was not even assigned to some of the allegedly mishandled matters, that he was not permitted the benefit of outside consultants on specialty matters, and that, unlike his white colleagues, he was given neither a secretary nor less-experienced staff for support. *Id.* at 234-35. The Third Circuit reversed the district court's granting of summary judgment for the defendant because the plaintiff's extensive and detailed testimony contained both circumstantial and direct evidence from which a jury could infer pretext. *Id.* at 236.

*11 The court is mindful of its role in this case, as it tries to be in every case brought before it for summary resolution. In other words, the court understands that, when determining the propriety of summary judgment, its job is not to weigh the evidence or to make credibility determinations. On the other hand, the Third Circuit in *Pamintuan* clearly established that there is a threshold of sufficiency which the plaintiff must surpass before she can survive summary judgment. In contrast to both *Weldon* and *Jackson,* McLaughlin's single piece of admissible evidence that might support an inference of discrimination is Johnson's uncorroborated statement that women should not be "employed at Diamond State Port because women should be sitting at home having men pay their bills." Simply put, the court does not believe this one statement crosses the sufficiency threshold. In other words, the court does not believe it would be reasonable, in light of the entire record, for a factfinder to infer that McLaughlin was the victim of gender-based discrimination based on Johnson's statement alone.

Therefore, McLaughlin has failed to establish a prima facie case as required by *McDonnell-Douglas,* and consequently, summary judgment on Count I of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)
**(Cite as: 2004 WL 3059543 (D.Del.))**

the complaint in favor of Diamond State is appropriate.

B. Count II--Equal Pay Act

The Federal Equal Pay Act provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1) (1998).

Aside from the fact that the class system at Diamond State probably fits into one of the enumerated exceptions of § 206(d)(1), it is an explicit statutory requirement that liability under this statute depends on finding a pay differential "on the basis of sex." In this case, McLaughlin has failed to present evidence from which a reasonable factfinder could infer gender-based discrimination. Therefore, it is axiomatic that she has also failed to present evidence sufficient to support finding a pay differential "on the basis of sex." Thus, summary judgment is appropriate on Count II of the complaint as well.

VI. CONCLUSION

*12 Because McLaughlin was unable to establish a prima facie case of gender discrimination through the introduction of admissible evidence, the court will grant summary judgment in favor of Diamond State on all counts in the complaint.

*ORDER*

IT IS HEREBY ORDERED that:

1. The defendant's Motion For Summary Judgment (D.I.36) be GRANTED; and

2. The plaintiff's complaint be DISMISSED on all counts.

Not Reported in F.Supp.2d, 2004 WL 3059543 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• _____1:03CV00617_____(Docket) (Jul. 01, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.