# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


DIANE POLAND,                    )
                                 )
              Plaintiff,         )
                                 )     Civil Action
v.                               )     No. 04-217 (GMS)
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
              Defendant.         )


            Deposition of DIANE POLAND taken pursuant
to notice at the law offices of Potter, Anderson &
Corroon, 1313 North Market Street, The Hercules Plaza,
Sixth Floor, Wilmington, Delaware, beginning at 9:10 a.m.
on Wednesday, March 30, 2005, before Kathleen White
Palmer, Registered Merit Reporter and Notary Public.


APPEARANCES:


        JEFFREY K. MARTIN, ESQUIRE
        KERI L. WILLIAMS, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19806
          for the Plaintiff

        LARRY R. SEEGULL, ESQUIRE
        AMY BETH LEASURE, ESQUIRE
        DLA PIPER RUDNICK GRAY CARY LLP
          6225 Smith Avenue
          Baltimore, Maryland  21209-3600
          for the Defendant


------------------------------------------------------
                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477




WILCOX & FETZER LTD.
Registered Professional Reporters

1    African Americans"; is that right?

2        A.    Yes.

3        Q.    He says:   "'I had coffee,'" and he's recounting

4    what you said, "'I had coffee, talking to Paul about home

5    repairs.'"   Does this ring a bell?

6        A.    Sounds familiar, yes.

7        Q.    "'Dawn came over, all dressed up.'"   Sound

8    familiar?

9        A.    Sounds familiar.

10       Q.    "'Paul asked her whether she had a big

11   meeting.'"

12       A.    Sounds familiar.

13       Q.    "'She said that she was going to her son's

14   graduation at church.'"

15       A.    Sounds familiar.

16       Q.    "'She then asked me,'" meaning yourself, "'why

17   do Black people dress up for church and why is the music

18   so loud.  I told her, I could not speak for all Black

19   people.'"

20       A.    Yes, I do recall that conversation.

21       Q.    Is that the whole conversation or is there more

22   to it than that?

23       A.    It probably was more to it, but that's the gist

24   of it.



1      Q.   Did you tell her you were offended by this

2  comment?

3      A.   No.

4      Q.   Why not?

5      A.   I didn't feel the need to.

6      Q.   She told you that her son was graduating -- was

7  it a black church she was going to?

8      A.   I don't know.

9      Q.   Who was the Paul that's being referred to here?

10     A.   Paul White.

11     Q.   Did you discuss with Mr. White this

12 conversation?

13     A.   I don't remember.  Maybe we did after the fact,

14 but not while Dawn was there.

15     Q.   Did you discuss it with anybody else?

16     A.   No, just Sonia, Maureen, people I'd been talking

17 with in HR.

18     Q.   Let's go to the second point.  It says:

19 "Miss Poland furnished another example of what she

20 considered a racially insensitive remark," and he's

21 quoting you now.  "'Dawn had moved Randy, promoted him,

22 into my group.  I worked with Randy on a server."

23          Who is this Randy that's being referred to

24 here?



# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                          )
                                       )
      Ms. Poland,                      )
                                       )
         v.                          )    C.A. No. 04-217 (GMS)
                                       )
COMPUTER SCIENCES CORP.,               )
                                       )
      Defendant.                       )
_____)

## AFFIDAVIT OF DAWN DWORSKY

I, Dawn Dworsky, do hereby depose and swear as follows:

1.  I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.  I am currently employed by Computer Sciences Corporation ("CSC") as the New Service Delivery Manager. My previous position during the relevant time period was Manager of Field Engineering, Test & Integration, Dazel and Managed Print. I have been employed by CSC or a predecessor company since 12/22/78. In my previous position, I was responsible for managing the Engineering of Desktop Application, Engineering of Managed Print & Dazel, and Engineering of Desktop Software.

3.  In May 2000, CSC implemented a business restructuring. As a result of this restructuring, I replaced Edwin Derek Alston as manager of the Managed Print and Dazel ("MPD") group. I became Diane Poland's supervisor at that time.

4.  Ms. Poland was a member of the Dazel subgroup of the MPD group throughout the time that I served as her supervisor. Dazel is a sophisticated software application that allows a computer to communicate with a printer, facsimile, or e-mail, and guarantees delivery. Dazel runs on the UNIX computer operating system. The UNIX

platform is a complex computer program with numerous command codes that require proficient knowledge, expertise, and skill of the operating system. In her position in the MPD group, Ms. Poland was expected to be able to perform command line programming in UNIX.

5.    In or about May 2001, I completed an annual performance evaluation of Ms. Poland for the period of April 1, 2000 through March 31, 2001. I rated Ms. Poland as a "3" or "good," indicating that Ms. Poland's performance "consistently meets expectations and job requirements."

6.    CSC considers its employees for merit salary increases at approximately the same time of year that its annual performance evaluations are conducted. In 2001, CSC's Human Resources department issued annual Overall Merit Guidelines ("Guidelines"), which designated the recommended merit percent increase an employee should receive based on his or her evaluation rating. The Guidelines also limited the percent of the workforce population that can receive a particular rating. If a manager wanted to diverge from these recommended Guidelines, he or she had to first obtain approval from Human Resources. With respect to employees who were rated a "3" during the 2001 evaluation and salary review period, the Guidelines recommended a salary increase of between 0-4%. I wanted to reward Ms. Poland's good effort and performance for her first year in her position as a Member of Technical Staff A ("MTSA") by providing Ms. Poland with a 5% salary increase. Because I wanted to provide Ms. Poland with a salary increase over and above the recommended Guidelines, I sought and obtained Human Resources' approval to do so, and Ms. Poland received a 5% salary increase in 2001.

2

7.     I met with Ms. Poland on June 12, 2001 regarding her performance appraisal. During this meeting, Ms. Poland indicated displeasure with not being given a promotion along with her salary increase, despite the fact that Ms. Poland received a "good" evaluation and a merit salary increase above the recommended Guidelines. Ms. Poland was upset that she was not promoted to Senior Member of Technical Staff ("SMTS") in May 2001, even though she had only held the position of MTSA for one year at that time. Ms. Poland expressed to me that she deserved a promotion because she had completed Computer Based Training ("CBTs") courses in the UNIX operating system, and was furthering her education by pursuing a degree in Business Management. In addition, Ms. Poland claimed that she deserved a larger salary increase because she had worked hard during the prior year.

