# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


DIANE POLAND,                    )
                                 )
              Plaintiff,         )
                                 )      Civil Action
v.                               )      No. 04-217 (GMS)
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
              Defendant.         )


          Deposition of DIANE POLAND taken pursuant
to notice at the law offices of Potter, Anderson &
Corroon, 1313 North Market Street, The Hercules Plaza,
Sixth Floor, Wilmington, Delaware, beginning at 9:10 a.m.
on Wednesday, March 30, 2005, before Kathleen White
Palmer, Registered Merit Reporter and Notary Public.


APPEARANCES:


          JEFFREY K. MARTIN, ESQUIRE
          KERI L. WILLIAMS, ESQUIRE
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware  19806
            for the Plaintiff

          LARRY R. SEEGULL, ESQUIRE
          AMY BETH LEASURE, ESQUIRE
          DLA PIPER RUDNICK GRAY CARY LLP
            6225 Smith Avenue
            Baltimore, Maryland  21209-3600
            for the Defendant


-----------------------------------------------------
                    WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters

ORIGINAL

Diane Poland                                                      82

1    then you received a raise on May 15th of 1999 that took

2    it to $43,118?

3        A.    I know I received an increase, but I guess

4    that's what it was, as well.  The numbers look pretty

5    familiar.

6        Q.    Then going to the next year in May of 2000, do

7    you see that your salary at that point had been $43,118

8    and from there it went to $46,996.98?

9        A.    Yes, I do see that.

10       Q.    That was effective on May 13th of 2000?

11       A.    I see that, as well, yes.

12       Q.    That was when you received a promotion?

13       A.    Yes, it is.

14       Q.    It was about a $4,000 raise?

15       A.    Approximately, yes.

16       Q.    Is that accurate that you received about a

17   $4,000 raise in May of 2000?

18       A.    Yes, that's accurate.

19       Q.    The next document is in a slightly different

20   format, but I think it tries to capture the same

21   information.  If you look at the far right column, and

22   we've done those last two, but let's start at the

23   second-to-the-last one.  Your salary was $46,996.98 as we

24   said in May of 2000.  You then received another increase



Diane Poland                                      83

1    to $49,345.92 in May of 2001?

2        A.    Yes.

3        Q.    That was a merit increase with a raise?

4        A.    It says "Merit Increase" with -- I guess that's

5    supposed to be raise.  It says an "R."

6        Q.    But, in fact, you received again about a $3,000

7    raise in May of 2001?

8        A.    Yes, approximately.

9        Q.    Then in September 2002 it shows not that there's

10   a raise, but it shows that there was a termination, a

11   voluntary termination due to health.

12       A.    That's what it shows, yes.

13       Q.    That's what it shows.  I understand you may not

14   know down to the last penny what you earned, but you are

15   not disputing the numbers that I just read to you?

16       A.    No, I'm not.

17       Q.    Those accurately reflect what your raises were

18   and what your salaries were?

19       A.    I believe so, yes.

20       Q.    And the dates of your raises and promotion?

21       A.    Yes.

22       Q.    In May of 2000 when you received your promotion,

23   you went from an MTSB to an MTSA; correct?

24       A.    Yes.



Diane Poland                                    272

1    status, this is the leave, this is the first leave you go

2    out on which is full time?

3         A.    I'm not sure because it's dated August the 8th.

4    I don't know.  I know it's a leave policy.  I don't know

5    when it was submitted to me.

6         Q.    Well, just to go back, didn't you request

7    full-time leave as of August 8th, 2001?  Didn't we just

8    look at that?

9         A.    I put in workmen's comp.  I believe that's what

10   this says, "Request for Leave."

11        Q.    Just look at Defendant's Exhibit 22.

12        A.    Okay.

13        Q.    Okay?  You see that your effective date of leave

14   was August 6, 2001?

15        A.    Yes.

16        Q.    So it was right after you requested that leave

17   that you were sent this letter; correct?

