# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                    )
                                 )
                Plaintiff,       )
                                 )     Civil Action
v.                               )     No. 04-217 (GMS)
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
                Defendant.       )


          Deposition of DIANE POLAND taken pursuant
to notice at the law offices of Potter, Anderson &
Corroon, 1313 North Market Street, The Hercules Plaza,
Sixth Floor, Wilmington, Delaware, beginning at 9:10 a.m.
on Wednesday, March 30, 2005, before Kathleen White
Palmer, Registered Merit Reporter and Notary Public.


APPEARANCES:


        JEFFREY K. MARTIN, ESQUIRE
        KERI L. WILLIAMS, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19806
          for the Plaintiff

        LARRY R. SEEGULL, ESQUIRE
        AMY BETH LEASURE, ESQUIRE
        DLA PIPER RUDNICK GRAY CARY LLP
          6225 Smith Avenue
          Baltimore, Maryland  21209-3600
          for the Defendant


--------------------------------------------------
              WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters
ORIGINAL

    1   correct?

    2       A.    I think so.

    3       Q.    But you went out again on an additional medical

    4   leave on August 27th through September 10th?

    5       A.    Yeah.  I know I went out again, but I don't

    6   remember the dates.

    7       Q.    You remember you stayed out until

    8   September 10th, 2001?

    9       A.    I remember being out, but I don't remember the

   10   dates.

   11       Q.    Do you remember when you returned to work you

   12   presented a disability certificate that allowed you to

   13   return to work, but only for 30 hours per week?

   14       A.    I do remember coming in with that note, yes.

   15       Q.    Do you remember that CSC approved your reduced

   16   schedule and designated the ten hours that you needed to

   17   have off as FMLA time?

   18       A.    I believe so, yes.

   19       Q.    They continued to pay you for those ten hours

   20   even though you were --

   21       A.    I believe so.  I think so.

   22       Q.    -- even though you were on leave?

   23       A.    Even though I was on leave.

   24       Q.    They continued to deduct those ten hours on a



**WILCOX & FETZER LTD.**

Registered Professional Reporters

Diane Poland                                278

1  your disability"?

2      A.    Yes, I do see that.

3      Q.    Do you see on the last page, January 24th, 2002,

4  the bottom e-mail?

5      A.    Yes.

6      Q.    Do you see that you were told at the end "Please

7  submit an updated doctor's note extending your

8  disability"?

9      A.    Yes, I do see that.

10     Q.    With respect to all of your medical notes and

11 your correspondence about your medical conditions, do you

12 know the exact dates on which you returned or provided

13 your certifications or medical information to CSC?

14     A.    No, I don't recall.

15     Q.    Would the company know what dates you turned in

16 your medical notes?

17     A.    I would assume so.

18     Q.    How would the company do that?  Would they look

19 at the dates of the notes?

20     A.    I don't know.

21     Q.    Would they look at facsimile headers?

22     A.    I don't know.

23     Q.    Now, you continued on a reduced leave schedule

24 until February 21, 2002; correct?



1      A.    Possibly, yes, around that time.

2      Q.    That's when you went out on full-time medical

3  leave?

4      A.    I believe so.

5      Q.    That lasted until September 27, 2002?

6      A.    I don't recall.

7      Q.    About that?

8      A.    About that.

9            (Defendant's Exhibit 26 was marked for

10  identification.)

11  BY MR. SEEGULL:

12     Q.    I'm now showing you what's been marked as

13  Defendant's Exhibit 26.  This first page is a letter that

14  you received from Maureen Summers on or about

15  February 25th, 2002?

16     A.    That's correct.

17     Q.    Ms. Summers told you that as required by CSC

18  policy, a certificate of disability from your attending

19  physician must be presented to CSC at the commencement of

20  your medical leave and then every 30 days thereafter;

21  correct?

22     A.    Yes.

23     Q.    She also told you that according to CSC's

24  policy, any failure on the part of the employee to



# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                        )
                                     )
        Ms. Poland,                  )
                                     )
        v.                           )        C.A. No. 04-217 (GMS)
                                     )
COMPUTER SCIENCES CORP.,             )
                                     )
        Defendant.                   )
_____)

### AFFIDAVIT OF SIMMIE HOEFT

I, Simmie Hoeft, do hereby depose and swear as follows:

1.      I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.      I am a former employee of Computer Sciences Corporation ("CSC"). I started my employment with CSC in October 2000. During my employment with CSC, I was known by the name "Simmie Osborn." At times during my employment with CSC, I served in the position of Leave Coordinator.

3.      CSC maintains a Leave of Absence Without Pay Policy ("Leave Policy"). The Leave Policy provides, in part, that an employee on a medical leave of absence must submit a certificate of disability to Human Resources from his or her attending physician every thirty days from the date the medical leave is commenced. The Leave Policy further provides that any failure on the part of the employee to provide a continuing medical certification may be considered a resignation by the Company. Importantly, CSC's Leave Policy places no affirmative duty on CSC to remind employees of their obligations under the policy. In fact, under the explicit terms of the policy, an employee

may be deemed to have resigned upon his or her first failure to provide a timely medical certificate.

