# **EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                    )
                                 )
            Plaintiff,           )
                                 )      Civil Action
v.                               )  No. 04-217 (GMS)
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
            Defendant.           )


            Deposition of DIANE POLAND taken pursuant
to notice at the law offices of Potter, Anderson &
Corroon, 1313 North Market Street, The Hercules Plaza,
Sixth Floor, Wilmington, Delaware, beginning at 9:10 a.m.
on Wednesday, March 30, 2005, before Kathleen White
Palmer, Registered Merit Reporter and Notary Public.


APPEARANCES:


        JEFFREY K. MARTIN, ESQUIRE
        KERI L. WILLIAMS, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19806
          for the Plaintiff

        LARRY R. SEEGULL, ESQUIRE
        AMY BETH LEASURE, ESQUIRE
        DLA PIPER RUDNICK GRAY CARY LLP
          6225 Smith Avenue
          Baltimore, Maryland  21209-3600
          for the Defendant


------------------------------------------------------
                 WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                   (302) 655-0477



**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters
**ORIGINAL**

Diane Poland

1      A.     That's correct.

2      Q.     Was there some other way that they retaliated

3   against you other than terminating you?

4      A.     Yes.

5      Q.     What is that?

6      A.     There were several things.

7      Q.     Go ahead.

8      A.     Do you want to get into detail?

9      Q.     We don't have to get into detail.  Can you just

10   categorize in some way if you can -- if you can't, we'll

11   deal with it later, but if you can generally categorize

12   the nature of the retaliation?

13      A.     Generally work was taken from me.  I was banned

14   from communication from the team.  I was -- I could not

15   meet with anybody on the team.  I couldn't talk to them.

16   And people in HR were given instruction not to talk to

17   me.

18      Q.     Have you finished your answer?

19      A.     Yes.

20      Q.     Any other way that you've been retaliated

21   against other than the ways -- let's call that isolation.

22   Is that fair to say that you were isolated, you felt?

23      A.     Yes.

24      Q.     So that you were isolated from the group, you

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    felt, and in addition you were terminated, those were the

2    ways that the company retaliated against you?

3        A.    Some of the ways, yes.

4        Q.    Is there anything else that we haven't talked

5    about?  We are going to explore all the details of that.

6    But anything else other than those two things?

7        A.    Well, that was just the generalization, so yes.

8        Q.    We'll get into the specifics of that later.

9               Then your last claim is that you have

10   brought a claim based on the breach of the covenant of

11   good faith and fair dealing, and what is that claim based

12   upon?

13       A.    I don't understand that question.

14       Q.    You brought a claim in your complaint for the

15   breach of the covenant of good faith and fair dealing.

16   What is that claim and what is it based upon?

17       A.    I don't know what good faith and fair dealing

18   means.  I don't know what you're saying.

19       Q.    Do you know what the supposed breach was?

20       A.    No.

21       Q.    Let's go back.

22               Have we now talked about all of your claims

23   in general terms?

24       A.    Yes.



Diane Poland

213

1       A.    Because I was told to.

2       Q.    That was a real project; correct?

3       A.    Yes.

4       Q.    It was important work?

5       A.    Yes.

6       Q.    Were you the only one that got to work on the

7    Dazel manual?

8       A.    Yes.

9       Q.    Were you able to do the work on the Dazel

10   manual?

11      A.    Yes.

12      Q.    Did you have the skills to write this Dazel

13   manual?

14      A.    Yes.

15      Q.    Did anybody else have the skills to write this

16   Dazel manual?

17      A.    I don't know.

18      Q.    Do you know if other people had projects they

19   were working on?

20      A.    I don't know.  I guess so.  I don't know.

21      Q.    Do you know what the other people were working

22   on when you were working on the Dazel manual?

23      A.    No.

24      Q.    Do you know anything about the performance of



Diane Poland

217

1    Q.    Anything else you can recall about this manual?

2    A.    No.

3    Q.    You weren't offended that you were asked to work

4    on this important manual, were you?

5    A.    I wasn't offended, no.

6    Q.    Have we talked about all of your conversations

7    with Dawn, or was there anything else that you remember?

8    A.    I don't know.  There was so many.  It's possible

9    we've talked about them all and it's possible we missed

10   some.

11   Q.    Let's just go through it again.

12         You talked about the performance of

13   appraisal conversations; correct?

14   A.    Correct.

15   Q.    You told me everything you remember about the

16   conversations about salary?

17   A.    Yes.

18   Q.    You've told me everything you remember about the

19   conversations related to expectations?

20   A.    Everything that I can remember.

21   Q.    And promotion?

22   A.    Yes.

23   Q.    You've told me everything you can remember about

24   the conversations related to the Dazel manual?



Diane Poland                                    276

1      A.    No.

2      Q.    They never told you about that?

3      A.    No.

4      Q.    You're not denying that they said that?

5      A.    No, I'm not.

6      Q.    Do you know of any other projects that were

7  available for you to work on other than the Dazel manual?

8      A.    I don't recall them, but there were several I

9  was assigned to at the time.

10      Q.    But do you recall any other projects that were

11  available that you could have worked on other than the

12  manual?

13      A.    To my knowledge, there were others, but I don't

14  remember the names of them.

15      Q.    Even though you worked on this manual, your

16  benefits didn't change?

17      A.    No.

18      Q.    Your salary didn't change?

19      A.    No.

20      Q.    You would agree that management has the right to

21  assign projects in accordance with what it deems best or

22  in the client's interest?

23            MR. MARTIN:    Objection.

24      A.    I don't know.



WILCOX & FETZER LTD.
Registered Professional Reporters

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                          )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )        C.A. No. 04-217 (GMS)
                                       )
COMPUTER SCIENCES CORP.,               )
                                       )
        Defendant.                     )
_____)

## AFFIDAVIT OF RANDALL MILLER

I, Randall Miller, do hereby depose and swear as follows:

1.      I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.      I am currently an employee of Computer Sciences Corporation ("CSC"), and have worked for CSC since the Spring of 1997. When I first began working for CSC, I was a Member of Technical Staff B. Shortly thereafter (within 3 months), I was promoted to Member of Technical Staff A. Prior to CSC, I worked for DuPont, one of CSC's largest customers. I started working for DuPont in 1984.

