# EXHIBIT 4

Westlaw.

Not Reported in F.Supp.                                    Page 1

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
David G. FINCH, Plaintiff,
v.
HERCULES INCORPORATED, Defendant.
**No. Civ. A. 92-251 MMS.**

Dec. 22, 1995.
Richard G. Elliott, Jr., and Helen M. Richards, of
Richards, Layton & Finger, Wilmington, DE, for
plaintiff.

Sheldon N. Sandler, and Bhavana Boggs, of
Young, Conaway, Stargatt & Taylor, Wilmington,
DE, for defendant.

*MEMORANDUM OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

I. INTRODUCTION
*1 Plaintiff David G. Finch ("Finch") has filed suit
against his former employer, defendant Hercules,
Incorporated ("Hercules" or "corporation"),
alleging he was discriminated against based on his
age in violation of the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. §§ 621-34.
After over three years of adamantine posturing by
both parties, the case is finally poised for trial.
Before the Court are plaintiff's and defendant's
cross-motions in limine seeking the exclusion of
various evidence and witnesses in the upcoming
trial.

For the reasons set forth below, the Court will grant
in part and deny in part both motions in limine.

II. FACTUAL BACKGROUND
For its fifth recitation of this saga, the Court gleans
the following facts, for the most part, from the
parties' joint Pretrial Stipulation, Docket Item
("D.I.") 204. Finch is presently age 63 and was born
on July 22, 1932. He started his tenure at Hercules
in 1962 as a Systems Analyst, progressing up the
company hierarchy to the helm of the Audit
Department, a position he held for eleven years
until Hercules terminated him in February 1991. At
that time, Finch was titled as General Auditor and
reported to the corporation's Chief Financial
Officer, Arden B. Engebretsen ("Engebretsen").
When terminated, Finch was 58 years old and
earning an annual salary of $102,608.

Finch's termination in 1991 is characterized by
Hercules as part of a reduction-in-force ("RIF"),
which had its genesis in late 1990. The 1991 RIF,
which eliminated 402 employees, was merely one in
a series of staff reductions in an overall program of
restructuring that Hercules had commenced in the
mid-1980s. To assist with the RIF process, Hercules
hired Thomas S. Litras Consultants ("Litras"),
which recommended a forced ranking/paired
comparison process to select the individuals to be
terminated. [FN1] In its proposal for ranking
employees, Litras recommended that the
corporation consider "performance, education,
versatility, flexibility, and continuous service. Age
[[was] to be the last factor considered, and then
*only if a 'tie-breaker' was required.* If there was a
tie, Hercules was to retain the older employee."
*Finch v. Hercules, Inc.,* 865 F. Supp. 1104,
1112-13 (D. Del. 1994) (emphasis in original;
internal citations omitted). It was agreed that
Hercules' preexisting performance appraisal system
was inadequate to support the required
decisionmaking.

In December, 1990, before any employee had been
selected for termination, the Hercules Board of
Directors appointed Thomas L. Gossage

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

("Gossage") as the corporation's new Chief Executive Officer ("CEO"). Coincident with these events, Hercules' Chief Financial Officer ("CFO") Engebretsen also retired, positioning Finch, at least on paper, as directly reporting to the neophyte CEO Gossage. Gossage subsequently gave George MacKenzie ("MacKenzie"), the corporation's Controller, responsibility for Finch's Audit Department.

MacKenzie undertook the forced-ranking of seven managers from the Audit and Controller's Departments. He ranked Finch near the bottom of the list at sixth place. On January 26, 1991, MacKenzie obtained approval for the elimination of the position of General Auditor and, therefore, Finch (as well as the employee who was listed in last place). MacKenzie broke the news to Finch on February 4, 1991; Finch was terminated effective February 28, 1991.

*2 Later in 1991, the successor Chief Financial Officer reinstated the position of General Auditor, but did not interview Finch in the process. Instead, Hercules hired Curtis Tomlin, age 38, for Finch's former position. In response to this entire series of events, armed with his Equal Employment Opportunity Commission right-to-sue letter, Finch brought this action on May 5, 1992. At this point, it is uncertain whether this case will be treated under a "mixed motive" analysis, *see Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Griffiths v. CIGNA*, 988 F.2d 457 (3d Cir.), *cert. denied*, 114 S.Ct. 186 (1993), or a "pretext" mode of analysis, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Miller v. CIGNA*, 47 F.3d 586 (3d Cir. 1995). [FN2]

### III. CROSS-MOTIONS IN LIMINE
Finch has moved in limine for a ruling on the admissibility of various evidence and testimony that Hercules proposes to put forth at trial. Hercules has likewise cross-moved in limine.

A. Plaintiff's Motion in Limine

1. Evidence Not Considered by MacKenzie When Force-Ranking Finch

As part of its defense to plaintiff's allegations of age discrimination, Hercules seeks to introduce at trial three types of documentary evidence. First, defendant offers an Indirect Productivity Improvement ("IPI") study performed by outside consultants in 1989 as evidence that Hercules needed a more proactive, involved audit department. *See* D.I. 119 at 486. This IPI study was not factored into any of the adverse employment decisions affecting plaintiff. Second, Hercules seeks to introduce evidence generated contemporaneously with the RIF process. During the latter part of January, 1991, Hercules reviewed the performance of all corporate staff groups for purposes of determining the amount of incentive bonuses ("Management Incentive Compensation Plan" or "MICP") for senior staff employees. Plaintiff asserts, and defendant does not contest, that the results of this MICP evaluation were not known until *after* Hercules decided to terminate Finch. Finally, Hercules seeks to admit Performance Appraisal Reports prepared by Finch for two of his employees.

Plaintiff argues that none of this evidence surfaced until the discovery phase of this litigation; MacKenzie did not consider any of it in his decision to terminate Finch. As such, plaintiff argues, the above documents should be inadmissible as "after-acquired" evidence under *McKennon v. Nashville Banner Publishing Co.*, 115 S.Ct. 879 (1995), and its progeny. The Third Circuit Court of Appeals has characterized after-acquired evidence as "evidence of the employee's ... misconduct or dishonesty which the employer did not know about at the time it acted adversely to the employee ..., but which it discovered at some point prior to, or more typically, during subsequent legal proceedings; the employer then tries to capitalize on the evidence to diminish or preclude entirely its liability for otherwise unlawful employment discrimination." *Mardell v. Harleysville Life Ins. Co.*, 31 F.3d at 1222. The evidence of which plaintiff complains does not involve any misconduct or dishonesty by Finch that would serve as a *post hoc* justification for Hercules terminating him; it therefore does not quite fit the Third Circuit's paradigm as being after-acquired. Nevertheless, "to be admissible in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 3

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

either a mixed motives or pretext case, evidence must be relevant to the proofs or rebuttals of defendant's discriminatory motivation." *Finch v. Hercules, Inc.,* 865 F.Supp. at 1110 n.3 (D. Del. 1994) (citing *St. Mary's Honor Ctr. v. Hicks,* 113 S.Ct. 2742 (1993)). *See also Mardell,* 31 F.3d at 1229 (employee must show that age was a substantial factor motivating the adverse employment decision at the time it was made). The person involved in the forced-ranking of plaintiff, MacKenzie, was not aware of either the IPI study or the MICP evaluation until after the decision to terminate Finch had been made. Consequently, this evidence could not have affected Hercules' motivation in either the forced-ranking process or the ultimate decision to terminate Finch.

*3 Hercules counters that the above evidence is not after-acquired evidence, and that the results of the IPI study and the MICP reports are not being introduced as a basis for MacKenzie's termination decision. Rather, defendant seeks to rebut Finch's assertion that his performance as auditor was "consistently excellent." *See* Complaint, D.I. 1 at ¶ 8. Hercules would introduce the evidence to show MacKenzie's decision was not "mistaken and unreasonable," but rather was consistent with the vast majority of other high ranking officials' opinions at Hercules. Answer Brief, D.I. 226 at 3. Plaintiff rejoins by citing Fed. R. Evid. 403 and arguing that the dangers of confusing and misleading the jury and the resultant prejudice substantially outweigh any probative value of this evidence.

The Court agrees that any limited probative utility of the IPI and MICP evidence would be substantially outweighed by the undue prejudice to plaintiff. Because MacKenzie did not consider and did not know of unflattering statistics, they are not probative of his decisionmaking process. Hercules should not be allowed to present, after the fact, further justification for its actions if that justification was completely uncontemplated at the relevant time. At issue is whether a discriminatory animus motivated Hercules in the employment decisions it made adverse to plaintiff at the time those decisions were made. *Fuentes v. Perkasie,* 32

F.3d 759, 765 (3d Cir. 1994); *Mardell,* 31 F.3d at 1229. Accordingly, for purposes of liability, a jury will deliberate as to whether Hercules was so motivated on the information it availed itself of at the time. [FN3] Admission of the MICP or IPI evidence would serve only to feed the jury facts that are extraneous to its task, yet once presented, would be difficult to "unlearn." Consequently, the Court finds any marginal relevance this evidence may have is substantially outweighed by the dangers of confusion and prejudice.

The Courts views differently, however, the third type of evidence Hercules proffers, *i.e.,* Performance Appraisal Reports authored by Finch as products of his evaluating two subordinate employees. Hercules argues that Finch has:

expressed disbelief in his low ranking by MacKenzie and has claimed that it could only be due to a discriminatory motive, because his supervisor gave him good evaluations. Ironically, Finch himself ranked two of his employees, Droney and Mekinc, at the bottom of the forced rankings after having given them good evaluations.

Defendant's Answer Brief, D.I. 226 at 4. Although Finch contends that "Finch's ranking was not based on performance," D.I. 231 at 2, MacKenzie has testified at deposition that his forced ranking of Finch *was* based on performance. D.I. 121 at B-106. The evidence in question is directly relevant to the fact-finder's consideration of whether Hercules employee evaluations necessarily correlate to forced-ranking decisions or an employee's prior performance. Therefore, the Court will allow this evidence to be admitted at trial.

2. Evidence of Finch's Reputation

*4 Plaintiff next argues that Hercules will try to introduce at trial evidence of Finch's general reputation at Hercules. During discovery, one Hercules employee testified that "[Finch] was not well regarded in Hercules other than by his prior boss." D.I. 119 at A374. Another employee provided a sworn statement that "The general perception within Hercules was that Mr. Finch was a lackluster performer ...." D.I. 212 at 11, citing D.I.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                           Page 4

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

135 at 8. [FN4] Finch argues that such testimony concerning the general view of unidentified persons in Hercules management should be excluded as hearsay as it is inherently unreliable, prejudicial, and not susceptible to cross-examination. Finch concedes, however, that a witness's testimony as to his or her own personally-held beliefs is susceptible to cross-examination. D.I. 231 at 8. Finally, Finch contends that such testimony is also barred under Fed. R. Evid. 701. Hercules counters by arguing that Finch misunderstands both the type of testimony it seeks to offer as well as the applicable law; it argues that this evidence is "exactly the type of testimony permissible under Rule 701." D.I. 226 at 6.

Fed. R. Evid. 701 allows the introduction of lay opinion testimony if the witness' testimony is "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Hercules maintains that both of the rule's requirements are easily met. First, as fulfillment of part (a), it argues that its witnesses are Hercules managers who have had the opportunity to interact with Finch and observe his performance; thus, they have first-hand knowledge about management's perceptions regarding Finch's performance. For part (b), Hercules contends that the managers' testimony will assist the jury to understand Finch's low rank resulting from the RIF process. It also argues that this testimony is crucial for an understanding of whether it was unreasonable for MacKenzie to conclude that Finch was an unsatisfactory performer and therefore terminate him.

If, as Hercules represents, its witnesses' testimony will be based on each witness's own perception of Finch, the testimony is not hearsay and is admissible. Plaintiff will be able to cross-examine these witnesses as to the reasons why they formulated their opinions and whether their opinions are rationally based. Although MacKenzie was the actual manager who decided plaintiff's fate, other managers were privy to the same or similar information possessed by MacKenzie regarding plaintiff's performance, assuming Hercules lays the

proper foundation under Rule 701(a). Their testimony may corroborate or undermine MacKenzie's decision; either way, this type of testimony is crucial to the fact-finder's consideration of whether Hercules' proffered explanation of its decision to terminate Finch is worthy of credence.

