# SCHEDULE (a)

# Uncontested Facts

### Schedule (a)

### Joint Stipulation of All Uncontested Facts

The following statements of fact are agreed to be true between the parties:

1. Computer Sciences Corporation ("CSC") is one of the world's leading information technology (IT) service companies, and provides outsourcing of IT services.

2. Plaintiff is an African-American female.

3. On October 29, 1997, Plaintiff was extended an offer of at-will employment as a helpdesk technician, Member Technical Staff B. Plaintiff accepted CSC's offer on November 5, 1997, and began employment on or about that date.

4. Plaintiff initially was hired as a help desk technician, Member Technical Staff B ("MTSB").

5. The normal chain of promotion within CSC is: from MTSB to Member Technical Staff A ("MTSA"), and, ultimately, to Senior Member Technical Staff ("SMTS").

6. When CSC hired Plaintiff, the Company offered her a starting annual salary of $41,000, which was $6,000 to $8,000 more than Plaintiff's annual salary at her previous job. Plaintiff considered this to be a fair starting salary.

7. During her employment with CSC, Plaintiff received performance appraisals.

8. As a help desk technician, Plaintiff was responsible for responding to calls regarding technical problems encountered by the customer, such as issues with printers, servers, and the desktop itself.

9. While in her role as a help desk technician, Plaintiff received a raise on May 16, 1998, and her annual salary was increased to $42,025. On May 15, 1999, Plaintiff received

another raise, thereby increasing her salary to $43,118 annually. Plaintiff also received bonuses during this time period.

10. On October 2, 1999, Plaintiff transferred from her position at the help desk to a position as a technical service analyst in the Managed Print and Dazel ("MPD") group. Plaintiff considered this move to be a promotion.

11. Plaintiff's new supervisor in the MPD group was Edwin Derek Alston.

12. Plaintiff worked in the Dazel subgroup of the MPD group, and provided "second level" e-mail, facsimile and print support to CSC's clients.

13. Dazel is a sophisticated software application that allows a computer to communicate with a printer, facsimile machine, or e-mail service, and guarantees delivery. Dazel runs on the UNIX operating system. The UNIX platform is a complex computer program with numerous command codes that require proficient knowledge, expertise and skill of the operating system.

14. In her position in the MPD group, Plaintiff was expected to be able to perform command line programming in UNIX.

15. On May 13, 2000, Mr. Alston promoted Plaintiff from MTSB to Member Technical Staff A ("MTSA"). Contemporaneously, Plaintiff also received a $4,000 raise, thereby increasing her salary from $43,118 to $46,996.98.

16. In May 2000, CSC implemented a business restructuring, and, as a direct result, Dawn Dworsky replaced Mr. Alston as manager of the MPD group, and became Plaintiff's new supervisor.

17. Dawn Dworsky is a Caucasian.

18. Despite the change in supervision, Plaintiff's duties did not change in any way.

2

19. In March 2001, Plaintiff applied for a transfer and reassignment to the position of Leverage Server Administration Supervisor, which was a position outside the MPD group. This position would have provided Plaintiff with additional responsibility because it was a supervisory position.

20. At that point in time, Beth Musumeci held the position for which Plaintiff applied, and was responsible for hiring into the job because she was transitioning to a new position.

21. Ms. Musumeci conducted an interview of Plaintiff for the supervisory position.

22. Despite the fact that Plaintiff had no supervisory experience at that time, Ms. Musumeci believed Plaintiff displayed capability for the position and decided to offer her the job.

23. Although the position was not a promotion for Plaintiff because it was an MTSA-level position, Ms. Musumeci chose to offer Plaintiff a 6% salary increase because the position involved additional responsibilities. This offer was well within the applicable salary range recommended by Human Resources for the position.

24. Ms. Musumeci's second offer of an 8% salary increase was still too low in Plaintiff's estimation, and she rejected the second offer. Plaintiff thus remained in her position with the MPD group at that time.

25. Previously, Plaintiff also had received a "3" in her annual performance appraisals for the period of April 1997 to March 1998, and for the period of April 1998 to March 1999, and Plaintiff had no complaint about those two evaluations.

26. CSC considers its employees for merit salary increases at the time the annual performance evaluations are conducted.

27. With respect to employees who were rated a "3" during the 2001 evaluation and salary review period, as Plaintiff did, the Overall Merit Guidelines recommended a salary increase of between 0-4%.

28. In approximately June 2001, Plaintiff received her performance review from Ms. Dworsky for the April 1, 2000 through March 31, 2001 time period.

29. In the Spring of 2001, the only person Ms. Dworsky promoted to an SMTS was MaryAnne Doll-Johnson.

30. At the time of Ms. Doll-Johnson's promotion to SMTS, she had both more years of relevant experience with the UNIX operating system and had been an MTSA for a longer period of time than Plaintiff.

31. In her meetings with Plaintiff, Maureen Summers thoroughly explained the salary increase process to Plaintiff, and that Plaintiff's salary was consistent with her peers and that she received a higher salary increase than recommended under the Guidelines.

32. Maureen Summers is Caucasian and works in the Human Resources Department as a Human Resource Specialist.

33. Plaintiff filed a charge of discrimination with the Delaware Department of Labor on July 5, 2001 alleging race and sex discrimination and retaliation.

