# SCHEDULE (b)

# Contested Facts

## Schedule (b)

## Contested Issues of Fact and Law

An agreed statement or statements by each party of the contested issues of fact and law and a statement or statements of contested issues of fact or law not agreed to.

**Plaintiff's Statement of Contested Facts**

Plaintiff reserves the right to modify the following submission, based upon the Court's ruling on the pending summary judgment motion and/or in the interests of justice.

1. When Plaintiff was transferred to Dawn Dworsky's team, Plaintiff was informed that her work responsibilities would continue as normal, and her performance expectations would remain the same as they were under her former hiring manager, Edwin Derek Alston. Plaintiff had no problems with any of her supervisors prior to Dworsky.

2. During the time when Plaintiff was employed by Defendant, Dworksy made a racially derogatory comment to a group in which Plaintiff was present. Dworsky asked "why do Black people dress up for church and why is the music so loud?" Plaintiff found this comment to be derogatory because it was a generalization of all Black people. Although, Plaintiff did not inform Dworksy that she was offended by the comment, Plaintiff did inform Human Resources.

3. A second incident that took place involved Dworsky and Randy Miller when they were making gestures of putting their hands to their noses, to infer there was a smell and laughing. Plaintiff asked what was funny and no one would tell her. Therefore, she believed since she was the only person who was "not involved" and that she was the only African-American present that the group was referring to her.

4. Prior to joining the employ of Defendant, Plaintiff had previously used certain software applications which included ORACLE, GMC, Card One, and UNIX for the database. Although Plaintiff did not program these applications, she was familiar with each software package.

5. Plaintiff did not specifically list all of her previous computer experience including her UNIX experience on her original employment application because she did not believe that she was proficient in each of these areas.

6. After Plaintiff began working for Defendant, she continued to build her technical skills by attending a Dazel Certification Course.

7. Plaintiff also attended a Microsoft Certification Course and a Microsoft Engineering Certification Course.

9

8. Plaintiff completed certain technology courses, including one or more UNIX courses.

9. Plaintiff completed several computer based training courses on-line through her employment with Defendant. Plaintiff continued to build her skills regarding UNIX and Dazel when she was in the Managed Print Group. She also programmed and analyzed problems with the computer languages of Shell and UNIX and used PERL along with Dazel. Finally, she was also pursuing further UNIX training on her own time.

10. Randall Miller became a member of the MPD team approximately 7 months before Plaintiff's 2001 appraisal. Randall Miller had no experience with Dazel because he was still in training to become certified; he had just recently become a member of the MPD team; and was still in 'job training'. Dworsky informed Plaintiff that she would not receive a promotion because she did not have the skill-set. However, Plaintiff's skill level in Unix, Perl, Dazel, etc. was greater than Randall's skills at that time.

11. During the performance evaluation meeting, Dworsky indicated that Plaintiff was doing a "good job," that she should continue on the path that she was on, that she was focused, that she was a good worker, and that Plaintiff had a good work ethic. At the conclusion of this conversation, Dworsky advised Plaintiff that she was only receiving a "3" rating on her review. It was at this point that Plaintiff advised Dworsky that she disagreed with her 2001 performance evaluation rating.

12. As a result of her performance evaluation, Plaintiff made several complaints to Defendant's Human Resources Office that she felt that she was being subjected to disparate treatment based upon her race.

13. During Plaintiff's performance evaluation meeting for her 2001 performance evaluation, Dworksy advised Plaintiff that she was not going to be promoted because there were guidelines and that she could only promote a certain number of people. However, Dworsky previously informed Plaintiff that she would not receive a promotion because she did not have the skill-set.

14. Dworsky advised Plaintiff that she would receive a salary adjustment because her salary was unfairly and unjustly disproportionate to other members of the team.

15. Shortly after Plaintiff made the internal complaints of discrimination, Plaintiff met with Ms. Maureen Summers and Dworsky to discuss her work assignments. Plaintiff was informed that she was being removed as lead Dazel engineer from all of her engineering projects, including the Dazel SAP ("DSAP"), the DuPont Dow Elastomers ("DDE"), the United States Postal Services ("USPS"), Aspen and the "Minerva" assignments. Instead, Plaintiff was forced to write a technical manual, to which she objected.

