IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE POLAND, | : | |
| | : | |
| Plaintiff, | : | C.A. NO. 04-0217-GMS |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| COMPUTER SCIENCES | : | |
| CORPORATION, a Delaware | : | |
| Corporation, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING PURPORTED ISOLATION IN THE WORKPLACE, PURPORTED UNFAIR SCRUTINY AND/OR CRITICISM OF WORK, AND REGARDING THE FACT THAT PLAINTIFF WAS ASSIGNED TO WORK ON A TRAINING MANUAL BECAUSE ALL FAIL TO RISE TO THE LEVEL OF AN ADVERSE EMPLOYMENT ACTION**

Plaintiff, Diane Poland ("Plaintiff"), by and through her undersigned counsel, hereby requests that Defendant, Computer Sciences Corporation's ("CSC") Motion in Limine to preclude evidence or argument regarding purported isolation in the workplace, purported unfair scrutiny and/or criticism of work, and regarding the fact that Plaintiff was assigned to work on a training manual because all fail to rise to the level of an adverse employment action be denied.

## I. INTRODUCTION

Shortly after Plaintiff made the internal complaints of discrimination, Plaintiff met with Ms. Maureen Summers (hereinafter "Summers") and Dawn Dworsky (hereinafter "Dworsky") to discuss her work assignments. Plaintiff was informed that she was being removed as lead Dazel engineer from all of her engineering projects,

including the Dazel SAP ("DSAP"), the DuPont Dow Elastomers ("DDE"), the United States Postal Services ("USPS"), Aspen and the "Minerva" assignments. Instead, Plaintiff was forced to write a technical manual, to which she objected. Subsequently, Plaintiff was told that all company projects had been completed, and that this assignment was the only one available to her. (Exhibit 1, at 208.) Even though Dworsky advised Plaintiff that the engineering projects were complete, Plaintiff was still receiving emails about the projects that indicated that they were not complete. (Exhibit 1, at 210.)

Dworsky treated Plaintiff differently from her similarly-situated co-workers, who were Caucasian, whereby Dworsky failed to recognize Plaintiff as a member of her group. (Exhibit 1, at 146.) When Plaintiff would request meetings with Dworsky, she failed to respond until Plaintiff made several repeated requests. (Exhibit 1, at 151.) Plaintiff was not aware of anyone else in her group that was having the same problems that she was experiencing with Dworsky. Plaintiff was the only African-American in the Managed Print Group. (Exhibit 1, at 147-148.)

On or about June 15, 2001, Plaintiff met with Summers, a Caucasian, Employee Relations Specialist in Defendant's Human Resources Department, and advised her that she believed she was being subjected to disparate treatment with regard to the terms and conditions of her employment compared to her similarly-situated Caucasian co-workers, Plaintiff also stated to Summers that she was the only African-American in the department and was being excluded from important communications, as well as subjected to offensive racially-based comments.

In several meetings with Summers and Sonia Koplowicz that took place over the next few weeks, Plaintiff also stated that she felt retaliated against for voicing her

complaints to Dworsky, who subsequently began to scrutinize Plaintiff's work, isolate her from the rest of the group and held Plaintiff to higher standards regarding Plaintiff's performance and the requirements and/or qualifications for advancement.

## II.    ARGUMENT

### A. Plaintiff's allegations taken as a whole constitute an adverse employment action

A plaintiff claiming retaliation under Title VII must establish that: (1) she engaged in a protected activity; (2) the defendant took an adverse employment action against her; and (3) a causal link exists between the protected activity and the adverse employment action. See Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1999).

Under Title VII, an adverse employment action is an action that alters the employee's compensation, terms, conditions or privileges of employment, deprives him of employment opportunities or adversely affects his status as an employee. See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997). "Job termination, however, is not a requirement for a finding of adverse employment action - much less severe action can suffice." Lafate v. Chase Manhattan Bank (USA), 123 F. Supp. 2d 773, 778 (D. Del. 2000); Torre v. Casio, Inc., 42 F. 3d 825, 831 (3d Cir. 1994) (finding that a job transfer without loss of pay or benefits, may constitute an adverse job action).

When determining whether an adverse employment action has occurred, courts should not analyze the employer's acts in isolation, but instead should analyze all of the employer's acts collectively. See Shaner v. Synthes, 204 F.3d 494, 503 (3d Cir. 2000); see also Lafate, 123 F. Supp. 2d at 778; and Lowman v. State of Delaware Department of

Corrections, 2003 U.S. Dist. LEXIS 2579 (D. Del. February 21, 2003) (holding that the multiple acts collectively can constitute an adverse employment action). Courts have established, as a matter of law, that conduct, including a reduction of duties, disciplinary actions, negative personnel reports and requiring an employee to undergo remedial training constitute an adverse employment action. See Id. (citing Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997).

