IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                           :
                                        :
    Plaintiff,                          :    C.A. NO. 04-0217-GMS
                                        :
v.                                      :
                                        :    JURY TRIAL DEMANDED
COMPUTER SCIENCES                       :
CORPORATION, a Delaware                 :
Corporation,                            :
                                        :
    Defendant.                          :


**PLAINTIFF DIANE POLAND'S RESPONSE TO DEFENDANT COMPUTER SCIENCES CORPORATION'S MOTION IN LIMINE TO PRECLUDE EVIDENCE OR ARGUMENT REGARDING PLAINTIFF'S CONTENTION THAT ON ONE OCCASION, DAWN DWORSKY AND RANDALL MILLER PUT THEIR HANDS TO THEIR NOSES TO INFER THERE WAS A SMELL AND LAUGHED**

Plaintiff, Diane Poland ("Plaintiff"), by and through her undersigned counsel, hereby requests that Defendant, Computer Sciences Corporation's ("CSC") Motion in Limine to preclude evidence or argument regarding Plaintiff's contention that on one occasion, Dawn Dworsky and Randall Miller put their hands to their noses to infer there was a smell and laughed be denied.

    **I.**    **INTRODUCTION**

Plaintiff has alleged that an incident that took place involving Dawn Dworsky (hereinafter "Dworsky") and Randall Miller (hereinafter "Miller") when they were making gestures of putting their hands to their noses, to infer there was a smell and laughing. Plaintiff asked what was funny and no one would tell her. Therefore, she believed since she was the only person who was "not involved" and that she was the only

African-American present that the group was referring to her. (Exhibit 1, at 302-312.) Furthermore, as indicated in Defendant's Motion in Limine, Dworsky testified as to what actually occurred. However, it is suspect that when Plaintiff asked what was funny, no one told her that a cord was allegedly burning.

## II.    ARGUMENT

### A. Plaintiff should be permitted to offer evidence or argument regarding the gesture made by Dworsky and Miller because it is relevant and probative to Plaintiff's claims.

In order to establish a *prima facie* case based on discrimination, plaintiff must prove that: (1) she is a member of a protected class; (2) she suffered some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination ... See Boykins v. Lucent Techs. Inc., 78 F. Supp. 402, 409 (E.D. Pa 2000) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999)). However, the Third Circuit recognizes that the elements of a discrimination case may vary depending on the facts and context of the particular situation. Pivirotto v. Innovative Sys. Inc., 191 F.3d 344, 352 (3d Cir. 1999).

Although Dworsky testified that there was a cord allegedly burning between the cubicle walls, it defies logic as to why Dworsky and Miller would not tell Plaintiff why they made the gesture if it was unrelated to Plaintiff. Since Plaintiff was the only African-American in the group and because of her knowledge of Dworsky's racial bias, Plaintiff was reasonable in her beliefs that the gesture was related to her.

### B. The gesture made by Dworsky and Miller, if admitted, would not be unduly prejudicial to CSC

In CSC's Motion in Limine to preclude evidence or argument regarding the gesture made by Dworsky and Miller, it argues that, if the evidence of the gesture is

relevant to Plaintiff's claims, any probative value is outweighed by unfair prejudice to CSC. Plaintiff acknowledges that relevant evidence must be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. However, for the reasons stated above, Plaintiff believes that there is significant probative value which significantly outweighs the danger of unfair prejudice to CSC to establish that the gesture made by Dworsky and Miller is a pretext to show racial discrimination and therefore it should not be precluded.

### III.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that CSC's Motion in Limine to preclude evidence or argument regarding Plaintiff's contention that on one occasion, Dawn Dworsky and Randall Miller put their hands to their noses to infer there was a smell and laughed be denied.

Respectfully submitted by,

MARGOLIS EDESLSTEIN

_____
Jeffrey K. Martin, Esquire (#2407)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
(302) 777-4682 (fax)
jmartin@margolisedelstein.com
Attorney for Plaintiff Diane Poland

Dated: October 5, 2005

# EXHIBIT

# 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DIANE POLAND,                )
                             )
            Plaintiff,       )
                             )   Civil Action
v.                           )   No. 04-217 (GMS)
                             )
COMPUTER SCIENCES CORP.,     )
                             )
            Defendant.       )


         Deposition of DIANE POLAND taken pursuant
to notice at the law offices of Potter, Anderson &
Corroon, 1313 North Market Street, The Hercules Plaza,
Sixth Floor, Wilmington, Delaware, beginning at 9:10 a.m.
on Wednesday, March 30, 2005, before Kathleen White
Palmer, Registered Merit Reporter and Notary Public.