8.     During our June 12, 2001 meeting, I explained to Ms. Poland the reasons that she did not receive a promotion in May 2001. I advised Ms. Poland that I did not promote Ms. Poland to SMTS that year because Ms. Poland did not yet have the requisite skill set or expertise for the SMTS position and because she had only been in her current position of MTSA for one year at that time. I also told Ms. Poland that she would have to demonstrate the ability to lead projects independently, mentor and train others, work independently with the client, improve her decision-making capabilities and independently manage a "category one" problem before she could be promoted. Further, I informed Ms. Poland that, although she was doing well with the UNIX system for her level as an MTSA, Ms. Poland did not yet have the requisite skills or expertise to work with the UNIX operating system at a senior level. During this meeting, I also shared with Ms. Poland my expectations of employees in MTSA and SMTS positions.

3

9.    The only person I promoted to an SMTS in May 2001 was MaryAnne Doll-Johnson. At the time of Ms. Doll-Johnson's promotion to SMTS, she had more years of relevant experience with the UNIX operating system than Ms. Poland, and had been an MTSA for a longer period of time than Ms. Poland. She also had all of the other skills that I was looking for in an SMTS, including the ability to lead projects independently, mentor and train others, work independently with the client, independently manage a "category one" problem, deal with issues related to outages on the network, had effective decision-making capabilities, and was skilled in advanced troubleshooting.

10.   Ms. Poland remained dissatisfied with her salary increase and the fact that she was not promoted and, thus, she arranged several meetings to discuss these issues with Maureen Summers (Human Resources Manager) and me. With respect to her request for a higher salary increase, I again explained why I rated Ms. Poland as I did. Ms. Summers and I again thoroughly explained the salary increase process to Ms. Poland and that Ms. Poland's salary was consistent with her peers, and reiterated that Ms. Poland received a higher salary increase than was recommended under the Guidelines. Ms. Summers and I also explained that Ms. Poland was not ready for a promotion to SMTS at that time because of her limited time in her current position (only one year, and thus had limited on-the-job experience) and because she did not have the necessary level of expertise and skill in UNIX, among other factors. I told Ms. Poland that she would be eligible for a promotion in the future if she concentrated on increasing her technical skills and continued her good performance.

11.   In the Summer of 2001, Ms. Poland made it known to me that she wanted

4

to be transferred out of the MPD group and into a management position with CSC. I was willing to help her in whatever manner that I could with her goal. In August 2001, Ms. Poland informed me of her interest in a UNIX-related position in the Applications Interconnect Services ("AIS") group under the supervision of Dahl Landers. I contacted Ms. Landers on Ms. Poland's behalf and recommended Ms. Poland to Ms. Landers. Ms. Landers scheduled two interviews with Ms. Poland during August 2001. Ms. Poland, however, stood Ms. Landers up for both interviews, and never provided Ms. Landers with any explanation. Subsequently, in November 2001, I again spoke with Ms. Landers, on Ms. Poland's behalf, about another open position in the AIS group. On November 26, 2001, I met with Ms. Poland to discuss the AIS opportunity. Despite the facts that open positions at CSC were very limited at that time and that Ms. Poland was purportedly anxious to transfer out of the MPD group, Ms. Poland failed to follow through with Ms. Landers, and never submitted an application for the position.

12.    In July 2002, while Ms. Poland was on a full-time medical leave of absence, I promoted Randall Miller (Caucasian) from MTSA to SMTS. My decision to promote Randall Miller had absolutely nothing to do with race. Rather it was a decision based on my business judgment that Mr. Miller was ready for promotion due to his qualifications, level of experience, his technical skills with the UNIX operating system, his overall performance and time within the MTSA position. Significantly, Mr. Miller had been in the MTSA position for nearly five (5) years prior to his promotion. At the time of his promotion, Mr. Miller had over 10 years of practical, tenured experience working with the UNIX operating system as an employee for both CSC and for past employers, including DuPont. While employed at CSC, Mr. Miller also complemented his UNIX

5

experience with CBTs and seminars related to the UNIX operating system. I also believed that Mr. Miller demonstrated the ability to work independently on important technical projects without direct supervision; to provide technical direction and guidance to others; to handle various tasks involving a variety of computer programs; to deal with issues related to outages on the network, independently manage a "category one" problem and that he possessed strong decision-making capabilities and was skilled in advanced troubleshooting. I did not believe that Ms. Poland possessed the same skills. In addition, in my business judgment, Mr. Miller's years of experience working with the UNIX operating system prior to July 2002 qualified him for promotion to SMTS. I believed that Mr. Miller displayed total competency with the UNIX operating system. I based my decision to promote Mr. Miller, among other factors, upon the factors set forth in the CSC Engineering Progression Promotion form. A true and correct copy of the CSC Engineering Progression Promotion form which I completed for Mr. Miller's planned progression promotion is attached to this Affidavit as Exhibit 1. These are the same factors that I would consider in promoting anyone, regardless of race or other protected category.

13.      Because Ms. Poland had been out on medical leave since February 2002, I did not consider Ms. Poland for a promotion in July 2002. It is standard CSC practice and policy not to consider an employee for promotion while they remain out on medical leave. I have never promoted any employee while the employee was on medical leave. I did not actually consider Ms. Poland for promotion at this time because she was on a leave of absence, but I also did not believe that she had sufficient UNIX experience, time in her MTSA role, or other skills to warrant a promotion at that time. Ms. Poland had only been

6

programming in UNIX for about 2 years, and I did not believe that Ms. Poland possessed the same level of computer skills and technical expertise as Mr. Miller. Although by February 2002, when Ms. Poland went out on full-time medical leave, Ms. Poland had progressed with her UNIX training, I did not believe that Ms. Poland had reached the level of total competency required of an SMTS. In order to be qualified for the SMTS position, I believed that Ms. Poland needed to progress to the point at which she could work more independently, improve her decision-making capabilities, improve her troubleshooting skills, and demonstrate increased proficiency in the UNIX operating system. Additionally, in February 2002, when Ms. Poland went out on full-time medical leave, Ms. Poland had only held the MTSA position for less than two years, far less time in her position than Mr. Miller had when he was promoted.