18        A.    Yes.

19        Q.    So that's what this letter relates to?

20        A.    I assume so, yes.

21        Q.    Ms. Osborn was telling you that CSC was going to

22   designate your leave as FMLA leave?

23        A.    I believe so, yes.

24        Q.    They were approving your leave?



Diane Poland                                          273

1    A.    I believe so, yes.  They did.

2    Q.    Do you see in paragraph 3 on the second page you

3  were told that you have to use all of your paid leave

4  according to the policy prior to taking an unpaid leave

5  of absence?

6    A.    Yes.

7    Q.    That was the policy of the company; right?

8    A.    Yes.

9    Q.    Then do you see on paragraph 7 that you were

10  told that if you were on leave for a personal health

11  condition, you were required to furnish the benefits

12  office with medical certification every 30 days?

13    A.    Yes, I do see that.

14    Q.    Now, in addition to this letter, isn't it true

15  that Ms. Osborn spoke to you over the phone when you

16  commenced your first leave of absence and told you about

17  your duties and your obligations under the leave of

18  absence policies?

19    A.    It's possible, but I don't recall I spoke with

20  her specifically about that.

21    Q.    Didn't she also tell you that you had to provide

22  an updated doctor's note every 30 days?

23    A.    It's possible.

24    Q.    You returned to work on August 22nd, 2001;



1    correct?

2        A.    I think so.

3        Q.    But you went out again on an additional medical

4    leave on August 27th through September 10th?

5        A.    Yeah.  I know I went out again, but I don't

6    remember the dates.

7        Q.    You remember you stayed out until

8    September 10th, 2001?

9        A.    I remember being out, but I don't remember the

10   dates.

11       Q.    Do you remember when you returned to work you

12   presented a disability certificate that allowed you to

13   return to work, but only for 30 hours per week?

14       A.    I do remember coming in with that note, yes.

15       Q.    Do you remember that CSC approved your reduced

16   schedule and designated the ten hours that you needed to

17   have off as FMLA time?

18       A.    I believe so, yes.

19       Q.    They continued to pay you for those ten hours

20   even though you were --

21       A.    I believe so.  I think so.

22       Q.    -- even though you were on leave?

23       A.    Even though I was on leave.

24       Q.    They continued to deduct those ten hours on a



# **EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                                )
                                             )
            Plaintiff,                       )
                                             )
      v.                                     )      C.A. No. 04-217 (GMS)
                                             )
COMPUTER SCIENCES CORP.,                     )
                                             )
            Defendant.                       )
                                             )

## AFFIDAVIT OF EDWIN DEREK ALSTON

I, Edwin Derek Alston, do hereby depose and swear as follows:

1.      I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.      I am currently an employee of Computer Sciences Corporation ("CSC"), and have worked for CSC since June 1997 in a managerial capacity.

3.      In 1999, my duties included supervising the Managed Print and Dazel ("MPD") group. On October 2, 1999, Diane Poland transferred into the MPD group as a technical service analyst. Accordingly, I became Ms. Poland's supervisor at that time. While Ms. Poland worked under my supervision, she was the lowest performer in the MPD group, due to her lack of experience. Ms. Poland was not nearly as technologically experienced as the other members of the group at that time. Ms. Poland was essentially in training when she first transferred into the group, and would frequently seek assistance from her team members.

4.      On May 13, 2000, I promoted Ms. Poland from Member Technical Staff B to Member Technical Staff A ("MTSA"). I have reviewed CSC's salary history

documentation for Ms. Poland. Ms. Poland also received a raise at that time, thereby increasing her salary from $43,118 to $46,996.98. At the time of her promotion, I told Ms. Poland that she should not expect another promotion any time soon based on time in her new position. I also advised her that she would have much to learn in order to be able to succeed at her new level of MTSA.

     5.     In May 2000, CSC implemented a business restructuring. As a direct result of this restructuring, Dawn Dworsky took over management of the MPD group, and I no longer supervised Ms. Poland.