4.    I have reviewed Ms. Poland's leave records.  On August 6, 2001, Diane Poland requested a full-time medical leave of absence due to stress.  I was assigned to be Ms. Poland's Leave Coordinator.  CSC granted Ms. Poland's request for leave, and counseled her both orally and in writing about her obligations and responsibilities during the time she was out on medical leave, including her duty to provide a medical certificate every 30 days to the Benefits Office.  On August 14, 2001, Ms. Poland acknowledged her obligations under the Leave Policy.  Specifically, Ms. Poland acknowledged that her "employment with CSC will be subject to termination if I fail to provide Human Resources with a doctor's certificate on a monthly basis."

5.    Ms. Poland returned from her medical leave on August 22, 2001.  Shortly thereafter, however, Ms. Poland took another full-time medical leave of absence on August 27, 2001 through September 10, 2001.

6.    On September 11, 2001, Ms. Poland returned to work and presented a medical certificate allowing her to return to work, but restricting her to a 30-hour workweek.  CSC accommodated Ms. Poland's request by providing Ms. Poland with a 30-hour reduced work schedule, and designated the remaining 10 hours as FMLA leave. Ms. Poland continued to work a reduced schedule until she returned to a full-time medical leave of absence on February 21, 2002.  Ms. Poland remained on a full-time leave of absence until September 27, 2002.

7.    In direct violation of her obligations under CSC's Leave Policy, Ms. Poland repeatedly failed to submit timely medical certifications to CSC every thirty days.

2

As one example, Ms. Poland submitted an October 30, 2001 certification from her medical provider, which stated that Ms. Poland was only able to work a 30-hour work week "for 1 month (the month of November)." Ms. Poland did not submit an updated medical certification (dated December 3, 2001), however, until December 13, 2001, as is clear by the facsimile history on the certification itself. True and correct copies of the medical certifications from Ms. Poland's medical provider dated October 30, 2001 and December 3, 2001 are attached to this Affidavit as Exhibits 1 and 2. Although, under the terms of its Leave Policy, CSC could have designated Ms. Poland's first omission to submit a medical certification every thirty days to constitute a voluntary separation from employment back in December 2001 (when Ms. Poland submitted her medical certification nearly two weeks late). CSC did not do so, however; rather, it provided Ms. Poland with numerous chances to comply with its Leave Policy, and gave Ms. Poland countless reminders and warnings regarding the potential consequences she would suffer if she continued to fail to comply. Ms. Poland was repeatedly told in writing that she needed to get her medical documentation in on time — but she was repeatedly late in providing her medical information. In fact, Ms. Poland failed to provide timely medical documentation on more than four separate occasions.

8.    Though not required under CSC's Leave Policy, I called, e-mailed and sent letters to Ms. Poland on numerous occasions to remind her that her medical certificate was either coming due or was delinquent. Maureen Summers, Human Resources Specialist, also reminded Ms. Poland several times in writing of her obligations under the Leave Policy, and the potential consequences for her failure to submit certifications. In fact, in addition to the notifications of her duties under the

3

Leave Policy mentioned above, Ms. Poland also received the following written reminders

of her obligation to timely submit medical certifications to CSC:

| Date | Reminder By Company To Ms. Poland To Submit Medical Documentation |
|------|------------------------------------------------------------------|
| 12/12/01 | E-mail from Ms. Osborn to Ms. Poland requesting that Ms. Poland submit an updated doctor's note. |
| 1/4/02 | E-mail from Ms. Osborn to Ms. Poland reminding Ms. Poland that she would need to submit a certification extending her disability period if she was not able to return to a 40-hour work week. |
| 1/24/02 | E-mail from Ms. Osborn to Ms. Poland requesting Ms. Poland to submit a doctor's note extending her disability period. |
| 2/25/02 | Letter from Ms. Summers to Ms. Poland reminding Ms. Poland of her obligation under the Leave Policy to submit a certificate of disability at the commencement of her medical leave and every thirty days thereafter. Ms. Summers also warned Ms. Poland that *"CSC Human Resources Management (HRMP) 247 further states that any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation."* |
| 3/18/02 | E-mail from Ms. Osborn to Ms. Poland reminding Ms. Poland to submit an updated medical certification which includes an estimated return to work date. |
| 5/21/02 | Letter from Ms. Summers to Ms. Poland reminding Ms. Poland of her obligation to provide a continuing certificate of disability every 30 days, and *noting that Ms. Poland had been reminded of this requirement at least six times via written correspondence and ten times via telephone.* Ms. Summers noted that her medical certification was due on 5/12/02, and thus, was overdue. Ms. Summers again reminded Ms. Poland that *"[f]ailure to provide the required medical certification on time and every 30 days is a violation of company policy, and considered by CSC to be a voluntary resignation."* |
| 6/20/02 | Letter from Ms. Osborn to Ms. Poland reminding Ms. Poland to submit an updated medical certification no later than 7/28/02. Ms. Osborn again warned Ms. Poland that *"[f]ailure to provide the required medical certification on a timely basis may be considered by CSC as a voluntary resignation of your employment with CSC."* |