3.      I have over 11 years of UNIX experience. As a DuPont employee, I gained hands-on practical experience by completing increasingly complex UNIX and programming assignments. During this time, I supplemented my practical experience by studying programming guides and handbooks and working with DuPont Electrical Engineers who were proficient in the UNIX operating system.

4.      Between April 1987 and April 1993, I worked in the DuPont Image Systems Department as a Research Technician and Software Specialist, where I created

customer interfaces for the Dupont's Digital Imaging products using the C programming language on a UNIX Sun Sparc network. Thereafter, I worked as a Technical Specialist in the DuPont Printing and Publishing Group from April 1993 to March 1995. In this capacity, I supported UNIX based Sun Sparc servers and workstations, image stations, and proofing systems. I was tasked with supporting customers who had no knowledge of the UNIX operating system and developed installation and maintenance scripts that aided the field support groups. I was also responsible for the maintenance and integrity of UNIX based Sun Sparc workstations within the work group, as well as a network of lab machines. My duties included the installation, maintenance and upgrading of the UNIX operating system, network, and application software, as well as troubleshooting hardware and software problems in UNIX.

5.    Between March 1995 and January 1997, I worked as a Support Analyst in DuPont's customer support center where I provided first level support involving UNIX issues. As a result of my experience, I developed a reputation among my peers as the contact person for UNIX resource issues, questions, and troubleshooting and had a strong command of the UNIX operating system. Following my transition to CSC in 1997, I worked as a Systems Engineer, where I created and maintained DceS Field Engineering websites on UNIX Web Servers. In mid-November 2000, I transferred to the Managed Print and Dazel ("MPD") team, which was supervised by Dawn Dworsky, to assist UNIX issues. My transition to the MPD group was not a promotion; rather, it was merely a change of assignment. Accordingly, I was not promoted to Senior Member of Technical Staff at that time.

2

6.      While with CSC, I complemented my UNIX experience with computer base training courses ("CBT") and seminars related to the UNIX operating system. Some of the courses include: Shell Programming; UNIX: Process and Data Utilities; UNIXWare File Management; UNIXWare Job Control; UNIX: Using Shell; TCP/IP for UNIX Users; Essentials of HP-UX; Solaris (SUN UNIX) 2.5.1 System Administration: System Operation; and Oracle Introduction: SQL Plus.

7.      I also gained background in the UNIX operating system by attending seminars and courses as a DuPont employee.

8.      I initially learned UNIX as a computer hobbyist. In fact, in the mid-1980's, I built a UNIX system on my home computer.

9.      Diane Poland was a member of the MPD group when I transferred into that group. When I first began working with Ms. Poland, she was very friendly and I got along with her very well. However, in approximately Fall of 2001, I noticed that Ms. Poland had isolated herself from other members of the MPD group. She stopped talking to me and other members of the group around that time.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_Randall P. Miller_                    5/4/05

Randall Miller                              Date

3

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                        )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )          C.A. No. 04-217 (GMS)
                                     )
COMPUTER SCIENCES CORP.,             )
                                     )
          Defendant.                 )
_____)

## AFFIDAVIT OF MARYANNE DOLL-JOHNSON

I, MaryAnne Doll-Johnson, do hereby depose and swear as follows:

1.      I am a witness over the age of twenty-one and have personal knowledge of the facts stated herein.

2.      I am currently an employee of Computer Sciences Corporation ("CSC"), and have worked for CSC since June 1997 in the Managed Print and Dazel ("MPD") group.

3.      When Diane Poland first joined the MPD group, she was on friendly terms with all of her co-workers in the group, including me. She would often ask her fellow team members for assistance with problems or questions, and they all willingly assisted her. Ms. Poland even recommended me for an award, claiming that she was able to accomplish her Dazel training with my assistance. A copy of the "Star Dust Award" is attached to this Affidavit as Exhibit 1. I considered her a friend.

4.      In approximately the Summer of 2001, Ms. Poland began to isolate herself from the other members of the MPD group, including me. For instance, Ms. Poland turned her monitor away from the group, and refused all invitations to join them for

lunch.  Ms. Poland also began to refuse to speak to her team members.  In fact, Ms.

Poland's purposeful isolation and refusal to communicate with her co-workers became so

uncomfortable for me that I contacted Human Resources via e-mail on September 14,

2001, and sought advice on how to alleviate the stressful work situation that Ms. Poland

created.  A copy of my September 14, 2001 e-mail to Maureen Summers in Human

Resources is attached as Exhibit 2.

In accordance with 28 U.S.C. § 1746, I solemnly affirm and declare under the

penalties of perjury and upon personal knowledge that the foregoing is true and correct.

_____          _____
MaryAnne Doll-Johnson                            Date

2

# Star D...

*Personal...*

## Maryanne D...

Thanks to you ... ...
training, I was able to ...
Certification. Your ...



All-Star Recognition



**MaryAnne Dolljohnson/GIS/CSC**
09/14/2001 12:17 PM
• • • • • • • • • • • • • • • • • • • • • • • • •

To      Maureen Summers/CEG/CSC@CSC
cc:
Subject:  work environment



Here are some of my feelings about my current work environment.

Unfortunately, Diane won't speak to any of her team members. We are a really excellent team I think one of our greatest strengths is communication and perhaps that is why this situation feels so painful - since she won't speak to us.
Once this week, I spoke to her directly just to ask her how she was doing and I felt horrible because she didn't turn to look at me or respond at all.
The other thing that was very disheartening was when someone had stopped and talked to her and then stopped me as I passed by and spoke to me she then looked very angrily at me. I was very taken aback by this and thought about it and wondered what I had done to make her so upset with me?

I am finding it difficult to function efficiently in an environment where one person feels and acts so isolated.


Things are very tense.

Thanks for listening.

MaryAnne

# EXHIBIT 4

Westlaw.