However, because the testimony of the individual managers will be admissible, Hercules will not be allowed to elicit testimony of Finch's general reputation among the Hercules management. The Court agrees with plaintiff that under these circumstances, the probative value of general reputation testimony will be substantially outweighed by the resultant prejudice to plaintiff. It will be unnecessary to ask each manager about how management in general regarded Finch because each manager will have the opportunity to testify about his or her personal and fact-based opinion of plaintiff. The jury will thus be able to draw its own conclusion as to Finch's reputation by weighing each manager's testimony. Based on this evidence, plus evidence presented by MacKenzie, the jury may or may not infer that it would be reasonable that MacKenzie held these same beliefs.

3. Finch's Membership and Participation in the Mormon Church

*5 Plaintiff plans to call at trial Arden Engebretsen, Hercules' former Chief Financial Officer and the administrator to whom plaintiff directly reported. Engebretsen and Finch were members of the same church, the Church of Jesus Christ of Latter-Day Saints, also known as the Mormon Church. During 1977-1980, Finch was a bishop of his and Engebretsen's Mormon congregation; Finch's duties as bishop included counseling members of the congregation, including young adults and teens. In his role as lay bishop, Finch counseled one or more of Engebretsen's children. Hercules argues that evidence of Finch's church-based relationship with Engebretsen is relevant to show that Engebretsen, who was responsible for evaluating Finch's performance, may have been and may still be biased in favor of Finch. Finch agrees that the following evidence is admissible: "that Engebretsen and Finch attend the same church and that, in connection with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

Finch's church activities, he counseled Engebretsen's children some fifteen years ago." [FN5] D.I. 231 at 12. Finch, however, objects to Hercules placing before the jury any specific reference to Finch's denomination, as it is his understanding that the Mormon sect is generally unpopular and not well understood in the eastern United States. As such, Finch argues, all reference to the Mormon Church should be excluded as unduly prejudicial under Rule 403.

Fed. R. Evid. 610 states that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." The rule's advisory committee notes add that while the rule forecloses inquiry into the religious beliefs or opinions of a witness for purposes of showing the witness's character for truthfulness, "an inquiry for the purpose of showing interest or bias because of them is not within the prohibition." The Court agrees that evidence of Finch attending the same church as his supervisor and counseling his supervisor's children is relevant and admissible to show possible bias on the part of Engebretsen. However, Engebretsen's bias, if there is bias, would flow from the nature of the relationship between these two men as members of the same religious community, independent of the specific denomination that community happens to be. Evidence of Finch's and Engebretsen's specific denomination is irrelevant to the substantive issues in this case; even if it were relevant, its probative value is substantially outweighed by the danger of undue prejudice to the plaintiff. While the Court does not necessarily find that the Mormon religion is unpopular in the District of Delaware, the Court does acknowledge the possibility that this evidence will only serve to distract the jury or take on an inflated and unwarranted significance. The Court therefore holds that evidence of Finch's and Engebretsen's membership in the Mormon church is inadmissible.

4. Exclusion of Hercules Witnesses

*6 Plaintiff also moves to exclude or at least limit

the testimony of certain Hercules' witnesses as listed in the Pretrial Stipulation. The grounds for exclusion are several.

a. Curtis "C.T." Tomlin

Hercules proposes to call Curtis Tomlin, a Harvard-educated, African-American, Certified Public Accountant who, at age 38, was hired in December 1991 as the corporation's new General Auditor. According to defendant, Tomlin was hired when R. Keith Elliott, Hercules' newly appointed Chief Financial Officer, decided to reinstate the General Auditor position. D.I. 226 at 34. Hercules seeks to introduce evidence of Tomlin's credentials and qualifications as probative of Hercules' non-discriminatory motive in re-filling Finch's former position; Finch was not interviewed or considered for rehire. Hercules also would have Tomlin testify regarding the environment in the Audit Department following Finch's eleven years at the department's helm. Tomlin would paint an unflattering portrait of Finch's legacy by charactering the Audit Department as "dispirited and reactive," one which Tomlin "needed to take considerable steps to improve." D.I. 241 at 30.

Finch argues that he is not alleging that Hercules discriminated against him based on his age when it refused to interview or rehire him in December 1991. Plaintiff argues that the only relevant evidence are Tomlin's hire date, his age, and the position for which he was hired. In his Complaint, Finch chose to allege these very facts as bearing on his age discrimination claim.

The Court agrees that Tomlin's age, date of hire, and position are germane to this action. Plaintiff has argued that the replacement of the 58-year-old Finch by this younger individual is probative of Hercules' discriminatory animus. But, if Finch wishes to offer these facts, Hercules will be allowed to offer proof of Tomlin's credentials as evidence of a legitimate motive underlying its actions. The Court is troubled by Hercules' assumption that the condition in which Tomlin found the Audit Department, eleven months after Finch was terminated, is directly attributable to Finch. During this interim period, the Audit Department was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                                                           Page 6

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

headed by one or more temporary managers who may or may not have contributed to the departmental environment into which Tomlin was thrust. However, it is simply impossible to determine in advance of trial whether this testimony would be substantially more prejudicial than probative. Accordingly, any ruling on this issue prior to trial would be premature. The Court will entertain argument on this issue during trial, out of the hearing of the jury, just prior to or at the time Tomlin takes the witness stand.

### b. Witnesses Identified By Hercules in the Pretrial Stipulation

In the Pretrial Stipulation, Hercules identified for the first time as trial witnesses several of its present and former employees: David S. Hollingsworth, predecessor CEO to Gossage; Fred L. Buckner, former President; James J. Anthony, Manager of Administration in the Audit Department; William Godfrey, Manager of Computer Audits from 1980 to 1987, Sue A. Murray, who ran the Audit Department on an interim basis after Finch was terminated; and Harry Gordon, who was the Director of Executive Resources in Hercules' Human Resources Department. [FN6]

*7 Plaintiff protests that these witnesses should have been disclosed as responsive to the following series of interrogatories:

4. Was elimination of the position of General Auditor the sole reason for terminating Mr. Finch? [Hercules' Answer: No]
5. If the answer to Interrogatory 5 was no, please state in detail:
a. each additional reason for terminating Mr. Finch; [Hercules' Answer: In connection with the downsizing, and in compliance with the mandates of Hercules' Policy Compliance Committee's requirements, the Financial Managers falling under the supervision of the Controller's Department were ranked. Mr. Finch's performance caused him to be ranked among the two lowest ranked financial managers in a group of seven, and these two employees were terminated.]
b. description of each document which refers to the additional reason;

c. *the name of each person who has knowledge of the additional reasons;*
d. whether any of the additional reasons were communicated to Mr. Finch, and if so, by whom." D.I. 227, Exh. C (emphasis added). Plaintiff contends that Hercules was noncompliant with its answers to his discovery requests, specifically question 5c, and that consequently, he never had an opportunity to depose the above witnesses. Fed. R. Civ. P. 26(a)(5) allows parties to propound written interrogatories as a part of the discovery process; the rules also provide a harsh penalty for noncompliance with this discovery mechanism. "A party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at a trial ... any witness ... not so disclosed." Fed. R. Civ. P. 37(c)(1). Finch requests these witnesses to be excluded from trial. Plaintiff's Opening Brief, D.I. 212 at 31.

Hercules counters that plaintiff's interrogatories were narrowly focused and, specifically, number 5c was merely "asking for the names of persons who had knowledge of any additional reasons, aside from the position elimination, why Finch was one of those chosen to be RIFed, *i.e.,* knowledge of what those additional reasons were." D.I. 226 at 20. In response to this interrogatory, Hercules identified individuals whom it contends knew *why* Finch was terminated, *i.e.,* that Finch's performance was considered as a factor. The Court agrees that this was a reasonable interpretation of interrogatory 5c, viewed standing alone and especially within the context of the surrounding questions. The interrogatories focus on Hercules' proffered reasons underlying its termination of plaintiff and individuals who were able to proffer those reasons.

In contrast, Hercules now seeks to offer the witnesses in question to testify about the quality (or lack thereof) of Finch's performance; it argues these witnesses did not know that Finch's performance was factored into the forced-ranking and termination decisions. Therefore, defendant argues, a listing of these witnesses was not required by plaintiff's interrogatories. Hercules has tendered a brief description of each of the witnesses in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 7

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

(Cite as: 1995 WL 785100 (D.Del.))

question. James J. Anthony served as Manager of Administration in the Audit Department and reported directly to plaintiff. He would be able to testify about the nature and quality of Finch's performance and present his view as to the functioning of the Audit Department. He was not, however, involved in the decision to terminate Finch.

*8 Sue A. Murray was one of several "interim" managers who ran the Audit Department after Finch was terminated. At trial, she would testify that it was clear that her function in this capacity would be strictly on an interim basis, and that she was granted unencumbered access to the Audit Committee, a Committee of the Hercules Board of Directors. Hercules seeks to rebut plaintiff's assertion that Hercules engaged in "subterfuge" when terminating Finch and eliminating his position on an interim basis. *See* D.I. 204 at 30-31. Hercules would also elicit Murray's testimony regarding problems she encountered when running the Audit Department allegedly stemming from plaintiff's "poor management." D.I. 226 at 34.

Fred Buckner was Hercules' President and Chief Operating Officer during the years antedating the 1991 RIF. Buckner served as the leader of Hercules' President's Team and was also a member of the corporation's Executive Team. These two groups evaluated the performance of different departments within the corporation, D.I. 227, Exh. O at 57; they were also responsible for the MICP evaluation, *supra*, section 1, which has been ruled admissible only if there is bifurcation of liability and damages. Hercules also argues that plaintiff has listed as one of his trial exhibits a document authored by Buckner and that Buckner should be allowed to testify about the document.

William Godfrey worked with Finch from 1980-1987 as Manager of Computer Audits. Hercules states that Godfrey will attest to plaintiff's unique relationship with CFO Engebretsen and his family during that time frame. Godfrey will also testify about Finch's personal activities purportedly occurring during the work day, including sleeping, church business, and reading the newspaper.

David Hollingsworth was Hercules' CEO prior to Gossage. Hercules does not currently plan to call this witness during its case in chief, but wishes to reserve its right to do so if necessary.

The current record shows that none of the above witnesses were positioned to know that Finch's performance played a role in the ultimate decision to terminate him. With one qualification, the Court will allow these witnesses to present their testimony, as outlined by Hercules, at the upcoming trial. If there is no bifurcation, Buckner will not be allowed to testify about the MICP evaluation or any other similar evidence which was not considered in the decision to terminate Finch.

Plaintiff objects to an additional trial witness identified by Hercules, Harry Gordon, who from the mid-1980s until July, 1991, was Hercules' Human Resources Director of Executive Resources. Plaintiff argues that Hercules affirmatively misled him during discovery as to the scope of this witness's knowledge of and involvement with Finch's termination. Hercules initially identified Gordon as an individual who participated in the development of standards or criteria for evaluating employees during or in preparation for its 1991 RIF. However, Hercules later narrowed its characterization of Gordon's expertise in this area by describing Gordon as one who attended a meeting at which the RIF policy was discussed, but who played no role in developing standards or criteria for evaluating employees.

*9 In November, 1992, Finch also asked to discover any Hercules documents related to the "replacement potential of all corporate financial positions" and for "promotability lists" prepared by Human Resources. D.I. 232 at C40. Hercules responded that there were none available at that time. In May, 1995, Finch renewed this same request for documents. Hercules responded by asserting it had just discovered an old notebook of Gordon's in a desk containing notes of business meetings Gordon attended in 1988. Gordon's notes quote Engebretsen, who was Hercules' CFO and Finch's direct supervisor, as declaring the corporation as needing "an accounting guru" and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 8

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

"Need Chief Auditor - repl Finch." D.I. 210, Exh F. at 5. After contacting Gordon, who had retired in July 1991, further probing revealed a 1985 file memo documenting a conversation between Gordon and MacKenzie. MacKenzie is said to have commented that plaintiff was "insecure" and was an "8:00-4:45 carpooler." *Id.* at 3. Hercules forwarded these and other of Gordon's documents to plaintiff's counsel in June and July of this year. It now seeks to call Gordon as a witness to testify how plaintiff was not highly regarded by his superiors.