34. The meetings between Plaintiff, Ms. Dworsky, Sonia Koplowicz (Senior Human Resources Manager) and Maureen Summers regarding Plaintiff's performance appraisal took place at a point in time shortly before and after Plaintiff filed her charge.

35. Plaintiff and one or more individuals in the Human Resources Department discussed the possibility of transferring Plaintiff to another position.

36. In the Summer of 2001, because she was still upset about not being promoted, Plaintiff requested assistance from Ms. Summers and Ms. Koplowicz to be transferred out of the MPD group and into another position with CSC. Plaintiff also met with or spoke to Ms. Dworsky, Mike Suman (Ms. Dworsky's supervisor) and Leanne Thomas (another Human Resources Manager) regarding this request.

37. In response to Plaintiff's request, Ms. Koplowicz, Ms. Summers and Ms. Dworsky spoke with various managers on Plaintiff's behalf regarding open positions for her transfer.

38. In early 2002, Ms. Summers, on Plaintiff's behalf, contacted Jennifer Miller at the help desk about an open position.

39. The position would have been a lateral move, and Plaintiff would have been able to maintain her then-current salary. Ms. Poland also would have been able to maintain her then-current schedule of working 30 hours per week, as an accommodation to her medical condition.

40. Ms. Miller and Plaintiff discussed the open position, and Ms. Miller offered her the position. Plaintiff, however, rejected Ms. Miller's offer. Accordingly, Plaintiff remained in the MPD group.

41. When Plaintiff had first started with the MPD group, she was on friendly terms with all of her co-workers in her group.

42. At that time, Plaintiff considered at least one of her co-workers, MaryAnne Doll-Johnson, to be her mentor, and even recommended Ms. Doll-Johnson for an award, claiming that she was able to accomplish her Dazel training with her assistance. Plaintiff also socialized on occasion with Ms. Doll-Johnson outside of work.

5

43. CSC maintains a Leave of Absence Without Pay Policy ("Leave Policy"). CSC's Leave Policy, provides, in relevant part: "A Medical Leave of Absence Without Pay may be granted for up to thirty calendar days and may be extended for successive periods of up to thirty calendar days for up to a total of twelve consecutive months upon presentation of a physician's statement, and CSC's verification as it deems appropriate.... A certificate of disability from the attending physician is required every thirty days from the date the medical leave is commenced. Any failure on the part of the employee to provide a continuing certificate of disability may be considered a resignation...."

44. Plaintiff requested leave under the Family and Medical Leave Act, and CSC assisted her in obtaining leave.

45. Plaintiff went on medical leave from CSC.

46. CSC granted Plaintiff's request for leave, and counseled her both orally and in writing about her obligations and responsibilities during the time she was out on medical leave, including her duty to provide a medical certification every thirty (30) days to the Benefits Office.

47. Plaintiff returned from her medical leave on August 22, 2001.

48. Shortly thereafter, however, Plaintiff took another full-time medical leave of absence on August 27, 2001 through September 10, 2001.

49. On September 11, 2001, Plaintiff returned to work and presented a medical certification allowing her to return to work, but restricting her to a 30-hour workweek.

50. CSC accommodated Plaintiff's request by providing Plaintiff with a 30-hour reduced work schedule, and designated the remaining ten (10) hours as FMLA leave.

51. Subsequent to September 11, 2001, Plaintiff continued to work a reduced schedule until she returned to a full-time medical leave of absence on February 21, 2002. Plaintiff remained on a full-time leave of absence until September 27, 2002.

52. Although, under the terms of its Policy, CSC could have designated Plaintiff's first such omission to constitute a voluntary separation from employment, CSC did not do so. Rather, CSC provided Plaintiff with numerous chances to comply with its Leave Policy, and gave Plaintiff countless written and telephonic reminders about her responsibilities under the Policy and warnings regarding the potential consequences she would suffer if she continued to fail to comply.

53. The decision to terminate Plaintiff following what CSC believed to be her voluntary resignation was made by Sonia Koplowicz and Maureen Summers.

54. In July 2002, Plaintiff had been out on full-time medical leave for five months, since February 2002.

55. In the Summer of 2002, Randall Miller had been an MTSA for nearly five (5) years, and consistently had performed well in his position.

56. When Plaintiff went out on medical leave in February 2002, she only had been an MTSA for less than two (2) years.

57. Randall Miller and MaryAnne Doll-Johnson were promoted and they are both Caucasian.

58. On one occasion during Plaintiff's employment with CSC, Ms. Dworsky posed an inquiry to a group of employees while Plaintiff was present regarding church practices after she visited an African-American church with her African-American babysitter.

59. Plaintiff reported the comment to Ms. Summers in Human Resources, who, in turn, reported the comment to her supervisor, Ms. Koplowicz.

60. Between July 2001 (when Plaintiff filed her charge of discrimination) and September 2002 (when Plaintiff was terminated), there were four individuals who performed engineering work in the Dazel subgroup: Plaintiff, Audrey Daigger, MaryAnne Doll-Johnson and Randall Miller.

61. During this period of time, MaryAnne Doll-Johnson was the highest paid member of the Dazel subgroup, earning an annual salary of $64,518.90.

62. In the Summer of 2002, Plaintiff only had been employed by CSC for five years.