16. Subsequently, Plaintiff was told that all company projects had been completed, and that this assignment was the only one available to her. Even though Dworksy advised

Plaintiff that the engineering projects were complete, Plaintiff was still receiving emails about the projects that indicated that they were not complete.

17. Dworsky treated Plaintiff differently than her similarly-situated co-workers, who were Caucasian, whereby Dworksy failed to recognize Plaintiff as a member of her group. When Plaintiff would request meetings with Dworsky, she failed to respond until Plaintiff made several repeated requests. Plaintiff was not aware of anyone else in her group that was having the same problems that she was experiencing with Dworsky. Plaintiff was the only African-American in the Managed Print Group.

18. Plaintiff complained of possible retaliation to Dawn Dworsky.

19. On or about June 15, 2001, Plaintiff met with Ms. Maureen Summers, a Caucasian, Employee Relations Specialist in Defendant's Human Resources Department, and advised her that she believed she was being subjected to disparate treatment with regard to the terms and conditions of her employment compared to her similarly-situated Caucasian co-workers, and that her wages were disproportionately lower than similarly-situated Caucasian male co-workers. Plaintiff also stated to Summers that she was the only African-American in the department and was being excluded from important communications, as well as subjected to offensive racially-based comments.

20. In several meetings with Ms. Summers and Sonia Koplowicz that took place over the next few weeks, Plaintiff also stated that she felt retaliated against for voicing her complaints to Dworsky, who subsequently began to scrutinize Plaintiff's work, isolate her from the rest of the group and held Plaintiff to higher standards regarding Plaintiff's performance and the requirements and/or qualifications for advancement.

21. Plaintiff applied for a supervisory position in Defendant's chemical group in or around March 2001. Plaintiff was granted an interview for the position on or about March 14, 2001. Plaintiff inquired with the hiring manager, Ms. Beth Musmeci, as to why the salary increase offer was only 6%, and was informed that the offer was comprised of a current supervisory increase of 3% and a promotion increase of 3%.

22. Plaintiff contacted Dworsky to inquire why the supervisory increase was so low, but Dworsky refused to increase Plaintiff's salary by more than 3%. Plaintiff requested a more reasonable increase for the position offered to her and was offered an additional 2% increase, for a total offering of 8%, by the hiring manager. Dworsky, however, refused to increase the offer above what had already been offered to Plaintiff.

23. Plaintiff never demanded a salary of $63,000 which was a 36% increase of her current salary. Plaintiff had no other option but to decline the position due to Defendant's unwillingness to increase Plaintiff's salary to a level that was comparable to the previous supervisor's salary that was paid to Ms. Beth Musmeci. After Plaintiff declined the position, a co-worker informed her that Dworsky did not like the fact that Plaintiff was applying for another position and this co-worker warned Plaintiff to "watch out".

Plaintiff informed this co-worker that she had discussed the opportunity with Dworsky and that Dworsky told Plaintiff she would not "hold [her] back" if she wanted the position.

24. Plaintiff was terminated on or about September 27, 2002 for alleged failure to provide medical certification. Although Plaintiff acknowledges that her failure to provide medical certification in a timely manner could result in a voluntary resignation, Plaintiff could not force her doctor to provide the certification at a certain time. As Defendant contends in its Opening Brief, Plaintiff consistently failed to provide medical certification in a timely manner. However, it was not until September when Defendant finally decided that it was going to accept Plaintiff's voluntary resignation, even though it failed to follow its own policies on several prior occasions.

**Defendant's Statement of Contested Issues of Fact**

Defendant reserves the right to modify the following submission, based upon the Court's ruling on the pending summary judgment motion and/or in the interests of justice.

Currently pending before the Court is Defendant's Motion for Summary Judgment, filed May 6, 2005, which has been fully briefed (D.I. 40, 42, 54, 56.) Defendant continues to believe that no genuine issues of material fact are in dispute, and that, accordingly, summary judgment is appropriate. However, certain nonmaterial issues of fact exist, and are summarized below.

1. Did Ms. Dworsky make a racially derogatory comment when she asked a question about the cultural practices of African American churches?