Here, it appears that when taken as a whole Plaintiff was subject to adverse employment actions when she was isolated in the workplace, subjected to unfair scrutiny and when she was assigned to work on a training manual.

### III.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that CSC's Motion in Limine to preclude evidence or argument regarding purported isolation in the workplace, purported unfair scrutiny and/or criticism of work, and regarding the fact that Plaintiff was assigned to work on a training manual because all fail to rise to the level of an adverse employment action be denied.

Respectfully submitted by,

MARGOLIS EDESLSTEIN

_____
Jeffrey K. Martin, Esquire (#2407)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
(302) 777-4682 (fax)
jmartin@margolisedelstein.com
Attorney for Plaintiff Diane Poland

Dated: October 5, 2005

# EXHIBIT

# 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                    )
                                 )
            Plaintiff,           )
                                 )    Civil Action
v.                               )    No. 04-217 (GMS)
                                 )
COMPUTER SCIENCES CORP.,         )
                                 )
            Defendant.           )

          Deposition of DIANE POLAND taken pursuant
to notice at the law offices of Potter, Anderson &
Corroon, 1313 North Market Street, The Hercules Plaza,
Sixth Floor, Wilmington, Delaware, beginning at 9:10 a.m.
on Wednesday, March 30, 2005, before Kathleen White
Palmer, Registered Merit Reporter and Notary Public.


APPEARANCES:


        JEFFREY K. MARTIN, ESQUIRE
        KERI L. WILLIAMS, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware  19806
          for the Plaintiff

        LARRY R. SEEGULL, ESQUIRE
        AMY BETH LEASURE, ESQUIRE
        DLA PIPER RUDNICK GRAY CARY LLP
          6225 Smith Avenue
          Baltimore, Maryland  21209-3600
          for the Defendant



----------------------------------------------------
                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

| | | |
|---|---|---|
| 1 | A. | I don't think she was a good supervisor at all. |
| 2 | Q. | You didn't like her management style? |
| 3 | A. | I didn't like her management style. |
| 4 | Q. | What didn't you like about her management style? |
| 5 | A. | She wasn't fair. |
| 6 | Q. | In what way wasn't she fair? |
| 7 | A. | In the way that she treated me. |
| 8 | Q. | How was she not fair in the way that she treated you? |
| 10 | A. | She didn't recognize me as a person within her group. Only if I requested meetings with Dawn would I have a meeting with Dawn. And that was after several requests. |
| 14 | Q. | So you felt she should meet with you more often? |
| 15 | A. | As her employee, she should have time to meet with me, yes. |
| 17 | Q. | How often did you want to meet with her? |
| 18 | A. | Whenever requested. I don't plan to meet with a supervisor unless I need to. |
| 20 | Q. | So you needed to meet with her a lot more often than she met with you? |
| 22 | A. | If I sent a request, that's when I needed to meet with her. |
| 24 | Q. | How many times did you request to meet with her? |

 1    A.    Several.  I don't know exactly the number.
 2    Q.    Would it be less than five?
 3    A.    I don't know.  I don't remember.  Several.
 4    Q.    Several times during the time that you were
 5 managed by her you requested to meet with her?
 6    A.    Yes.
 7    Q.    You're saying that you had to request several
 8 times for her to meet with you?
 9    A.    Yes.
10    Q.    Eventually she would have?
11    A.    Yes.
12    Q.    But you felt she should have met with you
13 immediately?
14    A.    Not immediately because I didn't know her
15 schedule.  Not immediately.
16    Q.    What do you feel should have happened?
17    A.    She should have responded at some point other
18 than several requests later.
19    Q.    Instead of having you to ask her three times or
20 several times to meet, she should have met with you or
21 arranged a time to meet with you right away?
22    A.    Yes.
23    Q.    Now, do you know if she treated others
24 differently or do you know if other people had similar

1  concerns and problems meeting with her?
2      A.  I don't think anyone had any of the same
3  problems that I had because I was the only
4  African-American in the group.
5      Q.  Do you know if others requested to meet with her
6  several times?
7      A.  That I don't know.
8      Q.  Do you know how many times she met with other
9  people in the group?
10     A.  That I don't know.
11     Q.  Why don't you know that?
12     A.  I wouldn't know that.
13     Q.  You mean because you weren't a supervisor?
14     A.  No, I was not.
15     Q.  Who was the supervisor of Miss Dworsky?
16     A.  It changed several times.  I believe Mike Suman
17 was her supervisor.  There was several people, but I
18 remember Mike.
19     Q.  Did you have any contact with Mr. Suman?
20     A.  At some point, yes, I did.
21     Q.  How many times?
22     A.  I may have met with Mike maybe three or four
23 times, approximately.
24     Q.  Tell me about those meetings.