APPEARANCES:


        JEFFREY K. MARTIN, ESQUIRE
        KERI L. WILLIAMS, ESQUIRE
        MARGOLIS EDELSTEIN
           1509 Gilpin Avenue
           Wilmington, Delaware  19806
           for the Plaintiff

        LARRY R. SEEGULL, ESQUIRE
        AMY BETH LEASURE, ESQUIRE
        DLA PIPER RUDNICK GRAY CARY LLP
           6225 Smith Avenue
           Baltimore, Maryland  21209-3600
           for the Defendant


------------------------------------------------
                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q. Did you tell her you were offended by this
2  comment?
3    A. No.
4    Q. Why not?
5    A. I didn't feel the need to.
6    Q. She told you that her son was graduating -- was
7  it a black church she was going to?
8    A. I don't know.
9    Q. Who was the Paul that's being referred to here?
10    A. Paul White.
11    Q. Did you discuss with Mr. White this
12  conversation?
13    A. I don't remember. Maybe we did after the fact,
14  but not while Dawn was there.
15    Q. Did you discuss it with anybody else?
16    A. No, just Sonia, Maureen, people I'd been talking
17  with in HR.
18    Q. Let's go to the second point. It says:
19  "Miss Poland furnished another example of what she
20  considered a racially insensitive remark," and he's
21  quoting you now. "'Dawn had moved Randy, promoted him,
22  into my group. I worked with Randy on a server."
23         Who is this Randy that's being referred to
24  here?



```
 1      A.   This is Randy Miller.  And I don't recall saying
 2 these things, what's written here.
 3      Q.   So where he writes "'Randy asked what's smelling
 4 here.  Dawn replied to Randy jokingly, "she," meaning
 5 Poland, "'smells'"?
 6      A.   No, I don't recall that.
 7      Q.   You don't recall this incident at all?
 8      A.   No, not like that.  There was an incident, but
 9 we never even spoke about it.
10      Q.   Who is "we"?
11      A.   Myself and Randy, or Dawn for that matter.  They
12 were joking about something that day.  But we didn't
13 discuss it like it's written here.  We didn't discuss it
14 at all, actually.
15      Q.   Tell me about the conversation you had, if
16 there's anything that's related to this or similar to
17 this.
18      A.   No, there was no conversation.  Dawn and Randy
19 were sitting there joking about something.  But there was
20 no conversation that involved me directly.
21      Q.   Was there anything about smelling?
22      A.   Yes.
23      Q.   Tell me about a conversation which the word
24 "smelling" came up, or "smells"?
```



1   A.  I don't know if it was a conversation.  It was
2   just gestures.  Nothing --
3   Q.  Tell me about whatever it was.
4   A.  It was a gesture that they made, Randy made
5   something like this (demonstrating) and Dawn said a joke
6   after the fact, but I don't remember what it was.
7   Q.  When did this happen?  Do you remember?
8   A.  No.
9   Q.  When did that first comment happen about the
10  church?  When did that happen?
11  A.  I don't recall.
12  Q.  Where were you sitting when this gesture about
13  smelling happened?
14  A.  I was sitting in my cubicle.  Well, in the quad
15  that we sit in.
16  Q.  The quad?
17  A.  Yes.  Our cubicles were squared off where four
18  people sat.  There were no dividers there.  Just a
19  walkway.
20  Q.  So was it two and two?
21  A.  Two -- yes, most of the time.
22  Q.  Who were the four people that sat together?
23  A.  Well, I don't remember everyone, but I know I
24  sat in one cube, MaryAnne sat in another, I think Paul