14.     Throughout the time that Ms. Poland was employed in the Dazel subgroup, a woman, MaryAnne Doll-Johnson, was the highest paid person in that subgroup. In July 2001, four individuals performed engineering work in the Dazel subgroup: Ms. Poland, Audrey Daigger, MaryAnne Doll-Johnson and Randall Miller. Any difference between the compensation received by Ms. Poland and Randall Miller was based solely on legitimate business reasons other than sex. Mr. Miller received a higher salary than Ms. Poland because of his experience and his longevity with the company, based upon his CSC service date. Mr. Miller had been employed with CSC and its predecessor, DuPont, for many years, much longer than Ms. Poland, who had only been employed by CSC for five years. Consequently, Mr. Miller had gradually earned a higher salary over that time period, whereas Ms. Poland started only a few years ago. The sex of the employees was not a factor in setting their compensation levels.

7

15.     I admit that I posed an inquiry regarding church practices after I visited a church with my African-American babysitter. I did not ask the question in a disrespectful manner and was simply asking about the cultural practices of the church. Ms. Poland did not show any physical offense to the comment at the time, and never informed me that she was offended by the comment. Ms. Summers and Ms. Koplowicz questioned me about the statement, and I admitted to asking about the cultural practices of an African-American church but denied that I meant it in a disrespectful manner. Ms. Koplowicz advised me that, although I genuinely intended to inquire about a specific practice, I needed to be careful with my statements because some statements may be misconstrued or taken out of context.

16.     Ms. Poland never complained to me about any alleged racial comments. Although Ms. Poland expressed to me that she felt that I favored other members of the team over her, I immediately addressed her concerns by discussing them with her. I also sought assistance from Human Resources to resolve Ms. Poland's concerns. I deny that I ever retaliated against Ms. Poland for voicing her complaints, through isolation or any other means. Despite efforts I took to lessen Ms. Poland's feelings of exclusion in the MPD team, Ms. Poland isolated herself from other members of the team.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

Dawn Dworsky

5/5/05
Date

8

# EXHIBIT 3

83 Fed.Appx. 455                                                                                            Page 1
83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.))
**(Cite as: 83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.)))**

**Briefs and Other Related Documents**

This case was not selected for publication in the
Federal Reporter.

NOT PRECEDENTIAL.

Please use FIND to look at the applicable circuit
court rule before citing this opinion. Third Circuit
Local Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Lewis JOHNSON, Appellant,
v.
Hershel W. GOBER, Acting Secretary of Veterans
Affairs; Rodney Kiscadden;
Alice Fidler; Peg Winters; Irvin Erickson; Raymer
Kent; American Federation
of Government Employees; Local 1966.
**No. 03-1423.**

Argued Dec. 5, 2003.
Decided Dec. 18, 2003.

**Background:** Former employee of Veterans Affairs
brought action against former employer, coworkers,
and union, challenging his non-selection for a
position, VA's contest of his claim for workers
compensation benefits, the termination of his
employment, and alleging creation of a hostile work
environment. The United States District Court for the
Middle District of Pennsylvania, John E. Jones, III,
J., granted summary judgment in favor of defendants.
Plaintiff appealed.

**Holdings:** The Court of Appeals, Sloviter, Circuit
Judge, held that:
(1) employee failed to establish that employer's
proffered reason for not selecting employee for
different position was pretext for discrimination;
(2) employee failed to file lawsuit challenging the
contest of his claim for workers compensation
benefits within 90 days of receipt of the notice of the
final agency decision;
(3) employee failed to file his hostile work
environment lawsuit within 90 days of receipt of

notice of the final agency decision;
(4) employee failed to exhaust administrative
remedies prior to filing lawsuit alleging constructive
discharge; and
(5) employee was not entitled to equitable tolling of
his time barred claims.
Affirmed.

West Headnotes

**[1] Civil Rights ☜1137**
78k1137 Most Cited Cases

**[1] Civil Rights ☜1141**
78k1141 Most Cited Cases
Employee failed to establish that employer's
proffered reason for not selecting employee for
different position, that applicant selected had 17
years of experience and good demeanor, was pretext
for discrimination based on race; although employee
had more seniority than applicant, employer's
agreement with union provided that employer could
consider a variety of criteria in filling a vacant
position, not only seniority, and one alleged racially
based disparaging remark made by supervisor, which
supervisor denied making, was not sufficient to show
racial bias.

**[2] Civil Rights ☜1530**
78k1530 Most Cited Cases
Former employee of Veterans Affairs (VA) failed to
file his Title VII lawsuit challenging the VA's contest
of his claim for workers compensation benefits
within 90 days of receipt of the notice of the final
agency decision denying benefits, barring lawsuit.
Civil Rights Act of 1964, § 717(c), 42 U.S.C.A. §
2000e-16(c).

**[3] Civil Rights ☜1530**
78k1530 Most Cited Cases
Former employee of Veterans Affairs (VA) failed to
file his Title VII lawsuit alleging hostile work
environment within 90 days of receipt of the notice of
the final agency decision dismissing his claim,
barring lawsuit. Civil Rights Act of 1964, § 717(c),
42 U.S.C.A. § 2000e-16(c).

**[4] Civil Rights ☜1514**
78k1514 Most Cited Cases
Former employee of Veterans Affairs (VA) failed to
exhaust his administrative remedies prior to filing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

83 Fed Appx. 455                                                                                      Page 2
83 Fed Appx. 455, 2003 WL 22967266 (3rd Cir (Pa.))
(Cite as: 83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.)))

lawsuit alleging constructive discharge, barring claim; employee never filed a formal complaint with Equal Employment Opportunity department. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 29 C.F.R. § § 1614.105(a)(1), 1614.106(b).

[5] Civil Rights ☞1505(6)
78k1505(6) Most Cited Cases

[5] Civil Rights ☞1530
78k1530 Most Cited Cases
Former employee of Veterans Affairs (VA) was not entitled to equitable tolling of the statutory time requirements governing his Title VII suit challenging VA's contest of his claim for workers compensation benefits and alleging hostile work environment; although employee claimed he thought all of his complaints were consolidated, ALJ clearly articulated the denial of the consolidation request and employee provided no evidence that he had mistakenly believed the complaints had in fact been consolidated. Civil Rights Act of 1964, § 717(c), 42 U.S.C.A. § 2000e-16(c).