     6.     Ms. Poland never complained to me that she was subjected to discriminatory statements, or that she was subjected to any other type of discrimination.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_____
Edwin Derek Alston

5-5-2005
Date

2

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

|                          |   |                      |
|--------------------------|---|----------------------|
| DIANE POLAND,            | ) |                      |
|                          | ) |                      |
| Ms. Poland,              | ) |                      |
|                          | ) |                      |
| v.                       | ) | C.A. No. 04-217 (GMS)|
|                          | ) |                      |
| COMPUTER SCIENCES CORP., | ) |                      |
|                          | ) |                      |
| Defendant.               | ) |                      |

## AFFIDAVIT OF SIMMIE HOEFT

I, Simmie Hoeft, do hereby depose and swear as follows:

1.     I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.     I am a former employee of Computer Sciences Corporation ("CSC"). I started my employment with CSC in October 2000. During my employment with CSC, I was known by the name "Simmie Osborn." At times during my employment with CSC, I served in the position of Leave Coordinator.

3.     CSC maintains a Leave of Absence Without Pay Policy ("Leave Policy"). The Leave Policy provides, in part, that an employee on a medical leave of absence must submit a certificate of disability to Human Resources from his or her attending physician every thirty days from the date the medical leave is commenced. The Leave Policy further provides that any failure on the part of the employee to provide a continuing medical certification may be considered a resignation by the Company. Importantly, CSC's Leave Policy places no affirmative duty on CSC to remind employees of their obligations under the policy. In fact, under the explicit terms of the policy, an employee

may be deemed to have resigned upon his or her first failure to provide a timely medical certificate.

4.     I have reviewed Ms. Poland's leave records.  On August 6, 2001, Diane Poland requested a full-time medical leave of absence due to stress.  I was assigned to be Ms. Poland's Leave Coordinator.  CSC granted Ms. Poland's request for leave, and counseled her both orally and in writing about her obligations and responsibilities during the time she was out on medical leave, including her duty to provide a medical certificate every 30 days to the Benefits Office.  On August 14, 2001, Ms. Poland acknowledged her obligations under the Leave Policy.  Specifically, Ms. Poland acknowledged that her "employment with CSC will be subject to termination if I fail to provide Human Resources with a doctor's certificate on a monthly basis."

5.     Ms. Poland returned from her medical leave on August 22, 2001.  Shortly thereafter, however, Ms. Poland took another full-time medical leave of absence on August 27, 2001 through September 10, 2001.

6.     On September 11, 2001, Ms. Poland returned to work and presented a medical certificate allowing her to return to work, but restricting her to a 30-hour workweek.  CSC accommodated Ms. Poland's request by providing Ms. Poland with a 30-hour reduced work schedule, and designated the remaining 10 hours as FMLA leave.  Ms. Poland continued to work a reduced schedule until she returned to a full-time medical leave of absence on February 21, 2002.  Ms. Poland remained on a full-time leave of absence until September 27, 2002.

7.     In direct violation of her obligations under CSC's Leave Policy, Ms. Poland repeatedly failed to submit timely medical certifications to CSC every thirty days.

2

As one example, Ms. Poland submitted an October 30, 2001 certification from her medical provider, which stated that Ms. Poland was only able to work a 30-hour work week "for 1 month (the month of November)." Ms. Poland did not submit an updated medical certification (dated December 3, 2001), however, until December 13, 2001, as is clear by the facsimile history on the certification itself. True and correct copies of the medical certifications from Ms. Poland's medical provider dated October 30, 2001 and December 3, 2001 are attached to this Affidavit as Exhibits 1 and 2. Although, under the terms of its Leave Policy, CSC could have designated Ms. Poland's first omission to submit a medical certification every thirty days to constitute a voluntary separation from employment back in December 2001 (when Ms. Poland submitted her medical certification nearly two weeks late). CSC did not do so, however; rather, it provided Ms. Poland with numerous chances to comply with its Leave Policy, and gave Ms. Poland countless reminders and warnings regarding the potential consequences she would suffer if she continued to fail to comply. Ms. Poland was repeatedly told in writing that she needed to get her medical documentation in on time — but she was repeatedly late in providing her medical information. In fact, Ms. Poland failed to provide timely medical documentation on more than four separate occasions.