4

9.     On June 21, 2002, CSC received a certification from Ms. Poland's medical provider dated June 14, 2002, which stated that Ms. Poland may "be able to return to work within the next two to three months." Thus, at the very latest, Ms. Poland was required under CSC's Leave Policy to provide an updated medical certification to CSC by September 14, 2002. Despite the numerous written and oral warnings Ms. Poland received regarding her obligation to provide timely medical certifications and specifying the consequences for a failure to do so, Ms. Poland did not provide an updated medical certification by that date. Therefore, in accordance with CSC's Leave Policy, Maureen Summers and Sonia Koplowicz determined that Ms. Poland's failure to submit a timely medical certification constituted a voluntary resignation on Ms. Poland's part, and terminated her employment effective September 27, 2002. CSC did not receive an updated medical certification for Ms. Poland until September 29, 2002, after she had been terminated.

10.    I have reviewed the medical leave of absence records of several other employees who were terminated for the same reason as Ms. Poland. CSC terminated both Aliza Panitz (Caucasian female) and Monte Moser (Caucasian male) due to their failure to provide requisite medical certifications related to their medical leaves of absence in accordance with CSC's Leave of Absence policy. Neither of these employees had ever made claims or complaints about discrimination about their employment with CSC.

5

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.


_____          _____
Simmie Hoeft                              Date    5-5-05

6

# **<u>EXHIBIT 3</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE POLAND, | ) | |
| | ) | |
| Ms. Poland, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-217 (GMS) |
| | ) | |
| COMPUTER SCIENCES CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AFFIDAVIT OF DAWN DWORSKY

I, Dawn Dworsky, do hereby depose and swear as follows:

1.   I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.      I am currently employed by Computer Sciences Corporation ("CSC") as the New Service Delivery Manager.  My previous position during the relevant time period was Manager of Field Engineering, Test & Integration, Dazel and Managed Print.  I have been employed by CSC or a predecessor company since 12/22/78.  In my previous position, I was responsible for managing the Engineering of Desktop Application, Engineering of Managed Print & Dazel, and Engineering of Desktop Software.

3.      In May 2000, CSC implemented a business restructuring.  As a result of this restructuring, I replaced Edwin Derek Alston as manager of the Managed Print and Dazel ("MPD") group.  I became Diane Poland's supervisor at that time.

4.      Ms. Poland was a member of the Dazel subgroup of the MPD group throughout the time that I served as her supervisor.  Dazel is a sophisticated software application that allows a computer to communicate with a printer, facsimile, or e-mail, and guarantees delivery.  Dazel runs on the UNIX computer operating system.  The UNIX

platform is a complex computer program with numerous command codes that require proficient knowledge, expertise, and skill of the operating system. In her position in the MPD group, Ms. Poland was expected to be able to perform command line programming in UNIX.

5.    In or about May 2001, I completed an annual performance evaluation of Ms. Poland for the period of April 1, 2000 through March 31, 2001. I rated Ms. Poland as a "3" or "good," indicating that Ms. Poland's performance "consistently meets expectations and job requirements."

6.    CSC considers its employees for merit salary increases at approximately the same time of year that its annual performance evaluations are conducted. In 2001, CSC's Human Resources department issued annual Overall Merit Guidelines ("Guidelines"), which designated the recommended merit percent increase an employee should receive based on his or her evaluation rating. The Guidelines also limited the percent of the workforce population that can receive a particular rating. If a manager wanted to diverge from these recommended Guidelines, he or she had to first obtain approval from Human Resources. With respect to employees who were rated a "3" during the 2001 evaluation and salary review period, the Guidelines recommended a salary increase of between 0-4%. I wanted to reward Ms. Poland's good effort and performance for her first year in her position as a Member of Technical Staff A ("MTSA") by providing Ms. Poland with a 5% salary increase. Because I wanted to provide Ms. Poland with a salary increase over and above the recommended Guidelines, I sought and obtained Human Resources' approval to do so, and Ms. Poland received a 5% salary increase in 2001.