Not Reported in F.Supp.2d                                                                        Page 1
Not Reported in F.Supp.2d, 2004 WL 1534778 (D.Del.)
**(Cite as: 2004 WL 1534778 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
David L. JONES, Plaintiff,
v.
CITY OF WILMINGTON, et al., Defendants.
**No. Civ.A. 00-952-KAJ.**

June 14, 2004.

J. Michael Johnson, Maron & Marvel, P.A.,
Wilmington, Delaware, for plaintiff.

Rosamaria Tassone, City of Wilmington Law
Department, Wilmington, Delaware, for defendants
City of Wilmington, Wilmington Police Department,
James Jubb, Michael Boykin, Rita Crowley, Nancy
Dietz, and Martin Donohue.

Seth Jason Reidenberg, Young, Conaway, Stargatt &
Taylor, Wilmington, Delaware, for defendant Robert
Fox.

MEMORANDUM OPINION

JORDAN, J.

I. Introduction

*1 Presently before me is a motion for summary
judgment by defendants the City of Wilmington, the
Wilmington Police Department ("WPD"), Sergeant
Robert Fox ("Sgt.Fox"), Captain James Jubb
("Cpt.Jubb"), Chief Michael Boykin ("Chief
Boykin"), Captain Rita Crowley ("Cpt.Crowley"),
Captain Nancy Dietz ("Cpt.Dietz"), and Captain
Martin Donohue ("Cpt.Donohue") (collectively
"Defendants") on plaintiff David L. Jones'
("Plaintiff") lawsuit for racial discrimination. (D.I.
104; "the Motion"). Because Plaintiff brings this
action pursuant to 42 U.S .C. § 1983 and Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et
seq.* ("Title VII"), I have jurisdiction over this case
pursuant to 28 U.S.C. § § 1331 and 1343. For the
reasons that follow, the Motion will be granted.

II. Background

The procedural history and factual background of
this case are set forth in a Memorandum Opinion
dated January 8, 2004 and will not be repeated here.
(D.I.95.) Rather, the facts pertinent to the Motion are
incorporated below.

In that earlier Memorandum Opinion, the
Defendants' motion for summary judgment on
Plaintiff's unlawful discrimination and retaliation
claim under Title VII and 42 U.S.C. § 1983 was
denied without prejudice because the Defendants
withheld discovery from Plaintiff that was essential
to a fair consideration of the Plaintiff's claims.
Specifically, the Defendants withheld Office of
Professional Standards ("OPS") files of "thirty-seven
officers charged and/or convicted of dishonesty
and/or inaccurate reporting ... [,] information
regarding camera room assignments ... [,][and]
information regarding officers who attended training
while serving punishment for a dishonesty
conviction." (D.I. 95 at 20.) I held that without these
OPS files, Plaintiff did not have a fair opportunity to
meet his burden of establishing a *prima facie* case of
race discrimination and retaliation under *McDonnell
Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).
(D.I. 95 at 23.) Accordingly, I also granted a motion
by the Plaintiff to compel the production of the thirty-
seven OPS files. (*Id.* at 24; D.I. 94.) Having produced
the OPS files to Plaintiff, the Defendants now renew
their motion for summary judgment against Plaintiff.
(D.I.104, 105.)

III. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a
party is entitled to summary judgment if a court
determines from its examination of "the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if
any," that there are no genuine issues of material fact
and that the moving party is entitled to judgment as a
matter of law. Fed.R.Civ.P. 56(c). In determining
whether there is a triable dispute of material fact, a
court must review all of the evidence and construe all
inferences in the light most favorable to the non-
moving party. *Goodman v. Mead Johnson & Co.,* 534
F.2d 566, 573 (3d Cir.1976). However, a court should
not make credibility determinations or weigh the
evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133, 150 (2000).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 1534778 (D.Del.)
(Cite as: 2004 WL 1534778 (D.Del.))

**\*2** To defeat a motion for summary judgment, <u>Rule 56(c)</u> requires the non-moving party to:

> do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'

<u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U .S. 574, 586-87 (1986)</u>. Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. <u>Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)</u>.

IV. Discussion

A. The <i>McDonnell Douglas</i> test for establishing a <i>prima facie</i> case of discrimination

The United States Supreme Court in <u>McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)</u>, set forth a three-step burden shifting analysis for <u>Title VII</u> and <u>§ 1983</u> racial discrimination claims. <i>See <u>St. Mary's Honor Society v. Hicks, 509 U.S. 502, 506 n.1 (1983)</u></i> (stating that the <i>McDonnell Douglas</i> framework applies to both <u>Title VII</u> and <u>§ 1983</u> discrimination claims). First, the plaintiff has the initial burden of establishing a <i>prima facie</i> case of racial discrimination. <i>See <u>McDonnell Douglas, 411 U.S. at 802</u></i>. This is done by showing that the plaintiff: 1) is a member of a protected class; 2) was qualified for the position; 3) suffered an adverse job action; and 4) was treated differently than employees who are not members of his protected class. <u>King v. City of Philadelphia, Civ. A. No. 99-6303, 2002 WL 1277329 at \*9 (E.D. Pa. June 4, 2002)</u> (applying the <i>McDonell Douglas</i> test to a race discrimination claim by a police officer who was terminated from employment), <i>aff'd</i> by <u>2003 WL 1705967 (3d Cir. Apr. 1, 2003)</u>; <i>see also <u>Weldon v. Kraft, 896 F.2d 793, 797 (3d Cir.1990)</u></i>. Whether the plaintiff has established a <i>prima facie</i> case of discrimination is a question of law for the court. <u>Sarullo v. United States Postal Service, 352 F.3d 789, 798 (3d Cir.2003)</u>.

If the plaintiff establishes a <i>prima facie</i> case of racial discrimination, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the employment decision. <u>McDonnell Douglas, 411 U.S. at 802</u>. "The employer satisfies its burden of production by introducing evidence which,

if taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." <u>Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994)</u>. If the employer meets its "relatively light" burden by articulating a legitimate reason for the employment decision, the burden shifts back to the plaintiff to show "by a preponderance of the evidence" that the nondiscrimination reason offered by the employer was a mere pretext for racial discrimination. <i>See id.</i> (citing <u>McDonnell Douglas, 411 U.S. at 802</u>).