Plaintiff argues that he has been prejudiced in his ability to prepare adequately for Gordon's trial testimony and that Hercules should not be allowed to profit from its abuse of the discovery process. Plaintiff therefore seeks to exclude this witness from testifying at trial.

The exclusion of otherwise admissible testimony because of a party's failure to meet a timing requirement is a harsh measure to be avoided where possible. *Central Maine Power Co. v. Foster Wheeler Corp.,* 115 F.R.D. 295, 297 (D. Me. 1987). However, sometimes, such exclusion is necessary; fidelity to the constraints of Scheduling Orders and deadlines is critical to the Court's case management responsibilities. *Tomlin v. Holecek,* 158 F.R.D. 132, 135 (D. Minn. 1994) (citing *Jochims v. Isuzu Motors, Ltd.,* 144 F.R.D. 350, 356 (S.D. Iowa 1992) ). Accordingly, the "flouting of discovery deadlines causes substantial harm to the judicial system." *Id.* As a sanction for failure to comply with a timing requirement set by the Scheduling Order in this case, the Court is authorized to exclude evidence proffered by the disobedient party. *United States v. 68.94 Acres of Land,* 918 F.2d 389, 396 (3d Cir. 1990). However, the Court also acknowledges that unreasonable adherence to such deadlines, without regard to whether a party was justified for its actions, runs counter to the dominant interest in the trial process, *i.e.,* ascertaining the truth. These competing considerations are properly resolved by the Court in exercising its discretion. *DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1201 (3d Cir. 1978).

When considering whether to exclude testimony,

courts generally look to the following: "the ability of the party to have discovered the witnesses earlier, validity of the excuse offered by the party, willfulness of the party's failure to comply with the court's order, the party's intent to mislead or confuse his adversary, and the importance of the excluded testimony." *Stewart v. Walbridge, Aldinger Co.,* 162 F.R.D. 29, 31 (D. Del. 1995) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904 (3d Cir. 1977), *overruled on other grounds, Goodman v. Lukens Steel,* 777 F.2d 113 (3d Cir. 1985), *aff'd,* 482 U.S. 656 (1987)). Based on these considerations, the court must weigh (1) the prejudice or surprise to the party against whom the excluded witnesses would have testified, (2) the party's ability to cure the prejudice, (3) the extent to which calling undisclosed witness would disrupt the trial process, and (4) bad faith or wilfulness in failing to comply with the court's order. *Meyers,* 559 F.2d at 904-05.

**\*10** At this point, on the eve of trial, the Court is inclined to exclude this witness. Defendant has not offered any compelling justification for why the documents were not produced when first requested during discovery. Hercules enjoyed access to both the documents and was able to reach Gordon for more information (even though he retired three years ago), and should have done as much as part of its duty to diligently produce evidence requested by its opponent. Plaintiff has been both surprised and prejudiced in not being able to depose this witness and prepare accordingly for trial. It would be unfair to plaintiff to have his case preparation impacted and disrupted at this late date. Additionally, there is no evidence that MacKenzie relied on any of this evidence when force-ranking or terminating Finch. On balance, consideration of the above factors weigh in favor of excluding this witness from trial.

B. Defendant's Motion in Limine

1. Evidence of Hercules Financial Earnings After the 1991 RIF

Hercules seeks to preclude at trial evidence of the earnings and financial status of both the corporation and several of its top executives. Plaintiff argues

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 9

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

that Hercules has placed its financial condition at issue when its CEO Gossage declared the purpose of the 1991 RIF was to cut indirect costs and put the company back on the path towards being "lean." Plaintiff's Answer Brief, D.I. 228 at 27. Plaintiff also "vigorously disputes Hercules' justification for the RIF" and "believes the RIF, as applied to him, was totally pretextual ...." *Id.* at 27. Specifically, Finch argues that there are substantial reasons to dispute whether Hercules' fiscal health was in serious jeopardy and whether Hercules' proffered economic justification for the RIF is worthy of credence.

Hercules argues that this evidence is not probative of whether the corporation discriminated against plaintiff based on his age. Rather, it asserts, evidence of Hercules' financial wealth would serve to prejudice the jury against defendant and its senior officers by portraying them as "avaricious fat cats who can afford to pay a sizable judgment." D.I. 209 at 2. The Court agrees. First, plaintiff seeks to introduce evidence of Hercules' earnings and argue that the RIF was not economically justified. According to plaintiff, Hercules' annual net earnings/losses were as follows: 1989, the corporation lost $81 million; in 1990, following a RIF, it enjoyed a net income of $96 million; in 1991, it similarly gained $95 million. In addition, plaintiff seeks to introduce the salaries and bonuses of both Hollingsworth and Gossage, Hercules's two most recent Chief Executive Officers. Their salaries ranged from the high six to low seven figures; plaintiff seeks to draw the inference that because Hercules was willing and able to afford such high-priced talent, it must not have been in such economic dire straits as to justify the 1991 RIF.

These figures would seem staggering to those uninformed about the operation of a large, Fortune 500 corporation such as defendant's. Were plaintiff allowed to introduce such evidence, defendant would no doubt find itself required to define in great detail the meaning of these numbers and how they compare with other similarly situated businesses and top executives. Hercules would also likely seek to illustrate the economic projections and reasoning behind the multiple RIF's and

whether, in hindsight, the prospective RIF planning correlated to the eventual financial results. In addition, the corporation would explain whether other forces impacted these financial statistics, such as availability and cost of raw materials, market demand, and the economic climate both national and international.

**\*11** Corporations implementing a RIF generally have an explicit plan to reduce expenses by eliminating jobs. *Hardin v. Hussman Corp.,* 45 F.3d 262, 264 (8th Cir. 1995). Such corporations usually provide decisionmakers with objective criteria by which to decide which jobs to eliminate. *Id.* At trial, plaintiff will have every opportunity to explore Hercules' stated reasons and criteria for terminating him pursuant to the RIF. However, the Court finds there is no requirement for a corporation to be in financial distress before embarking on such a RIF. *Id; Bashara v. Black Hills Corp.,* 26 F.3d 820, 824-25 (8th Cir. 1994). Therefore, the Court is not inclined to allow a mini-trial on the issue of whether Hercules' RIF was an exercise in sound business judgment. The presentation of Hercules' financial history in the years after the 1991 RIF would consume much trial time and serve only to distract attention from the pivotal issue in this case: whether Hercules discriminated against Finch based on his age when it terminated him. Accordingly, the Court holds that the prejudice to defendant resulting from admission of evidence of earnings of Hercules and its senior executives after the would substantially outweigh any probative value this evidence would have.

2. Statements by CEO Gossage

Plaintiff proposes to introduce before the jury the following: (1) a newspaper article appearing in the Wilmington *News Journal* containing comments attributed to CEO Gossage; (2) an article published on February 1, 1991 in *Horizons,* an internal Hercules publication; (3) remarks by Gossage to a Hercules executive named William Hosker in January, 1992; (4) remarks allegedly made by Gossage to another Hercules executive named Doyle Miller, and subsequently repeated by Miller to Hosker.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          Page 10

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

a. The *News Journal* Article and the *Horizons* Article

Plaintiff seeks to admit a Wilmington *News Journal* article entitled, "Hercules will cut 450 jobs," which quotes Gossage as saying, "The young people in the company want us to bring Hercules back to where it ought to be again .... Older people will see friends impacted and will feel bad about it. But we'll get this behind us." D.I. 119 at A539. In his deposition, Gossage testified that if not a direct quote, the article was a "similar quote" to something he said and at least captured the spirit of what he said. D.I. 121 at B71. The article was published on January 9, 1991, right as final approval was given for the RIF to get underway. D.I. 229 at B65, 68.

Subsequently, *Horizons,* Hercules' internal corporate newsletter, published an article styled in a question and answer format, entitled "Gossage answers employees' questions." In the article, Gossage was asked to amplify his statement published in *The News Journal,* and was quoted as saying:

What I said was that younger employees want to know when the company will get up and turn itself around, and I acknowledged that to those with long service to the company, it was painful to watch what was going on. I'd say it again.

*12 D.I. 121 at B288. Gossage allegedly made these remarks during a presentation at the Hercules Men's Club.

Hercules argues that Gossage's comments should not be admitted at trial for several reasons. First, it contends they are irrelevant and characterizes them as merely "observations about the reaction of Hercules' employees to the voluntary phase of the RIF, and generalities about evolutionary changes in expectations about the permanency of employment in the corporate world." D.I. 209 at 10. Second, it characterizes Gossage's remarks as "stray remarks" that are not indicative of age bias. Under the so-called "stray remark" doctrine, such remarks "made by non-decisionmakers or by decisionmakers unrelated to the decisionmaking process are rarely given great weight" and are not direct evidence of discrimination. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 779 (3d Cir. 1994) (citing *Ezold v. Wolf,*

*Block, Schorr and Solis-Cohen,* 983 F.2d 509, 545 (3d Cir. 1992), *cert. denied,* 114 S.Ct. 88 (1993)). Hercules maintains that Gossage had "very little to do with the 1991 RIF." D.I. 209 at 14.

The Court disagrees with both of Hercules' assertions. Fed. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The rule, therefore, sets a low threshold for relevancy, *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 783 (3d Cir. 1994), *cert. denied,* 115 S.Ct. 1253 (1995); evidence is irrelevant "only when it has no tendency to prove [a consequential] fact," *Spain v. Gallegos,* 26 F.3d 439, 452 (3d Cir. 1994) (citing *Blancha v. Raymark Indus.,* 972 F.2d 507, 514 (3d Cir. 1992)).

Gossage's statements in *The News Journal* and in the *Horizons* newsletter easily satisfy this lenient relevancy standard. In this disparate treatment case, plaintiff seeks to prove a discriminatory motive on the part of Hercules; he may meet his burden either by presenting direct or indirect evidence of unlawful age discrimination. *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1214 (3d Cir.1988), *cert. denied,* 490 U.S. 1098 (1989). As to Hercules' second contention, the Court finds that Gossage, as the corporation's CEO and leader, was well positioned to set the tone for the 1991 RIF. His highly public statement explaining the RIF to *The News Journal* demonstrates Gossage's intent to exhibit strong leadership at the corporate helm. Consequently, "because discriminatory comments by an executive connected with the decisionmaking process will often be plaintiff's strongest circumstantial evidence of discrimination, they are highly relevant." *Abrams v. Lightolier, Inc.,* 50 F.3d 1204, (3d Cir. 1995). Here, Gossage explicitly distinguished between older and younger employees and how he perceived the younger employees, as opposed to the older ones, as those who wanted to bring the corporation back to a better condition; it is for the jury to weigh the competing inferences generated by these remarks. *See Siegel v. Alpha Wire Corp.,* 894 F.2d 50, 54-55 (3d Cir.), *cert.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

*denied,* 496 U.S. 906 (1990) (reversing district court for holding that the defendant's use of the phrase "old dogs won't hunt" was not sufficiently probative to be admissible). As the Third Circuit Court of Appeals has observed:

**\*13** [w]hen a major company executive speaks, "everybody listens" in the corporate hierarchy, and when an executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it cannot compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman.

*Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 54 (3d Cir. 1989). Thus, it is possible that MacKenzie and other Hercules personnel were influenced by Gossage's characterizations of older versus younger employees; drawing or not drawing this inference will also be within the province of the fact-finder at trial. The Court holds this evidence to be relevant to plaintiff's proof of the corporation's anti-age animus.