2. Did Dawn Dworsky and Randall Miller put their hands to their noses to infer there was a smell and laugh, and, if so, were they laughing about Plaintiff?

3. If the answer to question two is in the affirmative, was their action taken with racial bias, and was it racially offensive?

4. Was Ms. Dworsky's comment regarding a smell related to a burning electrical cord?

5. After Plaintiff returned from her initial leave of absence, was writing a technical manual the only project available for Plaintiff to work on?

6. Was Plaintiff excluded from communications?

7. Did Ms. Dworsky begin to scrutinize and criticize Plaintiff's work and isolate her from the rest of the MPD group after Plaintiff voiced her complaints to Ms. Dworsky regarding her performance appraisal?

12

8. Did Ms. Dworsky have any input in determining the amount of the salary increase offers that Beth Musumeci made to Plaintiff for the position of leverage server administration supervisor in the chemical group in March 2001?

9. Did Ms. Dworsky not like the fact that Plaintiff applied for the leverage server administration supervisor position?

10. Did Ms. Dworsky advise Plaintiff that she would receive a salary adjustment because her salary was unfairly and unjustly disproportionate to other members of the team?

12. Plaintiff had never programmed in UNIX until she transferred to the MPD group. Thus, Plaintiff did not even begin to learn to program in UNIX until after she transferred to the MPD group on October 2, 1999.

13. At the time of Plaintiff's May 2000 promotion, Mr. Alston told Plaintiff that she should not expect another promotion any time soon based on time in her new position, and that she would have much to learn in order to succeed at her new level of MTSA.

14. In March 2001. Ms. Dworsky informed Plaintiff that she would not "hold [her] back" if she wanted to seek the supervisory position of Leverage Server Administration Supervisor.

15. Plaintiff turned down the offer of a position as Leverage Server Administration Supervisor at a 6% salary increase and informed Ms. Musumeci that she demanded a 36% salary increase.

16. Ms. Musumeci was shocked by this counter-offer, believing it excessively high, particularly given the fact that Plaintiff had no supervisory experience.

17. Ms. Musumeci provided Plaintiff with a second offer for the position, this time for an 8% salary increase.

18. In May 2001, Ms. Dworsky completed an annual performance evaluation of Plaintiff for the period of April 1, 2000 through March 31, 2001, in which she rated Plaintiff a "3" or "good", indicating that Plaintiff's performance "consistently meets expectations and job requirements."

19. In 2001, CSC's Human Resources department issued annual Overall Merit Guidelines ("Guidelines"), which designated the recommended merit percent increase an employee should receive based on his or her

evaluation rating. The Guidelines also limited the percent of the workforce population that could receive a particular rating. If a supervisor wanted to diverge from these Guidelines, approval had to be obtained from management and Human Resources.

20. Ms. Dworsky desired to reward what she perceived to be Plaintiff's good effort and performance for her first year as an MTSA by providing Plaintiff with a 5% salary increase.

21. Because Ms. Dworsky wanted to provide Plaintiff with a salary increase above the recommended Guidelines, Ms. Dworsky obtained approval from management and Human Resources, and Plaintiff received a 5% salary increase.

22. Despite the fact that Plaintiff received a "good" evaluation and a merit salary increase above the recommended Guidelines, Plaintiff was displeased with both her evaluation and salary increase. Plaintiff also was upset that she was not promoted to SMTS in May 2001, despite the fact that she had only held the position of MTSA for one year at that time.

23. When Ms. Dworsky met with Plaintiff to discuss her appraisal, Ms. Dworsky told Plaintiff that she was on the right career path and should continue doing the type of work that she was doing.

24. Ms. Dworsky advised Plaintiff that she did not promote Plaintiff at that time because Plaintiff did not yet have the requisite skill set or expertise to be an SMTS. For instance, she did not yet have the expertise to work with the UNIX operating system at a senior level. She also told Plaintiff that she would have to demonstrate the ability to lead projects independently, work independently with the client, mentor and train others, improve her decision-making capabilities, and independently manage a "category one" program before she could be promoted.

25. In Spring of 2001, Plaintiff believed that Ms. Doll-Johnson deserved to be promoted at the time. Ms. Doll-Johnson had more UNIX experience and more time in the MTSA position than Plaintiff did.