1  to do your job well?
2      A.   Yes.
3      Q.   Didn't he also tell you to set up a plan, have
4  goals?
5      A.   Yes, he did.
6      Q.   Didn't he tell you to try to meet monthly with
7  Miss Dworsky on the movement of your plan?
8      A.   Yes, he did.
9      Q.   Did you do that?
10     A.   I tried.
11     Q.   But she refused to meet with you?
12     A.   She didn't really reply at all.  I can't say she
13 refused because she didn't really like to communicate
14 with me.
15     Q.   Do you know if she met monthly with any of the
16 employees?
17     A.   No, I do not.
18     Q.   You liked Mr. Alston's management style?
19     A.   Yes, I did.
20     Q.   You did not like Miss Dworsky's management
21 style?
22     A.   That's correct.
23     Q.   Mr. Alston would meet with you more often than
24 Miss Dworsky?



1  Q. Is that correct?
2  A. That's correct.
3  Q. You said you had conversations with Mike Suman?
4  A. Yes, I had.
5  Q. How many conversations did you have with him?
6  A. Not many. Maybe two or three.
7  Q. Tell me about those conversations.
8  A. They were with regard to at some point Dawn
9  wanted me to do a Dazel manual, to write a Dazel manual,
10 which I was assigned to do, and at that point all the
11 engineering projects I was working on were taken away.
12 And we met with Mike because I did not believe in a
13 statement that Maureen and Dawn said to me that the
14 projects were complete.
15        And so I met with Mike and Dawn at
16 Maureen's request to resolve that issue. And when I went
17 into the meeting, we discussed pretty much Mike saying
18 whatever Dawn says is it and anything discussed prior to
19 that is erased, it does not count, it does not matter.
20 Q. I'm not following you, so you are going to have
21 to help me out.
22        First of all, what is a Dazel manual?
23 A. It's something I had to write.
24 Q. What is it?



1   manual.
2   Q.  So Mike Suman and Dawn told you that?
3   A.  Correct.
4   Q.  They said the only projects left for you is the
5   Dazel manual?
6   A.  Correct.
7   Q.  When was this that they said this?
8   A.  I don't know.  I don't recall.
9   Q.  Was this when you were coming back from your
10  leave?
11  A.  It's possible, yes.
12  Q.  Did they say that your other engineering
13  projects had been reassigned to other employees?
14  A.  No.  They said they were complete.
15  Q.  How do you know they weren't complete?
16  A.  I was still receiving e-mails on those same
17  projects.
18  Q.  Which projects were not complete?
19  A.  I don't recall them all, but there were several.
20  Q.  Do you recall any of them?
21  A.  There was a DDE project.
22  Q.  DDE?
23  A.  Yes.
24  Q.  What does that stand for?

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DIANE POLAND, | : |
| | : |
| Plaintiff, | :  C.A. NO. 04-0217-GMS |
| | : |
| v. | : |
| | :  JURY TRIAL DEMANDED |
| COMPUTER SCIENCES | : |
| CORPORATION, a Delaware | : |
| Corporation, | : |
| | : |
| Defendant. | : |

## CERTIFICATE OF SERVICE

I, Keri L. Morris, do hereby certify that on October 5, 2005, I electronically filed the *Plaintiff's Response to Defendant's Motion In Limine to Preclude Evidence or Argument Regarding Purported Isolation in the Workplace, Purported Unfair Scrutiny and/or Criticism of Work, and Regarding the Fact that Plaintiff was Assigned to Work on a Training Manual Because All Fail to Rise to the Level of Adverse Employment Action* with the Clerk of the Court using CM/ECF which will send notification of such filing, and have also sent one (1) true and correct copy by First Class U.S. Mail, postage prepaid to the following:

Larry R. Seegull, Esquire
DLA Piper Rudnick Gary Cary US LLP
6225 Smith Avenue
Baltimore, MD 21209

Sarah E. DiLuzio, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, DE 19801

MARGOLIS EDELSTEIN

*/s/ Keri L. Morris*
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680