1  sat on the other side, and there was an aisle in between,
2  but I don't remember who sat here.
3           But that day we were training Randy on
4  Dazel, myself and MaryAnne, and he was in the middle of
5  us on this side.
6     Q.   So --
7     A.   That wasn't his normal seat, though.
8     Q.   So Randy was sitting next to you during this
9  incident?
10    A.   He was sitting between myself and MaryAnne.
11    Q.   Normally he sat across the aisle?
12    A.   I forget where Randy sat.  I don't know if he
13 sat right across the aisle because we had other seats on
14 the other side of the wall.
15    Q.   Or diagonal?
16    A.   I don't recall.
17    Q.   But this was not his normal seat, but he was
18 sitting with you and MaryAnne Doll-Johnson --
19    A.   Yes.
20    Q.   -- to go over something in Dazel?
21    A.   Yes.
22    Q.   Tell me what happened.
23    A.   Dawn came down the aisle and they were talking
24 and I don't remember what they were all talking about.

Diane Poland    306

```
 1    Q.    Who is "they"?
 2    A.    MaryAnne, Randy, and Dawn.
 3    Q.    You don't know what they were talking about?
 4    A.    I don't recall, no.
 5    Q.    What happened?
 6    A.    And Randy did a gesture and Dawn made a joke and
 7  that was it.  And there was no discussion.
 8    Q.    The gesture that Randy did was what?
 9    A.    Just something like that (demonstrating).  I
10  don't remember the whole gesture.
11    Q.    He took his fingers to his nose?
12    A.    Yes.
13    Q.    And just put them at his nose?
14    A.    Yes.
15    Q.    Just laid them underneath his nose?
16    A.    Yes.
17    Q.    On his upper lip?
18    A.    Somewhere around there.
19    Q.    He didn't say anything?
20    A.    He said something, but I couldn't hear him.
21  Dawn heard him.
22    Q.    So you don't know what he said?
23    A.    I don't know what he said.
24    Q.    You're saying Dawn then made a joke?
```

1    A.   Yes.
2    Q.   What was the joke she made?
3    A.   I didn't hear it.
4    Q.   Did you hear anything she said?
5    A.   No.
6    Q.   Did this have any reference to you?
7    A.   I believe so, but I don't know.
8    Q.   Why do you believe it had a reference to you?
9    A.   Because it was just us present at the present
10   time and no one there told me what it was.
11   Q.   So nobody told you what they were laughing
12   about?
13   A.   That's correct.
14   Q.   You didn't hear it, so you didn't know what they
15   were laughing about?
16   A.   That's correct.
17   Q.   But you figured because they're all laughing, it
18   must be about me?
19   A.   At the time, yes.
20   Q.   Do you still believe that?
21   A.   Yes.
22   Q.   So he writes here:  "'Everyone laughed, I too,
23   because I didn't get it.  Later when I realized what she
24   meant, I was offended by the fact they were making a joke

Diane Poland                                                          308

of my perfume and body odor.'"

You never said anything like that to Dr. Rieger?

A. No, I did not.

Q. He made that up?

A. I don't know. I guess he did. I didn't write it.

Q. You're not denying you said that to him?

A. I'm not denying it, but I don't recall ever saying anything like that to him.

Q. But you might have, you might not have?

A. Might have, might not have. I don't think I did.

Q. Now, are you saying there was something racial about this incident, or it was just personally offensive because you weren't involved in the joke?

A. It was something offensive there, but I don't know the joke. I don't know what it was.

Q. So you don't know if it was racial or not?

A. I don't know.

Q. Let's go to the next incident, number 3.

"Miss Poland charged that in several meetings with human resources, Dawn and her manager, people could not understand her reaction: 'what was