*456 On Appeal from the United States District Court for the Middle District of Pennsylvania. (D C. Civil No. 00-cv-01873). District Judge: Hon. John E. Jones, III.

Andrew J Ostrowski (Argued), Bailey, Stretton & Ostrowski, Harrisburg, PA, for Appellant.

Thomas A. Marino, United States Attorney, Kate L. Mershimer (Argued), Assistant United States Attorney, Office of United States Attorney, Middle District of Pennsylvania, Harrisburg, PA, for Appellees

Before: SLOVITER, ALITO, Circuit Judges and OBERDORFER, District Judge. [FN*]

FN* Hon Louis F. Oberdorfer, United States District Court for the District of Columbia, sitting by designation.

OPINION OF THE COURT

SLOVITER, Circuit Judge.

**1 Lewis Johnson, a former employee of the Department of Veterans Affairs ("VA") at its Lebanon Medical Center ("Lebanon"), filed suit against the Secretary of the Veteran's Administration, employees of Lebanon and the employees' union,

complaining about his non-selection for a Housekeeping Aid position in 1998, the creation of a hostile work environment, the VA's contest of his claim for Worker's Compensation benefits, and the VA's termination of his employment. He appeals from the District Court's order granting summary judgment for the defendants. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the grant of summary judgment is plenary. Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir.2002).

I.

Johnson had been employed as a Housekeeping Aid and applied for another Housekeeping Aid position in the "extended care" section of the hospital. Under the applicable union agreement, positions designated as entry-level because of their high turn-over rate or the specific requirements of the job are placed on the "Open and Continuous" list and filled through a competitive selection process for which seniority was not the determining factor for selection.

In the spring of 1998, the VA changed its employment selection process to a new approach in which the units within the VA were viewed as "teams" and the employment *457 decisions were to be made by a product line manager who would seek employees to foster a team environment. The Housekeeping Aid vacancy for which Johnson applied was posted on the "Open and Continuous" list in June 1998. Johnson (who is African-American), Ronald Hull, and other VA employees applied for the position. Only Johnson and Hull were then employed as Housekeeping Aids; the other applicants were from the Food Service department.

The applications were referred to Alice Fidler, the Nurse Manager and team leader of the extended care unit, who was designated as the decision maker for this vacancy. Fidler in turn sought the assistance of Barbara Kohr, a Nurse Manager in the Hospice Unit. Fidler and Kohr focused their decision on Hull and Johnson because of their previous housekeeping experience. Fidler did not consider the applicants' seniority, and, instead, focused on selecting the applicant she believed was most qualified for the position

Fidler testified that she selected Hull because of his experience, initiative, and understanding of patients' needs. Fidler thought Hull possessed a better ability to get along with difficult patients as well as staff members. Because the "product line" approach was to build teams on the VA staff, Fidler thought that Hull was not only more qualified but that also he

© 2005 Thomson/West. No Claim to Orig. U.S Govt. Works.

would fit in better with the team than Johnson. Both Kohr and Fidler testified in their depositions that race played no role in the decisionmaking process. Nevertheless, Johnson believed that Fidler did not select him for the position because of his race.

In October 1999, a fellow Housekeeping Aid, Irv Erickson, made a racially disparaging remark to Johnson. Erickson admitted making the remark, but contended he was kidding with Johnson. A few days after the incident, Erickson heard that Johnson was going to file an Equal Employment Opportunity ("EEO") department complaint against him. In attempting to talk with Johnson about this complaint, Erickson allegedly bumped and pushed Johnson. Johnson submitted a "Report of Contact" to an EEO counselor on October 18, 1999, and on October 20, Erickson's supervisors informed him to refrain from future contact with Johnson or he would be subject to disciplinary actions. Johnson subsequently filed a complaint with the EEO claiming that Erickson's conduct constituted a hostile work environment.

**2 On May 9, 2000, the VA sent a letter to Johnson informing him that his claim was dismissed. The VA advised Johnson that he had a right to appeal this decision to the EEOC within 30 days, or file a civil action in a District Court within 90 days. Johnson received the VA's decision on May 10, 2000, but did not file an EEOC appeal. Rather, Johnson filed a Title VII complaint on October 24, 2000, over two months after the deadline.

Shortly after the October 1999 incident with Erickson, Johnson went on sick leave and sought Worker's Compensation Benefits. While there was some confusion as to the filing of the paperwork because of the guidance Johnson received from the VA, the Department of Labor ultimately denied Johnson's claim. Johnson complained to an EEO counselor on February 5, 2000 that the VA failed to follow the appropriate guidelines in processing his paper work for the Worker's Compensation claim. On April 13, 2000, Johnson filed a formal complaint with the EEO.

On May 10, 2000, the VA dismissed Johnson's claim because the authority to grant Workers Compensation benefits was vested solely with the discretion of the Department of Labor. Johnson was notified by letter that he had a right to appeal *458 to the EEOC within 30 days, or that he could file a civil action with 90 days. Johnson received this letter on or about May 11, 2000, but did not file an EEOC appeal. As noted above, he filed the lawsuit on October 24, 2000, more

than five months after he received the final decision.

Johnson did not return to work after he left for sick leave subsequent to the Erickson incident, and on November 25, 1999, his sick leave ran out. On August 4, 2000, Johnson was advised by letter that he could receive a maximum of one year leave without pay, and that year would conclude on November 24, 2000. Johnson's physician responded by letter dated August 16, 2000 that Johnson could not return to work. On October 24, 2000, the VA proposed terminating Johnson from his Housekeeping Aid position due to his medical problems, informed Johnson of this decision, and instructed him that he had fourteen days to reply.

On November 13, 2000, a Personnel Management Specialist contacted Johnson's attorney, who verified that Johnson had received the letter. On November 14, 2000, Johnson requested permission to continue his leave without pay pending his Worker's Compensation claim, but on November 17, 2000, the VA advised him that he was being removed from employment due to his medical condition and his inability to work. Johnson received the letter on December 2, 2000. This letter advised Johnson that he could appeal this decision to the Merit System Protection Board or under the negotiated grievance procedure. Johnson took neither action, nor did he see an EEO counselor to allege discrimination, retaliation, or improper termination.