8.    Though not required under CSC's Leave Policy, I called, e-mailed and sent letters to Ms. Poland on numerous occasions to remind her that her medical certificate was either coming due or was delinquent. Maureen Summers, Human Resources Specialist, also reminded Ms. Poland several times in writing of her obligations under the Leave Policy, and the potential consequences for her failure to submit certifications. In fact, in addition to the notifications of her duties under the

3

Leave Policy mentioned above, Ms. Poland also received the following written reminders of her obligation to timely submit medical certifications to CSC:

| Date | Reminder By Company To Ms. Poland To Submit Medical Documentation |
|------|------------------------------------------------------------------|
| 12/12/01 | E-mail from Ms. Osborn to Ms. Poland requesting that Ms. Poland submit an updated doctor's note. |
| 1/4/02 | E-mail from Ms. Osborn to Ms. Poland reminding Ms. Poland that she would need to submit a certification extending her disability period if she was not able to return to a 40-hour work week. |
| 1/24/02 | E-mail from Ms. Osborn to Ms. Poland requesting Ms. Poland to submit a doctor's note extending her disability period. |
| 2/25/02 | Letter from Ms. Summers to Ms. Poland reminding Ms. Poland of her obligation under the Leave Policy to submit a certificate of disability at the commencement of her medical leave and every thirty days thereafter. Ms. Summers also warned Ms. Poland that *"CSC Human Resources Management (HRMP) 247 further states that any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation."* |
| 3/18/02 | E-mail from Ms. Osborn to Ms. Poland reminding Ms. Poland to submit an updated medical certification which includes an estimated return to work date. |
| 5/21/02 | Letter from Ms. Summers to Ms. Poland reminding Ms. Poland of her obligation to provide a continuing certificate of disability every 30 days, and *noting that Ms. Poland had been reminded of this requirement at least six times via written correspondence and ten times via telephone.* Ms. Summers noted that her medical certification was due on 5/12/02, and thus, was overdue. Ms. Summers again reminded Ms. Poland that *"[f]ailure to provide the required medical certification on time and every 30 days is a violation of company policy, and considered by CSC to be a voluntary resignation."* |
| 6/20/02 | Letter from Ms. Osborn to Ms. Poland reminding Ms. Poland to submit an updated medical certification no later than 7/28/02. Ms. Osborn again warned Ms. Poland that *"[f]ailure to provide the required medical certification on a timely basis may be considered by CSC as a voluntary resignation of your employment with CSC."* |

4

9.    On June 21, 2002, CSC received a certification from Ms. Poland's medical provider dated June 14, 2002, which stated that Ms. Poland may "be able to return to work within the next two to three months." Thus, at the very latest, Ms. Poland was required under CSC's Leave Policy to provide an updated medical certification to CSC by September 14, 2002. Despite the numerous written and oral warnings Ms. Poland received regarding her obligation to provide timely medical certifications and specifying the consequences for a failure to do so, Ms. Poland did not provide an updated medical certification by that date. Therefore, in accordance with CSC's Leave Policy, Maureen Summers and Sonia Koplowicz determined that Ms. Poland's failure to submit a timely medical certification constituted a voluntary resignation on Ms. Poland's part, and terminated her employment effective September 27, 2002. CSC did not receive an updated medical certification for Ms. Poland until September 29, 2002, after she had been terminated.

10.    I have reviewed the medical leave of absence records of several other employees who were terminated for the same reason as Ms. Poland. CSC terminated both Aliza Panitz (Caucasian female) and Monte Moser (Caucasian male) due to their failure to provide requisite medical certifications related to their medical leaves of absence in accordance with CSC's Leave of Absence policy. Neither of these employees had ever made claims or complaints about discrimination about their employment with CSC.