2

7.    I met with Ms. Poland on June 12, 2001 regarding her performance appraisal. During this meeting, Ms. Poland indicated displeasure with not being given a promotion along with her salary increase, despite the fact that Ms. Poland received a "good" evaluation and a merit salary increase above the recommended Guidelines. Ms. Poland was upset that she was not promoted to Senior Member of Technical Staff ("SMTS") in May 2001, even though she had only held the position of MTSA for one year at that time. Ms. Poland expressed to me that she deserved a promotion because she had completed Computer Based Training ("CBTs") courses in the UNIX operating system, and was furthering her education by pursuing a degree in Business Management. In addition, Ms. Poland claimed that she deserved a larger salary increase because she had worked hard during the prior year.

8.    During our June 12, 2001 meeting, I explained to Ms. Poland the reasons that she did not receive a promotion in May 2001. I advised Ms. Poland that I did not promote Ms. Poland to SMTS that year because Ms. Poland did not yet have the requisite skill set or expertise for the SMTS position and because she had only been in her current position of MTSA for one year at that time. I also told Ms. Poland that she would have to demonstrate the ability to lead projects independently, mentor and train others, work independently with the client, improve her decision-making capabilities and independently manage a "category one" problem before she could be promoted. Further, I informed Ms. Poland that, although she was doing well with the UNIX system for her level as an MTSA, Ms. Poland did not yet have the requisite skills or expertise to work with the UNIX operating system at a senior level. During this meeting, I also shared with Ms. Poland my expectations of employees in MTSA and SMTS positions.

3

9.    The only person I promoted to an SMTS in May 2001 was MaryAnne Doll-Johnson.  At the time of Ms. Doll-Johnson's promotion to SMTS, she had more years of relevant experience with the UNIX operating system than Ms. Poland, and had been an MTSA for a longer period of time than Ms. Poland.  She also had all of the other skills that I was looking for in an SMTS, including the ability to lead projects independently, mentor and train others, work independently with the client, independently manage a "category one" problem, deal with issues related to outages on the network, had effective decision-making capabilities, and was skilled in advanced troubleshooting.

10.    Ms. Poland remained dissatisfied with her salary increase and the fact that she was not promoted and, thus, she arranged several meetings to discuss these issues with Maureen Summers (Human Resources Manager) and me.  With respect to her request for a higher salary increase, I again explained why I rated Ms. Poland as I did. Ms. Summers and I again thoroughly explained the salary increase process to Ms. Poland and that Ms. Poland's salary was consistent with her peers, and reiterated that Ms. Poland received a higher salary increase than was recommended under the Guidelines. Ms. Summers and I also explained that Ms. Poland was not ready for a promotion to SMTS at that time because of her limited time in her current position (only one year, and thus had limited on-the-job experience) and because she did not have the necessary level of expertise and skill in UNIX, among other factors.  I told Ms. Poland that she would be eligible for a promotion in the future if she concentrated on increasing her technical skills and continued her good performance.

11.    In the Summer of 2001, Ms. Poland made it known to me that she wanted

to be transferred out of the MPD group and into a management position with CSC. I was willing to help her in whatever manner that I could with her goal. In August 2001, Ms. Poland informed me of her interest in a UNIX-related position in the Applications Interconnect Services ("AIS") group under the supervision of Dahl Landers. I contacted Ms. Landers on Ms. Poland's behalf and recommended Ms. Poland to Ms. Landers. Ms. Landers scheduled two interviews with Ms. Poland during August 2001. Ms. Poland, however, stood Ms. Landers up for both interviews, and never provided Ms. Landers with any explanation. Subsequently, in November 2001, I again spoke with Ms. Landers, on Ms. Poland's behalf, about another open position in the AIS group. On November 26, 2001, I met with Ms. Poland to discuss the AIS opportunity. Despite the facts that open positions at CSC were very limited at that time and that Ms. Poland was purportedly anxious to transfer out of the MPD group, Ms. Poland failed to follow through with Ms. Landers, and never submitted an application for the position.

12.     In July 2002, while Ms. Poland was on a full-time medical leave of absence, I promoted Randall Miller (Caucasian) from MTSA to SMTS. My decision to promote Randall Miller had absolutely nothing to do with race. Rather it was a decision based on my business judgment that Mr. Miller was ready for promotion due to his qualifications, level of experience, his technical skills with the UNIX operating system, his overall performance and time within the MTSA position. Significantly, Mr. Miller had been in the MTSA position for nearly five (5) years prior to his promotion. At the time of his promotion, Mr. Miller had over 10 years of practical, tenured experience working with the UNIX operating system as an employee for both CSC and for past employers, including DuPont. While employed at CSC, Mr. Miller also complemented his UNIX

5

experience with CBTs and seminars related to the UNIX operating system. I also believed that Mr. Miller demonstrated the ability to work independently on important technical projects without direct supervision; to provide technical direction and guidance to others; to handle various tasks involving a variety of computer programs; to deal with issues related to outages on the network, independently manage a "category one" problem and that he possessed strong decision-making capabilities and was skilled in advanced troubleshooting. I did not believe that Ms. Poland possessed the same skills. In addition, in my business judgment, Mr. Miller's years of experience working with the UNIX operating system prior to July 2002 qualified him for promotion to SMTS. I believed that Mr. Miller displayed total competency with the UNIX operating system. I based my decision to promote Mr. Miller, among other factors, upon the factors set forth in the CSC Engineering Progression Promotion form. A true and correct copy of the CSC Engineering Progression Promotion form which I completed for Mr. Miller's planned progression promotion is attached to this Affidavit as Exhibit 1. These are the same factors that I would consider in promoting anyone, regardless of race or other protected category.