**\*3** In his complaint, Plaintiff advances a disparate treatment theory of discrimination, contending that the Defendants discriminated, harassed, and retaliated against him because he is African-American. (D.I. 1 at ¶ ¶ 98-123). Specifically, Plaintiff asserts that his disciplinary proceeding, his assignment to the camera room, and his lack of training opportunities demonstrate that he was treated more harshly than white and Hispanic police officers, and thus that he is the victim of racial discrimination. <u>[FN1]</u> (<i>Id.</i>) The Third Circuit has stated that "[a] disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated" on the basis of race. <u>E.E.O.C. v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir.1990)</u>.

> <u>FN1.</u> The Plaintiff has since backed away from his assertion that he has been treated differently than Hispanic officers would have been. (<i>See</i> n.3, <i>infra,</i> and associated text.)

The Defendants argue that Plaintiff "was not treated differently than white or Hispanic police officers with respect to the charges brought against him or the penalty imposed upon him," and "is not similarly situated to the white and Hispanic officers with whom Plaintiff seeks to compare himself in his Complaint and deposition." (D.I. 105 at 9.) The Defendants assert that those officers were not similarly situated to Plaintiff because, unlike Plaintiff, they were not charged with multiple acts of dishonesty and deception. <u>[FN2]</u> (<i>Id.</i> at 27.) Moreover, the Defendants claim that those other dishonesty and inaccurate reporting cases involved different OPS investigators, different OPS supervisors, different complaint board members, and different appeal hearing board members. (<i>Id.</i> at 28.) According to the Defendants, "Plaintiff cannot prove intentional racial discrimination when different decisionmakers are involved." (<i>Id.</i>) (Citing <u>Timms v. Frank, 953 F.2d 281, 287 (7th Cir.1992)</u> (holding

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534778 (D.Del.)
(Cite as: 2004 WL 1534778 (D.Del.))

that "it is difficult to say that the differen[t] [treatment] was more likely than not the result of intentional discrimination when two different decisionmakers are involved").) Therefore, the Defendants claim that Plaintiff has not established a *prima facie* case of discrimination under the fourth prong of the *McDonnell Douglas* test.

> FN2. In Plaintiff's Answering Brief to the Defendants' first motion for summary judgment, Plaintiff claimed that he is similarly situated to other white officers involved in single incidents of dishonesty because, even though he was charged with multiple counts of dishonesty, his course of conduct involved only a single set of events, in effect a single incident. (D.I. 75 at 16.)

**B. The cases involving allegedly "similarly situated" white officers**

Plaintiff argues that eight of the disciplinary files produced by the Defendants involve similarly situated white [FN3] officers and African-American officers "which establish disparate treatment between black and white officers in terms of the number of charges brought and the severity of the penalties imposed." (D.I. 112 at 12-13.) I disagree.

> FN3. Regarding the treatment of Hispanic police officers, Plaintiff states that "[s]uffice it to say that the dishonesty charges involving Hispanic officers are too few in number and too factually distinct to be probative on whether race played a role in disciplinary outcomes. Barring objection by the City, plaintiff would agree to an Order striking references to Hispanics from the pleadings." (D.I. 112 at 7.)

1. Case # 92-752 involved two white male WPD police officers who were off-duty, and had been drinking, when they went to an area frequented by prostitutes, supposedly to converse with them. (D.I. 106 at A-1.) While the officers were speaking to one of the prostitutes in the parking lot of a diner, a New Castel County ("NCC") police officer appeared. (*Id.*) Upon seeing the NCC police car, the WPD officers drove off. (*Id.*) Believing the WPD officers had been soliciting prostitutes, the NCC officer pulled the off-duty WPD officers over. (*Id.*) The WPD officers identified themselves as police and stated that they were speaking to a possible confidential informant in relation to a drug investigation. (*Id.*)

*4 The NCC officer released the WPD officers, but reported the incident to his superior. (*Id.* at A-2.) The NCC police department contacted the WPD about the situation and an internal investigation ensued. (*Id.*) The WPD officers admitted they lied to the NCC officer "to avoid any further embarrassment." (*Id.* at A-11.) Both officers were charged with one count of dishonesty and one count of associating with known criminals. (*Id.* at A46- 56.) Finding no evidence that the WPD officers intended to solicit the prostitutes for sex, the NCC police department did not charge the officers criminally. (*Id.*) The officers received a fifteen day suspension for the dishonesty charge and a two day suspension for the associating with known criminals charge. (*Id.*)

2. Case # 92-676 involved a white male police officer who was scheduled to be working an extra duty job at an apartment building when he was seen by a supervisor at the police station signing up for another extra-duty job. (*Id.* at A-57.) When the supervisor questioned why the officer was at the police station when he should have been at the apartment building, the officer stated that he had permission to leave his assignment by the apartment manager. (*Id.*) The matter was investigated and the apartment manager denied giving the officer permission to leave his assignment. (*Id.*) The officer was charged and found guilty on one count of dishonesty and one count of failure to properly patrol. (*Id.* at A-74.) As a result, the hearing board imposed a fifteen day suspension for the dishonesty conviction and issued a written reprimand for failing to properly patrol. (*Id.*) On appeal, the officer's dishonesty conviction was reversed and the conviction for failure to patrol was affirmed. (*Id.* at A-76.)

3. In Case # 01-092, the hearing board directed OPS to investigate a white male police officer for dishonesty as a result of an inconsistency in the officer's testimony during a hearing. (*Id.* at A-78-83.) Because three individuals verified the underlying facts surrounding the officer's statement, the case was dismissed as a misunderstanding. [FN4] (*Id.*)

> FN4. Plaintiff argues that "there was no penalty on the underlying issue or 'misunderstanding.' " (D.I. 112 at 4.)