Hercules adds that even if the remarks are relevant, plaintiff attempts to exploit them "out of context and without any basis in fact." D.I. 209 at 11. Thus, defendant argues, these comments, are misleading and inflammatory, and, if admitted, would be more prejudicial than probative. The Federal Rules of Evidence set forth the standard for this discretionary balancing: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...." Fed. R. Evid. 403. Thus, to exclude Gossage's remarks under Rule 403, their probative value must be "substantially" outweighed by their potential for prejudice. The Court finds such prejudice lacking here. It is axiomatic that all evidence adverse to a party is prejudicial; under the rule, the prejudice should rise to a level tantamount to being unfair. *Dollar v. Long Mfg., N.C. Inc.,* 561 F.2d 613, 618 (5th Cir. 1977), *cert. denied,* 435 U.S. 996 (1978). At trial, Hercules will be afforded ample opportunity to provide context and explanation for Gossage's remarks. Accordingly, the Court does not find Rule 403 to be a basis for excluding this evidence.

In its Reply Brief, D.I. 233, Hercules does make a final persuasive argument for exclusion of the *Horizons* article: it correctly identifies the article as hearsay under Fed. R. Evid. 802. Hercules argues that if the basis of the article was Gossage's Men's Club speech, then plaintiff must introduce admissible evidence of the speech, and not a hearsay article about the speech published later. The Court agrees that the Horizons article, even though arguably relevant, must be excluded as inadmissible hearsay.

Finally, Hercules argues that *The News Journal* article should be excluded because to do otherwise would have a chilling effect on free decisionmaking and encroach on an executive's right to speak about Hercules' future. As legal theory for this argument, Hercules relies on the First Amendment to the United States Constitution. The Court finds that this assertion emotes more heat than light, as there is no state actor involved in this case against whom the First Amendment could be invoked. Consequently, the Court finds this argument wholly without merit, warranting no further analysis.

**b. Remarks Attributed to Gossage by Hosker**

**\*14** Plaintiff also seeks to call William E. Hosker, who is the retired head of Hercules' Resins Group. In 1992, approximately one year after Finch's termination, Gossage led a reorganization of the corporation. In the reorganization, Hercules established three new groups: Chemical Specialties, Food and Functional Products, and the Hercules Materials Company. D.I. 229 at B43. According to Hosker, Gossage expressed his intent to have in place at the head of each group, positioned immediately below him in the corporate hierarchy, individuals who would be part of a cadre of qualified CEO candidates who would be in their early 50s by the time Gossage retired. Hosker claims Gossage made it clear that Hosker would be passed over because Hosker was already 54 years old. D.I. 58 at 20-21. According to Hosker, Gossage explained that "someone in their late 50s typically looks, expends their energies in preparing their retirement ....[while] younger people have perhaps more energy and a longer period of time in which they can perform their duties." *Id.* at 27.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

In its opinion on Hercules' summary judgment motion, the Court refused to consider this evidence. *See Finch v. Hercules,* 865 F. Supp. at 1125. For purposes of admissibility at trial, the Court reaches a similar result. While this statement on its face may raise an inference of age discrimination, the issue Gossage's statement was addressing, CEO succession planning, is a far cry from the issue in the instant case. The hiring and promotion of individuals to the position of Chief Executive Officer is treated differently under the ADEA. Under the statute's executive and policy making exception, 29 U.S.C. § 631(c)(1), a company has a right to require its CEO to retire at age 65. [FN7] At summary judgment, the Court held that "[a]ge bias in [such] promotion decisions simply does not make age bias in termination decisions more likely. Further, to the extent this portion of Hosker's testimony is minimally relevant, ... its probative value is substantially outweighed by the danger of unfair prejudice." *Finch v. Hercules,* 865 F.Supp. at 1125. These same considerations apply with full force at this stage of the litigation.

Hosker would also testify about a June 1992 meeting conducted by C. Doyle Miller, Hosker's direct superior. At that meeting, Miller discussed the results of the Management and Organization Review for Hosker's Chemical Specialties Group. While doing so, Miller relayed certain comments that Gossage had allegedly made to him; Hosker dictated a memo to his file that referenced these remarks. Hosker's memo states *inter alia*, that:

The only negative criticism received by Miller was Gossage's statement that the Chemical Company had not aggressively or creatively addressed "tired warriors," who, though contributing to the corporation, were blocking the movement of young, aggressive people, upon whom the future of the company had to be built.

D.I. 229 at B12. As a backdrop to this statement, plaintiff explains that "Gossage planned to get younger employees into the pipeline so that they could rise through developmental positions into the more senior positions and provide the Board with a choice of candidates to replace him when he retired." D.I. 228 at 13. Plaintiff quotes Gossage as testifying that "there has been, since I took over the

[CEO] position, an ongoing effort between the Board and myself on a regular basis to talk about my eventual retirement and the candidates who might replace me and what development plans are in place to prepare them for that eventuality." D.I. 229 at B34.

**\*15** Hercules correctly notes that this testimony was before the Court at summary judgment as well, and the Court declined to make a definitive ruling pending further illumination of this testimony. In its opinion, the Court requested clarification (1) as to the timing of these statements relative to Finch's termination, (2) whether Gossage actually used the words "tired warriors," (3) if he did use the term, what meaning did he ascribe to the phrase, and (4) whether this remark was targeted specifically to the Chemical Specialties Group. *Finch v. Hercules,* 865 F.Supp at 1125. The record shows that this remark allegedly occurred approximately 16 months following the 1991 RIF and Finch's termination. Miller denies ever using the phrase in any meetings he conducted or hearing Gossage use the phrase. D.I. 210 at Exh. G. The record is silent as to whether Gossage himself admits or denies making this statement and what it meant. Miller's memo defines the remark as directed specifically at his Chemical Specialties Group. D.I. 229 at B12. As such, Hercules argues that it is unrelated to the termination of Finch.

The Court finds the issue of admissibility of this evidence a closer question. Standing alone, the temporal remoteness of the statement is not troubling; it could very well indicate an ongoing corporate anti-age bias. Courts have found on numerous occasions remote statements admissible as circumstantial evidence of age discrimination. *Abrams,* 50 F.3d at 1214 (citing *Lockhart,* 879 F.2d at 54; *Roebuck v. Drexel Univ.,* 852 F.2d 715, 733 (3d Cir. 1988)). However, the hearsay nature of Hosker's memo and the circumstances surrounding the document's generation call into question the document's reliability. At summary judgment, the Court voiced concern about the stratified nature of the statements at issue here: Gossage to Miller to Hosker to Hosker's memo to file. The Court is willing to assume *arguendo* that Gossage and Miller

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 13

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

both made this alleged remark in their capacities as corporate agents acting within the scope of their agency or employment. *Finch v. Hercules,* 865 F. Supp. at 1126 and n.21. It is at the next level of hearsay, *i.e.,* Hosker's hearing the remark and reducing to writing that is troubling.

Plaintiff has argued that it can show that Hosker's memorandum would satisfy the requirements for the business records exception to the hearsay rule, Fed. R. Evid. 803(6). However, even if this document could be admitted under this rule, the inquiry into the admissibility of this evidence does not end here. Hosker may have been motivated to make this record for considerations other than the ordinary course of business. Just a few months earlier, in January 1992, Hosker was passed over for promotion and has testified that he is of the opinion he was discriminated on the basis of his age. D.I. 158, Exh. 1 at 31, 34. He candidly expressed that as result, he felt disadvantaged, and retained an attorney to look into the matter. *Id.* at 31. In June, 1992, when Hosker recorded his impression of the meeting conducted by Miller, he wrote

*16 Upon questioning Doyle as to the definition of "tired, old warriors," I used the phrase "white, old males," and was admonished that while perhaps that was an equivalent connotation, we must refrain from language that speaks to age discrimination. My point was that, in fact, Tom Gossage and Doyle Miller are urging management to find a mechanism to move old people out of key jobs to make way for younger personnel. To further clarify, I asked Doyle for a profile of a typical "tired, old warrior." His words were, "Someone who may be 54 years old, contributing to the corporation and planning to work until age 65. These types of individuals are blocking the ability to move people through."

D.I. 229 at B12. Hosker's memo clearly records Hosker's sentiments as to the meaning of the phrase "tired warriors." Hosker unabashedly interjected the word "old" into the phrase and recorded his own interpretation of the remark, an interpretation consistent with his previous impression that Gossage was discriminating against older managers such as himself. As someone who had already felt wronged by Gossage's conduct, Hosker seized the

opportunity to memorialize in writing his subjective impression of what he considered further evidence of age discrimination by his employer. The memo does not set forth an objective explanation of what meaning Gossage attributed to the remark; "tired warriors," standing alone, may or may not implicate considerations of age. *See EEOC v. Clay Indus.,* 955 F.2d 936, 942 (4th Cir. 1992) (analogous phrase, "dead wood" referred to employee evaluations regardless of age). Considering Hosker's jaundiced eye towards Gossage, the Court views this memo as reflective of Hosker's subjective opinion regarding Gossage's alleged remark. As such, the memo's potential for prejudice in misleading and confusing the jury substantially outweighs it probative value.

Although Hosker's memo will not be admissible at trial, the Court will allow Hosker to testify that he heard Miller relay Gossage's alleged "tired warriors" comment at the May 29, 1992 presentation. Plaintiff will still be afforded opportunity to expose this remark to the jury, and defendant may vigorously cross-examine and present its opposing evidence regarding the nature or even the existence of this remark. In so doing, however, the potential prejudice to Hercules by the extra layer of hearsay, Hosker's memo, will be eliminated.

3. Exclusion of Plaintiff's Witnesses

In the Pretrial Stipulation, plaintiff lists five witnesses whom he has never before **identified** as having information about the subject matter of this case. These **witnesses** are Maynard Turk, Alexander Searl, James Hunter, Chris Witham, and Gary Dunn. Similar to plaintiff's motion in limine to **exclude witnesses,** defendant seeks a ruling that these **witnesses** not be allowed to testify because they should have been, but were not, disclosed during **discovery.**

In its First Set of Interrogatories, Hercules asked plaintiff to "[i]dentify all persons that you know or believe have information regarding the subject matter of this action, and describe the information." D.I. 210, Exh. K. Plaintiff did not include any of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 14

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

these witnesses in his answer. Under Fed. R. Civ. P. 37(c)(1), the Court may permit witnesses not disclosed during discovery if the failure to disclose the identities was harmless, or if there was "substantial justification" for the non-disclosure.

*17 Plaintiff claims that its failure to disclose these witnesses' identity was substantially justified because he had no idea, until summary judgment, that Hercules intended to proffer evidence on why it terminated Finch, *i.e.,* justification based on plaintiff's record of performance. D.I. 228 at 32-33. The Court does not find this argument at all convincing. At deposition, MacKenzie explicitly testified that he based his forced ranking of Finch on Finch's performance. D.I. 121 at B-106. Hercules claims that its subsequent termination of Finch was influenced at least in part by the results of the forced-ranking; it could not have been clearer that plaintiff's performance would be at issue. The Court finds that plaintiff should have disclosed the names of these witnesses in response to the above interrogatory and that plaintiff's purported reasons for his nondisclosure do not rise to a level of being substantially justified.

Similarly, the Court does not find the nondisclosure to be harmless; the *Meyers v. Pennypack* considerations outlined above in section 4b, *supra*, with respect to plaintiff's motion to exclude defendant's witnesses now apply in this converse situation. Defendant has been surprised and prejudiced in not being able to depose these witnesses and prepare accordingly for trial. Because it is the eve of trial, with two closely intervening holidays, the Court is unwilling to disrupt defendant's trial preparation with having to notice five deponents and coordinate schedules. It would be unfair to penalize defendant and in effect reward plaintiff's noncompliance. Consequently, these witnesses will not be allowed to testify at trial.

4. Plaintiff's Rebuttal Evidence Regarding his Bonus and Plaintiff's Trial Exhibits

Additionally, plaintiff listed in the Pretrial Stipulation evidence that Hercules asserts as involving the calculation of Finch's bonus; plaintiff

argues that this evidence is relevant to his rebuttal case. Because this is rebuttal evidence, plaintiff does not wish to reveal his reasons for offering these documents for fear of exposing his trial strategy. The Court will defer ruling on this evidence until trial because the current record is not fully developed sufficiently to warrant a considered decision.