26. The promotion of Ms. Doll-Johnson instead of Plaintiff was in no way discriminatory.

27. Despite Ms. Dworsky's explanation to Plaintiff regarding her performance appraisal, Plaintiff remained dissatisfied, and, thus, arranged several meetings to discuss her performance appraisal with Ms. Dworsky, Maureen Summers (Human Resources Specialist) and Sonia Koplowicz (Senior Human Resources Manager).

28. During these meetings, Plaintiff informed these individuals that she wanted to be promoted to SMTS, even though she had been promoted only one year earlier. Ms. Dworsky again explained why she rated Plaintiff as she did.

29. Ms. Summers and Ms. Dworsky also explained that Plaintiff was not ready for a promotion to SMTS at that time because of her limited time in her current position (only one year) and because she did not have the necessary level of expertise and skill in UNIX, among other factors.

30. In Summer of 2001, Plaintiff put a number of limitations on the types of positions that she would consider. For instance, she informed Human Resources that she would not take a position that involved UNIX support, travel, or a rotational shift. She also stated that she needed a position with part-time hours due to her medical condition. Plaintiff, however, knew that CSC was then in a downsizing mode, and, accordingly, there were few open positions.

31. Ms. Koplowicz informed Plaintiff that CSC was committed to helping Plaintiff locate another position within CSC, and, thus, CSC managers worked very closely with Plaintiff towards this goal.

32. At times, however, Plaintiff failed to follow through when managers and/or HR staff attempted to assist her to find another position.

33. For instance, on several occasions, Plaintiff failed to provide Ms. Koplowicz with requisition numbers for the positions for which Plaintiff had an interest, even though Ms. Koplowicz informed Plaintiff that she needed such information in order to assist Plaintiff by contacting the relevant managers in charge of filling the positions in question.

34. As a result of CSC managers' efforts to assist Plaintiff to find another position, Plaintiff was offered transfers into several other positions, all of which Plaintiff declined to pursue. For instance, during August of 2001, Plaintiff expressed interest in a position in the Applications Interconnect Services ("AIS") group under the supervision of Dahl Landers.

35. Ms. Dworsky contacted Ms. Landers on Plaintiff's behalf and recommended Plaintiff to Ms. Landers. Based upon Ms. Dworsky's recommendation, Ms. Landers scheduled two interviews with Plaintiff during August 2001. Plaintiff, however, stood Ms. Landers up for both interviews, and never provided Ms. Landers with any explanation.

36. Subsequently, in November 2001, Ms. Dworsky, on Plaintiff's behalf, again spoke with Ms. Landers regarding another open position in the AIS group.

37. Ms. Landers was hesitant to give Plaintiff consideration after her failure to appear for the previous interviews, but Ms. Dworsky eventually convinced Ms. Landers to give Plaintiff another opportunity to apply.

38. Accordingly, on November 26, 2001, Ms. Dworsky met with Plaintiff to discuss the AIS opportunity.

39. Soon thereafter, Ms. Landers sent Plaintiff a link to the applicable job posting. Despite the facts that open positions at CSC were very limited at that time and that Plaintiff was purportedly so anxious to transfer out of the MPD group, Plaintiff failed to follow through with Ms. Landers, and never submitted an application for the position.

40. When she first started with the MPD group, Plaintiff often asked her co-workers for assistance with problems or questions that she had with her job duties, and they all willingly assisted Plaintiff with her problems.

41. However, after Plaintiff's meetings with Ms. Dworsky, Ms. Koplowicz and Ms. Summers in the Summer of 2001 regarding her performance appraisal and after Plaintiff filed her charge of discrimination, Plaintiff began to isolate herself from the other members of the MPD group.

42. For instance, Plaintiff began to refuse to speak to her team members and she refused all invitations to join them for lunch.

43. In fact, Plaintiff's purposeful isolation and refusal to communicate with co-workers became so uncomfortable and tense that one team member, Ms. Doll-Johnson, contacted Human Resources for advice on how to alleviate the stressful work situation that Plaintiff created.

44. On August 6, 2001, Plaintiff requested and was granted a full-time medical leave of absence due to stress.

45. CSC's Leave Policy places no affirmative duty on CSC to remind employees of their obligations under the policy. Further, under the explicit terms of the policy, an employee may be deemed to have resigned upon his or her first failure to provide a timely medical certification.