1   happening to me; and get me out of this department. Dawn
2   was in charge of about 30 people, and I was the only
3   African American.'"  Is that right?
4        A.    It's written here, but I don't remember saying
5   it like that. It's possible. I was under a lot of
6   stress at the time.
7        Q.    Looking at incident number 4, Dr. Rieger
8   recounts that you said the following, that "Miss Poland
9   reported another example of what she considered to be
10  racially insensitive remarks:  'MaryAnne said to Audrey:
11  I can see anyone can do this, black dogs and all, in
12  reference to a class action suit. That wasn't said to me
13  directly.'"
14            Do you recall that being said?
15       A.    Yes, but I didn't say it was said to Audrey.
16  That was said to Randy, actually.
17       Q.    So MaryAnne said to Randy "I can see anyone can
18  do this, black dogs and all, in reference to a class
19  action suit"?
20       A.    Right.
21       Q.    Now, were you there when this was said?
22       A.    Yes.
23       Q.    What is this referring to?
24       A.    I don't know. Some class action they were

```
 1   talking about.
 2       Q.   What did it have to do with dogs?
 3       A.   I don't know.
 4       Q.   You considered it --
 5       A.   That's what they said.
 6       Q.   You considered it insensitive because you think
 7   it's really referring to black people?
 8       A.   I thought it was referring to me.
 9       Q.   Why did you think it was referring to you if it
10   is referring to a class action suit?
11       A.   Because at the time they knew of the issues I
12   was having with Dawn.
13       Q.   When was this statement made?
14       A.   Sometime after that fact.
15       Q.   Did you consider MaryAnne to be a racist?
16       A.   Not up until that point.
17       Q.   After that point did you consider her to be
18   racist?
19       A.   I still don't consider MaryAnne to be a racist.
20   I think she's very intimidated by Dawn.
21       Q.   Do you think Dawn told her to make this
22   statement?
23       A.   No.
24       Q.   Did you ever ask MaryAnne what she meant by
```

1   this?
2       A.   No, I did not.
3       Q.   Did you ever talk to MaryAnne about this?
4       A.   No.
5       Q.   Did you ever talk to anybody else about this?
6       A.   Just HR.
7       Q.   What did HR say about this?
8       A.   Nothing.
9       Q.   Did it ever happen again?
10      A.   Not to my knowledge.
11      Q.   Did any other statements happen?
12      A.   Not that I recall.
13      Q.   So did HR tell you that they would make sure
14  that no racially insensitive remarks were made?
15      A.   No, they did not.
16      Q.   Who did you tell in HR about this statement?
17      A.   Maureen and Sonia.
18      Q.   What did they say about it?
19      A.   They didn't say anything.
20      Q.   They just listened?  They didn't say anything?
21      A.   That's correct.  There was no help there.
22      Q.   If they testified that they told you they would
23  look into it and make sure it didn't happen again, you
24  wouldn't deny that?



Diane Poland                                                                 312

1   A.   No, I wouldn't.

2   Q.   Let's turn to the next incident, which is number
3   5.  I think we've talked about this, but I want to make
4   sure that we have.

5        Dr. Rieger recounts that you were asked
6   whether there was a proverbial straw that broke the
7   camel's back and you responded that "'the straw was, that
8   on the day I left, I received an e-mail from Dawn asking
9   me to install a server.'"

10  A.   I don't remember this conversation, but it's
11  possible it took place.  I don't remember these exact
12  words?

13  Q.   Do you remember this incident?

14  A.   Yes, I do remember the incident.

15  Q.   Do you remember an incident about being asked to
16  install a server?

17  A.   Yes, I do.

18  Q.   Tell me about that.

19  A.   I remember receiving an e-mail from Dawn to
20  install a server.  I don't remember what day, but --

21  Q.   Was it the day that you left?

22  A.   I believe so, yes.  I don't remember what server
23  it was.  But it was in February.

24  Q.   Of 2002?

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DIANE POLAND, | : | |
| | : | |
| Plaintiff, | : | C.A. NO. 04-0217-GMS |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| COMPUTER SCIENCES | : | |
| CORPORATION, a Delaware | : | |
| Corporation, | : | |
| | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I, Keri L. Morris, do hereby certify that on October 5, 2005, I electronically filed the *Plaintiff, Diane Poland's Response to Defendant Computer Sciences Corporation's Motion In Limine to Preclude Evidence or Argument Regarding Plaintiff's Contention That On One Occasion, Dawn Dworsky and Randall Miller Put Their Hands to Their Noses to Infer There Was A Smell and Laughed* with the Clerk of the Court using CM/ECF which will send notification of such filing, and have also sent one (1) true and correct copy by First Class U.S. Mail, postage prepaid to the following:

Larry R. Seegull, Esquire
DLA Piper Rudnick Gary Cary US LLP
6225 Smith Avenue
Baltimore, MD 21209

Sarah E. DiLuzio, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
6th Floor, P.O. Box 951
Wilmington, DE 19801

MARGOLIS EDELSTEIN

*/s/ Keri L. Morris*
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680