## II.

### A. *Johnson's Non-Selection Claim*

The burden shifting analysis applicable to a discrimination claim as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), provides that the claimant bears the initial burden of establishing a prima facie case of discrimination by showing that plaintiff is a member of a protected class, was qualified for and rejected for the position, and that non-members of the protected class were treated more favorably. *See Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 522 (3d Cir.1993).

**3 Once a claimant establishes a prima facie case, the burden shifts to the employer to demonstrate a legitimate nondiscriminatory reason for the adverse employment decision. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the employer proffers a legitimate nondiscriminatory reason for its decision, the burden then shifts to the plaintiff to demonstrate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the proffered reason was a mere pretext for unlawful discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Here, the District Court held that Johnson satisfied his burden of demonstrating a prima facie case, that the VA articulated legitimate nondiscriminatory reasons for its decision, and that Johnson failed to demonstrate that these reasons were a mere pretext for discrimination.

[1] On appeal, Johnson appears to challenge the legitimacy of the VA's articulated reason for the adverse employment decision. He argues that he had more seniority than Hull and that the VA failed to award the Housekeeping Aid position to the applicant who had the most seniority. We have previously noted the limited inquiry that should be performed in evaluating the reasons put forth by the defendant. We stated, " 'The question is not whether the employer made the best, or even a *459 wise, business decision; [the ultimate inquiry] is whether the real reason is [discrimination].' " *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 647 (3d Cir.1998) (quoting *Keller v. Orix Credit Alliance,* 130 F.3d 1101, 1109 (3d Cir.1997)); *see also Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1216 (3d Cir.1988) ( "our inquiry ... is not an independent assessment of how we might evaluate [an] employee").

Here, the VA presented sufficient evidence to satisfy its burden at this step of the inquiry. Despite Johnson's argument to the contrary, the VA appropriately decided that the Housekeeping Aid position would not be awarded based entirely on seniority because the Master Agreement with the union provided that a vacant Housekeeping Aid position would be placed on the "Open and Continuous" list. Because of this designation, there was nothing to preclude award of this position after considering a variety of criteria, not only seniority.

The decision on Johnson's application was made in accord with the appropriate procedures as provided in the Master Agreement. The two decision makers, Fidler and Kohr, reviewed the applicants to determine which candidate was best for the position. The selection of Hull was based on a number of criteria including Hull's seventeen years of experience in housekeeping, Hull's demeanor with patients, and his general commitment to providing a clean working environment. Thus, the District Court's conclusion that the VA satisfied its burden of demonstrating a legitimate nondiscriminatory reason

for Johnson's non-selection was not erroneous.

Johnson argues that the reasons put forth were a mere pretext for discrimination. We have stated that
**4 To survive summary judgment when the employer has articulated a legitimate nondiscriminatory reason for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.
*Simpson,* 142 F.3d at 644 (quotations omitted) (citing *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994)).

In support of Johnson's allegation that Fidler considered race in reaching her decision, Johnson contends that a number of years earlier Fidler made a disparaging racial remark during another employment decision involving a black applicant. Johnson alleges that Randal Houck, a former subordinate of Fidler, heard Fidler say that she did not want any more of "them" on the floor. App. at 347. Houck apparently interpreted this statement to mean that Fidler would not hire the applicant because he was African-American, but Houck could not point to the specific time period when this statement was made, but suggested the statement was made between three or four years prior to Houck's deposition which would put the statement at one and one-half to three years before Johnson's non-selection. In her deposition, Fidler denied ever making this remark. Johnson admitted that he never saw or heard Fidler act in a racially discriminatory manner towards him or other employees.

As Justice O'Connor noted, a claimant fails to satisfy his or her burden to show pretext by presenting evidence of an isolated inappropriate remark made by a decision maker, unrelated to the decisionmaking process. *460*Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). Furthermore, this court has noted that "[s]tray remarks by non-decisionmakers or by decisionmakers related to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold,* 983 F.2d at 545.

In light of the isolation of this alleged remark and its failure to have any connection to Johnson's non-selection, we agree that this evidence is insufficient

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

83 Fed.Appx. 455                                                                                    Page 5
83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.))
(Cite as: 83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.)))

to establish that VA's proffered reason was a mere pretext for discrimination. We have no basis to reverse the District Court's grant of summary judgment in favor of VA on Johnson's non-selection claim, and therefore will affirm.

## B. *Johnson's Hostile Work Environment and Workers Compensation Claim*

This District Court properly concluded that Johnson waived his hostile work environment claim as well as his Workers Compensation claim by failing to file a timely appeal. We have made clear that a plaintiff in a Title VII action must "exhaust all required administrative remedies before bringing a claim for judicial relief." *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir.1997). Thus, an employee bringing suit under Title VII must adhere to the administrative requirements. Specifically, 42 U.S.C. § 2000e-16(c) (2003) provides that a Title VII claimant must initiate an action in federal court within 90 days of the receipt of the notice of a final agency action or after 180 days from the date of filing the original cause of action when no agency decision has been reached. Johnson failed to do so.

**5 [2] The EEO issued its decision on Johnson's Worker's Compensation claim on May 10, 2000. Johnson did not file an EEOC appeal, and filed his Title VII lawsuit on October 24, 2000, more than five months after he received the final agency decision.

[3] The VA sent Johnson a letter on May 9, 2000 informing him that his hostile work environment claim had been dismissed, and advised him that he had a right to appeal this decision to the EEOC within 30 days, or file a civil action in the district court within 90 days. Johnson received the VA's decision on May 10, 2000, but did not file an EEOC appeal and rather filed the Title VII complaint on October 24, 2000, over two months after the deadline passed. Therefore, these claims were untimely.