5

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

Simmie Hoeft

5-5-05
Date

6

# __EXHIBIT 4__

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                          )
                                       )
        Ms. Poland,                    )
                                       )
        v.                             )       C.A. No. 04-217 (GMS)
                                       )
COMPUTER SCIENCES CORP.,               )
                                       )
        Defendant.                     )
_____)

## AFFIDAVIT OF DAWN DWORSKY

I, Dawn Dworsky, do hereby depose and swear as follows:

1.  I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.  I am currently employed by Computer Sciences Corporation ("CSC") as the New Service Delivery Manager. My previous position during the relevant time period was Manager of Field Engineering, Test & Integration, Dazel and Managed Print. I have been employed by CSC or a predecessor company since 12/22/78. In my previous position, I was responsible for managing the Engineering of Desktop Application, Engineering of Managed Print & Dazel, and Engineering of Desktop Software.

3.  In May 2000, CSC implemented a business restructuring. As a result of this restructuring, I replaced Edwin Derek Alston as manager of the Managed Print and Dazel ("MPD") group. I became Diane Poland's supervisor at that time.

4.  Ms. Poland was a member of the Dazel subgroup of the MPD group throughout the time that I served as her supervisor. Dazel is a sophisticated software application that allows a computer to communicate with a printer, facsimile, or e-mail, and guarantees delivery. Dazel runs on the UNIX computer operating system. The UNIX

platform is a complex computer program with numerous command codes that require proficient knowledge, expertise, and skill of the operating system. In her position in the MPD group, Ms. Poland was expected to be able to perform command line programming in UNIX.

5.    In or about May 2001, I completed an annual performance evaluation of Ms. Poland for the period of April 1, 2000 through March 31, 2001. I rated Ms. Poland as a "3" or "good," indicating that Ms. Poland's performance "consistently meets expectations and job requirements."

6.    CSC considers its employees for merit salary increases at approximately the same time of year that its annual performance evaluations are conducted. In 2001, CSC's Human Resources department issued annual Overall Merit Guidelines ("Guidelines"), which designated the recommended merit percent increase an employee should receive based on his or her evaluation rating. The Guidelines also limited the percent of the workforce population that can receive a particular rating. If a manager wanted to diverge from these recommended Guidelines, he or she had to first obtain approval from Human Resources. With respect to employees who were rated a "3" during the 2001 evaluation and salary review period, the Guidelines recommended a salary increase of between 0-4%. I wanted to reward Ms. Poland's good effort and performance for her first year in her position as a Member of Technical Staff A ("MTSA") by providing Ms. Poland with a 5% salary increase. Because I wanted to provide Ms. Poland with a salary increase over and above the recommended Guidelines, I sought and obtained Human Resources' approval to do so, and Ms. Poland received a 5% salary increase in 2001.

7.     I met with Ms. Poland on June 12, 2001 regarding her performance appraisal. During this meeting, Ms. Poland indicated displeasure with not being given a promotion along with her salary increase, despite the fact that Ms. Poland received a "good" evaluation and a merit salary increase above the recommended Guidelines. Ms. Poland was upset that she was not promoted to Senior Member of Technical Staff ("SMTS") in May 2001, even though she had only held the position of MTSA for one year at that time. Ms. Poland expressed to me that she deserved a promotion because she had completed Computer Based Training ("CBTs") courses in the UNIX operating system, and was furthering her education by pursuing a degree in Business Management. In addition, Ms. Poland claimed that she deserved a larger salary increase because she had worked hard during the prior year.