13.    Because Ms. Poland had been out on medical leave since February 2002, I did not consider Ms. Poland for a promotion in July 2002. It is standard CSC practice and policy not to consider an employee for promotion while they remain out on medical leave. I have never promoted any employee while the employee was on medical leave. I did not actually consider Ms. Poland for promotion at this time because she was on a leave of absence, but I also did not believe that she had sufficient UNIX experience, time in her MTSA role, or other skills to warrant a promotion at that time. Ms. Poland had only been

6

programming in UNIX for about 2 years, and I did not believe that Ms. Poland possessed the same level of computer skills and technical expertise as Mr. Miller. Although by February 2002, when Ms. Poland went out on full-time medical leave, Ms. Poland had progressed with her UNIX training, I did not believe that Ms. Poland had reached the level of total competency required of an SMTS. In order to be qualified for the SMTS position, I believed that Ms. Poland needed to progress to the point at which she could work more independently, improve her decision-making capabilities, improve her troubleshooting skills, and demonstrate increased proficiency in the UNIX operating system. Additionally, in February 2002, when Ms. Poland went out on full-time medical leave, Ms. Poland had only held the MTSA position for less than two years, far less time in her position than Mr. Miller had when he was promoted.

14.    Throughout the time that Ms. Poland was employed in the Dazel subgroup, a woman, MaryAnne Doll-Johnson, was the highest paid person in that subgroup. In July 2001, four individuals performed engineering work in the Dazel subgroup: Ms. Poland, Audrey Daigger, MaryAnne Doll-Johnson and Randall Miller. Any difference between the compensation received by Ms. Poland and Randall Miller was based solely on legitimate business reasons other than sex. Mr. Miller received a higher salary than Ms. Poland because of his experience and his longevity with the company, based upon his CSC service date. Mr. Miller had been employed with CSC and its predecessor, DuPont, for many years, much longer than Ms. Poland, who had only been employed by CSC for five years. Consequently, Mr. Miller had gradually earned a higher salary over that time period, whereas Ms. Poland started only a few years ago. The sex of the employees was not a factor in setting their compensation levels.

15.    I admit that I posed an inquiry regarding church practices after I visited a church with my African-American babysitter. I did not ask the question in a disrespectful manner and was simply asking about the cultural practices of the church. Ms. Poland did not show any physical offense to the comment at the time, and never informed me that she was offended by the comment. Ms. Summers and Ms. Koplowicz questioned me about the statement, and I admitted to asking about the cultural practices of an African-American church but denied that I meant it in a disrespectful manner. Ms. Koplowicz advised me that, although I genuinely intended to inquire about a specific practice, I needed to be careful with my statements because some statements may be misconstrued or taken out of context.

16.    Ms. Poland never complained to me about any alleged racial comments. Although Ms. Poland expressed to me that she felt that I favored other members of the team over her, I immediately addressed her concerns by discussing them with her. I also sought assistance from Human Resources to resolve Ms. Poland's concerns. I deny that I ever retaliated against Ms. Poland for voicing her complaints, through isolation or any other means. Despite efforts I took to lessen Ms. Poland's feelings of exclusion in the MPD team, Ms. Poland isolated herself from other members of the team.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_Dawn Dworsky_
Dawn Dworsky

5/5/05
Date

8

# EXHIBIT 4

1994 U.S. Dist. LEXIS 1637; 64 Fair Empl. Prac. Cas. (BNA) 592

ROSA F. RUDISELL v. S.H.R.M. CATERING SERVICES, INC. AND CONOCO, INC.

CIVIL ACTION NO. 92-3212 SECTION "N" (4)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

1994 U.S. Dist. LEXIS 1637; 64 Fair Empl. Prac. Cas. (BNA) 592

February 10, 1994, Decided
February 11, 1994, Filed, Entered

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant corporations filed motions to dismiss or for summary judgment in an action brought by plaintiff employee that alleged that her termination from employment was in violation of Title VII, 42 U.S.C.S. § 2000e et seq., and the Civil Rights Act of 1991(1991 Act), 42 U.S.C.S. § 1981a.