4. Case # 95-688 and # 95-400 involved a white female police officer. (*Id.* at A-197-217.) The officer called in sick and reported that she had injured her hand in a door. (*Id.*) It was later discovered that the injury was a result of a physical confrontation with a married man with whom she was having a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534778 (D.Del.)
(Cite as: 2004 WL 1534778 (D.Del.))

relationship. (*Id.*) When questioned, the officer admitted she lied because she was embarrassed about the situation. The officer was charged with one count of dishonesty, but, the matter was later dismissed. (*Id.*) According to the Defendants, "the matter was later dismissed because of confidential information received from the officer's doctor." [FN5] (D.I. 105 at 12.)

> FN5. The Plaintiff disputes this characterization of the dismissal, saying "the record establishes that the matter was dismissed due to the officer's 'embarrassment.' ' (D.I. 112 at 4.)

5. Case # 91-381 involved a white male police officer. (D.I. 107 at A-444-- 452.) The officer called in sick after his supervisor denied his previous request to take that day off. (*Id.* at A-447.) After calling in sick, the officer twice left his residence without reporting the change in his location to the WPD, as required by departmental regulations. (*Id.* at A-448.) When questioned, the officer stated that his supervisor condoned taking a sick day periodically even when not actually ill. (*Id.*) The supervisor denied ever making the statement. (*Id.*) The officer was charged with one count of dishonesty and one count of violating the WPD sick leave policy. (*Id.* at A-450.) The OPS was also investigating another possible violation of the dishonesty directive by this officer that was unrelated to that matter. (*Id.* at A-452.) However, the officer resigned prior to a hearing on the charges. (*Id.*)

*5 6. In Case # 02-092, a white female police officer submitted a crime report under the wrong case number and failed to complete several reports in a timely manner. (D.I. 110 at A-1610.) The hearing board found the officer guilty of one count of inaccurate reporting and three counts of failing to submit reports on time. (*Id.* at A-1620-1628.) The hearing board imposed a five day suspension for the inaccurate report and a twelve day suspension for the remaining charges. [FN6] (*Id.*)

> FN6. The Plaintiff argues that there was one "clear" instance of dishonesty in this case and possibly more, yet no dishonesty was charged. (D.I. 112 at 13.) However, in this case review of the record belies the assertion that this case clearly involved dishonesty. (D.I. 110 at A-1610.)

7. Case # 02-385 involved a white male police officer. (*Id.* at A-1723- 1799.) The officer advised the

Assistant United States Attorney ("AUSA") prosecuting a case in which he was a witness that he would be unavailable for a suppression hearing because of a previously scheduled vacation. (*Id.* at A-1723.) The AUSA thus requested a continuance from the judge, who granted the continuance, but asked for verification of the officer's vacation plans. (*Id.* at A-1724.) When the AUSA advised the officer of the judge's request, the officer stated that he would be available for the hearing. (*Id.* at A-1725.) Upon further questioning, the AUSA discovered that the officer would have returned from his vacation prior to the hearing and was scheduled to work the night shift on the day of the hearing. (*Id.*) Because of the officer's false statement, which raised concerns about his credibility, the AUSA dismissed the case. (*Id.*) The officer was charged with a single count of dishonesty and his employment was terminated. [FN7] (*Id.* at A-1745.)

> FN7. The Plaintiff points out that there is some evidence in the record that the officer was also dishonest during the internal investigation, but was charged with only one count of dishonesty. (D.I. 112 at 6; *see also* D.I. 110 at 1729.) However, under a new directive which requires dismissal of an officer for a single conviction of dishonesty, it appears that any subsequent dishonesty charges would have been moot. (D.I. 105 at 14.)

8. In Case # 98-742, a white male probationary police officer was involved in an off-duty automobile accident. (*Id.* at A-1931-2042 .) The officer had been drinking and struck the curb with his vehicle, which damaged the tires. (*Id.* at A-1932.) The officer used profane language when addressing an Amtrak police officer who was present at the time. (*Id.*) Moreover, the officer was with a friend who had been convicted of a felony crime. (*Id.*) The Amtrak officer reported the accident. (*Id.*) After an investigation, the officer was charged with one count of violating the Standards of Conduct, one count of rude and insulting language, one count of failure to report an off-duty accident, and one count of associating with known criminals. (*Id.* at A-1943-1946.) The officer plead guilty to all charges with the exception of associating with known criminals. (*Id.* at A-1950.) The officer received a ten day suspension for each of the charges except associating with known criminals because that charge was found to be unsubstantiated. (*Id.*) In addition to what amounted to a thirty day suspension, the officer's probationary status was extended another year. (*Id.*)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1534778 (D.Del.)
**(Cite as: 2004 WL 1534778 (D.Del.))**

A review of the foregoing OPS cases demonstrates the weakness in Plaintiff's assertion that he and the white officers with whom he seeks to compare himself are similarly situated. In order to be similarly situated, the individuals with whom a plaintiff seeks to be compared must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Anderson v. Haverford College,* 868 F.Supp. 741, 745 (E.D.Pa.1994). In this case, as the Defendants accurately explain, Plaintiff was charged with multiple counts of dishonesty, while the officers referenced in the disciplinary files were only charged with one count of dishonesty. Any difference in the charging decisions is at least as plausibly connected to the specific facts of each case as it is to the race of the officers involved. Those cases thus do not provide a basis for concluding that the leveling of multiple dishonesty charges against Plaintiff was out of keeping with the charging practices that the WPD had followed in other cases. There is simply no evidence that the Defendants "piled on" charges or elevated the charges against the Plaintiff because the Plaintiff is African-American. [FN8]

> FN8. To the extent Plaintiff is also attempting to argue that cases from the OPS files show that African-American officers are generally treated less favorably in disciplinary proceedings than white officers, (see D.I. 112 at 13-14), his claim still fails. The issue presented is whether, in the specific context of people similarly situated, "others not in the protected class were treated more favorably." *See Weldon,* 896 F.2d at 797 (a plaintiff must show that "others not in the protected class were treated more favorably"). Generalizations about racial distinctions are not pertinent to that question, particularly when, as in this case, the complainant has admitted that there is no policy by the City to discriminate against African-American officers. (*See* D.I. 75 at 21.)