Similarly, defendant has delineated a laundry list of exhibits it seeks to exclude from trial. In his answering brief, plaintiff has provided brief descriptions of the exhibits and his arguments as to why they should be admissible. The Court has not actually viewed the exhibits nor had the benefit of oral explanation or argument on these exhibits. Out of fairness to both parties and a desire to fully appreciate this evidence, the Court will defer its ruling until such time, either at or before trial, that the parties may be heard more completely on these issues.

5. Defendant's Additional Motion in Limine

On November 29, 1995, defendant filed an additional motion in limine, D.I. 243, seeking a substantive ruling on the issue of the relevant time frame for calculation of plaintiff's damages. Defendant's Reply Brief was filed on December 20, 1995. A review of the briefs makes clear the relief defendant seeks is merits relief masquerading as a motion in limine. The proffered record is not appropriate for consideration of merits relief. Because trial will commence on January 8, 1996, and there is inadequate time to both put this matter in the correct procedural posture, and determine the same, the Court is not inclined to consider any application for merits relief. If it should become necessary, since the matter goes to the appropriate amount of damages, it can be treated by post-trial motion.

IV. CONCLUSION

*18 For the above discussed reasons, the Court will grant in part and deny in part Plaintiff's Motion in Limine, D.I. 211, and do the same as to Defendant's Motion in Limine, D.I. 209. Defendant's Motion in Limine, D.I. 243, is denied. An appropriate order

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**(Cite as: 1995 WL 785100 (D.Del.))**

will issue.

FN1. When force-ranking employees, "evaluators are instructed to identify the 'best employee' and the 'worst' employee with regard to a particular factor, and then the second best and the second worst, and so on down the line." *Finch v. Hercules, Inc.*, 865 F. Supp. 1104, 1111 n.4 (D. Del. 1994) (quoting N. Thompson Powers, *Reductions in Force Under the Age Discrimination in Employment Act*, 2 Lab. Law. 197, 216-217 (1986)). *See generally* this Court's previous opinion, *supra*, for a more extensive treatment of the factual details in this action.

FN2. For a complete summary of how these analyses differ, *see generally, Finch v. Hercules*, 865 F.Supp. at 1118-1119; *Mardell v. Harleysville Life Ins. Co.*, 31 F.3d at 1225 n.6 (3d Cir. 1994), *opinion vacated on other grounds*, 115 S.Ct. 1397 (1995).

FN3. When this issue first surfaced, the court suggested bifurcation of the liability and damages phases of the trial. At that time, Hercules declined the offer. If Hercules wishes bifurcation it should promptly file a motion requesting the same. Under *Mardell*, after-acquired evidence is not admissible in the liability stage of a cause of action brought under the ADEA. *Mardell*, 31 F.3d at 1239; *see also Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072, 1073 n.1 (3d Cir. 1995). The evidence the Court holds inadmissible here, *i.e.*, the MICP and IPI evidence, would be admissible in a damages phase of trial were the issue of damages bifurcated from the liability phase of trial.

FN4. The above cited affidavit has been ordered stricken. However, Finch referenced it in his brief as a harbinger of possible prejudicial testimony.

FN5. In plaintiff's opening brief, he argued that evidence pertaining to Finch's counseling of Engebretsen's children should be excluded for several reasons. First, he contended that the evidence is both irrelevant and too remote in time to be admissible in the upcoming trial. Second, he declared that this evidence should be excluded based on the clergy-communicant privilege. D.I. 212 at 25-26. However, the defendant argued in its answering brief that this evidence is relevant to show that bias on the part of Engebretsen. Hercules also argued that the clergy-communicant privilege does not shield the identity of the communicants or the fact that the communication took place. D.I. 226 at 15-16. Because plaintiff has since conceded that evidence of plaintiff's counseling the Engebretsen children *is* admissible, the Court will not address this issue.

FN6. In his Opening Brief, plaintiff also initially objected to a witness named Patrick Donohue. However, based on Hercules' description of Donohue's proposed testimony, plaintiff subsequently withdrew his objection. D.I. 231 at 16.

FN7. At the pretrial conference in this matter, counsel for Hercules for the first time verified that the company does in fact have such a retirement policy for its CEO. However, this evidence was not known nor necessary to the Court's decision at summary judgment; the Court likewise need not consider it here.

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:92cv00251 (Docket)

(May. 05, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

90 Fed.Appx. 604                                                      Page 1

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

**(Cite as: 90 Fed.Appx. 604)**

**H**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Joseph R. LETTRICH, and all Others Similarly
Situated, Appellant,
v.
J.C. PENNEY COMPANY, INC.
**No. 02-4476.**

Argued Oct. 21, 2003.
Decided Jan. 22, 2004.

**Background:** Former employee brought action against former employer to recover under severance pay program. The United States District Court for the Western District of Pennsylvania, Donald J. Lee , J., granted employer's motion for summary judgment, and employee appealed. The Court of Appeals, 213 F.3d 765, Sloviter, Circuit Judge, reversed and remanded. On remand, the District Court, Lee, J., entered final judgment for employer. Employee appealed.

**Holdings:** The Court of Appeals held that:
(1) district court did not abuse its discretion in ruling that employee lacked **personal knowledge** for his interpretation of plan provisions and proxy statement, and any error from exclusion of that

interpretation was harmless;
(2) employee did not have vested rights under plan, even though plan used that phrase, as it also reserved employer's legitimate right to terminate plan;
(3) severance pay program was not terminated in bad faith or with intent to conceal, despite fact employer's sole notification to participants of change in benefits came by way of two paragraphs inserted in middle of sixty-one page notice of shareholders meeting and proxy statement;
(4) employer was not acting as plan fiduciary when it terminated severance pay plan and thus could do so even though termination was contrary to interest of plan participants; and
(5) denial of motion for class certification was not abuse of discretion.
Affirmed.

West Headnotes

**[1] Witnesses** 🔑**37(2)**
410k37(2) Most Cited Cases
In ERISA action to recover under severance pay program, district court did not abuse its discretion in excluding, for lack of **personal knowledge**, participant's interpretation of plan provisions relating to "successor in interest," "vested rights," and "merger or consolidation" and his interpretation of proxy statement where participant had not read plan's terms before it was terminated. Fed.Rules Evid.Rule 602, 28 U.S.C.A.

**[2] Federal Courts** 🔑**898**
170Bk898 Most Cited Cases
Any error from district court's exclusion of ERISA plan participant's interpretation of plan provisions and proxy statement was harmless where court had allowed participant's counsel to develop his theory of proper interpretation. Fed.Rules Evid.Rule 602, 28 U.S.C.A.

**[3] Labor and Employment** 🔑**549(2)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 604                                                                    Page 2

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

**(Cite as: 90 Fed.Appx. 604)**

231Hk549(2) Most Cited Cases
(Formerly 296k66.1)
Participant in terminated Separation Allowance Program, an employee welfare benefit plan, did not have vested rights thereunder even though plan used phrase "vested rights" therein, where immediately preceding enumeration of employee benefits, plan document reserved employer's legitimate right to terminate plan altogether. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[4] Labor and Employment ⬤➔484(1)**
231Hk484(1) Most Cited Cases
(Formerly 296k47)
Severance pay program was not terminated in bad faith or with intent to conceal, even though employer's sole notification to participants of change in benefits came by way of two paragraphs inserted in middle of sixty-one page notice of shareholders meeting and proxy statement. 29 C.F.R. § 2520.104b-1(b)(1).

**[5] Labor and Employment ⬤➔474**
231Hk474 Most Cited Cases
(Formerly 296k66.1, 296k44)
Employer was not acting as plan fiduciary when it terminated severance pay plan and thus could do so even though termination was contrary to interest of plan participants. Employee Retirement Income Security Act of 1974, § 404, 29 U.S.C.A. § 1104.

**[6] Federal Civil Procedure ⬤➔184.5**
170Ak184.5 Most Cited Cases
District court did not abuse its discretion by denying former employee's motion for class certification in ERISA action to recover under severance pay program; former employee had not clearly identified class he sought to represent, failed to identify questions of law or fact common to class, and admitted his claims were not identical to those of individuals harmed by pattern of concealment, arguing only that "they could be made typical," and while some common questions of law or fact might exist there was no indication in limited record that such issues would predominate over individual issues. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A .; Employee Retirement Income Security Act of

1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.
**\*606** On Appeal from the United States District Court for the Western District of Pennsylvania. (Dist. Court No. 98-cv-00137). District Court Judge: Hon. Donald J. Lee.

Jerome K. Lipsich (argued), J.C. Penney Company Legal Dept., Dallas, TX, for Appellant.

Daniel W. Ernsberger (argued), Behrend & Ernsberger, Pittsburgh, PA, for Appellee.

Before ALITO, FUENTES, and ROSENN, Circuit Judges.

OPINION OF THE COURT

PER CURIAM.

In this appeal, Joseph R. Lettrich challenges the District Court's pretrial denial of class certification, several evidentiary rulings, several findings of fact and conclusions of law, and the final judgment in favor of J.C. Penney. In 1988, J.C. Penney created and adopted a Separation Allowance Program ("the Plan") under ERISA for its profit-sharing associates. In 1993, J.C. Penney terminated the Plan. Following corporate restructuring that substantially reduced Lettrich's income and bonuses, he ended his employment with J.C. Penney and unsuccessfully attempted to collect benefits under the Plan.

Lettrich asserts that he has "vested rights" under the terminated Plan. He also argues that, even if the proper termination of the Plan would have divested him of his vested rights, the Plan's termination was ineffective as to him, because he did not receive proper notice. Finally, Lettrich argues that all similarly situated Thrift Drug associates had vested rights and must also be paid. We affirm.

I.

In 1975, Lettrich was employed as a pharmacist by the Thrift Drug Division of J.C. Penney. In March 1988, J.C. Penney implemented the Plan for its profit-sharing associates in an effort to alleviate growing employee concerns over job security and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 604                                                         Page 3

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

**(Cite as: 90 Fed.Appx. 604)**

the possibility of lost welfare benefits. These employee concerns emanated from the company's announced relocation of its home from New York to Texas and from the vigorous acquisition activity that was occurring at that time in the retail merchandise industry. The Plan addressed these concerns by providing a lump-sum severance payment if an eligible employee was terminated within two years of a change of control. [FN1] The amount of the severance payment was to be based on the *607 employee's length of service. Prior to the Plan's inception, Lettrich was a profit-sharing associate. After establishing the Plan, J.C. Penney circulated news of the Plan to eligible employees, including Lettrich, along with a descriptive brochure.

> FN1. A "change of control" was defined to include a merger or consolidation, whether friendly or hostile.

In January 1991, three years after the establishment of the Plan, the Thrift Drug Division of J.C. Penney was detached and became a wholly-owned subsidiary of J.C. Penney. The assets of the Thrift Drug Division became the assets of the new Thrift Drug, Inc. subsidiary, and the J.C. Penney employees became Thrift Drug, Inc. employees. In November 1992, less than five years after the Plan was created, the J.C. Penney Board of Directors terminated the Plan. Notification to participants of this change in benefits came by way of two paragraphs on page 30 of J.C. Penney's 61-page notice of shareholders meeting and proxy statement ("Proxy Statement"), which was distributed to all shareholders of record, including Lettrich, in April 1993. In 1996, J.C. Penney purchased Eckerd Drugs and merged Thrift Drug, Inc. into the new wholly owned subsidiary. Following that merger, all Thrift Drug stores, including the one Lettrich managed, were closed and reopened as Eckerd stores.

In 1997, Lettrich was notified of a significant decrease in his pay and bonuses. Upon receiving this notification, Lettrich attempted to avail himself of the Plan. J.C. Penney denied Lettrich's request for benefits, stating that the Plan had ended as to

Thrift Drug associates in January 1991 when the Thrift Drug Division of J.C. Penney was spun off into a wholly owned subsidiary and that the Plan had been terminated altogether in 1993.

In 1998, Lettrich filed suit against J.C. Penney in the United States District Court for the Western District of Pennsylvania pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), on behalf of himself and others similarly situated. He contended that J.C. Penney's attempt to notify participants of the termination of the Plan failed to satisfy ERISA's notice and disclosure requirements set forth in 29 U.S.C. § 1024(b)(1)(B) and 29 C.F.R. § 2520.104b-1(b)(1). He also contended that his benefits under the Plan were vested and therefore survived the termination of the plan.