46. On August 14, 2001, Plaintiff acknowledged her obligations under the Leave Policy. Plaintiff specifically acknowledged that her "employment with CSC will be subject to termination if I fail to provide Human

16

Resources with a doctor's certificate on a monthly basis." Accordingly, Plaintiff was well aware of her obligations to provide a medical certification every thirty days during her medical leave of absence.

47. She also knew that her failure to comply with this obligation would give CSC the right to terminate her employment, and that CSC could have terminated her employment on the first occasion that she failed to provide timely certification.

48. After Plaintiff returned from her initial medical leave of absence, she was assigned to write a technical manual. The technical manual was an important project for the MPD group, and Plaintiff was not offended by the assignment. Further, Plaintiff did not receive any change in salary or benefits as a result of being assigned to this project.

49. In direct violation of her obligations under CSC's Leave Policy, Plaintiff repeatedly and consistently failed to submit timely medical certifications to CSC every thirty (30) days while she was on leave.

50. Plaintiff first violated CSC's Leave Policy by failing to submit a timely medical certification in December 2001, when she submitted her medical certification nearly two weeks late.

51. Although not required under CSC's Leave Policy, Simmie Osborn, CSC Service Center Representative, called, e-mailed and sent letters to Plaintiff on numerous occasions to remind her that her medical certification was either coming due or was delinquent.

52. Maureen Summers also reminded Plaintiff several times in writing of her obligations under the Leave Policy, and the potential consequences for her failure to submit certifications.

53. Plaintiff specifically was warned in writing several times that a failure to provide a timely medical certification could be considered a voluntary resignation under the Leave Policy. In fact, she was told in writing on at least the following occasions that a failure to provide timely medical documentation would be grounds for termination: August 14, 2001, February 25, 2002, May 21, 2002, and June 20, 2002.

54. Despite all of these warnings, Plaintiff failed to provide timely medical documentation on more than four separate occasions.

55. On June 21, 2002, CSC received a certification from Plaintiff's medical provider dated June 14, 2002, which stated that Plaintiff may "be able to return to work within the next two to three months." Thus, at the very

latest, Plaintiff was required under CSC's Leave Policy to provide an updated medical certification to CSC by September 14, 2002.

56. Despite the numerous written and oral warnings Plaintiff received regarding her obligation to provide timely medical certifications and specifying the consequences for a failure to do so, Plaintiff did not provide an updated medical certification by that date.

57. Therefore, in accordance with its Leave Policy, CSC determined that Plaintiff's failure to submit a timely medical certification constituted a voluntary resignation on Plaintiff's part, and terminated her employment effective September 27, 2002.

58. CSC acted in compliance with its Leave Policy when it terminated Plaintiff's employment.

59. Plaintiff was not terminated from CSC until September 27, 2002, nearly fifteen months after she filed her July 5, 2001 charge of discrimination. Plaintiff did not engage in any other protected activity between July 5, 2001 and September 27, 2002.

60. CSC has terminated other similarly-situated employees, who had not previously filed charges of discrimination, based on their failures to provide requisite medical certifications related to their medical leaves of absence in accordance with CSC's Leave Policy. For instance, CSC terminated both Aliza Panitz (Caucasian female) and Monte Moser (Caucasian male) due to their failure to provide requisite medical certifications related to their medical leaves of absence in accordance with CSC's Leave of Absence policy.

61. Ms. Dworsky did not consider Plaintiff for a promotion in July 2002 because, according to CSC's standard practice and policy, employees on an extended medical leave of absence are not considered eligible for promotion. In accordance with this policy and practice, Ms. Dworsky has never promoted any employee while the employee was out on medical leave.

62. However, even though Ms. Dworsky did not consider Plaintiff for a promotion in July 2002 because she was ineligible due to her leave status, Ms. Dworsky did not believe that Plaintiff had sufficient UNIX experience, time in her MTSA role or other skills to warrant a promotion to SMTS at that time.