## C. *Johnson's Constructive Discharge Claim*

[4] The District Court concluded that Johnson waived his discharge related claims by failing to exhaust or even pursue his administrative remedies. An employee must seek relief by contacting the EEO within 45 days of the alleged discriminatory event, 29 C.F.R. § 1614.105(a)(1), and filing a formal EEO complaint within 15 days of the receipt of the notice of the right to file such a complaint, 29 C.F.R. § 1614.106(b). Here, Johnson did not contact the EEO at any point, and therefore never filed a formal

complaint. Thus, Johnson failed to exhaust his administrative remedies for his discharge claims, and his Title VII claim based on this ground cannot be maintained.

## D. *Absence of Any Basis to Excuse Untimeliness*

[5] Despite failing to exhaust his administrative remedies, Johnson argues that the District Court should have excused the untimeliness of his claims. He contends first that the time requirements *461 should be waived because his other claims would have grown out of his non-selection claim. He argues second that the District Court should have applied equitable considerations and tolled the statutory requirements in relation to his claims. We agree with the District Court that neither argument has merit. First, Johnson's hostile work environment claim and Worker's Compensation claim involve distinct factual circumstances unrelated to his non-selection claim. Second, it is also unlikely that Johnson's discharge claim would grow out of Johnson's non-selection claim.

In *Rush v. Scott Specialty Gases Inc.*, 113 F.3d 476, 484-85 (3d Cir.1997), we noted that a failure to promote claim and a harassment claim involved distinct and different types of conduct. *Id.* The same conclusion is applicable here. Johnson's discharge claim occurred nearly two years after Johnson's application for the Housekeeping Aid position, and would not, in any way, grow out of a consideration of his non-selection claim. The District Court properly concluded that Johnson's discharge claim was untimely.

Nor is equitable tolling appropriate. We have stated:
[T]here are three principal, though not exclusive, situations in which equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.
**6 *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1391-92 (3d Cir.1994). We have recognized that "[r]unning throughout the equitable [tolling] cases is the obligation of the plaintiff to exercise due diligence to preserve his or her claim." *Robinson*, 107 F.3d at 1023.

Here, Johnson argues that equitable tolling was appropriate because he requested that his complaints

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be consolidated, and that even though the ALJ refused his request, he proceeded as if the complaints were consolidated. The District Court noted that the ALJ clearly articulated the denial of the consolidation request, and that Johnson provided no evidence that he had mistakenly believed that the complaints had in fact been consolidated. Additionally, the records from the administrative hearings on the non-selection claim show that Johnson's other claims were not under consideration. Because the record is devoid of any reasonable basis for Johnson's belief that his claims had been consolidated, we conclude he did not exercise due diligence in preserving his claims. Thus, the District Court did not err in concluding that equitable tolling was not appropriate.

### III.

Johnson not only failed to satisfy his burden of demonstrating that the VA's proffered reason for his adverse employment decision was pretext, but he also failed to exhaust his administrative remedies as required. We will therefore affirm the District Court's decision granting summary judgment for the defendants.

83 Fed.Appx. 455, 2003 WL 22967266 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

*   03-1423                        (Docket) (Feb. 13, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## EXHIBIT 4

Westlaw.

131 Fed.Appx. 867                                                                                    Page 1
131 Fed.Appx. 867
**(Cite as: 131 Fed.Appx. 867)**

This case was not selected for publication in the
Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit
court rule before citing this opinion. Third Circuit
Local Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Lisa K. FORNICOIA Appellee,
v.
HAEMONETICS CORPORATION Appellant.
No. 04-2873.

Argued May 4, 2005.
Decided May 20, 2005.

**Background:** Former employee brought action
against former employer alleging sexual harassment,
retaliation, and constructive discharge under Title
VII. The United States District Court for the Western
District of Pennsylvania, Gary L. Lancaster, J.,
entered judgment following jury verdict in favor of
employee on sexual harassment claim and in favor of
employer on retaliation and effective discharge
claims. Employer appealed.

**Holdings:** The Court of Appeals, Van Antwerpen,
Circuit Judge, held that:

(1) when no tangible employment action is taken
against an employee who alleges sexual harassment
by a supervisor, employer may raise affirmative
defense to liability or damages;

(2) in order to impose liability on an employer for a
co-worker's sexual harassment of an employee the
employee must demonstrate that the employer knew
or should have known of the harassment and failed to
take prompt remedial action; and

(3) probative value of evidence that coworker made
harassing remark to another coworker approximately
two years after employee left employment was
outweighed by danger of unfair prejudice.
Reversed and remanded.

West Headnotes

**[1] Civil Rights** ☜1189
78k1189 Most Cited Cases
When no tangible employment action is taken against
an employee who alleges sexual harassment by a
supervisor in a Title VII action against employer,
employer may raise affirmative defense to liability or
damages; the defense comprises two necessary
elements, that the employer exercised reasonable care
to prevent and correct promptly any sexually
harassing behavior, and that the employee
unreasonably failed to take advantage of any
preventive or corrective opportunities provided by
the employer or to avoid harm otherwise. Civil
Rights Act of 1964, § 701 et seq., 42 U.S.C.A. §
2000e et seq.

**[2] Civil Rights** ☜1189
78k1189 Most Cited Cases
Under Title VII, in order to impose liability on an
employer for a co-worker's sexual harassment of an
employee, where the harassing co-worker is not in a
supervisory position over employee, the employee
must demonstrate that the employer knew or should
have known of the harassment and failed to take
prompt remedial action. Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

**[3] Evidence** ☜129(5)
157k129(5) Most Cited Cases
Probative value of evidence that coworker made
harassing remark to another coworker approximately
two years after employee left employment was
outweighed by danger of unfair prejudice in
employee's Title VII action against employer alleging
sexual harassment by same coworker; evidence shed
no light on whether employee was objectively
reasonable in finding coworker's behavior offensive
given length of time between complaints and
dissimilarity between complained of acts. Fed.Rules
Evid.Rule 403, 28 U.S.C.A.
*868 Appeal from a Judgment for the Plaintiff in the
United States District Court for the Western District
of Pennsylvania. (No. 99-cv-01177). District Judge:
Honorable Gary L. Lancaster.

Richard J. Antonelli (Argued), Rebecca J. Dick-
Hurwitz, Spilman Thomas & Battle, PLLC,
Pittsburgh, PA, for Appellant.