8.     During our June 12, 2001 meeting, I explained to Ms. Poland the reasons that she did not receive a promotion in May 2001. I advised Ms. Poland that I did not promote Ms. Poland to SMTS that year because Ms. Poland did not yet have the requisite skill set or expertise for the SMTS position and because she had only been in her current position of MTSA for one year at that time. I also told Ms. Poland that she would have to demonstrate the ability to lead projects independently, mentor and train others, work independently with the client, improve her decision-making capabilities and independently manage a "category one" problem before she could be promoted. Further, I informed Ms. Poland that, although she was doing well with the UNIX system for her level as an MTSA, Ms. Poland did not yet have the requisite skills or expertise to work with the UNIX operating system at a senior level. During this meeting, I also shared with Ms. Poland my expectations of employees in MTSA and SMTS positions.

3

9.     The only person I promoted to an SMTS in May 2001 was MaryAnne Doll-Johnson.  At the time of Ms. Doll-Johnson's promotion to SMTS, she had more years of relevant experience with the UNIX operating system than Ms. Poland, and had been an MTSA for a longer period of time than Ms. Poland.  She also had all of the other skills that I was looking for in an SMTS, including the ability to lead projects independently, mentor and train others, work independently with the client, independently manage a "category one" problem, deal with issues related to outages on the network, had effective decision-making capabilities, and was skilled in advanced troubleshooting.

10.     Ms. Poland remained dissatisfied with her salary increase and the fact that she was not promoted and, thus, she arranged several meetings to discuss these issues with Maureen Summers (Human Resources Manager) and me.  With respect to her request for a higher salary increase, I again explained why I rated Ms. Poland as I did. Ms. Summers and I again thoroughly explained the salary increase process to Ms. Poland and that Ms. Poland's salary was consistent with her peers, and reiterated that Ms. Poland received a higher salary increase than was recommended under the Guidelines. Ms. Summers and I also explained that Ms. Poland was not ready for a promotion to SMTS at that time because of her limited time in her current position (only one year, and thus had limited on-the-job experience) and because she did not have the necessary level of expertise and skill in UNIX, among other factors.  I told Ms. Poland that she would be eligible for a promotion in the future if she concentrated on increasing her technical skills and continued her good performance.

11.     In the Summer of 2001, Ms. Poland made it known to me that she wanted

4

to be transferred out of the MPD group and into a management position with CSC. I was willing to help her in whatever manner that I could with her goal. In August 2001, Ms. Poland informed me of her interest in a UNIX-related position in the Applications Interconnect Services ("AIS") group under the supervision of Dahl Landers. I contacted Ms. Landers on Ms. Poland's behalf and recommended Ms. Poland to Ms. Landers. Ms. Landers scheduled two interviews with Ms. Poland during August 2001. Ms. Poland, however, stood Ms. Landers up for both interviews, and never provided Ms. Landers with any explanation. Subsequently, in November 2001, I again spoke with Ms. Landers, on Ms. Poland's behalf, about another open position in the AIS group. On November 26, 2001, I met with Ms. Poland to discuss the AIS opportunity. Despite the facts that open positions at CSC were very limited at that time and that Ms. Poland was purportedly anxious to transfer out of the MPD group, Ms. Poland failed to follow through with Ms. Landers, and never submitted an application for the position.

    12.    In July 2002, while Ms. Poland was on a full-time medical leave of absence, I promoted Randall Miller (Caucasian) from MTSA to SMTS. My decision to promote Randall Miller had absolutely nothing to do with race. Rather it was a decision based on my business judgment that Mr. Miller was ready for promotion due to his qualifications, level of experience, his technical skills with the UNIX operating system, his overall performance and time within the MTSA position. Significantly, Mr. Miller had been in the MTSA position for nearly five (5) years prior to his promotion. At the time of his promotion, Mr. Miller had over 10 years of practical, tenured experience working with the UNIX operating system as an employee for both CSC and for past employers, including DuPont. While employed at CSC, Mr. Miller also complemented his UNIX