**OVERVIEW:** The court had previously dismissed some of the employee's claims. The court found that the test used to determine whether an employment relationship existed in a Title VII case was a hybrid economic realities/common law control test. There were disputed issues of material fact regarding one of the corporations status as an employer, and the court denied that one corporation's motion for summary judgment. The jury and damages provisions of the 1991 Act did not apply to claims filed after the effective date of the 1991 Act that referenced pre-1991 Act conduct. Therefore, the court dismissed the employee's claims for compensatory and punitive damages and her jury demand. There was an issue as to whether the employee was disabled and unable to work during a specific period, and whether any economic loss during that period was caused by a disability or the alleged discrimination. However, the corporations' motions were granted to the extent that they sought dismissal of the claim for back pay after the date the employee started receiving worker's compensation.

**OUTCOME:** The court denied the corporations' motions insofar as they sought dismissal of the employee's claim of retaliatory discharge.

**CORE TERMS:** summary judgment, termination, national origin, effective date, punitive damages, jury trial, compensatory, retroactivity, retroactively, harassment, sex, Civil Rights Act, prima facie case, equitable relief, employment relationship, worker's compensation, policy statement, remaining claim, time card, irregularities, retaliation, terminated, disability, occurring, disabled, adduced, disputed issues, material fact, moot

**LexisNexis(TM) Headnotes**

*Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1964*

[HN1]The test used to determine whether an employment relationship exists between a plaintiff and defendant in a Title VII of the Civil Rights Act of 1964 case is a hybrid economic realities/common law control test. The right to control, which is the most important component of the test, includes consideration of whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule. The economic realities test looks to whether the alleged employer paid a salary, withheld taxes, provided benefits and set the terms and conditions of employment.

*Labor & Employment Law > Discrimination > Title VII Amendments*

[HN2]Section 102 of the Civil Rights Act of 1991 adds compensatory and punitive damages as available relief under Title VII and adds a provision whereby either party may request a jury trial if the plaintiff seeks such damages. 42 U.S.C.S. § 1981a.

*Governments > Legislation > Effect & Operation > Prospective & Retrospective Operation*

*Labor & Employment Law > Discrimination > Title VII Amendments*

[HN3]The amendments to the Civil Rights Act of 1991 (Act) are not to be retroactively applied to conduct occurring prior to the effective date of the Act. The damage provisions of the Civil Rights Act of 1991 do not apply to conduct occurring before its effective date.

*Governments > Legislation > Effect & Operation > Prospective & Retrospective Operation*

*Governments > Legislation > Effect & Operation > Amendments*

*Labor & Employment Law > Discrimination > Title VII Amendments*

1994 U.S. Dist. LEXIS 1637; 64 Fair Empl. Prac. Cas. (BNA) 592

[HN4]In the case of amendments to Title VII of the Civil Rights Act of 1964, which is administered by the Equal Employment Opportunity Commission, if the statute is silent or ambiguous with respect to the specific issue of retroactivity, the question for a court is whether the agency's answer is based on a permissible construction of the statute.

*Labor & Employment Law > Discrimination > Title VII Amendments*

[HN5] 42 U.S.C.S. § 1981a, added by § 102 of the Civil Rights Act of 1991, provides that a jury trial may be requested by either party only when the complaining party seeks to recover compensatory and punitive damages. It follows that if damages are not available, then a jury trial is not available.

*Labor & Employment Law > Discrimination > Title VII Amendments*

[HN6]The jury and damages provisions of the Civil Rights Act of 1991 do not apply to claims filed after the effective date of the 1991 Act which reference pre-1991 Act conduct.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Remedies*

*Labor & Employment Law > Discrimination > National Origin Discrimination > Remedies*

[HN7]An award of back pay is designed to place a plaintiff in the position she would have been in "but for" the discrimination.

*Labor & Employment Law > Discrimination > Retaliation*

[HN8]To establish a prima facie case of unlawful retaliation under Title VII of the Civil Rights Act of 1964, the plaintiff must establish that she engaged in statutorily protected conduct, that there was an adverse employment action, and that there was a causal connection between the two.

**JUDGES:** [*1] FONSECA

**OPINIONBY:** RONALD A. FONSECA

**OPINION: ORDER AND REASONS**

This matter is before the Court on defendants' motions to dismiss and/or for summary judgment. After a hearing on February 2, 1994, the Court dismissed plaintiff's claims pursuant to 42 U.S.C. §§ 1981 and 1983 and La. R.S. § 23:1006 and her Title VII claims for sexual and national origin harassment. Plaintiff's remaining claim is that her termination from employment was in violation of Title VII, 42 U.S.C. § 2000e, et seq.