*6 Finally, Plaintiff does not rebut the Defendants' claim that the decision makers in several of the disciplinary cases were not the same as the decision makers in Plaintiff's case. Because Plaintiff has not shown that he is similarly situated to the white officers with whom he seeks to compare himself, and the individual Defendants were not the same as the decision makers in many of the cases that Plaintiff

cites, I hold that Plaintiff has not demonstrated that he was treated differently than similarly situated white officers. Accordingly, Plaintiff has failed to satisfy his burden of establishing a *prima facie* case of race discrimination with respect to internal WPD disciplinary proceedings.

C. Camera room assignment and training opportunities

With respect to Plaintiff's assignments to the camera room, the Defendants argue that Plaintiff cannot establish a *prima facie* case of discrimination because this assignment does not constitute an adverse employment action under *McDonnell Douglas.* (D.I. 105 at 30) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (holding that "conduct must be extreme to amount to a change in the terms and conditions of employment"). The Defendants claim that officers assigned to the camera room

> were not exposed to the elements, did not work late night hours, did not experience a reduction in salary or benefits and were afforded regular meal breaks. The position did not involve skills which exceeded Plaintiff's capabilities. The position did not involve any onerous requirements. The assignment simply entailed monitoring a camera and keeping a log of certain activity observed on the camera. Further, Plaintiff's assignment to the camera room was not a permanent transfer, merely temporary.

(D.I. 105 at 31.) Therefore, the Defendants argue, Plaintiff's assignment to the camera room does not amount to an adverse employment action. (*Id.*) Plaintiff does not even address these claims in his Answering Brief. (D.I.112.) Because unrebutted evidence and argument supports the Defendants' position that Plaintiff's assignment to the camera room does not constitute an adverse employment action, Plaintiff has not established a *prima facie* case of discrimination or retaliation based on that assignment.

Regarding his claim that he was discriminated against because of a lack of training opportunities, Plaintiff asserts that from his first full year on the force to the year of the incident in question, 1998, he averaged 53 hours a year in training. (D.I. 112 at 11.) By contrast, in 1999, Plaintiff attended 16 hours of training, 34.5 in 2000, and 13 in 2001. (*Id.*) However, Plaintiff has not offered any evidence that Plaintiff requested to attend a training program and was denied such an opportunity while he was on modified duty. Plaintiff also does not state who denied his requests for training, if any such requests were

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2004 WL 1534778 (D.Del.)
**(Cite as: 2004 WL 1534778 (D.Del.))**

denied, and there is no evidence that any of the named Defendants refused a request by Plaintiff for training. Accordingly, Plaintiff has not met his burden of showing that any lack of training opportunities was the consequence of or amounted to discrimination.

V. Conclusion

*7 For the reasons set forth herein, the Motion (D.I.104) will be granted. An appropriate order will issue.

*ORDER*

For the reasons set forth in the Memorandum Opinion issued in this case today,

IT IS HEREBY ORDERED that the Defendants' motion for summary judgment (D.I.104) is GRANTED.

Not Reported in F.Supp.2d, 2004 WL 1534778 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• _____1:00CV00952_____(Docket)
(Nov. 14, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

131 Fed.Appx. 867
131 Fed.Appx. 867
**(Cite as: 131 Fed.Appx. 867)**

Page 1

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Lisa K. FORNICOIA Appellee,
v.
HAEMONETICS CORPORATION Appellant.
No. 04-2873.

Argued May 4, 2005.
Decided May 20, 2005.

**Background:** Former employee brought action against former employer alleging sexual harassment, retaliation, and constructive discharge under Title VII. The United States District Court for the Western District of Pennsylvania, Gary L. Lancaster, J., entered judgment following jury verdict in favor of employee on sexual harassment claim and in favor of employer on retaliation and effective discharge claims. Employer appealed.

**Holdings:** The Court of Appeals, Van Antwerpen, Circuit Judge, held that:

(1) when no tangible employment action is taken against an employee who alleges sexual harassment by a supervisor, employer may raise affirmative defense to liability or damages;

(2) in order to impose liability on an employer for a co-worker's sexual harassment of an employee the employee must demonstrate that the employer knew or should have known of the harassment and failed to take prompt remedial action; and

(3) probative value of evidence that coworker made harassing remark to another coworker approximately two years after employee left employment was outweighed by danger of unfair prejudice.
Reversed and remanded.

West Headnotes

**[1] Civil Rights** 🔑**1189**
78k1189 Most Cited Cases
When no tangible employment action is taken against an employee who alleges sexual harassment by a supervisor in a Title VII action against employer, employer may raise affirmative defense to liability or damages; the defense comprises two necessary elements, that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights** 🔑**1189**
78k1189 Most Cited Cases
Under Title VII, in order to impose liability on an employer for a co-worker's sexual harassment of an employee, where the harassing co-worker is not in a supervisory position over employee, the employee must demonstrate that the employer knew or should have known of the harassment and failed to take prompt remedial action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[3] Evidence** 🔑**129(5)**
157k129(5) Most Cited Cases
Probative value of evidence that coworker made harassing remark to another coworker approximately two years after employee left employment was outweighed by danger of unfair prejudice in employee's Title VII action against employer alleging sexual harassment by same coworker; evidence shed no light on whether employee was objectively reasonable in finding coworker's behavior offensive given length of time between complaints and dissimilarity between complained of acts. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

**\*868** Appeal from a Judgment for the Plaintiff in the United States District Court for the Western District of Pennsylvania. (No. 99-cv-01177). District Judge: Honorable Gary L. Lancaster.

Richard J. Antonelli (Argued), Rebecca J. Dick-Hurwitz, Spilman Thomas & Battle, PLLC, Pittsburgh, PA, for Appellant.

Michael E. Hoover (Argued), Charles E. Boyle, Diefenderfer Hoover Boyle & Wood, Pittsburgh, PA,

131 Fed.Appx. 867
131 Fed.Appx. 867
**(Cite as: 131 Fed.Appx. 867)**

Page 2

for Appellee.

Before McKEE, VAN ANTWERPEN and WEIS, Circuit Judges.