The Magistrate Judge to whom the case was referred for pretrial proceedings in *Lettrich I* noted: "It is not surprising that [Lettrich] was not aware of the termination of the separation allowance program since the notice of termination was 'buried' in the notice of the annual meeting." Amended Report and Recommendation (Nov. 24, 1998) at 10. However, relying on this Court's decision in *Ackerman v. Warnaco, Inc.,* 55 F.3d 117 (3d Cir.1995), the Magistrate Judge recommended that J.C. Penney's motion for summary judgment be granted. [FN2] Amended Report and Recommendation (Nov. 24, 1998) at 10 ("[D]efects in notice do not entitle an employee to receive the benefits unless the *608 employee can show extraordinary circumstances such as bad faith by his employer or active concealment of a change of the benefits plan.").

> FN2. Other Circuits have suggested that notwithstanding the general rule that plan amendments are valid in spite of inadequate notice, participants may recover the benefits that were available under the plan before the amendment if they can make a showing of "bad faith, active concealment, or detrimental reliance," *see Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 569 (7th Cir.1995), or can "show active concealment of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 604                                                    Page 4

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

**(Cite as: 90 Fed.Appx. 604)**

amendment ... or some significant reliance upon, or possible prejudice flowing from the lack of notice," *see Godwin v. Sun Life Assur. Co. of Canada,* 980 F.2d 323, 328 (5th Cir.1992) (internal quotations omitted), or demonstrate cognizable prejudice from the company's failure to fully comply with ERISA's disclosure requirements, *see Veilleux v. Atochem North Am., Inc.,* 929 F.2d 74, 76 (2d Cir.1991) (per curiam).

The District Court adopted the Magistrate Judge's Amended Report and Recommendation as the opinion of the court. Accordingly, the District Court held that the disclosure in the Proxy Statement J.C. Penney sent to Lettrich was legally sufficient notice of the Plan's termination. After the District Court granted summary judgment in favor of J.C. Penney, Lettrich appealed to this Court. *See Lettrich v. J.C. Penney Co. Inc.,* 213 F.3d 765 (3d Cir.2000) (*"Lettrich I"*).

Specifically at issue in the 2000 appeal was ERISA's requirement that an employer notify participants of a material change in a welfare plan. In *Lettrich I,* we construed 29 C.F.R. § 2520.104b-1(b)(1), the regulation that focuses on the need to take measures reasonably calculated to ensure receipt of notice, to contemplate that in some situations mailing may not be enough if it is not reasonably calculated to alert the recipients to the significance of the mailing. *See* 29 U.S.C. § 1022. We did not decide whether that was the case here. Rather, we held that a fact finder could conclude that a two- or three-paragraph notice of termination of a welfare benefit which was "buried" in the middle of a 61-page Proxy Statement, with nothing on the exterior to call this notice to the attention of the participants, did not satisfy the requirement. [FN3] Accordingly, we remanded the case, and the case proceeded to trial. *Lettrich I,* 213 F.3d at 777.

> FN3. In *Lettrich I,* we did not suggest that the circumstances of this case compel a finding of active concealment sufficient to void the termination of the Plan as to Lettrich. Nor did we imply that an

inference of bad faith or active concealment may arise simply from a failure to comply with ERISA's reporting and disclosure requirements. However, in light of the similarity in the circumstances here and in *Ackerman,* we held that Lettrich's case should not have been dismissed on summary judgment.

II.

[1][2] During the trial, the District Court excluded from evidence Lettrich's interpretation of the Plan's provisions relating to "successor in interest," "vested rights," and "merger or consolidation," as well as his interpretation of the Proxy Statement, because Lettrich had not read the plan's terms before the plan was terminated. The District Court denied certification of a class, and at the conclusion of the bench trial entered judgment in favor of J.C. Penney. The District Court did not abuse its discretion in ruling that under FRE 602, Lettrich lacked **personal knowledge** for his interpretation of the Plan. Furthermore, any error was harmless because the District Court allowed Lettrich's counsel to develop his theory of the proper interpretation.

III.

Lettrich asserts that he has a right to be paid benefits under the terminated Plan. The interpretation and construction of an *unambiguous* ERISA plan is a conclusion of law, subject to *de novo* review when the "plan administrator" has a financial interest in the outcome. *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 382-83 (3d Cir.2000). The determination of whether a term is ambiguous is also a question of law. *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.,* 40 F.3d 1416, 1424 (3d Cir.1994). However, where a plan is found to be *ambiguous,* ascertaining its meaning requires examining many factors, which may include considering how the plan was understood by its beneficiaries, and the interpretation of ambiguous *609 plan provisions is a question of fact. *Smith v. Hartford Ins. Group,* 6 F.3d 131, 135-36 (3d Cir.1993). Contract principles dictate that review of the conflicted benefits denial should be *de novo,* giving no deference to the interpretation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 604                                                    Page 5

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

**(Cite as: 90 Fed.Appx. 604)**

of either J.C. Penney or Lettrich. This Court applies "principles governing construction of contracts between parties bargaining at arms length." *Pinto,* 214 F.3d at 382-83.

We exercise plenary review over the District Court's conclusions of law. *Epstein Family Partnership v. Kmart Corp.,* 13 F.3d 762, 765-66 (3d Cir.1994). We review findings of fact for clear error, giving deference to the District Court's credibility determinations. *Goldstein v. Johnson & Johnson,* 251 F.3d 433, 441, 445 (3d Cir.2001).

Denial of class certification is reviewed for abuse of discretion. *Fotta v. Trustees of the United Mine Workers of America,* 319 F.3d 612, 616 (3d Cir.2003); *La Salle Nat'l Bank v. First Connecticut Holding Group,* 287 F.3d 279, 288 (3d Cir.2002) ("[A]buse of discretion occurs when the court bases its opinion on a clearly erroneous finding of fact, an erroneous legal conclusion, or an improper application of law to fact.").

Lettrich cites *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1284 (7th Cir.1977), for the proposition that a "critical view" of challenged findings of fact and conclusions of law is appropriate in this case, because the District Court adopted many of J.C. Penney's suggested findings and conclusions. [FN4] In addition to the fact that this Court has never adopted the Seventh Circuit's approach, Lettrich's argument is inapposite here. At the conclusion of trial, the District Court directed both parties to submit proposed findings of fact and conclusions of law, directing the attention of both sides to issues that concerned the court while inviting them to address other issues they deemed appropriate. Lettrich and J.C. Penney each proposed 152 findings and conclusions. After close to two months of deliberation, the District Court issued 124 findings of fact and 120 conclusions of law. Many were adopted from Lettrich's suggestions, many were adopted from J.C. Penney's suggestions, and many were entirely original. Therefore, the facts of this case do not militate in favor of considering the heightened standard of review articulated by the Seventh Circuit in *Flowers.*

FN4. In *Flowers,* the District Court ruled in favor of the defendant from the bench, directed defense counsel to draft appropriate findings and conclusions, and then adopted defense counsel's draft verbatim. Here, the District Court's findings of fact and conclusions of law were not merely the product of one party's independent research and briefing after a trial on the merits. On the contrary, both parties had previously filed extensive summary judgment briefs, pre-trial memoranda, and pre-trial proposed conclusions of fact and law.

IV.
A.
1.

ERISA covers both employee welfare benefit plans and employee pension benefit plans, *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.,* 520 U.S. 510, 514, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997), but ERISA specifically exempts employee welfare benefit plans from its stringent vesting requirements. *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 79-81, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995).

Lettrich's argument that he is entitled to payments because he has "vested rights" misconstrues the benefit J.C. Penney conferred. Under ERISA, "vested right" is a term of art. The provisions governing welfare benefit plans, unlike **\*610** those governing pension plans, *see* 29 U.S.C. §§ 1051-1061, do not provide for the automatic vesting of welfare benefit rights. This Court has recognized that ERISA does not require welfare plan benefits to vest. [FN5] *International Union, United Auto., Aerospace & Agr. Implement Workers of America, U.A.W. v. Skinner Engine Co.,* 188 F.3d 130, 137-38 (3d Cir.1999) ("Although ERISA contains elaborate vesting requirements for pension plans, it does not require automatic vesting of welfare benefit plans."). Here, the parties agree that J.C. Penney's Separation Allowance Program was a welfare benefits plan.

FN5. Other courts agree. *See, e.g.,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

**(Cite as: 90 Fed.Appx. 604)**

*Hughes v. 3M Retiree Medical Plan,* 134 F.Supp.2d 1062, 1070-71 (D.Minn.2001) (citing *Int'l Union, UAW v. Skinner Engine Co.,* 188 F.3d 130, 139 (3d Cir.1999)); *Hutchins v. Champion Intern. Corp.,* 110 F.3d 1341 (8th Cir.1997) (welfare benefits did not vest under terms of ERISA benefits plan, where plan specifically provided employer with authority to terminate or modify it). *Vasseur v. Halliburton Co.,* 950 F.2d 1002, 1006 (5th Cir.1992) (citing *McGann v. H & H Music Co.,* 946 F.2d 401, 405 (5th Cir.1991). *See also Alday v. Container Corp. of Am.,* 906 F.2d 660, 663 (11th Cir.1990), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991); *Musto v. American Gen. Corp.,* 861 F.2d 897, 901 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *and Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 492 (2d Cir.1988)).

Because vesting welfare benefits under an ERISA plan constitutes an extra ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in *clear and express language. Id.* at 137 (emphasis added); *see also Hutchins v. Champion Intern. Corp.,* 110 F.3d 1341, 1345 (8th Cir.1997) (A participant's disability benefits do not vest under the terms of an ERISA benefits plan, where the plan specifically provided the employer with the authority to terminate or modify it.). In the absence of a vested rights provision, an employer is free to terminate a welfare benefit plan at any time. *See Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 79-81, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); *Becker v. Mack Trucks, Inc.,* 281 F.3d 372, 379 (3d Cir.2002), *cert. denied,* 537 U.S. 818, 123 S.Ct. 93, 154 L.Ed.2d 24 (2002); *International Ass'n of Machinists and Aerospace Workers, Woodworkers Div., AFL-CIO v. Masonite Corp.,* 122 F.3d 228, 234 n. 4 (5th Cir.1997) (Because vesting is not mandatory for employee welfare benefit plans, an employer may unilaterally modify or terminate employee welfare benefits absent the employer's contractual agreement to the contrary.); *John*

*Morrell & Co. v. United Food & Commercial Workers Int'l Union,* 37 F.3d 1302, 1308 (8th Cir.1994) (same).

[3] The drafting of J.C. Penney's Separation Allowance Program indicates an appreciation of the fact that welfare benefits would not vest automatically. Immediately preceding the enumeration of employee benefits, J.C. Penney reserved the right to terminate the plan, a legitimate right under ERISA. Accordingly, the District Court's finding that Lettrich did not have vested rights under the Plan supports its judgment in favor of J.C. Penney.

It is true that the Plan uses the term "vested rights," but even a cursory contextual analysis of J.C. Penney's plan document discloses that J.C. Penney did not intend to confer unalterable and irrevocable rights on its employees. This is evident because the plan document, before J.C. Penney addressed any employee rights, reserved its right as the employer to terminate the Plan altogether.

As an employer, J.C. Penney conferred on its employees welfare benefits that would mature unless the employer amended *611 or terminated the Plan. These benefits were to mature when: (i) an employee was eligible for bonuses (i.e., higher level management employees) and (ii) that employee lost his or her job, status or salary within two years of a "Change of Control" of J.C. Penney. Once an employee's benefits matured, the employee had specific rights. These rights enabled a profit-sharing management employee, such as Lettrich, who had accumulated nine months of tenure: (i) to prevent J.C. Penney from terminating the Plan, *except upon its five-year anniversary;* (ii) to prevent J.C. Penney from amending the Plan to reduce benefits, except upon the written approval of all participants; (iii) to enforce the Plan against J.C. Penney or any successor in interest, in the event of a change of control within the five-year term of the Plan; and (iv) to be paid benefits under the Plan in the event of a termination of employment within two years after a change in control.