63. In the Summer of 2002, Randall Miller had over ten (10) years of practical, tenured UNIX experience and possessed the necessary expertise and competencies for the SMTS position. Specifically, Ms. Dworsky

18

believed, in her business judgment, that Mr. Miller was qualified for the SMTS position because he demonstrated the ability to work independently on important technical projects without direct supervision, provide technical direction and guidance to others, handle various tasks involving a variety of computer programs; deal with issues related to outages on the network, independently manage a "category one" problem, was skilled in advanced troubleshooting, and that he possessed strong decision-making capabilities.

64. Ms. Dworsky did not believe that Plaintiff possessed these same skills.

65. In February of 2002, Plaintiff had only been programming in UNIX for about two (2) years and had not reached the level of competency that is required of an SMTS, in Ms. Dworsky's business judgment.

66. Before Plaintiff could qualify for an SMTS position, Ms. Dworsky believed that Plaintiff still needed to further progress to the point that she could work more independently on important technical projects without direct supervision, improve her troubleshooting skills, improve her decision-making capabilities, demonstrate the ability to provide technical direction and guidance to others, demonstrate the ability to deal with issues related to outages on the network, demonstrate the ability to independently manage a "category one" problem, and demonstrate increased proficiency in the UNIX operating system.

67. Ms. Dworsky's question regarding church practices was not asked in a disrespectful manner and was simply directed to cultural practices of an African-American church. Plaintiff did not show offense at the time, and never informed Ms. Dworsky that she was offended by the comment.

68. Ms. Summers and Ms. Koplowicz questioned Ms. Dworsky about the statement, who admitted to asking about the cultural practices of an African-American church but denied she meant it in a disrespectful manner. Ms. Koplowicz advised Ms. Dworsky that, although she genuinely intended to inquire about a specific practice, she must be careful with her statements because some statements may be misconstrued or taken out of context.

69. On one occasion while Plaintiff was employed in the MPD group, one of the desktop engineers reported to Ms. Dworsky that they smelled something burning. In response, Ms. Dworsky walked through the rows of cubicles to determine the source of the burning smell. She discovered that there was a cord in between the cubicle walls that was burning.

70. Even though Plaintiff claims that she witnessed Ms. Dworsky and Mr. Miller make gestures of putting their hands to their noses to infer that they

19

        smelled something and laughed, Plaintiff (1) did not hear what was said; (2) never learned what was said; (3) does not know whether it was about her; and (4) does not know whether it was racial in nature.

71. Randall Miller and MaryAnne Doll-Johnson received higher salaries than Plaintiff, in part, because of their experience and longevity with the Company, based upon their CSC service dates. The "CSC Service Date" refers to the length of time that an employee has worked either directly for CSC or DuPont, one of CSC's largest customers, and a predecessor employer for many of CSC's employees.

72. In the Summer of 2002, both Mr. Miller and Ms. Doll-Johnson had been employed with CSC and its predecessor DuPont for 18 years each.

73. Mr. Miller and Ms. Doll-Johnson gradually had earned a higher salary over the time period in which they were employed by CSC and DuPont.

74. At the time Plaintiff was terminated from CSC, her annual salary was $49,345.92. Plaintiff found employment in September 2003, approximately one year after her termination from CSC, at a comparable salary and with comparable benefits to what she was receiving from CSC at the time she was terminated. In 2004, Plaintiff received an annual compensation of $49,258.35. Thus, Plaintiff almost completely mitigated her loss of employment.

**Joint Stipulation of Contested Issues of Law**

1. Has Plaintiff proven by a preponderance of the evidence a *prima facie* case for race discrimination?

2. Has Plaintiff proven by a preponderance of the evidence a *prima facie* case for retaliation?

3. Has Plaintiff met her burden of proving by a preponderance of the evidence that Computer Sciences Corporation terminated Plaintiff because she filed a charge of discrimination?

4. Has Plaintiff met her burden of proving by a preponderance of the evidence that Computer Sciences Corporation harbored ill will towards Plaintiff, that Computer Sciences Corporation intended to cause harm to Plaintiff, that Computer Sciences Corporation committed acts of deceit, fraud or misrepresentation towards Plaintiff, and that all such acts resulted in her discharge from employment or her lack of promotion?

    5.    Has Plaintiff proven by a preponderance of the evidence that she was harmed by the alleged breach of the implied covenant of good faith and fair dealing?