Michael E. Hoover (Argued), Charles E. Boyle,
Diefenderfer Hoover Boyle & Wood, Pittsburgh, PA,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 Fed.Appx. 867                                                                    Page 2
131 Fed.Appx. 867
(Cite as: 131 Fed.Appx. 867)

for Appellee.

Before McKEE, VAN ANTWERPEN and WEIS, Circuit Judges.

OPINION

VAN ANTWERPEN, Circuit Judge.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because we write only for the parties, we recount only the facts relevant to our decision. Appellee Lisa Fornicoia began her employment with Appellant Haemonetics *869 Corporation on November 2, 1992, as a Clinical Specialist. In 1993 she was transferred to the company's Life Support Division where her title was changed to Manager, Clinical Services. In this new position, she reported directly to John Teutsch. Teutsch reported to Gary Stacey who had overall responsibility for the Life Support Division.

Fornicoia alleged that between May 1994 and February 1997, Teutsch engaged in behavior that she found sexually harassing and dangerous. This included inappropriate touching; diverting conversations to personal, intimate or sexual topics; sending her and her daughter gifts; appearing before her partially clothed; and implying that he wanted to hurt her, her family or himself. In October 1994, Fornicoia approached Stacey, and later Alicia Lopez, Haemonetic's General Counsel and Human Resources Director, and shared her concerns about Teutsch's behavior.

Lopez determined that Teutsch had not sexually harassed Fornicoia, but still referred Teutsch to a forensic psychologist for evaluation. Based on his report and other information they had gathered, Lopez and Stacey changed the reporting relationship so that Fornicoia no longer reported to Teutsch. They also directed that Teutsch channel all correspondence to Fornicoia through Stacey's office and instructed the two not to take business trips together.

Fornicoia alleged that Teutsch continued to harass her and that she made a complaint in May 1995. Stacey and Lopez did not recall this complaint, but agreed that Fornicoia did complain again on January 14, 1997. Based on this complaint, Lopez again determined that Teutsch's behavior did not constitute sexual harassment but agreed that Fornicoia and

Teutsch could not work together. Stacey sent a letter to Teutsch dated January 28, 1997 re-emphasizing that he was to have no contact with Fornicoia.

About a month later, Stacey advised Fornicoia that Haemonetics was reorganizing and that she was being laterally moved to the position of Clinical Specialist. In her new position, she would have the same pay and would not be required to relocate, but would have to report to the training organization in Tucson, Arizona. Fornicoia shortly thereafter gave notice of her resignation on March 22, 1997.

Fornicoia filed suit against Haemonetics in the United States District Court for the Western District of Pennsylvania. In her suit, she asserted claims of sexual harassment, retaliation and constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. A jury trial commenced on September 15, 2003, and concluded on September 22. The jury found in favor of Fornicoia on her sexual harassment claim and in favor of the Haemonetics on her retaliation and effective discharge claims.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. We exercise de novo review over the legal accuracy of the District Court's jury instructions, Citizens Fin. Group, Inc. v. Citizens Nat. Bank, 383 F.3d 110, 133 (3d Cir.2004), and review the District Court's rulings regarding the admission of evidence for abuse of discretion, Glass v. Phila. Elec. Co., 34 F.3d 188, 191 (3d Cir.1994).

## III. ANALYSIS

Haemonetics raises two issues on appeal. First, Haemonetics claims that the District Court misstated the standard for *870 employer liability when an employee is sexually harassed by a supervisor. According to Haemonetics, the District Court failed to inform the jury that Haemonetics was entitled to assert affirmative defenses if Fornicoia did not suffer a tangible job detriment. Haemonetics also claims that the District Court misstated the standard for co-worker liability by improperly placing the burden of proof on the defense. Finally, Haemonetics insists that it is entitled to a new trial because the District Court improperly allowed testimony that was irrelevant, and if not irrelevant, more prejudicial than probative.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 Fed.Appx. 867                                                    Page 3
131 Fed.Appx. 867
(Cite as: 131 Fed.Appx. 867)

We agree that the District Court's jury instructions were erroneous, and therefore we will reverse the order of the District Court and remand for a new trial.

### A. The Jury Instructions

When examining an allegedly erroneous jury instruction, we must "determine whether the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury." _Ayoub v. Spencer, 550 F.2d 164, 167 (3d Cir.1977)._ When jury instructions "fail to advise, or misadvise, a jury of concepts it needs to know to properly discharge its duties" we must remand the case for a new trial. _Dressler v. Busch Entm't Corp., 143 F.3d 778, 783 (3d Cir.1998)._

Haemonetics argues that the District Court erroneously charged the jury on Fornicoia's sexual harassment claim. Because the parties disputed whether Teutsch was Fornicoia's supervisor when the alleged harassment took place, the District Court charged the jury with two sets of instructions depending on their factual findings. We address each in turn.

#### 1. Supervisor Liability

[1] Haemonetics argues that the District Court incorrectly explained the legal standard for imposing liability on Fornicoia if the jury found that Teutsch was Fornicoia's supervisor. The District Court stated:

> If you find from the evidence that Mr. Teutsch was plaintiff's supervisor during the relevant period, then the defendant is liable for his conduct. And it is liable for his conduct whether senior management officials, in this case, Lisa Lopez or Gary Stacey, were aware of his [conduct or] not. This is called strict liability. That is, if plaintiff establishes that Mr. Teutsch was her supervisor, then defendant is liable for his conduct, regardless of whether they were aware of his conduct or not, or even if they were aware of it and took reasonable steps to stop it.
> Joint App. vol III at 762a

The District Court's instruction directly contradicts the Supreme Court's opinion in _Faragher v. City of Boca Raton, 524 U.S. 775, 792, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998),_ which reaffirmed that "Title VII does not make employers 'always automatically liable for sexual harassment by their supervisors,' _ibid.,_ contrary to the view of the Court of Appeals, which had held that 'an employer is strictly liable for a hostile environment created by a supervisor's sexual advances, even though the employer neither knew nor reasonably could have known of the alleged

misconduct,' _id._ at 69-70, 106 S.Ct., at 2406-2407." (citing _Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 69-70, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986))._ The correct standard was set out by the Court as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability *871 or damages, subject to proof by a preponderance of the evidence, see _Fed. Rule Civ. Proc. 8(c)._ The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. See _Burlington, 524 U.S. at 762-763, 118 S.Ct., at 2269._
> _Faragher, 524 U.S. at 807-08._

The jury was not asked consider whether Fornicoia suffered a tangible employment action, nor was it given instructions on Haemonetics' right to assert an affirmative defense had Fornicoia not suffered a tangible employment action. Given that the jury found that Fornicoia did not suffer retaliation or constructive discharge, it may also have found that Fornicoia did not suffer a tangible employment action. If this was the case, the jury was obligated to consider Haemonetics' affirmative defenses.