experience with CBTs and seminars related to the UNIX operating system. I also believed that Mr. Miller demonstrated the ability to work independently on important technical projects without direct supervision; to provide technical direction and guidance to others; to handle various tasks involving a variety of computer programs; to deal with issues related to outages on the network, independently manage a "category one" problem and that he possessed strong decision-making capabilities and was skilled in advanced troubleshooting. I did not believe that Ms. Poland possessed the same skills. In addition, in my business judgment, Mr. Miller's years of experience working with the UNIX operating system prior to July 2002 qualified him for promotion to SMTS. I believed that Mr. Miller displayed total competency with the UNIX operating system. I based my decision to promote Mr. Miller, among other factors, upon the factors set forth in the CSC Engineering Progression Promotion form. A true and correct copy of the CSC Engineering Progression Promotion form which I completed for Mr. Miller's planned progression promotion is attached to this Affidavit as Exhibit 1. These are the same factors that I would consider in promoting anyone, regardless of race or other protected category.

13.    Because Ms. Poland had been out on medical leave since February 2002, I did not consider Ms. Poland for a promotion in July 2002. It is standard CSC practice and policy not to consider an employee for promotion while they remain out on medical leave. I have never promoted any employee while the employee was on medical leave. I did not actually consider Ms. Poland for promotion at this time because she was on a leave of absence, but I also did not believe that she had sufficient UNIX experience, time in her MTSA role, or other skills to warrant a promotion at that time. Ms. Poland had only been

6

programming in UNIX for about 2 years, and I did not believe that Ms. Poland possessed the same level of computer skills and technical expertise as Mr. Miller. Although by February 2002, when Ms. Poland went out on full-time medical leave, Ms. Poland had progressed with her UNIX training, I did not believe that Ms. Poland had reached the level of total competency required of an SMTS. In order to be qualified for the SMTS position, I believed that Ms. Poland needed to progress to the point at which she could work more independently, improve her decision-making capabilities, improve her troubleshooting skills, and demonstrate increased proficiency in the UNIX operating system. Additionally, in February 2002, when Ms. Poland went out on full-time medical leave, Ms. Poland had only held the MTSA position for less than two years, far less time in her position than Mr. Miller had when he was promoted.

14.    Throughout the time that Ms. Poland was employed in the Dazel subgroup, a woman, MaryAnne Doll-Johnson, was the highest paid person in that subgroup. In July 2001, four individuals performed engineering work in the Dazel subgroup: Ms. Poland, Audrey Daigger, MaryAnne Doll-Johnson and Randall Miller. Any difference between the compensation received by Ms. Poland and Randall Miller was based solely on legitimate business reasons other than sex. Mr. Miller received a higher salary than Ms. Poland because of his experience and his longevity with the company, based upon his CSC service date. Mr. Miller had been employed with CSC and its predecessor, DuPont, for many years, much longer than Ms. Poland, who had only been employed by CSC for five years. Consequently, Mr. Miller had gradually earned a higher salary over that time period, whereas Ms. Poland started only a few years ago. The sex of the employees was not a factor in setting their compensation levels.

15.    I admit that I posed an inquiry regarding church practices after I visited a church with my African-American babysitter. I did not ask the question in a disrespectful manner and was simply asking about the cultural practices of the church. Ms. Poland did not show any physical offense to the comment at the time, and never informed me that she was offended by the comment. Ms. Summers and Ms. Koplowicz questioned me about the statement, and I admitted to asking about the cultural practices of an African-American church but denied that I meant it in a disrespectful manner. Ms. Koplowicz advised me that, although I genuinely intended to inquire about a specific practice, I needed to be careful with my statements because some statements may be misconstrued or taken out of context.

16.    Ms. Poland never complained to me about any alleged racial comments. Although Ms. Poland expressed to me that she felt that I favored other members of the team over her, I immediately addressed her concerns by discussing them with her. I also sought assistance from Human Resources to resolve Ms. Poland's concerns. I deny that I ever retaliated against Ms. Poland for voicing her complaints, through isolation or any other means. Despite efforts I took to lessen Ms. Poland's feelings of exclusion in the MPD team, Ms. Poland isolated herself from other members of the team.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

Dawn Dworsky

Date 5/5/05

8