## 1. Conoco's Motion for Summary Judgment

Asserting that it is not plaintiff's employer and therefore not subject to liability under Title VII, Conoco, Inc. ("Conoco") has moved for dismissal of plaintiff's Title VII claim against Conoco. For all purposes relevant to this case, Title VII clearly requires an employment relationship. n1 See 42 U.S.C. § 2000e-2; Broussard v. L.H. Bossier, Inc., 789 F.2d 1158, 1159 (5th Cir. 1986). [HN1]The test used to determine whether an employment relationship exists between the plaintiff and defendant in a Title VII case is a "hybrid [*2] economic realities/common law control test." Deal v. State Farm County Mutual Insurance Co., 5 F.3d 117, 119 (5th Cir. 1993), and cases cited therein. The right to control, which is the most important component of the test, includes consideration of "whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule." Id. at 119. The economic realities test looks to whether the alleged employer paid a salary, withheld taxes, provided benefits and set the terms and conditions of employment. Id.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 An individual may also, under Title VII, sue an employer to whom she applied for employment, employment agencies, labor organizations or entities controlling training programs. See 42 U.S.C. § 2000e-2(a)-(d). None of these categories are relevant to the issues in this case.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

We find that there are disputed issues of material [*3] fact for trial regarding Conoco's status as an employer. For example, in her affidavit, plaintiff states that Conoco employees supervised her conduct and attendance, had the right to tell her how to perform her duties, prepared written evaluations of her work and had a part in plaintiff's termination. Accordingly, Conoco's motion for summary judgment is DENIED.

## 2. Motion to Dismiss and for Summary Judgment on behalf of S.H.R.M. Catering Services, Inc. and Conoco, Inc.

### A. Compensatory and punitive damages and jury demand

Defendants seek dismissal of plaintiff's compensatory and punitive damages claims and demand for a jury trial.

Page 2

1994 U.S. Dist. LEXIS 1637; 64 Fair Empl. Prac. Cas. (BNA) 592

Traditionally, the only relief available under Title VII was equitable relief. Bennett v. Corroon and Black Corporation, 845 F.2d 104, 106 (5th Cir. 1988), cert. denied, 489 U.S. 1020, 109 S. Ct. 1140, 103 L. Ed. 2d 201 (1989). [HN2]Section 102 of the Civil Rights Act of 1991 added compensatory and punitive damages as available relief under Title VII and added a provision whereby either party may request a jury trial if the plaintiff seeks such damages. See Civil [*4] Rights Act of 1991, Pub. L. No. 102-166, sections 102(a)(1), 102(c), 105 Stat. 1072-73 (1991) (the "1991 Act"), 42 U.S.C. § 1981a. The effective date of the 1991 Act was November 21, 1991. Although plaintiff filed her complaint after the effective date, her claim is based on conduct which occurred prior to November 21, 1991. The question before the court, therefore, is whether the damages and jury provisions of the 1991 Act are applicable to post-1991 Act claims arising from pre-1991 Act conduct.

The Fifth Circuit has indicated that [HN3]the amendments to the 1991 Act are not to be retroactively applied to conduct occurring prior to the effective date of the Act. In Landgraf v. USI Film Products, 968 F.2d 427, 433 (5th Cir. 1992), cert. granted in part, 113 S. Ct. 1250, 122 L. Ed. 2d 649 (1993), the Fifth Circuit stated that "the damage provisions of the Civil Rights Act of 1991 do not apply to conduct occurring before its effective date." In Landgraf, the plaintiff's Title VII claim had been fully adjudicated at a bench trial prior to the enactment of the 1991 Act and the [*5] plaintiff, on appeal, sought a remand to consider her claim for damages and for a jury trial. The Fifth Circuit noted that "there is no clear congressional intent on the general issue of the Act's application to pending cases." Id. at 432. The court also noted the "recognized tension" between the Supreme Court's decisions in Bradley v. Richmond School Board, 416 U.S. 696, 94 S. Ct. 2006, 40 L. Ed. 2d 476 (1974) (statutes should be applied retroactively unless Congressional intent indicates otherwise or manifest injustice would result) and Bowen v. Georgetown University Hospital, 488 U.S. 204, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988) (absent clear Congressional intent to the contrary, statutes apply prospectively only). Landgraf did not attempt to resolve this tension, because the court found that even under the relaxed Bradley retroactivity test, the jury and damages provisions should not be retroactively applied in that case.

In Rowe v. Sullivan, 967 F.2d 186 (5th Cir. 1992), the Fifth Circuit found [*6] that [HN4]in the case of amendments to Title VII, which is administered by the Equal Employment Opportunity Commission ("EEOC"), "if the statute is silent or ambiguous with respect to the specific issue [of retroactivity], the question for the Court is whether the agency's answer

is based on a permissible construction of the statute." Id. at 194. The Court found the agency's answer to the retroactivity question in a policy statement issued by the EEOC dated December 27, 1991:

> In light of the ambiguity in legislative history and Supreme Court precedent, the issue of whether the damages provisions in the new Act should be applied retroactively is much in question . . . Bowen represents the Supreme Court's more recent holding on this issue, and the Commission will follow the dictates of that case with regard to the retroactivity of the damages provisions. Accordingly, the Commission will not seek damages in charges filed prior to enactment of the Act, or in post-Act charges that challenge pre-Act conduct.