OPINION

VAN ANTWERPEN, Circuit Judge.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because we write only for the parties, we recount only the facts relevant to our decision. Appellee Lisa Fornicoia began her employment with Appellant Haemonetics *869 Corporation on November 2, 1992, as a Clinical Specialist. In 1993 she was transferred to the company's Life Support Division where her title was changed to Manager, Clinical Services. In this new position, she reported directly to John Teutsch. Teutsch reported to Gary Stacey who had overall responsibility for the Life Support Division.

Fornicoia alleged that between May 1994 and February 1997, Teutsch engaged in behavior that she found sexually harassing and dangerous. This included inappropriate touching; diverting conversations to personal, intimate or sexual topics; sending her and her daughter gifts; appearing before her partially clothed; and implying that he wanted to hurt her, her family or himself. In October 1994, Fornicoia approached Stacey, and later Alicia Lopez, Haemonetic's General Counsel and Human Resources Director, and shared her concerns about Teutsch's behavior.

Lopez determined that Teutsch had not sexually harassed Fornicoia, but still referred Teutsch to a forensic psychologist for evaluation. Based on his report and other information they had gathered, Lopez and Stacey changed the reporting relationship so that Fornicoia no longer reported to Teutsch. They also directed that Teutsch channel all correspondence to Fornicoia through Stacey's office and instructed the two not to take business trips together.

Fornicoia alleged that Teutsch continued to harass her and that she made a complaint in May 1995. Stacey and Lopez did not recall this complaint, but agreed that Fornicoia did complain again on January 14, 1997. Based on this complaint, Lopez again determined that Teutsch's behavior did not constitute sexual harassment but agreed that Fornicoia and

Teutsch could not work together. Stacey sent a letter to Teutsch dated January 28, 1997 re-emphasizing that he was to have no contact with Fornicoia.

About a month later, Stacey advised Fornicoia that Haemonetics was reorganizing and that she was being laterally moved to the position of Clinical Specialist. In her new position, she would have the same pay and would not be required to relocate, but would have to report to the training organization in Tucson, Arizona. Fornicoia shortly thereafter gave notice of her resignation on March 22, 1997.

Fornicoia filed suit against Haemonetics in the United States District Court for the Western District of Pennsylvania. In her suit, she asserted claims of sexual harassment, retaliation and constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* A jury trial commenced on September 15, 2003, and concluded on September 22. The jury found in favor of Fornicoia on her sexual harassment claim and in favor of the Haemonetics on her retaliation and effective discharge claims.

### II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. We exercise *de novo* review over the legal accuracy of the District Court's jury instructions, *Citizens Fin. Group, Inc. v. Citizens Nat. Bank,* 383 F.3d 110, 133 (3d Cir.2004), and review the District Court's rulings regarding the admission of evidence for abuse of discretion, *Glass v. Phila. Elec. Co.,* 34 F.3d 188, 191 (3d Cir.1994).

### III. ANALYSIS

Haemonetics raises two issues on appeal. First, Haemonetics claims that the District Court misstated the standard for *870 employer liability when an employee is sexually harassed by a supervisor. According to Haemonetics, the District Court failed to inform the jury that Haemonetics was entitled to assert affirmative defenses if Fornicoia did not suffer a tangible job detriment. Haemonetics also claims that the District Court misstated the standard for co-worker liability by improperly placing the burden of proof on the defense. Finally, Haemonetics insists that it is entitled to a new trial because the District Court improperly allowed testimony that was irrelevant, and if not irrelevant, more prejudicial than probative.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 Fed.Appx. 867                                                                                           Page 3
131 Fed.Appx. 867
(Cite as: 131 Fed.Appx. 867)

We agree that the District Court's jury instructions were erroneous, and therefore we will reverse the order of the District Court and remand for a new trial.

**A. The Jury Instructions**

When examining an allegedly erroneous jury instruction, we must "determine whether the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury." _Ayoub v. Spencer, 550 F.2d 164, 167 (3d Cir.1977)._ When jury instructions "fail to advise, or misadvise, a jury of concepts it needs to know to properly discharge its duties" we must remand the case for a new trial. _Dressler v. Busch Entm't Corp., 143 F.3d 778, 783 (3d Cir.1998)._

Haemonetics argues that the District Court erroneously charged the jury on Fornicoia's sexual harassment claim. Because the parties disputed whether Teutsch was Fornicoia's supervisor when the alleged harassment took place, the District Court charged the jury with two sets of instructions depending on their factual findings. We address each in turn.

*1. Supervisor Liability*

[1] Haemonetics argues that the District Court incorrectly explained the legal standard for imposing liability on Fornicoia if the jury found that Teutsch was Fornicoia's supervisor. The District Court stated:

If you find from the evidence that Mr. Teutsch was plaintiff's supervisor during the relevant period, then the defendant is liable for his conduct. And it is liable for his conduct whether senior management officials, in this case, Lisa Lopez or Gary Stacey, were aware of his [conduct or] not. This is called strict liability. That is, if plaintiff establishes that Mr. Teutsch was her supervisor, then defendant is liable for his conduct, regardless of whether they were aware of his conduct or not, or even if they were aware of it and took reasonable steps to stop it.

Joint App. vol. III at 762a.

The District Court's instruction directly contradicts the Supreme Court's opinion in _Faragher v. City of Boca Raton, 524 U.S. 775, 792, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998),_ which reaffirmed that "Title VII does not make employers 'always automatically liable for sexual harassment by their supervisors,' _ibid,_ contrary to the view of the Court of Appeals, which had held that 'an employer is strictly liable for a hostile environment created by a supervisor's sexual advances, even though the employer neither knew nor reasonably could have known of the alleged

misconduct,' _id._ at 69-70, 106 S.Ct., at 2406-2407." (citing _Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 69-70, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986))._ The correct standard was set out by the Court as follows:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability *871 or damages, subject to proof by a preponderance of the evidence, see _Fed. Rule Civ. Proc. 8(c)._ The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. See _Burlington, 524 U.S. at 762-763, 118 S.Ct., at 2269._

_Faragher, 524 U.S. at 807-08._

The jury was not asked consider whether Fornicoia suffered a tangible employment action, nor was it given instructions on Haemonetics' right to assert an affirmative defense had Fornicoia not suffered a tangible employment action. Given that the jury found that Fornicoia did not suffer retaliation or constructive discharge, it may also have found that Fornicoia did not suffer a tangible employment action. If this was the case, the jury was obligated to consider Haemonetics' affirmative defenses.