Lettrich relies heavily upon Section 16 of the Plan,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 604                                                    Page 7

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

**(Cite as: 90 Fed.Appx. 604)**

which indicates that the Plan intended to "confer vested rights on each Participant." [FN6] However, were this Court to interpret that language to confer absolute rights, as Lettrich argues it should, we would have to ignore Section 15 of the Plan, [FN7] which entitles J.C. Penney to terminate the Plan on its five-year anniversary. J.C. Penney's explicit retention of the ability to terminate the plan evidences its intent not to confer unalterable or interminable rights. *Becker v. Mack Trucks, Inc.,* 281 F.3d 372, 379 (3d Cir.2002), *cert. denied,* 537 U.S. 818, 123 S.Ct. 93, 154 L.Ed.2d 24 (2002). *See Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 79-81, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). J.C. Penney exercised its prerogative under Section 15 of the Plan, terminating it prior to its five-year anniversary. Notwithstanding the language Lettrich highlights in the Plan, referring to "vested rights," J.C. Penney did not confer rights that were absolute, irrevocable, or unalterable.

FN6. In full, Section 16 of the Plan states: *Participant Rights* ¶ The Company and Subsidiary intend ths Program to constitute a legally enforceable obligation to each (a) the Company or Subsidiary (as appropriate) and (b) each Participant, and to be subject to enforcement under Section 502(a) of ERISA. It is also intended that the Program confer vested rights on each Participant under the terms of the Program with each Participants being third party beneficiaries. Nothing in the Program, however, shall be construed to confer on any Participant any right to continue in the employ of the Company or a Subsidiary or affect in any way the right of the Company or Subsidiary or affect in any way the right of the Company or Subsidiary to terminate a Participant's employment without prior notice at any time for any reason or no reason. A178.

FN7. In full, Section 15 of the Plan states: *Termination* ¶ The Program shall continue for a term of five years from the Effective Date, provided, however, that it shall be renewed automatically for

subsequent five year periods unless the Board of Directors of the Company or Subsidiary (as appropriate) shall decide to terminate the Program by duly adopting a resolution stating that it shall not be renewed. Such resolution shall be adopted at least sixty days before the end of any of the above five year periods. If, however, a Change of Control occurs during the term of the Program, it shall continue until the Company or Subsidiary (as appropriate) shall have fully performed all of its obligations under the Program with respect to all Participants. A178.

To the extent that an ERISA plan document is unambiguous, oral statements and other extrinsic evidence may not be introduced to modify its meaning. *See In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 58 F.3d 896, 902 (3d Cir.1995); *see also *612Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.,* 180 F.3d 518, 522 (3d Cir.1999) ("An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.") (citation omitted); *International Union, United Auto., Aerospace & Agr. Implement Workers of America, U.A.W. v. Skinner Engine Co.,* 188 F.3d 130, 139 (3d Cir.1999) ("[C]ourts are reluctant to read more benefits into an ERISA plan than its plain language confers.") (citation omitted). Documents like the Plan must be interpreted so as to give effect to the entirety of their provisions, rather than by selectively excising certain words and phrases to imbue them with meaning. *See Atlantic Mut. Ins. Co. v. Brotech Corp.,* 857 F.Supp. 423, 427 (E.D.Pa.1994), *aff'd,* 60 F.3d 813 (3d Cir.1995); *Filiatrault v. Comverse Technology, Inc.,* 275 F.3d 131, 138 (1st Cir.2001). Interpretation of the entirety of the Plan's provisions supports the District Court's conclusion that Lettrich did not have vested rights under the Plan. [FN8]

FN8. In passing, we note an additional argument by Lettrich respecting interpretation of a key phrase in the Plan. Lettrich insists that he should have been

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 604

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

(Cite as: 90 Fed.Appx. 604)

allowed to testify about his personal understanding of the term "successor in interest," as well as on other relevant terms in the Plan. However, the District Court correctly barred such testimony as irrelevant. As Lettrich concedes, he did not even see the Plan until after he filed suit, so his understanding of "successor in interest" could have no relevant bearing on the parties' intended meaning of that term. Moreover, Lettrich's interpretations of the various terms were undoubtedly represented to the District Court by counsel, so there was no prejudice in excluding his testimony.

2.

Any employee benefit plan to which ERISA applies "is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) (cited by *Henglein v. Informal Plan for Plant Shutdown Ben. for Salaried Employees,* 974 F.2d 391, 396 (3d Cir.1992)). As stated above, ERISA recognizes two types of employee benefit plans, pension plans and welfare benefit plans, [FN9] and delineates different requirements for each.

> FN9. 29 U.S.C. § 1002(1); 29 C.F.R. § 2510.3-1(a)(2) ("only plans which provide benefits described in section 3(1)(A) of [ERISA] or in section 302(c) of the Labor Management Relations Act of 1947 ... (other than pensions on retirement or death) constitute welfare plans"); *see In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 58 F.3d 896, 901 (3d Cir.1995) (*"Unisys II"*). Unlike pension plans, welfare benefit plans are not subject to the full scope of ERISA's requirements. 29 U.S.C. §§ 1051(1) 1081(a)(1).

3.

ERISA requires every plan to be "established and maintained pursuant to a written instrument," the contents of which are statutorily specified. 29 U.S.C. § 1102(a)(1). Any change or modification to a welfare plan must be in writing. *Id.; Bill Gray Enters. v. Gourley,* 248 F.3d 206, 220 (3d Cir.2001) (holding that failure to recognize the unambiguous written provisions of a plan as controlling negates the effectiveness of any modification) (citation omitted). Plan administrators must furnish participants with a summary of any material modifications written in a manner calculated to be understood by the average participant. *See* 29 U.S.C. § 1022(a). ERISA characterizes all persons having authority over or responsibility for the plan as fiduciaries, and it imposes upon these fiduciaries both reporting and disclosure obligations, as well as prescriptions **\*613** for their conduct of plan business. *See* 29 U.S.C. §§ 1002(21)(A), 1021, 1101-1114.

[4] Additionally, a welfare benefits plan must include an amendment procedure. [FN10] 29 U.S.C.A. § 1102(b)(3); *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); *Ackerman v. Warnaco, Inc.,* 55 F.3d 117, 125 (3d Cir.1995). The District Court in *Ackerman,* like the District Court in *Lettrich I,* entered summary judgment for the employer after emphasizing that a procedural defect in notice does not give rise to a substantive remedy and after finding no extraordinary circumstances to warrant deviating from the general rule requiring notice. [FN11] On appeal, we acknowledged the validity of this general rule, but stated that nonetheless there are situations, usually presenting extraordinary circumstances, where the remedy of striking a plan amendment may be available. [FN12] *Ackerman,* 55 F.3d at 125 n. 8. The two such situations delineated in *Ackerman* were (i) "where the employer has acted in bad faith" or (ii) "where the employer has actively concealed a change in a benefit plan, and the covered employees have been substantially harmed by virtue of the employer's actions." *Id.,* at 125. No facts to indicate either bad faith or active concealment support reversal of the District Court's judgment in favor of J.C. Penney. In fact, J.C. Penney provided actual notice of the Plan's termination in its 1993 Proxy Statement. [FN13]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 604

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

(Cite as: 90 Fed.Appx. 604)

Page 9

FN10. The Supreme Court emphasized the importance of amendment procedures in *Curtiss-Wright Corp. v. Schoonejongen.* 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). In *Curtiss-Wright,* the Supreme Court held that an employer must follow the amendment procedure set out in its benefit plan, and the Court remanded for a determination whether there was compliance with that amendment procedure. 514 U.S. at 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995).

A few months after the Supreme Court's decision in *Curtiss-Wright,* this Court rejected an employer's contention that the amendment procedures of ERISA are inapplicable to the complete rescission of a benefit plan. *Ackerman v. Warnaco, Inc.,* 55 F.3d 117, 125 (3d Cir.1995) (If a plan administrator actively conceals a material change in welfare benefits from an employee, and the employee relies to his or her detriment on that omission by the administrator, the change is invalid as to that employee.). In *Ackerman,* this Court emphasized that "the requirements of section 402(b)(3) apply to plan terminations as well as plan amendments," reasoning that "it is anomalous to suggest that ERISA offers employees protection from mere changes in employee benefit plans, but does not afford protection against wholesale elimination of benefits." *Id.,* at 121; *see also Deibler v. United Food & Commercial Workers' Local Union 23,* 973 F.2d 206, 210 (3d Cir.1992)

FN11. In reversing the grant of summary judgment in *Ackerman,* this Court focused on the active concealment exception, noting: (i) the complete failure to provide the handbook to the employees; (ii) the failure to hold scheduled meetings; (iii) the issuance of a potentially misleading letter to the employees concerning "changes" to the severance program rather than the termination of the program; and

(iv) the hostile employment climate. *Ackerman v. Warnaco, Inc.,* 55 F.3d 117, 123-25 (3d Cir.1995).

FN12. In *Ackerman,* we stated: "While we do not rule out the possibility that administrative error accounted for [the employer's] omissions, we conclude that a reasonable fact finder could infer from these facts and from the plaintiffs' evidence regarding the employment climate at the Altoona plant that Warnaco actively concealed the change to its severance policy in order to prevent employees at the Altoona plant from leaving." *Id.* Additionally, in *Hozier v. Midwest Fasteners, Inc.,* we "implicitly recognized the possibility of striking down a plan amendment where there has been a reporting and disclosure violation concerning the amendment." *Id.,* at 125, n. 8 (citing *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1168-69 n. 15 (3d Cir.1990)).

FN13. The actual notice provided by J.C. Penney similarly nullifies Lettrich's equitable estoppel argument, since equitable estoppel requires a showing of material misrepresentation and fraud. *Skinner Engine,* 188 F.3d at 151-52.

*614 4.

[5] Lettrich asserts that, as a fiduciary, J.C. Penney can never be permitted to terminate the Plan because doing so would be contrary to the interests of the Plan's beneficiaries. [FN14] However,

FN14. The Supreme Court has held that an employer acted as a "fiduciary" when it significantly and deliberately misled plan beneficiaries. *Varity Corp. v. Howe,* 516 U.S. 489, 498-99, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). *Varity* held that Section 502(a)(3) of ERISA authorizes lawsuits for individual equitable relief for breach of fiduciary obligations. This type of fiduciary breach may also result in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 604                                                                                    Page 10

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

**(Cite as: 90 Fed.Appx. 604)**

class-wide relief. However, such analysis is not on point where, as here, there is no fiduciary relationship to speak of and there was no deliberate misrepresentation.

[w]hen an employer makes decisions about the design of a welfare plan, such as a severance plan, it functions as an employer and not as an administrator and thus is not acting as a fiduciary. Accordingly, an employer can create a plan that furthers its business interests, and it can act according to these interests in amending or terminating the plan.

*Noorily v. Betts Corp.,* 188 F.3d 153, 158 (3d Cir.1999), *cert. denied,* 529 U.S. 1053, 120 S.Ct. 1555, 146 L.Ed.2d 460 (2000) (citations omitted). It is only when an employer is acting as an administrator of the plan, by paying benefits or investing plan funds, that the employer is a fiduciary who must act in the interest of the plan's participants. *Noorily,* 188 F.3d at 158. In that instance, the employer's actions are evaluated under the law of trusts. J.C. Penney neither paid benefits nor invested plan funds.

Key to this analysis is the fact that J.C. Penney was acting in its own business interest in implementing the plan. The Plan was adopted to address profit-sharing employee concerns about job security prompted by merger and acquisition activity in the retail industry and the relocation of J.C. Penney's headquarters from New York to Texas. It was intended to retain valued employees and promote their productivity by providing severance benefits to ease the concerns of managers who might lose income or stature as a result of a merger. The Plan was not intended to pay benefits to employees who lost their jobs because J.C. Penney sold the division the employees worked for, or because J.C. Penney elected to engage in a massive reduction in force. Furthermore, at its inception, adoption of the Plan was not motivated by J.C. Penney's desire to retain Thrift Drug Division employees. In short, J.C. Penney's business purpose in implementing the Plan was to ensure productivity and loyalty among key employees by assuring them that the company was loyal to them.