**Plaintiff's Statement of Contested Issues of Law**

    1.    Whether Defendant and/or the agents of Defendant intentionally discriminated against Plaintiff on the basis of race?

    2.    Whether Defendant and/or the agents of Defendant intentionally retaliated against Plaintiff for engaging in protected activity?

    3.    Whether Plaintiff was paid less than her male counterparts for performing substantially similar work?

    4.    Whether Defendant breached the covenant of good faith and fair dealing when it discriminated against Plaintiff and retaliated against her?

    5.    Whether Plaintiff suffered punitive damages as a result of Defendant's discrimination and retaliation?

**Defendant's Statement of Contested Issues of Law**

Defendant reserves the right to modify the following submission, based upon the Court's rulings on the pending summary judgment motion and/or in the interests of justice.

Currently pending before the Court is Defendant's Motion for Summary Judgment, filed May 6, 2005, which has been fully briefed. (D.I. 40, 42, 54, 56.)

Defendant filed the following motions in limine with this Court in accordance with the Scheduling Order:

- Motion in Limine to Preclude Evidence or Argument Regarding Determinations of the Equal Employment Opportunity Commission and the Delaware Department of Labor;

- Motion in Limine to Preclude Evidence or Argument Regarding Emotional Distress;

- Motion in Limine to Preclude Evidence or Argument Regarding Purported Isolation in the Workplace, Purported Unfair Scrutiny and/or Criticism of Work, and Regarding Fact That Plaintiff Was Assigned to Work on Training Manual Because All Fail to Rise to the Level of an Adverse Employment Action;

21

- Motion in Limine to Preclude Damages for a Purported Failure to Promote Because Plaintiff Was on Unpaid Medical Leave When Randall Miller Was Promoted to Senior Member of Technical Staff Position;

- Motion in Limine to Preclude Evidence or Argument Regarding Plaintiff's Contention that On One Occasion, Dawn Dworsky and Randall Miller Put Their Hands to Their Noses to Infer There Was a Smell and Laughed;

- Motion in Limine to Preclude Evidence or Argument Regarding Dawn Dworsky's Purported Statement Regarding Cultural Practices in African-American Churches;

- Motion in Limine to Restrict Plaintiff's Claims for Backpay and Lost Wages to Periods of Time During Which Plaintiff Was Capable of Working;

- Motion in Limine to Exclude Witnesses Lacking Personal Knowledge, Witnesses Unidentified in Discovery Responses, and High Level Executive Witnesses Called for Purposes of Harassment.

In addition, Defendant submits the following contested issues of law:

1. Has Plaintiff met her burden of proving by a preponderance of the evidence that CSC made a final decision not to promote Plaintiff?

2. Has Plaintiff met her burden of proving by a preponderance of the evidence that the decision not to promote Plaintiff was because of Plaintiff's race?

3. If so, does a preponderance of the evidence demonstrate that CSC would have decided not to promote Plaintiff regardless of her race?

4. If Plaintiff met her burden of proving by a preponderance of the evidence a *prima facie* case for retaliation and met her burden of proving by a preponderance of the evidence that CSC terminated Plaintiff because she filed a charge of discrimination, does a preponderance of the evidence demonstrate that CSC would have terminated Plaintiff even if she had not filed a charge of discrimination but had still failed to properly submit medical certifications?

5. Has Plaintiff met her burden of proving by a preponderance of the evidence that CSC paid Plaintiff less than male workers for equal work in

22

      jobs that required substantially equal skill, effort and responsibility, and that were performed under similar working conditions?

6. Does a preponderance of the evidence demonstrate that the wage differential between male and female workers, if one exists, was based on any factor other than sex?

7. Does a preponderance of the evidence demonstrate that CSC willfully violated the Equal Pay Act, meaning that CSC knew that its conduct was prohibited by law or showed reckless disregard for the law?

8. Does a preponderance of the evidence demonstrate that the damages Plaintiff claims are speculative?

9. Has Plaintiff proven by a preponderance of the evidence that she is entitled to punitive damages for any alleged wrongdoing?

10. Does a preponderance of the evidence demonstrate that Plaintiff did all that she could to reduce or avoid any damages?