#### 2. Co-Worker Liability

[2] The District Court also misstated the standard for co-worker liability by improperly placing the burden of proof on the defendant. The District Court explained the standard for co-worker liability as follows:

> On the other hand, if you find from the evidence that Mr. Teutsch was not plaintiff's supervisor, but merely a co-worker, then defendant is entitled to assert certain defenses. Defendant neither knew nor, with reasonable diligence, should have known of his conduct; or, two, once defendant learns of the conduct, they took appropriate remedial action to stop it; and plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer and to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

131 Fed.Appx. 867
131 Fed.Appx. 867
(Cite as: 131 Fed.Appx. 867)

avoid harm, otherwise.
I am going to go over each of these defenses in
more detail. Be mindful that the defendant has the
burden of proving these defenses by a
preponderance of the evidence.
Joint App. vol III at 763a.

The District Court mischaracterized the standard of
liability as an affirmative defense. In order to impose
liability on an employer for one co-worker's sexual
harassment of another (where the harassing employer
is not in a supervisory position over the victim), the
plaintiff must demonstrate that " 'the defendant knew
or should have known oft'he harassment and failed to
take prompt remedial action." ' *Kunin v. Sears
Roebuck and Co., 175 F.3d 289, 293-94 (3d
Cir.1999)* (quoting *Andrews v. City of Philadelphia,
895 F.2d 1469, 1482 (3d Cir.1990)).* This is not an
affirmative defense, but rather the burden of the
plaintiff. *See Kunin, 175 F.3d at 294.* If the jury
found that Teutsch was not Fornicoia's supervisor,
but merely her co-worker when he harassed her,
Fornicoia had the burden of demonstrating that
Haemonetics knew or should have known of the
harassing conduct and failed to act.

It appears that the District Court intertwined the
standards of liability for supervisor and co-worker
sexual harassment and thereby failed to properly
instruct the jury on the issue. Because the jury
instructions did not fairly and adequately advise the
jury on the standards of liability, we must remand for
a new trial consistent with this opinion.

**B. The Admission of Evidence**

[3] We are troubled by the admission of what
appears to be hearsay evidence *872 that Teutsch
allegedly made a harassing remark to another
employee approximately two years after Fornicoia
left Haemonetics. We also question the relevance of
the testimony, see Fed.R.Evid. 402, [FN1] and
further note that, even if relevant, it is difficult to see
how its probative value outweighs its prejudicial
effect and tendency to confuse the issues, see
Fed.R.Evid. 403. [FN2] Therefore, we briefly
address this matter so as to offer guidance to the
District Court in conducting the new trial.

> FN1. "All relevant evidence is admissible,
> except as otherwise provided by the
> Constitution of the United States, by Act of
> Congress, by these rules, or by other rules
> prescribed by the Supreme Court pursuant to
> statutory authority. Evidence which is not
> relevant is not admissible." Fed.R.Evid. 402.

> FN2. "Although relevant, evidence may be
> excluded if its probative value is
> substantially outweighed by the danger of
> unfair prejudice, confusion of the issues, or
> misleading the jury, or by considerations of
> undue delay, waste of time, or needless
> presentation of cumulative evidence."
> Fed.R.Evid. 403.

The District Court allowed Fornicoia to present
evidence that, in 1999, an employee named Lisa
Lovis complained about Teutsch's behavior. Lopez
testified that Lovis complained that she was offended
when Teutsch "either said something or made some
explicit gesture about her in the company of others."
(Appellant App. at 486a.) This complaint apparently
led Haemonetics to review Teutsch's performance
and professionalism, and eventually resulted in his
termination.

The District Court allowed the testimony for the
purpose of establishing that the workplace was
hostile. Following the testimony, the trial judge
explained to the jury that the testimony was allowed,
"for a limited purpose only, in order for the plaintiff
to establish her claim, she must establish that the
behavior she complains of would be offensive to an
objectively reasonable person." (Appellant App. at
489a-90a.)

This Court has upheld the admission of evidence of
other acts of sexual harassment where the evidence
may be "probative as to whether the harassment was
sexually discriminatory" and "may help the jury
interpret otherwise ambiguous acts." *Hurley v.
Atlantic City Police Dept., 174 F.3d 95, 111 (3d
Cir.1999).* However, even relevant evidence may be
excluded under Rule 403 "if its probative value is
substantially outweighed by the danger of unfair
prejudice." Fed.R.Evid. 403. "[Evidence] is unfairly
prejudicial if it 'appeals to the jury's sympathies,
arouses its sense of horror, provokes its instinct to
punish,' or otherwise 'may cause a jury to base its
decision on something other than the established
propositions in the case.' " *Carter v. Hewitt, 617 F.2d
961, 972 (3d Cir.1980)* (quoting 1 J. Weinstein & M.
Berger, Weinstein's Evidence P 403(03), at 403-15 to
403-17 (1978))

Fornicoia introduced evidence that another employee
complained about a single offensive comment in
front of co-workers or customers nearly two years
after Fornicoia left Haemonetics. This evidence
sheds no light on whether Fornicoia was objectively

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

131 Fed.Appx. 867
131 Fed.Appx. 867
**(Cite as: 131 Fed.Appx. 867)**

Page 5

reasonable in finding Teutsch's inappropriate touching, continual advances, or erratic behavior offensive. Given the length of time between the complaints, the dissimilarity between the complained of acts, and the likelihood that this additional evidence will at least minimally prejudice the jury, we believe this evidence should have been excluded.

### IV. CONCLUSION

For the reasons set forth above, we reverse the Order of the District Court **\*873** and remand for a new trial consistent with this opinion.

131 Fed.Appx. 867

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.