EEOC decision number 915.002, 1991 WL 323429 at *4 (December 27, 1991). The Fifth Circuit found that the EEOC's decision was reasonable. Rowe, 967 F.2d at 194. [*7]

As noted above, [HN5] 42 U.S.C. § 1981a, added by Section 102 of the 1991 Act, provides that a jury trial may be requested by either party only when the complaining party seeks to recover compensatory and punitive damages. It follows that if damages are not available, then a jury trial is not available.

Guided by Landgraf and Rowe and with reference to the EEOC's policy statement on the retroactive application of the 1991 Act, we find that [HN6]the jury and damages provisions of the Civil Rights Act of 1991 do not apply to claims filed after the effective date of the 1991 Act which reference pre-1991 Act conduct. Because plaintiff's claim falls within this category, her demand for compensatory and punitive damages and jury demand are hereby DISMISSED.

B. Availability of equitable relief

Defendants assert, and plaintiff apparently does not dispute, that plaintiff would not be entitled to an award of back pay for any period during which she has been totally disabled from employment. [HN7]An award of back pay is designed to place the plaintiff in the position she would have been in "but for" the discrimination. Sellers v. Delgado Community College, 839 F.2d 1132, 1136 (5th Cir. 1988). [*8] In this case, plaintiff has been receiving worker's compensation benefits for total disability since April 19, 1991. Thus, any economic losses suffered by plaintiff since that date were caused by her disability and not by the alleged discrimination. However, it is possible that plaintiff may be entitled to an award of

Page 3

back pay for the period from her termination on March 15, 1991 until she started receiving worker's compensation benefits on April 19, 1991. For at least part of that one month period, plaintiff worked for another employer. Thus, there is an issue whether plaintiff was in fact disabled and unable to work during that period and whether any economic loss during that period was caused by a disability or the alleged discrimination. Accordingly, defendants' motion is GRANTED to the extent that it seeks dismissal of plaintiff's claim for back pay after April 19, 1991. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 If, during the period between now and the trial, plaintiff's condition improves to the point that she is no longer disabled and that she is able and willing to work, she may also have a claim for back pay for the period from the improvement in her condition to the date of judgment.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*9]

Defendants also assert that there is no other equitable relief available to plaintiff and that the case should be dismissed as moot. Plaintiff asserts, however, that she anticipates improvement in her medical condition and that reinstatement may be an appropriate remedy. Accordingly, to the extent that defendants' motion seeks dismissal of plaintiff's Title VII claim as moot, the motion is DENIED.

3. Motion for Summary Judgment by Defendants, S.H.R.M. Catering Services, Inc. and Conoco, Inc.

Defendants finally seek summary judgment on the merits of plaintiff's remaining claim of discriminatory discharge. In her opposition to defendants' motion, plaintiff concedes that it "may be true" that she cannot prove that her termination was due to her sex or national origin. Furthermore, plaintiff has made no attempt to establish the elements of a prima facie case. Accordingly, summary judgment is appropriate. See Celotex Corporation v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Defendants' motion is GRANTED as to plaintiff's claim that she was terminated because of her sex and/or national origin and that [*10] claim is hereby DISMISSED.

Plaintiff contends, however, that there are disputed material facts relating to the issue of whether she was discharged in retaliation for her complaints of sex and national origin harassment. [HN8]To establish a prima facie case of unlawful retaliation under Title VII, the

plaintiff must establish that she engaged in statutorily protected conduct, that there was an adverse employment action, and that there was a causal connection between the two. Whatley v. Metropolitan Atlanta Rapid Transit Authority, 632 F.2d 1325, 1328 (5th Cir. 1980). In their motion, defendants contend that plaintiff cannot meet the third element of the prima facie case because "she has absolutely no evidence that her transfer off of the Conoco contract was due to anything other than time card irregularities." We find, however, that plaintiff has adduced enough evidence to raise disputed issues of material fact as to this element. n3 Plaintiff's termination from employment followed, in time, her complaints of sex and national origin harassment. n4 Her deposition testimony indicates that, after she complained of harassment, she was made to feel that [*11] she was the problem. Furthermore, she testified that she was told by S.H.R.M. that she was being fired at the request of a Conoco employee.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 We note that, in connection with their motion, defendants have adduced no evidence in support of the proffered nondiscriminatory reason for plaintiff's transfer or termination, i.e. time card irregularities.

n4 Neither party has clearly set forth the circumstances regarding plaintiff's termination. Thus, it is unclear whether plaintiff was offered a transfer off of the Conoco contract or whether she was simply terminated from employment with S.H.R.M.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Accordingly, defendants' motion is DENIED to the extent that it seeks dismissal of plaintiff's claim of retaliatory discharge.

New Orleans, Louisiana, this 10 day of February, 1994.

RONALD A. FONSECA

United States Magistrate Judge