*2. Co-Worker Liability*

[2] The District Court also misstated the standard for co-worker liability by improperly placing the burden of proof on the defendant. The District Court explained the standard for co-worker liability as follows:

On the other hand, if you find from the evidence that Mr. Teutsch was not plaintiff's supervisor, but merely a co-worker, then defendant is entitled to assert certain defenses. Defendant neither knew or nor, with reasonable diligence, should have known of his conduct; or, two, once defendant learns of the conduct, they took appropriate remedial action to stop it; and plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer and to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 Fed.Appx. 867                                                                                      Page 4
131 Fed.Appx. 867
**(Cite as: 131 Fed.Appx. 867)**

avoid harm, otherwise.
I am going to go over each of these defenses in
more detail. Be mindful that the defendant has the
burden of proving these defenses by a
preponderance of the evidence.
Joint App. vol. III at 763a.

The District Court mischaracterized the standard of
liability as an affirmative defense. In order to impose
liability on an employer for one co-worker's sexual
harassment of another (where the harassing employer
is not in a supervisory position over the victim), the
plaintiff must demonstrate that " 'the defendant knew
or should have known oft'he harassment and failed to
take prompt remedial action." ' *Kunin v. Sears
Roebuck and Co.,* 175 F.3d 289, 293-94 (3d
Cir.1999) (quoting *Andrews v. City of Philadelphia,*
895 F.2d 1469, 1482 (3d Cir.1990)). This is not an
affirmative defense, but rather the burden of the
plaintiff. *See Kunin,* 175 F.3d at 294. If the jury
found that Teutsch was not Fornicoia's supervisor,
but merely her co-worker when he harassed her,
Fornicoia had the burden of demonstrating that
Haemonetics knew or should have known of the
harassing conduct and failed to act.

It appears that the District Court intertwined the
standards of liability for supervisor and co-worker
sexual harassment and thereby failed to properly
instruct the jury on the issue. Because the jury
instructions did not fairly and adequately advise the
jury on the standards of liability, we must remand for
a new trial consistent with this opinion.

**B. The Admission of Evidence**
[3] We are troubled by the admission of what
appears to be hearsay evidence *872 that Teutsch
allegedly made a harassing remark to another
employee approximately two years after Fornicoia
left Haemonetics. We also question the relevance of
the testimony, see Fed.R.Evid. 402, [FN1] and
further note that, even if relevant, it is difficult to see
how its probative value outweighs its prejudicial
effect and tendency to confuse the issues, see
Fed.R.Evid. 403. [FN2] Therefore, we briefly
address this matter so as to offer guidance to the
District Court in conducting the new trial.

> FN1. "All relevant evidence is admissible,
> except as otherwise provided by the
> Constitution of the United States, by Act of
> Congress, by these rules, or by other rules
> prescribed by the Supreme Court pursuant to
> statutory authority. Evidence which is not
> relevant is not admissible." Fed.R.Evid. 402.

> FN2. "Although relevant, evidence may be
> excluded if its probative value is
> substantially outweighed by the danger of
> unfair prejudice, confusion of the issues, or
> misleading the jury, or by considerations of
> undue delay, waste of time, or needless
> presentation of cumulative evidence."
> Fed.R.Evid. 403.

The District Court allowed Fornicoia to present
evidence that, in 1999, an employee named Lisa
Lovis complained about Teutsch's behavior. Lopez
testified that Lovis complained that she was offended
when Teutsch "either said something or made some
explicit gesture about her in the company of others."
(Appellant App. at 486a.) This complaint apparently
led Haemonetics to review Teutsch's performance
and professionalism, and eventually resulted in his
termination.

The District Court allowed the testimony for the
purpose of establishing that the workplace was
hostile. Following the testimony, the trial judge
explained to the jury that the testimony was allowed,
"for a limited purpose only, in order for the plaintiff
to establish her claim, she must establish that the
behavior she complains of would be offensive to an
objectively reasonable person." (Appellant App. at
489a-90a.)

This Court has upheld the admission of evidence of
other acts of sexual harassment where the evidence
may be "probative as to whether the harassment was
sexually discriminatory" and "may help the jury
interpret otherwise ambiguous acts." *Hurley v.
Atlantic City Police Dept.,* 174 F.3d 95, 111 (3d
Cir.1999). However, even relevant evidence may be
excluded under Rule 403 "if its probative value is
substantially outweighed by the danger of unfair
prejudice." Fed.R.Evid. 403. "[Evidence] is unfairly
prejudicial if it 'appeals to the jury's sympathies,
arouses its sense of horror, provokes its instinct to
punish,' or otherwise 'may cause a jury to base its
decision on something other than the established
propositions in the case.' " *Carter v. Hewitt,* 617 F.2d
961, 972 (3d Cir.1980) (quoting 1 J. Weinstein & M.
Berger, Weinstein's Evidence P 403(03), at 403-15 to
403-17 (1978)).

Fornicoia introduced evidence that another employee
complained about a single offensive comment in
front of co-workers or customers nearly two years
after Fornicoia left Haemonetics. This evidence
sheds no light on whether Fornicoia was objectively

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

131 Fed.Appx. 867
131 Fed.Appx. 867
(Cite as: 131 Fed.Appx. 867)

reasonable in finding Teutsch's inappropriate touching, continual advances, or erratic behavior offensive. Given the length of time between the complaints, the dissimilarity between the complained of acts, and the likelihood that this additional evidence will at least minimally prejudice the jury, we believe this evidence should have been excluded.

### IV. CONCLUSION

For the reasons set forth above, we reverse the Order of the District Court *873 and remand for a new trial consistent with this opinion.

131 Fed.Appx. 867

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.