**B.**

[6] On remand, Lettrich sought certification of a class, pursuant to Fed. R. Civ. Proc. 23. [FN15] The District Court referred the case to a Magistrate Judge for pretrial proceedings and adopted the Report and **\*615** Recommendation of the Magistrate, denying class certification.

> FN15. Lettrich was required to establish the following requirements: (i) the class is so *numerous* that joinder of all members is impracticable; (ii) there are questions of law or fact *common* to the class; (iii) the claims or defenses of Lettrich are *typical* of the claims or defenses of the class; and (iv) Lettrich would fairly and adequately protect the interests of the class. Lettrich attempted to certify the class under Fed. R. Civ. Proc. 23(b)(3), which dictates that "the questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy."

**1.**

Lettrich had not clearly identified the class he sought to represent. The Plan provided benefits only for full-time, bonus eligible employees and only for employees who terminated their employment within two years after a change of control. Additionally, the Plan did not provide benefits for employees who retired during that two-year period or for employees who would have passed away during that two-year period. Finally, the numbers included in Lettrich's class would be further reduced by the need of the class members to establish that they relied on the notice of the Plan to their detriment, that they were constructively discharged, and that they were eligible for bonuses.

**2.**

Lettrich failed to identify questions of law or fact common to a class. Lettrich's proposed class included two different groups. Lettrich's individual claim was that the termination of the Plan in 1993 was ineffective as to him because he was not given

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 604

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

**(Cite as: 90 Fed.Appx. 604)**

notice of the termination and he relied to his detriment on the existence of the Plan by not leaving Thrift to accept other offers. However, because many of the members of the proposed class were never told about the Plan, they could not have relied on its existence to their detriment. Lettrich therefore identified a second group within the class-- employees who were not told about the existence of the class and who therefore did not rely on it to their detriment. Lettrich's two separate groups presented different questions of law and fact and would have required different jury instructions for each group.

3.

Lettrich admitted that his claims were not identical to those of individuals who were harmed by a pattern of concealment, arguing only that "they could be made typical." In addition to not clearly identifying the class, Lettrich had not identified how he could adequately represent class members who had claims that were factually and legally different from his.

4.

Finally, it was altogether possible that as to each of the two different groups Lettrich attempted to identify, [FN16] there might be *some* common questions of law or fact. However, the limited record did not indicate that such issues would predominate over the individual issues, such as each member's reliance on the notice. Because of the District Court's recognition of the difficulties in certifying Lettrich's proposed class and subclass, it did not abuse its discretion in denying class certification.

> FN16. One group consisted of claimants who received notice of the Plan. The other group consisted of claimants who did not receive notice of the Plan.

V.

For the reasons explained above, we affirm the judgment of the District Court. We have considered all of the appellant's remaining arguments and find no ground for reversal.

90 Fed.Appx. 604, 31 Employee Benefits Cas. 2857

**Briefs and Other Related Documents (Back to top)**

• 02-4476  (Docket)

(Dec. 20, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 6

Westlaw.

139 F.3d 890 (Table)

139 F.3d 890 (Table), 1998 WL 85293 (4th Cir.(Va.))
**Unpublished Disposition**

**(Cite as: 139 F.3d 890, 1998 WL 85293 (4th Cir.(Va.)))**

Page 1

**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
Laverne A. LEWIS, Plaintiff-Appellant,
v.
SENTARA ALTERNATIVE DELIVERY
SYSTEM, Defendant-Appellee.
**No. 96-2263.**

Argued July 18, 1997.
Decided March 2, 1998.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. J. CALVITT CLARKE, Jr., Senior District Judge. (CA-95-1176-2)

Scott Meadows Reed, SCOTT M. REED, P.C., Virginia Beach, Virginia, for Appellant.

William McCardell Furr, Willcox & Savage, P.C., Norfolk, Virginia, for Appellee.

Linda W. Harris, LINDA W. HARRIS, P.C., Virginia Beach, Virginia, for Appellant. Susan R. Blackman, WILLCOX & SAVAGE, P.C., Norfolk, Virginia, for Appellee.

Before ERVIN, Circuit Judge, and BUTZNER and PHILLIPS, Senior Circuit Judges.

OPINION

PER CURIAM

**1 Laverne A. Lewis appeals a judgment entered on the verdict of a jury in favor of Sentara Alternative Delivery System (Sentara) in an action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* We view the evidence in the light most favorable to Sentara which was the prevailing party at the trial. Sentara, a manager of a health maintenance organization in Hampton Roads, Virginia, hired Lewis, an African-American, as a member service representative. During her six-months' probationary period, Lewis's work failed to meet Sentara's expectations, and she was given the option of resigning or being discharged at the end of her probationary period. Lewis did not resign. After being discharged she brought this action, assigning error to the selection of the jury and to the district court's evidentiary rulings and denial of a new trial. Finding no cause for reversal, we affirm.

I

Lewis protests Sentara's peremptory strikes of all African-Americans from the trial jury and the failure of the district court to properly analyze this issue. Sentara attempted to strike for cause Frederick Puller, Virginia Harris, and Virgie Harvey based on their prior connections with Sentara. The district court denied those requests. Sentara then used its peremptory strikes to remove these jurors and also Larry Parker. All four jurors were African-American, and they were the only four African-Americans on the panel. Lewis promptly objected.

A prospective juror called to serve in a federal private civil case has a right not to be excluded by the exercise of a peremptory challenge because of his or her race. This right is based on the equal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

139 F.3d 890 (Table)

Page 2

139 F.3d 890 (Table), 1998 WL 85293 (4th Cir.(Va.))
**Unpublished Disposition**

**(Cite as: 139 F.3d 890, 1998 WL 85293 (4th Cir.(Va.)))**

protection component of the Fifth Amendment's Due Process Clause.

*Edmondson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). A finding by a district court concerning whether or not a peremptory challenge was exercised for a racially discriminatory reason is given great deference and is reviewed only for clear error. *Hernandez v. New York,* 500 U.S. 352, 364-365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

The United States Supreme Court has outlined a three-step process for evaluating whether or not a party has used peremptory challenges in a manner that violates the Constitution. *Batson v. Kentucky,* 476 U.S. 79, 96-98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). First, the party raising the equal protection challenge must establish a prima facie case of purposeful discrimination. Second, if the requisite showing has been made, the burden shifts to the party whose conduct is being challenged to come forward with a race neutral explanation for striking the jurors in question. Finally, the trial court must determine whether or not the party raising the equal protection challenge has carried his burden of proving purposeful, racial discrimination.

Because Lewis made a prima facie case of racial discrimination, Sentara was required to offer race neutral explanations for striking the jurors in question. It struck Ms. Harris and Ms. Harvey because they were insured through Sentara. It struck Mr. Puller because his wife had worked at Sentara for 12 years and he hesitated for several seconds before answering that his wife's employment would not effect his decision. In *Hernandez* a prospective juror's hesitation before answering a *voir dire* question was recognized as a legitimate reason for a peremptory strike. 500 U.S. at 361- 362. Sentara struck Mr. Parker, who occupied a low level position in a large company similar to Lewis. Based on this fact, Sentara suspected that he might be sympathetic to Lewis's case against her employer. This court has recognized the propriety of using peremptory strikes "to eliminate from the final jury venire

persons whom either side believes will be too sympathetic to its opponent." *United States v. McMillon,* 14 F.3d 948, 953 (4th Cir.1994).

**\*\*2** After Sentara came forward with reasons for exercising its peremptory strikes, Lewis had the burden of proving purposeful discrimination, that the reasons given were pretextual, and that race was the real reason for the strike. *Hernandez,* 500 U.S. at 359. Lewis's attorney stated "[w]e just would submit those reasons are inadequate as a mat ter of law and note our objections on the record to this jury panel." This statement is inadequate to satisfy Lewis's burden. The district court reviewed Sentara's reasons and held that the strikes were "correct." A discriminatory intent was not inherent in Sentara's explanation, and the reasons it offered are deemed race neutral. *See Hernandez,* 500 U.S. at 360. Mindful of the deference we owe the district court, we find no reversible error in the court's rulings with respect to the peremptory challenges.

II

Rulings by a district court on the admission or exclusion of evidence are reviewed only for abuse of discretion. *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1357 (4th Cir.1995).

Lewis offered testimony that showed she had satisfactorily performed her previous job at Blue Cross/Blue Shield. The purpose of this testimony was to create an inference that if Lewis did satisfactory work for her previous employer she probably did satisfactory work for Sentara as well. The evidence Lewis proffered, however, was eight years old. The district court excluded this evidence as too remote, fearing that there are "so many things that can happen to a person in eight years to change their attitude towards life, towards work, towards the government, ... I think that's too remote."

We find that the district court's decision concerning the proffered testimony was not an abuse of discretion. *See Rauh v. Coyne,* 744 F.Supp. 1181, 1184 (D.D.C.1990) (plaintiff's performance at jobs before and after her employment with defendants is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

139 F.3d 890 (Table)                                                    Page 3

139 F.3d 890 (Table), 1998 WL 85293 (4th Cir.(Va.))
**Unpublished Disposition**

**(Cite as: 139 F.3d 890, 1998 WL 85293 (4th Cir.(Va.)))**

not admissible).

Lewis also proffered another witness to show that she satisfactorily performed her job at Blue Cross/Blue Shield. This witness, however, received his information concerning Lewis's performance fourth hand. Lewis reported to a supervisor, who reported to a manager, who reported to another manager, who reported to the witness.

The trial court properly determined the witness had no **personal** knowledge of Lewis's job performance and, therefore, excluded his testimony. Federal Rule of Evidence 602 provides: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has **personal** knowledge of the matter."

### III

Lewis sought to show that her supervisor would break up gatherings of African-American employees and request that they go back to work. A witness was prepared to testify that she saw Elva Anderson, an African-American employee, crying because of something the supervisor had done. The purpose of this testimony was to show a discriminatory employment environment.

**\*\*3** The district court ruled that for these incidents to constitute evidence of racism, additional evidence needed to be offered, specifically that the supervisor did not break up gatherings of white employees and that Ms. Anderson was crying because the supervisor acted in a racist fashion. Lewis failed to introduce this additional information. Consequently, the court ruled that this evidence was not probative of any issue in the case.

We cannot say this was an abuse of the trial court's discretion. "The determination of the relevancy of proof offered at the trial is a matter resting largely within the sound discretion of the trial court, and is not ordinarily reviewable upon appeal." *Beaty Shopping Center, Inc. v. Monarch Ins. Co.,* 315 F.2d 467, 471 (4th Cir.1963); Fed.R.Evid. 401, 403

### IV

Another witness testified that when she interviewed at Sentara for a job, she thought that the receptionist was surprised to see an African-American woman named Elizabeth. The witness did not receive the job, and she believed it had to do with her race. The district court then excluded this testimony, wanting to avoid a "trial within a trial" on why the witness was denied the job for which she had interviewed.

Relevant evidence may be excluded if its probative value is substantially outweighed by a danger of confusing the issues or undue delay. Fed.R.Evid. 403. Excluding testimony under Rule 403 to avoid litigating collateral matters was not an abuse of discretion. *See Hogan v. American Tel. & Tel. Co.,* 812 F.2d 409, 410-411 (8th Cir.1987).

### V

The district court properly denied Lewis a new trial. Her reasons for moving for a new trial were based on assignments of error pertaining to Sentara's peremptory challenges and to the exclusion of evidence which we have found to be without merit.

*AFFIRMED.*

139 F.3d 890 (Table), 1998 WL 85293 (4th Cir.(Va.)), Unpublished Disposition

**Briefs and Other Related Documents (Back to top)**

• 1997 WL 33513372 (Appellate Brief) Brief of Appellee (May. 05, 1997)Original Image of this Document with Appendix (PDF)

• 1997 WL 33513371 (Appellate Brief) Brief of Appellant (Mar. 31, 1997)Original Image of this Document (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.